1

```
1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                      ORLANDO DIVISION

3       BORDEN M. LARSON,     CASE NO.:  6:050-CV-686-ORL-31-JGG

4           Plaintiff,

5       vs.

6       CORRECT CRAFT, INC.,
        ROBERT TODD AND WILLIAM SNOOK,
7
            Defendants.
8       _____/

9                                    Orlando, Florida

10                                   Thursday, September 6, 2007

11                                   9:55 a.m.

12      A P P E A R A N C E S:

13              BEECHER A. LARSON, ESQUIRE
                Law Offices of Beecher A. Larson
14              1201 Ridge Road
                Longwood, Florida  32750
15
                    Appearing on behalf of the Plaintiff
16
                TODD NORMAN, ESQUIRE
17              Stump, Storey, Callahan, Dietrick & Spears, P.A.
                37 North Orange Avenue
18              Suite 200
                Orlando, Florida  32801
19
                    Appearing on behalf of the Defendants
20
        ALSO PRESENT:  Leigh Doney
21

22

23                      VOLUME I OF 2

24
                    VIDEOTAPED DEPOSITION OF:
25
                        WALTER N. MELOON
```

Page 2

1          I N D E X
2          VOLUME I
3                    PAGE
4 TESTIMONY OF WALTER N. MELOON:
5    Direct Examination - By Mr. Larson        5
6 CERTIFICATE OF OATH                174
7 CERTIFICATE OF REPORTER                175
8 SUBSCRIPTION OF DEPONENT             176
9
10          VOLUME II
11 TESTIMONY OF WALTER N. MELOON (cont.):
12    Direct Examination (cont.) - By Mr. Larson   180
13    Cross Examination - By Mr. Norman      334
14    Redirect Examination - By Mr. Larson    337
15 CERTIFICATE OF OATH                344
16 CERTIFICATE OF REPORTER                345
17 SUBSCRIPTION OF DEPONENT             346
18 READ AND SIGN LETTER              347
19
20    PLAINTIFF'S EXHIBITS MARKED FOR IDENTIFICATION:
21 EXHIBIT 62 - Meloon Subpoena          5
22 EXHIBIT 63 - ESPN Screen Shot       106
23 EXHIBIT 64 - Meloon Deposition      168
24 EXHIBIT 65 - Allen Depo         195
25 EXHIBIT 66 - Correct Craft Log      210

Page 3

1 EXHIBIT 67 - Judge Presnell Decision      215
2 EXHIBIT 68 - Management Meeting Minutes      264
3 EXHIBIT 69 - Reader's Digest       275
4 EXHIBIT 70 - Vincent Book          285
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          The videotaped deposition of WALTER N.
2 MELOON, taken on behalf of the Plaintiff, at
3 1516 East Hillcrest Street, Suite 300, Orlando,
4 Florida, on Monday, September 6, 2007, beginning
5 at 9:55 a.m., before LINDE R. BLOSSER, being a
6 Stenotype Shorthand Reporter and Notary Public,
7 State of Florida at Large.
8          - - - - -
9          COURT REPORTER:  Do you swear the
10 testimony you're about to give will be the
11 truth, the whole truth, and nothing but the
12 truth, so help you God?
13          THE WITNESS:  I do.
14          COURT REPORTER:  Today's date is September
15 the 6th, 2007.  This is the deposition of Walter
16 N. Meloon.  We are on the record.  The time is
17 9:55 a.m.
18          MR. NORMAN:  Just for the record, before
19 we get started, I do object, again, to the use
20 of a videotape without a licensed videographer.
21          I've raised that at each prior
22 deposition and continue to raise it today.
23          MR. LARSON:  And, of course, I have never
24 heard of a licensed videographer, so I find
25 nothing objectionable about it.

Page 5

1          DIRECT EXAMINATION
2 BY MR. LARSON:
3    Q.    Mr. Meloon, my name is Beecher Larson.  I
4 represent my brother, Borden Larson in this matter.
5 You're familiar with my brother, Borden?
6    A.    Yes.
7          (Whereupon, Plaintiff's Number 62 was
8          marked for Identification)
9 BY MR. LARSON:
10    Q.    Okay.  And I have placed before you what I
11 have marked as Exhibit 62.  And just for your own
12 information, we have done six or seven depositions
13 over the last -- actually, maybe eight or nine over
14 the last year, and the numbering system I'm using is
15 the exact same numbers that I've -- you know, I'm just
16 adding to the numbers.
17          So, when I started Exhibit Number 1 over
18 here, is when I took your son's deposition a year ago.
19 I started with Exhibit 1 up to through 19.  And then
20 when we took, you know, Herb Allen's and Mr.
21 Napolitano's and Larry Meddock's deposition the
22 numbers were added to.
23          So, you're starting with 62.  I didn't
24 mean to, you know, have you assume that there's a
25 bunch of exhibits that, you know, were entered before,

Page 6

1 and I'm going to refer to them during this period of
2 time, but I will explain them to you.
3       Mr. Meloon, you're here based on the
4 subpoena that I've placed before you, Exhibit 62?
5    A.   Yes.
6    Q.   And you received a copy of that?
7    A.   Yes.
8    Q.   And this was originally scheduled to, you
9 know, take place on August 30th, up in Speculator, New
10 York?
11   A.   Yes.
12   Q.   And based on your request it was moved to
13 today's date here in Florida?
14   A.   My suggestion, yes.
15   Q.   Okay.  Now, one of the things we've asked
16 you to produce here, any documents that you've
17 reviewed in preparation for this deposition.
18       Have you reviewed anything in preparation
19 for today?
20   A.   Not -- no.
21   Q.   Did you speak to anybody about the matters
22 of the Wakeboard Tower, or about Borden's employment
23 in preparation of today?
24   A.   Yes, there've been conversations.
25   Q.   And who were those with?

Page 7

1    A.   The attorney.
2    Q.   How about with your son, Gary?
3    A.   No.
4    Q.   So, after his deposition you didn't speak
5 to him at all?
6    A.   Oh, I've spoken to him.
7    Q.   And you didn't say, hey, Gary, how was the
8 deposition?
9    A.   No.
10   Q.   He lives right next door to you, doesn't
11 he?
12   A.   Yes.
13   Q.   And you knew he was being deposed?
14   A.   Yes.
15   Q.   And you knew when he came home that night
16 after the deposition?
17   A.   Yes.
18   Q.   And you didn't say, Gary, how did the
19 deposition go?
20       MR. NORMAN:  Objection.  Asked and
21       answered.
22       THE WITNESS:  No.
23 BY MR. LARSON:
24   Q.   Did he say, Dad, my deposition went such
25 and such?

Page 8

1    A.   He mentioned that he had been deposed.
2    Q.   And did he mention any subjects that were
3 raised in the deposition?
4    A.   No.
5    Q.   Did you talk business about Correct Craft
6 on that date?
7    A.   Current business, yes.
8    Q.   And past business, you didn't talk about
9 at all?
10   A.   Not pertaining to this, no.
11   Q.   What current business did you talk to him
12 about?
13   A.   Just, you know, how things were going with
14 the marketing and sales department.  They're short of
15 staff.
16   Q.   Now, Angela Pilkington was deposed last
17 week, too.  Did you speak to her prior to her
18 deposition?
19   A.   Prior to?  Of course, yes.
20   Q.   And what did you talk to her about?
21   A.   Request for information pertaining to
22 current reports, current business.  That type of
23 thing.
24   Q.   And those are the type of discussions you
25 have with her often?

Page 9

1    A.   Yes.
2    Q.   And after her deposition did you speak to
3 her?
4    A.   Yes.
5    Q.   And what did you talk to her about after
6 her deposition?
7    A.   She informed me that -- of the date and
8 time of this deposition.
9    Q.   Did you talk at all about the matters that
10 had come up in her deposition?
11   A.   No.
12   Q.   Now, you're familiar with a company called
13 Correct Craft, are you not?
14   A.   Yes.
15   Q.   How are you familiar with them?
16   A.   For 40 years of my life I ran the company.
17   Q.   And you began working there as a young
18 man?
19   A.   Yes.
20   Q.   You started in production?
21   A.   Yes.
22   Q.   How much time did you spend working in
23 production?
24   A.   Probably -- oh, I would guess eight to
25 nine years.

Page 10

1    Q.    And you moved from there into what
2  position?
3    A.    General manager.
4    Q.    Did you do purchasing decisions?
5    A.    Yes.  I've done that, yes.
6    Q.    And sales?
7    A.    Yes.
8    Q.    When you were in production, did you work
9  on designing new boats, new hulls and decks?
10    A.    Not the actual design, no.
11    Q.    You hadn't worked with boat companies
12  prior to working with Correct Craft where you learned
13  design work?
14    A.    No.
15    Q.    So, you've never done boat design work?
16    A.    Not as a professional, no.
17    Q.    You never, you know, lofted plans and
18  made --
19    A.    No.
20    Q.    -- jigs?
21    A.    No.
22    Q.    But you've seen it done?
23    A.    Yes.
24    Q.    Many times?
25    A.    Yes.

Page 11

1    Q.    Now, you said you became the general
2  manager.  Is that the same as the president, or are
3  those two different positions?  Because I believe
4  you're also the president.
5    A.    Yeah.  They're two different positions.
6    Q.    Okay.  Tell me about your position as
7  general manager.
8    A.    I then had people working under me.  A
9  larger group of people working under me in different
10  departments at the time.
11    Q.    What years was that?
12    A.    That was back in the early years.  That
13  was in the '60s.  Late '60s, early '70s, maybe.
14  Somewhere around there.
15    Q.    Because you started in '56, did you not?
16    A.    Yes.
17    Q.    So, by the early '60s you were the general
18  manager?
19    A.    Approximately.
20    Q.    And you became the president at some time?
21    A.    Yes.
22    Q.    In '85?
23    A.    Yes.
24    Q.    And you held that job until 2002?
25    A.    Yes.

Page 12

1    Q.    During the time you were the president did
2  you have the ultimate authority to determine what new
3  boats were going to be built?
4    A.    Yes.
5    Q.    And during that period of time you, you
6  know, would make decisions on, you know, the lines and
7  hulls and decks, and say we're going to build this or
8  we're not going to build that?
9    A.    I had -- I had something to do with those
10  decisions, yes, but they were probably, in the early
11  days, made by my father.
12    Q.    But during the time you were the
13  president?
14    A.    Yes.  From an aesthetic viewpoint and what
15  the market was demanding I would have something to say
16  about it.
17    Q.    Now, you're familiar with the Wakeboard
18  Tower, which this lawsuit is about, are you not?
19    A.    Yes.
20    Q.    And during the time you were the president
21  you had the ultimate authority on building that tower?
22    A.    Yes.
23    Q.    And you had the ultimate authority on
24  different decisions made in the patenting process?
25    A.    Yes.

Page 13

1    Q.    And when Master Craft protested your
2  patent and the patent was reissued, you had the
3  ultimate authority regarding decisions during that
4  protest?
5    A.    Yes.
6    Q.    And you had decisions -- ultimate
7  authority based on decisions of reissue?
8    A.    Yes.
9    Q.    Now, you're a shareholder of the company,
10  too, are you not?
11    A.    Correct.
12    Q.    How many shares do you own?
13    A.    Approximately 66,000 shares.
14    Q.    And that's out of how many total shares?
15    A.    220-some thousand.
16    Q.    And these shares are paying dividends
17  today?
18    A.    They do.
19    Q.    And what's the annual dividend?
20    A.    There was no dividend the last year.
21    Q.    But prior to that, what was the normal
22  dividend?
23    A.    Anywhere from 50 cents to a dollar.
24    Q.    Now, in October of 2002, you left the
25  presidency?

Page 14

1    A.    Yes.
2    Q.    And what were the circumstances of you
3  leaving the presidency?
4    A.    Retirement.
5    Q.    Would Angela Pilkington be wrong if she
6  testified the other day that you were actually voted
7  out of your position by your Uncle Ralph and your Aunt
8  Etta Warner (sic)?
9    A.    My sister.
10    Q.    That's your sister?
11    A.    Yes.
12    Q.    Would she be wrong in testifying that's
13  why you left the presidency?
14    A.    That had something to do with my
15  retirement, yes.
16    Q.    And what were the circumstances where your
17  Uncle Ralph and your sister, Etta, wanted to remove
18  you from the presidency?
19        MR. NORMAN:  Objection.  Calls for
20    speculation.
21        THE WITNESS:  There were no real reasons
22    that I -- that I can identify.  There were
23    reasons they gave me, but they were not reasons
24    that justified, as far as I was concerned.
25  BY MR. LARSON:

Page 15

1    Q.    What reasons did they give you?
2    A.    They thought that I was not cognizant of
3  the management as far as their feelings or the family,
4  their feelings.  If decisions were made I didn't
5  recognize the difference between a customer, a family
6  member, and a stockholder.
7    Q.    And did you have big discussions in the
8  family about those issues?
9    A.    Oh, they were ongoing discussions forever.
10    Q.    Now, today you still serve on the Board of
11  Directors, do you not?
12    A.    Yes.
13    Q.    What's your position on the Board?
14    A.    I'm a Board member.
15    Q.    Are you the secretary?
16    A.    Yes.  Secretary.  I believe that's
17  correct, yes.
18    Q.    Is that a Board position or is that just a
19  corporate position?
20    A.    It's a corporate position.
21    Q.    What about serving on committees?
22    A.    I'm chairman of the executive committee.
23    Q.    And what is that committee?
24    A.    That -- we're there to help the CEO.  If
25  he has any questions or doubts about direction, or

Page 16

1  policy, or administration, or anything.  If he asks
2  for help we're there to provide input.
3    Q.    And are you very active as a Board member?
4    A.    Yes.
5    Q.    And today you're active in your capacity
6  as the executive committee chairman?
7    A.    When you say active, not hourly, no.
8    Q.    But you take a vocal position and you
9  understand the issues that are on the table today in
10  the company?
11    A.    Yeah.  If -- if they ask for my input,
12  yes.
13    Q.    But when you are at a Board meeting, are
14  you not, as a Board member, required to offer your
15  input as opposed to being passive and just sit there
16  and wait for them to ask?
17    A.    Oh, yes.
18    Q.    And you are not passive and wait for them
19  to ask you, are you?
20    A.    As a Board member?
21    Q.    Yes.
22    A.    No.
23    Q.    And what about as executive committee
24  member, are you passive in that capacity or are you
25  active.

Page 17

1    A.    We're there to serve at the -- at the
2  behest or the request of the CEO.
3    Q.    And is the CEO asking for your advice from
4  time to time?
5    A.    Yes.
6    Q.    And when was the last time he asked for
7  it?
8    A.    Ask may be the wrong term.  He may come
9  and discuss a situation.  Instead of asking what I
10  would do, he may come and we discuss it.
11    Q.    How much time do you spend at the plant?
12    A.    Very little.
13    Q.    When he comes and asks you, how does he
14  get ahold of you?
15    A.    Phone, e-mail.
16    Q.    When was the last time you were there?
17    A.    I have not been in the plant, probably,
18  six, eight months.
19    Q.    Now, when I refer to the plant, is that
20  the same thing as the offices, also?
21    A.    Uh-huh.  Yes.
22    Q.    But you've been involved in the
23  progression of the Borden Larson's lawsuit, have you
24  not?
25    A.    When you say -- I'm not active, no.  In a

1  passive way, because I was there, I knew what was
2  going on.
3      Q.    But you're kept informed as to how this
4  lawsuit is progressing?
5      A.    Not on a regular basis, no.
6      Q.    Who in the company keeps you informed on
7  an irregular basis?
8      A.    It would be the CEO.
9      Q.    How about your son, Gary, does he keep you
10 informed?
11     A.    No.
12     Q.    How about your Uncle Ralph, does he keep
13 you informed?
14     A.    No.
15     Q.    You were involved in some of the
16 collection of documents that were produced in this
17 case, were you not?
18         MR. NORMAN:  Objection.  Vague.
19         THE WITNESS:  Yeah.  Not to a great
20     extent.  I mean, I didn't spend a lot of time
21     with it.  Maybe I would suggest something.
22 BY MR. LARSON:
23     Q.    To what extent were you involved?
24     A.    A -- percentagewise, probably 1 percent.
25     Q.    And what did you do for that 1 percent?

1      A.    Explain to them where to look for certain
2  things.
3      Q.    And who did you explain that to?
4      A.    It would be the CEO.
5      Q.    And who is that guy?
6      A.    That's Bill Yeargin.
7          COURT REPORTER:  I'm sorry.  Yeargin?
8          THE WITNESS:  Yeargin.  Y-e-r-g-i-n.
9      Y-e-a-r-g-i-n.  I'm sorry.
10 BY MR. LARSON:
11     Q.    And the CEO before Bill Yeargin, did you
12 have the same relationship with him where you would
13 explain things to him?
14     A.    Yes.
15     Q.    And his name was Terry?
16     A.    Terry.
17     Q.    Terry McNew (ph)?
18     A.    McNew.
19     Q.    Did you have more involvement with Terry
20 McNew than you are with Bill Yeargin?
21     A.    No.
22     Q.    You're having more with Bill Yeargin?
23     A.    No.
24     Q.    So, you're having the same involvement?
25     A.    About the same.

1      Q.    Now, if people from the Stump, Callahan
2  firm told me that the boxes of documents that you
3  produced -- you know, you were the one that presented
4  it to them, would they be telling me -- I mean, is
5  that truthful?
6          MR. NORMAN:  Objection.  Mischaracterizes
7      his prior testimony.  Assumes facts not in
8      evidence.
9              Answer it, if you can.
10         THE WITNESS:  I don't believe, I did, no.
11 BY MR. LARSON:
12     Q.    Do you know why people at the Stump,
13 Callahan firm would actually think you were the
14 president of the company?
15         MR. NORMAN:  Objection.  It assumes facts
16     not in evidence.
17         THE WITNESS:  Depending on the time.
18 BY MR. LARSON:
19     Q.    During the period of this lawsuit?
20         MR. NORMAN:  Same objection.
21         THE WITNESS:  I believe I was at the
22     beginning.  At the time, I -- I'm not clear on
23     the time as to yes it was or no.
24 BY MR. LARSON:
25     Q.    But if you had enough involvement with the

1  different people at the Stump, Callahan firm where
2  they could assume that you were the president?
3          MR. NORMAN:  Can you define for him what
4      people you're talking about?  Like a runner in
5      our office, you're asking if he knows who the
6      president of Correct Craft is?  Is that what
7      you're asking him?
8          MR. LARSON:  I'm asking him whether or not
9      the people he was --
10         MR. NORMAN:  Which people?  That's what I
11     want to know, which ones.  Like, Doug Spears,
12     I'm pretty sure, knows who the president is.
13     But if you're asking about a runner, tell him
14     that and he'll tell you if he thinks a runner at
15     our office knows who the president of Correct
16     Craft is.
17 BY MR. LARSON:
18     Q.    Have you had interactions with Bill, who
19 is a runner at the Stump, Callahan firm?
20     A.    No.
21     Q.    So, if he told me that he got the boxes
22 from you, he would be telling me something incorrect?
23         MR. NORMAN:  Objection.  It assumes facts
24     not in evidence.
25         THE WITNESS:  I -- I would not recollect

Page 22

1    that incident happening. I mean --
2        MR. LARSON: And, Mr. Norman, who is the
3    other attorney that worked on this before you?
4        MR. NORMAN: I'm guessing you're referring
5    to Steve Sheldon, but I don't know.
6  BY MR. LARSON:
7        Q.    Would Steve Sheldon be wrong in making an
8    assumption or a statement to me that he thought you
9    were the president of the company?
10        MR. NORMAN: Objection. Mischaracterizes
11    prior testimony. Assumes facts not in evidence.
12        THE WITNESS: He may have assumed it, but
13    depending on the time.
14  BY MR. LARSON:
15        Q.    But you've met with Steve Sheldon?
16        A.    I don't recall meeting. I don't recall
17    the name.
18        Q.    I want to change focus just a little bit
19    here.
20            Do you recall when Borden Larson was hired
21    by Correct Craft?
22        A.    Approximately the time period, yes.
23        Q.    And what can you tell me about that?
24        A.    At -- at that time, I interviewed him.
25        Q.    And he was hired?

Page 23

1        A.    Yes.
2        Q.    Into what position?
3        A.    At that time, a draftsman.
4        Q.    And do you know what his first duties
5    were?
6        A.    He was working with what we would refer to
7    as research and design, which covered a large area.
8        Q.    Wasn't his first duties to take castings
9    out of the part room and make drawings of those
10    castings?
11        A.    Yes, as a draftsman.
12        Q.    And the reason for that is that when you
13    wanted to change a casting by a couple degrees or a
14    little bit, it would be easier if you had a drawing
15    and you could change it and send it -- that drawing,
16    then, to the foundry to have it recast?
17        A.    Yes.
18        Q.    And the company didn't have mechanical
19    drawings of many of the parts that they had in the
20    stockroom?
21        A.    Right.
22        Q.    Does that refresh your recollection as to
23    what he did in his first position, sir?
24        A.    Yes.
25        Q.    Now, I believe, for the record, we can

Page 24

1    maybe assume that he was hired sometime in 1986, I
2    believe.
3        A.    That would be about the time I would
4    assume, yes.
5        Q.    We can go through his personnel file in a
6    little bit and memorialize that date.
7            But by 1986 your company had been in
8    existence some 50-odd years maybe or more?
9        A.    Correct.
10        Q.    And they made many boats of different
11    types over the years?
12        A.    Correct.
13        Q.    And there were many castings that had been
14    cast for the many different boats?
15        A.    Yes.
16        Q.    And there was no archive of those drawings
17    at that time?
18        A.    None.
19        Q.    So, it was important to go and make an
20    archive of the different parts that were actually
21    being used at that time?
22        A.    That was the direction, yes.
23        Q.    So, when a new boat would be designed and,
24    you know, a strut had to be changed by two degrees,
25    you could just take the drawing and change it by two

Page 25

1    degrees and send it to the foundry?
2        A.    Correct.
3        Q.    And archiving of those type of drawings
4    was important to Correct Craft?
5        A.    Yes.
6        Q.    They wouldn't destroy that type of
7    archive?
8        MR. NORMAN: Objection. It calls for
9    speculation.
10        THE WITNESS: Not purposely.
11  BY MR. LARSON:
12        Q.    So, there's no policy to go out and
13    destroy, you know, final mechanical drawings of parts
14    that were in production?
15        A.    I think that would probably depend on the
16    part itself, the particular part, was there something
17    that superseded it.
18        Q.    But if something superseded it, wouldn't
19    it be normal to keep the copy of the old drawing and
20    the new drawing so you could see the change?
21        A.    Yes.
22        Q.    Now, there came a time -- well, strike
23    that.
24            Do you recall Borden was working part time
25    for Correct Craft at that time or full time?

Page 26

1    A.    I believe at that time I recall it was
2  full time.
3    Q.    You don't recall that he was in college at
4  that time?
5    A.    He could have been.
6    Q.    Do you recall that he graduated from
7  college at a certain point and came to you and said,
8  hey, Walt, you know, I just graduated from college,
9  I'm looking for a full-time job?
10    A.    That -- that could be, yes.  I don't
11  recall the dates or the times.
12    Q.    Now, I want to change focus a little bit
13  and talk about how, you know, hulls and new -- and
14  let's say new boats are designed.
15         Now, you testified before that you had the
16  ultimate authority as a president to make decisions on
17  new boats that were going to be built?
18    A.    I had a lot to do with the final decision,
19  yes.
20    Q.    And to determine if you were going to
21  build a new boat or not you would have focus groups,
22  and talk to dealers, and go to boat shows and see what
23  the market had out there?
24    A.    Correct.
25    Q.    And from all of those discussions and all

Page 27

1  of those observations you would gather information?
2    A.    Correct.
3    Q.    And from that information you say we need
4  a boat that's bigger, wider, or a deeper V, or a
5  flatter V, that type of decision-making?
6    A.    Yes.
7    Q.    And, for instance, in 1990, I believe you
8  came out with a new Ski Nautique which was wider and
9  longer?
10    A.    Yes.
11    Q.    And that was a decision that you had made,
12  just say, hey, you know, I think we should make this
13  boat wider and we should make it longer?
14    A.    Yes.
15    Q.    And the decision that you would make to
16  say let's go make this -- our existing Ski Nautique,
17  let's make it longer, let's make it wider, that
18  decision would flow from you to Bill Snook?
19    A.    Correct.
20    Q.    And then from Bill Snook it would flow to
21  either Borden alone or Borden and Bill together?
22    A.    Correct.
23    Q.    And they would draw up the lines for, you
24  know, what they would propose back to you?
25    A.    Correct.

Page 28

1    Q.    And you would look at whatever line
2  drawings they brought back, and say, hey, let's go
3  build a plug and see what that looks like?
4    A.    Correct.
5    Q.    And then Borden and Bill would go out in
6  the plug and mold shop and make a model?
7    A.    Correct.
8    Q.    Now, the 1990 Ski Nautique, do you recall
9  how they lengthened the hull on that?
10    A.    I don't remember exactly, but I think that
11  we tried to do a mid-section to lengthen the boat.
12    Q.    And you did that from 17-6 to 19-6?
13    A.    Yes.
14    Q.    So, it was lengthened by two feet?
15    A.    Uh-huh.
16    Q.    So, your recollection is they just cut the
17  boat in half and put the two feet in the middle?
18    A.    That would be a simplification of it, yes.
19    Q.    And they could have also cut it in many
20  other pieces and put two inches between it.  If they
21  cut it in ten -- in ten sections they could have put
22  two inches between each of those sections?
23    A.    It could be, yes.
24    Q.    But that certainly is the process that
25  that hull was lengthened?

Page 29

1    A.    Are you telling me that's the process they
2  used?
3    Q.    No, I'm asking you.
4         Do you know if that was the process that
5  was used as opposed to drawing it up and actually
6  lofting it from scratch?
7    A.    I would think that they would have, at
8  that time, lofted it.
9    Q.    But if they had lofted it, they certainly
10  wouldn't have just cut it in half and put two feet in
11  the center?  They would have lengthened it
12  proportionally across the length, would they not?
13    A.    That would be a decision that they would
14  make.
15    Q.    But that boat was redesigned, lengthened
16  by two feet and brought to you?
17    A.    Yes.
18    Q.    And a plug was made and that plug was
19  brought to you?
20    A.    Yes.
21    Q.    And you made a decision to say, let's
22  build this boat?
23    A.    Yes.
24    Q.    And the deck, then, had to be redesigned
25  for that boat, also?

Page 30

1    A.   Yes.
2    Q.   And that -- a plug was made for that deck
3 and that was brought to you?
4    A.   Yes.
5    Q.   And that boat was a very successful boat?
6    A.   Yes.
7    Q.   It revolutionized pretty much the towboat
8 industry?
9    A.   At that time, yes.
10   Q.   Now, there have been claims in this case
11 that in 1988 you promoted Borden to head up the design
12 department. I think it's what they call head of --
13 head of design. And I want to show you what's been
14 mark previously as Exhibit 5, which I believe is his
15 personal file, and it's Bates Number 23.
16       Now, have you seen that document before,
17 Bates Number 23?
18   A.   Yes.
19   Q.   When did you see that before?
20   A.   Is that 5/2/88?
21   Q.   I believe that's what --
22   A.   May 2 of '88?  Yes.  That would have been
23 the date that I saw that.
24   Q.   Now, do you know whose writing is on this
25 document?

Page 31

1    A.   On the top of it, it could have been
2 personnel or it could have been the plant manager.
3    Q.   But you can't identify it, as you sit here
4 today, whose writing that is?
5    A.   Not the writing.
6    Q.   What about down where it says reason for
7 change, head of design department?  Do you know whose
8 writing that is?
9    A.   Same.  I don't know whose it is.
10   Q.   Now, when you signed this document or when
11 this document was created, do you recall if Borden
12 Larson was given a copy of this?
13   A.   I would assume that he was, yes.
14   Q.   And what about Bill Snook, do you recall
15 whether Bill Snook was given a copy of this?
16   A.   I don't recall.
17   Q.   What would you think of Bill Snook's
18 testimony when I asked him these same questions and
19 asked him whether or not Borden was head of the design
20 department in 1988, and he says that never happened?
21       MR. NORMAN:  Objection.
22 Mischaracterizes -- go ahead.
23 BY MR. LARSON:
24   Q.   What would you think of -- of the truth of
25 that testimony from Bill Snook?

Page 32

1        MR. NORMAN:  Objection.  Mischaracterizes
2 prior testimony.
3        Answer, if you can.
4        THE WITNESS:  I -- I don't understand why.
5 BY MR. LARSON:
6    Q.   What would you think if Bill Snook said
7 the most Borden was at that point was a designer,
8 because there was no design department?
9        MR. NORMAN:  Objection.  Mischaracterizes
10 prior testimony.
11       THE WITNESS:  I -- I have no reason to
12 disagree with it or agree with it.
13 BY MR. LARSON:
14   Q.   Why would you not have any reason to
15 disagree with it when he says at most Borden was a
16 designer, because there was no design department?
17       MR. NORMAN:  Objection.  Mischaracterizes
18 prior testimony.
19       THE WITNESS:  It -- that may have been his
20 opinion.
21 BY MR. LARSON:
22   Q.   Have you spoken to him about that subject
23 matter?
24   A.   No, I have not.
25   Q.   Now, Borden was reporting to Mr. Snook at

Page 33

1 this time, was he not?
2    A.   They were working together, yes.
3    Q.   So, Mr. Snook wasn't Borden's direct
4 report?
5    A.   At this -- at this time, I -- well, he
6 could be, but I don't recall the exact time.
7    Q.   Now, above your signature there's a slot
8 for recommended by, and that's blank?
9    A.   Right.
10   Q.   Is there any reason why someone didn't
11 recommend Borden to head up this design department?
12   A.   No reason that I can say.
13   Q.   Isn't it customary that these forms are
14 filled out with two signatures?
15   A.   Yes.
16   Q.   And can you tell me why this one wasn't
17 filled out with two signatures?
18   A.   It would appear as though I made the
19 decision.
20   Q.   And how did you ensure that Borden knew
21 about this decision?
22   A.   He would have been informed.
23   Q.   So, at this point Borden Larson would no
24 longer be working under Bill Snook?
25       MR. NORMAN:  Objection.  Mischaracterizes

Page 34

1    prior testimony.
2         THE WITNESS:  It -- there was -- in that
3    department there were many functions that were
4    covered.  Different people were assigned to
5    different functions.  They would be more working
6    side-by-side, probably, than for each other or
7    under one another at that time.
8  BY MR. LARSON:
9         Q.   So, you're saying that Bill Snook could
10   have been working under Borden Larson at this time?
11        A.   Side-by-side.
12        Q.   So, of equal status in the company?
13            MR. NORMAN:  Objection.
14            THE WITNESS:  Depending on the project.
15  BY MR. LARSON:
16        Q.   But at that time Bill Snook was on the
17   management team, was he not?
18        A.   By virtue of the fact that he was an
19   engineer, yes.
20        Q.   And he went to management meetings?
21        A.   Yes.
22        Q.   And at that time Borden Larson was not on
23   the management team?
24        A.   Correct.
25        Q.   And did not go to management meetings?

Page 35

1         A.   Correct.
2         Q.   So, why would you say they worked
3    side-by-side as equals?
4             MR. NORMAN:  Objection.  Mischaracterizes
5    his prior testimony.
6             THE WITNESS:  Because of Bill's
7    engineering degree.  There were often questions
8    that were asked in the meeting that we would
9    need his advice.  So, he was there as a
10   department head during part of his employment
11   and as an advisor during the rest of it.
12  BY MR. LARSON:
13        Q.   But here you're putting Borden as a
14   department head of the design department.  Why would
15   he not go to management meetings if he was truly the
16   head of the design department?
17        A.   Well, design department could have been a
18   branch of, or they worked side-by-side, because it was
19   a small company.  Everybody had multi-positions that
20   they filled.  Everybody, sometimes, had to substitute
21   and work beside somebody else to get the job done.
22        Q.   Now, who was the head of the design
23   department before Borden was given this position in
24   1988?
25        A.   It was called research and development.

Page 36

1    Bill was the first one that came into that position.
2         Q.   So, you're saying that Bill had this job
3    as heading up the design department?
4         A.   Research and development.
5         Q.   But we're talking about this design
6    department.  You're saying that the -- that the title
7    was changed?
8         A.   This is -- I mean, this can be very
9    generic, you know, as far as design department.  What
10   were they designing?  Shoes, boats?
11            You know, this, perhaps, would be a
12   misnomer, but at this time there was lap-over in that
13   department tremendously, because of projects that had
14   to be done.
15        Q.   But Borden Larson never designed rudders,
16   did he?
17        A.   No.
18        Q.   And he never designed struts?
19        A.   No.
20        Q.   He never designed stuffing boxes?
21        A.   No.
22        Q.   He never designed, you know, the mounting
23   systems that the engine and transmission were mounted
24   on?
25        A.   He could have had something to -- some

Page 37

1    input in that area.
2         Q.   But maybe in the fiberglass stringer
3    system that you developed?
4         A.   Definitely.
5         Q.   But he never designed, you know, the
6    pylons?
7         A.   A ski pylon?
8         Q.   Uh-huh.
9         A.   No.
10        Q.   So, when you say that there's some overlap
11   in this department, in this design department, it
12   could be a misnomer, you know, the overlap did not
13   include having Borden designing these, you know, metal
14   parts, or metal castings, or -- or, you know, the
15   pylon, I believe, was an extrusion that was machined.
16   He wasn't involved in that?
17        A.   Those were all parts that had been in use
18   for many years in one form or another.
19        Q.   But as you change a boat and the angle of
20   the -- of the drive shaft coming out the -- out of the
21   boat is changed, you have to change the -- and I don't
22   know the mechanics of the boat, but I think when you
23   come through the stuffing box, you have to change the
24   angle of that, do you not, so that has to be
25   redesigned?

Page 38

1     A.    If you relocate the engine, yes.
2     Q.    And the strut has to --
3     A.    It could be affected.
4     Q.    And maybe the rudder might be affected,
5 you know, based on the angle of the prop?
6     A.    Not necessarily, no.
7     Q.    But the prop is not running vertically.
8 The prop is at what, 12 degrees or 15 degrees or
9 something like that?
10    A.    In that neighborhood, yes.
11    Q.    And is the rudder vertical or is the
12 rudder merely in the angle of the prop?
13    A.    No, it's -- it's vertical.
14    Q.    And so as the prop angle would change
15 based on the motor position, the rudder would never be
16 redesigned?
17    A.    Depending on what you wanted the boat
18 to -- how you want it to perform, what you want it to
19 do, that could have an effect on it.
20    Q.    Now, what about the skegs on the boat?
21 Now, I don't know if that's what you call them.
22 They're like the shark fins up in the front that would
23 keep it tracking laterally.  Are those called skegs?
24    A.    No.
25    Q.    What are they called?

Page 39

1     A.    Fins.
2     Q.    Okay.  The fins.
3          Would Borden design the fins?
4     A.    He may have had something to do with that
5 working in conjunction with the other people, Bill.
6     Q.    But do you have any evidence that he
7 actually designed the fins?
8     A.    I don't have any evidence of that, no.
9     Q.    Okay.  I want to get back here to this
10 design department here.
11         Now, what were Borden's duties prior to
12 this promotion to head up the design department?
13    A.    What we discussed; the drafting of
14 different parts, he probably worked with production in
15 physical changes that might be made to expedite
16 production, you know, in those areas.
17    Q.    And what were his duties after this form
18 was put into his personnel file?
19    A.    He would probably be more into the actual
20 design of the boat.  Perhaps hardware, windshields,
21 seating, that type of thing.
22    Q.    But you don't know that for a fact?
23    A.    I don't recall that that was all of the
24 job description or any of that was a part of it at
25 that time.

Page 40

1     Q.    Now, prior to this being -- heading up the
2 design department, did he supervise anybody?
3     A.    He may have had someone who worked with
4 him, but I don't recall that, no.
5     Q.    What about after this "head up design
6 department" was put in this file, did he supervise
7 anybody after that?
8     A.    I would assume that he did.
9     Q.    Now, you're familiar with a gentleman by
10 the name of Scott Moore?
11    A.    Yes.
12    Q.    And he was working with Bill Snook at this
13 time, too?
14    A.    In the area of design and research,
15 development, testing, yes.
16    Q.    And are you saying that Borden became
17 Scott Moore's supervisor if Borden was to head up this
18 design department?
19    A.    Scott Moore was a part of marketing, which
20 he may have been lent to them to do that, to help them
21 if they needed support in some area.
22    Q.    But in May of 1988 he wasn't part of the
23 marketing, was he?
24    A.    I don't recall if he was in marketing or
25 not at that time.

Page 41

1     Q.    But do you have any memory or evidence
2 that Borden Larson, you know, was never Scott Moore's
3 supervisor in any way?
4     A.    I couldn't be absolutely sure of that.
5     Q.    But isn't that a safe assumption that
6 Borden did not supervise Scott Moore?
7          MR. NORMAN:  Objection.  Calls for
8 speculation.
9          THE WITNESS:  I would hesitate to assume
10 that.
11 BY MR. LARSON:
12    Q.    If Borden Larson did supervise Scott
13 Moore, what type of records would exist that would
14 show that relationship?
15    A.    Well, I'm not sure that there would be
16 records other than personnel records.
17    Q.    Well, if Borden Larson was truly
18 supervising Scott Moore, wouldn't Borden be filling
19 out, you know, forms for pay increases?
20    A.    He would fill out forms for anyone who
21 worked under him, yes.
22    Q.    So, if Scott Moore worked under Borden
23 there would be some type of form there when Scott
24 Moore had different personnel issues?
25    A.    If he worked there long enough to earn

Page 42

1  merit pay or something before -- you know.  If, at
2  that time, he was not in marketing.  But I don't
3  recall that that would be the case.
4      Q.   What about if Scott Moore was absent,
5  would the supervisor fill out an absence report?
6      A.   Well, supervisors or managers, yeah, they
7  would a fill out absence reports.
8      Q.   Have you ever seen any reports that Borden
9  filled out on Scott Moore?
10      A.   No, I have not.
11      Q.   Now, nowhere on this form does it say
12  Borden Larson is to head up an invention department,
13  does it?
14          MR. NORMAN:  Objection.  The document
15      speaks for itself.
16          THE WITNESS:  Under the broad term of
17      design.
18  BY MR. LARSON:
19      Q.   Did you ever sit down with Borden and say,
20  Borden, we want you to go and invent things?
21      A.   Sat down and told him we wanted him to
22  design things.
23      Q.   And you wanted him to design things that
24  you were going to sell to end consumers?
25      A.   It would be an integral part of the

Page 43

1  product, yeah.  Yes.
2      Q.   In that time in 1988, did you sell
3  anything to Mastercraft?
4      A.   I don't believe we did in '88.  I don't
5  recall.
6      Q.   Between '88 and 1996, was Correct Craft in
7  any business where you were actually selling things to
8  other boat companies?
9      A.   We were not -- I don't believe we were
10  specifically selling any items or things.
11      Q.   Between 1988 and 1996, were you involved
12  in licensing any of your technology to other boat
13  companies?
14      A.   That could be.
15      Q.   And what would you have been licensing
16  between 1988 and 1996?
17      A.   I don't -- I don't recall anything
18  specifically between '88 and '96.
19      Q.   So, when Borden Larson was tasked with
20  designing things for Correct Craft, he was tasked with
21  designing things for -- that would go into the boats
22  that would be sold to end consumers?
23          MR. NORMAN:  Objection.  Mischaracterizes
24      his prior testimony.  Assumes facts not in
25      evidence.

Page 44

1          THE WITNESS:  Yeah, as a designer.
2  BY MR. LARSON:
3      Q.   So, he was never tasked with designing
4  something that was going to be used to market to other
5  boat companies?
6          MR. NORMAN:  Objection.  Mischaracterizes
7      his prior testimony.
8          THE WITNESS:  Not that I -- not that I
9      remember.
10  BY MR. LARSON:
11      Q.   Now, if Borden Larson was the head of the
12  design department in 1988, would that mean that when
13  you and your management team made decisions on new
14  boats to build, you would communicate directly with
15  Borden, or you would communicate to Snook -- Mr. Snook
16  and he would then communicate that to Borden?
17      A.   Generally, we would ask that Borden be
18  present at a management meeting if we were discussing,
19  you know, a future design or a different direction.
20      Q.   But are you saying that your orders to
21  design a certain product would not go through
22  Mr. Snook, and then go to Borden?
23      A.   Depending on the timeframe and depending
24  on the -- whether he was working directly under Bill
25  or not.

Page 45

1      Q.   Well, in 1988, if Borden was to head up
2  the design department, wouldn't you communicate
3  directly with Borden about design you wanted done?
4      A.   Yeah.  That would -- that could happen.
5      Q.   But are you -- but did that happen or did
6  you still go through Mr. Snook?
7      A.   On occasions we probably had him come into
8  manager's meetings and discuss things with the
9  managers.
10      Q.   And the rest of the time isn't it true
11  that you actually gave design decisions to Bill Snook
12  who then gave them to Borden?
13      A.   There could be times that that happened,
14  yes.
15      Q.   Isn't that true all the time?
16          MR. NORMAN:  Objection.  Mischaracterizes
17      his prior testimony.
18          THE WITNESS:  Time is generic to me.  I
19      mean, what frame?
20  BY MR. LARSON:
21      Q.   Well, let's go back and talk about the
22  1990 Ski Nautique.
23          The 1990 Ski Nautique would have been
24  developed in a year or two years after this 1988 date?
25      A.   Uh-huh.

Page 46

1    Q.   Now, I don't mean to, you know, have you
2  try to remember the specifics of this, because I know
3  it's a long time ago, but the 1990 Ski Nautique, you
4  know, you would have told that to Bill Snook, would
5  you not?  And say, hey, Bill, we want to build this
6  longer, we want to build it wider?
7    A.   Quite possibly, because in an instance of
8  that type we would probably be asking him for his
9  input from an engineering standpoint.
10   Q.   Do you recall at all communicating with
11 Borden saying we want this boat longer and wider?
12   A.   Oh, I'm sure that there was conversation
13 sometime or another that included him, yes.
14   Q.   What about the initial task to make it
15 longer and wider, and through what channels did that
16 initial task go?
17   A.   At that time, we would -- we generally
18 would try to do a markup -- a mockup and test it
19 before we would actually go into a design.
20   Q.   But before that mockup somebody made a
21 decision, let's make it longer, let's make it wider?
22   A.   Yes.
23   Q.   So, you communicated that to some person?
24   A.   Correct.
25   Q.   And was that one person Bill Snook?

Page 47

1    A.   It could well have been in that case where
2  we were asking for a mockup, yes.
3    Q.   And then Bill Snook would have worked with
4  Borden to work on the drawings and then work on the
5  mockup?
6    A.   I'm quite sure they did.
7    Q.   So, is it true, then, that the
8  organizational structure would still go from you to
9  Bill Snook down to Borden?
10   MR. NORMAN:  Objection.  It
11 mischaracterizes his prior testimony.
12   THE WITNESS:  Only by virtue of the fact
13 that we would be seeking an engineering input,
14 and once a decision was made Bill would probably
15 have conversation with Borden.
16   You know, I would assume that as a part
17 of the team, that they would work together.
18 And, obviously, yeah, they did in many
19 instances.
20 BY MR. LARSON:
21   Q.   But I'm not asking about what happened on
22 the team.  I'm asking the pecking order, so to speak,
23 the organizational structure.
24   Is it not correct that when that 1990 Ski
25 Nautique was developed, which would have been a year

Page 48

1  or two years after this 1988 date here on this
2  document, you would have told Mr. Snook who would have
3  told Mr. Larson?
4    MR. NORMAN:  Objection.  Assumes facts not
5  in evidence.  Mischaracterizes his prior
6  testimony.
7    Answer it, if you can.
8    THE WITNESS:  It could have happened that
9  way, but not necessarily, because of direct
10 lines or something else, because it was a team
11 effort.
12 BY MR. LARSON:
13   Q.   Okay.  Let's fast-forward to the 1997 Ski
14 Nautique.  That was another, you know, very successful
15 redevelopment of that boat, was it not?
16   A.   Yes.
17   Q.   And do you recall what decisions you made
18 to say, hey, let's redesign the 1999 -- 1997 Ski
19 Nautique and this is what I want it to look like.  Do
20 you recall what decisions you made?
21   A.   On a Ski Nautique I would never -- I would
22 never tell them what I want it to look like.  I would
23 tell them how I want it to perform.
24   Q.   How about length and width?
25   A.   That would affect the performance.

Page 49

1    Q.   But you would make the decision that I
2  want it this wide and this long?
3    A.   I would ask them to give me a boat that
4  had the same characteristics, a larger boat with the
5  same characteristics or the same performance, because
6  that boat sold because of its performance.
7    Q.   What do you recall -- what do you recall
8  of your involvement in the 1997 Ski Nautique?
9    A.   My involvement would be to instruct them
10 and give them direction, and then they would go from
11 there and do the development, the testing, and design.
12   Q.   And that directive would be given to Bill
13 Snook instead of Borden Larson?
14   A.   I don't know that it was.  I don't recall.
15   Q.   Well, would not that directive be given to
16 the person truly in charge of design?
17   A.   It could be, yes.
18   Q.   I'm going to show you what we've marked
19 before as Exhibit 59.  This, for your information, is
20 some photocopies of a bunch of different design
21 elements that were presented in a folder for the 176,
22 which I think is a miniature version of the Ski
23 Nautique, the 17-foot, six.  And in there is this
24 document, which is 1611, and it's a letter dated
25 6/29/95, from Bill Snook to you.

Page 50

1     And, if you would, just take a look at
2 that a little bit and see if that refreshes your
3 recollection as to who you communicated with in 1995.
4     Does that refresh your recollection as to
5 who you communicated with regarding design elements in
6 1995?
7     A.    On this particular matter that he brought
8 up the question concerning the boat, I think the
9 question was in his mind as to -- but at the same time
10 I probably had the conversation with Bill Snook
11 concerning this, as I would with many of the other
12 people that I worked with at that time.
13    Q.    But this here is direction -- directives
14 from you had come directly to Bill Snook regarding the
15 redesign of the '97 Ski Nautique, and Bill was writing
16 you a memo, and I guess you were upstate New York at
17 the time, and wanted to clarify exactly what you
18 wanted; is that true?
19        MR. NORMAN:  Objection.  Compound
20    question.  Mischaracterizes his prior testimony.
21    Facts not in evidence.
22        THE WITNESS:  I'm sure that Bill, in doing
23    his job, if he thought there was an error, or
24    that something was wrong where he had a
25    misunderstanding or what someone else was to do

Page 51

1    or he was to participate and help them, he would
2    have a reason for asking the question.
3 BY MR. LARSON:
4    Q.    But here on June 29th, '95, he writes you
5 a memo.  And he says, Dear Walt, I just wanted to put
6 down for all of us to see the results of our phone
7 conversation of earlier today.
8        So, he's memorializing the fact that you
9 and he spoke on the phone that day?
10    A.    Yes.
11    Q.    So, you weren't talking to Borden about
12 design, you were talking to Bill Snook about design?
13        MR. NORMAN:  Objection.  Assumes facts not
14    in evidence.  Mischaracterizes his prior
15    testimony.
16        THE WITNESS:  Yeah.  Did he call me or did
17    I call him?  I don't remember which came first.
18    I don't recall that, so --
19 BY MR. LARSON:
20    Q.    The second paragraph says -- and this is
21 Bill writing -- first of all, length of the boat will
22 not change from the current 19-and-a-half feet, but
23 the maximum beam will go to 88 inches fiberglass to
24 fiberglass, up to 91 inches fiberglass to fiberglass.
25        So, again, you had a conversation that

Page 52

1 very morning that the length of the boat isn't going
2 to change, but the beam may go from 88 inches up to 91
3 inches?
4    A.    Uh-huh.
5    Q.    So, you're talking to Bill Snook about
6 design?
7    A.    He brought the issue up.  We talked on the
8 phone, yes, because he would be -- he would be
9 responsible for seeing to it that the function of the
10 boat -- that it would perform, you know, as it had to
11 to fill the market we sell it into.
12    Q.    But you had made a decision that we want
13 to modify our Ski Nautique for 1997?
14    A.    Sure.
15    Q.    And you had talked to Bill about it?
16    A.    Yes.
17    Q.    And you're talking about making it wider?
18    A.    Yes.
19    Q.    And wasn't this limitation on how wide it
20 was going to be based on how wide a shipping container
21 was?  So, you're measuring shipping containers and
22 saying, hey, how wide can we go to go in there?
23    A.    At that time quite possibly, yes.
24    Q.    Now, if Borden was in charge of design,
25 why weren't you having this discussion with Borden?

Page 53

1        MR. NORMAN:  Objection.  Assumes facts not
2    in evidence.
3        THE WITNESS:  They were working as a team.
4    But I may have had this discussion with him
5    verbally before this.  Maybe Bill misunderstood
6    it or thought that he wanted to clarify it,
7    because he was a part of the conversation prior.
8 BY MR. LARSON:
9    Q.    The next paragraph says the transom of the
10 boat will be rounded, more like the Nautique Super
11 Sport and the Ski Nautique 176.
12    A.    Uh-huh.
13    Q.    Now, you're talking about -- that was a
14 directive you gave to him in this phone conversation,
15 because he's trying to memorialize this?
16    A.    Yeah.
17    Q.    So, you're telling Bill, hey, why don't we
18 make the transom more rounded?
19    A.    From an engineering standpoint, I would
20 have the right to ask him that.  Did he have any
21 reasons for us not to do it.
22    Q.    And then he would take this and go to
23 Borden and say, hey, let's go make the transom rounded
24 like our other two boats?
25        MR. NORMAN:  Objection.  Assumes facts not

Page 54

1    in evidence.
2        THE WITNESS:  That could be, yes.
3    BY MR. LARSON:
4        Q.   But you weren't having this conversation
5    with Borden as the head of the design department.  You
6    were having this conversation with Bill Snook?
7        MR. NORMAN:  Objection.  Mischaracterizes
8        his prior testimony.
9        THE WITNESS:  Only from the standpoint
10       they work together.
11   BY MR. LARSON:
12       Q.   And Bill Snook was actually Borden's
13   supervisor at that point?
14       MR. NORMAN:  Objection.  Mischaracterizes
15       prior testimony.
16       THE WITNESS:  I don't know that he was.  I
17       don't recall.
18   BY MR. LARSON:
19       Q.   But if Borden Larson was Bill Snook's
20   subordinate at that point, this would be the normal
21   order of business for you to talk to Bill, and then
22   Bill would talk to Borden?
23       MR. NORMAN:  Objection.  Mischaracterizes
24       his prior testimony.  Assumes facts not in
25       evidence.

Page 55

1        THE WITNESS:  If?
2    BY MR. LARSON:
3        Q.   Yes.  If Borden was his subordinate.
4        A.   If that was the scenario.
5        Q.   Now, I'm going to just change subjects a
6    little bit since we're in this personnel file and,
7    again, I'm talking about Exhibit 5.
8        There is a mention to certain departments
9    here.  I'm going to turn to what has been marked as
10   Page 6.  This document talks about department 97.  Do
11   you know what Department 97 is?
12       A.   I would -- I believe that that could have
13   been referred to as design and research or -- yeah.
14   That probably be under design and research.
15       Q.   But do you actually know what 97 is or you
16   just believe that?
17       A.   I would assume that that was the
18   department.
19       Q.   Okay.  The next document, it says
20   Department 90.
21       A.   Uh-huh.
22       Q.   And what department is 90?
23       A.   That was written by Mike Elrod, and I do
24   not recall why there was a difference.
25       Q.   Now, do you know what Department 86 is?

Page 56

1        A.   I don't recall.
2        Q.   Now, prior to this lawsuit starting Borden
3    Larson wrote Correct Craft a letter asking for a copy
4    of his personnel file, and Page Number 6 is the
5    envelope and Page Number 7 is the letter.  And it's
6    actually misdated.  It's August 3 of 2003.
7        Borden says, Dear Shirley, who is the HR
8    director, I would like to request a copy of my Correct
9    Craft employment file.  Also, please send a sheet
10   count and I will pay for the materials, labor, and
11   postage to send me these copies.  Thanks for this
12   consideration.  Regards, Borden Larson.
13       Do you know if Correct Craft ever sent a
14   copy of his personnel file to Borden?
15       A.   I do not know.
16       Q.   Would it be Correct Craft's policy to
17   ignore this letter?
18       A.   I don't think they would.
19       Q.   Did you ever have a discussion with
20   anybody that, hey, Borden sent a letter in asking for
21   a copy of his personnel file?
22       A.   No.
23       Q.   I want to change subjects slightly and I
24   want to talk about the Wakeboard Tower.
25       Now, there was a meeting on August 30,

Page 57

1    1996, and I believe Borden Larson came into that
2    meeting with some drawings of a tower.  Do you recall
3    that meeting?
4        A.   We had meetings on the tower.
5        Q.   Do you recall the first time?
6        A.   The date, no, but we obviously did have a
7    first meeting.
8        Q.   Do you recall the first meeting?
9        A.   I believe I do.  I don't -- the dates, and
10   time, and everything else, no, but --
11       Q.   I'm going to show you what's been
12   previously marked as Exhibit 12.  I'll just give you a
13   moment to review.
14       And, for the record, these are the
15   management minutes of the August 30th, 1996 model
16   change meeting for the Sport Nautique.
17       Have you seen those minutes before?
18       A.   Yes.
19       Q.   And you were at that meeting?
20       A.   Yes.
21       Q.   And Borden came into that meeting and
22   presented drawings of a tower positioned amidship over
23   Sport Nautique?
24       A.   The question again?
25       Q.   Borden came into this meeting and showed

1 you drawings of a tower mounted amidship over a Sport

2 Nautique?

3     A.    We discussed towers, but I see nothing

4 here that there was a drawing that was presented.  Did

5 he -- did he point that out in the letter?

6     Q.    On the second page, which is Number 1583

7 in this paragraph it says discussions concerning radar

8 dome ski pylon, Borden's drawings were four-and-a-half

9 foot and six foot.  Skylines were eight foot.

10     A.    Uh-huh.

11     Q.    Does this refresh your recollection that

12 Borden brought drawings into this meeting?

13     A.    I would assume that he did, based on that,

14 which that would indicate that he did, yes.

15     Q.    Now, normally the drawings that Borden

16 would work on were, you know, normal -- large

17 three-foot wide by two-foot large drawings?

18     A.    I -- I don't know whether he did or not.

19     Q.    You don't recall the size of the drawings

20 he bought in?

21     A.    The only pencil sketches or anything that

22 looked like a drawing was on an eight-and-a-half by

23 11.

24     Q.    But are those eight-and-a-half by 11 that

25 you've seen recently, are those not photocopies of

1 some originals somewhere?

2     A.    Oh, I would imagine if I -- you know, they

3 are photocopies if there's anything in the records,

4 yes.

5     Q.    And weren't those photocopies actually

6 reduced in order to make those drawings fit on an

7 eight-and-a-half by 11?

8         MR. NORMAN:  Objection.  Calls for

9     speculation.

10         THE WITNESS:  I do not know.

11 BY MR. LARSON:

12     Q.    Have you ever taken a scale to the

13 dimensions on those eight-and-a-half by 11s to

14 determine whether or not the scale matches?

15     A.    No.

16     Q.    But if you did that, if you got a

17 dimension on and eight-and-a-half by 11 that says six

18 feet, and the -- and the scale is one inch equals one

19 foot, and the scale doesn't match, wouldn't it assume

20 that either that drawing has been reduced or blown up?

21         MR. NORMAN:  Objection.  Calls for

22     speculation.

23         THE WITNESS:  I would assume, yes.

24 BY MR. LARSON:

25     Q.    What can you tell me about this meeting

1 when Borden brought in these drawings, whether they

2 were big drawings or little drawings?  Let's not

3 debate that.  But what did -- what do you remember of

4 this meeting?

5     A.    We were discussing, you know, how to

6 improve the performance of the boat and stay in the

7 number one position, which brought about the

8 discussion of, you know, how do we get a higher point

9 for the wakeboarders to attach the rope.

10     Q.    Do you see anything in these meeting

11 minutes that talk that -- that even mention the fact

12 that you were talking about how you get a higher point

13 on the boat to tie the rope?

14     A.    There doesn't seem to be anything in here,

15 but that was the whole purpose of the conversation of

16 the meetings we were having.

17     Q.    Is there any reason why -- strike that.

18         Angela Pilkington was your secretary that

19 took these minutes?

20     A.    Yes.  Correct.

21     Q.    She's a very skillful secretary?

22     A.    Very good at what she does, yes.

23     Q.    And she would take these things in

24 shorthand?

25     A.    Yes.

1     Q.    Which is on --

2     A.    Wait a minute.  I'm assuming she took them

3 in shorthand at that time.  I'm not --

4     Q.    And do you know that shorthand is almost

5 identical to what we see here with the stenographer?

6     A.    Yes.

7     Q.    And so she could take in shorthand an

8 actual verbatim transcript of the meeting?

9         MR. NORMAN:  Objection.  Calls for

10     speculation.

11         THE WITNESS:  If she took it in shorthand,

12     yes.

13 BY MR. LARSON:

14     Q.    And if the purpose of this meeting was to

15 discuss raising the tow point on the boat, a skillful

16 secretary would certainly include in the minutes the

17 discussions of the actual purpose of the meeting,

18 wouldn't she?

19         MR. NORMAN:  Objection.  Calls for

20     speculation.

21         THE WITNESS:  I -- I would think so.

22 BY MR. LARSON:

23     Q.    Okay.  And our first paragraph here it

24 says Borden presented a memo of considerations given

25 to the redesign of the Sport Nautique.

Page 62

1    So, he's asking, hey, this is what I
2 think, what do you guys think?
3    It says the memo includes lots of ideas
4 and Borden is looking for feedback to see what we are
5 looking for in the next year in the Sport.
6    Does it say anything in there that he was
7 bringing to you methods to raise the tow point?
8    A.   Not in this, these minutes.
9    Q.   Okay.  And the next one, we actually hear
10 what you say.  It says W.N. Meloon, which is you,
11 stated there are a couple of things he asked Borden
12 and Bill to do as to the direction we are talking the
13 Sport Nautique, and that is to work the engine back as
14 far as we could.
15    A.   Uh-huh.
16    Q.   Also, you wanted this turned seat to be
17 full of water to add weight, and you want to know how
18 big and how much weight can you put in it.
19    A.   Correct.
20    Q.   And now if the purpose of this meeting was
21 to raise the tow point, don't you think you would have
22 said that?
23    A.   That -- the purpose of the meeting and
24 what was actually discussed or what was assumed could
25 be, you know, different.

Page 63

1    Q.   But you got a copy of these minutes after
2 they were created, did you not?
3    A.   Yes.
4    Q.   Do you ever ask for them to be changed,
5 because they omitted the actual purpose of the whole
6 meeting?
7    A.   No, because I don't know that it was not
8 discussed and it just was not put in here, because you
9 may have five or six people around the table talking,
10 you know, about what to do and making suggestions and
11 so on.
12    Q.   How did Borden describe this tower that he
13 showed on this date?
14    A.   Where was that 1583?
15    He was -- he was speaking of a radar dome
16 ski pylon.  And for that reason that would indicate to
17 me that we were looking for a point of reference to
18 hook the rope to that is higher than what we were
19 talking about or than what we were using in the boat.
20    Q.   But isn't the first time you ever talked
21 about this was this day that Borden presented it to
22 the management team?
23    MR. NORMAN:  Objection.  Assumes facts not
24 in evidence.
25    THE WITNESS:  I don't know that that was

Page 64

1 the first time we discussed it.
2 BY MR. LARSON:
3    Q.   Have you ever seen anything in writing
4 where it talks about -- that it was discussed prior to
5 this date?
6    A.   I don't recall if there's anything in
7 writing or not that we had discussed it before or not.
8    Q.   But when Borden showed you the boat with
9 the tower on it, didn't the people in the meeting
10 laugh, and say, hey, that looks like a -- a poling
11 platform on a flats boat?
12    A.   Well, there were all sorts of comments,
13 because nobody ever had any idea we were going to, you
14 know, venture into a sport or into an area of design
15 of that type.
16    I mean, that was so far from what the
17 company usually did.  There was, you know, all sorts
18 of attempted humor.
19    Q.   But if this had been discussed before all
20 of that humor would have been worked out by the
21 date -- this date, wouldn't it?
22    A.   Not necessarily, no.
23    Q.   Now, did Borden show you a tower with
24 speakers mounted on top with skis on top of it drawn
25 in?

Page 65

1    A.   I don't recall seeing anything like that.
2    Q.   Did he explain to you that the reason he
3 drew this is he was looking at ways to mount skis on
4 top of the bimini top?  Do you recall him saying that?
5    A.   There was some discussion on the bimini
6 top, yes.
7    Q.   So, if Borden said the whole idea came
8 about, because he was talking about putting skis on a
9 bimini top, what does that have to do with raising the
10 tow point?
11    A.   I don't know that he -- I don't know that
12 he ever made that statement to me or that comparison
13 or said that that was a direction or not.
14    Q.   But you've read that, that he was never
15 working on trying to raise the tow point, but was
16 working on trying to use a bimini knee top as a car
17 top carrier, so to speak, on a boat?
18    MR. NORMAN:  Objection.  Assumes facts not
19 in evidence.
20    THE WITNESS:  I would assume, yes, that
21 would be the direction.
22 BY MR. LARSON:
23    Q.   So, you're saying that you've seen
24 writings like that, that Borden was working on trying
25 to store skis on top of the bimini top?

Page 66

1    A.    I know there was conversations and I would
2 assume that there was some mention of it, yes.
3    Q.    Did you ever write back to Borden and say,
4 Borden, that's not how it came about?
5    A.    I don't know that necessarily I would have
6 put that in writing.  I may have been done it verbally
7 if I had the opportunity, or if I felt that that was
8 taking up, you know, his effort and going in a
9 direction we didn't want to go, it may be a verbal
10 conversation, but I don't recall it.
11    Q.    Now, did Mr. Snook present any tower on a
12 boat on this day?
13    A.    I don't recall that Mr. Snook presented a
14 tower.
15    Q.    So, Borden and Mr. Snook didn't come in as
16 a team and present this together?
17    A.    When you say a team, I would -- the whole
18 management group functioned as a team.  They were a
19 part of it.
20    Q.    But did Mr. Snook come in with Mr.
21 Borden -- with Borden and say, hey, we worked on this
22 tower together, this is something we did together?
23    A.    I don't recall that -- that that happened,
24 but I'm sure that he did have input and discussion,
25 because he is a mechanical engineer, and everything we

Page 67

1 build or make has his approval put on it.
2    Q.    Now, prior to this date you had not gone
3 to Borden and said, Borden, we want you to design a
4 tower for a boat to tow a skier by, to tow a skier
5 with?
6    A.    My recollection, that was -- that was
7 discussed in a management meeting.
8    Q.    What was discussed in a management
9 meeting?
10    A.    A tow point for the wakeboard boat.
11    Q.    But Borden Larson doesn't normally go to
12 management meetings, does he?
13    A.    He probably -- quite -- quite possibly he
14 could have been in that meeting.
15    Q.    And have you ever seen the minutes of that
16 meeting?
17    A.    I have not gone back and researched.  I
18 don't recall.
19    Q.    Have you been involved in trying to find
20 the minutes of that meeting for production in this
21 case?
22    A.    No.
23    Q.    But Borden Larson wasn't specifically told
24 to go and design a tower?
25          Like, you went to Borden and said, Borden,

Page 68

1 I know we got tuna towers, I know we got radar arches.
2 I want you to design a tower for our boats to tow a
3 skier by.  You never said that to Borden?
4    A.    I may never have said that to him
5 directly, but there was discussions about that.
6    Q.    About putting a tower on a boat?
7    A.    About getting an elevated point without
8 using a higher pylon, and what we had referred to --
9 radar domes, rod racks, those types of things that
10 were used on larger boats.
11    Q.    And where are the meeting minutes of using
12 radar domes and rod racks prior to this August 30th
13 meeting?
14    A.    I don't know that we ever had a formal set
15 of minutes on the meeting.  I know we had that
16 discussion, and it was a very generic discussion in
17 the -- in the room.  The whole group was sitting there
18 talking about it.
19    Q.    And how do you know Borden was in there?
20    A.    Well, at that time, I would assume that he
21 was, because he had become as active as the rest of
22 the team had in the wakeboard boats.
23    Q.    But if you had already discussed putting a
24 radar dome on a boat, why is Borden bringing in this
25 memo here saying he's looking for your feedback as to

Page 69

1 something that you had already talked about?
2    A.    Well, he -- it -- his terminology is
3 different than what we were, you know, discussing at
4 the time.  We were looking for a -- a replacement for
5 a pylon for a tow point, and he referred back to the
6 radar dome or the radar arch.
7    Q.    So, you're saying --
8    A.    He had to come up with that somewhere and
9 I assume that that would be from the conversations
10 that we had had prior to this.
11    Q.    You don't think that Borden knew the terms
12 radar dome prior to you telling him that there is such
13 a term?
14    A.    He may have.  I wouldn't question his --
15 you know, his knowledge in that area.
16    Q.    And how do you know the term radar dome
17 came from Borden as opposed to someone else in the
18 room when they looked at his tower and said, hey, it
19 looks like a radar dome to me?
20    A.    I don't know that it would make any
21 difference whether somebody else said it or he said
22 it.  In the industry -- in the Marine industry radar
23 arches or domes are prevalent on larger boats.  It's
24 common.
25    Q.    Where do you see in these minutes your

Page 70

1  discussion saying, hey, thanks, Borden, for bringing
2  in this radar dome that we talked about in these other
3  meetings that we've had.  We're going to solve the
4  problem of raising the tow point.
5        Where does it say anything about that?
6     A.   I don't know that it -- it says that
7  anyplace.  I don't recall that.
8     Q.   And if you had been talking about this in
9  many other meetings, don't you think here Borden would
10 come in and say, hey, I'm bringing to you, you know, our
11 solution of these other minutes -- these other
12 meetings we've had?  Why doesn't it say that?
13       MR. NORMAN:  Objection.  It calls for
14 speculation.
15       THE WITNESS:  Why -- why would I assume
16 that?
17 BY MR. LARSON:
18    Q.   Why would you assume that the minutes
19 accurately reflect what was discussed?
20    A.   No.  That he would come in and say I've
21 got the solution.
22    Q.   Well, if you had these meetings that we've
23 never seen a single paper on, where you've already
24 talked about radar arches, you've already talked about
25 using fishing pole towers, and if Borden just brought

Page 71

1  to you what you already told him to bring to you, why
2  don't these minutes reflect that?
3        MR. NORMAN:  Objection.  Calls for
4  speculation.
5        THE WITNESS:  I have no idea.
6  BY MR. LARSON:
7     Q.   And isn't it true that two years after
8  this, or three years after this when Todd is claiming
9  that Correct Craft stole the idea from him, that you
10 had stolen the idea from him, even at that point two
11 years later you never went out and said, hey, wait a
12 minute.  We've been talking about radar arches for a
13 long time around here.  You still never said even
14 then; isn't that correct?
15    A.   That -- that conversation would have been
16 with legal and probably would have been between Larry
17 Meddock and -- and our attorneys.  That was his
18 primary function, was to be a liaison between the
19 company and the attorneys.
20       If there was a discussion of that type, I
21 would assume that it -- it would have been between
22 them, and I'm quite sure that he and I may have had
23 that discussion, but I don't recollect the actual
24 timing of it or anything else.
25    Q.   But when Mr. Todd is claiming that he

Page 72

1  invented this, why didn't you go back and find out all
2  your meetings where we've been talking about radar
3  arches for years, and, Borden, he didn't think up the
4  radar arch, because we had already done it.  We told
5  him to go design the radar arch.
6        Where are those meetings about where
7  you're talking about radar arches?
8     A.   There's a difference between what Todd
9  claimed and what we did.
10    Q.   And what's the difference?
11    A.   He had a design patent.  We had a utility
12 patent.  That will trump a design patent any day.
13    Q.   I'm asking specifically when Todd said
14 that he was the original designer of putting what's
15 called a radar arch on a ski boat, why didn't you go
16 back and say, no, we've been talking about radar
17 arches on ski boats a long time ago, and we have a
18 meeting right here on August 30th, '96, where Borden
19 brought in drawings of it, and then prior to that we
20 had another meeting, and another meeting, and another
21 meeting?  Where are the other meetings?
22    A.   Whether there were meetings or not the
23 fact is that we had the -- we had the utility patent.
24 And that was our aim and our goal, was to have the
25 utility patent.  He took our designs and made a few

Page 73

1  changes and then claimed that he designed or invented
2  the tower, and Todd didn't.
3     Q.   But at that time you were on notice that
4  all the discussions at Correct Craft regarding the
5  conception were important documents, weren't they?
6        Weren't you on notice when Todd said, hey,
7  I invented it?  You were on notice to say, hey, no, we
8  invented it.  We've got the August 30th meeting when
9  Borden brought in the towers, and now you're telling
10 me today that you had meetings before that date where
11 you actually talked about radar arches.
12    A.   But I did not say that we necessarily had
13 meetings.  We had conversations, we may have had
14 discussions, because someone in marketing or someone
15 in sales would come in and say, we've got this
16 problem, or we've got this or we got that, or
17 production, and we may sit down and have a discussion,
18 and that happens in a company.
19    Q.   But that discussion that you had, what
20 Mr. Snook did is he went out and added 18 inches on
21 your existing pylon that's what his response was to
22 discussions.
23    A.   That was -- that was his job to go out and
24 test it, and he came back and said that it was not --
25 it was not desirable and it was not -- didn't perform

Page 74

1  and didn't function and he would not recommend it.
2  That was a part of his job, is to protect the company
3  go out and do that.
4      Q.   But you're saying based on those
5  discussions, that you had discussions prior to this
6  meeting, you talked about radar arches, you talked
7  about fishing pole holders or towers.  Why didn't
8  Mr. Snook come back with the tower if you already
9  discussed it?  He didn't.  He came back with an
10  18-inch longer pylon, didn't he?
11      A.   He came back and reported that it did
12  not -- it was not what we were looking to do.  It was
13  not satisfactory.  It did not pass.
14      Q.   You're saying the 18-inch longer pylon?
15      A.   Right.
16      Q.   But you just told me that you had a
17  discussion with him about towers.  Why didn't he come
18  back to you with a tower?
19      A.   I did not tell you that we had a
20  discussion with him about towers.  We talked about
21  various things of -- of increasing the height of the
22  tow point at which time the word tower, the word radar
23  arch, or dome, or tuna tower, or something else may
24  have come in the conversation.
25      Q.   But you don't know --

Page 75

1      A.   We had conversations all the time that may
2  never have gone on the record.
3      Q.   But you don't know if radar arch, or tuna
4  tower, or fishing pole tower came into those
5  discussions, do you?
6      A.   Yes, I do.
7      Q.   So, you're sitting down prior to this
8  meeting with Bill Snook and you're saying, Bill, let's
9  raise the tow point, go look at radar arches, go look
10  at tuna towers, go look at fishing pole towers, and he
11  did none of those.  He came back with an 18-inch
12  longer pylon; isn't that correct?
13      MR. NORMAN:  Objection.  Mischaracterizes
14  his prior testimony.
15      THE WITNESS:  I -- as a president of
16  Correct Craft I had a right to have a
17  conversation with anyone on the -- you know, in
18  our employment that I so chose and with any
19  subject.
20        And it could well have been that --
21  that we talked to him and before he did, or
22  said, or went any further, he went out as an
23  engineer, because that was his job, and tested a
24  pylon, which means to me, thank goodness, I've
25  got a man that can think on his feet.

Page 76

1        And he went out and tested something to
2  see if it might be the answer.  It wasn't the
3  answer.  So, then we would go back and we follow
4  through with the other discussion and we go that
5  way.  That happens in a company all the time.
6  BY MR. LARSON:
7      Q.   Do you know that Bill Snook says none of
8  this ever happened, and the first time he ever heard
9  about this tower was right before this meeting when
10  Borden brought in the drawings?
11      MR. NORMAN:  Objection.  Mischaracterizes
12  prior testimony and an absolute lie.
13        But go ahead and answer it, if you can.
14      MR. LARSON:  Absolute lie?
15      MR. NORMAN:  Yes.  That's absolutely what
16  he didn't -- what he -- the opposite of what he
17  said and you know it.
18        Go head and answer, if you can.
19      THE WITNESS:  I don't recall that there
20  would be any reason that that statement would be
21  made.  I don't --
22  BY MR. LARSON:
23      Q.   You never read Bill Snook's deposition
24  where he says that, you know, Borden came in with the
25  drawings and he says, hey, I think this will solve our

Page 77

1  problem?  He had never seen the drawings before that.
2  He never even knew the tower was drawn before that.
3        Now, if you had discussions with Bill
4  Snook and saying, Bill, let's use a tower, let's use a
5  tuna tower, let's use a radar arch, let's use a poling
6  platform, let's do all this, why would Bill respond
7  and say, Borden, wow, you solved the problem.  You had
8  already told him how to solve the problem.
9      A.   I didn't necessarily say that I had told
10  him how.  We had conversations about how we might,
11  what we might do, what steps we might take.  Whether
12  that was the first, second meeting or not, I don't
13  recall.
14      Q.   Now, after this whole tower was developed,
15  I mean, isn't it true that you went around Correct
16  Craft bragging that you were actually almost the
17  inventor of this, because you told him to go put a
18  tower on the boat?  You told -- you told Mr. Snook to
19  do this and Mr. Snook went to Borden and the tower
20  came about because of you?
21      A.   I -- I don't know that I ever made those
22  statements.
23      Q.   Would those --
24      A.   I don't recall them.
25      Q.   Would those be far removed from the truth?

Page 78

1    A.   I don't recall that I ever made statements
2  that could be interpreted that way or that I made
3  those actual statements.
4    Q.   But we still haven't seen any meeting
5  minutes of any discussion with Bill Snook or anybody
6  else prior to this meeting here, have we?
7    A.   There are a lot of conversations that
8  you'll never find minutes on, because they were
9  discussions in general.
10    Q.   And those conversations, you don't have
11  any evidence that Borden Larson was ever at those
12  meetings?
13    MR. NORMAN:  Objection.  Mischaracterizes
14    his prior testimony.
15    THE WITNESS:  He could have, but I don't
16    recall.
17  BY MR. LARSON:
18    Q.   And most of the management minutes --
19  management meetings Borden was not even allowed to go
20  to; isn't that correct?
21    A.   Allowed is not the proper term.  He was
22  not asked to come in, because he did not serve on a
23  level that sat on that group.
24    Q.   But you never went to Borden specifically
25  and said, Borden, I want you to invent a new towing

Page 79

1  method; is that correct?
2    A.   There would be no reason that I would
3  necessarily go to Borden and ask him to do that.
4    Q.   Okay.  And you never went to him and said,
5  Borden, I want you to redesign the pylon?
6    A.   I don't know that I did or did not.  I
7  don't -- there may be a good reason that I didn't, you
8  know.
9    Q.   And what was the good reason that you
10  didn't?
11    A.   I may have not thought it was necessary at
12  that time.
13    Q.   What, to go to --
14    A.   That he become, you know, involved in it.
15    Q.   Okay.  And you never went to Borden Larson
16  and said, hey, I want you to redesign the extended
17  pylon that are being used on all these other boats.
18  You never did that either, did you?
19    A.   If there was any instruction given, it was
20  not to -- it was definitely not to increase the size
21  of the pylon, because we had tested it and found out
22  that it didn't work.
23    Q.   Now --
24    A.   We had -- we had questions about the
25  safety of the people and the stress that was -- from

Page 80

1  engineering standpoint it put on the boat.
2    Q.   Now, isn't it true that Bill Snook doesn't
3  agree with that at all, and actually reported that the
4  pylons are very beneficial and they're used day in and
5  out on your boats?
6    THE WITNESS:  Oh, yes --
7    MR. NORMAN:  Objection.
8    THE WITNESS:  -- under -- under certain
9    required measurements that are required for the
10    specific events or the venues that that boat is
11    used in.  And those are tested by the
12    organization and by the companies to have a safe
13    height and a regulation.
14  BY MR. LARSON:
15    Q.   Do you know who Dean Lavelle is?
16    A.   Oh, I know Dean, yes.
17    Q.   And he -- he used one in his boats and he
18  was a contract skier with you?
19    A.   Yes.
20    Q.   And you allowed him to use an extended
21  pylon on his boat?
22    A.   We told him we preferred that he did not,
23  and we did not know about it until sometime after he
24  started using it.
25    Q.   You actually did photo shoots of him

Page 81

1  skiing behind his extended pylon and put them in your
2  catalogs, did you not?
3    A.   I don't recall that we did or didn't.
4  That could have --
5    Q.   I'm going to show you what's been marked
6  as Exhibit 41, which for the record is a 1996 catalog.
7  On Page 13, is that -- is that not a picture of Dean
8  Lavelle?
9    A.   This picture right here (indicating)?
10    Q.   Uh-huh.
11    A.   That is.  Yeah, that's Dean.
12    Q.   And he's way up in the air?
13    A.   Uh-huh.
14    Q.   And the tow rope from where he's holding
15  onto it goes way up over the photographer?
16    A.   I don't know if the photographer was
17  sitting in the back seat or where the photographer was
18  in relationship to this.
19    Q.   But that --
20    A.   I -- I can't assume that that was shot
21  with a Skylon or a higher ski pole.
22    Q.   But that rope is definitely going up over
23  the head of the photographer?
24    A.   Well, if the photographer was laying down
25  in the back seat, yes, it would, or sitting behind the

Page 82

1 motor box shooting it, yes, it would.  It would be
2 over his head.
3      Q.   Why would Dean Lavelle use a low pylon
4 when he owned his boat and he had a tall pylon and you
5 knew it?
6          MR. NORMAN:  Objection.  Calls for
7      speculation.
8          THE WITNESS:  He may have been headstrong
9      about it and just, you know, thought we were
10     nuts, but that's what we was skiing behind in
11     tournaments, and that's the way he was going to
12     do it, you know.  Or wakeboarding behind it and
13     he felt that he had to do it and had the right
14     to do it.
15 BY MR. LARSON:
16     Q.   Well, on your catalog quote it says, team
17 Nautique member Dean Lavelle, above, a familiar sight
18 at tournaments, gets big air behind his Sport
19 Nautique.
20     A.   Okay.  That's advertising.
21     Q.   So, you're using a tall pylon to shoot
22 this shot with?
23     A.   You assume that's a tall pylon.  If the
24 photographer was sitting in the back behind the engine
25 box shooting that photograph with a long lens it would

Page 83

1 appear -- the rope would appear over his head, yes.
2      Q.   How high is the normal pylon over the top
3 of the transom in the back of the boat?
4      A.   Probably -- oh, I would say in a Ski
5 Nautique probably three -- three feet, maybe, under
6 the -- depending on the event.
7      Q.   You're saying the pylon -- well, how tall
8 is a normal pylon off the floor off the sole of the
9 boat?
10     A.   I think the regulation -- and I'm not sure
11 this is exactly right -- but I think the association,
12 the United States Water Ski Association regulates that
13 height.  And it's -- I don't remember if it's between
14 48 and 52 inches, but they give us a height that we
15 have to be within.
16     Q.   How tall is the engine box?
17     A.   The engine box may be two-and-a-half feet,
18 three feet.
19     Q.   Aren't the pylons just minisculy (sic)
20 above the engine box?
21     A.   Well, depending on the size of the engine.
22     Q.   Well, take a look at Page 13 here.  You
23 have an engine box right there.  It looks to me the
24 pylon is just like minisculy above the engine box.
25     A.   I don't know what the scale of this

Page 84

1 photograph is.
2      Q.   You don't need a scale, sir.  You look at
3 the pylon next to the engine box.  And how much over
4 the engine box is the pylon?
5      A.   Well, miniscule to me is rather generic.
6 I don't know if that's a foot over to two foot over
7 it, or, you know, ten inches from the way -- the angle
8 of the shot.
9      Q.   Okay.  Look at that (indicating).  There's
10 another one there.  How tall is that pylon over the
11 motor box?
12     A.   I can't see whether that's a pylon or if
13 that's a speaker on the side of the boat.
14     Q.   You built these boats, did you not, sir?
15     A.   Yeah.  And we have speakers --
16     Q.   And you don't know high --
17     A.   We have speakers here and we have that,
18 yes.  The height varies in reference to an engine box
19 depending on the size of the engine that the engine
20 box is put in.
21     Q.   I'm going to change subjects a little bit.
22          You testified at the trial, the Atlantic
23 Tower trial?
24     A.   Yes.
25          MR. NORMAN:  I just want to let you know

Page 85

1      whenever you need to take a break, let us know,
2      because we've been going for almost two hours
3      now.
4          THE WITNESS:  Okay.  Thanks.
5          MR. LARSON:  Why don't we take a little
6      break now, because I want to find -- I want to
7      find the exact transcripts that we testified
8      from.  So, these pages are a little bit --
9      they're not out of order, but, you know, they're
10     a little bit difficult to determine.  So,
11     let's -- why don't we take ten minutes.
12         COURT REPORTER:  This is the deposition of
13     Walter N. Meloon.  The date is September 6th,
14     2007.  We are off the record, and the time is
15     11:31 a.m.
16          (Whereupon, a break was taken)
17         COURT REPORTER:  This is the deposition of
18     Walter N. Meloon.  The date is September 6th,
19     2007.  The time is 11:45 a.m.  We are back on
20     the record.
21 BY MR. LARSON:
22     Q.   Mr. Meloon, during our break I have put in
23 front of you what we previously marked as Exhibit 8,
24 which is a copy of the trial transcript in the Correct
25 Craft versus Atlanta Tower trial.

Page 86

1        And I have in front of you the second day
2 of that trial, and on Page 137 we have the transcript
3 of your testimony.  And I've given you some time here
4 to read between Page 137 and 141; is that correct?
5        A.    Yes.
6        Q.    And you've read those to the best of your
7 ability in this brief amount of time?
8        A.    Yes.
9        Q.    Okay.  On Page 137, Line 7 through 9 --
10 and to some degree I'm going to paraphrase this, but
11 this is you speaking -- and it's going to say, we
12 sponsored athletes, tournaments, and to stay in that
13 market we needed to change.  Everybody is raising the
14 ski pole, coming up with 10-foot booms.  Do you see
15 where that says that pretty much?  In fact, I'm going
16 from Lines 9 through 12.
17        A.    Uh-huh.
18        Q.    Do you recall that testimony?
19        A.    Uh-huh.
20        Q.    Now, when you say everybody was raising
21 the ski pole, who is everybody?
22        A.    That was our competitors.
23        Q.    And who were they by name?
24        A.    Oh, they could be -- could have been
25 Mastercraft, Malibu, Tiga, Centurion, Supra, Moomba.

Page 87

1        Q.    So, you're saying that in June of 1996 is
2 what Borden brought -- drew up the tower, you're
3 saying in June of '96, Mastercraft, and Malibu, and
4 Moomba, and all those other ones were raising the ski
5 pole?
6        A.    Our competitors were, yes.
7        Q.    And they were actually selling it on their
8 boats?
9        A.    No.  They were not selling them on their
10 boats.  There were manufacturers who were making
11 towers -- or poles that fit down over the -- the stock
12 manufacturer's pole.
13        I don't know if the others -- if
14 Mastercraft and the others were manufacturing any
15 poles or not.  The point was they were raising the
16 height by using a different method.
17        Q.    Well, your competitors weren't doing that.
18 Some after-market companies was -- were selling
19 add-ons?
20        A.    Our competitors were allowing it to be
21 done and did not take a position.  We took a position
22 that it should not be done, even to put warning labels
23 on the boat.
24        Q.    And how do you know that your competitors
25 were not taking that position?

Page 88

1        A.    We never saw a warning label on their
2 boat, never heard them make the statement.  As a
3 matter of fact, they would use it against us.  They
4 would say, well, you -- you can't -- if you buy a
5 Correct Craft, you can't put a Skylon on it or a boom.
6        Q.    And where are the writings where you saw
7 that they were saying that?
8        A.    Oh, this was reported through our sales
9 reps.  Dealers who sell the product in the field.
10        Q.    Have you produced any writings like that
11 in this lawsuit stating that those sales reps are
12 writing this in to?
13        MR. NORMAN:  Objection.
14        THE WITNESS:  I didn't say that they were
15    writing it in to us.  They reported it to us.
16 BY MR. LARSON:
17        Q.    And how did you record it?
18        A.    Generally, it was verbal.  I don't think
19 that we ever put it in writing.
20        Q.    Okay.
21        A.    It was a challenge.
22        Q.    You're familiar with the WaterSki
23 Magazine?
24        A.    Yes.
25        Q.    Have you reviewed this Exhibit 38, which

Page 89

1 is May 1996?  It's an article written by Rob May
2 called extended pylons?
3        A.    No.  Well, did I read it?  Yes.  But I
4 don't recall what -- you know, what Rob may have
5 wrote.  I'm sure I read it.
6        Q.    For the record, Rob May's name is not on
7 this.  I've spoken to Rob May.
8        A.    Right.
9        Q.    And he told me he wrote this.  So, I'm
10 just going to clarify that.  His name is not on here.
11        I'm going to show you Page 41.  It says
12 while -- it says while the extended pylon helps skiers
13 to fight gravity, some boat manufacturers, Mastercraft
14 and Correct Craft, most notably, aren't jumping on the
15 bandwagon.
16        Now, Mr. Meloon, you just told me that
17 Mastercraft was allowing them to be used on their
18 boat.  Here's an article one month before Borden drew
19 the tower.  It says right here Mastercraft isn't
20 jumping on the bandwagon?
21        A.    Well, jumping on the bandwagon, number
22 one, what's he talking about?
23        Q.    Well, let's read the -- let's read the
24 rest.  Here is a quote from Larry Meddock, who was
25 your employee.  It says any change in the design of

Page 90

1  our products is what we are opposed to, says Larry
2  Meddock, vise president of marketing at Correct Craft.
3          Quote, and any change in the center of
4  gravity is a design change. That's what some
5  after-market products do. That's why we tell our
6  dealers not to install them on Correct Craft boats.
7  We have modified the warning labels on our boats to
8  reflect our opposition to extended pylons.
9          Now, you're familiar with Glenn Sandridge,
10 do you know who he is?
11     A.   Uh-huh.
12     Q.   Okay. Well, the next paragraph, Glenn
13 Sandridge, Meddock's counterpart at Mastercraft has a
14 similar philosophy. We're telling our dealers that
15 some third-party devices can cause a change in the
16 boat's center of gravity. These include extended
17 pylons.
18     A.   Uh-huh.
19     Q.   So, here Mastercraft is going on the
20 record that they don't -- they tell their dealers,
21 don't put them on our boats either.
22          MR. NORMAN: Objection. Mischaracterizes
23     prior testimony and the document itself.
24 BY MR. LARSON:
25     Q.   Now, you know who Tom Helwood (ph) is at

Page 91

1  ECI? He makes Skylons?
2      A.   I -- I don't know if I've met Tom or not.
3  I know ECI.
4      Q.   Okay. Well, the paragraph down below
5  there -- we're on Page 42.
6      A.   Okay. Yeah.
7      Q.   Here it says Tom Helwood of ECI, maker of
8  the Skylon, understands their concern. He says, I'd
9  vote to distance the company from third-party devices,
10 too, he says. That's because of the liability
11 climate. Big companies have big pockets. It's an
12 understandable reaction to a new product.
13          So, here -- here even the manufacturer of
14 these extended pylons is going on the record saying I
15 know why the big companies aren't offering it.
16          Now, Mr. Meloon, you said that your
17 competitors were accepting it. Where in this article,
18 that was written one month before Borden drew up the
19 tower, where does it say that any of your competitors
20 are allowing these to be put on their boats, or
21 embracing them being put on their boats?
22     A.   Well, I think Helwood just spelled it out
23 for you. Sure, talk is cheap. You know, you can say
24 we suggest you don't do that, but you don't
25 necessarily take a stand. That's a marketing twist.

Page 92

1  I mean, that's just a spin.
2      Q.   Well, it says Mastercraft took a stand.
3  They're your biggest competitor.
4      A.   That's -- that was the opinion of the
5  person that wrote this right here, and that says --
6  that's a spin. It's a marketing spin.
7          Yeah. Do you think that Mastercraft is
8  going to come out and -- and disagree with us in
9  writing or in print? But that doesn't mean that's
10 necessarily their stand when they get out in the
11 marketplace or the spin they put on it once they get
12 out there, or how they train their salespeople to
13 sell. You know, it has nothing to do with it.
14     Q.   You just testified that Mastercraft -- or,
15 people are going out there saying, hey, Correct Craft
16 is putting a warning label on it, we don't. Well,
17 here Mastercraft --
18     A.   Did I say that they -- we did and they
19 don't? I said I never saw one. I don't recall.
20     Q.   I mean, how much time did you spend
21 looking for warning labels on other people's pylons?
22     A.   But I mean, usually that's very easy when
23 you go to a boat show.
24     Q.   And you specifically went to boat shows
25 and climbed up on their boats and looked for warning

Page 93

1  labels?
2      A.   I didn't do it in all the boat shows, no.
3  I didn't attend all of them, but I had people that
4  did. I had marketing people. Borden did, Bill Snook
5  did. These people would go out and they were sent out
6  with a directive. Go and take a look at this, check
7  this out, find this out, and let us know what's going
8  on.
9      Q.   But in spite of your warning label you
10 know that those pylons were used on your boats day in
11 and day out?
12     A.   Sure.
13     Q.   And your warning label actually says don't
14 use barefoot booms, too?
15     A.   Exactly.
16     Q.   But you know barefoot booms are used?
17     A.   That's right.
18     Q.   And barefoot booms are dangerous?
19     A.   Exactly.
20     Q.   You can clip someone with a barefoot boom
21 and decapitate them.
22     A.   Exactly.
23     Q.   You can't do that with an extended pylon.
24     A.   You can -- you can do a lot of other
25 things with it, though.

Page 94

1    Q.    You even know that barefoot booms have
2  catapulted boats where people have turned and the --
3  and the boom -- the barefoot boom has plowed in the
4  water and the boats have catapulted.
5    A.    All sorts of things can happen.
6    Q.    And you know that barefoot booms are used
7  on your boats?
8    A.    Yes.
9    Q.    Were you at a competitor disadvantage
10  selling boats to barefooters, because you had a
11  warning label on the boat that say don't use barefoot
12  booms?
13    A.    No.  We -- to some people a salesman would
14  say, well, but take a look at what Correct Craft says.
15  They say don't do that on our boat, you know.
16          I mean, in the marketplace, you know, when
17  you get in the trenches and you're selling boats, it's
18  warfare.  It's ugly.  It doesn't get nice.  And things
19  are said that may not be the stand of the corporation
20  or anybody else.
21          I ride a motorcycle.  Did you ever read
22  the warning on a motorcycle?  Buy it, ride it, die.  I
23  bought it, I ride it.  One day, you know, I may pay
24  the man.
25    Q.    But this warning label was put on there to

Page 95

1  protect the corporation --
2    A.    Exactly.
3    Q.    -- on liability?
4    A.    And that's what -- that's what the
5  motorcycle company tells me, you know, do this, do
6  that.
7    Q.    But you weren't at a competitive
8  disadvantage with your warning label against barefoot
9  booms, because you had a barefoot Nautique.  You were
10  selling that to barefooters, and they're all putting
11  barefoot booms on that boat.
12    A.    They were used primarily for training and
13  teaching barefooting.  In a tournament they never used
14  a boom.  They pulled from the ski pole -- from the ski
15  pole.
16    Q.    But there's a lot of training going on to
17  teach someone how to barefoot?
18    A.    Exactly.
19    Q.    And Ron Scarpa was, you know, one of your
20  athletes and he was a champion barefooter.
21    A.    Exactly.
22    Q.    And he ran a ski school.
23    A.    Exactly.
24    Q.    And he used barefoot booms.
25    A.    Exactly.

Page 96

1    Q.    On your boats.
2    A.    Exactly.
3    Q.    With your knowledge.
4    A.    Yes.
5    Q.    And they were dangerous as all get out.
6    A.    And we had a statement, a policy, and we
7  told him verbally and he was warned.  And if something
8  happened, it's like anything, that's the only thing
9  you've got to stand between, just to distance yourself
10  as far as you can.  Helwood said that.
11    Q.    But what you're saying here in this
12  transcript is, though, is you're saying everybody is
13  raising the ski pole.  And that's not true.  Everybody
14  wasn't raising it.
15    A.    It --
16    Q.    They were available to after-market people
17  who wanted to buy one.
18    A.    Yeah.  And, you know -- okay.  So I blamed
19  the companies.  I didn't blame the after-market people
20  who were doing it.  But they were doing it.  Their
21  boats were, you know -- I mean, a customer would look
22  at us and say what does this mean?  We'd tell them
23  exactly what it meant.  It was dangerous.
24    Q.    And then in Lines 23 to 25 -- or 22, you
25  say we were hesitant to put a tall pylon in the boat.

Page 97

1          Well, Mr. Meloon, what did it matter if
2  you put a tall pylon in the boat when they could go
3  out and buy one after-market anyway?
4    A.    We just tried to separate ourselves -- as
5  Helwood said right here in the article.  Try to put as
6  much space between us and -- and the end-user as
7  possible.
8    Q.    But the end-user was still going out, if
9  they wanted to, and they bought these extended pylons
10  and they did use them.
11    A.    I'm sure.
12    Q.    And you --
13    A.    People are buying stuff and putting them
14  on cars every day that the manufacturer doesn't
15  recommend.
16    Q.    And you knew that they were putting them
17  on the boats?
18    A.    Yes.
19    Q.    And Line 23, it says, and the wakeboard
20  world came to us and says, look, you've got to make
21  some change or we're going to start -- we'll ride
22  other manufacturer's products.
23    A.    Well, they -- there were people who came
24  to us that were in wakeboarding, and there were riders
25  that came to us, you know, and said that, you know, we

Page 98

1  can perform better behind the Skylons than we can
2  behind the lower pole.
3      Q.   Okay.  Who came to you?
4      A.   Well, we had our -- we had our riders come
5  and tell us that it was a problem for them, because
6  they couldn't compete.
7      Q.   And which rider was it?
8      A.   Oh, you had -- gosh, we had three or four
9  riders at that time that made mention of it at that
10  time.  Whoever our contract wakeboarders were.  Jimmy
11  Redmon.
12      Q.   He was a contract wakeboarder?
13      A.   No.  Jimmy Redmon was the -- the man who
14  was credited with starting the sport of wakeboarding.
15      Q.   Okay.  Well, let's just talk about the
16  athletes now.
17           You said the athletes came to you that
18  were under contract and said we can't compete unless
19  we have a tall pylon.
20      A.   They may not have come to me, because they
21  worked primarily with Scott Moore or with Larry
22  Meddock.
23      Q.   But --
24      A.   And they would -- you know, and that
25  report would come back through them to me and say,

Page 99

1  hey, you know, this is what we're hearing in the field
2  and this is the problem we got.
3      Q.   But we just looked in the catalog, Exhibit
4  41, and here -- and here is Dean Lavelle, and you know
5  he had a pylon -- an extended pylon on his boat.
6      A.   Okay.  He had one on his boat, but I don't
7  know that photograph was shot behind his boat.
8      Q.   Okay.  Regardless of where the photo was
9  shot, Dean Lavelle had an extended pylon on his boat
10  in 1996, did he not?
11      A.   I'm assuming that he did in 1996.  I don't
12  know for sure.
13      Q.   And he was one of Correct Craft's
14  athletes?
15      A.   Right.
16      Q.   So, did Dean Lavelle come to you and say I
17  want you to put an extended pylon on your boat,
18  because I already have one on my boat?
19           Why would he say something like that?  He
20  had already had one on his boat.
21      A.   No, he would probably come and tell us
22  from a marketing standpoint that people didn't want to
23  use our boats, because we were -- took such a stand
24  against it, we were so outspoken.
25      Q.   But that's not what you're saying here.

Page 100

1  You're saying the wakeboard world came to us and says
2  you have to make some change or we'll ride other
3  manufacture's products.
4           Did Dean Lavelle ever come to you and say
5  you better put a tall pylon on your boat or I'm going
6  to Mastercraft, I'm going to be on their team?
7      A.   He wouldn't -- I don't know that Dean
8  Lavelle would leave us.  He would probably continue to
9  stay with us, because he had a contract and it was
10  worth something to him.
11      Q.   And he already --
12      A.   It had value.
13      Q.   And he already had what you told -- what
14  you tell us here that he didn't have.  He already had
15  a tall pylon --
16      A.   I did not say he did not have it.  I was
17  speaking in general terms of the people who were
18  competitors, contract skiers of ours, and the people
19  who -- in the hierarchy of water skiing at that time
20  or were the leaders of wakeboarding.
21      Q.   Well, let's take them one at a time.  You
22  just gave me a litany.
23           You started off that your athletes came to
24  you and say we can't compete in the tournaments.  Now,
25  which athletes were it?

Page 101

1           We just saw Dean Lavelle is one of your
2  athletes.  He already had an extended pylon.
3      A.   Did he go to marketing and speak to them
4  and marketing brought it to me?  I don't know how the
5  information came to me.
6      Q.   No.  You said that he can't compete at the
7  tournaments.  How did Dean Lavelle --
8      A.   No, I did not say that Dean Lavelle could
9  not compete.  I said the competitors said that they
10  couldn't compete, and they wanted something higher,
11  because they were always looking, you know, for more
12  air.
13      Q.   Okay.  What competitors?
14      A.   Competitors.  There may be 1500
15  competitors out there.  Maybe only ten of them said
16  anything to us or our representatives, but it was an
17  indication that there was a problem in the future and
18  we may lose our position in the world of wakeboarding
19  if we don't make a change.
20      Q.   Okay.  You're saying a competitor is not a
21  competitor as Mastercraft is your competitor.  You're
22  saying the athlete who competes at a tournament.
23      A.   Exactly.
24      Q.   Okay.  So, there's 1500 wakeboard
25  athletes, you're saying, in 1996?

Page 102

1    A.    I -- I said -- listen, there may be 500,
2  there may be 1,000, there may be 1500.  I don't know
3  the number.  I don't know how many there were out
4  there.  I don't know today how many wakeboarders there
5  are out there.
6    Q.    Okay.  But X number of wakeboarders
7  existed in '96.
8    A.    Uh-huh.
9    Q.    And you're saying those wakeboarders can't
10  compete, because Correct Craft won't put a pylon on
11  their boat?
12    A.    No, they didn't say they won't compete.
13    Q.    They couldn't compete.
14    A.    And they didn't say that they couldn't
15  necessarily.  What they were saying was in the future,
16  you know, this is the way that the sport is going.
17  And it's going to go this way.  And Correct Craft, you
18  need to accept it.
19          I may have stated that in totally
20  different terms than that, but the bottom line is the
21  same.  We were number one in the wakeboard -- you
22  know, towboat in the wakeboard world, and we may have
23  lost that position had we not made a change.
24    Q.    But you state here on Line 25 that these
25  people in the wakeboard world came to you and says

Page 103

1  we're going to ride other manufacturer's products.
2  That means they're going to go buy someone else's boat
3  instead of your boats.
4    A.    And they may well have if -- you know, if
5  we continued to -- you know, along the line that we
6  did and lost our position as the number one innovator
7  in wakeboarding.
8    Q.    But you weren't preventing people who
9  bought their own boat from putting poles --
10    A.    And I cannot.
11    Q.    -- on their boats.
12    A.    I can't prevent you from doing it if you
13  want to do it.
14    Q.    Your own athlete, Dean Lavelle, had a tall
15  pole in his boat.
16    A.    Yes, he did.
17    Q.    And you know that other wakeboarders with
18  your boats were using day in and day out, those tall
19  poles?
20    A.    Right.
21    Q.    So, who is threatening you, because
22  they're going to stop buying your boats, because
23  you're preventing them from doing something that
24  everybody is doing anyway?
25    A.    That -- these threats may have come to us

Page 104

1  not as a threat.  That may be the wrong term, and, you
2  know, so be it if that was the wrong term that I used,
3  but the information came back to us through
4  competitors, through -- which are wakeboarders, not
5  Malibu or anybody else, and through our skiers, and
6  through the wakeboarding people who were in the
7  hierarchy of it who were in the organization or were
8  putting the organization together, that there was a
9  future move and that that was the direction of it, and
10  we may well lose our position if we did not allow it,
11  because they would probably allow taller -- at that
12  time they were looking at putting taller booms in
13  the -- in the events --
14    Q.    Now, in what --
15    A.    -- to give better performance.
16    Q.    Now, in what events?  In 1996, tell me
17  what wakeboarding events there were that all these
18  people were competing with?
19    A.    Oh, gosh, you had -- you had local
20  tournaments, you had regional tournaments, you had
21  national tournaments, you had world tournaments.
22    Q.    What do you know about the X-Games?
23    A.    X-Games, you know, that was a Mastercraft
24  event and I don't know too much about it other than
25  it's considered an extreme sport --

Page 105

1    Q.    Wasn't the --
2    A.    -- wakeboarding is.
3    Q.    Wasn't the X-Games, the wakeboarding
4  X-Games one of the first big wakeboarding tournaments?
5    A.    Yes.
6    Q.    And --
7    A.    When -- when you say one of the first, it
8  was probably, by recognition, you know, the most
9  notable at the time, because of the TV coverage and
10  everything else.
11    Q.    And the first X-Games was put on ESPN?
12    A.    I believe it was, yes.
13    Q.    And that's pretty much what put
14  wakeboarding on the map?
15    A.    Wakeboarding was going very rapidly prior
16  to that.  It certainly did not hurt it, and it
17  couldn't do -- it could not do anything but help it.
18    Q.    Now, you know that the first wakeboarding
19  X-Games was in 1996?
20    A.    I assume that it was.
21    Q.    How do you assume that?
22    A.    Well, I just -- you asked me the question
23  and I would assume that you had the information
24  available and it was reliable.
25    Q.    I'm going to show you what I'm marking as

Page 106

1  Exhibit 63.
2          (Whereupon, Plaintiff's Exhibit Number
3      63 was marked for Identification)
4  BY MR. LARSON:
5      Q.   This, for the record, is a screen shot of
6  the ESPN site.  And over here (indicating) there is a
7  drop-down, and this says 1995 X-Games Number I, which
8  would say X-Games 1996 was Number II.
9          If you flip the page over -- actually, to
10 the last page under 1995 men's wakeboarding, it says
11 event not held.  1996, it says Parks Bonifay won it.
12         So, is this a fair explanation that, you
13 know, the first big publicized wakeboarding
14 competition was in 1996?
15         MR. NORMAN:  Objection.  Lack of
16     foundation.
17         THE WITNESS:  That would be their claim to
18     fame, and I couldn't argue with it.
19 BY MR. LARSON:
20     Q.   And do you know that they towed that
21 tournament with a low pylon or a tall pylon?
22     A.   I don't have any idea how they towed it.
23     Q.   Now, after this point in time in 1996 when
24 they had the second X-Games, and the first
25 wakeboarding tournament, did Mastercraft come out with

Page 107

1  a specific wakeboarding boat called the X-Star?
2          MR. NORMAN:  Objection.  It assumes facts
3      not in evidence.
4          THE WITNESS:  I believe that was when they
5      came out with it.
6  BY MR. LARSON:
7      Q.   And is that the first boat that you know
8  of that had an extended pylon put on it?
9      A.   I don't know that that was the first boat.
10     Q.   I'm going to show you what's previously
11 been marked as Exhibit 38.16, 38, dot, 16.  There's an
12 article in September 1997 out of Boating World.
13         Now, is this the first article -- well,
14 strike that.
15         Have you seen this article before?  Are
16 you aware of this?
17         If you turn the page it will talk about
18 the X-Star.
19     A.   I don't recall that -- if I did read this.
20     Q.   Mine's in color.  You can look at it.
21     A.   Okay.
22     Q.   It says a star has been born.  It shows a
23 Mastercraft with an extended boom on it.
24     A.   Uh-huh.
25     Q.   Is that the first time Mastercraft ever

Page 108

1  used an extended boom in a tournament?
2      A.   I do not know.
3      Q.   But would you dispute that?
4      A.   As it being the first?
5      Q.   Uh-huh.
6      A.   No, I don't.
7      Q.   So, that's in September of '97?
8      A.   Is that the truth?  I don't know.
9      Q.   Well, that's when the article is dated?
10     A.   Yeah.
11     Q.   Now, Borden designed the tower in June of
12 1996, over a year and months before that article?
13     A.   Uh-huh.
14     Q.   So, where is the evidence that other
15 people were towing tournaments with a tall pylon?
16     A.   Whether they were towing them with tall
17 pylons or not was not the issue.  The issue was that
18 they were in the field, they were being used by the
19 professionals, and the professionals were wanting them
20 adopted and put into the world tournaments.
21         And that word came to us that, you know,
22 we're going to have to make a change in the rules,
23 and, therefore, Correct Craft, you're going to lose if
24 you don't make a change.  And, basically, that's what
25 it boiled down to.

Page 109

1      Q.   But what world tournaments were pulling in
2  1996, that you had to make a change and start --
3      A.   Oh, I don't know that we were pulling a
4  world tournament at that time.  We probably were.  I
5  don't have the schedule of the tournaments we pulled
6  in 1996.
7      Q.   Well, you just said you were going to be
8  out of this wakeboarding business, because you're
9  pulling tournaments, and unless you adopted this tall
10 pylon, you would be at some competitive disadvantage.
11     A.   Yeah, in the future.  We were told that we
12 were going to be at a disadvantage.
13     Q.   But what tournaments were you pulling that
14 you were going to be at a disadvantage at?
15     A.   Probably every tournament we were in,
16 because everybody bids on every tournament that comes
17 up.  It's very competitive.  Every tournament that I
18 pull, Mastercraft wants it.  Every one that they pull,
19 I want it.  It's very competitive.
20     Q.   But haven't we asked Correct Craft for
21 documentation of these tournaments?
22         MR. NORMAN:  Objection.  Lack of
23     foundation.
24         THE WITNESS:  I don't have any idea
25     whether you've asked Correct Craft for them or

Page 110

1    not.
2  BY MR. LARSON:
3      Q.    I want you to look at Exhibit 22.  This is
4  38-22.  And, for the record, this is a contract
5  between Correct Craft and World Sports of Marketing.
6          Are you familiar with that contract?
7      A.    I believe I've seen this before, yes.
8  Cafe de Columbia.
9      Q.    And what is that contract?
10     A.    Well, it's a sponsorship for three years
11  of a tournament.
12     Q.    And it's dated in December of 1997?
13     A.    Yeah.  Uh-huh.
14     Q.    Have you seen any contracts to tow
15  wakeboard tournaments prior to this agreement?
16         MR. NORMAN:  Objection.  Lacks predicate.
17         THE WITNESS:  Most of the -- no, because
18     this was with World Sports Marketing, which was
19     a take -- a branch, or -- of the WaterSkier
20     Magazine, which was World Publications.  World
21     Publications was The Corporation.  These were
22     separate entities under it.
23         And, at that point, if you made an
24     agreement, the agreement that you would make
25     would be with individuals or individual

Page 111

1      tournaments as they were available, because
2      people come to you every day and say we are
3      going to put a tournament on, and do you want to
4      sponsor it, and it's going to cost you X number
5      of dollars and you say yes or no.
6  BY MR. LARSON:
7      Q.    How about before June of 1996, what
8  wakeboard tournaments did you pull back then where the
9  height of the towing point became an issue?
10         MR. NORMAN:  Objection.  Asked and
11     answered.
12         THE WITNESS:  I don't -- you know, when it
13     became a towing issue was based on the fact that
14     these youngsters wanted more air.  They wanted,
15     you know, to get to perform their tricks.
16  BY MR. LARSON:
17     Q.    And when did you ever --
18     A.    And the future was, you know, going to be
19  in this direction.
20     Q.    And when did you ever get turned down for
21  a towing position, because you refused to use a tall
22  pylon?
23     A.    I don't -- I don't know that we were
24  turned down at that time.
25     Q.    When did you ever -- when were you ever

Page 112

1  threatened to be turned down?
2      A.    The threat came to us as information based
3  on what was happening out in the field, and what
4  tournament sponsors were wanting to do, what the
5  riders wanted to do in the future in the direction of
6  the sport.
7          And, you know, we took that advice.  When
8  somebody comes in and gives you good advice, you take
9  it.  So, we set to -- to do something about it.
10     Q.    Now, you mentioned Jimmy Redmon.
11     A.    Uh-huh.
12     Q.    How is Jimmy Redmon involved in any of
13  this?
14     A.    Jimmy Redmon and another young man are
15  credited for, you know, inventing the sport of
16  wakeboarding.
17     Q.    How does -- how does Jimmy Redmon figure
18  into inventing the tower?
19     A.    Jimmy Redmon didn't.  He was one of them
20  that came to us and gave us the warning that, you
21  know, you're losing your position, you're going to
22  lose more position if you don't make a change.
23     Q.    But what position did you have and what
24  position were you losing?
25     A.    We were the number one choice in

Page 113

1  wakeboarding, and he came and told us what the
2  direction was that people were talking and looking to
3  do, and doing in practice.  And that was going to be
4  adopted, because they were putting pressure on him and
5  the other people who organized to give them a higher
6  tow point.
7          And he said the pressure being put on us,
8  we're going to have to make some changes.  You're
9  going to have to make changes, Correct Craft, if
10  you're going to stay number one in the world of
11  wakeboarding.
12     Q.    But what authority did Jimmy Redmon have
13  to go out and, you know, negotiate these towing
14  contracts or negotiate the height of the pylons?
15     A.    He was just -- yeah, he was recognized as
16  the -- you know, the man of the hour.  He was the man.
17  I mean, he was the first there, he was the one that --
18  he -- I mean, everybody looked to Jimmy Redmon for
19  direction in the world of wakeboarding.
20     Q.    Did he ever hire Correct Craft to be a tow
21  boat?
22     A.    He didn't hire us.  We sponsored some of
23  the events that he had.
24     Q.    And under what name did he have these
25  events?

Page 114

1    A.    I don't know.  Could be various names.  It
2  could have been Jim -- you know, Jim Bob's World of
3  Wakeboarding, or something else.  I mean, it's -- it's
4  just whatever struck their fancy they would give it a
5  name.
6    Q.    Yeah.  But you pulled for that name.  I
7  mean, did you have a contract with Jim Bob's event?
8    A.    Probably not.  Probably he came to us and
9  said, look, I've got an event, will you pay 50,000 to
10  pull it, or will you pay 25, or will you pay, you
11  know, 100,000.
12      Whatever the figure he thought it was
13  worth, because I'm going to give you TV, and we are
14  going to have ESPN there, and we're going to have
15  this, and we're going to have -- you know, and he
16  gives you all his marketing and sales pitch, and
17  you make up your mind; do you want to pull his
18  tournament or don't you.
19    Q.    Do you know of any specific tournament
20  that you actually pulled for him where he came to you
21  and says, hey, you want to pay $50,000, and you said
22  yes.  Tell me the name of that tournament.
23    A.    I don't know what tournament.  It may have
24  been that, it may have been less, or it may have been
25  more.

Page 115

1    Q.    Isn't it true that Jimmy Redmon never had
2  a contract with Correct Craft until 2005?
3    A.    That's quite possible.  Quite possible we
4  worked with him on a -- on a handshake basis or just
5  friend to friend.
6    Q.    Isn't it true that he didn't even work
7  with you on a handshake basis and that he was working
8  through what we're looking at here, if he was working
9  at all, through Exhibit 22 with World Sports and
10  Marketing?
11    A.    That was at this time he was, but there
12  was wakeboarding that was going on prior to this.
13    Q.    And where are those -- where are those
14  contracts where you actually signed contracts?
15    A.    We may not have signed contracts.
16    Q.    Well, you would pay $50,000 for an event
17  to go do something and you didn't even have --
18    A.    I said --
19    Q.    -- know what the deal points were?
20    A.    I said it may be 25, it may be 50, it may
21  be 100 depending on -- when he came in and gave you
22  the sales pitch, you know, you listen to him and you
23  say, wait a minute, that's a lot of blue sky, or you
24  make a decision.  You do it or you don't.
25    Q.    When did Jimmy Redmon ever come and sit

Page 116

1  down with you at your office?
2    A.    Jimmy Redmon would work through Larry
3  Meddock in marketing.
4    Q.    So, you're saying Jimmy Redmon actually
5  came down and sat down with Larry Meddock here in
6  Orlando?
7    A.    He may have talked to him on the
8  telephone, he may have talked to him on tournament
9  sites in different locations.  He may never have come
10  to Orlando during that period.
11    Q.    So, you don't know?
12    A.    When you say I don't know, I don't know
13  what --
14    Q.    You don't know if he sat down and talked
15  to Mr. Meddock or you're just guessing?
16    A.    No.  Larry Meddock would come to me if he
17  had something to present, and try to sell me on the
18  idea and I would say yes or no.
19    Q.    When did you ever talk to Jimmy Redmon?
20    A.    Oh, we had phone calls, we talked on
21  tournament sites several times.  I considered him a
22  friend, he considered me a friend.
23    Q.    And when he -- so, you're saying Jimmy
24  Redmon talked to you and he told you that if you don't
25  raise the pylon height you're going to be out of

Page 117

1  the --
2    A.    I don't know that the correct term is he
3  talked to me personally.  The information came to us,
4  and as I said, it probably came to us through
5  marketing or one of the event managers.
6    Q.    So, you don't recall a specific call where
7  Jimmy Redmon called you and says, hey, Walt, you know,
8  everyone is raising the tow point out there.  If you
9  want to keep pulling tournaments you've got to raise
10  the tow point?
11    A.    He told us that was the direction of the
12  future, that it was going to happen in -- you know,
13  his organization or the tournaments would have to make
14  a choice then as to whose boat they were going to use.
15    Q.    And what was his organization?
16    A.    Well, it was -- World Wakeboarding, I
17  think, was the eventual organization that he
18  established.
19    Q.    What, the World Wakeboard Association?
20    A.    I think it was, yes.
21    Q.    But wasn't that established with Larry
22  Meddock a year, 11 months after Borden thought up the
23  tower?
24    A.    Quite possibly, yes.
25    Q.    Do you know if Mr. Redmon had any

Page 118

1 organization in June of '96?
2    A.   It was probably a one-man band.  If he had
3 an organization, it was one-man band.
4    Q.   And that one-man band, did he ever call
5 you specifically and tell you, hey, Walt, you've got
6 to raise the towing height of this or people aren't
7 going to use you as an official towboat anymore?
8    A.   I don't know that he -- when you say
9 called me, it's quite possible that we had those
10 conversations standing on the -- a tournament site.
11 He would say, Walt, have you talked to Larry or, you
12 know, has Larry delivered this message to you, are
13 you-all going to make changes?  You know, it could
14 have been any part of a conversation.  I talked to him
15 all the time.
16   Q.   Do you have any notes of those
17 conversations?
18   A.   No.
19   Q.   When Borden brought the tower in on June
20 30th of 1996, did you call up Jimmy Redmon and say,
21 Jimmy, we solved the problem?
22       MR. NORMAN:  Objection.  Mischaracterizes
23   his prior testimony.
24       THE WITNESS:  I don't know that we called
25   him and told him we had solved the problem.

Page 119

1 BY MR. LARSON:
2    Q.   Did you jump up in that meeting and yell,
3 eureka, we've solved the problem, we can still be
4 number one in the wakeboarding?
5    A.   I -- I'm not given to impulse to jump up
6 and holler eureka about anything.
7    Q.   Did you make any excited utterance that we
8 can still stay number one, because now we've just
9 solved the problem?
10   A.   Oh, I'm -- I'm sure that after they -- you
11 know, after they did the testing of it and came back
12 with the results of it, that I was elated as everyone
13 else was.
14   Q.   Okay.  Let's go turn -- change subjects
15 here a little bit.  Let's go back to this transcript
16 and let's go look at 140, Page 140.
17       MR. NORMAN:  Do -- what are we planning to
18   do -- and this is really the witness's question
19   for lunch.  Do you want to try to work through
20   and get done earlier today, do you want to take
21   a break?  What would you like to do.
22       THE WITNESS:  It's -- hey, I blocked out
23   the whole day.  I'm like you.  I blocked out the
24   day.  Somebody gets hungry and wants to eat,
25   I'll eat.  If -- you know, if we don't, I can

Page 120

1 survive on that stuff.
2       MR. NORMAN:  What's your plan, then.
3       MR. LARSON:  It's up to you.
4       COURT REPORTER:  I'm good to go.
5       MR. LARSON:  All right.  I'm good to go.
6 BY MR. LARSON:
7    Q.   Okay.  Let's look at 140.
8    A.   If I'm on the floor and not responding,
9 you know I went past my lunchtime.
10   Q.   If you die and don't fall over --
11   A.   Yeah, push me over.
12   Q.   Okay.  Let's look at Page 140.  Lines 3
13 and 4, you say, oh, we had professionals using the
14 boat and they're backing away from us, they're back
15 being away from them.
16       Now, what professionals were using your
17 boat and which professionals were backing away from
18 you?
19   A.   Well, backing away probably was not, you
20 know, the best description of what was happening.
21 They were -- you know, they were talking to us
22 directly and saying, you know, look, this is what we
23 got to have.  You guys got to do it.  Help us.  Do
24 something, you know.
25       Which is an indication that, you know, if

Page 121

1 you don't do something, and you don't resolve the
2 issues, they're going to be looking for somebody else.
3    Q.   But you're saying that people were backing
4 away.  So, today you're saying that, well, they didn't
5 really back away?
6    A.   When I say backing away, they're coming to
7 us and saying to us, look, you know, this has got to
8 happen.  This is the way it's going to go.  Are you
9 going to be there?  Are you going to make a change
10 Correct Craft?  Are you going to do it.
11   Q.   And were they telling you all these other
12 boat companies are using the tall pylons but you?
13   A.   No.  Basically the conversation was that,
14 you know, you people or so vocal about this thing,
15 because, you know, you put the warning labels on the
16 boat, you know, you teach the dealers to tell the
17 customers don't do it.  You know, guys, you got to fit
18 into the world like everybody else.
19   Q.   So, they're telling you to lighten up on
20 the warnings labels?
21   A.   No.  They're telling us to -- to -- yeah,
22 I guess it would be to lighten up, because they wanted
23 a higher tow point.
24   Q.   But they were putting them on the boats
25 anyway.

Page 122

1    A.    Right.  But, you know -- so these are
2  friends or these are people who come to us and they're
3  concerned, and they say, hey, you know, this is a --
4  this is a situation Correct Craft.  Do something.
5    Q.    But nobody was backing away from you,
6  because you had a warning label.
7    A.    Some may have.  I don't know that
8  anybody -- you know, we don't run surveys to see how
9  many people didn't buy our boat because of the warning
10  labels.
11    Q.    And what about people who refused to go
12  ski in a tournament, because you weren't towing it
13  with a tall pylon?
14          Did you find people -- you know,
15  professional skiers who said, I'm not going to go to
16  that tournament, because you're pulling with a low
17  pylon?
18    A.    I don't know that that happened, because
19  at this time the tall pylon had not been used, or had
20  it been accepted as a part of the tow equipment for
21  the tournaments, but it was being used in training
22  every day and the wakeboarders saying that is what we
23  want to perform behind.  That is what we want.
24    Q.    So, the wakeboarders, then, and the Jimmy
25  Redmons of the world were telling Mastercraft the same

Page 123

1  thing they were telling you, because Mastercraft
2  wasn't towing a tournament with a tall pylon, and you
3  weren't towing a tournament with the tall pylon.  They
4  were going to both of your companies and saying, hey,
5  we train with tall pylons, we want a tournament with
6  tall pylons.
7          MR. NORMAN:  Objection.  Calls for
8      speculation.
9  BY MR. LARSON:
10    Q.    Isn't that true?
11    A.    I would assume that he did.  I mean, I
12  would like to think that his allegiance was to us
13  alone and he didn't saying anything to them, but I
14  wouldn't suggest that that happened.
15    Q.    Okay.  Let's go down to 16 and 17.  And 16
16  is a question:  At that point, did you talk to your
17  engineering department?
18          Your answer:  Yes, we had some long
19  conversations as to what to do and how to do it.
20          Question:  Your engineering department at
21  that time was made up of whom?
22          Answer:  Engineering at that time was Bill
23  Snook and Borden Larson.
24          Well, my question to you is in Line 18 and
25  19 you had long conversations as to what to do.  Now,

Page 124

1  when did you have those conversations?
2    A.    Well, it could have been over lunch, it
3  could have been right after breakfast, it could have
4  been mid-afternoon, it could have been on a telephone
5  call, you know that we -- that I talked to the
6  different people in the organization and said, you
7  know, and they would say that, and -- you know.  I
8  mean, those -- those conversations go on every day --
9    Q.    And who were they with?
10    A.    -- in a corporation.
11          It could have been with any of the
12  managers, any one of the sales reps, anyone that I was
13  associated with or responsible for.
14    Q.    Do you have any evidence that that
15  conversation was with Borden Larson?
16    A.    I would assume that he was a part of some
17  of those conversations or a party to them.
18    Q.    Now, if he had those conversations with
19  you, why would he be writing memos later stating that
20  he thought up this tower, because of the bimini top
21  and storing skis on top?  Why wouldn't he say in the
22  memo he thought the tower up, because of these long
23  conversations?
24          MR. NORMAN:  Objection.  Calls for
25      speculation.  Mischaracterizes his prior

Page 125

1      testimony and the documents.
2          THE WITNESS:  I have no idea what his
3      intentions were, what his thoughts were when he
4      wrote that.
5  BY MR. LARSON:
6    Q.    And when you read those, did you have any
7  inclination to go to him and correct him and say,
8  Borden, man, I don't know about this bimini top idea,
9  but, you know, you knew we had long talks about this.
10  Why are you saying that you thought about this,
11  because of a bimini top and using it as a cartop
12  carrier of sorts to store skis?
13    A.    Why would I go to him and say that?
14    Q.    Because he's saying something that you say
15  is false today.
16    A.    When I said it's false?  What did I say
17  was false?
18    Q.    You're saying that you had long
19  conversations -- and you're saying that Borden Larson
20  was there -- about what to do with this extended
21  pylon --
22    A.    I'm sure he was there for part of the
23  discussions.
24    Q.    Which ones and on what day?
25    A.    It didn't -- I mean, I -- in the world

Page 126

1 that I operate in when I was running the company, that
2 could have been any day, it could have been any time,
3 it could have been any place.
4    Q.    Have you ever -- you know Borden Larson?
5    A.    Do I know Borden Larson?  Yes, I know
6 Borden Larson.
7    Q.    Do you know him a man of truth or a man of
8 lies?
9       MR. NORMAN:  Objection.  Calls for
10    speculation.
11       THE WITNESS:  I would have to assume that.
12    And I -- you know.
13 BY MR. LARSON:
14    Q.    So, you worked with him for 16 years and
15 you don't know if he was a man of truth or man of
16 lies?
17       MR. NORMAN:  Objection.  Calls for
18    speculation.  Vague.
19       THE WITNESS:  Again, I would have to
20    assume that he was a man of truth, but I mean,
21    that's an assumption on my part, because I do
22    not know the man on a personal basis.  We were
23    not social friends, we were not personal
24    friends.  If we were -- you know, we worked
25    together.

Page 127

1 BY MR. LARSON:
2    Q.    But both Bill Snook and Borden Larson
3 wrote you two memos a day apart not saying anything
4 about these long conversations.  Why didn't you go to
5 Bill Snook and say, Bill, man, we had long
6 conversations about that.  Why aren't you saying that
7 in the memos?
8    A.    You know, why would I ask him why he
9 did -- made a statement in a memo when he's writing a
10 memo to me for clarification, or to be sure he's on
11 the right track, or asking me, or, you know, direction
12 or something else?  I mean, I don't know what his
13 thought process was when he wrote the memo.
14    Q.    But when you got the memos, did you know
15 that they were false?
16    A.    When I -- when you say false, what do you
17 mean by false?
18    Q.    Well, if the memos didn't say about where
19 the tower came about -- you know, you're saying here
20 this tower came about because of these long meetings.
21       And when you wrote -- asked Borden and
22 Bill to write you memos about where the tower came
23 about, the memos didn't say anything about these long
24 meetings.
25    A.    Maybe they forgot about them.  Maybe they

Page 128

1 didn't think they -- you know, that that had anything
2 to do with that particular, you know, time and place
3 and -- that he wrote the memos.  I don't know.
4    Q.    And you didn't do anything about the memos
5 with either Borden or Bill, say hey, you know, we had
6 long talks about this.  You know, it would be better
7 if you put that in the memo?
8    A.    There would be no reason for me to do
9 that.  Maybe -- I mean, if they wrote me a memo we
10 probably had a conversation after that.  What was the
11 conversation we had after that, I don't recall.
12    Q.    Okay.  Let's look at 23 -- 22 and 23.
13       You go, engineer at the time was Bill
14 Snook and Borden Larson.  Isn't it true that in 1996
15 Borden worked for Mike Elrod in manufacturing and
16 wasn't even in engineering?
17    A.    He -- he did work under Mike Elrod, but he
18 was very much a part of the team that did the
19 engineering, and the research, and the development,
20 and all the rest of it by virtue of the fact that a
21 lot of what he and Bill did depended on what Mike
22 Elrod could do in production.  And so he would -- you
23 know.  Well, we would look at both of them as being
24 team members or working together, or -- you know.
25    Q.    But Borden Larson was not in engineering

Page 129

1 in June of '96; isn't that correct?
2       MR. NORMAN:  Objection.  Asked and
3    answered.  Mischaracterizes prior testimony.
4       THE WITNESS:  By description of his job,
5    probably it would be assumed that he wasn't, but
6    by function of his job he was.
7 BY MR. LARSON:
8    Q.    What about Jodie Seal (ph)?  He was
9 actually working in engineering at that time; isn't
10 that correct?
11    A.    Yeah.  Jodie serviced our promo boats and
12 worked with Bill in testing, and --
13    Q.    And he worked on testing pylons?
14    A.    I would assume that if they were testing
15 pylons, he did, yes.
16    Q.    And he worked on testing a lot of
17 different mechanical aspects of the boat?
18    A.    Yes.  From an engineering standpoint it
19 was very necessary.
20    Q.    And why didn't you talk to Bill Snook and
21 Jodie Seal and tell them to go solve this problem?
22    A.    Jody Seal's job function probably did not
23 qualify him to do that at that time, and that was a
24 decision that I had to make.
25    Q.    What do you mean his job function didn't

Page 130

1 qualify him?
2    A.   Well, he may be testing other things or
3 doing other things by direction of Bill or by request
4 of somebody of the engineering department, and he was
5 assigned to another task.
6        He may have been at an event.  He traveled
7 quite a bit going to events to see to it that the
8 equipment functioned properly while it was being used
9 in the events.
10   Q.   So, you say he might have been busy?
11   A.   Could have been, yes.
12   Q.   But Borden could have been busy, too?
13   A.   He could have, yes.
14   Q.   So, you don't know if Jody Seal was
15 available after you had these long conversations?
16   A.   There was no reason that I would
17 particularly know that he was or wasn't, because of
18 the schedule.  He didn't report to me directly when he
19 was or wasn't there or someplace else.
20   Q.   Okay.  Now, 24 and 25, the question is:
21 What task -- and the verbiage a little bit odd -- but
22 in essence, what task did you give to Mr. Snook and
23 Mr. Larson to do.  Isn't that pretty much the way it
24 reads?
25   A.   Yeah.  Pretty much.

Page 131

1    Q.   And your answer -- and again, it doesn't
2 answer that question directly -- but you're saying
3 that I gave a task to Mr. Snook and Mr. Larson.  And
4 your answer on the next page, 141:  Well, the
5 challenge was to do something so that we could compete
6 in the world, enhance the performance of the boat,
7 plus enhance the performance of the wakeboarders at
8 the time.
9        So, you're telling the trial that you gave
10 Borden and Mr. Snook a task, or a challenge.  You told
11 them it was a challenge.  So, you're saying
12 specifically that you sat down with Borden and
13 Mr. Snook and said, gentlemen, we've got a challenge
14 to do something in this world, to be -- in the ski
15 wakeboard world to be effective.
16       Now, when did you ever sit down with
17 Mr. Snook and Mr. Larson?
18   A.   It could have been any day of the week
19 that they were on duty and at their job and
20 functioning.  It could have been any time.
21   Q.   So, you specifically remember sitting down
22 with the two of them and giving them this task.
23   A.   I don't know that I could give you the
24 time of day when wet he sat down and discussed it,
25 because he had a lot of discussions on a lot of items

Page 132

1 at different times.
2    Q.   Do you specifically remember sitting down
3 with both of them on this item?
4    A.   It -- it quite possibly could have been in
5 a manager's meeting where they were both there at the
6 time, where Borden was asked to come in because of
7 the -- you know, the situation that we were looking
8 at, and -- and asking he and Bill to do something.
9    Q.   And you would have minutes of those
10 management meetings?
11   A.   If there's -- was minutes taken they would
12 be, yes, somewhere in the files.
13   Q.   And those minutes are important historic
14 documents for Correct Craft?
15   A.   I don't know that they're historically
16 important.
17   Q.   But you do keep the management minutes in
18 the company?
19   A.   I'm assuming that the company retains
20 those records.
21   Q.   You don't have any policy to destroy
22 management minutes?
23   A.   In -- in what way?  I mean --
24   Q.   In any way.
25   A.   We have a retention policy.

Page 133

1    Q.   Okay.  But management minutes is historic
2 information as to decisions the company makes.  I
3 mean, do you destroy decisions the company makes so
4 nobody knows what happened five years ago or ten years
5 ago?
6    A.   It all depends on -- on what your
7 retention policy states.
8    Q.   What is the retention policy for
9 management meeting minutes?
10   A.   I do not know what the retention policy
11 states.
12   Q.   What was it --
13   A.   I don't recall it.
14   Q.   What was it while you were president?
15   A.   There were certain things that legally we
16 had to keep forever and certain things that we could
17 get rid of.
18   Q.   Did you ever call a meeting and say, hey,
19 it's time that we throw out all our management minutes
20 from --
21   A.   No.  That was -- that was set up based on
22 a tickler file and a calendar, as far as I know.
23   Q.   And have you ever seen a tickler file that
24 says we're going to destroy management minutes?
25   A.   No.  That was the function of a secretary.

Page 134

1  If that was the policy, she would follow that policy.
2      Q.   And have you ever seen anything in writing
3  that says we're going to destroy management minutes --
4  management meeting minutes?
5          MR. NORMAN:  Objection.  Asked and
6      answered.
7          THE WITNESS:  I think I just answered that
8      and -- you know.
9  BY MR. LARSON:
10     Q.   Well, I think you said it was a function
11 of a secretary.
12         But I'm trying to find out --
13     A.   No.  It was a function of the retention
14 policy.  The secretary merely followed the policy and
15 the calendar.  And if it fit in that description or in
16 that period or the policy under which the retention
17 records were kept, then she would take care of it.
18 She would keep those forever that we had to keep and
19 destroy those that the retention policy said could be
20 destroyed.
21     Q.   Were you ever in a meeting where you
22 discussed what your retention or your destruction
23 policy was going to be?
24     A.   The only meeting I remember is that we
25 decided to set up a retention policy at the advice of

Page 135

1  our -- at -- I think we had questioned legal advice on
2  it, and they said that there was certain things we
3  could and couldn't.  Some things we had to under
4  corporate law.
5      Q.   And when was that meeting?
6      A.   Oh, it could have been -- it could have
7  been as much as 20 years ago.
8      Q.   Is that the only meeting that you
9  remember?
10     A.   There was no reason to meet after that to
11 make a decision to destroy or not to destroy once the
12 policy was established.
13     Q.   And how much destruction of documents
14 happened after that meeting?
15     A.   I don't have any idea.
16     Q.   You didn't monitor that?
17     A.   I don't recall.  No.
18     Q.   Okay.  Page 141, Line 9 and 10.  And
19 Mr. Snook and Mr. Larson went off to their little
20 area.  Did they come back to one of your management
21 meetings with an idea?
22         Answer:  Yes, they did.
23         When did Mr. Snook and Mr. Larson go off
24 to the little area?
25     A.   Well, sometime after -- you know, we had

Page 136

1  the discussion of what we were -- you know, we needed
2  to change and gave them the challenge and they went.
3  I don't know exactly what the dates, nor do I recall
4  the dates and the time.
5      Q.   How do you know they went together?
6      A.   I don't know if they went together.  One
7  may have gone to lunch and the other gone to the
8  bathroom.  I don't know.
9      Q.   How do you know they worked on it
10 together?
11     A.   I would assume that since the CEO gave the
12 challenge to both of them that they would.  Now, did
13 they sit down and work side by side?  I don't have any
14 idea that they did or didn't.
15     Q.   Now, have you talked to Mr. Snook about
16 this any time recently?
17     A.   No, I have not.
18     Q.   Would it surprise you that he says this
19 never happened either?
20         MR. NORMAN:  Objection.  Mischaracterizes
21     his prior testimony.
22         THE WITNESS:  I -- I don't know what his
23     intent or -- you know, interpretation of that
24     situation was.
25 BY MR. LARSON:

Page 137

1      Q.   Okay.  And 12, your answer:  Yes, they
2  did.  They went out and did a little research and came
3  back.
4          Question:  And what did they present to
5  you?
6          Answer:  Basically they presented to us
7  the original tower that we had built and put on the
8  boat.
9          So, you're saying here that Borden and
10 Bill were given this challenge.  They went out
11 together to a little area.  They came back and
12 presented you the tower.  And the presentation of the
13 tower was on the August 30th meeting that we looked at
14 when we started this deposition?
15         MR. NORMAN:  Objection.  Mischaracterizes
16     his prior testimony.
17 BY MR. LARSON:
18     Q.   Is that correct?
19     A.   I -- I would assume that's the way it
20 came about.
21     Q.   Now, where in the minutes of that August
22 30th min -- meeting does it say that Bill came in with
23 anything?
24     A.   I don't know that it did.  I don't know
25 that it didn't.  And I don't know why it would.  They

Page 138

1 asked me a question and I gave them the answer, to the
2 best of my knowledge.
3          And, you know, the challenge was given to
4 them and they came back and who brought it in the room
5 actually, I don't know. I don't recall.
6     Q.   Now, Robert Todd called you sometime in
7 late 1997 claiming that he was the inventor?
8     A.   I don't know that Robert called me. I
9 don't recall.
10    Q.   Do you recall going to Borden and to Bill
11 and saying, hey, I need to know about how this tower
12 got conceived?
13    A.   Probably did, yes. Looking for a time
14 line or, you know, some information to refute that.
15    Q.   I'm going to show you what's been marked
16 as Exhibit 17, which for the record is Borden Larson's
17 memo of October 20, '97, and actually Bill Snook's
18 memo of the next day. Are you familiar with that
19 document?
20          Now, Mr. Meloon, the first memo here is
21 Borden's October 20th, 1997 memo to you.
22    A.   Uh-huh.
23    Q.   And it says, Walt, the flight control
24 tower as we know it today began sometime in the month
25 of June 1996, when I was working on concept drawings

Page 139

1 for the '98 Sport Nautique. It says I was struggling
2 for a better way to store skis and wakeboards and I
3 thought about sticking them on top of the bimini top.
4 That idea evolved into a welded arch that we welded to
5 the boat.
6          Now, Meloon, where does it say in here
7 that Borden was working on a challenge to resolve the
8 issue raised by the wakeboarders to raise the height,
9 the tow height?
10    A.   Why would he say anything about the
11 challenge? He obviously answered what he thought was
12 my question, and gave me, obviously, what he thought
13 was the information I was looking for.
14    Q.   But where does it say that he was working
15 on a challenge?
16          MR. NORMAN: Objection. Asked and
17       answered.
18          THE WITNESS: Yeah. That's --
19 BY MR. LARSON:
20    Q.   It doesn't say that, does it?
21    A.   No, it doesn't. There's no reason for it
22 to.
23    Q.   Didn't you call him up and say, hey, we
24 got this guy, Robert Todd, claiming that we stole this
25 from him. We stole the tower from Robert Todd. How

Page 140

1 did the tower come about?
2     A.   I'm sure we had that discussion sometime
3 or another, yes.
4     Q.   Okay. So, Borden is trying to answer you
5 where the tower came about.
6          Now, you testified at the trial that you
7 already knew where it came about. It came about by
8 this challenge. Why weren't you telling Borden?
9     A.   That's where it started. The challenge
10 was where this whole thing started, was, guys, you've
11 got to do something, you know, look for it.
12    Q.   Where does it say --
13    A.   Find something, you know.
14    Q.   But where does it say in this memo that
15 there is any challenge? It's looks like he was
16 challenged to find ways to store skis and wakeboards
17 on top of the bimini top.
18    A.   I don't think that he was -- that -- that
19 he's indicated he was challenged to do that. I think
20 here that he's merely speaking to the fact that he was
21 doing his job and trying to better the equipment that
22 we manufactured to make it more saleable.
23    Q.   But where does it say that he was working
24 on a challenge to raise the height of the ski -- the
25 tow rope attachment point for wakeboarders?

Page 141

1          MR. NORMAN: Objection. Asked and
2       answered now about three times.
3          THE WITNESS: It doesn't say it.
4 BY MR. LARSON:
5     Q.   His last paragraph says, I stuck my sketch
6 off to the side thinking it was a bit too extreme.
7          Now, if Borden was working on a challenge
8 that was very important to Correct Craft's his -- or
9 future in this tournament, why would he stick it off
10 to the side?
11          MR. NORMAN: Objection. Calls for
12       speculation.
13          THE WITNESS: I think he made -- he
14       clarifies the statement right there. To him it
15       was a bit too extreme.
16 BY MR. LARSON:
17    Q.   And he drew these in June of '96, and he
18 didn't present them until August 30th of '96. So, he
19 sat on them for two-and-a-half, almost three months?
20          MR. NORMAN: Objection. Mischaracterizes
21       his prior testimony.
22 BY MR. LARSON:
23    Q.   Now, how important was this challenge that
24 Borden was apparently working on?
25    A.   Shame on him if he sat on an idea for two

Page 142

1  months.
2      Q.    But he doesn't say anything about the fact
3  that he was working on any challenge at all, did it?
4      A.    There was no reason for him to.
5      Q.    Why not?  That was his job.
6      A.    His job was to take the challenge and go
7  do it.  And he obviously did it and then he felt it
8  was too extreme and he didn't show it.
9      Q.    Where did it say he was working on a
10 challenge?
11     A.    It didn't say that.  It just -- he
12 indicates here that what he was doing seemed, you
13 know, too extreme, and so he withheld it.
14     Q.    Isn't it true that the only one who is
15 talking about a challenge is you?
16         MR. NORMAN:  Objection.  Mischaracterizes
17     his prior testimony.
18         THE WITNESS:  Yeah.  And I have a right to
19     talk about the challenge.
20 BY MR. LARSON:
21     Q.    And when you asked people about how the
22 tower was originated, no one ever responds that you
23 gave them a challenge?
24         MR. NORMAN:  Objection.  Mischaracterizes
25     his prior testimony.

Page 143

1          THE WITNESS:  Why they didn't acknowledge
2      it, I can't answer that question.
3  BY MR. LARSON:
4      Q.    Why didn't you write them back?  Here
5  you've got 1997.  You're talking about a year and two
6  or three months.  14 months after the tower got
7  designed and all of a sudden your challenge isn't even
8  recognized.  The next page is Bill Snook's memo.
9          Does he recognize that you ever gave a
10 challenge?
11     A.    I don't know if he recognizes or not.  He
12 doesn't say he does here.
13     Q.    He says Borden presented me with a concept
14 sketch for the flight control tower early in August of
15 '96.  It doesn't say Borden and I went out to a little
16 area and worked on it and came back to the management
17 meeting.
18         It didn't say that either, does it?
19     A.    I -- no.  Why he didn't say it, I have no
20 idea.
21     Q.    He doesn't even say he worked with Borden.
22     A.    Why he didn't acknowledge it, I have no
23 idea.
24     Q.    Do you know that Bill -- do you know that
25 Bill Snook has testified that he never drew a thing

Page 144

1  for any tower, for any of the patents on any tower,
2  never drew one drawing.
3          MR. NORMAN:  Objection.  Mischaracterizes
4      his prior testimony.
5          Answer it, if you can.
6          THE WITNESS:  I don't know what his
7      testimony was in that area, no.
8  BY MR. LARSON:
9      Q.    Now, when did you start talking about the
10 fact that you gave him a challenge?
11         When did that -- when did you start
12 talking about that?
13         MR. NORMAN:  Objection.  Assumes facts not
14     to evidence.  Mischaracterizes his prior
15     testimony.
16         THE WITNESS:  Well, you -- you know, there
17     were no dates.  I mean, I don't recall what the
18     dates were that we -- that we had those
19     conversations when I challenged him.
20 BY MR. LARSON:
21     Q.    No.  I'm saying when did you start going
22 on the record with your version that you had actually
23 made a challenge.
24         What's the first time that you ever came
25 on the record and said that?

Page 145

1      A.    I don't -- I don't recall unless it was in
2  that testimony that we -- you know, I've said nothing
3  else that says that I said that and --
4      Q.    So, the testimony at the -- at the tower
5  trial in 2003 was the first time you ever talked about
6  giving Borden and Bill Snook a challenge?
7          MR. NORMAN:  Is that the correct date on
8      that, sir?
9          MR. LARSON:  It could be 2002.
10         THE WITNESS:  I don't remember.
11         MR. NORMAN:  You're asking if that's the
12     first time he testified to that?
13 BY MR. LARSON:
14     Q.    Well, is that the first record?
15         MR. NORMAN:  Did you look at his
16     deposition in that case?
17         MR. LARSON:  I have his deposition.  We
18     can go there.
19         MR. NORMAN:  All right.  And are there
20     interrogatories in that case?
21         MR. LARSON:  For the record, the trial was
22     February 19th of '03.  February 19, 20, 21 and
23     22.  Those four days or five days.
24 BY MR. LARSON:
25     Q.    So, Mr. Meloon, have you ever seen any

Page 146

1  writing where you went on the record prior to that
2  date in 2003 saying that you actually gave a challenge
3  to Borden?
4      A.   Not in writing, no.
5      Q.   Now, you know that Borden offered to
6  testify truthfully at that trial, do you not?
7      A.   Well, I would assume if he took an oath at
8  the trial, yes, he did.
9      Q.   But he didn't testify at the trial, did
10  he?
11      A.   I don't have any idea whether they called
12  him or not.
13      Q.   So, you weren't present at the trial?
14      A.   Not for the whole trial, no.
15      Q.   So you don't know that Borden was never
16  called as a witness?
17      A.   No.  I don't recall that -- having any
18  knowledge of that.
19      Q.   Okay.  I'm going to change subjects a
20  little bit here.
21          Now, after Borden presented this tower at
22  this June -- or at this August 30th, '96 meeting, you
23  decide to build a prototype and you called up
24  Mr. Todd, sent faxes out to two or three people, chose
25  Mr. Todd and he built you a prototype; is that

Page 147

1  correct?
2      A.   I didn't.
3      Q.   Yeah, but the company?
4      A.   Right.  The company.
5      Q.   And so a prototype type of the tower came
6  back.  Mr. Todd had welded it up, and it came back on
7  a boat and you went out and tested it?
8      A.   They tested it, yes.
9      Q.   Now, do you know that Correct Craft paid
10  Mr. Todd one-half of his fee when he started to do the
11  project, and then once he completed you paid him the
12  other half on delivery?  Does that sound reasonable?
13      A.   What -- what project was that?
14      Q.   Building the prototype of the tower.
15      A.   It could have.  That would have been under
16  purchasing if they made that decision.  If that was a
17  requirement that he made, I would not be surprised.
18      Q.   I'm going to show you what's been marked
19  as Exhibit 50.  And somehow the original exhibit of
20  this is out with the court reporter, so I'm going to
21  show you mine.  And I'm just going to show this to you
22  so that we can clarify the dates in our own mind.
23          This here -- and you might see some of my
24  notes on it and they're not part of the exhibit.
25  Don't be distracted by them.

Page 148

1          This here is Exhibit 50-1, and this is
2  your son's fax to Mr. Todd of 9/9/96, and he says,
3  hey, here's a couple of drawings, you know, give me a
4  quote on the prototype on welding.  So, you have a
5  side view of the tower.  This is RT49, which is Robert
6  Todd.  He produced this to us.  And then you have a
7  top view of the tower.  So, this goes to Todd.  And
8  there was a meeting, I presume, where Mr. Todd says,
9  yeah, I will build it.
10          In the next document here, which is
11  Exhibit 50-2, is Correct Craft's payments history.
12      A.   Uh-huh.
13      Q.   So, on 9/17/96 a check was cut to him for
14  585, and on 9/23/96 another check was cut to him.  And
15  I'm assuming that when the second check was cut to him
16  he delivered the boat, because he testified that he
17  wouldn't have given the boat back or the tower until
18  he got paid.
19      A.   I -- I would have to accept that
20  assumption.
21      Q.   Yeah.  And I'm accepting that assumption
22  that on 9/23 you got a boat with a tower, because
23  that's when you paid for it.
24      A.   Yeah.  I would assume that's correct.
25      Q.   Okay.  So, let's just use that date.  I

Page 149

1  mean, I'm not holding you to it.  I mean, if that date
2  is different and we find out, hey, it was delivered a
3  week later, a week earlier, let's use whatever we can
4  find out is true.  But right now 9/23 is the date I
5  believe that tower was delivered, okay?
6          So, do you recall when -- when you saw the
7  tower when it was delivered?
8      A.   I don't remember if it was that -- that
9  day that he delivered it originally, or whether it was
10  after they had started testing.
11      Q.   But you somehow saw this tower on a boat?
12      A.   Yes.
13      Q.   Okay.  Now, what did you think when you
14  saw the tower?
15      A.   Well, I think that like everybody else,
16  when I saw it, it -- aesthetically it was -- you know,
17  it was different than the part of the design of the
18  boat.  From an aesthetic standpoint it was different.
19      Q.   You know, a side issue --
20      A.   Startling.
21      Q.   You know, a side issue today is the towers
22  on the boats today are aesthetically much more
23  pleasing --
24      A.   Oh, yes.
25      Q.   -- than the first towers.

Page 150

1    Yeah.  But they still function.  They
2  still do the same purpose.
3    A.   Do the same thing, exactly.
4    Q.   Okay.  These here -- I'm just showing you
5  right now what's been marked as Exhibit 46, and this
6  is marked in a previous deposition.  And this is Roman
7  Numeral Number I.  So, it's 46, Roman Numeral Number
8  I.  And I think in Roman Numeral Number IV are some
9  notes, and these have been identified by Gary, your
10  son.
11    Do you recognize his handwriting?
12    A.   That could be his handwriting.
13    Q.   Okay.  So, the first note -- the first
14  note was, you know, 9/11/96, where he took, you know,
15  notes on what he did during the day.
16    A.   Uh-huh.
17    Q.   Okay.  The next thing we see is 9/25.
18  These, again, you recognize his handwriting?
19    A.   It appears as though -- you know.
20    Q.   Now, when we talked to your son the other
21  day about the same thing, we get down here and he
22  has -- in Item Number 6 he says, well, patent on Sky
23  Tower.
24    So, here your son and you are having a
25  discussion about a patent on the Sky Tower.

Page 151

1    MR. NORMAN:  Objection.  Assumes facts not
2    in evidence.  Mischaracterizes prior testimony.
3    Answer it, if you can.  I don't know if
4    there's a question pending.
5  BY MR. LARSON:
6    Q.   Now, do you recall a discussion with Gary
7  on or about 9/25/96 about a patent on the tower?
8    A.   I would have had a discussion with him on
9  the tower any time after that, or any time during that
10  timeframe.
11    Q.   But you did talk to Gary about items
12  having to do with patents on the tower?
13    A.   Oh, I'm sure we had conversations.
14    Q.   What do you recall about those
15  conversations?
16    A.   It -- it would depend on what he thought
17  was pertinent information that I needed to know, or
18  there was information that I had the need to know at
19  that time, or there was a problem, or something else.
20  You know, he or anybody else who was dealing with it
21  at that time would bring it to my attention.
22    Q.   Well, if the tower was delivered on 9/23,
23  which he just established on that other memo, and this
24  is 9/25, this is two days later.  So, two days after
25  that tower got delivered you're talking to your son

Page 152

1  about, I think, getting the patent on the tower, were
2  you not?
3    MR. NORMAN:  Objection.  Mischaracterizes
4    prior testimony.  Asked and answered.
5    THE WITNESS:  It could well be.
6  BY MR. LARSON:
7    Q.   Now, did you assign Gary a task to go and
8  work towards getting a patent on the tower?
9    A.   If I remember correctly, the -- Larry was
10  working -- Gary was working with Larry and anybody
11  else who had information that was necessary for the --
12  you know, for the attorneys to file the patent.
13    Q.   But on 9/25/96, had you hired any
14  attorneys to go get a patent?
15    A.   I'm not sure when we hired the attorneys.
16    Q.   Now, why didn't you call Borden at this
17  time and say, hey, Borden, we would like to get a
18  patent on the tower?
19    A.   Why would I?
20    Q.   Wasn't he the inventor of the tower?
21    A.   He was an employee of the company.
22    Q.   Did Gary invent the tower?
23    A.   He was an employee of the company.
24    Q.   Why didn't you call Mr. Snook and say,
25  hey, Mr. Snook, I want to get a patent on your tower,

Page 153

1  you're a co-inventor?
2    A.   He was an employee of the company.
3    Q.   Why didn't you bring Borden in and have
4  discussions with Gary when you talked to him about the
5  patent on the tower?
6    A.   Because I discussed whatever items I want
7  to with whoever I please as president and CEO of the
8  company.  If I chose not to at that time, I'm sure I
9  had a good reason.
10    Q.   Did you call Borden at that time and
11  advise him that patents have to be in the name of the
12  inventors, and Borden was the inventor?
13    A.   I did -- I did not know the legalities of
14  it.  And, no, I did not call him and tell him that,
15  and there was no reason for me to do it.
16    Q.   Why is there no reason to call and tell
17  Borden that patents have to be in the name of the
18  inventor?
19    A.   Because I was not aware of the -- the --
20  you know, the legality of it at that time.  Whether
21  you did, didn't, who had, or would be, or anything
22  about the patent.
23    This is one of the first -- if this was
24  not the first, it was one of the first patents -- I
25  know it's the first patent I ever had any dealing

Page 154

1 with.

2    Q.    I want to show you what's been marked as
3 Exhibit 46-II.  And you just said that Borden's tower
4 patent was the first patent you ever had any dealing
5 with.  I want you to look at 46-II.  Is that not a
6 fuel tank patent that you had dealings with, in two
7 years prior to Borden's tower patent?

8    A.    No, I obviously had something to do with
9 it by virtue of my position with the company.

10    Q.    Well, isn't this --

11    A.    This patent pales in significance compared
12 to the tower, and what the tower, you know, did for
13 the performance of the boat.

14    Q.    But the process by which -- the process by
15 which you applied for the patent were identical, were
16 they not?

17    MR. NORMAN:  Objection.  Foundation.

18    THE WITNESS:  I -- I'm sure they were, but
19    I -- you know, whether I was informed at that
20    time that there had to be an inventor's name put
21    on it, and Bill's name would be the one or -- I
22    just don't recall the whole proceedings.

23 BY MR. LARSON:

24    Q.    Well, this patent here was filed on May
25 20th, 1994.  Doesn't it say that right on the face?

Page 155

1    A.    Uh-huh.

2    Q.    And the patent was granted up here on May
3 21, 1996.

4    A.    Uh-huh.

5    Q.    So, when this patent was granted you
6 certainly got it in the mail from the attorneys, did
7 you not?

8    A.    Yes.

9    Q.    And you certainly said, hey, wow, Correct
10 Craft now is an assignee of a patent, and the patent
11 says inventor William N. Snook?

12    A.    That's what it says.

13    Q.    And so what do you recall the day that you
14 received that patent back from the patent attorneys?

15    A.    Oh, I don't recall when this came in.

16    Q.    Well, it says the date of the patent, May
17 21, '96.

18    A.    That was the date it was approved.  I
19 don't know what date it hit, you know, our office,
20 that -- you know, copies of it, or the original, or
21 anything else.  I don't know what the dates were.

22    Q.    But you remember when it came in?

23    A.    No, I don't -- I do not remember the dates
24 that it came in.

25    Q.    No, I didn't ask you the dates.  I asked

Page 156

1 you do you remember that it did come in?

2    A.    I -- it obviously came in.  I mean, you
3 know -- and I have to accept the fact that it, you
4 know, came in, yes.

5    Q.    And you knew it came in?

6    A.    Probably in the day-to-day -- yeah, I
7 knew.

8    Q.    And you knew the company had applied for
9 it?

10    A.    Yes.  I probably gave the instructions to
11 do it.

12    Q.    And can you tell me what this patent was
13 for?

14    A.    It was for our fuel tank.  It was for
15 the -- to stop the -- the fuel pump from running out
16 of fuel, because of the tanks, the way they were
17 built, when you go to turn, if there was low volume
18 gas it would run out of fuel.

19    Q.    In fact, it would even run out of fuel
20 when you had a high volume of gas in the tanks?

21    A.    On occasions it would, yes.

22    Q.    So, you knew that problem?

23    A.    Uh-huh.

24    Q.    And you knew that Bill had solved that
25 problem by putting a sump in the bottom of the tank?

Page 157

1    A.    Yeah.  I mean, that was the -- what he did
2 to better the product, and answer the problem, and
3 resolve it.

4    Q.    And when the problem was answered and
5 resolved, you said, hey, let's get a patent on this?

6    A.    Probably did, yeah.

7    Q.    You don't recall doing that?

8    A.    I mean, that would be my job and it would
9 be something that I would do just like other things
10 that I do during the day.  If they come to me an said,
11 we ought to file a patent for this, I would say go
12 ahead.  If it was recommended to me by Bill, or
13 marketing, or sales, or anybody else.

14    Q.    And you were involved in the process and
15 kept up to date with the day-to-day activities of this
16 patent process?

17    MR. NORMAN:  Objection.  Mischaracterizes
18    prior testimony.

19    THE WITNESS:  Probably not.

20 BY MR. LARSON:

21    Q.    But you knew that the inventor's name had
22 to be on the patent, did you not?

23    MR. NORMAN:  Objection.  Asked and
24    answered and mischaracterizes prior testimony.

25    THE WITNESS:  I do -- I can't really say

Page 158

1    yes that I knew an inventor's name had to be on
2    it even after receiving this, because I could
3    have looked at it and it said inventor Bill
4    Snook, and I'd say, hey, Bill, congratulations,
5    great job, you know, whatever. I may not have
6    said anything to him.
7 BY MR. LARSON:
8    Q.   And under the inventor it says assignee
9 and it says Correct Craft?
10    A.   Right.
11    Q.   Do you know what the word assignee means?
12    A.   Uh-huh.
13    Q.   What does it mean?
14    A.   Well, basically it was assigned to us.
15    Q.   So, you knew that for Correct Craft to
16 obtain title to this patent there had to be an
17 assignment?
18        MR. NORMAN: Objection. Calls for a legal
19    conclusion.
20        THE WITNESS: I --
21        MR. NORMAN: Mischaracterizes prior
22    testimony. Assumes facts not in evidence.
23        THE WITNESS: That I can't answer. I
24    don't know for sure.
25 BY MR. LARSON:

Page 159

1    Q.   But you had attorney's that were working
2 on your behalf to get Correct Craft the title to this
3 patent?
4    A.   They were working on behalf of Correct
5 Craft.
6    Q.   Okay. And Exhibit 61, which we've marked
7 before, is the actual assignment that Bill Snook
8 signed conveying Correct Craft the right to this
9 patent, does it not?
10        MR. NORMAN: Objection. Calls for a legal
11    conclusion.
12        THE WITNESS: I -- I'm assuming, yes.
13 BY MR. LARSON:
14    Q.   And you know that these are filed in the
15 patent trademark office?
16    A.   By virtue of the fact, you know, you're
17 showing them to me and telling me, yes.
18    Q.   And you know that -- you know that when
19 they come back from the patent and trademark office
20 and you're sent the originals, and you keep them in a
21 fireproof safe?
22    A.   I'm sure we do.
23    Q.   You wouldn't keep things in there that are
24 just ministerial pieces of paper that are not
25 important, would you?

Page 160

1    A.   I wouldn't believe so, no.
2    Q.   Would those documents in the fireproof
3 safe, you know, be archived, and saved, and not
4 destroyed?
5    A.   I wouldn't think so.
6    Q.   So, you had some experience here prior to
7 the time that this tower came about with the patent
8 process?
9        MR. NORMAN: Objection. Vague.
10        THE WITNESS: If there was any experience
11    it was very, very limited. I was very
12    unknowledgeable (sic).
13 BY MR. LARSON:
14    Q.   You were very what?
15    A.   Not knowledgeable. I was very
16 unknowledgeable about it. I just -- you know, I mean,
17 it was outside of my -- you know, the area that I
18 generally functioned in.
19    Q.   But you had attorneys working for you that
20 could have made you as knowledgeable as you desired to
21 be?
22    A.   Sure.
23    Q.   And you had access to people that could
24 keep you apprised of everything regarding the patent
25 process?

Page 161

1    A.   Sure. If it was necessary and they felt
2 there was something I need to know because of or
3 whatever the reason was.
4    Q.   And when you had this meeting with Gary,
5 your son, on 9/25, did you have an inclination to call
6 Borden and said, Borden, we want to get a patent on
7 this tower, and you're going to have to sign an
8 assignment for us to get title to it?
9        MR. NORMAN: Objection. Assumes facts not
10    in evidence.
11        THE WITNESS: No.
12 BY MR. LARSON:
13    Q.   Why didn't you call Borden and say that
14 you have to sign an assignment?
15    A.   I didn't know that he did. Regardless of
16 what happened in the future. Did I forget it? Did I
17 not understand it? I chose not to do it.
18        He was an employee of the company. I
19 wanted a patent. And it was up to the -- you know,
20 the legal people to do whatever needed to be done.
21    Q.   You're saying -- is it up to the legal
22 people to advise Borden what his rights were?
23        MR. NORMAN: Objection. Calls for a legal
24    conclusion.
25        THE WITNESS: I'm -- I'm not clear on

Page 162

1    that. I -- I don't know that -- if that's not
2    the responsibility of theirs.
3 BY MR. LARSON:
4    Q.   You're saying that you don't know if it's
5 their responsibility?
6    A.   I don't know that it is. I don't know
7 that it isn't.
8    Q.   Would you think it's your responsibility?
9        MR. NORMAN: Objection.
10       THE WITNESS: Obviously, at that time I
11 didn't.
12 BY MR. LARSON:
13   Q.   What safeguards did you put in place that
14 Borden's rights, whatever they may be, would be
15 protected?
16   A.   He was an employee of the company. We --
17 he worked for the company. His job was -- and, you
18 know, beyond that point I -- I saw no reason other
19 than he was an employee of the company.
20   Q.   So, you're saying because he was an
21 employee he had no rights?
22   A.   No, I did not say that. I just didn't
23 know that there was any reason for me to, you know,
24 advise him of anything.
25   Q.   And that was specifically just because he

Page 163

1 was an employee?
2    A.   That would a good assumption, yes.
3    Q.   So, you were pretty confident that Correct
4 Craft had the rights to this, any patent on the tower
5 just because Borden was an employee?
6    A.   Confident, yes.
7    Q.   And if you were fairly confident what harm
8 would it have been to tell Borden, hey, Borden, I
9 think we own all the rights, but why don't you go out
10 and get your own attorney, and I think that attorney
11 will probably confirm what I say?
12       MR. NORMAN: Objection. Calls for
13 speculation.
14 BY MR. LARSON:
15   Q.   Why didn't you say that?
16   A.   I -- I didn't know there was a need to and
17 I didn't.
18   Q.   But if you were fairly confident that
19 Correct Craft owned this, because Borden was an
20 employee, that means that was a small part in your own
21 admission today that he might have had some rights?
22       MR. NORMAN: Objection. Mischaracterizes
23 his prior testimony.
24       THE WITNESS: I mean, I can tell you that
25 if -- you know, if that's a sticking point,

Page 164

1    could I say fairly, I will tell you I was
2    confident of the fact. I just -- you know, if
3    that helps any I was confident. You know, I
4    just -- there was no question.
5 BY MR. LARSON:
6    Q.   And if there's no question there would
7 have been no harm in telling Borden, hey, Borden, why
8 don't you go get your own counsel, because I want you
9 to feel comfortable with what we're doing here?
10   A.   There would have been no harm of me doing
11 a whole lot of things and having different
12 conversations with Borden about other things, you
13 know. I mean, in the day-to-day I talked to Borden
14 whenever it was necessary, or whenever I felt I
15 should.
16   Q.   No, I'm talking specifically about this
17 patent.
18       If you were totally confident that you
19 owned this and he owned nothing, what harm would it
20 have been to say, hey, Borden, why don't you go get
21 your own lawyer?
22   A.   I don't know if there was any harm that I
23 didn't or harm that it would. You know, I'm not
24 qualified to answer that.
25   Q.   Now, you had lawyers representing you

Page 165

1 during this time, right?
2    A.   The company.
3    Q.   Okay. Yeah. I mean the company. When I
4 say you, I'm not talking about -- in fact, maybe --
5    A.   Let's clarify that. You're talking about
6 the company, not me personally.
7    Q.   Okay. So, the -- the company had lawyers
8 that were looking out for their interests, true?
9    A.   Correct.
10   Q.   Wouldn't it have been fair to say, hey,
11 Borden, we've got lawyers looking out for our
12 interests, you know, it would be fair for you to go
13 get lawyers to look out for your interest?
14       MR. NORMAN: Objection. Vague. Calls for
15 speculation.
16       THE WITNESS: I -- I don't -- you know, I
17 don't feel that -- you know, I should have
18 acknowledged that in any way or any form other
19 than, you know, what I did as president of the
20 company.
21 BY MR. LARSON:
22   Q.   Why not?
23   A.   Why would I? He was an employee of the
24 company. His job was to design equipment to -- that
25 made the boat function better, perform better, more

Page 166

1  saleable.  That -- that's what the weekly paycheck was
2  for.
3          That's what the whole thing was about, you
4  know.  You make the company better and stronger and
5  that's our job.  That was my job every day.  Do
6  everything I could to make the company stronger and
7  better.
8      Q.    And if that was all true, what foul would
9  it have been to say, Borden, I think you should go
10  just get a lawyer just to confirm in your own mind
11  that all these rights are ours, because of your job
12  duties here?
13          MR. NORMAN:  Objection.  Asked and
14      answered at least four or five times.
15          THE WITNESS:  I -- you know, I just stand
16      on the answer that we've given.  I did not feel
17      it was necessary nor --
18  BY MR. LARSON:
19      Q.    Now, these discussions that you had with
20  Gary were private from Borden, were they not?
21      A.    They were a lot of discussions I had with
22  Borden that was private and not with others.
23      Q.    I'm talking about the tower.
24      A.    You know, the same thing goes.  It applies
25  either way, yes.

Page 167

1      Q.    And you've never informed Borden of these
2  discussions?
3      A.    No.  I saw no reason to.
4      Q.    Did you have discussions regarding what
5  kind of royalties you thought you can obtain?
6      A.    No.
7      Q.    You never had any discussions with Gary or
8  other people about, you know, once we get the patent
9  this is the type of royalties we can get?
10      A.    No, because I had no idea, you know, whether
11  would be reasonable, or fair, or, you know, whether
12  anybody else would ever want it.
13      Q.    You never came up with a thought that you
14  could get 20 or 25 percent royalty?
15      A.    Oh, we -- I mean, there's always that
16  hope, yes.  No guarantees.
17      Q.    And did you have that discussion about the
18  hope with Gary?
19      A.    Well, I don't know that we discussed the
20  financial end of it.
21          MR. LARSON:  What number are on now?  Are
22      we on 63?
23          MR. NORMAN:  The last time I thought it
24      was 63.
25          MR. LARSON:  That's the X-Games file.

Page 168

1          MR. NORMAN:  That's what I remember.
2  BY MR. LARSON:
3      Q.    I'm going to mark what I've marked as 64.
4          (Whereupon, Plaintiff's Exhibit Number
5      64 was marked for Identification)
6  BY MR. LARSON:
7      Q.    This, for the record, is your deposition,
8  Mr. Meloon.
9          MR. NORMAN:  Thank you.
10  BY MR. LARSON:
11      Q.    Did you ever have discussions with any
12  lawyers about what you thought you could get for the
13  royalties?
14          MR. NORMAN:  Objection.  Don't answer the
15      question.  Attorney/client privilege.
16  BY MR. LARSON:
17      Q.    I want to direct your attention to Page 14
18  and 15 of this deposition.  And you're talking about
19  royalties here and I believe the licensing fees that
20  you charge is, like, 7 percent.
21          And -- and Line 19 you say, how did you
22  determine any particular royalty to offer anybody that
23  letter?  And I think it was a letter you sent out
24  after the patent was granted.
25          Your answer:  How did we determine it?

Page 169

1          Yes.
2          Answer:  I think we arrived at that after
3  a lot of discussion based on what we knew about
4  manufacturing costs and the value of towers being sold
5  on the market.
6          And who was involved in these discussions?
7          Myself and the patent lawyers, was your
8  answer.
9          Now, did you ever give Borden any feedback
10  as to what royalties you thought Correct Craft could
11  obtain from the licensing of the tower?
12      A.    No.
13      Q.    Why?
14      A.    I didn't feel there was a reason to.
15      Q.    But you asked him to sign assignments
16  later on where he gave up his rights for a dollar,
17  that he never got paid, and other consideration, did
18  you not?
19          MR. NORMAN:  Objection.  Mischaracterizes
20      his prior testimony.  Argumentative.
21          Answer it, if you can.
22          THE WITNESS:  I -- I assumed that was the
23      procedure that the attorneys followed.
24  BY MR. LARSON:
25      Q.    But you authorized the attorneys to follow

Page 170

1 that, did you not?
2   A.   If it was a matter of law that -- you
3 know, that for whatever reason he would sign the
4 assignment, or had to, or wanted to, or whatever.  I
5 mean, that -- I'm a boat builder.
6   Q.   You accepted the benefits of Borden
7 signing those assignments, did you not?
8   A.   The company did.
9   Q.   That's what I mean.
10       And prior to him signing those assignments
11 you never went to Borden and said, Borden, we think
12 we're going to make a whole bunch of money on
13 royalties.  And we've done all these calculations of
14 market studies and we're pretty convinced that we can
15 license this out and make this kind of royalty, but we
16 want you to sign these assignments.  You never went to
17 Borden and said that?
18   A.   No.
19   Q.   So, you asked Borden to sign those
20 without -- without him being aware of these internal
21 calculations the company had made?
22       MR. NORMAN:  Objection.  Calls for
23   speculation.  Mischaracterizes his prior
24   testimony and assumes facts not in evidence.
25   Vague.

Page 171

1       You can answer it, if you can.
2       THE WITNESS:  I personally didn't have any
3   conversation with him about the assignment.
4   That was the attorneys.
5 BY MR. LARSON:
6   Q.   But you authorized the attorneys to have
7 those conversations with Borden?
8   A.   They send me a bill monthly and I pay them
9 for what they do, yes.
10   Q.   You didn't tell them that they were out of
11 line to ask Borden to sign that?
12       MR. NORMAN:  Objection.  Attorney/client
13   privilege.  Please don't answer the question.
14 BY MR. LARSON:
15   Q.   Now, what percentage did you feel that you
16 could obtain in royalties from the licensing of a
17 tower patent?
18   A.   I'm -- I'm sorry?
19   Q.   What percentage?
20   A.   What percentage?
21   Q.   Yeah.
22   A.   That was decided upon -- again, after we
23 had discussions with the attorneys, and those that
24 were in the market that had already started copying
25 the tower who had already started making them.

Page 172

1   Q.   But when you started the patent process
2 did you come in your own mind to whether or not you
3 would get a 10 percent royalty, or a 7 percent
4 royalty, 15, 20?  What number did you come up with?
5   A.   Well, we probably hoped for something.
6   Q.   Do you know what it was?
7   A.   It was like, you know, you hope for the
8 moon and you settle for whatever you can get, but
9 I'm -- I'm sure that there were discussions about
10 that.  There was not a set figure that I recall, no.
11   Q.   You don't recall hoping for 20 or 25
12 percent?
13   A.   No.  Not that we had -- I don't recall
14 conversations where we talked about that kind of
15 money.
16   Q.   I'm going to show you, again, your trial
17 transcript.  I'm on Page 154.  If you look at Line 2,
18 you talk there about getting 20 or 25 percent, do you
19 not?
20   A.   Yeah.  Yes.
21   Q.   So, your memory was pretty clear in 2003
22 that when you started the whole process you were
23 thinking about 20 or 25 percent?
24   A.   Doesn't hurt to dream.
25   Q.   And did you actually calculate, at that

Page 173

1 time, how much that would net if you made -- if you
2 licensed 1,000 towers a year?
3   A.   Well, I'm sure that that number was
4 bandied around somewhere.  I don't know that I did it.
5   Q.   But some calculation was made based on,
6 you know, we know there's 15,000 boats being built
7 between us and Mastercraft and the other ones, and,
8 you know, let's say half of the boats get a tower, you
9 actually did numbers and calculations as to what you
10 thought the market was?
11       MR. NORMAN:  Objection.  Calls for
12   speculation.
13       THE WITNESS:  Oh, I'm -- I'm -- I'm sure
14   that we did all kinds of numbers, and talked
15   about them, and --
16 BY MR. LARSON:
17   Q.   And you didn't share those discussions
18 with Borden?
19   A.   No.
20 * * * * *
21       (This concludes Volume I of 2 of the
22   deposition of Walter N. Meloon, continued in
23   Volume 2, Page 179, with nothing omitted)
24
25

Page 174

CERTIFICATE OF OATH

1
2 STATE OF FLORIDA)
3 COUNTY OF ORANGE)
4        I, the undersigned authority, certify that
5    WALTER N. MELOON, personally appeared before me
6    and was duly sworn.
7        WITNESS my hand and official seal this
8    18th day of September, 2007.
9
10
11
12
13
14
15
16
17
18
19    _____
20    LINDE R. BLOSSER
21    Notary Public - State of Florida
     My Commission No. DD318810
22    Expires: May 31, 2008
23
24
25

Page 175

C E R T I F I C A T E

1
2 STATE OF FLORIDA
3 COUNTY OF ORANGE
4    I, LINDE R. BLOSSER, Stenotype Shorthand
     Reporter and Notary Public, State of Florida at Large,
5    do hereby certify that I did, at the time and place
     herein designated, place under oath the deponent,
6    Walter N. Meloon, who was thereupon examined; that
     said examination was recorded by me, and through the
7    use of computer-aided transcription reduced to
     typewritten form; and that the foregoing pages
8    numbered 5 through 173, inclusive, constitute a true,
     complete and accurate transcription of my said
9    stenotype notes taken therein.
        I FURTHER CERTIFY that I am neither of
10   counsel, nor related to any party involved in this
     action, nor am I financially interested in the outcome
11   of this case.
        WITNESS MY HAND AND OFFICIAL SEAL, this
12   18th day of September, 2007, in the City of Orlando,
     County of Orange, State of Florida.
13
14
     _____
15   LINDE R. BLOSSER
     Stenotype Shorthand Reporter
16
17
18
19
20
21
22
23
24
25

Page 176

SUBSCRIPTION OF DEPONENT

1
2    BORDEN LARSON vs. CORRECT CRAFT, INC., et al.
3    Date of Deposition:  September 6, 2007
4        I, WALTER N. MELOON, do hereby certify that I
     have, this day, exercised my express right to read
5    this true and correct record of the proceedings, had
     at the time and place herein designated, with the
6    following corrections:
7 PAGE    LINE    CORRECTION
8    ____    ____    _____
9    ____    ____    _____
10   ____    ____    _____
11   ____    ____    _____
12   ____    ____    _____
13   ____    ____    _____
14   ____    ____    _____
15   ____    ____    _____
16   ____    ____    _____
17
        Under the penalties of perjury, I declare
18   that I have read my deposition and that it is
     true and correct subject to any changes in form
19   or substance entered here.
20
     _____
21   Walter N. Meloon
22   _____
     DATE
23
24
25

Page 177

1    IN THE UNITED STATES DISTRICT COURT
        MIDDLE DISTRICT OF FLORIDA
2           ORLANDO DIVISION
3 BORDEN M. LARSON,    CASE NO.:  6:050-CV-686-ORL-31-JGG
4    Plaintiff,
5 vs.
6 CORRECT CRAFT, INC.,
     ROBERT TODD AND WILLIAM SNOOK,
7
     Defendants.
8    _____/
9           Orlando, Florida
10          Thursday, September 6, 2007
11          9:55 a.m.
12 A P P E A R A N C E S :
13    BEECHER A. LARSON, ESQUIRE
        Law Offices of Beecher A. Larson
14      1201 Ridge Road
        Longwood, Florida  32750
15
        Appearing on behalf of the Plaintiff
16
     TODD NORMAN, ESQUIRE
17      Stump, Storey, Callahan, Dietrick & Spears, P.A.
        37 North Orange Avenue
18      Suite 200
        Orlando, Florida  32801
19
        Appearing on behalf of the Defendants
20
   ALSO PRESENT:  Leigh Doney
21
22
23      VOLUME II OF 2
24
     VIDEOTAPED DEPOSITION OF:
25
        WALTER N. MELOON

Page 178

1          I N D E X
2          VOLUME I
3                         PAGE
4  TESTIMONY OF WALTER N. MELOON:
5     Direct Examination - By Mr. Larson        5
6  CERTIFICATE OF OATH                      174
7  CERTIFICATE OF REPORTER                  175
8  SUBSCRIPTION OF DEPONENT                 176
9
10            VOLUME II
11 TESTIMONY OF WALTER N. MELOON (cont.):
12    Direct Examination (cont.) - By Mr. Larson   180
13    Cross Examination - By Mr. Norman        334
14    Redirect Examination - By Mr. Larson     337
15 CERTIFICATE OF OATH                      344
16 CERTIFICATE OF REPORTER                  345
17 SUBSCRIPTION OF DEPONENT                 346
18 READ AND SIGN LETTER                     347
19
20    PLAINTIFF'S EXHIBITS MARKED FOR IDENTIFICATION:
21 EXHIBIT 62 - Meloon Subpoena              5
22 EXHIBIT 63 - ESPN Screen Shot            106
23 EXHIBIT 64 - Meloon Deposition           168
24 EXHIBIT 65 - Allen Depo                  195
25 EXHIBIT 66 - Correct Craft Log           210

Page 179

1  EXHIBIT 67 - Judge Presnell Decision       215
2  EXHIBIT 68 - Management Meeting Minutes    264
3  EXHIBIT 69 - Reader's Digest               275
4  EXHIBIT 70 - Vincent Book                  285
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

1          (This is the continuation of the
2  deposition of Walter N. Meloon continued from
3  Volume I, Page 173, with nothing omitted)
4  * * * * *
5  BY MR. LARSON:
6     Q.   Now, you're talking about Borden being an
7  employee, and because of that Correct Craft had the
8  rights.
9          Now, how did you convey that belief to
10 Borden?  That, hey, Borden, because you're an
11 employee, you drew up the tower, we have the rights
12 to the patents?
13         How did you convey that belief to him?
14    A.   I did not convey that to him.
15    Q.   So, you just assumed that Correct Craft
16 owned it and you went through the patent process as
17 though Borden assumed that, also?
18         MR. NORMAN:  Objection.  Calls for
19 speculation.
20         THE WITNESS:  As far as assumptions go,
21 that -- you know, I would assume that was it.
22 BY MR. LARSON:
23    Q.   Now, you believe that future royalties
24 also belong to Correct Craft?
25    A.   Absolutely.

Page 181

1     Q.   And how did you convey that belief to
2  Borden?
3     A.   I haven't had a conversation with Borden
4  about that.
5     Q.   Now, what about the patent assignments,
6  did you believe those were just a mere formality in
7  the patenting process?
8     A.   I believe so, yes.
9     Q.   And how did you convey that to Borden?
10    A.   I didn't.  The attorneys had those
11 conversations with him.
12    Q.   And you authorized those attorneys to have
13 that type of conversation?
14    A.   Like I said, they do a job, they send me
15 the bill, and we pay it.  So, they --
16    Q.   And so you instructed the attorneys to do
17 whatever they had to do to get Correct Craft the
18 patent, not Borden the patent?
19         MR. NORMAN:  Objection.  Attorney/client
20 privilege.  Please don't answer the question.
21 BY MR. LARSON:
22    Q.   Did you ever tell the attorneys to do
23 whatever you can do to protect Borden's rights?
24         MR. NORMAN:  Objection.  Attorney/client
25 privilege.  Please don't answer the question.

Page 182

1  BY MR. LARSON:
2      Q.   Now, you believe that Correct Craft didn't
3  have to pay any consideration when Borden signed the
4  assignments; is that correct?
5      A.   I -- I really didn't know.  I mean,
6  legally what was required to be done or not done.
7      Q.   Well, when you looked at what's been
8  marked as 61 -- this is Bill Snook's assignment -- it
9  says, now therefore in consideration of one dollar and
10 other good and valuable consideration, the receipt of
11 which is hereby acknowledged.
12          Now, are you saying that when the language
13 says I'm paying the dollar, you don't have to pay it?
14          MR. NORMAN:  Objection.  Calls for a legal
15      conclusion.
16          THE WITNESS:  I -- I have no idea.
17 BY MR. LARSON:
18     Q.   Would you sign a document like that, that
19 says I'm paying you a dollar when the dollar was never
20 paid?
21     A.   I probably have, because, you know -- I
22 don't know that I have, but I probably would.
23     Q.   Would you sign it in this situation where
24 you're signing away the rights to one of the biggest
25 inventions in the 35 years in the boat business?

Page 183

1          MR. NORMAN:  Objection.  Calls for a legal
2      conclusion, assumes facts not in evidence,
3      misstates the law, misstates the prior
4      testimony.
5          Go ahead and answer it, if you could.
6          THE WITNESS:  What was the question again?
7          MR. LARSON:  Go ahead and read it back.
8          (Whereupon, the requested question was
9      read back)
10         MR. NORMAN:  Same objection.
11         THE WITNESS:  I don't know in that case.
12     Really, nobody knew at that time and I don't
13     know that I would have known if I had been in
14     that position.
15 BY MR. LARSON:
16     Q.   You're not -- you're not saying that in
17 March of '98, when the assignments -- first
18 assignments were signed in March '98, that the whole
19 ski boat world had adopted towers at that point in
20 time?
21     A.   No, I'm not saying that.
22     Q.   But they had by that point, hadn't they?
23     A.   Probably.
24     Q.   So, you knew this was big in March of '98?
25     A.   Well, when you say big, we knew that there

Page 184

1  was, you know, a market out there that Jeff -- you
2  also have to understand that the amount of money you
3  spend to collect those -- those royalties eat up
4  whatever you get very, very fast, because everybody
5  fights.
6          So, you know, who knew what the real value
7  of this was at the end of the day.
8      Q.   No, but I'm talking about what you would
9  do.  Would you have signed that for a dollar you never
10 received given the fact this had -- at the point in
11 time that Borden was signing these, had been adopted
12 by virtually every ski boat company in the market?
13         MR. NORMAN:  Objection.  Calls for
14     speculation.  Presents a hypothetical that did
15     not occur.
16         If you can answer it.
17         THE WITNESS:  I don't know what I would
18     do.
19 BY MR. LARSON:
20     Q.   Would you have gone to a lawyer and say,
21 hey, do I got to sign this?
22     A.   Again, I -- I don't know.  I might have.
23     Q.   Well, you believed it was Borden's job
24 duty to sign the assignment forms?
25     A.   Yeah, I think so.

Page 185

1      Q.   And how did you convey that belief to him?
2      A.   I didn't.
3      Q.   But because of the conduct of the company
4  asking him to sign it, was that not conveying the
5  belief, hey, Borden, you got to sign this to get the
6  patents?
7      A.   If legally that's what had to be done,
8  yes.  I mean --
9      Q.   So, Correct Craft is going to do
10 everything legally that had to be done for Correct
11 Craft to get the patents?
12     A.   Why would I try to do it any other way?
13     Q.   Well, you could have said, Borden, you
14 know, this invention is yours, you can get the
15 patents, and since you worked here let's split this.
16 You could have said that?
17         MR. NORMAN:  Objection.  Calls for a legal
18     conclusion.
19 BY MR. LARSON:
20     Q.   Isn't that true?  You could have said
21 that?
22     A.   Could I have said that?
23     Q.   Sure.
24     A.   Had it crossed my mind at the time, I
25 might have, but I didn't see there was any reason to.

Page 186

1    Q.    And since the time that these patents have
2  been granted you have been quoted on many different
3  news articles about these patents; isn't that true?
4    A.    I would assume so.  I don't recall.
5    Q.    And you've never given Borden any credit
6  whatsoever that he came up with the idea; isn't that
7  correct?
8    A.    It was a Correct Craft project.  It was
9  done by Correct Craft employees.  It was an
10  accomplishment of Correct Craft and the whole group.
11    Q.    You give credit to Leo Benz, who came to
12  Correct Craft with the first Ski Nautique molds?
13    A.    Yes, we did.
14    Q.    And you had no obligation to him.  He just
15  walked in one day and said, hey, I've got these molds,
16  you want to buy them?  And you go, nope, don't have
17  the money, then he came and gave them to you.
18    A.    Yep.
19    Q.    You give him credit.
20    A.    Okay.
21    Q.    Why did you give him credit?
22    A.    I mean, I don't see the correlation,
23  but --
24    Q.    Well, why give Leo Benz any credit at all?
25  He didn't want the molds and he just got rid of them.

Page 187

1    A.    Leo Benz had pride and he wanted to the
2  company to continue to -- to manufacture that boat,
3  because at that time there was not an inboard boat
4  that was accepted by AWSA.
5    Q.    And you're saying that Borden didn't have
6  pride?
7        MR. NORMAN:  Objection.
8        THE WITNESS:  No, I'm not saying that.
9  BY MR. LARSON:
10    Q.    Why are you giving Leo Benz credit for
11  giving Correct Craft a set of molds that
12  revolutionized Correct Craft, but you won't give
13  Borden credit for creating a tower that's not only
14  revolutionized Correct Craft, but revolutionized the
15  industry?
16        MR. NORMAN:  Objection.  Asked and
17    answered.  Compound question.
18        Answer it, if you could.
19        THE WITNESS:  I don't know what the -- I
20    don't know what the correlation is.  And, you
21    know, I don't understand why I would say anymore
22    in an article about -- and I'm not even aware of
23    what articles you're talking about.  I'm --
24    there may be some, but I don't recall what they
25    are.

Page 188

1  BY MR. LARSON:
2    Q.    But doesn't Correct Craft pride themselves
3  on, you know, biblical values, and Golden Rule values,
4  and treating people like they want to be treated?
5    A.    We operate under certain principals and
6  ethics --
7    Q.    And one --
8    A.    -- as a family.
9    Q.    And one of those is the Golden Rule?
10    A.    That would be a part of the standards and
11  the belief that the family exercises, yes.
12    Q.    And what is the Golden Rule?
13    A.    Well, you know, you -- obviously, you know
14  what the Golden Rule is.  My interpretation is that
15  you treat others like you would want to be treated.
16    Q.    Well, I asked you if you would sign an
17  assignment knowing that this was revolutionizing the
18  boat industry, and you go, well, I might have some
19  thoughts about that.
20        Now, that's how you would want to be
21  treated.  What did you do to allow Borden to be
22  treated the same way?
23    A.    No.  I think what I told you was that I
24  would have to give it some consideration and I would
25  not -- under the circumstances I would not know,

Page 189

1  because I was not in that position.
2    Q.    And under the circumstances you had to
3  give it some consideration, but what did you allow
4  Borden to do, to say, Borden, I think under the
5  circumstances you should give this some consideration?
6        How did you treat Borden the way you would
7  like to be treated?
8    A.    I don't know what the -- you know, what
9  the comparison is, or, you know, how relevant it is,
10  or how it parallels each other.  He had the
11  opportunity to say yes or no when he was asked to sign
12  it.
13    Q.    When did you give him the opportunity and
14  say, Borden --
15    A.    I did not, the company did not.  The
16  attorneys dealt with him.
17    Q.    And the attorneys were your agent to
18  obtain those assignments from Borden?
19        MR. NORMAN:  Objection.  That calls for a
20    legal conclusion.
21  BY MR. LARSON:
22    Q.    Were they not?
23    A.    I would -- yes.  I would assume that was,
24  you know, their function.  That was their job.
25    Q.    And their job was to go get these

Page 190

1 assignments from Borden and not give him advice; isn't
2 that correct?
3          MR. NORMAN:  Objection.  Calls for a legal
4     conclusion.  Assumes facts not in evidence.
5          THE WITNESS:  There's no way I can answer
6     that, because I'm not an attorney.
7 BY MR. LARSON:
8     Q.   Well, I'm asking you what their -- what
9 their jobs were.  You don't have to be an attorney.
10 You're the one that hired -- Correct Craft is the one
11 that hired the attorney.
12          Was their job to go give -- get the
13 assignments from Borden without giving him any legal
14 advice?
15          MR. NORMAN:  Objection.  Calls for a legal
16     conclusion.
17          THE WITNESS:  I don't have any idea.
18 BY MR. LARSON:
19     Q.   You don't have any idea what your
20 attorneys were told to do?
21          MR. NORMAN:  Objection.  That's not the
22     question you asked him.  If that's the question,
23     attorney/client privilege.  Please don't answer
24     the question.
25 BY MR. LARSON:

Page 191

1     Q.   Did you ever tell your attorneys, I want
2 you to protect Borden's rights, do whatever you can to
3 make sure his rights are protected?
4          MR. NORMAN:  Objection.  Attorney/client
5     privilege.  Please don't answer the question.
6 BY MR. LARSON:
7     Q.   Do you ever instruct anyone in the
8 company, we want to protect Borden's rights, we want
9 to treat him like we would be treated?
10     A.   No.  I never had that conversation with
11 anyone.
12     Q.   Isn't that a conversation that a company
13 that prides themselves on following the Golden Rule
14 should have every day?
15     A.   I don't know that that would apply under
16 those circumstances.  I don't know that it wouldn't.
17 That was never a question at the time.  It was not
18 brought up.
19     Q.   And as the president of the company, if it
20 wasn't you to bring it up, who was it to bring it up?
21     A.   Well, anybody could bring it up.
22     Q.   Do you have an ethics officer at the
23 company that makes sure the Golden Rule is in place
24 every day?
25     A.   No.  The family kind of oversaw each

Page 192

1 other, kind of watched out for each other when it came
2 to the principles that we operated under.
3     Q.   And did any of the family ever come and
4 say, hey, you know, Borden had something to do with
5 this thing, the Golden Rule says we should do
6 something for Borden, because he's revolutionized not
7 only this company, but the industry, and I wouldn't
8 want to be treated like that, I think we should do
9 something for Borden?
10          MR. NORMAN:  Objection.  Compound
11     question.
12          THE WITNESS:  Yeah.  That's kind of
13     difficult.  I -- I can't answer that.
14 BY MR. LARSON:
15     Q.   So, no -- you've never heard a discussion
16 like that at all talking about Borden Larson within
17 your family?
18     A.   Not -- no.  Not when it comes to that, no.
19     Q.   Now, during this whole patent process
20 Borden never came to you complaining, did he?
21     A.   Not that I recall.
22     Q.   He never had any concerns about I got
23 rights to this and I don't like what's going on?
24     A.   Not that I remember.
25     Q.   And he never raised any concern of I own

Page 193

1 this thing?
2     A.   I don't recall having that conversation.
3     Q.   But in spite of his lack of raising
4 concerns, did he have a reason to complain about the
5 advice he's been given by Correct Craft?
6          MR. NORMAN:  Objection.  Calls for
7     speculation.  Lack of foundation.  Vague.
8          THE WITNESS:  I would assume that he would
9     exercise his right to complain about anything he
10     wanted to, knowing Borden.  If he wanted to
11     complain about it, he would.
12 BY MR. LARSON:
13     Q.   Now, you're saying knowing Borden.  Did
14 you know Borden as a complainer?
15     A.   He -- he had his moments.
16     Q.   And what did he complain about?
17     A.   Oh, it could -- you know, someone else did
18 this, or someone did that.  There's always things that
19 happen in a company that somebody is upset about, or
20 concerned about, or, you know, he did that, he did --
21 you know, there's just a myriad of things that go on.
22 And quite often you draw a conclusion as to whether
23 the, you know, employee is a complainer or, you know.
24 I wouldn't say he was a chronic complainer, but he --
25 he was not shy about registering his complaints.

Page 194

1    Q.   But he never complained about anything in
2 the whole patent process?
3    A.   Not that I recall.
4    Q.   And do you believe he had a reason to
5 complain?
6    A.   No.
7    Q.   Do you believe had he had his own counsel,
8 he would come back and say, hey, I don't like the way
9 this is going, I got a reason to complain here?
10    MR. NORMAN:  Objection.  Calls for
11    speculation.
12    THE WITNESS:  I don't know what he would
13    decide to do.
14 BY MR. LARSON:
15    Q.   Now, your attorney in the patent process
16 was Herb Allen, primarily?
17    A.   Yes.
18    Q.   And you have followed his advice during
19 the whole process?
20    A.   I'm sure that if the attorney gave us
21 advice, we followed it.
22    Q.   And you believed his advice?
23    A.   There was no reason not to question it.
24    Q.   And do you know that Attorney Allen has
25 actually testified that Borden had real reasons to

Page 195

1 complain about the advice he was given by Correct
2 Craft?
3    MR. NORMAN:  Objection.  Mischaracterizes
4    his testimony.
5    THE WITNESS:  I'm not aware of that
6    conversation.
7 BY MR. LARSON:
8    Q.   If Mr. Allen actually said that under
9 oath, would you believe it?
10    MR. NORMAN:  Objection.  Why don't you
11    show him the document if you want him to
12    speculate on it?
13    THE WITNESS:  Yeah.  If I had -- yeah.
14    I'd -- I mean, I don't have any reason to
15    believe that he would say that.  And I don't
16    know why he would.
17 BY MR. LARSON:
18    Q.   But if he said that, would you believe it?
19    MR. NORMAN:  Objection.  Calls for
20    speculation.  It assumes facts not in evidence,
21    mischaracterizes his prior testimony.
22    Take -- answer it, if you possibly
23    could.
24    (Whereupon, Plaintiff's Exhibit Number
25    65 was marked for Identification)

Page 196

1 BY MR. LARSON:
2    Q.   I'm going to show you what I've marked as
3 Exhibit 55 -- 65.  This is excerpts of Mr. Allen's
4 deposition that was taken on November 24, 2004.
5    And if you turn over to Page 137, Mr.
6 Allen's answer says, no, I've never had a personal
7 relationship with Borden Larson.  I've had a very
8 cordial relationship with him in the sense of the
9 brief times I met him it's been cordial.  And my sense
10 was that Borden was very happy with the way things
11 were progressing until his relationship with Correct
12 Craft terminated.
13    Question:  This is me talking -- and in
14 what ways was Borden happy?
15    Answer:  He never questioned any of the
16 decisions that Correct Craft was making and the
17 conduct of the wakeboard program in my presence.  He
18 never called to complain that Correct Craft -- about
19 these assignments.
20    Question:  Is there any -- any reason why
21 Borden would have complained?
22    Answer:  Well, yes.  That's the subject of
23 this lawsuit, as I understand it.
24    And, Mr. Meloon, here your own attorney
25    MR. NORMAN:  Why don't you read the next

Page 197

1 sentence, too, because then it answers that
2 question, what he meant.
3    MR. LARSON:  Well, what it says --
4    MR. NORMAN:  It says, I don't know why he
5 would complain.  You tell me.  I don't know.  I
6 haven't read his Complaint in this case.  So, I
7 don't know why he now contends that he never
8 signed those assignments when he signed not one,
9 but multiple assignments.
10    That's what he said.  And he doesn't
11 understand what the heck you're talking about
12 what he said.
13    MR. LARSON:  I say -- I say in 11 and 12,
14 I say, is there any reason why Borden would have
15 complained?
16    His answer:  Well, yes.  I mean, those --
17 those, which are the reasons he would have
18 complained, are the subjects of this lawsuit as
19 I understand it.
20    And if you want to go with what
21 Mr. Norman is saying, and what are those
22 reasons?
23    And now he's going, oh, my God.  I put
24 myself in hot water here.
25    MR. NORMAN:  Well, he's told you the

Page 198

1    truth.  One or the other.
2        MR. LARSON:  Okay.  So, now -- so now the
3    attorney is saying both sides of the truth on
4    one thing and 14 and 15 he says, yep, he has a
5    reason to complain, and 18 and 19, he's goes,
6    oh, I don't know.
7    BY MR. LARSON:
8        Q.   Now, Mr. Meloon, what do you think?
9    You're attorney says Borden had a reason to complain.
10   What do you think?
11       A.   I don't know what to think.  I don't -- I
12   don't know what this -- what basis Borden had for a
13   complaint.  I don't know what reason anybody would
14   give you that.  And I -- you know.
15       Q.   Well, your attorney says on 14 and 15,
16   well, yes, I mean, those are the subjects of this
17   lawsuit, as I understand it.  And those mean the
18   reason he should have complained.  He says the lawsuit
19   spells out the reasons he should have complained.
20       MR. NORMAN:  No.  No, no, no.  Read the
21   sentence.  Why would you want to lie to this man
22   when it's in black and white in front of him?
23       MR. LARSON:  Why I am lying to him --
24       MR. NORMAN:  Because he then says he
25   didn't read the Complaint, he doesn't know what

Page 199

1    those reasons are.  You're asking him if he had
2    the opportunity to complain and he said, yes, if
3    he had a compliant he should have voiced it, and
4    I don't know why he wouldn't other than maybe
5    he's making it up after the fact when his
6    brother gets to him and feeds him a bunch of
7    bull about what the law is, and so then he sees
8    that he can strike it rich.  Perhaps that's what
9    Mr. Allen is saying, you think?
10       MR. LARSON:  Is that a speaking objection?
11       MR. NORMAN:  No.  You asked me a question,
12   what is he saying, and I told you exactly what I
13   think he's saying.
14   BY MR. LARSON:
15       Q.   Mr. Meloon, in Line 11 and 12 it says, is
16   there any reason why Borden would have complained.
17       The answer says, well, yes, the reasons he
18   would have complained are the subjects of the lawsuit,
19   and in the lawsuit it talks about fraud, and
20   constructive fraud, and not being paid.
21       Now, do you think are reasons he should
22   have complained, Borden should have complained,
23   Mr. Meloon?
24       A.   I -- to me, I understand that the other
25   way.  That -- you know, did he have a -- you know,

Page 200

1    could have, did he have a reason, you know.
2    Obviously, he thought he had a reason and -- but then
3    he says down here that he doesn't.
4        Q.   No.  He says I don't know.  You tell me.
5    He wants me to testify and tell him what Borden's
6    reasons are.  I don't know.  You tell me.  And that's
7    right after he goes, oh, yeah, he had a reason.
8    That's what the lawsuit is about.
9        MR. NORMAN:  He didn't say that.
10   BY MR. LARSON:
11       Q.   Well, let me ask you another question.
12   Down on -- down below here, Page 139, 16.  It says,
13   well, you're stating, Mr. Allen, that Mr. Borden was
14   happy.  If Borden Larson knew the truth about the
15   patent law, do you think he would have continued to be
16   happy?
17       Answer:  I have no ethical obligation to
18   disclose any aspect of the patent law to Borden
19   Larson.
20       Now, my question to you, Mr. Meloon, is
21   did you, as a company, have an ethical responsibility
22   to Borden Larson to disclose the patent law to him?
23       MR. NORMAN:  Objection.  Calls for a legal
24   conclusion.
25       THE WITNESS:  I don't think so.

Page 201

1    BY MR. LARSON:
2        Q.   Why?
3        A.   I don't think so.
4        Q.   You don't have a --
5        A.   It was a decision.
6        Q.   It was a --
7        A.   That I made.  I had the right to make that
8    decision and I didn't think so.
9        Q.   And what decision did you make?
10       A.   Not to -- you know, discuss any of that
11   with Borden.
12       Q.   You're saying not to discuss anything
13   about the patent law with Borden?
14       A.   No, because I'm -- I'm a boat builder.  I
15   don't understand the law.  I don't understand -- and
16   for any other reason he was -- you know, we had an
17   agreement, he came to work, he worked 40 hours, he got
18   paid, he did his job.  His job was to improve the
19   product.  End of the day.
20       Q.   Where was -- where was his agreement to
21   invent?
22       A.   I don't know that that has anything to do
23   with what he did.  He came up with an idea and it
24   was -- and, you know, in answer to the problem we had.
25   That was a part of his job.

Page 202

```
 1    Q.   Did you ever have Borden -- an agreement
 2 with Borden that says, Borden, your job is to invent?
 3    A.   No.  But design, he was a -- he agreed --
 4 when I first hired him, he wanted to come on as a --
 5 we were looking for a draftsman.
 6         And he brought me a whole portfolio of
 7 things that he had designed, and he said, this is my
 8 long suit.  I can -- you know, I can draft, I can do
 9 design.
10         And I hired him based on that.  Based on
11 his portfolio when he brought it to me.
12    Q.   And so he had never invented something
13 before?
14    A.   I don't have any idea whether he did or
15 didn't.
16    Q.   And he didn't come and say, I'm an
17 inventor, I want you to hire me to invent?
18    A.   He came as a designer and he designed a
19 piece of equipment.
20    Q.   And you never had an intellectual property
21 agreement with him that says if you invent anything on
22 the job, it ours?
23    A.   That's a legal aspect and I --
24    Q.   Well, you know your company has an
25 intellectual property agreement now, do you not?
```

Page 203

```
 1    A.   I would certainly assume we do.
 2    Q.   Well, why do you need one of those now
 3 if -- if everything the employees invent already
 4 belong to you?
 5         MR. NORMAN:  Objection.  Calls for a legal
 6     conclusion.
 7 BY MR. LARSON:
 8    Q.   You certainly wouldn't have meaningless
 9 pieces of paper if you didn't need them, did you --
10 would you?
11    A.   You may be forced to do things you don't
12 want to do and you that you don't like doing by virtue
13 of the fact that -- of the legal ramifications.
14    Q.   So, would you be forced to tell
15 someone like Borden what the patent law is before he
16 signs documents?
17         MR. NORMAN:  Objection.  Calls for a legal
18     conclusion.
19         THE WITNESS:  Would I -- you know, would I
20     have to be forced or would I be forced or --
21 BY MR. LARSON:
22    Q.   Would you have to be forced to tell an
23 employee what his legal rights are before you asked
24 him to sign -- before he signed documents?
25    A.   I don't believe that I'm forced to do it.
```

Page 204

```
 1    Q.   How would --
 2    A.   Is it a wise thing to do?  Obviously, it
 3 is.
 4    Q.   Why is it so obvious that it is?
 5    A.   I can think of a lot of reasons.
 6    Q.   How about in this case?
 7    A.   Most of it -- most of it in the time and
 8 effort and cost that this thing has gone through.
 9    Q.   What has --
10    A.   Just like anything else.  You try to hedge
11 your bets.
12    Q.   And what bets did you hedge in this case?
13    A.   We didn't -- that in the -- you know, that
14 in the future we don't run into this type of a
15 challenge.
16    Q.   Well, did Mr. Allen have an ethical
17 obligation to tell Borden and disclose to him what the
18 patent law was?
19         MR. NORMAN:  Objection.  Calls for a legal
20     conclusion.
21         THE WITNESS:  That -- that's in his field.
22     That's a legal -- you know, a legal thing.
23 BY MR. LARSON:
24    Q.   Well, what do you think?
25         MR. NORMAN:  Objection.  Calls for a legal
```

Page 205

```
 1     conclusion.
 2 BY MR. LARSON:
 3    Q.   You know, you hired him to go talk to
 4 Borden and to work through to get the patent.
 5     What is his ethical responsibility?  He's
 6 working for you.
 7    A.   The company did not hire him --
 8         MR. NORMAN:  Objection.  Calls for a legal
 9     conclusion.
10         THE WITNESS:  -- to go talk to Borden.
11     The company hired him to handle a process that
12     we had to go through for the patent.
13 BY MR. LARSON:
14    Q.   And as part of that does he have an
15 ethical responsibility to tell your employees what the
16 patent law is?
17         MR. NORMAN:  Objection.  Calls for a legal
18     conclusion.
19         THE WITNESS:  I don't -- I don't know
20     where the line would be drawn between legal and
21     ethical.
22 BY MR. LARSON:
23    Q.   Where would you draw it?
24    A.   I -- I'm not sure that I -- that I could
25 identify that.
```

Page 206

1    Q.   Well, you don't think Correct Craft had
2  any ethical responsibilities to Borden.  You've
3  already said that.
4    A.   We did have ethical responsibility to him
5  in as far as he was an employee, we did what we
6  promised we would do.  He worked, he got paid.  He had
7  benefits, he had paid vacations.  We took care of all
8  of that.  We did everything that we promised him we
9  would do or told him we would do when he came to work.
10    Q.   But now you had assignments that you made
11  him sign that said you're going to pay him a dollar
12  and other consideration.
13      Do you ever negotiate with him for what
14  the other consideration was?
15    A.   That was -- that was a legal matter.
16    Q.   So, you never negotiated with him for the
17  other consideration?
18    A.   No.
19    Q.   Did you tell the lawyers, hey, I want you
20  to negotiate with him?
21    A.   They --
22      MR. NORMAN:  Objection.  Attorney/client
23    privilege.  Don't answer the question.
24  BY MR. LARSON:
25    Q.   Did you ever go to Borden and say, Borden,

Page 207

1  these assignments say that we're going to give you
2  other consideration, and I want to negotiate with you
3  as to what they are?
4      MR. NORMAN:  Objection.  Asked and
5    answered.
6  BY MR. LARSON:
7    Q.   Can you answer that?
8    A.   Did -- yeah.  What was that again?
9      (Whereupon, the question was read back)
10      MR. NORMAN:  There was another question
11  after that where he asked him again if he
12  negotiated with him.
13      THE WITNESS:  If I negotiated with Borden?
14      MR. NORMAN:  Borden.
15      THE WITNESS:  No, I did not negotiate with
16    him.
17  BY MR. LARSON:
18    Q.   Now, you understood what -- that employees
19  of companies and sometimes do own their inventions, do
20  you not?
21      MR. NORMAN:  Objection.  Calls for a legal
22    conclusion.
23      THE WITNESS:  I -- I would think that that
24    would be based on any agreements they had prior
25    to their employment or when they became an

Page 208

1    employee.
2  BY MR. LARSON:
3    Q.   You didn't have discussions in the company
4  about, hey, what are the rights of someone who invents
5  on the job?
6    A.   No.
7    Q.   Well, Mr. Todd came and says this
8  invention is mine.  And you came and said, no, it's
9  not, you did it for us.  And when Mr. Todd was
10  claiming ownership of the invention you didn't have
11  any discussion as to what ownership of inventions were
12  or whether employees could own inventions.
13      MR. NORMAN:  And you're asking within the
14    company as opposed to with counsel?
15  BY MR. LARSON:
16    Q.   Well, let's say within the company.
17    A.   I -- I hate to ask that, but, you know,
18  can do that again, because it --
19      (Whereupon, the question was read back)
20      MR. NORMAN:  And I would object to vague.
21  He clarified that he meant not with counsel,
22  only with -- internal to the company.  It would
23  compound.  It assumes facts not in evidence.
24      But answer it, if you can.
25      THE WITNESS:  I don't recall.

Page 209

1  BY MR. LARSON:
2    Q.   But after -- but after Mr. Todd claimed
3  ownership, did you not fight him for two-and-a-half
4  years before you settled with him?
5    A.   Of course.
6    Q.   And during that two-and-a-half years you
7  didn't get any research as to what the legalities were
8  of employees inventing on the job?
9      MR. NORMAN:  You're now asking him if he
10    had conversations with counsel?
11      MR. LARSON:  I'm asking if he was briefed
12    and got information --
13      MR. NORMAN:  Yeah.  If he was briefed by
14    counsel, don't answer the question.
15  BY MR. LARSON:
16    Q.   Did you get any information about
17  ownership by employees?
18      MR. NORMAN:  Objection.  Attorney/client
19    privilege.  Don't answer the question.
20  BY MR. LARSON:
21    Q.   Did you tell Borden that, Borden, I think
22  you should go get your own lawyer, because I'm getting
23  briefed about ownership by employees, and I think you
24  should get briefed by ownership of employees?
25    A.   No.

Page 210

1 Q. You never gave that to Borden.
2 (Whereupon, Plaintiff's Exhibit 66 was
3 marked for Identification)
4 BY MR. LARSON:
5 Q. I'm going to show you what I've marked as
6 Exhibit 66. This a privilege log that Correct Craft
7 has filed.
8 On the bottom, the first page, second one
9 up it says someone at Allen, Dyer did attorney legal
10 research regarding ownership of patents.
11 Mr. Meloon, did you not learn something
12 about ownership of patents by employees?
13 MR. NORMAN: Objection. Attorney/client
14 privilege. Don't answer the question.
15 BY MR. LARSON:
16 Q. And, Mr. Meloon, when you asked Borden to
17 sign these assignments, were you not aware of the law
18 on ownership by employees of their inventions?
19 MR. NORMAN: Objection. Answer only if
20 you can without regard to what you heard from
21 counsel, if you heard colloquially, I guess,
22 about ownership.
23 THE WITNESS: I -- I don't recall anything
24 that I was advised about ownership of patents of
25 my employees or any discussion with my other

Page 211

1 employees regarding that.
2 BY MR. LARSON:
3 Q. But if you wanted to get information on
4 that you certainly had attorneys on staff, or on
5 retainer, that could provides you that information;
6 isn't that correct?
7 A. Well, we certainly had legal counsel.
8 Q. And on the second page of this privilege
9 log, the second item, it says, again, Allen, Dyer did
10 some work on summary of various legal issues
11 researched by attorneys from Correct Craft regarding
12 invention and patent ownership.
13 Now, did you ever --
14 A. What is the date of this?
15 Q. Correct Craft filled this out. I don't
16 know why they didn't put a date on it.
17 A. But I mean, that -- that -- a date has
18 everything to do with this.
19 Q. I know that. I asked them to put a date.
20 They refused to put it.
21 A. And there's nothing here I can answer,
22 because I was not aware of this document. The only
23 date, you know -- I was not aware of this document,
24 nor did I have anything to do with it.
25 Q. But at no time did you ever advise Borden

Page 212

1 Larson to go out and get some legal research on what
2 the ownership of patents is; is that correct?
3 MR. NORMAN: objection. Asked and
4 answered.
5 THE WITNESS: No. We didn't -- didn't
6 give him any advice.
7 BY MR. LARSON:
8 Q. All right. Now, you recall just a moment
9 ago we were talking about Mr. Allen's deposition, and
10 in Mr. Allen's deposition he says I have no -- down
11 here he says I have no ethical obligation to disclose
12 any aspect of the patent law to Borden Larson. See
13 where it says that?
14 A. Uh-huh.
15 Q. And I asked you if Correct Craft had any
16 ethical obligation, and I believe your answer was no.
17 A. Correct.
18 Q. Now, my question to you, does Correct
19 Craft follow higher ethical obligations than you
20 believe attorneys should be held to, or do you think
21 attorneys have higher ethical obligations?
22 MR. NORMAN: Calls for a legal conclusion.
23 And watch your answer, Walt.
24 THE WITNESS: I'm liable to get shot. I
25 mean, I could -- how to do that. I'm sitting

Page 213

1 between two of you and one of you is going to
2 kill me.
3 MR. LARSON: I don't have a gun.
4 THE WITNESS: Oh, okay.
5 BY MR. LARSON:
6 Q. Who has higher ethical obligations,
7 Correct Craft or attorneys?
8 A. I would hope that the ethical standard
9 would be the same for both Correct Craft and the
10 attorneys.
11 Q. Well, the ethical standards of Correct
12 Craft are based on biblical beliefs and the Golden
13 Rule and everything like that. When have you ever
14 seen attorneys out saying that our ethics are based on
15 biblical beliefs?
16 A. Never. But I -- my answer was I would
17 hope that they would be the same.
18 Q. And in practice what have you found?
19 MR. NORMAN: Objection. Calls for
20 speculation.
21 THE WITNESS: Yeah. I -- I don't think
22 I've had enough legal experience to be able to
23 answer that truthfully.
24 BY MR. LARSON:
25 Q. You're familiar with the fact that

Page 214

1  Mr. Allen and his firm were disqualified from
2  representing you in this case, are you not?
3      A.   Yes.
4      Q.   Do you know why they were disqualified?
5      A.   I was --
6          MR. NORMAN:  Answer only if you can do so
7      without reference to your own --
8          THE WITNESS:  The only thing I have heard
9      was they were disqualified, because of conflict.
10     That was -- now, you know, whether that's the
11     reason or not, I haven't seen the legal opinion
12     or anything else.
13 BY MR. LARSON:
14     Q.   And what did you think about them being
15 disqualified for conflict?
16     A.   Well, personally I wasn't real happy about
17 it.
18     Q.   Why?  You think that attorneys should be
19 able to represent one client against another client?
20         MR. NORMAN:  Assumes facts not in
21     evidence.
22         THE WITNESS:  No, I don't think that the
23     circumstances were, you know -- were like that,
24     because he was representing the company and,
25     frankly, the employees are a part of the

Page 215

1  company.
2  BY MR. LARSON:
3      Q.   So, you don't think employees have any
4  independent interest whatsoever while they're
5  employed?
6      A.   I did not say that.
7          (Whereupon, Plaintiff's Exhibit Number
8      67 was marked for Identification)
9  BY MR. LARSON:
10     Q.   I'm going to show you what I've marked as
11 67, and this is Judge Presnell's decision
12 disqualifying Mr. Allen.
13         And if you turn to Page 12 -- there's
14 actually two decisions in here.  One is
15 disqualifying -- the first one is the disqualification
16 on September 8th of '05, and the second one is another
17 disqualification on 12/01 of 06.
18         Mr. Meloon, if you turn to Page 12 of the
19 first one, here you see had Allen complied with his
20 ethical obligations by disclosing to Larson that was
21 acting only on behalf of CC's interests, this dispute
22 would have been avoided.
23         Now, did you know that Judge Presnell
24 disqualified Mr. Allen, because he hadn't complied
25 with his ethical obligations to Borden?

Page 216

1      A.   In those exact terms, no, I did not
2  understand that.
3      Q.   Sure.  A footnote 18 down here the Judge
4  writes, says Rule 4-1.13 of the rules regulating the
5  Florida Bar -- I'll paraphrase some of this -- states,
6  quote, in dealing with organizations, directors,
7  officers, employees, a lawyer shall explain the
8  identity of the client when it is apparent that the
9  organizations interests are adverse to those of the
10 constituents with whom the lawyer is dealing.
11         Down in this block quote it goes on.  The
12 lawyer should advise any constituent -- and just for
13 the record the constituent are the directors,
14 officers, employees or members.  That's what they're
15 talking about as a constituent.
16         It says the lawyer should advise any
17 constituent whose interests the lawyer find adverse to
18 that of the organization of the conflict, or potential
19 conflict of interest that the lawyer cannot represent
20 such constituent, and that such person may wish to
21 obtain independent representation.
22         Care must be taken to assure that the
23 constituent understands that when there is such
24 adversity of interest the lawyer for the organization
25 cannot provide legal representation for that

Page 217

1  constituent, and that discussions between lawyer for
2  the organization and the constituent may not be
3  privileged.
4          Now, Mr. Meloon, this is the rules by
5  which lawyers are supposed to operate.  And to
6  paraphrase this it says, hey, Mr. Allen, Attorney
7  Allen, should have gone to Borden and said, Borden,
8  your interests are adverse to Correct Craft, I can't
9  advise you, and you may wish to obtain independent
10 representation.  And this is the rule by which Judge
11 Presnell disqualified Mr. Allen.
12         And my question to you is, if you think
13 that lawyers and Correct Craft should live up to the
14 same ethical responsibilities, if the judge is saying
15 Mr. Allen should have gone to Borden and said, Borden,
16 I can't represent you, you might have some interests
17 here, I think you should go talk to a lawyer, why
18 didn't Correct Craft have the same responsibility?
19         MR. NORMAN:  Objections.  Assumes facts
20     not in evidence, misstates the opinion, calls
21     for a legal conclusion portion.
22         Answer it, if you could.
23 BY MR. LARSON:
24     Q.   Do you understand the question?
25     A.   I would think the difference here is that

Page 218

1  this is the judge's ruling and the other is a personal
2  belief and reaction, and something that you operate by
3  on a day-to-day.
4       It's -- it's not a -- you know, ethical,
5  how many ways can that be interpreted. Was this
6  morally ethical, was it biblically ethical, was it
7  legally ethical. I'm at a loss.
8       Q.  But my question is this: If a lawyer is
9  supposed to be held to an ethical standard that says
10 when you have someone in front of you that might have
11 some interest or some legal rights, even if the right
12 might be miniscule --
13       MR. NORMAN: Does it say that?
14 BY MR. LARSON:
15      Q.  -- the lawyer has an obligation to take
16 care to make sure that the constituent understands.
17      Now, my question to you is, does Correct
18 Craft not hold itself to the same standards that is at
19 least as high as lawyers are held to?
20      MR. NORMAN: Objection. Mischaracterizes
21      prior testimony, calls for a legal conclusion,
22      directly misstates what the opinion says. And
23      asked and answered.
24      But with that, if you could answer it
25 again, you may.

Page 219

1       THE WITNESS: I -- I can't draw a
2  conclusion between what the judge calls ethical
3  obligations and what we interpret as ethical
4  obligations from a spiritual basis.
5  BY MR. LARSON:
6       Q.  Well, what is a spiritual basis?
7       A.  Well, I mean it's going to be -- it's
8  going to come into the question or into play every
9  time something comes up. He was an employee, we did
10 exactly what we said we would do when he started his
11 employment.
12      He came to work, he did his job, we paid
13 him. We paid him to better the product, we paid him
14 to design and change the product so that it would
15 perform better and make it more saleable and us more
16 competitive. And he did that. And, in turn, we paid
17 him.
18      Q.  And you have -- with the right to use the
19 tower, you have the benefits of everything that you
20 paid Borden for. You have the tower, do you not?
21      A.  Yes.
22      Q.  You sell, maybe, 2000 of them a year?
23      A.  I don't -- those numbers I'm not aware of.
24      When you say you, now you're talking about
25 Correct Craft or the industry?

Page 220

1       Q.  Correct Craft.
2       A.  I'm not --
3       Q.  Well, I have -- for the record, I've
4  subpoenaed, you know, the records from, you know,
5  Diamondback and also from Sunshine Welding, and it
6  looks to me that you're buying 2,000 towers a year
7  from them, between the two of them. So, would you
8  dispute that? Are the numbers somewhere around that?
9       MR. NORMAN: Objection. Asked and
10      answered.
11      THE WITNESS: We only built 2600 units
12      last year total. That's a -- six different
13      models. So, I'm -- I don't know that the usage
14      of the tower in Correct Craft is that high.
15 BY MR. LARSON:
16      Q.  You haven't heard --
17      A.  It might be.
18      Q.  You haven't heard in your own writings
19 that the usage is up to 80 percent?
20      A.  In my own writings or the company's?
21      Q.  Company's writings.
22      A.  No. I've not seen that statement made.
23      Q.  Okay. But let me go back here.
24      You say that Borden was hired to design
25 and to make improvements to the company -- and make

Page 221

1  improvements to the product, right?
2       A.  Uh-huh.
3       Q.  And you have access to the tower, which
4  Borden designed, you're not paying him any royalty,
5  you sell the towers in your boats, so you have access,
6  by selling the towers on your boats to everything that
7  you had asked Borden to do, do you not?
8       MR. NORMAN: Objection. Calls for a legal
9      conclusion.
10      THE WITNESS: He did it as an employee.
11      That was part of his job.
12 BY MR. LARSON:
13      Q.  And you do have access to the towers on
14 your boats as an employee, and you still are selling
15 the towers based on what his original idea was?
16      Maybe not the original design. The
17 designs are different, because they're shaped, you
18 know, very nicely looking today, but you still have
19 access to that tower today?
20      A.  Yeah. We have access to the tower.
21      Q.  Okay. But in addition to having access to
22 the tower and selling the tower, you're going out to
23 every boat company in the country and asking for
24 license fees?
25      A.  Yes.

Page 222

1    Q.    And where in Borden's employment
2 agreement, or agreement with you, did you ever say,
3 Borden, when you design something for the company
4 there's two parts to this; we're going to use it
5 ourselves, and then license it to the world and make
6 money on that?
7         MR. NORMAN:  Objections.  Calls for a
8    legal conclusion.
9 BY MR. LARSON:
10    Q.    Where did you ever have an agreement with
11 him that what he was going to be designing was going
12 to be licensed to the world?
13         MR. NORMAN:  Same objection.
14         THE WITNESS:  That -- there was no reason
15    to have that agreement.
16 BY MR. LARSON:
17    Q.    So, you didn't have an agreement?
18    A.    No.
19    Q.    And you never had a discussion with him
20 that things that he designed would be licensed to
21 other boat companies?
22    A.    No.  There was no reason to.
23    Q.    Why not?
24    A.    He was hired as a draftsman and a
25 designer.  His job was to, you know, help perfect the

Page 223

1 boat and its performance so that it was a better
2 selling product.
3    Q.    And he did that?
4    A.    And the company, you know, survives.
5    Q.    And he did that?
6    A.    And, in turn, we -- we provided him with
7 security while he was with the company.
8    Q.    And he did that and you have a tower based
9 on -- you know, you paid him a salary one week and he
10 designed the tower, and now you're making -- you know,
11 you're selling 2,000 towers a year at two grand
12 apiece, that's grossing four million a year.
13    A.    And you want to see the legal bills, too,
14 to collect all of those?
15    Q.    But you're grossing four million a year.
16    A.    And the other side of it is the cost and
17 you're aware of that.
18         But we had an agreement.  We hired him.
19 He -- he did the job.  I think I've told you this
20 about 15 times, you know.  It's the same thing.
21    Q.    But you didn't have an agreement with him
22 that he was going to go design things that were going
23 to be used to license out to other boat companies?
24         MR. NORMAN:  Objection.  Calls for a legal
25    conclusion.

Page 224

1         THE WITNESS:  How was I to know what there
2    would be in the future?
3 BY MR. LARSON:
4    Q.    Now, going back here to Page 12 of
5 Mr. Presnell's (sic) ruling, in the bottom paragraph
6 he goes, rules are regulated in the Florida bar
7 comment, quote, the fact that Larson was induced to
8 give up his interest in his invention -- and in
9 parens, without consideration, end paren -- by signing
10 the CCI indicates that the interests of the two
11 parties were adverse, yet Allen never took steps to
12 clarify the situation with Larson.
13         Well, you knew that you were asking Borden
14    sign these assignments without consideration, didn't
15    you?
16         MR. NORMAN:  Objection.  Calls for a legal
17    conclusion, asked and answered, assumes facts
18    not in evidence.
19         THE WITNESS:  We had -- you know, we have
20    a relationship with the attorneys and they do
21    legally what they have to for the company.
22         And, you know, do they consult me on
23    everything that they do?  No.  They advise me on
24    what has been, or if there has to be a decision.
25         You know, the company followed their --

Page 225

1 their advice.  We did what they suggested we do.
2 BY MR. LARSON:
3    Q.    Now, after Attorney Allen was disqualified
4 from representing you in this case, you continued to
5 employee them, did you not?  You, I mean Correct
6 Craft?
7    A.    What?  The law firm?
8    Q.    Yes.
9    A.    Yes.
10    Q.    And you continued to use them in this
11 case, did you not?
12    A.    Now or --
13    Q.    After the first disqualification.
14    A.    To use them for what, though?  General --
15 you know, general legal advice.
16    Q.    Did you not use them after they were
17 disqualified to come and testify against Borden
18 Larson?
19    A.    Well, I'm -- obviously.
20    Q.    Why would you have -- why would you use an
21 attorney that's just been disqualified for ethics to
22 continue to represent Correct Craft in any way?
23    A.    Perhaps I and the judge disagree, on, you
24 know, the judge's reason.  But he's the judge.
25 Perhaps the other company disagrees, and I think that

Page 226

1  they're still the company that we should -- or the law
2  firm we should deal with.
3      Q.    So, you're not concerned that Correct
4  Craft should avoid even the imp -- that you should
5  avoid even the appearance of impropriety?
6      A.    I don't think -- probably the company
7  doesn't feel there is.
8      Q.    Okay.
9      A.    But that's a matter of disagreement.  We
10 have that right.
11     Q.    But you did use Attorney Allen and Carl
12 Napolitano again to present expert opinion against
13 Borden, did you not?
14         MR. NORMAN:  Objection.
15 Mischaracterizes --
16         THE WITNESS:  I'm sure --
17         MR. NORMAN:  Assumes facts not in
18 evidence.
19             Answer it, if you could.
20         THE WITNESS:  I'm -- I'm -- yeah.  I'm
21     sure that they were subpoenaed or whatever.
22 BY MR. LARSON:
23     Q.    Well, do you know --
24     A.    In depositions or whatever.
25     Q.    Do you know the judge disqualified

Page 227

1  Attorney Allen again a second time in this case?
2      A.    I'm --
3          MR. NORMAN:  Objection.  Misstates the
4      facts and the law.
5              Answer it, if you could.
6      THE WITNESS:  I'm not aware of that, no.
7  BY MR. LARSON:
8      Q.    Well, let me show you the next order here.
9  There's a pink sheet of paper, and here's another
10 order.  This is December 1st, 2006.
11         And here Judge Presnell now disqualified
12 Herb Allen and Carl Napolitano from testifying for
13 Correct Craft -- or testifying based on opinion
14 evidence.
15         Just to read some of this --
16         MR. NORMAN:  Why don't you allow him to
17     read the whole thing if you want to ask him
18     questions about it.
19         MR. LARSON:  Take your time.  You can read
20     it.
21 BY MR. LARSON:
22     Q.    Now, sir, this ruling from Judge Presnell
23 reads -- I'm reading in here (indicating).
24         It says on September 8th, 2005, following
25 an extensive hearing this Court issued an order, which

Page 228

1  is Document 53, which we just read, disqualifying
2  Allen and his law firm from representing the
3  Defendants, which is Correct Craft.
4          That ruling is based on the Court's
5  finding that an attorney/client relationship had
6  existed between Allen and Larson during and after the
7  patent prosecution proceedings.  Since this case
8  involves the propriety of those proceedings, the Court
9  found that Allen's representation of the Defendants,
10 which is your company, in this case was foreclosed by
11 Rule 4-1.9 of the rules regulating the Florida Bar.
12         So, again, the judge is just reciting what
13 the first opinion was that we just read.  But then it
14 goes on.
15         Notwithstanding that order, Defendants,
16 which is Correct Craft, have designated Allen and
17 Napolitano as expert witnesses who will testify
18 against their former client, which is Larson.  And he
19 talks about two different things that they're going to
20 testify to, one and two.
21         And then he says Plaintiff, which is
22 Borden, claims that such opinion testimony violates
23 various rules which regulate the conduct of lawyers in
24 Florida.  If you skip the next paragraph --
25         MR. NORMAN:  Don't skip the next

Page 229

1      paragraph.  Read it.
2          MR. LARSON:  This is my deposition.
3          MR. NORMAN:  Why don't you let him read
4      the whole document, though.
5          MR. LARSON:  I thought he had.
6  BY MR. LARSON:
7      Q.    It says, in essence, Allen and his law
8  firm having been disqualified as counsel for the
9  Defendants by reason of their conflict, now seek to
10 perpetuate that conflict by offering, quote, expert
11 testimony, against their former client.  This they
12 cannot do.  And there's a footnote.  And the footnote,
13 if you read at the bottom, this is not the first
14 occasion that Allen's firm has evidenced a cavalier
15 attitude concerning conflict issues before the Court.
16         Now, Mr. Meloon, my question to you is, is
17 it the reputation of Correct Craft that you employ
18 lawyers and employees who violate ethical obligations
19 and have cavalier attitudes to ethics?
20     A.    To me, cavalier is kind of generic, one.
21 Two, when you get to the point of whether or not we do
22 or don't, we have the right to do business with who we
23 chose to.  The judge has a -- you know, has made a
24 ruling and that's his ruling, and we have made a
25 choice and, obviously, the company is happy with it,

Page 230

1  as far as I'm concerned.
2      Q.  Hasn't Correct Craft promised to the world
3  and to Borden that you would live up to certain
4  ethical standards and the employees of the company
5  have to live up to that same standard?
6      A.  Does that ethical standard state anywhere
7  in the standard of ethics that we have done anything
8  other than what we promised to do for Borden?
9      Q.  Well, here Judge Presnell is saying that
10  your attorney should have given Borden some advice to
11  say, hey, there's a conflict of interest here, Borden,
12  you have to get your own counsel, there's an issue
13  here.
14          And you said that the standard for your
15  company and attorneys, hopefully, are the same.  Well,
16  if the attorneys had to live up to that, why shouldn't
17  you?
18      A.  I can't be a judge whether -- you know,
19  the ethics of the Court or the attorneys are the same
20  just merely reading a ruling that a judge made,
21  because we have the right to make a decision as to who
22  we do business with.
23      Q.  But what are -- but what are your ethics?
24      A.  We -- we honored our commitments to
25  Borden.

Page 231

1      Q.  And you had him sign assignments to say
2  that he was going to get one dollar and other valid
3  consideration.
4          Now, when have you ever paid him the
5  dollar, first of all?
6      A.  We can settle that now, if you like.
7      Q.  What about the other valid consideration?
8      MR. NORMAN:  Objection.  Calls for a legal
9  conclusion.
10      THE WITNESS:  Yeah.  You know --
11  BY MR. LARSON:
12      Q.  Did you ever negotiate with Borden the
13  fact that he had the right under these assignments to
14  have other valid consideration?
15      A.  No.
16      Q.  It doesn't say in there that for the
17  salary you've been paid as an employee, does it?
18      A.  I -- that -- I mean, that's standard
19  operating procedure when you're employed by a company
20  to do a job.  You do the job, you get paid.
21      Q.  These assignments, sir, they do not say
22  that consideration for the patents assignments are the
23  salary that you had paid him.  And I'm going to show
24  you Exhibit 43.  Those are the different assignments.
25  Take your time.

Page 232

1      Show me in there where it says his
2  consideration is the fact that we had an agreement,
3  and we're going to pay him a salary, and that salary
4  is his consideration for these assignments.  Tell me
5  where it says that.
6      MR. NORMAN:  Calls for a legal conclusion.
7  The document speaks for itself.
8      THE WITNESS:  Obviously, you know, it
9  doesn't say what you say it says.  I mean,
10  otherwise you would not ask me to read it
11  through and point it out to you.
12  BY MR. LARSON:
13      Q.  But are you saying that was the
14  consideration, that Borden was paid a salary --
15      A.  No.
16      Q.  -- and that's what his agreement was?
17      A.  There are considerations and agreements
18  made as a term and a part of employment that sometimes
19  is in writing and sometimes it's verbal.
20          And there are certain understandings and
21  there are certain, you know, things that you agree to
22  by virtue of the fact you take the job.
23      Q.  And where did you have that memorialized
24  with Borden that --
25      A.  You don't memorialize those.

Page 233

1      Q.  You are today.  You have intellectual
2  property agreements that you -- that Karen -- no.
3  Angela Pilkington said that all employees of the
4  company now have signed.
5      A.  Correct, because of the circumstances that
6  we're operating right now.
7      Q.  And you lawyers haven't advised you that
8  all other big companies have those in place when
9  people are hired if they want the intellectual
10  properties to remain with the company?
11      MR. NORMAN:  Objection.  Attorney/client
12  privilege.  Please don't answer the question.
13  BY MR. LARSON:
14      Q.  The last part of this Exhibit 67 -- do you
15  still have that in front of you?  Well, I'll just show
16  you mine.
17          The last part of it says furthermore, all
18  attorneys shall even avoid the appearance of
19  impropriety.  See where it says that?
20      A.  Uh-huh.
21      Q.  Is it your belief that Correct Craft
22  doesn't need to avoid the appearance of impropriety?
23      A.  This judgment is not about us or the
24  company.
25      Q.  Okay.  But my question to you is, here the

Page 234

1    judge is saying that Attorney Allen didn't avoid the
2    appearance of impropriety.
3        A.   It doesn't reflect on whether we do or
4    don't.
5        Q.   But they were your agent in this whole
6    process.
7        A.   Yes, they were.
8        Q.   And you accepted the fruit of their labor
9    during this whole process?
10       A.   We paid for that.
11       Q.   And the judge now is saying that in that
12   process, they were unethical, and you're still
13   accepting the fruit of their labor, are you not?
14            MR. NORMAN:  No.  Objection.
15   Mischaracterizes the statement.  He said that in
16   representing them in this case, that would be
17   unethical, not what they did in the underlying
18   case, sir.  That's not true and you know it.
19            MR. LARSON:  Well, it -- it is true.  And
20   he said it, because Attorney Allen --
21            MR. NORMAN:  Disqualified them from this
22   case.  He didn't enter a judgment against them
23   for something they may have done in the past and
24   you know that just as well as I do.
25            MR. LARSON:  You're confusing the issues.

Page 235

1        The first -- the first disqualification order
2    said Mr. Allen had an ethical obligation to
3    disclose to Borden the fact that he's only
4    working for Correct Craft, and Borden may wish
5    to obtain independent representation.  And Allen
6    didn't do that, and that's a violation of
7    ethics.
8    BY MR. LARSON:
9        Q.   So, my question to you, Mr. Meloon, is
10   throughout the whole patent process this Judge
11   Presnell is saying Mr. Allen had an ethical
12   obligation.  There's six different assignments.  Every
13   single one he had an ethical obligation to say, wait a
14   minute.  I'm representing Correct Craft only and you
15   may wish to obtain independent representation, which
16   comes out of Rule 4 dot 1 point 13.
17            So, through the whole process Mr. Allen
18   was employed by you, correct?
19       A.   They were our attorneys.
20       Q.   And they were following your advice to go
21   get them a patent.  And Judge Presnell says Mr. Allen
22   violated his ethical duties to Borden while he's
23   working for you?
24            MR. NORMAN:  Objection.  Mischaracterizes
25   the document, testimony, calls for a legal

Page 236

1    conclusion, assumes facts not in evidence, and
2    assumes facts completely contradicted by the
3    very document you're referring to.
4    BY MR. LARSON:
5        Q.   Isn't it true he was working for you
6    during this whole process?
7        A.   They were our attorneys.
8        Q.   And they were working for you.
9            Let me change subjects a little bit.  You
10   probably wouldn't mind.  I want to talk about
11   Mr. Todd.
12            MR. NORMAN:  Just so you know, we're about
13   four hours into this deposition.  You're aware
14   of the time limits the court places on these
15   depositions.  Those time limits will be enforced
16   today, sir.
17   BY MR. LARSON:
18       Q.   Now, Mr. Todd called you up and says, hey,
19   I have some rights; is that correct?
20       A.   I don't know that he called me and said he
21   had rights.  No, he did not confront me with that.
22       Q.   But he confronted someone at the company?
23   He said I have some rights and for two-and-a-half
24   years Correct Craft, through Herb Allen, confronted
25   him back and says, no, you don't; is that correct?

Page 237

1        A.   I'm assuming that's what had happened,
2    yes.
3        Q.   And after two-and-a-half years you had a
4    mediation, and on April 1st of 2000, you settled with
5    him?
6        A.   That would be correct, I believe.
7        Q.   And you were at that mediation?
8        A.   Yes.
9        Q.   And you signed documents where Mr. Todd
10   was going to get paid $355,000 over a period of time?
11       A.   Uh-huh.
12       Q.   Now, why did you agree to pay Mr. Todd
13   $355,000?
14            MR. NORMAN:  Answer only to the extent you
15   can about information not learned through the
16   mediation or through your attorneys.
17   BY MR. LARSON:
18       Q.   Do you understand the question?
19       A.   We weren't -- I mean, we were operating
20   based on the information that was provided to us that
21   it would make our claim much stronger when we went to
22   the market, even though we could -- our patent trumped
23   the design patent, because we had a utility patent.
24            Otherwise, that could have been called --
25   you know, somebody could have fought them and said

Page 238

1 that's a radar, or that's a -- you know, a tuna tower,
2 that's a -- something else.
3        And ours was a utility patent that was
4 for -- it did a specific thing, 49 specific things.
5 And what -- we just felt that it was -- it would make
6 our case a whole lot stronger when we went to the
7 marketplace.
8     Q.   My question to you -- well, let me ask a
9 different question.
10       What did Todd do throughout the whole
11 process to be worthy of being paid $355,000?
12       MR. NORMAN:  Again, if you can answer
13    without things that you've learned from counsel
14    or the mediation.
15       THE WITNESS:  Basically he was an
16    obstacle.
17 BY MR. LARSON:
18    Q.   So, you paid $355,000 to get rid of an
19 obstacle?
20    A.   We negotiated an agreement that -- you
21 know, where we purchased the design rights, because it
22 strengthened our position in the marketplace.
23    Q.   But what did he do regarding the design
24 that was worthy of $355,000?
25       MR. NORMAN:  Objection.  Asked and

Page 239

1 answered.
2       THE WITNESS:  Do what?
3       MR. NORMAN:  I said objection.  Asked and
4    answered.
5        You already answered it, but you can
6    answer it again, if you like.
7       THE WITNESS:  What did he do?
8 BY MR. LARSON:
9    Q.   Uh-huh.
10    A.   He interfered with the whole process by,
11 you know, jumping out in front of us and claiming that
12 he had rights to it and designed it.
13    Q.   So, you're saying he didn't do anything to
14 earn the $355,000?
15       MR. NORMAN:  Objection.  Mischaracterizes
16    his prior testimony.  Asked and answered.
17       THE WITNESS:  What he did was make life
18    difficult.
19 BY MR. LARSON:
20    Q.   So, you don't think he was deserving of
21 the 355?
22       MR. NORMAN:  Objection.  Vague.
23       THE WITNESS:  I wouldn't say he's not
24    deserving of it.  At the -- at the same time
25    nobody is happy to have to make those kind of

Page 240

1    settlements.
2 BY MR. LARSON:
3    Q.   Well, what part --
4    A.   Based on the circumstances.
5    Q.   What part of the 355 was he deserving of?
6       MR. NORMAN:  Objection.
7       THE WITNESS:  I don't know if there would
8    be a percentage that he was worthy of or a
9    percentage that he wasn't worthy of.  That was
10    an agreement that was made between him and the
11    company in legal negotiations and --
12 BY MR. LARSON:
13    Q.   Now, after you settled with him, you never
14 told Borden Larson that you had settled with Todd for
15 $355,000, did you?
16    A.   Why would I?
17    Q.   Well, why wouldn't you?
18    A.   No reason.
19    Q.   Isn't that a Golden Rule?  Wouldn't you be
20 treating Borden how you would want to be treated?
21    A.   That's not exactly a Golden Rule.  It was
22 a business decision that had nothing to do with
23 Borden.
24    Q.   After you settled with Todd you went to
25 ask Borden to add Todd as a co-inventor, did you not?

Page 241

1    A.   Yeah.  That was part of the negotiations.
2    Q.   So, you instructed Borden to add Todd as a
3 co-inventor after you had settled with Todd.
4       Now, why would Borden want to add Todd as
5 a co-inventor when everyone said he wasn't an
6 inventor?
7    A.   That was part of the negotiation in the
8 settlement that was made.
9    Q.   And that settlement was kept secret from
10 Borden, was it not?
11    A.   Why wouldn't we keep it secret?  What
12 business was it of Borden's?
13    Q.   You were asking him to sign documents
14 based on agreements that you had in the these secret
15 negotiations.  That's why.  You don't think Borden had
16 a right to know why he was signing documents he
17 disagreed with?
18    A.   Borden -- Borden was paid for what he did.
19 He did a job and we paid him, you know, weekly, and we
20 provided him security.
21       And those were decisions that were made by
22 management, and there was no reason to ask an employee
23 anything about it.  Those are decisions that are made
24 at a different level.  And, you know, that was part of
25 the negotiations, and it was done, and it was settled,

Page 242

1  and that's it.
2      Q.    And didn't you tell Borden that actually
3  Todd had given up, and based on him giving up you
4  wanted to go and reissue this patent and have him
5  added --
6      A.    He didn't give you.
7      Q.    -- as co-inventor?
8      A.    He didn't give up.
9      Q.    You never told Borden that you settled
10  with him for $355,000.
11      A.    I didn't tell him he -- he didn't give up,
12  I didn't tell him he gave up, I didn't tell him that
13  we settled anything. There was no reason to.
14      Q.    So, you had information that you kept from
15  Borden, but then you asked Borden to go add Todd as a
16  co-inventor?
17      MR. NORMAN: Objection. Mischaracterizes
18      prior testimony, assumes facts not in evidence.
19      Asked and answered.
20      THE WITNESS: Yeah. I mean, that was a
21      part of the process and that's the way it
22      happened, but it was all, you know -- I didn't
23      feel that we owed Borden any explanation for
24      anything, or any -- there was no reason for it.
25  BY MR. LARSON:

Page 243

1      Q.    Well, why did you pay Todd $355,000 for
2  his signature on the assignments, but you paid Borden
3  Larson nothing for his signature on the assignments?
4      A.    I think I pretty well answered that a
5  minute ago. You know, he had a -- he had a patent on
6  file, and he had the patent, and we felt it
7  strengthened our position.
8      Q.    And if Borden hadn't signed those patent
9  assignments, your position would be pretty weak, too,
10  wouldn't it?
11      MR. NORMAN: Objection. Calls for a legal
12      conclusion.
13      THE WITNESS: I don't know that that would
14      be the situation.
15  BY MR. LARSON:
16      Q.    So, you're not saying that you actually
17  needed Borden Larson's signature on all these patent
18  assignments?
19      MR. NORMAN: Objection.
20      THE WITNESS: I'm a boat builder, not --
21      not an attorney. I don't have any idea.
22  BY MR. LARSON:
23      Q.    And Borden was a boat builder, not an
24  attorney either, was he?
25      A.    He was an employee of a boat company.

Page 244

1      Q.    And he'd worked in boat building for a
2  long time?
3      A.    Uh-huh.
4      Q.    Now, you had attorneys. Why didn't you,
5  you know, give Borden access to an attorney just like
6  you had an attorney?
7      MR. NORMAN: Objection. Mischaracterizes
8      prior testimony, assumes facts not in evidence.
9      THE WITNESS: Can I tell him how to spend
10      his money? If he needed an attorney and wanted
11      one he should have went (sic) and gotten one.
12  BY MR. LARSON:
13      Q.    And you never advised him that it might be
14  good for him to do that?
15      MR. NORMAN: Objection. Asked and
16      answered.
17      THE WITNESS: I didn't feel there was a
18      reason.
19  BY MR. LARSON:
20      Q.    I want to turn to 163. I'm changing
21  subjects here. I'm going back to your transcript of
22  your -- the trial. This is the second day. This is
23  your testimony.
24      On Page 163 down here, we're talking about
25  Todd and they're asking you the same questions as I'm

Page 245

1  asking you here. And Line 14 -- or Line 11 says,
2  Question: Ultimately you paid Todd some money, didn't
3  you?
4      Answer: Yes, we did.
5      Question: And you listed him as the
6  inventor?
7      15: That is correct.
8      16: Why would you agree to pay him some
9  money.
10      Answer: Our company's philosophy is one
11  that is very strong. It is based on good business
12  principals and practices, and biblical principals.
13      Now, I want to stop right there. What
14  biblical principals were in play that caused you to
15  pay him $355,000?
16      A.    Well, the interpretation -- my
17  interpretation of the principles may be different from
18  anybody else's, but basically it's where that -- he was
19  a Christian, and we, as a Christian, are not to go
20  into civil court to settle claims. And we chose not
21  to go to court.
22      Q.    Okay. And so you're saying that Borden is
23  not Christian now, because he's in civil court with
24  you?
25      A.    I did not say that. I said that was our

Page 246

1 belief. I did not say anything about Borden.
2    Q.    Do you know Borden Larson has written your
3 company two or three letters before this lawsuit
4 commenced and you never responded once?
5    A.    I'm not aware of that. That was not on my
6 watch, that I'm aware of.
7    Q.    Is that a Christian principle to ignore
8 employees or ex-employees?
9    A.    You understand I'm not the president and
10 CEO. I do not make the decision of the Board. And
11 there may be people on the Board who have a little
12 disagreement with the way the family looked at -- the
13 way we operated the company.
14    Q.    So, you're saying the biblical principle
15 here is that you wanted to settle with Todd, because
16 Christians don't go into civil court with each other?
17    A.    That's -- that's correct. That's what I
18 said.
19    Q.    Do you know in Matthew 18 it says between
20 Christians you should first approach them, and if they
21 don't listen to you, you get two or three witnesses to
22 approach them?
23    A.    I'm well aware of Matthew 3:18, yes.
24    Q.    And you know that Borden approached
25 Correct Craft and got nowhere?

Page 247

1    A.    I'm not -- I'm not aware of him
2 approaching and nobody answering. I'm not aware of
3 that.
4    Q.    And do you know that he's taken other
5 witnesses and approached Correct Craft and he's gotten
6 nowhere?
7    A.    I -- I'm not aware that he's brought other
8 witnesses into it.
9    Q.    And do you know that he has approached the
10 church, he's approached Moody, he's approached Billy
11 Graham asking them to mediate and asking Correct Craft
12 to mediate with him based on biblical guidelines and
13 Correct Craft has refused?
14    A.    Correct Craft refused?
15    Q.    Yes.
16    A.    I'm not aware of that.
17    Q.    Do you know of an organization called
18 Peacemakers?
19    A.    Only I've -- I've heard the name.
20    Q.    What do you know about them?
21    A.    I'm not aware of what they do.
22    Q.    Do you know they're an organization of
23 Christian lawyers and judges that mediate disputes
24 among Christians?
25    A.    I -- I wasn't aware of that, no.

Page 248

1    Q.    Do you know Borden called your Uncle Ralph
2 and invited him, specifically invited him to a weekend
3 Peacemakers' meeting and he refused?
4    A.    I -- I -- no, I don't. I don't know that
5 that happened.
6    Q.    Do you know that Borden spoke to Bill
7 Yeargin and invited him to the same meeting that was
8 in Bill Yeargin's own town, and Bill Yeargin refused
9 to go to Peacemakers?
10    A.    I haven't had a conversation with him
11 about that, that's for sure.
12    Q.    And do you know that Matthew 3:18, after
13 it says you bring your complaint to them, and if they
14 ignore it, you bring two or three witnesses and they
15 ignore it, you bring it to the church and if they
16 ignore it, do you know what the next step is for a
17 Christian to deal with another Christian?
18    A.    What's your interpretation?
19    Q.    I want to know if you know what it says.
20    A.    Well, at that point there's got to be a
21 settlement made.
22    Q.    Matthew says you treat them as you would a
23 pagan.
24    A.    Okay. Then does that mean that we treat
25 Borden as a pagan or he treats us as a pagan?

Page 249

1    Q.    I'm saying that --
2    A.    If we do that, then we throw all the rules
3 out.
4    Q.    Why are you throwing all the rules out?
5    A.    If that's what the Scripture says and
6 that's what he's going to stand on, you know, that's
7 what the Scripture says and I have no choice but to
8 follow what the Scripture says. If that's what you're
9 quoting to me.
10    Q.    You have no choice to do what?
11    A.    Do exactly what it said.
12    Q.    What? To treat Borden as a pagan?
13    A.    That was my question. You know, who
14 treats who as a pagan? He treats us as a pagan?
15    Q.    What do you think you should do?
16    A.    That's a decision that Borden Larson has
17 to make.
18    Q.    What do you think Correct Craft should do
19 after Borden comes and says I want you to go to
20 Peacemakers with me, I want to sit down with your
21 pastors with me, and Correct Craft refuses?
22        MR. NORMAN: Objection. Assumes fact not
23 in evidence, mischaracterizes prior testimony.
24        THE WITNESS: Yeah. And this is an
25 endless argument. We'll be --

Page 250

1 BY MR. LARSON:
2    Q.  Well, what's your answer?
3    A.  To what?
4    Q.  What should Borden do after Correct Craft
5 refuses?
6    A.  If -- if he's claiming the Scripture, then
7 he knows what the Scripture tells him.  If that's his
8 decision.
9    Q.  And what is Correct Craft's belief about
10 that Scripture?
11   A.  We believe that we have sought counsel
12 from -- from others in the church and the -- of like
13 faith, and gone through the whole situation, and
14 there's disagreement among our people who advise --
15 who we sought counsel with and who he sought counsel
16 with, and his Pastor, you know, and our Pastor.
17   Q.  And what's your pastor say?
18   A.  There's disagreement with everything.
19   Q.  What Pastor is that?
20   A.  He's a Pastor of the First Baptist Church
21 in Pinecastle.
22   Q.  What's his name?
23   A.  What relevance has that got to do with it?
24   Q.  I would just like to know.
25   A.  I mean, what is Borden Larson's Pastor's

Page 251

1 name?
2    Q.  I can't do that.
3    A.  I've spoken to him on the phone.
4        Send me his name and I'll send you our
5 name.
6    Q.  But what -- but what -- oh, so, you don't
7 know the name off the top of your head, or you don't
8 want to give it to me?
9    A.  The Pastor?  I would prefer not to give it
10 to you.
11   Q.  Okay.  But you've had discussions with
12 that Pastor?
13   A.  Ralph Meloon has.
14   Q.  And the Pastor says we don't need to
15 mediate and he we don't need to follow Matthew's --
16   A.  I'm -- I'm not saying that he said that.
17 I'm saying there's a disagreement.
18   Q.  A disagreement between whom?
19   A.  Obviously what Borden's Pastor was telling
20 him and what our Pastor felt after reading the
21 Scripture and listening to the -- you know, to the
22 information provided.
23   Q.  So, your Pastor doesn't believe that
24 Christians should mediate things within the church?
25   A.  I didn't say that.  I said there was a

Page 252

1 disagreement.  I didn't say about what.
2    Q.  Do you know what the disagreement is
3 about?
4    A.  No.
5    Q.  They didn't tell what the disagreement was
6 about?
7    A.  I didn't ask.
8    Q.  And who told you this meeting with the
9 Pastor even occurred?
10   A.  Ralph, Sr.
11   Q.  Okay.  On 164 you're talking about the
12 reason you're settling with Todd is that he was in
13 Sunday school saying that he was about to -- I'm
14 actually at 163.
15   A.  Uh-huh.  I'm with you.
16   Q.  It says Todd's in Sunday school and he's
17 requesting prayer, because he's about to get sued by
18 Correct Craft and the Meloon family.
19       Now, you just told me that the Meloons
20 didn't believe in suing other Christians.  Why are you
21 saying here --
22   A.  We had not filed suit with him.  We had
23 not even talked to him about it.  And he felt guilty
24 and felt that we were going to jump on him and he made
25 that statement.  And one of our employees was sitting

Page 253

1 in the room with him and he came to me and he said,
2 Walt, here's what happened.
3    Q.  Okay.  And you say, Walt, this isn't
4 right, this is not good, and our reputation of the
5 company, because it's not what our company stands for.
6       Is that what the employee said?
7    A.  Yeah.  It says so right there.
8    Q.  Okay.  So, my question to you, though, is
9 why is an employee coming to you telling you what your
10 company should stand for?
11   A.  Because --
12       MR. NORMAN:  Objection.  Calls for
13   speculation.
14       Answers it, if you can.
15       THE WITNESS:  Because he was -- he was a
16   trusted friend and a loyal employee of the
17   company.
18 BY MR. LARSON:
19   Q.  Well, you knew this conflict with Todd was
20 going on for two-and-a-half years.  Why didn't you
21 stand up and say this isn't what we stand for?
22   A.  It was not public at that time.  Nobody
23 had challenged anybody.
24   Q.  So, only because it's public in the Sunday
25 school?

Page 254

1    A.    When it came to that and we understood
2 that he was preparing for a fight, that's when we
3 called him and asked him to come in.  That was the
4 first time he came in and we -- we talked to him about
5 it.  Just sat down and talked.
6    Q.    Okay.  And 164, Line 7:  And you paid him
7 about $100,000?
8        That's correct.
9        And is that something you did on the
10 advice of some attorney?
11        It was.  I would say it was prompted by
12 both the ethics by which we try to operate and the
13 urgings of our attorney.
14        And my question to you is what ethics
15 required you to pay Todd 355,000 and pay Borden
16 nothing?
17    A.    I was referring to the fact that we
18 settled that in -- in mediation rather than going into
19 court.
20    Q.    But that's not what you say here.  You say
21 that you paid him the money because of the ethics by
22 which we try to operate.  Now, let's just stop right
23 there.  What ethics is there?
24    A.    Your interpretation of that sentence is
25 different than -- than mine and the reason for the

Page 255

1 statement that I made.  We chose to settle it and not
2 go to court.
3    Q.    What does that have to do with ethics?
4 That looks like --
5    A.    We did what -- what we said we should do
6 under biblical principles.
7    Q.    Prior to the mediation you weren't going
8 to settle with him.  You go to mediation, you say
9 let's settle.  Why were ethics involved at the
10 mediation and why you settled?
11        MR. NORMAN:  Objection.  Asked and
12 answered.
13        THE WITNESS:  When in business do you
14 ever, the first time you sit down with someone,
15 get up and walk out of the meeting and maybe
16 leave money on the table?
17        I mean, at that point in time we just
18 had a conversation about did you do this, why
19 did you do it, what was the reason, you know.
20 It was a -- that was the kind of discussion we
21 had.
22 BY MR. LARSON:
23    Q.    I want to know what ethics allowed Mr.
24 Todd to get $355,000 and Borden get nothing, and they
25 signed exactly the same piece of paper?

Page 256

1        MR. NORMAN:  Objection.  Asked and
2 answered.  It calls for a legal conclusion.
3        Answer it, if you could.
4        THE WITNESS:  Well, again -- and I've
5 answered this before -- we chose not to go to
6 court, because of the way we believe and we
7 negotiated the settlement and -- and mediation.
8 BY MR. LARSON:
9    Q.    So, in other words, the ethics is the fact
10 that you don't go to court?
11    A.    We prefer not to.
12    Q.    But you sued Tower Systems, did you not?
13    A.    Tower Systems -- Tower Systems filed suit
14 against us first.
15    Q.    Okay.  And you sued them back?
16    A.    And we filed suit against them in a New
17 Jersey court to get them moved -- to get it moved to
18 Orlando.  They fired the first shot.
19    Q.    Okay.  What about Wake Design?  They
20 didn't fire the first shot?
21    A.    Wake Design?
22    Q.    You sued them, too.
23    A.    And where did that go to?  I mean, what
24 was the results of the action that was taken?  I don't
25 recall on the Wake Design.

Page 257

1    Q.    Well, I believe --
2    A.    There was a threat made.  Not by us, but
3 by him.
4    Q.    Well, I've -- I've seen the pleadings.  I
5 haven't followed them.  And, for the record, I don't
6 know.  But I know that you sued Wake Design.
7        What about Sea World of Orlando?  You sued
8 them, too.
9    A.    Sued Sea World?
10    Q.    Or Ski World.
11    A.    Ski World.  Okay.  We sued him, because we
12 could not get any satisfaction out of Wake Design.
13 The only thing we could do, was to do that to stop
14 shipments of the product into the State of Florida.
15    Q.    Did you call them up and ask them if
16 they're Christians first?
17    A.    No, we did not, because they fired the
18 first shot on us and they let us know that, you
19 know --
20    Q.    Wake Design did?
21    A.    Yeah.  That -- that -- they came to us and
22 let us know there was no way on the face of this earth
23 we would ever get one red cent out of them.  And they
24 had attorneys and they were going to fight to the end,
25 and they talked to every Tom, Dick, and Harry they

Page 258

1 could.
2    Q.   So, you did sue them, though?
3    A.   I think we filed the suit against Ski
4 World here to stop them from shipping into the state.
5 I believe that's the way that happened.
6    Q.   You didn't call them up first and say, are
7 you Christians, I think that we should follow the
8 biblical framework --
9    A.   I think the conversations we had prior to
10 that was -- the assumption was that we're not
11 dealing -- you know, they're not looking at this or
12 they don't believe the way we do and they're not going
13 to practice it.  And that was the decision that was
14 made.
15    Q.   But you didn't call them up and ask them
16 if they're Christians and whether they would --
17    A.   No, I didn't.
18    Q.   What about all the other companies that
19 Correct Craft has sued over the years, did you call
20 them up and ask them if they're Christians?
21    A.   None of those lawsuits have ever gone
22 anywhere.  They were all settled.  They were all
23 negotiated.  And that's all we did was bring them to
24 the table, because they wouldn't come and negotiate
25 otherwise.

Page 259

1    Q.   But you never called them up first, and
2 say, are you Christians, I think we should follow what
3 Matthew says?
4    A.   No.
5    Q.   So, you don't do that?
6    A.   We do that if we know the situation, we
7 know that the people are.  But how many -- how many
8 people do you know in the business world you would
9 call up and say are you a Christian?  Not very many of
10 them.
11    Q.   I would say 90 percent of this country
12 says, if you ask them, they're Christians, wouldn't
13 you think?
14    A.   Would say they were Christians?
15    Q.   Yes, sir.
16    A.   But they may not believe the same way you
17 do.
18    Q.   Well -- so, you're not calling up people
19 and asking them if they're Christians before you sue
20 them?
21    A.   The only reason we used the lawsuit was to
22 get their attention to get them it the table to
23 negotiate and sign the lease agreement.
24    Q.   Now, on Page 164, on Lines 16 and 17
25 they're saying, why did you pay Todd, in a question.

Page 260

1       Line 16:  You thought Todd deserved
2 something?
3       Answer:  Yes, we did.
4       And my question to you, so what did --
5 what did Todd do that he deserved anything?
6       You've been testifying that he was a
7 problem and got in the way of things.  Well, what did
8 he do that he deserved something?
9    A.   I don't -- you know, perhaps my answer was
10 a little evasive, and perhaps it wasn't correct when I
11 made that statement, but I would -- I would think by
12 virtue of the fact that he did in some ways help by
13 virtue of the fact that he changed some small items on
14 that tower before he ever produced it.
15    Q.   But the tower --
16    A.   And he did -- he did have some valuable
17 information that we were able to use.
18    Q.   But the tower he produced is the spitting
19 image of a -- of a radar arch, isn't it?
20    A.   Yeah.
21       MR. NORMAN:  Objection.
22       THE WITNESS:  I mean, when you say the
23 spitting image, it's very similar to.
24 BY MR. LARSON:
25    Q.   I mean, we deposed him the other day.  And

Page 261

1 would you dispute with the fact that he said, hey, all
2 I did is copy what we've been making as radar arches.
3       MR. NORMAN:  Objection.  Mischaracterizes
4 his prior testimony.
5       THE WITNESS:  That's his statement.
6 That's his feeling.  I don't have any idea
7 why -- why he would make that statement or,
8 know, what the reason would be for it.
9 BY MR. LARSON:
10    Q.   Okay.  I'm going to change the subject a
11 little bit.  You've testified that anything that
12 Borden made belonged to Correct Craft's, because he
13 was an employee.
14    A.   Uh-huh.
15    Q.   That's correct?
16    A.   Yes.
17    Q.   And you believe the same with anybody
18 else?
19    A.   Yes.
20    Q.   Any other employee?
21    A.   Uh-huh.
22    Q.   And you believe that today?
23    A.   Yes.
24    Q.   Okay.  Whether or not you told them to --
25 whenever they came up with, whatever their idea was,

Page 262

1 whether or not you instructed it?
2    A.    Correct.
3    Q.    So, they can come up with an idea that
4 had -- nobody else thought about it, nobody else
5 instructed him to do it, and it's Correct Craft's,
6 because they're employees?
7    A.    Well, every day there are employees that
8 will come to you with ideas and suggestions.  That's
9 why you put suggestion boxes all over the place.
10        Some of them are great.  Some of them make
11 huge amounts of money for you.  Some of them secure
12 the man's position, because the company is more secure
13 and that's part of his job.
14    Q.    But it's Correct Craft's position that any
15 idea someone comes to them with belongs to Correct
16 Craft just because of the employment relationship?
17        MR. NORMAN:  Objection.  The witness
18        hasn't been designated to testify on those
19        subject matters.
20        If he want to render a personal
21        opinion, you may.
22        THE WITNESS:  What was the question again?
23 BY MR. LARSON:
24    Q.    My question is just simply this.  I mean,
25 your position is that anything that an employee does

Page 263

1 at Correct Craft, the patent rights belong to Correct
2 Craft?
3        MR. NORMAN:  Objection.  It calls for a
4        legal conclusion.
5        THE WITNESS:  Yeah.  It's -- my personal
6        opinion?  Yes.
7 BY MR. LARSON:
8    Q.    Okay.  What about someone from outside
9 Correct Craft?  Let's say a boat dealer.  You know,
10 one of your dealers calls up and says, hey, I got this
11 idea.  Correct Craft have the right to patent that?
12        MR. NORMAN:  Objection.  Calls for a legal
13        conclusion.
14        THE WITNESS:  If it's his idea and he's
15        not on our payroll, I don't know why the man
16        would call us and offer something unless he was
17        looking for us to buy it.
18 BY MR. LARSON:
19    Q.    Do you know who Lee Moore is?
20    A.    Lee Moore?  Yes.
21    Q.    Did Lee Moor make suggestions that you
22 wanted a patent?
23    A.    He may have.
24    Q.    And you wanted to patent it and just give
25 him lip service without including him as an inventor?

Page 264

1    A.    I don't recollect the -- you know, that
2 particular incident or anything that --
3    Q.    But would that be consistent with what
4 your belief is as to people who give ideas to Correct
5 Craft?
6    A.    Again, it depends on whether he was an
7 employee or not.  Lee Moore is not -- if you're
8 speaking of the Lee Moore that was in Montgomery,
9 Alabama, he was not an employee.
10        (Whereupon, Plaintiff's Exhibit Number
11        68 was marked for Identification)
12 BY MR. LARSON:
13    Q.    I'm going to show you what I've marked as
14 Exhibit 68.  These are three different management
15 meeting minutes.
16        First is August 26th, 1999.  If you turn
17 over to the last page, Number 9, we're talking about
18 an out-drive SS.  What does SS stand for?
19        Well, it doesn't matter.  That's okay.
20    A.    SS --
21    Q.    But you --
22    A.    I don't remember the term that we used at
23 that time.
24    Q.    But here you're talking about designing an
25 out-drive as opposed to just a straight inboard; is

Page 265

1 that correct?
2        My only question in this is the last
3 sentence.  And right before it, it says WN likes the
4 IO, because you do not have to add a lot of weight.
5 And it says as we develop new ideas we need to make
6 draws and patent.
7    A.    Uh-huh.
8    Q.    So, that, again, it's fair to assume that
9 you're stating that no matter who comes up with the
10 ideas Correct Craft has the right?
11    A.    This is after the fact, too, is it not?
12    Q.    Yeah.  This is in August 26th of '99.
13    A.    Yeah.  This is after the fact.  I mean,
14 this is after we had gone through the patent process
15 and all the rest of it, right?
16    Q.    Yeah.  And we're talking about patenting
17 other things.  You're talking about an out-drive for
18 an IO.  And you're saying as we develop knew ideas, we
19 need to make drawings and patents.
20    A.    You want me to explain that paragraph to
21 you?
22    Q.    Sure.  Sure.
23    A.    Okay.  In order to create a larger wake
24 behind a wakeboard boat, you have to do something.
25 You have to add weight, which lowers the free board.

Page 266

1 It could affect the performance of the boat.
2         And we were looking at a way to get around
3 putting excessive weight in a boat. And out-drive
4 unit can be trimmed. And if you could trim the boat
5 and maintain the speeds that a wakeboarder wanted, as
6 you trim it out it pushes the back of the boat down,
7 which would create more wake.
8         And it was a test that we wanted to run
9 with an IO to see if that was the direction we wanted
10 to go in. And then I simply made the statement that,
11 you know, as we develop knew ideas we need to make
12 drawings and patents.
13     Q.   But this goes along with your belief that
14 anyone in a company who comes up with an idea, the
15 idea doesn't belong to them, the patent rights, it
16 belongs with the company.
17         MR. NORMAN: Objection.
18         THE WITNESS: Yeah.
19 BY MR. LARSON:
20     Q.   So, it's consistent with what you've been
21 saying.
22     A.   Yeah.
23     Q.   Okay.
24     A.   And it's been consistent all afternoon.
25     Q.   I agree.

Page 267

1     A.   Do we have to be consistent about this the
2 rest of the afternoon?
3     Q.   Let's go to the next one. The next one is
4 May 2nd, 2001. And down here we're talking about the
5 tower on a Ski I Nautique. And the last sentence, it
6 says anyone with ideas, get it on a piece of paper and
7 get it to the patent office.
8         So, again, this is being consistent with
9 the fact that anyone with an idea, the patent rights
10 belongs to Correct Craft?
11     A.   Yeah. And there's a reason for that. My
12 basic reason is that the -- the company is in business
13 to make money. And if we find patents, or find
14 something we can patent that makes the company more
15 stable, and makes it grow, makes it more profitable,
16 the better off we service our employees by making
17 their job more secure.
18     Q.   But during this whole process have you
19 never come across the US Constitution and the patent
20 clause in that Constitution?
21     A.   No, I can't say that I have.
22     Q.   You haven't read the Constitution where it
23 says that Congress shall have the rights to adopt laws
24 that guarantee inventors the rights to their
25 inventions for a limited period of time?

Page 268

1     A.   Now, when you speak of the Constitution,
2 the Constitution of the United States?
3     Q.   Yes.
4     A.   Yes.
5     Q.   You're not aware that there's a patent
6 clause in there that guarantees intellectual --
7     A.   I -- I've read it through, but I was
8 never -- paid my particular attention to that, no.
9     Q.   So, you're not aware that inventors have
10 constitutional rights to their inventions?
11     A.   Well, everybody has constitutional rights.
12     Q.   We're talking about to their intellectual
13 properties and their inventions.
14     A.   I would -- we're talking about
15 individuals?
16     Q.   Uh-huh.
17     A.   Are we talking about individuals who have
18 an agreement with a company and work for them for pay,
19 or individuals who are entrepreneurs and inventors and
20 just sit out there and invent things day-by-day and,
21 you know, live based on that?
22     Q.   Individuals who work for companies.
23     A.   And you're telling me that's what it says;
24 individuals who work for companies?
25     Q.   The case law interpreting that for 200

Page 269

1 years says that.
2         MR. NORMAN: That's a misstatement of the
3 law. It calls for a legal conclusion.
4         Answer it, if you can.
5 BY MR. LARSON:
6     Q.   But my question is, are you familiar with
7 the patent clause in the US Constitution?
8     A.   Not that, no. Individual rights as
9 individuals and not an employee of a company, I --
10 yes, I -- the individual rights as an American
11 citizen, yes, 100 percent. But that -- that, to me, I
12 never interpreted it that way.
13     Q.   Do you ever have an agreement with Borden
14 when he came to work for you that his rights under the
15 Constitution, he waves them when he works for you?
16     A.   No.
17     Q.   Let's go to the last one here. And,
18 again, I'm looking at Exhibit 68. The last one here
19 is November 28th, 2001.
20     A.   Okay. What section are you looking at?
21     Q.   Right in the front. Bill Waits is
22 talking, and you're talking about this Lee Moore
23 system. Now, Lee Moore developed a ballast system of
24 one type or another, did he not? The last paragraph
25 says --

Page 270

1    A.   Yeah.  And I -- I don't recall what type
2  it was, or -- because there were a lot of people that
3  had a lot of ideas out there, but go head.
4    Q.   Well, the last paragraph says, they are
5  going to take the Lee Moore system and tweak it.  It
6  will be helm controlled with a level gauge on the
7  dash.  WN stated, we need to do something for Lee
8  Moore to recognize what he did.  Maybe put it in
9  DIDYOUKNOW, Nautique News, In Touch, to encourage
10  dealers to give us usable input.
11       Next page.  Maybe we can let Lee buy
12  ballast tanks at a discount for the rest his life.
13  Also, WN, which is you, wants somebody to put the new
14  system on paper and send it to the patent office as
15  soon as possible.  WN would like to get a utility
16  patent on this.
17       Now, my question is this:  You're taking
18  an idea that came from Lee Moore, who is a dealer,
19  you're taking his idea, or tweaking it, and then
20  you're going to send it to the patent office and get a
21  patent on it.
22       Now, why does Correct Craft have the
23  rights to patent an idea that came from Lee Moore?
24       MR. NORMAN:  Objection.  Calls for a legal
25    conclusion, assumes facts not in evidence.

Page 271

1       THE WITNESS:  I don't even remember what
2  his -- what his ballast system was.
3  BY MR. LARSON:
4    Q.   But are you saying that Correct Craft has
5  the rights to patents on their own ideas that come
6  from outside third parties?
7    A.   Well, I think that my statement here was
8  to the effect that, you know, the idea that he gave us
9  probably would be very difficult, so we should take
10  it, see if we can make it work or tweak it, and if we
11  could, then perhaps we would want to file for a
12  patent, at which time, based on all the conversations
13  I've had today, I'm assuming that legally somebody
14  would have thrown the flag at legal counsel.
15       But, you know, to patent something is not
16  a bad idea, but to take -- and I did acknowledge him.
17  I mean, you know, he was a customer anyhow.  He was a
18  dealer of ours.  Yeah.  He was an independent
19  businessman that came to us and tried to help us
20  better the product and thought he had a good idea.  I
21  don't know that we ever did it.
22    Q.   But you're claiming here that the most
23  you're going to do for him is give him some lip
24  service.  You say maybe put it in DIDYOUKNOW,
25  recognize him a little bit to encourage other dealers

Page 272

1  to give usable input.
2    A.   Yeah, we were going to sell the ballast
3  system to him at a -- at a discount where he could
4  make additional money if it worked, but I don't think
5  that that -- I don't think we ever did anything with
6  that.
7    Q.   Well, what about adding -- saying that
8  he's an inventor and he's got the -- he's got the
9  royalty rights?
10    A.   That would have been a legal matter and I
11  think, if I know Lee Moore, if Lee Moore thought we
12  were going to take advantage of him in some way, Lee
13  Moore would have stood up and said something.
14    Q.   And so --
15    A.   That's -- that's -- that would be the Lee
16  Moore I know.
17    Q.   So, the only way Borden would have been
18  able to get something is if he stood up and said
19  something?
20    A.   I don't think so, because Borden was an
21  employee, again.  You know, Borden had a right to
22  stand up and say something, but he was an employee.
23    Q.   But you're saying you're going to take
24  this idea from Lee Moore and tweak it and patent it,
25  and only give him some lip service in a magazine?

Page 273

1       MR. NORMAN:  Objection.  Mischaracterizes
2    his prior testimony, mischaracterizes the
3    document.
4       Answer it, again, if you can.
5       THE WITNESS:  No, I disagree with that.
6  Yeah, we said we might take it and tweak it,
7  why?  Because it was, like I said, may not have
8  been a functioning idea.  And we would tweak it
9  and, you know, if we could get a patent on it we
10  would patent it.
11       And to repay him we'd sell them to him
12  at -- at a discount, you know, and he could --
13  that's where he would make his money or he would
14  be repaid.  But understand, he was a dealer.  He
15  was not an employee.
16  BY MR. LARSON:
17    Q.   And even as a dealer you weren't going to
18  allow him to have patent rights unless he stood up?
19    A.   That's a legal matter.  I'd -- I would
20  have nothing to say about that.
21    Q.   Okay.  I'm going to change subjects a
22  little bit.
23       MR. NORMAN:  Why don't we take a break for
24    a little bit.  We've now been going for about, I
25    think, five hours straight.

Page 274

1    THE WITNESS:  Is that all?
2    MR. NORMAN:  And we need to be -- we need
3  to be cognizant of the time.
4    MR. LARSON:  Yeah.  I want to be out of
5  here by 4:00.  We've taken, like, two 15-minute
6  breaks, I think I have until, like, 4:30.
7    MR. NORMAN:  We've taken one break and it
8  was about five minutes, maybe ten.
9    COURT REPORTER:  The date is September
10  6th, 2007.  We are going off the record.  The
11  time is 3:08 p.m.
12    (Whereupon, a break was taken)
13    COURT REPORTER:  This is the deposition of
14  Walter N. Meloon.  The date is September 6th,
15  2007.  The time is 3:17 p.m.  We're back on the
16  record.
17  BY MR. LARSON:
18    Q.  Mr. Meloon, over the years Correct Craft
19  has had a bunch of books written about them and
20  different articles?
21    A.  Yes.
22    Q.  And you were in the Reader's Digest in
23  June 2000 -- or, 1992?
24    A.  Yes.  I believe it was '92.
25    Q.  How did that article come about, that you

Page 275

1  know of?
2    A.  I don't -- I don't recall.  We, obviously,
3  received a call or a letter and they sent a -- a
4  journalist down.
5    (Whereupon, Plaintiff's Exhibit Number
6    69 was marked for Identification.)
7    MR. NORMAN:  You gave me two.  Did you
8  intend to?
9    MR. LARSON:  I'm sorry.
10    THE WITNESS:  I didn't get one.
11    MR. LARSON:  I'm going to give you an
12  original.
13  BY MR. LARSON:
14    Q.  I'm going to show you what I've marked as
15  Exhibit 69.  This is the June 1992 Reader's Digest.
16  On Page 140 is an article, These Good Guys Finish
17  First.
18    A.  Uh-huh.
19    Q.  Are you familiar with that article?
20    A.  Yeah.
21    Q.  And you were quoted in here?
22    A.  I am.
23    Q.  Now, the first paragraph says when Walter
24  Meloon founded Correct Craft in 1925, he set out to
25  make fine boats and abide by the Golden Rule.

Page 276

1    Now, my question to you, is the Golden
2  Rule treating others as you would want to be treated
3  yourself.
4    A.  Basically, yes.
5    Q.  Would you describe it any way different
6  from that?
7    A.  That's pretty accurate.
8    Q.  How would you describe it?
9    A.  Same way.
10    Q.  And when Borden got a job at Correct Craft
11  and became aware of these type of articles, was that a
12  promise to Borden that you would abide by the Golden
13  Rule in treating him?
14    MR. NORMAN:  Objection.  Calls for a legal
15  conclusion.
16    THE WITNESS:  I think -- I mean, he could
17  probably assume that we were going to honor our
18  commitment to him, and our commitment to him was
19  to pay him for the work that he did.
20  BY MR. LARSON:
21    Q.  But I asked if it was a promise to him
22  that you would treat him as you would like to be
23  treated?
24    MR. NORMAN:  Same objection.
25    THE WITNESS:  I don't know how he would

Page 277

1  interpret it or -- you know, it could be
2  interpreted that way.
3  BY MR. LARSON:
4    Q.  But when you go out into the public and
5  put these statements out in a public venue like
6  Reader's Digest, is that -- is this not a promise to
7  the world and a promise to Borden Larson?
8    MR. NORMAN:  Objection.  Calls for
9  speculation.  Calls for a legal conclusion.
10    THE WITNESS:  It's -- it's a statement,
11  you know, of what we do and what we try to do,
12  and we do it.
13  BY MR. LARSON:
14    Q.  Did you have any disclaimer anywhere in
15  here that says employees should get their own
16  attorneys, and when Correct Craft asks them to sign
17  anything they better get their own counsel, because
18  Correct Craft is not going to tell them everything
19  that Correct Craft knows about this issue?
20    MR. NORMAN:  Objection.  Argumentative,
21  misstates prior testimony, assumes facts not in
22  evidence.
23    THE WITNESS:  No -- no disclaimers.
24  BY MR. LARSON:
25    Q.  And then it says, as he said, if you've

Page 278

1 made a decision based on only money, you have made a
2 bad decision.
3          Now, what does that mean to you?
4     A.   Well, we are a company that believes in
5 relationships.  We are a company that believes that
6 suppliers, you should establish a relationship.
7          And when you have a supplier that has
8 treated you right over the years, though he may charge
9 a little bit more than somebody else comes who wants
10 to take the -- job away from him, or take the
11 business away from him, that if you -- you know, that
12 if you cross that bridge or make that decision you
13 could be making a bad decision.
14    Q.   But there's no footnote anywhere in here
15 that says -- that only has that statement; that if
16 you've made a decision based solely on money --
17 there's nothing in here that says it only has to do
18 with the vendors or suppliers, does it?
19    A.   No, it has -- there's no footnote.
20    Q.   And when about employees?  Could employees
21 take that to heart and say, hey, I'm an employee and I
22 know Correct Craft will not make a decision about me
23 based only on money?
24          MR. NORMAN:  Objection.  Calls for
25 speculation.  Vague.

Page 279

1          THE WITNESS:  The conclusion that an
2 employee would make, I have no control over
3 that, nor could I convince him to -- what to
4 decide.
5 BY MR. LARSON:
6    Q.   But you haven't said anything in here that
7 applies to vendors, and employees, it doesn't apply to
8 employees?
9    A.   No.  I just happen to know what the basics
10 philosophy of the company and the family has been.
11    Q.   Now, up on top of 141 there's another
12 quote, and this, I think, has to do with after Correct
13 Craft was bankrupt and went and paid off all their
14 debt.  As the Court ruled, we only had to pay 20 cents
15 on every dollar we owed, says Walter O., but Dad
16 wanted to honor all our debts.
17          So, is this a promise to the world and to
18 employees that Correct Craft believes they pay all
19 their debts?
20    A.   It was a promise to those that we do
21 business with, that if we cost you money or you lose
22 money, then that was basically the context of this
23 statement, was if you're a supplier of ours or we do
24 business with you.
25    Q.   Now, what about these assignments in 43?

Page 280

1 And it says in here that for consideration of one
2 dollar and other consideration.  I mean, isn't that a
3 debt that Correct Craft has incurred?
4          MR. NORMAN:  Objection.  Calls for a legal
5 conclusion, mischaracterizes prior testimony.
6 Asked and answered.
7          Answer it again, if you could.
8          THE WITNESS:  Well, the difference here is
9 we're talking about people we do business
10 with, the suppliers, and he's talking about an
11 employee there.
12 BY MR. LARSON:
13    Q.   Was not Borden a supplier of an idea
14 that's made your company millions of dollars?
15          MR. NORMAN:  Objection.  Mischaracterizes
16 his prior testimony.
17          THE WITNESS:  Borden was an employee that
18 did his job.
19 BY MR. LARSON:
20    Q.   And you have a tower on your boat based on
21 that.
22    A.   That was his job.
23    Q.   And what gave you the right, based on that
24 employment, to go out and charge Mastercraft for
25 royalties?

Page 281

1          MR. NORMAN:  Objection.  Calls for a legal
2 conclusion.
3          THE WITNESS:  Well, we -- we have an
4 obligation to the employees to provide them with
5 security.  And part of providing them with
6 security is making a profit.  And that -- that
7 definitely had an effect.
8 BY MR. LARSON:
9    Q.   And when Borden was fired, like a week
10 before 9/11, in what way did that provide security to
11 Borden?
12          MR. NORMAN:  Objection.  Argumentative.
13          THE WITNESS:  That -- well, you know, in
14 life things happen.  Things became different.
15 Borden wasn't, you know, producing.  I'm
16 assuming that was the reason for his dismissal.
17 BY MR. LARSON:
18    Q.   And you don't know that as you sit here
19 today, do you?
20    A.   Well, yeah, that was a misstatement.  I
21 should not have made that statement that way.
22    Q.   Borden produced you a tower that's made
23 you -- might make you 20, 30 million dollars.
24    A.   That's right.  And then Borden hit a level
25 and he kicked back and coasted.

Page 282

1    Q.   And there's nothing in his personnel file
2  that says that, is there?
3    A.   No.  Why would I say that and he could
4  come back and, you know, beat up us to death with it.
5    Q.   Because if it's the truth it belongs in
6  his file, does it not?
7    A.   There's -- there's truth that you don't
8  put in files, because of legal ramifications.
9    Q.   Do you not do annual reviews?
10   A.   You don't tell lies and you don't -- you
11 know, you don't tell the truth every time either.
12   Q.   You mean you didn't set goals for
13 employees and do annual reviews?
14   A.   Oh, we do annual reviews, yes.
15   Q.   Where is his annual review that says he
16 wasn't performing?
17   A.   Perhaps the annual review was done in the
18 form of a discussion with whoever he was working with
19 at that time or with me.
20   Q.   Has any employee in the history of your
21 company designed something that's made you 20 to 30
22 million dollars?
23   A.   This hasn't made us 20 to 30 million
24 dollars.
25   Q.   You're grossing a million-and-a-half a

Page 283

1  year right now, aren't you?
2    A.   Roughly, yes.
3    Q.   Okay.  Times ten --
4    A.   You want to take out the cost of it,
5  though?
6    Q.   Time ten years --
7    A.   Gross -- gross has nothing to do with it.
8  It's what you got left over at the end of the day.
9    Q.   Does not your Uncle Ralph go out and put
10 on seminars claiming that the whole factory that
11 you've built out there is being paid for by the
12 royalties on this patent?
13   A.   He may make that statement, but I don't
14 know that he was directed to or that it's right or
15 it's wrong.
16   Q.   But the royalties are paying for the
17 mortgage on your building, are they not?
18   A.   I don't know that it's paying all of the
19 mortgage.  I do not know that.
20   Q.   The last statement here, it says to Walter
21 N. Meloon, the secret of this success is simple,
22 quote, it all comes down to treating others as you
23 want to be treated.
24        Now, was this a promise that Borden could
25 rely on?

Page 284

1        MR. NORMAN:  Objection.  Calls for a legal
2  conclusion.
3        THE WITNESS:  Yeah, he is.  And the other
4  employee was treated, you know, the same as
5  others.
6  BY MR. LARSON:
7    Q.   Now, after you fired Borden, he got a job
8  in one day, didn't he?
9    A.   I assume he did.  I don't know that for
10 sure.  I guess he did.
11   Q.   And you paid him severance pay after you
12 fired him?
13   A.   Yes.
14   Q.   And how much severance did you pay him.
15   A.   I don't have any -- I don't recall what
16 the amount was.
17   Q.   And after you learned he got a job the
18 next day, you threw a fit, for lack of a better term?
19   A.   A fit?
20   Q.   Yeah.
21   A.   Why?  Because the man was successful and
22 landed another job?
23   Q.   You didn't set up a policy at that point
24 to say, hey, we're not going to pay severance anymore,
25 because Borden got a job in one day and the severance

Page 285

1  was cut out?
2    A.   You'll have to show me that policy in
3  writing.
4    Q.   So, if Bob Burns says that you were in the
5  meeting the week after Borden was fired trying to --
6  saying that you wanted to cancel the severance policy,
7  because Borden got a job in one day, Bob Burns would
8  not be telling me the truth?
9        MR. NORMAN:  Objection.  Assumes facts not
10 in evidence.
11 BY MR. LARSON:
12   Q.   Or telling the truth?
13   A.   I don't have any idea why Bob Burns would
14 or would not make that statement, or what his reason
15 for making that statement was.
16   Q.   But you did cut off the severance policy
17 after that?
18   A.   I don't believe we did.
19        (Whereupon, Plaintiff's Exhibit Number 70
20        was marked for Identification)
21 BY MR. LARSON:
22   Q.   I'm going to show you what I've marked as
23 Exhibit 70.  It is Jim Vincent's book, Parting the
24 Waters.  Are you familiar with that book?
25   A.   Yes.

Page 286

1    Q.   And how did this book came about?
2    A.   This came about -- it was an update of the
3 original book that was written.
4    Q.   You're talking about the two books; Saved
5 From Bankruptcy, and On The Waters of the World?
6    A.   Yes.
7    Q.   Saved From Bankruptcy, I believe, is --
8    A.   That was the original.
9    Q.   Would it be wrong to -- strike that.
10       So, you called up Moody, and says that you
11 wanted an update to the book?
12   A.   I don't know whether we called Moody or
13 they called us and said, you know, the book's been out
14 for a while, you know, would you like to have an -- I
15 don't know how it came about.
16   Q.   So, if Jim Vincent told me that you guys
17 actually called up and said, hey, you know, we need a
18 book that casts us as a principled company, would he
19 be telling me the truth?
20   A.   There would have been a call made, yes.
21 That would have been between my father and him, at
22 that time.  I was -- my father and Ralph were in those
23 positions and --
24   Q.   Now, this book that I handed you, this is
25 actually your anniversary edition?

Page 287

1    A.   Uh-huh.  75 years.
2    Q.   And the first part of this has a -- has a
3 letter from you, and down here it says Correct Craft
4 is celebrating 75 years of building boats to the glory
5 of God.
6        What does it mean to you to build boats to
7 the Glory of God?
8    A.   That we do everything humanly possible as
9 Christians to honor God.  Being human beings
10 there's -- you know, we can't be perfect, but we have
11 to make the effort.
12   Q.   And when Borden reads these words can he
13 take that as a promise from you that you will do
14 everything in your power to honor God?
15       MR. NORMAN:  Objection.  Calls for a legal
16 conclusion.  Vague.
17       THE WITNESS:  This was not a part of his,
18 you know, employment agreement when he came to
19 work.  This is not a part of his application,
20 nor a part of the rules or -- or anything else.
21       We operate as -- you know, as best we
22 can to -- to honor God in every way we can.
23 BY MR. LARSON:
24   Q.   But you -- but Correct Craft has purchased
25 20,000 of these books, have they not?

Page 288

1    A.   Why do you think Moody printed them?  For
2 us to buy them.
3    Q.   And you bought 20,000 of them and handed
4 them out?
5    A.   The exact number, I'm not sure.
6    Q.   And you give them to every person who buys
7 boats.
8    A.   They used to.  I don't know if they're
9 still continuing that or not.
10   Q.   And you have them available to employees?
11   A.   Yes.
12   Q.   And you don't have any disclaimer in here
13 to say that the statements in here are just opinions
14 and you cannot rely on them?
15   A.   No, there's no statement in here that says
16 they cannot rely on anything.
17   Q.   And there's no statements to employees --
18 like when you walk in on a plaque -- that says Correct
19 Craft tries to build boats to the glory of God, but,
20 you know, you can't rely on it as an employee?
21       MR. NORMAN:  Objection.  Argumentative.
22       THE WITNESS:  I think you know the answer
23 to that.  Obviously, we don't -- you know we
24 don't have a plaque to that, or a sign.
25 BY MR. LARSON:

Page 289

1    Q.   I want you to turn to Page 46 for a
2 moment.
3    A.   (Complies)
4    Q.   In the paragraph that starts my job --
5    A.   Uh-huh.
6    Q.   -- it says, I think -- quoting you -- my
7 job is to make money.  There's no doubt about it, WN
8 says.  And the last sentence there is, one of the
9 tasks is that you've got to remember those who help
10 you complete the task, the employees.
11       Now, was that a promise that Borden could
12 rely on, that if an employee completed a task you
13 would remember them?
14   A.   He completed a task every day, every week,
15 and he was paid for that task, for the completion of
16 it.
17   Q.   And isn't that the same thing that every
18 company in the country does?
19   A.   Well, if they don't they probably don't
20 stay in business.
21   Q.   Do other companies who pay their employees
22 on Friday, do they write books stating that they have
23 a certain value of building boats to the glory of God
24 and remembering their employees?
25   A.   I have not done a survey to that effect to

Page 290

1  see who has and who hasn't.
2      Q.    Well, what is the difference between the
3  way you remember employees and the way any other
4  company out there would remember employees?
5      A.    I don't know that any other companies out
6  there remember their employees any different than we
7  do.
8      Q.    Well, after Borden conveyed to you his
9  interest in this wakeboard tower, how did you remember
10  him for completing that task, after inventing the
11  wakeboard tower?
12      A.    After Borden contacted me or --
13      Q.    No.  Let me ask it again.
14          I mean, Borden thought up the idea for the
15  wakeboard tower, did he not?
16          MR. NORMAN:  Objection.  Mischaracterizes
17      his prior testimony.
18          THE WITNESS:  The wakeboard tower, the
19      flight control tower came about while he was
20      employed by Correct Craft.
21  BY MR. LARSON:
22      Q.    And he thought it up?
23          MR. NORMAN:  Objection.  Mischaracterizes
24      his prior testimony.  Vague.
25  BY MR. LARSON:

Page 291

1      Q.    And what have you done to remember him
2  based on what you state here?  One of those tasks is
3  you've got to remember who helped you complete the
4  task, the employees.
5          What did you do to remember Borden?
6      A.    I just answered that.
7          MR. NORMAN:  Objection.  Vague.
8          THE WITNESS:  Every Friday night we paid
9      him for a job well done.  We paid him with good
10      money, he did a good job.
11  BY MR. LARSON:
12      Q.    Now, on Page 47 -- you got 47?
13      A.    Uh-huh.
14      Q.    Up at the top --
15      A.    Uh-huh.
16      Q.    -- it says in earlier history of the
17  company, WN -- which is you, I believe -- emphasized
18  the consistency of Correct Craft's purpose.  It has
19  not changed, neither will it change from that of
20  producing quality recreational boats and servicing our
21  customers at a profit in a means of glorifying God and
22  rendering Him excellent.
23          Let me ask you:  How did you glorify God
24  and render Him excellent when you fired Borden?
25          MR. NORMAN:  Objection.  Vague.

Page 292

1          Answer it, if you could.
2          THE WITNESS:  I -- if a man is not doing
3      the job and, you know, he's coasting, and he's
4      not effective in his position the company
5      usually replaces him.
6  BY MR. LARSON:
7      Q.    My question is how did that glorify God?
8          MR. NORMAN:  Objection.  Asked and
9      answered.
10  BY MR. LARSON:
11      Q.    Did it glorify you and the company, or did
12  it glorify God, is my question?
13          MR. NORMAN:  Objection.  Asked and
14      answered.
15          THE WITNESS:  Would it glor -- would it
16      have glorified God had we kept him and let him
17      be -- you know, let him take advantage of the
18      company in the position to the risk of everybody
19      else?
20  BY MR. LARSON:
21      Q.    What risk was he causing to people?
22      A.    Well, he -- he wanted the money, but he
23  didn't want the job.
24      Q.    And what records do you have anywhere that
25  says anything close to that?

Page 293

1      A.    That would not be written in the records.
2  That would not be written down.
3      Q.    How could Borden have any -- strike that.
4          How could Correct Craft have any liability
5  for doing an employee -- employment review and saying
6  Borden didn't comply with certain requirements?
7          MR. NORMAN:  Objection.  Calls for a legal
8      conclusion.
9  BY MR. LARSON:
10      Q.    Do you understand the question?
11      A.    Not clearly, no.
12      Q.    Did you set annual goals for Borden?
13      A.    We had goals, which we had time lines
14  established, and those time lines had to be adhered
15  to.
16      Q.    And did you ever -- you wrote those time
17  lines down?
18      A.    Those were supplied to me by the
19  independent individuals who were working on the
20  project or heading up the project.
21      Q.    And you looked at those times lines and
22  Borden was not completing the jobs within that time
23  line?
24      A.    There were some of them that he did very
25  well with and some of them that weren't on time.

Page 294

1 There's always reasons why things happen.
2    Q.    And where are these records today?
3    A.    I don't know that those -- he would have
4 had those records.  The time lines would have been in
5 his office.
6    Q.    And Correct Craft would have had those
7 once they fired him and marched him out the door?
8    A.    I don't know that we would have.  I don't
9 know whether he took them, or destroyed them, or -- or
10 whether they were still there.  I don't have any idea.
11    Q.    So, you don't know that your son and Bill
12 Waits went to Borden's office and marched him right
13 out to his car?
14    A.    I know they did that.  But, again, before
15 that I don't know whether all the records were still
16 there, whether they were not there.
17        We just merely tried to stop him from
18 getting into the computer and creating any problems.
19 We do that with every employee that's in a position
20 that could hurt the company.
21    Q.    Why would Borden go in the computer and
22 create problems?
23        MR. NORMAN:  Objection.  Calls for
24 speculation.
25        THE WITNESS:  I have no idea why people do

Page 295

1    things.  Some of them do them for various
2    reasons.
3 BY MR. LARSON:
4    Q.    Do you have any reason that Borden would
5 do that?
6        MR. NORMAN:  Objection.  Calls for
7    speculation.
8        THE WITNESS:  I -- that there was -- it
9    was a precaution that we take.
10 BY MR. LARSON:
11    Q.    Do you know that Bill Snook was actually
12 shocked that you fired Borden?
13        MR. NORMAN:  Objection.  Mischaracterizes
14    his prior testimony.  Assumes facts not in
15    evidence.
16        THE WITNESS:  I'm not aware of that, no.
17 BY MR. LARSON:
18    Q.    Do you know that Larry Meddock was
19 actually shocked that you fired Borden?
20        MR. NORMAN:  Objection.
21        THE WITNESS:  I'm not aware of that
22    either.
23        MR. NORMAN:  Mischaracterizes prior
24    testimony, assumes facts not in evidence.
25 BY MR. LARSON:

Page 296

1    Q.    If Borden hadn't been producing, you
2 didn't think Bill Snook would know it?
3        MR. NORMAN:  Objection.  Calls for
4    speculation.
5        THE WITNESS:  I -- it wasn't Bill's
6    responsibility.
7 BY MR. LARSON:
8    Q.    I asked you if Borden hadn't been
9 producing, don't you think Bill would know that?
10        MR. NORMAN:  Objection.  Asked and
11    answered.
12        THE WITNESS:  You would think that he
13    would.
14 BY MR. LARSON:
15    Q.    And Bill Snook never went to you and said,
16 Borden is not producing, we have to fire this guy?
17    A.    No.
18    Q.    Now, the guy that really fired Borden was
19 Bill Waits; isn't that true?
20    A.    That was because he -- he was under Bill,
21 and after the decision, he was the one that carried
22 the message.
23    Q.    And Bill Waits was promoted and then
24 people walked -- walked out of the door because of
25 Bill Waits; isn't that correct?

Page 297

1        MR. NORMAN:  Objection.
2        THE WITNESS:  I'm not -- I don't know that
3    that is correct, no.
4 BY MR. LARSON:
5    Q.    Jody Seal, when he found out Bill Waits
6 was in charge, packed up all his stuff and left on the
7 hour's notice?
8        MR. NORMAN:  Objection.  Calls for
9    speculation.
10 BY MR. LARSON:
11    Q.    Isn't that correct?
12    A.    Did Jody Seal come back?
13    Q.    Jody Seal's in Panama City, I think.
14    A.    Well, when did he move to Panama City?
15 Just recently.  About two years ago.
16    Q.    Let's go look at 47 again.  Second
17 paragraph from the bottom it says, the company's
18 consistent Christian stand through the years has given
19 employees a standard in which they count.
20        Now, what standard do employees have if
21 you're going to fire them just like any other company
22 who is not a Christian company?
23    A.    Basically, what we're talking about here
24 is that we make a commitment to the employee when
25 they're hired and as long as they honor their

Page 298

1 commitment to the company, we honor our commitment to
2 them.
3     Q.   What is the difference between that and
4 the factory down the street?
5     A.   What factory down the street?
6     Q.   Any factory.  Any employee, when the guy
7 comes in, they make a commitment that you work through
8 the week and I'll pay you on Friday.
9     A.   But I can't make a comparison to anybody
10 else and what they do, and how they do it, and what
11 decisions they make.
12     Q.   So, the consistent standard that the
13 employees can rely on is only the fact that you pay
14 them on Friday?
15     A.   No.  There's -- I mean, there's other
16 things you do.  You provide benefits, you provide the
17 best benefits you can, the best health package for
18 them and the family at the least amount of cost.
19     Q.   What does have to do with the Christian
20 stand?
21         Are you saying only Christians provide
22 benefits?
23     A.   No, I did not, but we were very faithful
24 in doing that and giving them the best that we could
25 get.

Page 299

1     Q.   Don't companies all over this country
2 provide benefits to their employees?
3     A.   I'm sure they do, but some of them are far
4 less than others.  Some of them are worse than.  Some
5 of them are, you know, terrible.
6     Q.   What does that have to do with
7 Christianity, whether they provide good benefits or
8 bad benefits?
9     A.   That are a lot of moral people out there
10 that -- that have very good principles and ethics.  I
11 mean -- and I can't argue that point and I can't --
12 you know --
13     Q.   So, the only Christian stand you say here,
14 is I'll pay you on Friday and I'll give you benefits?
15     A.   No, that's not what I said.
16         MR. NORMAN:  Objection.  Mischaracterizes
17 his prior testimony.
18 BY MR. LARSON:
19     Q.   What is the Christian stand that employees
20 can count on?
21         MR. NORMAN:  Objection.  Vague.
22         THE WITNESS:  I think I've answered that.
23 BY MR. LARSON:
24     Q.   Okay.  Let's go to Page 49.  The middle
25 paragraph says even some managers at Correct -- at the

Page 300

1 company are not Christians, but WN insists that before
2 they join Correct Craft they must be willing to be,
3 quote, ethically and morally correct.
4         Let me stop right there.  Your attorney,
5 Mr. Allen, has been disqualified from this case twice
6 for being unethical and you still employ him?
7         MR. NORMAN:  Objection.
8         THE WITNESS:  That's a -- that's a
9 business decision that has been made by the
10 company regardless of what the judge said or the
11 reason the judge said it, or what the judge's
12 reason for doing it.  We made the decision that
13 it was worthwhile to stay with them and they've
14 done it, as far as I know.
15 BY MR. LARSON:
16     Q.   Do you have any disclaimer on here that
17 says if employees are even ruled unethical by Federal
18 judges, we have the right to continue to use people
19 who have been ruled unethical?
20     A.   No.
21     Q.   But was this a promise that people could
22 rely on, the fact that the employees of, and the
23 managers of the company have to be morally and
24 ethically correct?  Is that a promise?
25         MR. NORMAN:  Objection.  Calls for a legal

Page 301

1 conclusion.
2         THE WITNESS:  It's -- it's not a promise
3 to anybody.  It was a requirement that we had
4 and we discussed it with the employees, and if
5 they were comfortable with that, they accepted
6 and we employed them.
7         These are -- these of managers.  These
8 are top -- top management.  They're not line
9 workers.  And if they're willing to understand
10 that we do not do business in a bar, we do not
11 do business over alcohol, we don't buy alcohol
12 to do business, that, you know, and they're
13 comfortable with that -- some of them may drink,
14 but they don't drink and do Correct Craft
15 functions at the same time.  And if they can
16 accept that, then, you know, fine.
17 BY MR. LARSON:
18     Q.   So, the only ethics and morals that you
19 have then, is you don't drink?
20         MR. NORMAN:  Objection.
21         THE WITNESS:  Why did I know that one was
22 coming?
23         MR. NORMAN:  Mischaracterizes his prior
24 testimony.
25         THE WITNESS:  No.

Page 302

1  BY MR. LARSON:
2      Q.   What are other ethics and morals that you
3  have?
4      A.   Well, you try to tell the truth.  You try
5  to be -- you know -- you try to see to it that
6  whatever you do is -- is done to the benefit of those
7  around you.
8      Q.   What about telling the whole truth?  Do
9  you try to tell the whole truth?
10     A.   Of course.
11     Q.   Well, when you pay Todd $355,000 you never
12 told that to Borden even though you asked for his
13 signature a week later.
14     A.   There was nothing in there that you can
15 call the truth with sharing that information with
16 Borden.
17     Q.   But you withheld that from Borden.  You
18 didn't tell him you had just paid Todd --
19     A.   We didn't withhold anything from him.  We
20 just didn't tell him, because we didn't see that it
21 was necessary.
22     Q.   So, in other words, you can withhold the
23 whole truth sometimes and that's still ethically and
24 morally correct?
25         MR. NORMAN:  There ought to be a stronger

Page 303

1  objection, by I'll just say mischaracterizes his
2  prior testimony.
3         THE WITNESS:  Yeah.
4  BY MR. LARSON:
5      Q.   I want to turn to 71.  Or Page 70.  And
6  this first paragraph here at the bottom -- and I
7  believe we're talking about WO.  That's your father,
8  right?
9         It says repeating the thought that, quote,
10 God is not poor, WO inspired them to trust the Lord
11 for their money.
12        Now, my question to you is, do you think
13 if God wanted Correct Craft to have this patent, God
14 was capable of giving the idea to you?
15        MR. NORMAN:  Objection.  Calls for
16 theological speculation.  Vague.
17        And it's becoming in the neighborhood
18 of abusive and harassing the witness, which
19 violates your ethical duties, sir --
20        MR. LARSON:  I'm not --
21        MR. NORMAN:  Yes, you are, sir.
22        And given that, if you continue to
23 treat this witness in that manner, I'm going to
24 have to seek sanctions.
25        So, you can go head and answer to the

Page 304

1  extent you can, sir, if you have that
2  theological speculation in your body.
3  BY MR. LARSON:
4      Q.   Well, let me ask you, when this book was
5  written, what did you mean by God is poor, and you
6  inspired yourself to trust the Lord for -- for your
7  money, and in the next two years $100,000 came in?
8         Now, what do you mean by God is not poor
9  and all of a sudden you end up with $100,000?
10     A.   I think that's -- you know, it's pretty
11 self-explanatory.  God is not poor.  God is the
12 creator.
13     Q.   So, in other words, God gave you $100,000?
14     A.   No, God didn't give it to us.  God gave us
15 the -- the wisdom, or whatever, to do whatever he
16 needed to have done, or whatever we did in the
17 marketplace that, you know, the money was made through
18 sales, through whatever we did at that time.
19     Q.   And going back here to this objectionable
20 statement, I mean, if you think God is not poor, don't
21 you think God could give you the idea for the tower
22 instead of giving it to Borden?
23        MR. NORMAN:  Objection.  Calls for
24 speculation of what God could, or would, or
25 might want to do.

Page 305

1         THE WITNESS:  God -- God can use anybody
2  and anything as a tool to accomplish what he
3  wants.  He can use you to accomplish what he
4  wants, he can use me.  God is not limited.
5  BY MR. LARSON:
6      Q.   But God didn't give the tower idea to any
7  one of the Meloons, did he?
8      A.   Am I to assume that God gave that to
9  Borden, or am I to assume that God created a young man
10 there that used his ability to fulfill his obligations
11 to the company and he did, and that was the results of
12 it?
13     Q.   And for you to get that from him you had
14 to have him sign these assignments that are Exhibit
15 43.
16        Did God, you know, make those assignments
17 to get you this patent?
18        MR. NORMAN:  Objection.  Calls for a legal
19 conclusion, misstates the law, calls for
20 speculation, and continues to try to abuse and
21 harass the witness.
22        MR. LARSON:  I'm trying to find out what
23 he means in these books.
24        MR. NORMAN:  Well -- well, what -- what
25 does it matter with what his beliefs in God are,

Page 306

1  sir, exactly? What exactly does that mean?
2  What if he wasn't a Christian? Would you be
3  able to just castigate him here today? Do you
4  feel some moral righteousness over him?
5      MR. LARSON: I don't feel any moral
6  righteousness --
7      MR. NORMAN: Then why do you care what his
8  beliefs in God are?
9      MR. LARSON: Because he's wrote (sic) a
10  book to the world and gave it to Borden, and
11  Borden believed this.
12      MR. NORMAN: Did you give this to Borden?
13  Did I -- did I miss that testimony? You handed
14  this to Borden and told him to rely upon this?
15      THE WITNESS: I did not hand this book to
16  him. It was made available to him. If he took
17  it and read it, then it was his.
18  BY MR. LARSON:
19      Q.  Didn't your --
20      A.  If he chose not to read it, then it was --
21  I mean, he had a choice.
22      Q.  And your uncle, didn't he hand this book
23  to Borden just six months ago when they met for lunch?
24      A.  He may have.
25      Q.  Doesn't he hand them out?

Page 307

1      A.  But what does that have to do with -- you
2  know, with anyone? So, my uncle is a very generous
3  man and he handed Borden a book. And, you know, I
4  thought that Borden might enjoy it. I mean, he is a
5  very benevolent person.
6      Q.  And this book is a benevolent gift to
7  someone?
8      A.  I think that any gift that is given to
9  you -- you don't look a gift horse in the mouth. You
10  thank the person that gave it to you and consider
11  it -- them as being benevolent.
12      MR. NORMAN: Or your attorney would as to
13  cross-examine him based on it.
14  BY MR. LARSON:
15      Q.  Let's go page 71.
16      A.  Okay. I was looking at pictures there.
17      Q.  Page 71, it says don't rely on your
18  attorney for everything, he says, attorneys are human
19  beings. Stay in contact with your creditor. God used
20  the Meloons and worked through them. He did. The
21  best advice, Walt said, will come from God.
22      And my question to you is, were these
23  statements to the world that the Meloons will get
24  advice from God as opposed to their attorneys?
25      A.  Jim Welch was a good friend of the family.

Page 308

1  He was an attorney. He represented the family while
2  we were in bankruptcy. And he was a born-again
3  Christian.
4      And he made this statement that, you know,
5  the best advice you can seek does come from God.
6  However, there are times that when you get into a
7  legal situation that you have to have some advice, and
8  then, perhaps, God can use that advice or tell you to
9  ignore that advice after you get it from a legal
10  source.
11      Q.  So, Borden could rely on this to say that,
12  you know, even though you rely on attorneys now and
13  then, you're absolutely going to go rely on God in
14  addition to the attorneys? Is that what this means?
15      A.  Well, we certainly seek His guidance and
16  leadership on a daily basis.
17      Q.  And how have you sought His guidance in
18  respect to the situation before us today with Borden?
19      MR. NORMAN: Objection. Abusing and
20  harassing the witness. Completely unethical and
21  we will move for sanctions.
22      Go ahead and answer, if you can.
23      MR. LARSON: I'm just trying to find out
24  what --
25      MR. NORMAN: You've asked the same

Page 309

1  question about 50 or 60 times, trying to put a
2  pejorative spin so you can try to create some
3  type of perceived shame based upon a civil claim
4  that you brought for monies you want.
5      MR. LARSON: Why would it be shameful,
6  sir, for someone to believe in God, and when I'm
7  asking --
8      MR. NORMAN: It's shameful to use God's
9  name in the manner.
10      Go ahead and answer the question to the
11  extent you can, sir.
12      MR. LARSON: Sir, I didn't write these
13  books about how God is involved in the business
14  decisions of this company.
15      MR. NORMAN: You're taking advantage of
16  it, though.
17      THE WITNESS: Can you ask that question
18  again?
19  BY MR. LARSON:
20      Q.  Let's turn to Page 81. At the bottom of
21  Page 80, actually, Larry Meddock is talking. It says,
22  I think that Correct Craft is a principled company.
23  We have principals. And it's difficult to stand by
24  them at times, but we must.
25      Now, what principles is it difficult to

Page 310

1  stand by?
2       MR. NORMAN:  Objection.  Calls for
3   speculation.
4       THE WITNESS:  You -- you'll have to ask
5   Larry what he was referring to.  I can't
6   speculate, you know, on what he was referring
7   to.
8  BY MR. LARSON:
9    Q.   Okay.  Let's go look at 86, second page
10  from the -- second paragraph from the bottom.  Mike
11  Elrod is talking.  It says, quote, the company never
12  asks you to do anything that's illegal, or borderline
13  legal, to make a profit.
14       Now, is that a promise that Correct Craft
15  stands by?  That they'll never ask you to do anything
16  that's illegal, or borderline legal, to make a profit?
17       MR. NORMAN:  Objection.  Calls for a legal
18   conclusion.
19       Answer the best that you can.
20       THE WITNESS:  We've -- to the best of our
21   knowledge, we've never asked anybody to do that.
22  BY MR. LARSON:
23    Q.   How about doing something unethical?
24   Is that the same as illegal or borderline
25   legal?

Page 311

1    A.   Again, to the best of our -- our knowledge
2   and our ability, we try not to do that.
3    Q.   So, when Judge Presnell says your
4   attorneys have been unethical, how does that play into
5   the promise here that the company will never ask
6   someone to do something illegal or borderline legal?
7    A.   Number one, I would ask -- I would not ask
8   Judge -- what's his name?
9       MR. NORMAN:  Presnell.
10       THE WITNESS:  -- Presnell to give a ruling
11   on what is spiritual and what isn't spiritual,
12   or what is Godly or what is not Godly, or advise
13   me in spiritual matters.
14       I would not look forward to asking a
15   judge to do that, because he deals in the world
16   the legalism.
17  BY MR. LARSON:
18    Q.   And doesn't Correct Craft operate in the
19   world of legalism in building and selling boats?
20    A.   Yeah, it's -- you see, you can live in the
21   world and work in the world, but you don't have to be
22   a part of the world.
23    Q.   And when you fired Borden without any
24   warning, are you not acting just like anybody else did
25   in the world?

Page 312

1       MR. NORMAN:  Objection.  Assumes facts not
2   in evidence.
3       THE WITNESS:  I'm -- I'm sure that
4   probably there have been other instances in
5   other companies with other employees that would
6   fall in the same category.
7  BY MR. LARSON:
8    Q.   But my question was when you fired Borden,
9   were you not acting like any other company would in
10  the world?
11    A.   By virtue of the fact that we're not
12  perfect, perhaps.  But, again, I'm sure that that
13  happens on a regular basis.
14    Q.   Anywhere else?
15    A.   All over the world in business.
16    Q.   So, Correct Craft is no different than any
17  other company in spite of all these promises in this
18  book?
19       MR. NORMAN:  Objection.  Mischaracterizes
20   his prior testimony.  And you're being abusive
21   and harassing the witness.
22       THE WITNESS:  The difference between
23   Correct Craft and the rest of the world, or the
24   rest of the companies is that we do make an
25   effort to do what is right.

Page 313

1  BY MR. LARSON:
2    Q.   And what effort did you make to allow
3   Borden to have access to some legal counsel before he
4   signed all these documents?
5    A.   That's a question of -- of -- you know,
6   who had the rights at the time the decision was made.
7   We did not advise him of it.
8    Q.   Okay.  I'm going on to Page 92.  There's a
9   heading, Keeping Employees Healthy and Wise.  It says
10  Correct Craft management has always believed it must
11  treat right those who make the company a success;
12  customers, dealers, vendors, and certainly employees.
13       Was this a promise to Borden that they
14  would treat him right if he made the company a
15  success?
16       MR. NORMAN:  Objection.  Calls for a legal
17   conclusion.
18       THE WITNESS:  Well, I think what the
19   context of this was that -- keeping employees
20   healthy and wise.
21  BY MR. LARSON:
22    Q.   So, you say that healthy -- you send them
23  to the doctors?
24    A.   No.  I mean, this -- does that mean -- is
25  that money or is that health?  Or, you know, how do

Page 314

1  you describe healthy?
2    Q.    Well, this is Correct Craft's book, is it
3  not?
4    A.    Yes.
5    Q.    And you edited this book, or had a chance
6  to edit it before it went to print?
7    A.    It was edited, yes.
8    Q.    And this statement, then, that Correct
9  Craft, you know, had a chance to read and edit?
10   A.    Certainly.
11   Q.    What does that mean, then, that Correct
12 Craft's management has always believed it must treat
13 right those who make the company a success?
14   A.    And it lists the customers, dealers,
15 vendors, and certainly employees.  And we do.
16   Q.    And how do you treat employees right who
17 make the company a success?
18   A.    We honor our commitment to them when they
19 become an employee.
20   Q.    So, you're saying that paying them on
21 Friday is the only thing that you do to treat them
22 right?
23      MR. NORMAN:  Objection.  Mischaracterizes
24 his testimony.
25      THE WITNESS:  No.  Guaranteeing them

Page 315

1  security as much as possible.
2  BY MR. LARSON:
3    Q.    What else besides guaranteeing them
4  security?
5    A.    Well, that's a -- that's an effort that
6  the whole -- that everybody has to make.  A commitment
7  everybody has to make to each other to do their part
8  to keep the company healthy.
9    Q.    Well, other than giving them security,
10 what else do you have to do to treat someone right?
11      MR. NORMAN:  Objection.  Vague.  Calls for
12 speculation.
13      THE WITNESS:  Yeah.  I -- there's a -- you
14 know, numerous things depending on the -- the
15 need.  If there is a need.
16 BY MR. LARSON:
17   Q.    Now, is this a promise that Correct Craft
18 made to the world and certainly employees?
19   A.    We didn't make a promise to the world.  We
20 made --
21      MR. NORMAN:  Objection.
22      THE WITNESS:  We merely made a statement
23 of what our beliefs and what our efforts were
24 and -- and what we tried to do.
25 BY MR. LARSON:

Page 316

1    Q.    And is there any reason Borden couldn't
2  rely on this statement?
3      MR. NORMAN:  Objection.  Calls for a legal
4  conclusion.  Vague.
5      THE WITNESS:  It -- I mean, I'm sure that
6  Borden made a decision of when he came to the
7  company, that he -- it's a place he wanted to
8  be.
9      And so, therefore, I mean, he -- you
10 know, took on the responsibility of a commitment
11 to the company as we did to him.
12 BY MR. LARSON:
13   Q.    My question to you was, is there any
14 reason Borden couldn't rely on this statement, that
15 Correct Craft's management believes that it must treat
16 employees right?
17      MR. NORMAN:  Objection.  Asked and
18 answered.
19      THE WITNESS:  This is the -- the paragraph
20 that's on -- what page were you on that you
21 had --
22 BY MR. LARSON:
23   Q.    We're on Page 92.
24   A.    Yeah.  I missed that one.  I didn't miss
25 it.  I flipped over.

Page 317

1      And you're talking about keeping employees
2  healthy and wise?
3    Q.    Yeah.  It says Correct Craft --
4    A.    What has that got to do with it?
5    Q.    Well, the statement says Correct Craft's
6  management has always believed it must treat right
7  those who make the company a success; customers,
8  vendors, dealers, and certainly employees.
9    A.    Uh-huh.
10   Q.    And my question, is this a statement or
11 promise that Borden could rely on, that Correct Craft
12 would treat employees right who make them successful?
13   A.    This was --
14      MR. NORMAN:  Objection.  Calls for a legal
15 conclusion.  Vague.
16      THE WITNESS:  This -- this is not
17 necessarily a statement, nor is it a commitment.
18 This is merely a recitation of what we believe
19 and the way we live, and what we try to do and
20 try to be.
21 BY MR. LARSON:
22   Q.    And so Borden could rely on this, that
23 this is a statement of what you try to do?
24      MR. NORMAN:  Mischaracterizes prior
25 testimony.  Vague.  Calls for a legal

Page 318

```
 1   conclusion.
 2        THE WITNESS:  Depending on, you know,
 3   whether he chose to believe it or not.  I mean,
 4   that was a decision he made.
 5   BY MR. LARSON:
 6        Q.   Well, do you have any disclaimer on that,
 7   that says, you know, this is only a statement to you
 8   if you believe it or not?
 9        A.   No.  There's no disclaimer on there that
10   has Borden's name on it.
11        Q.   Well, a disclaimer for anybody that, you
12   know, this is only a statement for -- you know, the --
13   we'll only treat you right if you believe it?
14        A.   Obviously, there's no disclaimer there.
15        Q.   But if --
16        A.   Obviously, nobody has needed it.
17        Q.   But if Borden believed this, would he be
18   wrong to believe that you actually have stated that
19   Correct Craft's management has a commitment to treat
20   people right who make the company a success?
21        A.   And the company does treat the people
22   right that helps make it a success.
23        Q.   And when you requested Borden to sign
24   these assignments, which are Exhibit 43, you never
25   advised him to go get his own private counsel, did
```

Page 319

```
 1   you?
 2        A.   You're asking me --
 3        MR. NORMAN:  Objection.
 4        THE WITNESS:  -- if I advised him.  I had
 5   nothing to do with the signing of that.
 6   BY MR. LARSON:
 7        Q.   But Correct -- but Correct Craft didn't,
 8   in any way, say, hey, Borden, we're going to treat you
 9   right here with these assignments, and we're going to
10   allow you to get your own private counsel?
11        MR. NORMAN:  Objection.  Asked and
12   answered.
13   BY MR. LARSON:
14        Q.   You never said that?
15        A.   No.
16        Q.   And they never said, Borden, we're going
17   to treat you right, because you've made us very
18   successful, and we're actually going to negotiate with
19   you for this good and valuable consideration that is
20   stated in this document?
21        A.   There's also about another -- at that
22   time, probably 300 people there that were making us
23   successful and they are very happy.
24        Q.   And did any of those come up with an
25   invention that is making you a million-and-a-half
```

Page 320

```
 1   dollars in royalties today?
 2        A.   They may not have come up with a flight
 3   control tower, but I'm sure that there are suggestions
 4   that have been made by employees that have made money
 5   for the company.
 6        Q.   And how did you treat them after they made
 7   those suggestions?
 8        A.   The same way we treated Borden.  We
 9   honored our commitment to them and paid them for the
10   work that they did.
11        Q.   So, you didn't pat them on the back at the
12   end and give them a plaque at the end of the year?
13        A.   Well, you may pat them on the back.  Who
14   said we didn't pat Borden on the back and said
15   congratulations.
16        Q.   Did you ever pat him on the back?
17        A.   I personally did not.
18        Q.   Do you know anyone that did?
19        A.   I never did a survey of the rest of the
20   managers to find out who did or didn't.
21        Q.   Do you ever have a meeting and say, hey,
22   you know, Borden has done something very significant
23   this year, we want to, you know, recognize him in some
24   way?
25        A.   Not to -- to that extent, no.
```

Page 321

```
 1        Q.   Do you think that's a big extent?
 2        A.   I wouldn't -- no, I wouldn't say it was
 3   a -- an extent or a great extent, or anything else.
 4        Q.   Isn't that a simple thing --
 5        A.   We just didn't do it.
 6        Q.   Isn't that a simple thing to, at the end
 7   of the year, go to the employees who have contributed
 8   and just say thank you?
 9        A.   We generally do.  We usually do it in mass
10   when we have the annual Christmas party, and, you
11   know, we give out the Christmas bonuses, and, if the
12   company is successful, everybody gets a bonus.
13        Q.   But Borden never received a bonus
14   specifically for the fact that he came up with an
15   invention that's making you a lot of money today?
16        A.   Nobody else received a bonus for anything
17   that they did that made the company successful.  With
18   the exception of if the company made money there were
19   bonuses.
20        Q.   Okay.  On Page 96 it says when it comes to
21   cost-cutting and improving the bottom line, employees
22   are often seen to be expendable, but that's not the
23   attitude of Correct Craft.
24        Now, is that a promise that Borden could
25   rely on?
```

Page 322

1    A.    As long as he was a part of the company
2 and had the best interests of the company at heart and
3 did the job, yes.
4    Q.    And what evidence do you have that he
5 doesn't have the best interests of the company at
6 heart?
7    A.    I think we went through that earlier.
8    Q.    Well, it says here that expendable
9 employees is not the attitude of Correct Craft.
10 There's only -- has laid off staff only twice in its
11 history.
12       Instead of firing Borden, why wouldn't you
13 go send him out to the factory somewhere?  It's what
14 it says you do here.
15    A.    I think you've taken that a little out of
16 context from the standpoint that we only had two
17 layoffs in the history of the company.
18       Any other time there had to be a cut in
19 the work force, we let it go by natural attrition.  If
20 people left, we didn't replace them, but we did
21 everything we could to provide them a job as long as
22 we could.
23       And so, therefore, we did not have layoffs
24 when things turned down.  We just -- as they -- if
25 they left the company, we didn't replace them.

Page 323

1    Q.    Now, on Page 98 you talk, again -- you say
2 when you're a Christian, when you put something in
3 writing and say something, you better be ready to back
4 it up.
5       What do you mean by that?
6    A.    Was there any -- exactly what I said.  Was
7 there anything in writing that I gave to anybody that
8 you know of that I didn't back it up or didn't try to
9 honor it?
10    Q.    Well, let's talk about, you know, your
11 statements today that Borden wasn't performing.  It
12 says, when you're a Christian and you put something in
13 writing and say something.  Today you're saying
14 something; that Borden wasn't performing.
15       You know, do you want to take a look at
16 his personnel file and see, you know, where he was not
17 performing?
18       Let's just go through it together.  Page
19 Number 13.  This is April of 2001.  This is five
20 months before he was fired.
21    A.    Uh-huh.
22    Q.    It says review, good performance, by Mike
23 Elrod.  Signed by you.
24    A.    Yep.  Well, it says verbal, and then they
25 wrote my name in.

Page 324

1    Q.    Okay.  Well, Mike Elrod called you up and
2 says, Borden just had a good review --
3    A.    Yeah.  I was probably out of town and
4 they --
5    Q.    Okay.  So, this is in April of 2001.  You
6 fired him in September --
7    A.    Uh-huh.
8    Q.    -- of 2001?
9    A.    Uh-huh.
10    Q.    Now, why didn't you tell Mike Elrod, Mike,
11 that's a false document?  He's very badly -- I've got
12 all these time lines here, we all know, he's doing
13 badly.
14    A.    At that time, he may have, you know,
15 performed very well in one job or one instance, or
16 perhaps he was performing very well at that time.
17 Things do change and people change.
18    Q.    Okay.  But you're guessing, aren't you?
19    A.    Guessing?
20    Q.    What evidence do you have that between
21 April of '01, and September of '01, Borden Larson quit
22 performing?
23    A.    The fact that, you know, we had to let him
24 go.
25    Q.    The fact that Bill Waits didn't like him,

Page 325

1 and you promoted Bill Waits and he says we're getting
2 rid of him.
3    A.    That's -- no.
4    Q.    Where is the evidence that you had to let
5 him go, because he wasn't performing?
6    A.    I mean --
7    Q.    Here.  April of 2000.  Mike Elrod with
8 your verbal.  Annual review.  He gets a 3-and-a-half
9 percent pay raise.  You give him a pay raise, because
10 he's doing it badly.
11       Year before that, April of '99.  Annual
12 review.
13    A.    Okay.  So, his --
14    Q.    A 4-and-a-half percent raise --
15    A.    His history up to that time was good, but
16 he -- people change.  Attitudes change.
17    Q.    When did he change?  What day did he
18 change?
19    A.    Sometime between the last review that he
20 got and the time that he was let go.
21    Q.    And what did he do to change?
22    A.    I don't recall everything that happened at
23 the time.  I'm sure that before he left there, that
24 there was discussions between me and those that he
25 worked with.

Page 326

1    Q.    And what were the discussions?
2    A.    Obviously, they resulted -- the discussion
3  was that he was let go.
4    Q.    Here.  1994.  Annual review.  Very good
5  performance.  You signed that.
6    A.    At that time, yes.  That's history.  That
7  was prior to his being let go.
8    Q.    1993, good job.
9    A.    Good.
10   Q.    1991, good job.  You signed it.
11   A.    Okay.  So, he performed well at that time
12  and then his performance dropped off.
13   Q.    So, from 1991 all the way to April of 2001
14  he has absolutely perfect reviews.  And we have to
15  believe you that ten years of history, of perfect
16  history, all went out the window in what?  Four
17  months?
18   A.    It could happen, yes.
19   Q.    Where's the proof?
20   A.    There's -- there's nothing in the file
21  that says the reason we let him go.
22   Q.    Why didn't you put that in there?
23   A.    Why would I put that in there?
24   Q.    Because --
25   A.    At that level I don't have to.

Page 327

1    Q.    If it's the truth, wouldn't you put it in
2  there?
3    A.    Yeah.  The truth can also create a whole
4  lot the problems if someone decides to use it.
5    Q.    And when Borden Larson wrote to you asking
6  for a copy of his file, you didn't even give him a
7  copy, did you?
8    A.    He did not write to me.
9    Q.    He wrote to the company.
10        So, how is Borden Larson going to find out
11  what's in his file when you won't even give him a copy
12  of his file?
13   A.    All right.  When did he write that letter
14  to them?
15   Q.    He wrote it -- he wrote it on August 3rd,
16  2003.  He says I want a copy of my personnel file.
17   A.    I wasn't there.  You're talking about the
18  company, not me.  I can't answer that question.
19   Q.    Let's go look at Page 188.
20   A.    Does this mean we're getting close to the
21  end?
22   Q.    Yes.
23   A.    Good.  You are right at the end of it,
24  aren't you?
25        Okay.  Caught up with you.

Page 328

1    Q.    Page 188, Number 4, it says develop
2  corporate policies that reflect Christian values.
3        Now, what corporate policy did you have at
4  Correct Craft that reflected Christian values?
5    A.    You mean a corporate policy in writing?
6    Q.    I don't know.  It's your book.
7    A.    No.  I mean, the -- the basic philosophy
8  and the policy of the -- of the family, because it's a
9  family-owned business, and company, was to do exactly
10  what we said, to the best of our ability, and to honor
11  everyone.
12   Q.    What corporate policies did you develop
13  that reflected Christian values?
14        MR. NORMAN:  Objection.  Asked and
15  answered.
16        THE WITNESS:  There were no written
17  policies.  This was a philosophy.  Maybe I
18  should have said philosophy instead of policy at
19  the time the book was written.
20  BY MR. LARSON:
21   Q.    The next sentence, such treatment -- see
22  where it says that -- such treatment has resulted in a
23  management offering fair benefits to employees, and
24  demonstrating integrity and honesty to employees.
25        Is that a promise that Borden could rely

Page 329

1  on, that you would have integrity and honesty to him?
2        MR. NORMAN:  Objection.  Calls for a legal
3  conclusion.  Vague.
4        THE WITNESS:  Again, if -- if I -- I don't
5  know what he believed.  I don't know what he
6  thought about the policy.  I don't know if he
7  believed it or not.
8  BY MR. LARSON:
9    Q.    I asked is that a promise to Borden that
10  he --
11   A.    It's not a promise to Borden.  It is a
12  promise that is made that the family is going to
13  operate, to the best its ability, to do what is right
14  and to honor God in doing so.
15   Q.    What about integrity and honesty to
16  employees?
17   A.    This book is not about promises.  This is
18  not a book of promises.  This is a book about the
19  history of the family and the company, and what we
20  strive to do.
21   Q.    Well, it says here, Number 4, Developing
22  Corporate Policies, the heading here, and then it says
23  such treatment resulted in management offering fair
24  benefits to employees, and management demonstrating
25  integrity and honesty to employees.

Page 330

1    A.    And who's to question whether we did or
2  didn't?
3    Q.    Well, my question to you is, were they
4  promises to Borden that management of the company --
5    A.    This book was not a book of promises.
6  This is merely a recitation of the -- of the family's
7  belief, and the history of the company and the way we
8  operate.
9    Q.    So, you're saying the way you operate
10  would have to do with integrity and honesty to
11  employees?
12    A.    And I believe we have acted that way.
13    Q.    And when you had Borden sign these
14  assignments when you had a lawyer and you knew Borden
15  didn't have a lawyer, is that high integrity that you
16  used?
17    A.    I think I answered that earlier.  I did
18  not have him sign those papers.  That was a matter --
19  that was what the legal team followed through and what
20  they considered was in the best interests of the
21  company.  And that's what they were hired for.
22        I did not ask him to sign those papers.  I
23  did not hand him those papers.
24    Q.    Well, you're not saying that Correct Craft
25  would give them back, because whoever handed them to

Page 331

1  him over at the Allen, Dyer firm didn't give him --
2  didn't say, hey, Borden, go get your own lawyer; you
3  still want to keep these assignments regardless of the
4  fact that nobody advised Borden to get his own
5  counselor, aren't you?
6        MR. NORMAN:  Objection.  Compound
7  question.
8        THE WITNESS:  Legally I -- you know, I --
9  I think the only thing that I would say or do is
10  whatever the attorneys advise us to do.  If they
11  say keep it, we keep it.
12  BY MR. LARSON:
13    Q.    What about integrity?
14    A.    What about integrity?
15    Q.    What does that mean to you?
16    A.    Well, I think integrity covers a lot of
17  things.
18    Q.    Well, when you settled with Todd for
19  $355,000, and then asked Borden to sign papers a
20  couple weeks later and kept all that information from
21  Borden, doesn't that have to do with integrity?
22    A.    No, I don't think so.
23    Q.    That has to do with you withholding facts
24  relevant to you?
25    A.    No, I don't believe so.

Page 332

1    Q.    Does it have to do with withholding facts
2  relevant to Borden?
3    A.    I don't think so.
4    Q.    What about honesty?  It says honesty to
5  employees.
6    A.    Did I make a commitment to Borden that I
7  would tell him everything the company did?  No, I did
8  not.
9    Q.    Did you make a commitment to Borden when
10  he signed these that you were going to be truthful
11  about what you knew about the patent law?
12    A.    Again, I didn't have anything to do with
13  that assignment, okay?  That was done by the attorneys
14  and the advice was, and we hired them to do it and
15  they did it.
16    Q.    But you've been telling me all this time
17  that your belief is that everything an employee does
18  while they work for Correct Craft belongs to Correct
19  Craft; isn't that true?
20    A.    That's correct.
21    Q.    And that's your interpretation of what you
22  believe the patent law says?
23    A.    Correct.
24    Q.    And did you ever advise Borden, that, you
25  know, there may be other beliefs about the patent law

Page 333

1  and you better go and find out your own thought about
2  the patent law?
3    A.    No.  Again, I had no conversation with
4  Borden whatsoever concerning the patent law or
5  anything else of that nature.
6    Q.    But all the decisions based on this whole
7  patent process were decisions that you ultimately had
8  the responsibility for?
9    A.    As -- as head of the corporation and
10  president, yes.
11    Q.    And you chose to not say, hey, Borden, I
12  think you should go get your own advice on this issue?
13    A.    Again, there was no reason for me to say
14  that.
15    Q.    Why not?
16    A.    I didn't make a commitment to him to
17  divulge any information to him personally.
18    Q.    You didn't -- these books here don't say
19  that you have --
20    A.    This is not a commitment to Borden or to
21  anybody.  This is a recitation or a -- of verbalizing
22  of what the company -- the company history and what
23  the company -- the family believes and how they try to
24  operate.  This is not a commitment or a promise to
25  anybody.  It does not have anybody's name in it.

Page 334

1    Q.    Where does it say anything here that this
2  is not promises that people can rely on?
3    A.    This is merely a story about the family
4  and the company, and the way we try to do things.
5    Q.    Did you ever tell the employees that these
6  books were given to, or allowed to have, did you ever
7  tell them, hey, you cannot rely us?
8    A.    No.  There was no reason to.
9        MR. LARSON:  Okay.  I have nothing
10  further.
11        MR. NORMAN:  I have a couple of questions
12  for you.
13              CROSS EXAMINATION
14  BY MR. NORMAN:
15    Q.    You said Borden never designed the ski
16  pylon.  Do you know if he had any efforts with the ski
17  pylon at all?
18    A.    The original ski pylon went back to the
19  50s.
20    Q.    Right.
21    A.    There was a change made down the road
22  where we made it out of aluminum and inserted a brass
23  ring into it and a brass piece on the bottom.  It's
24  quite possible at that time he did have something to
25  do with that.

Page 335

1    Q.    You said you never asked Borden to invent
2  a new towing point.  Did you give him a charge to go
3  and look at raising the towing point, a challenge to
4  do so?
5    A.    That was a general challenge that the --
6  the whole team accepted the fact that we had a
7  problem, we needed to do something about it.
8        And, I mean, would a marketing manager go
9  down and do it?  Would a salesman?  No.  But we all
10  talked about it.
11    Q.    Sure.
12        So -- but you did ask him to do that,
13  to -- to solve that problem somehow?
14    A.    It was a problem that needed to be solved,
15  yes.
16    Q.    Sure.
17        And you said you didn't hire him as an
18  inventor.
19        If Mr. Larson wants to portray moving the
20  tow point up as an invention instead of just an
21  improvement of the design, would that change your
22  answer as to what -- whether he was asked to invent?
23    A.    It was an improvement in the performance
24  of the boat.
25    Q.    Sure.

Page 336

1    A.    It help the salability of it.
2    Q.    Sure.
3        So, you just viewed that as not an
4  invention, but as an improvement of the design?
5    A.    Exactly.
6    Q.    But in either event that's what he was
7  hired to do?
8    A.    Exactly.
9    Q.    Okay.  And did you ever prevent him from
10  getting an attorney?
11    A.    No.
12    Q.    And did you advise him not to get an
13  attorney?
14    A.    No.
15    Q.    Did you ever encourage him not to get an
16  attorney?
17    A.    No.
18    Q.    Did you know that his brother was an
19  attorney?
20    A.    No.  I didn't know he had a brother.
21  Sorry.
22        MR. NORMAN:  Thanks.  Nothing further.
23  We'll read.
24              REDIRECT EXAMINATION
25  BY MR. LARSON:

Page 337

1    Q.    Mr. Meloon, did you not have a
2  confidentiality program with employees, that
3  developments in the company had to maintain some type
4  of secrecy until the products were brought to market?
5    A.    We didn't have a policy.  We made a
6  general request that -- you know, for the -- for their
7  security and the company's security, it's best not to
8  go out of here and talk about things that happened
9  here.
10    Q.    Where Borden worked at the -- you know,
11  the blue building, the two blue buildings, he worked
12  in the right one, the plug and mold shop, wasn't there
13  a time when you discovered photographers up the trees
14  across the street taking photos of different plugs and
15  stuff the company had been building in the back?
16    A.    Oh, we had people always peeping through
17  the -- through the -- the gates and the wire fence,
18  and poking around and trying to get into to where they
19  weren't supposed to be.
20    Q.    And so there was a chain link fence around
21  the back of that building --
22    A.    Yes.
23    Q.    -- that extended quite high?
24    A.    It was an average -- it was six foot
25  with -- I mean, a standard six-foot fence.

Page 338

1    Q.    It wasn't, like, ten or 12 feet?
2    A.    No, not behind that building.  Behind the
3 office there was a -- a fence that went, like, to 18
4 feet to keep the kids from going down the railroad
5 track from throwing rocks through the windows.
6    Q.    But behind the plug -- behind the mold
7 shop, though, there was not only a chain link fence,
8 but, you know, security slats put through there so you
9 couldn't see inside?
10    A.    Oh, yeah.  They -- like, Venetian blinds
11 they pull them down through to make it as secure as
12 possible.
13    Q.    because you didn't want, you know,
14 competitors or anybody else to see what was being
15 built in the back?
16    A.    Yeah.  Those things were always coming
17 back around the front door.  They would go out the
18 back door and come around the front door and hit you.
19 And like anybody else we'd like to keep some things in
20 a priority until we're ready to put it into the
21 market.
22    Q.    But if Borden had taken the tower idea and
23 got out to his own patent attorney, like Mr. Todd did,
24 wouldn't he have been somewhat violating certain
25 confidentiality that he had with Correct Craft?

Page 339

1        MR. NORMAN:  Objection.  Calls for a legal
2    conclusion.  Vague.
3            Answer it, if you could.
4        THE WITNESS:  There was nothing in
5    writing.  We just trusted them not to it when we
6    asked them to.
7 BY MR. LARSON:
8    Q.    And he did not do that, did he?
9    A.    Not to my knowledge.
10    Q.    And Borden dealt with the Correct Craft
11 personnel during the patenting process?
12    A.    Did he?
13    Q.    Yeah, he did.
14    A.    Yeah.  I mean --
15    Q.    And he trusted what you were advising him
16 to do?
17    A.    I did not --
18        MR. NORMAN:  Objection.  Calls for
19    speculation.
20        THE WITNESS:  -- advise him to do
21    anything.
22 BY MR. LARSON:
23    Q.    He trusted what Correct Craft asked him to
24 do.
25        MR. NORMAN:  Objection.  Calls for

Page 340

1    speculation.
2        THE WITNESS:  One would assume that if he
3    stated that.
4 BY MR. LARSON:
5    Q.    And he trusted even what, you know, Herb
6 Allen and Carl Napolitano asked him to do.
7        MR. NORMAN:  Objection.  Calls for
8    speculation.
9        THE WITNESS:  Again, I think we've been
10    through that.  I would guess he did.
11 BY MR. LARSON:
12    Q.    After reading a book like this, which is
13 Exhibit 70, do you see any reason -- I mean, assuming
14 Borden believed what was in that book, do you see any
15 reason why Borden would doubt Correct Craft's advice
16 to him that wasn't in his best interests?
17        MR. NORMAN:  Objection.  Calls for
18    speculation and it assumes facts not in evidence
19    that any advice was given.
20        THE WITNESS:  I don't think we gave him
21    any advice.
22 BY MR. LARSON:
23    Q.    Well, you --
24    A.    I just don't.
25    Q.    Do you see any reason why Borden would go

Page 341

1 out and get his own counsel when you're saying that
2 Correct Craft is morally -- morally and ethically
3 correct?
4        Why would Borden have to go out and find
5 his own counsel when you're saying I'm ethical, I'm
6 moral?
7    A.    I think the statement that we made -- or,
8 I tried to make, was that we made every effort to be
9 as ethical and moral as possible.
10    We're human beings.  We fail sometimes.
11 Did we fail in this instance?  I don't think that
12 applies here.
13    Q.    Well, is there any reason Borden would
14 think he has to get his own lawyer after you say
15 Correct Craft's management always treats employees
16 right?
17        Why would Borden need his own lawyer after
18 he gets statements like that from you?
19    A.    That would be a decision he makes.
20    Q.    Yeah, but do you see any reason after you
21 tell him, through these books, that you always treat
22 employees right?
23        Why would he need to go out and find his
24 own lawyer to protect himself from what you're telling
25 him to do?

Page 342

1      MR. NORMAN:  Objection.  Calls for
2  speculation.  It assumes facts not in evidence.
3      THE WITNESS:  If this book had a heading
4  on here that said, Borden, this is a commitment
5  to you -- that's not a commitment personally to
6  anybody.
7        This is a statement, generally, of how
8  we operate and the considerations we try to give
9  other people.
10 BY MR. LARSON:
11     Q.   But my question to you is very simple.
12        After reading this book, why would Borden
13 need to go out and find his own lawyer to protect his
14 rights when you state in here that one of the things
15 we've got to remember of -- or that we remember is the
16 employees?
17     MR. NORMAN:  Same objection.
18        THE WITNESS:  We also -- we also try to
19 remember and honor our suppliers, our customers,
20 our dealers, you know, employees, you know.
21 BY MR. LARSON:
22     Q.   I'm talking about Borden.
23        After reading that book, why would Borden
24 think that he had to go out and protect himself from
25 you or your company?

Page 343

1      A.   It's not a book of promises.
2      Q.   Is there a disclaimer in the book?
3      A.   No, there's not a disclaimer in the book.
4  Is there a disclaimer in all books that you read?
5  Biographies, or autobiographies, or about businesses,
6  are there disclaimers in them?  No.
7      Q.   I'm asking about why would Borden have to
8  go out and get an attorney to represent himself after
9  reading this book, where you state that you have a
10 consistent stand on which employees can count?
11     A.   I have no idea, you know, what his take on
12 it was or -- you know, what he thought, or what he
13 felt, or what he believed, or anything else.
14     MR. LARSON:  I have nothing further.
15     MR. NORMAN:  No further questions.  We'll
16 read.
17        (Whereupon, this deposition was
18 concluded at 4:28, p.m., and the witness,
19 through his attorney, reserved the right to read
20 and sign the deposition transcript)
21        - - - - -
22
23
24
25

Page 344

1          CERTIFICATE OF OATH
2  STATE OF FLORIDA)
3  COUNTY OF ORANGE)
4      I, the undersigned authority, certify that
5  Walter N. Meloon, personally appeared before me
6  and was duly sworn.
7        WITNESS my hand and official seal this
8  18th day of September, 2007.
9
10
11
12
13
14
15
16
17
18
19    _____
20    LINDE R. BLOSSER
21    Notary Public - State of Florida
      My Commission No. DD318810
22    Expires:  May 31, 2008
23
24
25

Page 345

1          C E R T I F I C A T E
2  STATE OF FLORIDA
3  COUNTY OF ORANGE
4      I, LINDE R. BLOSSER, Stenotype Shorthand
   Reporter and Notary Public, State of Florida at
5  Large, do hereby certify that I did, at the time
   and place herein designated, place under oath
6  the deponent, Walter N. Meloon, who was
   thereupon examined; that said examination was
7  recorded by me, and through the use of
   computer-aided transcription reduced to
8  typewritten form; and that the foregoing pages
   numbered 180 through 343, inclusive, constitute
9  a true, complete and accurate transcription of
   my said stenotype notes taken therein.
10     I FURTHER CERTIFY that I am neither of
   counsel, nor related to any party involved in
11 this action, nor am I financially interested in
   the outcome of this case.
12     WITNESS MY HAND AND OFFICIAL SEAL, this
   18th day of September, 2007, in the City of
13 Orlando, County of Orange, State of Florida.
14
15    _____
   LINDE R. BLOSSER
16    Stenotype Shorthand Reporter
17
18
19
20
21
22
23
24
25

Page 346

1          SUBSCRIPTION OF DEPONENT
2      Borden Larson vs. Correct Craft, Inc., et al,
3        Date of Deposition:  September 6, 2007
4        I, WALTER N. MELOON, do hereby certify that I
  have, this day, exercised my express right to read
5  this true and correct record of the proceedings, had
  at the time and place herein designated, with the
6  following corrections:
7  PAGE    LINE    CORRECTION
8  _____   _____   _____
9  _____   _____   _____
10 _____   _____   _____
11 _____   _____   _____
12 _____   _____   _____
13 _____   _____   _____
14 _____   _____   _____
15 _____   _____   _____
16 _____   _____   _____
17
          Under the penalties of perjury, I declare
18     that I have read my deposition and that it is
       true and correct subject to any changes in form
19     or substance entered here.
20

21           _____
             Walter N. Meloon
22           _____
             DATE
23
24
25

Page 347

1   L E T T E R   O F   N O T I F I C A T I O N
2  September 17th, 2007
3  Todd Norman, Esquire
   Sutmp, Storey, Callahan, Dietrich & Spears, P.A.
4  37 North Orange Avenue, Suite 200
   Orlando, FL  32801
5
    RE:    Larson vs. Correct Craft
6  DEPONENT:  Walter N. Meloon
   DATE TAKEN:  September 6, 2007
7
   Dear Mr. Norman:
8
      As you may recall, at the conclusion of
9  the deposition taken on the above date in the
   aforementioned action, you requested the
10 deponent have the opportunity to review the
   deposition transcript.
11
      Enclosed herewith, along with your copies
12 of the above-referenced deposition, is the
   original Errata Sheet.  Please provide your
13 client with a copy of their deposition and
   instruct him not to write on the copy itself,
14 but to make any corrections on the Subscription
   Pages and sign same.
15
      Once signed, please forward the original
16 Errata Sheet directly to Beecher Larson,
   Esquire, at 1201 Ridge Road, Longwood, FL,
17 32750, and keep a copy for yourself.
18    Thank you for your cooperation in this
   matter.  Please contact our office if you have
19 any questions.
20
      _____
21    Linde R. Blosser
      Landmark Reporting, Inc.
      1516 East Hillcrest Street
22    Suite 300
      Orlando, FL  32803
23    407-898-2044
24
25