1

1               IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF FLORIDA
                  ORLANDO DIVISION

3

4

5

6  CORRECT CRAFT, INC., A
    FLORIDA CORPORATION

7         PLAINTIFF,

8

     -VS-           CASE NO.:  6:00-CV-788-ORL-22-A

9

10  TOWER SYSTEMS, INC., D/B/A,
     ATLANTIC TOWERS, A

11  CORPORATION

12       DEFENDANTS.

13

14  _____
                     JUNE 18, 2002

15                   9:00 O'CLOCK A.M.

16      THE DEPOSITION OF WALTER MELOON, TAKEN ON

17  BEHALF OF THE DEFENDANTS, PURSUANT TO NOTICE OF

18  TAKING DEPOSITION, AT THE OFFICES OF ALLEN, DYER,

19  DOPPELT, MILBRATH, & GILCHRIST, P.A., 255 SOUTH

20  ORANGE AVENUE, SUITE 1401, ORLANDO, FLORIDA, BEFORE

21  SHELLEY N. TROISE, SHORTHAND REPORTER, AND NOTARY

22  PUBLIC, IN AND FOR THE STATE OF FLORIDA, AT LARGE.

23

24       ATTORNEYS EYES ONLY -- CONFIDENTIAL

25
              BARBARA PERRY & COMPANY
                407-422-2953

Page 2

```
1
2   APPEARANCES:
3
        BRIAN GILCHRIST, ESQUIRE
4       HERBERT L. ALLEN, ESQUIRE
        ALLEN, DYER, DOPPELT, MILBRATH &
5       GILCHRIST, P.A.
        255 SOUTH ORANGE AVENUE
6       SUITE 1401
        ORLANDO, FLORIDA 32801
7
8       REPRESENTING THE PLAINTIFF
9
10
11      ARTHUR M. PESLAK, ESQUIRE
        MANDEL & PESLAK, LLC
12      80 SCENIC DRIVE SUITE 5
        FREEHOLD, NEW JERSEY 07728
13
        REPRESENTING THE DEFENDANTS
14
15
16      ALSO PRESENT:
17      GARY MELOON
18
19
20
21
22
23
24
25
```

Page 3

```
1           TABLE OF CONTENTS
2
    WALTER MELOON
3   JUNE 18, 2002
4   APPEARANCES                          02
5   STIPULATIONS                         04
6   TESTIMONY OF WALTER MELOON
7     DIRECT EXAMINATION BY MR. PESLAK    05
8   JURAT                               122
9   CERTIFICATE OF REPORTER             123
10          EXHIBITS
11  1              21
    2              25
12  3              35
    4              58
13  5              63
    6              64
14  7              64
    8              66
15  9              70
    10             75
16  11             77
    12             79
17  13             82
    14             83
18  15             84
    16             85
19  17             86
    18             88
20  19             91
    20             95
21  21             96
    22             98
22  23             99
    24            101
23  25            103
    26            103
24  27            105
    28            106
25  29            109
```

Page 4

```
1
2
3           S T I P U L A T I O N S
4       IT IS HEREBY STIPULATED AND AGREED BY AND
5   BETWEEN COUNSEL PRESENT FOR THE RESPECTIVE PARTIES
6   AND THE DEPONENT THAT THE READING AND SIGNING OF THE
7   DEPOSITION IS RESERVED.
8               (END OF STIPULATION)
9               * * *
10  REPORTER'S KEY TO PUNCTUATION:
11  -- AT END OF QUESTION OR ANSWER REFERENCES
        AN INTERRUPTION.
12
    ...REFERENCES A TRAIL-OFF BY THE SPEAKER
13      NO TESTIMONY OMITTED.
14  "UH-HUH" REFERENCES AN AFFIRMATIVE SOUND.
    "UNH-UNH" REFERENCES A NEGATIVE SOUND.
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1           P R O C E E D I N G S
2           WALTER MELOON,
3       HAVING BEEN FIRST DULY SWORN BY THE REPORTER,
4       THEREUPON TESTIFIED UPON HIS OATH AS FOLLOWS:
5           DIRECT EXAMINATION
6   BY MR. PESLAK:
7       Q.  GOOD MORNING, MR. MELOON, COULD YOU STATE
8   YOUR NAME AND ADDRESS FOR THE RECORD PLEASE?
9       A.  WALTER, MIDDLE INITIAL N, LAST NAME
10  MELOON.  THE ADDRESS IS 6109 MATCHETT ROAD.
11      Q.  AND WHERE IS THAT IN ORLANDO?
12      A.  ORLANDO.
13      Q.  THAT IS YOUR RESIDENCE ADDRESS?
14      A.  YES.
15      Q.  YOU EMPLOYED BY CORRECT CRAFT?
16      A.  YES.
17      Q.  WHAT'S YOUR POSITION AT CORRECT CRAFT?
18      A.  PRESIDENT.
19      Q.  HOW LONG YOU BEEN PRESIDENT OF CORRECT
20  CRAFT?
21      A.  MARCH 29, 1985.
22      Q.  AND WERE YOU EMPLOYED AT CORRECT CRAFT
23  BEFORE MARCH 29, 1985?
24      A.  YES.
25      Q.  AND HOW LONG WERE YOU EMPLOYED AT CORRECT
```

Page 6

1 CRAFT PRIOR TO MARCH 29, 1985?

2    A. I THINK IT WAS 1960 AROUND 1960.

3    Q. IS IT SAFE TO SAY THAT YOU WORKED AT

4 CORRECT CRAFT ALL OF YOUR ADULT LIFE?

5    A. YES.

6    Q. AS PRESIDENT OF CORRECT CRAFT DO YOU

7 REPORT TO ANYONE ELSE AT THE COMPANY?

8    A. NO, I'M CEO.

9    Q. SO THERE'S NO ONE ELSE YOU REPORT TO?

10    A. NO.

11    Q. IS CORRECT CRAFT -- STRIKE THAT.

12       IS THE STOCK IN CORRECT CRAFT PUBLICLY

13 TRADED?

14    A. NO.

15    Q. ARE YOU ALSO A SHAREHOLDER OF CORRECT

16 CRAFT?

17    A. YES.

18    Q. DOES CORRECT CRAFT HAVE MORE THAN ONE

19 CLASS OF STOCK?

20    A. NO.

21    Q. HOW MUCH OF -- HOW MANY SHAREHOLDERS DOES

22 CORRECT CRAFT HAVE?

23    A. APPROXIMATELY I WOULD SAY APPROXIMATELY

24 30, MAYBE 35.

25    Q. DOES -- STRIKE THAT.

Page 7

1       DOES CORRECT CRAFT HAVE A BOARD OF

2 DIRECTORS?

3    A. YES.

4    Q. ARE YOU A MEMBER OF THE BOARD OF DIRECTORS

5 OF CORRECT CRAFT?

6       (MR. ALLEN ENTERS THE ROOM.)

7    A. NO, I'M NOT.

8    Q. WHO ARE THE MEMBERS OF THE BOARD OF

9 DIRECTORS OF CORRECT CRAFT?

10    A. THERE'S RALPH MELOON, WALTER MELOON,

11 GORDON PURDY, JIM WELCH, DON PENINGTON. NORM SONJA,

12 DAVE CHAMBERS, MARTIN MOSVOLD, M-O-S-V-O-L-D.

13    Q. ANYONE ELSE?

14    A. I BELIEVE THAT IS IT.

15    Q. YOU MENTIONED ANOTHER WALTER MELOON?

16    A. YES.

17    Q. IS THAT YOUR FATHER?

18    A. YES.

19    Q. YOU ALSO MENTIONED A RALPH MELOON?

20    A. YES.

21    Q. IS THAT ALSO ONE OF YOUR RELATIVES?

22    A. THAT IS MY UNCLE.

23    Q. DO YOU ATTEND THE BOARD OF DIRECTORS

24 MEETINGS OF CORRECT CRAFT?

25    A. YES.

Page 8

1    Q. AND HOW OFTEN DOES THE BOARD OF DIRECTORS

2 OF CORRECT CRAFT MEET?

3    A. TWICE.

4    Q. TWICE A YEAR?

5    A. YEAH.

6    Q. WHO ARE THE OTHER OFFICERS OF CORRECT

7 CRAFT BESIDES YOURSELF -- STRIKE THAT.

8       YOU'RE AN OFFICER OF CORRECT CRAFT, RIGHT,

9 PRESIDENT?

10    A. YES.

11    Q. WHO ARE THE OTHER OFFICERS OF CORRECT

12 CRAFT?

13    A. MY FATHER, HE HOLDS THE TITLE OF SECRETARY

14 TREASURER, RALPH IS CHAIRMAN OF THE BOARD, AND THEN

15 WE HAVE THREE VICE-PRESIDENTS.

16    Q. AND WHO ARE THE THREE VICE-PRESIDENTS?

17    A. LARRY MEDDOCK, MIKE ELROD, AND GARY

18 MELOON.

19    Q. AND WHAT ARE MR. MEDDOCK'S

20 RESPONSIBILITIES?

21    A. HE'S THE DIRECTOR OF MARKETING.

22    Q. AND MR. ELROD?

23    A. HE'S PRODUCTION.

24    Q. MANUFACTURING?

25    A. YES.

Page 9

1    Q. AND GARY MELOON?

2    A. SALES.

3    Q. AT -- DOES SOMEONE KEEP MINUTES OF THE

4 MEETINGS OF THE BOARD OF DIRECTORS OF CORRECT CRAFT?

5    A. OF COURSE.

6    Q. WHO IS RESPONSIBLE FOR THAT?

7    A. I HAVE A SECRETARY.

8    Q. YOUR FATHER?

9    A. NO.

10    Q. ANOTHER PERSON THAT IS A SECRETARY?

11    A. YES.

12    Q. AND WHO IS THAT?

13    A. THAT IS ANGELA TOKINTON. (PH)

14    Q. SO SHE ATTENDS THE MEETINGS AND WRITES

15 DOWN NOTES AND?

16    A. YES.

17    Q. HAS THIS LAWSUIT EVER BEEN DISCUSSED AT A

18 BOARD OF DIRECTORS MEETING?

19    A. IT'S BEEN IN MY REPORT.

20    Q. IN A REPORT THAT YOU MAKE TO THE BOARD OF

21 DIRECTORS?

22    A. UH-HUH. YES, SIR.

23    Q. HAS THE LICENSING PROGRAM FOR CORRECT

24 CRAFT'S WAKEBOARDING PATENT BEEN DISCUSSED AT BOARD

25 OF DIRECTORS MEETINGS?

Page 10

1    A.  ALSO BEEN IN MY REPORTS, YES.
2    Q.  AND HAVE YOU MADE THOSE REPORTS AVAILABLE
3 TO YOUR LAWYER TO -- FOR PRODUCTION IN THIS CASE?
4    A.  WE'VE MADE EVERYTHING AVAILABLE HE'S ASKED
5 FOR.
6        MR. PESLAK:  OKAY.  I'M GOING TO REQUEST
7    PRODUCTION OF MR. MELOON'S REPORTS, BRIAN.
8        IN -- I UNDERSTAND THAT YOU PROVIDE
9    REPORTS TO THE BOARD OF DIRECTORS, HAS THIS
10   LAWSUIT ACTUALLY BEEN DISCUSSED AT A BOARD OF
11   DIRECTORS MEETING?
12   A.  NOT IN DETAIL, NO.
13   Q.  HAS IT BEEN DISCUSSED AT ALL AT THE BOARD
14 OF DIRECTORS MEETINGS?
15   A.  MENTIONED.
16   Q.  HAS THE LICENSING PROGRAM FOR CORRECT
17 CRAFT'S WAKEBOARDING PATENT BEEN DISCUSSED AT A
18 BOARD OF DIRECTORS MEETING?
19   A.  NOT IN DETAIL.
20   Q.  FOR EXAMPLE HAS THE LICENSE WITH
21 MASTERCRAFT BEEN DISCUSSED AT A BOARD OF DIRECTORS
22 MEETING?
23   A.  MENTION WAS MADE OF IT, YES.
24   Q.  AND WOULD THAT BE REFLECTED IN THE MINUTES
25 OF THE BOARD OF DIRECTORS MEETINGS?

Page 11

1    A.  IT COULD BE UNDER ONE OF THE DEPARTMENT
2 REPORTS.
3    Q.  AND WHAT ARE DEPARTMENT REPORTS?
4    A.  THE DEPARTMENT HEADS MAKE REPORTS.
5    Q.  WHO ARE THE DEPARTMENT HEADS AT CORRECT
6 CRAFT?
7    A.  THE THREE MEN THAT I NAMED.
8    Q.  MR. MEDDOCK, MR. ELROD, AND MR. GARY
9 MELOON?
10   A.  YES.  AND THERE ARE OTHERS THAT SERVE IN
11 OTHER CAPACITIES.
12   Q.  HAVE YOU EVER HAD YOUR DEPOSITION TAKEN
13 BEFORE?
14   A.  YES.
15   Q.  HOW MANY TIMES?
16   A.  OH, PROBABLY A COUPLE DOZEN.
17   Q.  HAS THAT ALL BEEN IN CONNECTION WITH
18 CORRECT CRAFT BUSINESS?
19   A.  YES.
20   Q.  AND PRIOR TO THIS LAWSUIT HAS CORRECT
21 CRAFT EVER BEEN INVOLVED IN A PATENT INFRINGEMENT
22 LAWSUIT?
23   A.  NOT TO MY KNOWLEDGE.
24   Q.  NEVER BEEN SUED FOR PATENT INFRINGEMENT TO
25 YOUR KNOWLEDGE?

Page 12

1    A.  NO.
2    Q.  AND WHAT TYPE OF LAWSUITS WERE YOU GIVING
3 DEPOSITIONS IN?
4    A.  GENERALLY -- USUALLY LIABILITY.
5    Q.  WHAT DO YOU MEAN BY LIABILITY?
6    A.  IN REFERENCE TO MANUFACTURING.
7    Q.  YOU MEAN YOU WERE BEING SUED BY CUSTOMERS?
8    A.  BY USERS OF THE PRODUCT.
9    Q.  OF THE PRODUCT?
10   A.  YES.
11   Q.  SO, THEY WERE USERS OF CORRECT CRAFT BOATS
12 WHO WERE SUING CORRECT CRAFT BECAUSE THEY HAD SOME
13 PROBLEM WITH THEIR BOAT?
14   A.  NORMALLY THAT WAS THE REASON, YES.
15   Q.  HAS CORRECT CRAFT EVER BEEN A PLAINTIFF IN
16 A LITIGATION BEFORE PRIOR TO THIS SUIT?
17   A.  THE NATURE OF THE COMPANY IS NOT TO DO
18 THAT AND I DON'T RECALL IF WE HAVE BEEN.  IT'S --
19 THE POSSIBILITY IS VERY VAGUE.
20   Q.  YOU DON'T HAVE ANY RECOLLECTION THAT
21 CORRECT CRAFT WAS EVER A PLAINTIFF IN A LAWSUIT
22 PRIOR TO THIS SUIT AT LEAST WHEN YOU WERE PRESIDENT?
23   A.  NOT TO MY RECOLLECTION, NO.
24   Q.  WHEN DID CORRECT CRAFT FIRST ANTICIPATE
25 THAT IT WAS GOING TO HAVE TO SUE SOMEONE ON ITS

Page 13

1 WAKEBOARD PATENT?
2        MR. GILCHRIST:  IN RESPONDING TO THAT,
3    MR. MELOON, I WANT YOU TO EXCLUDE ANY
4    DISCUSSIONS YOU HAD WITH YOUR ATTORNEYS.
5        MR. PESLAK:  I'M NOT ASKING FOR
6    DISCUSSIONS; I'M JUST ASKING FOR AN APPROXIMATE
7    TIME.
8    A.  I GUESS AFTER EXHAUSTING EVERY AVENUE TO
9 COME TO AN AGREEMENT.
10   Q.  SO IT WOULD HAVE BEEN AFTER THE PATENT
11 ISSUE?
12   A.  CERTAINLY.
13   Q.  WHEN THE WAKEBOARDING PATENT WAS ISSUED IN
14 THIS CASE, YOU ON BEHALF OF CORRECT CRAFT SENT OUT
15 LETTERS OFFERING LICENSES UNDER THE PATENT, CORRECT?
16   A.  CORRECT.
17   Q.  AND THAT WAS AROUND NOVEMBER OR DECEMBER
18 1999?
19   A.  I DON'T RECALL THE EXACT TIME FRAME.
20   Q.  OKAY.  IF I TOLD YOU THE PATENT ISSUED
21 LATE NOVEMBER 1999, WOULD THAT HELP YOU?
22   A.  THAT IS REASONABLE.
23   Q.  SO, IT'S REASONABLE THOSE LETTERS WOULD
24 HAVE WENT OUT NOVEMBER OR DECEMBER 1999?
25   A.  YEAH, IF THAT WAS THE ISSUE DATE OF THE

Page 14

1 PATENT.
2    Q.  HOW MANY OF THOSE -- APPROXIMATELY HOW
3 MANY OF THOSE LETTERS DID YOU SEND OUT OFFERING
4 LICENSES IN NOVEMBER OR DECEMBER 1999?
5    A.  I REALLY HAVE NO IDEA WHAT THE NUMBER IS.
6    Q.  WOULD HAVE BEEN MORE THAN TEN?
7    A.  I WOULD ASSUME IT WOULD BE MORE THAN TEN.
8    Q.  MORE THAN 20?
9    A.  I COULDN'T SAY THAT IT WOULD BE, YOU KNOW,
10 MORE OR LESS.  I JUST DON'T RECALL.
11    Q.  DID YOU ALSO AT THAT POINT IN TIME, THAT
12 INITIAL PERIOD OF TIME IN NOVEMBER OR DECEMBER 1999
13 DID YOU MAKE THE SAME LICENSING OFFER TO EVERYONE
14 YOU SENT A LETTER TO?
15    A.  YES.
16    Q.  AND DID YOU SEND THAT LETTER TO BOTH TOWER
17 COMPANIES AND BOAT COMPANIES?
18    A.  YES.
19    Q.  HOW DID YOU DETERMINE WHAT PARTICULAR
20 ROYALTIES TO OFFER TO ANYONE IN THAT LETTER?
21    A.  HOW DID WE DETERMINE IT?
22    Q.  YES.
23    A.  I THINK WE ARRIVED AT THAT AFTER A LOT OF
24 DISCUSSION BASED ON WHAT WE KNEW ABOUT MANUFACTURING
25 COSTS AND THE VALUE OF TOWERS BEING SOLD ON THE

Page 15

1 MARKET.
2    Q.  WHO WAS INVOLVED IN THOSE DISCUSSIONS?
3    A.  MYSELF AND THE PATENT ATTORNEYS.
4    Q.  OKAY.  WHO -- WERE THERE ANY OTHER
5 BUSINESS PEOPLE INVOLVED?
6    A.  THERE MAY BE SOME OUT OF THE OFFICE THAT
7 WERE INTO IT IN MARKETING.
8    Q.  SO IS IT FAIR TO SAY YOU ESSENTIALLY
9 LOOKED IN THE MARKET AS TO WHAT TOWERS WERE SELLING
10 FOR AND THAT IS HOW YOU DETERMINED WHAT THE ROYALTY
11 WAS GOING TO BE AT LEAST WHAT YOU WERE OFFERING?
12    A.  I THINK THAT IS A GOOD ASSUMPTION, YES.
13    Q.  DID YOU SPEAK TO ANY TOWER COMPANIES?
14    A.  THE COMPANIES THAT WE WERE DOING BUSINESS
15 WITH.
16    Q.  WHO WAS THAT?
17    A.  SUNSHINE WELDING.
18    Q.  AND THAT IS THE COMPANY THAT MAKES YOUR
19 TOWER?
20    A.  YES.
21    Q.  SO -- BUT YOU OFFERED THE SAME THING TO
22 THE BOAT COMPANIES; THE SAME LICENSE ARRANGEMENT TO
23 THE BOAT COMPANIES?
24    A.  YES.
25    Q.  AND DID BOAT COMPANIES SELL THEIR -- WHAT

Page 16

1 BOAT COMPANIES DID YOU SEND IT TO IN NOVEMBER OR
2 DECEMBER 1999; DO YOU REMEMBER?
3    A.  EVERYONE THAT WE COULD IDENTIFY FROM THEIR
4 ADVERTISING IN MAGAZINES.
5    Q.  SO THEN MASTERCRAFT?
6    A.  YES.
7    Q.  MALIBU?
8    A.  YES.
9    Q.  BAYLINER?
10    A.  WE'VE BEEN IN TOUCH WITH THEM.
11    Q.  TOYOTA?
12    A.  YES.
13    Q.  WHAT'S THE APPROXIMATE SELLING PRICE FOR A
14 BOAT, THESE KIND OF BOATS THAT YOU OFFERED -- STRIKE
15 THAT.
16        APPROXIMATELY THESE BOATS SELL FOR ABOUT
17 $30,000 ON THE MARKET?
18    A.  PLUS.
19    Q.  SO DID YOU THINK THAT A BOAT COMPANY WAS
20 GOING TO MAKE THE SAME SORT OF BUSINESS DECISION AS
21 THE TOWER COMPANY WHO WAS SELLING THE TOWERS FOR A
22 THOUSAND DOLLARS?
23    A.  ON THAT I HAVE NO IDEA WHAT THEIR DECISION
24 MAKING PROCESS WOULD BE.
25    Q.  BUT YOU PROBABLY AGREE WITH ME THAT A BOAT

Page 17

1 COMPANY IS PROBABLY MAKING MORE PROFIT ON A $30,000
2 BOAT THAN A TOWER COMPANY IS MAKING ON A THOUSAND
3 DOLLAR TOWER?
4    A.  I GUESS THAT WOULD DEPEND ON COST AND
5 PERCENTAGES.
6    Q.  BUT AS A PROPOSITION, PROBABLY THE TOTAL
7 DOLLAR VALUE OR PROFIT ON A BOAT SELLING FOR $30,000
8 IS A LOT MORE TOTAL PROFIT THAN ON A TOWER SELLING
9 FOR A THOUSAND, CORRECT?
10    A.  YOU WOULD ASSUME SO.
11        MR. GILCHRIST:  OBJECTION.
12 BY MR. PESLAK:
13    Q.  WHO HAVE YOU SUED BESIDES TOWER SYSTEM ON
14 THE WAKEBOARDING PATENT?
15    A.  WAKE DESIGNS WAS IN, WAS IN THERE
16 SOMEWHERE.  AND I BELIEVE THERE WAS ONE OTHER BUT
17 I'M NOT SURE WHO THAT WAS.
18    Q.  SKI WORLD OF ORLANDO?
19    A.  YES.
20    Q.  WHATEVER -- IS THAT A TOWER COMPANY SKI
21 WORLD OF ORLANDO?
22    A.  NO.
23    Q.  IS IT A BOAT COMPANY?
24    A.  YES.
25    Q.  AND WHAT HAPPENED TO SKI WORLD OF ORLANDO;

Page 18

1 DID YOU SETTLE WITH THEM?
2    A.  NO.
3    Q.   DID THEY GO OUT OF THE BUSINESS?
4    A.  NO.
5    Q.   YOU JUST DROPPED THE CASE AGAINST THEM?
6    A.  IT'S -- I THINK IT'S WHAT YOU MIGHT SAY IS
7 ON THE BACK BURNER RIGHT NOW.
8    Q.   DID YOU SUE ANYONE ELSE ON THE
9 WAKEBOARDING PATENT?
10    A.  I DON'T RECALL THAT WE HAVE.
11    Q.   SO YOUR TESTIMONY IS IN NOVEMBER OR
12 DECEMBER 1999 YOU SENT OUT BETWEEN 10 AND 20 OF
13 THESE LICENSING LETTERS?
14       MR. GILCHRIST:  OBJECT TO THE FORM, THAT
15    IS NOT HIS TESTIMONY.
16       MR. PESLAK:  APPROXIMATELY.  YOU SAID IT
17    WAS MORE THAN 10 BUT COULDN'T -- PROBABLY MAYBE
18    NOT MORE THAN 20, RIGHT?
19       MR. GILCHRIST:  OBJECT TO THE FORM.
20       MR. PESLAK:  YOU SAID IT WAS MORE THAN TEN
21    LETTERS, RIGHT?
22    A.  WHATEVER MY ANSWER WAS WOULD BE THE SAME
23 NOW.
24    Q.   BUT IT WASN'T MORE THAN 20, YOU DIDN'T
25 THINK IT WAS MORE THAN 20?

Page 19

1       MR. GILCHRIST:  OBJECT TO THE FORM.
2    A.  I DON'T THINK I SAID "YES" OR "NO" TO
3 THAT.
4    Q.   BUT YOU SENT OUT AT LEAST TEN OF THE
5 LETTERS?
6    A.  I BELIEVE THAT WAS MY ANSWER BEFORE.
7    Q.   WHEN YOU FILED THIS LAWSUIT OTHER THAN
8 TODD'S T-TOPS, NOBODY SIGNED A LICENSE FOR THIS
9 PATENT, RIGHT?
10    A.  I DIDN'T UNDERSTAND THAT.
11    Q.   WHEN THIS LAWSUIT WAS FILED AROUND JUNE OF
12 2000 HAD ANYONE SIGNED A LICENSE FOR THE
13 WAKEBOARDING PATENT?
14    A.  I COULDN'T ANSWER THAT SPECIFICALLY NOT
15 WITHOUT LOOKING AT THE RECORDS.
16    Q.   WHY DIDN'T YOU SUE MASTERCRAFT THEN?
17       MR. GILCHRIST:  OBJECT TO THE FORM.  I
18    INSTRUCT YOU NOT TO -- IF YOU CAN ONLY ANSWER
19    THAT BY REVEALING WHAT YOU AND YOUR ATTORNEYS
20    TALKED ABOUT YOU'RE NOT TO ANSWER.  OTHERWISE
21    YOU CAN ANSWER IT.
22    A.  AGAIN WHAT WAS YOUR QUESTION?
23    Q.   WHY DIDN'T YOU SUE MASTERCRAFT IN JUNE OF
24 2000?
25    A.  I DON'T THINK I -- I DON'T THINK I COULD

Page 20

1 GIVE AN ANSWER AS TO WHY WE DID OR DIDN'T.
2    Q.   WHY NOT?
3    A.  AT THAT TIME I DON'T RECALL WHERE WE WERE
4 IN THE TALKS OR NEGOTIATIONS WITH THEM.
5    Q.   WHY DIDN'T YOU SUE -- STRIKE THAT.
6       SO WHY DID YOU PICK TOWER SYSTEMS TO SUE
7 IN JUNE OF 2000?
8       MR. GILCHRIST:  SAME INSTRUCTION.
9    A.  I COULDN'T ANSWER THAT QUESTION AS TO WHY,
10 NOT WITHOUT.
11    Q.   NOT WITHOUT WHAT?
12    A.  YOU KNOW, SOME RESEARCH.
13    Q.   YOU AUTHORIZED FILING THIS LAWSUIT,
14 CORRECT?
15    A.  I WOULD BE THE ONE THAT WOULD AUTHORIZE
16 SUCH ACTIONS.
17    Q.   CAN YOU -- SITTING HERE TODAY YOU HAVE NO
18 RECOLLECTION OF WHY YOU DECIDED TO SUE TOWER SYSTEMS
19 WHEN YOU DID?
20    A.  NOT THE SPECIFICS OF IT, NO.
21    Q.   DID YOU PICK THEM OUT BECAUSE YOU THOUGHT
22 THEY WERE A SMALL COMPANY AND WOULD JUST FOLD?
23       MR. GILCHRIST:  OBJECT TO THE FORM.
24    A.  I DON'T THINK WE EVER HAD DISCUSSION AS TO
25 SIZE OR ANYTHING ELSE.

Page 21

1    Q.   IS CORRECT CRAFT EVER REPRESENTED BY A
2 LAWYER BY THE NAME OF ED HAUGHEY?
3    A.  I HAVE NO IDEA.
4    Q.   YOU DON'T RECALL THAT LAWYER --
5    A.  NO.
6    Q.   -- EVER REPRESENTING CORRECT CRAFT IN
7 ANYTHING?
8    A.  AT THE MOMENT THE NAME IS NOT FAMILIAR.
9       MR. ALLEN:  MADAME COURT REPORTER, HOW ARE
10    YOU SPELLING THAT NAME?
11       MR. PESLAK:  H-A-U-G-H-E-Y.  CAN WE MARK
12    THIS?
13    (EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION.)
14    Q.   LET ME SHOW YOU WHAT THE COURT REPORTER
15 JUST MARKED AS DEFENDANT'S EXHIBIT NUMBER 1.  IT'S A
16 NOTICE OF DEPOSITION OF CORRECT CRAFT PURSUANT TO
17 FEDERAL RULE CIVIL PROCEDURE 30B6; HAVE YOU SEEN
18 THIS DOCUMENT BEFORE?
19    A.  IF I HAVE SEEN THIS AND HAD A COPY OF IT,
20 I WOULD HAVE SIGNED IT AND DATED IT.
21    Q.   IT'S ACTUALLY SOMETHING I SERVED ON YOUR
22 LAWYER.
23    A.  THIS IS -- I WOULD ASSUME WE'VE HAD
24 CONVERSATIONS ABOUT THIS.
25    Q.   DO YOU KNOW -- IT SETS FORTH 11 CATEGORIES

Page 22

1 OF INFORMATION ON WHICH I WAS REQUESTING THAT
2 CORRECT CRAFT PRODUCE A WITNESS TO TESTIFY ABOUT.
3 DO YOU KNOW WHO'S GOING TO TESTIFY FOR CORRECT CRAFT
4 ON ANY OF THESE CATEGORIES?
5     A. I KNOW WHO YOU HAVE ASKED TO TAKE
6 DEPOSITIONS OF BUT AS TO THE CATEGORIES.
7     Q. IT'S KIND OF A LITTLE DIFFERENT, I ASKED
8 TO TAKE DEPOSITIONS OF PEOPLE INDIVIDUALLY BUT I
9 ALSO WANT CORRECT CRAFT'S CORPORATE TESTIMONY ON
10 THIS WHEN WE GET TO TRIAL. I NEED TO KNOW WHO IS
11 GOING TO TESTIFY ON BEHALF OF CORRECT CRAFT ON THESE
12 ITEMS. I CAN'T DESIGNATE FOR YOU WHO IS THE MOST
13 KNOWLEDGEABLE PERSON ON THOSE ITEMS SO I'M ASKING
14 WHO IS GOING TO TESTIFY ON BEHALF OF CORRECT CRAFT?
15     A. I'M FAMILIAR WITH SOME OF THESE AREAS.
16 THE OTHERS I THINK WOULD BE OTHER PEOPLE WOULD HAVE
17 TO ANSWER SOME OF THOSE.
18     Q. WHICH AREAS ARE YOU FAMILIAR WITH?
19     A. THE GENERAL AREAS.
20     Q. CAN YOU JUST TELL ME BY PARAGRAPH NUMBER?
21     A. I -- THE -- I GUESS NUMBER NINE AS TO THE
22 COMMERCIAL SUCCESS OF IT. OF COURSE THERE'S A LOT
23 OF PEOPLE THAT KNOW ABOUT THAT.
24         MR. GILCHRIST: ALSO NUMBER TEN THE
25     LICENSING.

Page 23

1     A. YEAH, NUMBER TEN.
2     Q. ANYTHING ELSE?
3     A. THOSE WOULD BE THE AREAS I WOULD BE THE
4 MOST FAMILIAR WITH.
5     Q. DO YOU KNOW WHO IS GOING TO TESTIFY ABOUT
6 THE OTHER AREAS?
7     A. WHAT'S THAT?
8     Q. DO YOU KNOW WHO THE OTHER PEOPLE ARE THAT
9 ARE GOING TO TESTIFY ABOUT THE OTHER AREAS?
10     A. I ONLY KNOW WHO YOU ASKED TO COME IN AND
11 I'M ASSUMING YOU ASKED THEM FOR SPECIFIC REASONS TO
12 ASK QUESTIONS ON THOSE AREAS.
13     Q. IS THERE ANYBODY ELSE AT CORRECT CRAFT
14 THAT IS GOING TO HAVE MORE KNOWLEDGE ON ANY OF THESE
15 TOPICS THAN THE PEOPLE I'VE NOTICED TO COME IN?
16     A. I THINK THE ONES YOU'VE NOT NOTICED ARE
17 PROBABLY THE MOST KNOWLEDGEABLE.
18     Q. AND THEY'RE GOING TO COVER THE GAMUT OF
19 ALL THESE TOPICS?
20     A. I THINK PROBABLY THEY'RE CAPABLE OF THAT.
21     Q. AND YOU AS PRESIDENT OF CORRECT CRAFT
22 BELIEVE THAT THEY CAN TESTIFY ON BEHALF OF CORRECT
23 CRAFT?
24         MR. GILCHRIST: OBJECT TO THE FORM.
25     A. BY VIRTUE OF THE FACTS THAT OUR COUNSEL

Page 24

1 HAS TOLD US, THESE ARE ONES THAT YOU ASKED FOR AND
2 THEY ARE THE ONES THAT HAVE BEEN THE MOST INVOLVED.
3     Q. AT ONE POINT IN TIME CORRECT CRAFT WAS
4 SELLING A BOAT CALLED THE FISHING NAUTIQUE?
5     A. YES.
6     Q. AND DURING WHAT PERIOD OF TIME DID CORRECT
7 CRAFT SELL THAT BOAT?
8     A. PROBABLY '70S. EXACT TIME FRAME I
9 COULDN'T TELL YOU BECAUSE IT'S BEEN OUT OF
10 PRODUCTION FOR PROBABLY 10, 11 YEARS. MAYBE A
11 LITTLE MORE.
12     Q. LATE '80S EARLY '90S IS WHEN YOU STOPPED
13 MAKING AND SELLING THAT BOAT?
14     A. IN THAT TIME FRAME MAYBE A LITTLE BEFORE
15 THAT.
16     Q. DID YOU EVER SELL THAT BOAT WITH A TOWER
17 ON IT?
18     A. WITH A T-TOP.
19     Q. DID YOU EVER SELL IT WITH A TUNA TOWER ON
20 IT?
21     A. I DON'T RECALL THAT WE EVER DID. THE
22 DEALER MAY HAVE INSTALLED THEM.
23     Q. WAS THAT A CENTER CONSOLE BOAT?
24     A. YES.
25     Q. AND YOU SOLD IT WITH A T-TOP YOU SAID?

Page 25

1     A. YES.
2     Q. WAS THAT A HARD TOP?
3     A. NO, IT WAS A CLOTH TOP.
4     Q. AND WAS THAT T-TOP INSTALLED OVER THE
5 CENTER CONSOLE OF THAT BOAT WHEN YOU SOLD IT?
6     A. YES.
7     Q. HOW MANY MOUNTING POINTS WERE THERE FOR
8 THAT T-TOP ON THERE?
9     A. TWO.
10     Q. IT HAD -- WHAT DO YOU MEAN IT HAD TWO, ONE
11 U-FRAME SUPPORTING THE T-TOP?
12     A. UH-HUH.
13     Q. IT DIDN'T HAVE TWO U-FRAMES?
14     A. NO.
15     Q. AND WAS THAT AN OPTION THAT YOU OFFERED
16 ALL THROUGH THE TIME THAT?
17     A. T-TOP WAS JUST STANDARD.
18     Q. YOU DIDN'T OFFER A TUNA TOWER ON THAT
19 BOAT?
20         MR. GILCHRIST: OBJECT.
21     A. I DON'T RECALL THAT WE OFFERED IT; IT WAS
22 JUST -- THAT WAS FACTORY INSTALLED.
23     Q. IS YOUR MIDDLE INITIAL N.?
24     A. RIGHT.
25 (EXHIBIT NUMBER 2 WAS MARKED FOR IDENTIFICATION.)

Page 26

1    Q.  MR. MELOON, THE COURT REPORTER JUST
2  MARKED --
3        MR. GILCHRIST:  ART, IF YOU'RE GOING TO
4  ASK HIM QUESTIONS ABOUT THIS, THIS IS
5  DESIGNATED ATTORNEYS EYES ONLY, YOUR CLIENT
6  WILL HAVE TO LEAVE THE ROOM.  FOR THE COURT
7  REPORTER'S BENEFIT WE HAVE A CONFIDENTIALITY
8  AGREEMENT IN PLACE, QUESTIONS REGARDING ITEMS
9  DESIGNATED CONFIDENTIAL ATTORNEYS EYES ONLY BE
10  BOUND SEPARATELY AND SEALED.
11 BY MR. PESLAK:
12    Q.  MR. MELOON, HAVE YOU EVER SEEN THIS
13 DOCUMENT BEFORE?
14    A.  OBVIOUSLY I'VE SIGNED IT, YES.
15    Q.  IS THAT YOUR HANDWRITING ON TOP?
16    A.  YES.
17    Q.  THIS REFERS TO SOME MANAGEMENT MEETING
18 MINUTES ON TOP?
19    A.  UH-HUH.
20    Q.  WHAT'S A MANAGEMENT MEETING?
21    A.  IT'S A WEEKLY MEETING WHERE WE DO
22 SCHEDULING OF PRODUCTION.  REVIEW OF ORDERS AND THAT
23 TYPE OF THING.
24    Q.  DO YOU NORMALLY ATTEND THOSE MEETINGS?
25    A.  YES.

Page 27

1    Q.  DO YOU KNOW WHETHER YOU ATTENDED THIS
2  MEETING OCTOBER 3, 1996?
3    A.  UNDER OCTOBER 3, LET'S SEE, I'M REFERRED
4  TO BY THE OTHER MANAGERS.  MY NAME IS NOT
5  UNDERSCORED EXCEPT IN THE NEXT SET.  SO THIS MEETING
6  I MAY HAVE BEEN OUT OF TOWN OR ON THE ROAD.
7    Q.  LET ME ASK YOU THIS, WHO NORMALLY TYPES UP
8  THESE MEETINGS ANGELA TOKINTON?
9    A.  YES.
10    Q.  SO, SHE ATTENDS THE MEETING AND IS IT THE
11 NORMAL PRACTICE WHERE WE HAVE GARY MELOON
12 UNDERSCORED ON THE FIRST PAGE THIS WOULD HAVE BEEN A
13 REPORT THAT GARY MELOON GAVE TO THE MEETING?
14    A.  YES.
15    Q.  AND I ASSUME IN THE NORMAL COURSE OF
16 BUSINESS AT CORRECT CRAFT WHETHER OR NOT YOU
17 ACTUALLY ATTENDED THIS MEETING, THIS IS A DOCUMENT
18 YOU WOULD HAVE RECEIVED AFTER THE MEETING; IS THAT
19 CORRECT?
20    A.  YES.
21    Q.  AND YOU WOULD HAVE REVIEWED THIS WHEN YOU
22 RECEIVED IT?
23    A.  YES.
24    Q.  OKAY.  IN THE THIRD PARAGRAPH ON THE FIRST
25 PAGE --

Page 28

1    A.  UH-HUH.
2    Q.  -- IT SAYS W.N. STATED.  IS THAT W.N. A
3  REFERENCE TO YOURSELF?
4    A.  YES.
5    Q.  AND IT SAYS IN THE THIRD SENTENCE THERE
6  W.N. SUGGESTED CHANGING THE FOOTPRINT TO BRING IT
7  DOWN TO ONE AND A HALF INCHES TO TWO INCHES,
8  STREAMLINING IT SO IT DOES NOT LOOK LIKE THE TUNA
9  TOWER FROM THE FISHING NAUTIQUE SITTING ON A SPORT
10 NAUTIQUE.  DO YOU SEE THAT?
11    A.  UH-HUH.
12    Q.  DO YOU EVER REMEMBER MAKING A STATEMENT
13 LIKE THAT?
14    A.  I WAS -- THIS APPEARS THAT THIS WAS A
15 REPORT THAT WAS MADE BY GARY AND THAT THESE WERE
16 CONVERSATIONS THAT WE HAD HAD CONCERNING THIS PRIOR
17 THE MEETING.  I HAD A PERSONAL FISH NAUTIQUE THAT I
18 FISHED TOURNAMENTS.  IT WAS MY PERSONAL BOAT.
19    Q.  SO YOU -- AND YOU HAD A TUNA TOWER ON
20 THAT?
21    A.  I HAD ONE INSTALLED.
22    Q.  AND WAS THAT FISHING NAUTIQUE A CENTER
23 CONSOLE BOAT?
24    A.  YES.
25    Q.  AND WAS THAT -- WHEN DID YOU HAVE THAT

Page 29

1  TUNA TOWER INSTALLED?
2    A.  WHILE THAT BOAT WAS IN PRODUCTION WHICH
3  WAS PRIOR TO THIS DATE.  CONSIDERABLY.
4    Q.  SO YOU WOULD HAVE HAD THE TUNA TOWER
5  INSTALLED WHEN YOU HAD THE BOAT MADE AT CORRECT
6  CRAFT?
7    A.  WELL THE BOAT BELONGED TO ME AND I SENT IT
8  OUT AND HAD THE TOWER INSTALLED ON IT BECAUSE I
9  FISHED TOURNAMENTS AT THAT TIME.
10    Q.  AND AT THAT TIME WOULD THAT HAVE BEEN THE
11 1980'S VINTAGE?
12    A.  LATE '70S, '80S SOMEWHERE IN THERE.
13    Q.  AND WAS THAT TUNA TOWER INSTALLED OVER THE
14 CENTER CONSOLE OF THAT FISHING NAUTIQUE?
15    A.  AS IT IS IN OTHERS, YES.
16    Q.  AND IS THAT NORMALLY WHERE TUNA TOWERS ARE
17 INSTALLED OVER THE OPERATORS STATION OF A FISHING
18 BOAT?
19    A.  DEPENDING ON THE BOAT.
20    Q.  DESCRIBE FOR ME THE TUNA TOWER INSTALLED
21 ON YOUR PERSONAL FISHING NAUTIQUE.
22    A.  IT WAS A TOWER THAT SERVED AS A SECOND
23 STEERING STATION.
24    Q.  AND HOW MANY MOUNTING POINTS WERE THERE
25 FOR THAT TUNA TOWER?

Page 30

1  A. I BELIEVE THAT ONE HAD FOUR POINTS.
2  Q. AND WHERE THERE TWO IN FRONT OF THE
3 OPERATOR STATION?
4  A. IN THAT GENERAL AREA.
5  Q. AND TWO BEHIND THE OPERATOR STATION?
6  A. ROUGHLY IN THAT AREA, YES.
7  Q. AND THEN IT HAD A SECOND PLATFORM WITH A
8 SECOND OPERATOR STATION ON TOP?
9  A. YES.
10  Q. A NORMAL TUNA TOWER WHERE YOU WANT TO BE
11 UP THERE SO YOU CAN LOOK FOR TUNA OUT IN THE WATER?
12  A. ANY SCHOOLING FISH THAT YOU'RE FISHING
13 FOR.
14  Q. TUNA, MARLIN, WHATEVER YOU'RE LOOKING --
15 YOU WANT TO BE UP THERE SO YOU CAN SEE THE FISH IN
16 THE WATER?
17  A. UH-HUH.
18  Q. AND DID THAT HAVE U-SHAPED STRUCTURES
19 ATTACHED TO THE DECK?
20  A. I THINK IT COULD BE CALLED U-SHAPED I
21 GUESS.
22  Q. SO IT WOULD HAVE BEEN A U-SHAPED STRUCTURE
23 IN FRONT OF THE OPERATOR STATION AND A U-SHAPED
24 STRUCTURE BEHIND THE OPERATOR STATION, CORRECT?
25      MR. GILCHRIST: OBJECT TO THE FORM.

Page 31

1 BY MR. PESLAK:
2  Q. YOU CAN STILL ANSWER.
3  A. YEAH, IT WAS A STANDARD TOP AND THAT WAS
4 THE BASIC DESIGNS.
5  Q. OKAY. AND JUST SO WE'RE CLEAR THAT WAS --
6 I WANT TO BE ABSOLUTELY CERTAIN THAT BOAT HAD THAT
7 TUNA TOWER INSTALLED IN THE '80S?
8  A. WHATEVER THE DATE OF THE PRODUCTION OF THE
9 BOAT WAS.
10  IN ANY EVENT IT WOULD NOT HAVE BEEN
11 AFTER -- IT WOULD NOT HAVE BEEN INSTALLED AFTER
12 1996?
13  A. NO, NOT ON THAT BOAT.
14      MR. PESLAK: I'M JUST GOING TO GET MY
15 CLIENT. ANY TIME YOU NEED A BREAK JUST TELL
16 ME, OKAY?
17  A. SURE.
18  (A DISCUSSION WAS HAD OFF THE RECORD.)
19  Q. MR. MELOON, CORRECT CRAFT HAS ALSO -- I
20 SHOULDN'T SAY ALSO -- STRIKE THAT.
21      I'D LIKE TO DEAL FOR A FEW MINUTES BEFORE
22 I GET BACK TO THE PATENT ISSUE ON YOUR TRADEMARK
23 INFRINGEMENT CLAIM THAT YOU HAVE AGAINST TOWER
24 SYSTEMS IN THIS CASE. AS I UNDERSTAND THE COMPLAINT
25 AND MAYBE YOU CAN CORRECT ME IF I'M WRONG, CORRECT

Page 32

1 CRAFT IS CLAIMING THAT MY CLIENTS USE OF THE WORDS
2 AIRTOWER OR AIRTOWER PRO IN CONNECTION WITH THE SALE
3 OF ITS TOWERS INFRINGES ON CERTAIN TRADEMARK RIGHTS
4 OF CORRECT CRAFT?
5      MR. GILCHRIST: MR MELOON IS NOT
6 DESIGNATED ON 30B6 ON THIS ISSUE.
7      MR. PESLAK: WHO IS?
8      MR. GILCHRIST: IT WOULD BE MR. MEDDOCK.
9      MR. PESLAK: OKAY. WELL, HE DID SUBMIT AN
10 AFFIDAVIT EARLIER IN THE CASE SO I'M GOING TO
11 AT LEAST QUESTION HIM ABOUT THAT.
12      MR. GILCHRIST: AS I UNDERSTAND IT YOU
13 HAVE NOTICED THEM BOTH INDIVIDUALLY AS WELL AS
14 WHAT 30B6 WOULD DESIGNATE SO, YOU CERTAINLY
15 HAVE LEEWAY TO ASK HIM VARIOUS ISSUES. I JUST
16 WANT TO MAKE IT CLEAR FOR THE RECORD THAT HE IS
17 NOT THE CORPORATE REPRESENTATIVE ON THIS ISSUE.
18      MR. PESLAK: I UNDERSTAND.
19 BY MR. PESLAK:
20  Q. BUT YOU HAVE AN UNDERSTANDING OF THE
21 TRADEMARK INFRINGEMENT CLAIM?
22  A. I HAVE AN UNDERSTANDING, YES.
23  Q. WHAT EXACTLY IS THE TRADEMARK THAT CORRECT
24 CRAFT IS CLAIMING THAT TOWER SYSTEMS IS INFRINGING
25 ON?

Page 33

1  A. WELL.
2      MR. GILCHRIST: MR. MELOON, TO THE EXTENT
3 THE ANSWER WOULD REQUIRE YOU TO DISCLOSE WHAT
4 YOU HAVE DISCUSSED WITH YOUR ATTORNEYS I
5 INSTRUCT YOU NOT TO ANSWER. IF YOU CAN ANSWER
6 INDEPENDENTLY OF WHAT YOU DISCUSSED WITH YOUR
7 ATTORNEYS, YOU'RE FREE TO DO SO.
8  A. BECAUSE OF THE USE I BELIEVE IT'S
9 CONFUSING.
10  Q. OKAY. CONFUSION WITH WHAT?
11  A. THAT IT MAY BE A PRODUCT OF OURS.
12  Q. OKAY. HAVE YOU HAD CUSTOMERS COME TO YOU
13 AND TELL YOU THEY THOUGHT THIS COMPANY IN NEW JERSEY
14 WAS SELLING A CORRECT CRAFT PRODUCT TO YOUR
15 KNOWLEDGE?
16  A. TO MY KNOWLEDGE THERE'S BEEN SOME
17 DISCUSSION AS TO WHETHER IT HAS OR HASN'T. BUT I
18 COULDN'T ANSWER THE QUESTION.
19  Q. SO YOU BELIEVE THERE'S BEEN DISCUSSIONS
20 WITHIN CORRECT CRAFT AS TO -- I MEAN THE
21 CUSTOMERS -- DO YOU GO TO BOAT SHOWS YOURSELF?
22  A. YES, OCCASIONALLY.
23  Q. YOU HAVEN'T HAD A CUSTOMER COME UP TO YOU
24 AND SAY, HEY, YOU HAVE GOT THIS COMPANY IN NEW
25 JERSEY THAT'S SELLING TOWERS NOW; NOTHING LIKE THAT

Page 34

1 HAS HAPPENED, RIGHT?
2    A.  I WOULDN'T SAY THAT THEY'VE COME AND
3 ACCUSED US OF HAVING A COMPANY.  BUT THEY HAVE MADE
4 REFERENCE TO IT IN GENERAL CONVERSATION BECAUSE OF
5 THE USE THAT WE HAVE OF THE TERM.
6    Q.  A CUSTOMER HAS COME TO YOU PERSONALLY?
7    A.  NOT TO ME PERSONALLY.
8    Q.  SO, THAT IS WHAT I WAS ASKING.
9    A.  NOT ME PERSONALLY, NO.
10    Q.  BUT TO YOUR KNOWLEDGE PEOPLE HAVE COME UP
11 TO OTHER PEOPLE IN YOUR COMPANY AND MADE THOSE
12 COMMENTS?
13    A.  THERE HAS BEEN CONVERSATIONS, BUT NOT TO
14 ME PERSONALLY, NO.
15    Q.  AND WHO IN YOUR COMPANY HAVE YOU HAD THOSE
16 CONVERSATIONS WITH?
17    A.  THOSE WOULD BE GENERAL CONVERSATIONS THAT
18 WOULD COME UP AS A DEBRIEFING FROM A BOAT SHOW OR
19 SOMETHING LIKE THAT, WHICH THERE'S DOZENS OF SHOWS,
20 YOU KNOW.
21    Q.  I UNDERSTAND THAT.  BUT I GUESS MY
22 QUESTION WAS, DO YOU RECALL ANYONE IN PARTICULAR AT
23 CORRECT CRAFT THAT REPORTED THAT TO YOU?
24    A.  NO.
25    Q.  WOULD IT HAVE BEEN MR. MEDDOCK?

Page 35

1    A.  IT COULD HAVE BEEN.
2    Q.  GARY MELOON?
3    A.  I COULDN'T RECALL WHETHER IT WOULD BE OR
4 NOT.
5    Q.  HOW RECENTLY HAVE YOU HAD THOSE
6 CONVERSATIONS WITH ANYONE AT CORRECT CRAFT?
7    A.  DURING THE SHOW TIME WHICH IS VARIOUS
8 TIMES OF THE YEAR.  THERE HASN'T BEEN ANY DISCUSSION
9 WITHIN THE LAST FEW WEEKS OR, YOU KNOW, OF THAT
10 NATURE.
11    Q.  IN THIS YEAR?
12    A.  I CAN'T RECALL IF IT WAS THIS YEAR OR WHEN
13 THE TOWERS FIRST CAME OUT.
14    (EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION.)
15    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
16 THE COURT REPORTER JUST MARKED AS DEFENDANT'S
17 EXHIBIT 3?  AND I'LL ASK YOU WHETHER YOU RECOGNIZE
18 THIS DOCUMENT?
19    A.  YES.
20    Q.  AND IS THIS AN AFFIDAVIT THAT YOU SIGNED?
21    A.  YES, THAT IS MY SIGNATURE.
22    Q.  CAN YOU TURN BACK TO PAGE 2 AND PARAGRAPH
23 THREE OF THE AFFIDAVIT?
24    (THE WITNESS COMPLIES.)
25    Q.  DO YOU SEE THAT?

Page 36

1    A.  UH-HUH.
2    Q.  OKAY.  JUST SO I UNDERSTAND WHAT YOU'RE
3 SAYING HERE, DID -- WAS CORRECT CRAFT'S FIRST USE OF
4 THE WORD AIR IN CONNECTION WITH ITS PRODUCT, WAS
5 THAT IN CONNECTION WITH AIR NAUTIQUE AND AIRTIQUE?
6    A.  I BELIEVE IT WAS.
7    Q.  SO THE FIRST USE OF AIR WOULD NOT HAVE
8 BEEN AIR INDEPENDENTLY?
9    MR. GILCHRIST:  OBJECT TO THE FORM.
10    A.  NO, WE'VE USED IT IN THE NOMENCLATURE OF
11 THE PRODUCT.
12    Q.  EXCUSE ME?
13    A.  WE'VE USED IT AS YOU HAVE IT HERE.
14    Q.  AIR NAUTIQUE AND AIRTIQUE?
15    A.  UH-HUH.
16    Q.  OKAY.  AND THEN LATER ON YOU BEGAN USING A
17 STYLIZED VERSION OF AIR IN ADDITION TO THAT; IS THAT
18 WHAT HAPPENED?
19    A.  IT WOULD HAVE BEEN ABOUT THE SAME TIME.
20 THE EXACT TIME FRAME IT WOULD BE IN THAT GENERAL
21 TIME FRAME.
22    Q.  BUT EVENTUALLY CORRECT CRAFT APPLIED FOR
23 TWO U.S. TRADEMARK APPLICATIONS ON STYLIZED VERSIONS
24 OF AIR, CORRECT?
25    A.  I BELIEVE THAT IS CORRECT.

Page 37

1    Q.  AND THOSE -- YOU WOULD RELY ON WHATEVER
2 MR. MEDDOCK REPRESENTED TO THE PATENT OFFICE AS TO
3 THE DATE OF THE FIRST USE OF THOSE INDEPENDENT AIR
4 MARKS?
5    MR. GILCHRIST:  OBJECT TO THE FORM.
6    A.  HE WOULD PROBABLY BE VERY FAMILIAR WITH
7 THAT.
8    Q.  AND YOU WON'T HAVE ANY REASON TO DISAGREE
9 WITH WHAT HE REPRESENTED TO THE PATENT AND TRADEMARK
10 OFFICE?
11    MR. GILCHRIST:  OBJECT TO THE FORM.
12    A.  I HAVE NO KNOWLEDGE TO ANYTHING OTHER THAN
13 THAT I MEAN.
14    Q.  SO YOU RELY ON WHATEVER HE SAID?
15    MR. GILCHRIST:  OBJECT TO THE FORM.
16 BY MR. PESLAK:
17    Q.  HE BEING MR. MEDDOCK?
18    A.  IF THAT WAS HIS STATEMENT UNDER OATH.
19    Q.  YOU HAD NO REASON TO DISAGREE WITH IT?
20    A.  IF THE STATEMENT WAS MADE UNDER OATH I
21 WOULDN'T.
22    Q.  JUST SO -- THE TRADEMARK CLAIM IS --
23 YOU'RE NOT CLAIMING THAT AIR TOWER IS CONFUSING TO
24 AIR NAUTIQUE -- WITH AIR NAUTIQUE, ARE YOU?
25    MR. GILCHRIST:  OBJECT TO THE FORM.

Page 38

1   A.  I THINK I ANSWERED THAT EARLIER.
2   Q.  I'M NOT SURE YOU DID.  I MEAN, YOU'RE
3 SAYING THAT OUR USE OF AIR TOWER IS CONFUSING WITH
4 AIR ALONE?
5   A.  I THINK THAT THE TERM AIR, YES, IS
6 CONFUSING.
7   Q.  AND -- BUT AIR TOWER -- STRIKE THAT.
8     SO MY CLIENTS USE OF THE WORD AIR YOU'RE
9 CLAIMING IS CONFUSING WITH CORRECT CRAFT'S USE OF
10 THE MARK AIR?
11    MR. GILCHRIST:  OBJECT TO THE FORM.
12   A.  SEEMS LIKE A REASONABLE ASSUMPTION, YES.
13   Q.  DOES THE TERM AIR MEAN ANYTHING IN
14 WAKEBOARDING?
15   A.  YEAH.
16   Q.  WHAT DOES IT MEAN?
17   A.  THAT IS IN THEIR LINGO OR VERNACULAR THEY
18 SPEAK OF AIR -- THEY DON'T SPEAK OF -- YOU KNOW, HOW
19 MUCH AIR THEY CAN GET.
20   Q.  SO WAKEBOARDERS USE THAT AS A -- I'M NOT A
21 WAKEBOARDER SO YOU KNOW MORE ABOUT THIS THAN ME.
22 AIR MEANS WHAT TO A WAKEBOARDER; WHAT DOES THAT MEAN
23 WHEN A WAKEBOARDER SAYS THEY CAN GET MORE AIR?
24   A.  WHEN THEY SAY MORE AIR THEY'RE SPEAKING
25 ABOUT GETTING HIGHER.

Page 39

1   Q.  SO WHEN THEY DO A JUMP THEY GET HIGHER UP?
2   A.  YES.
3   Q.  THEY GET HIGHER IN THE AIR I GUESS?
4   A.  YES.
5   Q.  AND THAT IS -- AS FAR AS YOU KNOW THAT'S A
6 WELL KNOWN TERM IN THE WAKEBOARDING FIELD?
7   A.  IT'S A COMMON TERM, YES.
8   Q.  WHO ARE CORRECT CRAFT'S COMPETITORS?
9     MR. GILCHRIST:  IN WHAT REGARD?
10    MR. PESLAK:  IN ANY REGARD.
11    MR. GILCHRIST:  OBJECT TO THE FORM.
12   A.  IF IT'S BOATS AND IT'S IN MY SIZE BRACKET
13 THEY ARE A COMPETITOR.
14   Q.  OKAY.  THAT IS A START.  WHO DO YOU
15 CONSIDER YOUR COMPETITORS, MR. MELOON?
16    MR. GILCHRIST:  OBJECT TO THE FORM, ASKED
17    AND ANSWERED.
18 BY MR. PESLAK:
19   Q.  YOU DIDN'T NAME ANYBODY INDIVIDUALLY?
20   A.  WHAT'S THAT?
21   Q.  YOU DIDN'T NAME ANYBODY INDIVIDUALLY AND
22 THAT IS WHAT I'M ASKING IS, WHO IN PARTICULAR DO YOU
23 CONSIDER COMPETITORS OF CORRECT CRAFT?
24   A.  THAT WOULD BE ANYBODY THAT MANUFACTURES AN
25 INBOARD.

Page 40

1   Q.  WHO ARE SOME OF THOSE COMPANIES?
2   A.  OH, THERE'S MASTERCRAFT, MALIBU, I THINK
3 YOU NAMED SEVERAL OF THEM YOURSELF.
4   Q.  I -- YOU DON'T CONSIDER TOWER COMPANIES
5 YOUR COMPETITORS?
6   A.  WHAT'S THAT?
7   Q.  YOU DON'T CONSIDER TOWER COMPANIES YOUR
8 COMPETITORS?
9   A.  YEAH, IF THEY ARE NOT LICENSED WE DO.
10   Q.  WHY ARE THEY COMPETITORS?
11   A.  BECAUSE THEY ARE NOT LEAVING THE
12 OPPORTUNITY FOR US TO SELL TOWERS.
13   Q.  IF YOU DIDN'T HAVE THIS PATENT YOU
14 WOULDN'T CONSIDER TOWER SYSTEMS YOUR COMPETITOR?
15    MR. GILCHRIST:  OBJECT TO THE FORM.
16   A.  I THINK IF IT WASN'T FOR TOWERS THAT WOULD
17 BE REASONABLE, YES.
18   Q.  YOU MEAN IF IT WASN'T FOR THE PATENT IT
19 WOULDN'T BE A COMPETITOR?
20    MR. GILCHRIST:  OBJECT TO THE FORM.
21   A.  I GUESS THAT WOULD BE A GOOD ASSUMPTION.
22   Q.  WHAT PRODUCTS DOES CORRECT CRAFT SELL?
23   A.  ANYTHING THAT IS -- THAT CAN BE INSTALLED
24 ON A PIECE OF EQUIPMENT LIKE WE MANUFACTURE.
25   Q.  THAT IS WHAT I'M ASKING YOU, YOU SELL

Page 41

1 INBOARD BOATS FOR SKIING, RIGHT?
2   A.  YES.
3   Q.  ANY OTHER KIND OF BOATS YOU MAKE AND SELL
4 RIGHT NOW?
5   A.  WHEN YOU SAY SKIING I'M ASSUMING THAT
6 YOU'RE REFERRING TO OUR WHOLE LINE.
7   Q.  RIGHT.  YOUR -- YOU DON'T SELL FISHING
8 BOATS ANYMORE?
9   A.  NO.
10   Q.  YOU SELL RECREATIONAL WATER SPORTS BOATS
11 NOW; IS THAT A FAIR TERM?
12   A.  THAT IS FAIR, YES.
13   Q.  DO YOU MANUFACTURE ANY OTHER PRODUCTS
14 BESIDES THE BOATS?
15   A.  NO.
16   Q.  SO ANYTHING ELSE YOU SELL IN CONNECTION
17 WITH THE BOATS YOU BUY FROM SOMEONE ELSE?
18   A.  IN THE WAY OF ACCESSORIES MOST OF THEM,
19 YES.  WE HAVE PARTNERS THAT WE DEAL WITH.
20   Q.  SO THE TOWERS YOU PUT ON YOUR BOATS YOU
21 DON'T MANUFACTURE, CORRECT?
22   A.  NO.
23   Q.  SUNSHINE WELDING MANUFACTURES THEM?
24   A.  CORRECT.
25   Q.  DO YOU SELL YOUR PRODUCTS DIRECTLY TO THE

Page 42

1 CONSUMER?
2    A.   NO, THEY GO THROUGH A DISTRIBUTION SYSTEM.
3    Q.   SO YOU HAVE INDEPENDENT COMPANIES THAT
4 DISTRIBUTE YOUR PRODUCTS?
5    A.   WE HAVE DEALERS, YES.
6    Q.   AND YOU SELL YOUR BOATS TO THE DEALERS AND
7 THE DEALERS RESELL THEM TO THE END USER?
8    A.   YES.
9    Q.   NOW, YOU, CORRECT CRAFT, YOU SELL ANY
10 TOWERS INDEPENDENT OF THE BOATS?
11   A.   YES.
12   Q.   HOW DO YOU DO THAT?
13   A.   THROUGH OUR SERVICE PARTS.
14   Q.   SO WOULD THAT BE -- DO YOU SELL THEM TO
15 PEOPLE WHO OWN BOATS THAT ARE NOT CORRECT CRAFT
16 BOATS?
17   A.   I WOULD IMAGINE THERE HAVE BEEN SOME SOLD
18 THAT WAY, YES.
19   Q.   AND THAT WOULD HAVE BEEN SOLD DIRECTLY
20 FROM CORRECT CRAFT?
21   A.   NO THROUGH THE DEALERS.
22   Q.   SO THE DEALER MIGHT CALL UP AND SAY
23 SOMEBODY WANTS A TOWER, HE CALLS THE FACTORY AND YOU
24 HAVE SUNSHINE WELDING MAKE IT AND YOU SELL IT TO THE
25 DEALER WHO SELLS IT TO THE END USER?

Page 43

1    A.   THAT WOULD BE THE PROCESS.
2    Q.   NOW, IS THERE SOME WAY AT CORRECT CRAFT
3 THAT YOU COULD DETERMINE HOW MANY OF THOSE TOWERS
4 HAVE BEEN SOLD INDEPENDENTLY TO BOATS?
5    A.   NOT FROM CORRECT CRAFT, NO.
6    Q.   SO -- BUT YOU SAID THEY'RE ORDERED THROUGH
7 THE SERVICE DEPARTMENT?
8    A.   YES.
9    Q.   DO YOU KEEP TRACK OF THOSE SALES OF TOWERS
10 INDEPENDENTLY?
11   A.   WE KNOW WHAT TOWERS HAVE BEEN SOLD, YES.
12 FOR WHAT APPLICATION THAT IS NOT NECESSARY WHEN THEY
13 ORDER A TOWER.
14   Q.   SO, WHEN YOU SHIP A BOAT FROM CORRECT
15 CRAFT YOU DON'T SHIP IT WITH A TOWER?
16   A.   IT DEPENDS ON THE ORDER, THE PERSON THAT
17 BOUGHT THE BOAT, WHAT MODEL IT IS.
18   Q.   BUT THERE ARE BOATS THAT ARE SOLD WITHOUT
19 TOWERS?
20   A.   SOME, YES.
21   Q.   AND A DEALER MIGHT THEN SELL THAT BOAT --
22 RESELL THAT BOAT TO SOMEONE WHO WANTS A TOWER AND
23 THEN THEY WOULD CALL IN AND HAVE A TOWER
24 INDEPENDENT?
25   A.   CORRECT.

Page 44

1    Q.   SO, YOU BEING CORRECT CRAFT, YOU WOULD
2 HAVE NO IDEA WHEN THEY ORDERED THAT TOWER WHETHER IT
3 WENT ON A NEW CORRECT CRAFT BOAT OR A USED CORRECT
4 CRAFT BOAT OR A MASTERCRAFT BOAT?
5    A.   NO.
6    Q.   HOW MANY DEALERS DO YOU HAVE?
7    A.   WE HAVE ROUGHLY 70, 75.
8    Q.   AND THAT IS 75 IN THE UNITED STATES?
9    A.   YES.
10   Q.   AND DO YOU -- I ASSUME YOU MARK UP THOSE
11 TOWERS WHEN YOU SELL THEM TO THE DEALERS?
12   A.   THAT IS A GOOD ASSUMPTION, YES.
13   Q.   THAT'S OKAY.  WE'RE ALL IN BUSINESS TO
14 MAKE MONEY.  I JUST WANT TO GET IT ON THE RECORD.
15 DO YOUR DEALERS WHEN THEY RESELL THOSE TOWERS DO
16 THEY PAY A ROYALTY BACK TO YOU ON THE PATENT?
17   A.   NO.
18   Q.   DO YOU CLAIM IN THIS LAWSUIT THAT CORRECT
19 CRAFT HAS BEEN HARMED BY ANY ACTION OF TOWER SYSTEMS
20 OTHER THAN ALLEGED PATENT INFRINGEMENT OR ALLEGED
21 TRADEMARK INFRINGEMENT?
22        MR. GILCHRIST:  OBJECT TO FORM.
23   A.   WITHOUT RE-READING IT, IT WOULD BE HARD
24 FOR ME TO STATE EXACTLY.
25   Q.   OKAY.  BUT YOU WOULD RE-READ THE COMPLAINT

Page 45

1 IN ORDER TO DO THAT; IS THAT WHAT YOU'RE SAYING?
2    A.   TO UNDERSTAND IT, YES.  IT'S NOT SOMETHING
3 THAT'S LAYING ON MY DESK EVERY DAY AND I READ FIRST
4 THING IN THE MORNING.
5    Q.   I UNDERSTAND THAT.  GOD FORBID IF YOU DID.
6    A.   I'D NEED ANOTHER LIFE.
7    Q.   BUT SITTING HERE TODAY YOU CAN'T THINK OF
8 ANYTHING ELSE OTHER THAN PATENT INFRINGEMENT AND
9 TRADEMARK INFRINGEMENT?
10   A.   THAT SEEMS REASONABLE.
11   Q.   OKAY.  LET ME ASK YOU THIS QUESTION THEN,
12 YESTERDAY WHEN YOUR LAWYER WAS TAKING MY CLIENT'S
13 DEPOSITION HE WAS ASKING ABOUT THIS QUOTE, UNQUOTE
14 COALITION LETTER THAT MY CLIENT SENT OUT.  HAS -- AS
15 PRESIDENT OF CORRECT CRAFT HAS CORRECT CRAFT BEEN
16 HARMED IN ANY WAY BY -- LET'S BACK UP A SECOND.  HOW
17 DID YOU FIRST FIND OUT ABOUT THAT COALITION LETTER?
18   A.   I THINK THE ATTORNEY SHARED IT WITH US.
19   Q.   YOU DIDN'T GET IT FROM SOMEBODY WHO WAS A
20 RECIPIENT OF THE COALITION LETTER DIRECTLY?
21   A.   WE HAD HEARD CONVERSATIONS IT WAS OUT
22 THERE BUT WE HAD NOT SEEN IT.
23   Q.   WHAT WAS YOUR REACTION WHEN YOU SAW IT?
24   A.   WHAT WAS MY REACTION?
25   Q.   YEAH.

Page 46

1    A.  WELL, I THINK IT WOULD BE SAFE TO SAY THAT
2 I WAS SOMEWHAT IRRITATED.
3    Q.  WHY WERE YOU SOMEWHAT IRRITATED?
4    A.  I THINK THAT IT -- THEY MADE STATEMENTS
5 THAT WERE UNTRUE AND FALSE ABOUT THE COMPANY.
6    Q.  WHAT STATEMENTS WERE THOSE?
7    A.  THAT WE WERE -- BASICALLY REFERRED TO AS A
8 TROUBLE MAKER, AN AGITATOR, SOMEBODY THAT WAS
9 DISAGREEABLE, HARD TO DEAL WITH I GUESS THEY CALLED
10 US A PARIAH OR SOMETHING LIKE THAT.  THAT JUST
11 CERTAINLY DOES NOT FIT CORRECT CRAFT'S IMAGE.
12    Q.  ANYTHING ELSE YOU THOUGHT WAS UNTRUE THAT
13 YOU RECALL SITTING HERE?
14    A.  THERE MAY BE SOME OTHER THINGS THAT I
15 COULD BUT I'D HAVE TO GO BACK AND RE-READ IT.
16    Q.  AS PRESIDENT OF CORRECT CRAFT, DO YOU
17 BELIEVE THAT CORRECT CRAFT WAS HARMED IN ANY WAY BY
18 THE FACT THAT MY CLIENT MAY HAVE SHARED THAT
19 COALITION LETTER WITH OTHER PEOPLE IN THE INDUSTRY?
20       MR. GILCHRIST:  OBJECT TO THE FORM.
21    A.  I CERTAINLY BELIEVE THAT IT DID HARM, YES.
22    Q.  EXPLAIN THAT FOR ME PLEASE.
23    A.  EXPLAIN IT?
24    Q.  YES.  THE TYPE OF HARM?
25    A.  WELL, THERE ARE PEOPLE WHO ARE

Page 47

1 MANUFACTURING TOWERS OUT THERE AND MAKING PROFIT OFF
2 OF OUR PATENT THAT ARE NOT PAYING LICENSE FEES.
3    Q.  AND HAS ANYONE TOLD YOU THAT THEY WOULD
4 HAVE TAKEN A LICENSE UNDER YOUR PATENT BUT FOR THE
5 FACT THAT THEY RECEIVED THE COALITION LETTER?
6    A.  I DON'T THINK THERE'S ANYBODY OUT THERE
7 THAT IS DUMB ENOUGH TO DO THAT.
8    Q.  SO THE ANSWER IS, NO?
9    A.  THAT IS A REASONABLE ANSWER, YES.
10    Q.  AND YOU COULD STILL SUE THOSE PEOPLE,
11 CORRECT, THAT HAVEN'T TAKEN A LICENSE?
12    A.  WE HAVE CHOICES THAT WE CAN MAKE, YES.
13    Q.  ANY OTHER WAY THAT YOU BELIEVE CORRECT
14 CRAFT MAY HAVE BEEN HARMED BY THE DISTRIBUTION OF
15 THAT COALITION LETTER?
16    A.  THE COSTS THAT WE'VE INCURRED, YES.
17    Q.  WHAT COSTS?
18    A.  IN TRYING TO GET LICENSES SIGNED AND FEES,
19 ATTORNEYS' FEES.
20    Q.  ATTORNEYS' FEES?
21    A.  YES.
22    Q.  DO YOU KNOW -- YOU WERE TRYING TO LICENSE
23 EVERYBODY ANY WAY, RIGHT?
24    A.  IF YOU HAVE A PATENT I THINK THAT'S WHAT
25 YOU WOULD DO, YES.

Page 48

1    Q.  SO YOU WERE INCURRING ATTORNEYS' FEES ANY
2 WAY TO TRY TO GET PEOPLE TO SIGN UP FOR LICENSES?
3    A.  I WOULD THINK THERE WERE REASONABLE FEES
4 IF YOU DIDN'T HAVE AN OBSTACLE THROWN OUT IN FRONT
5 OF YOU SUCH AS THIS.
6    Q.  THERE'S SOME INCREMENT IN ATTORNEYS' FEES
7 YOU MAY HAVE SPENT THAT YOU ATTRIBUTE TO MY CLIENT'S
8 DISTRIBUTION OF THE COALITION LETTER?
9    A.  I THINK THAT IS A CORRECT STATEMENT.
10    Q.  AND CAN YOU GIVE ME AT LEAST AN
11 APPROXIMATION OF WHAT YOU THINK THAT INCREMENT IS?
12    A.  NOT WITHOUT AN AWFUL LOT OF ACCOUNTING.
13 IT WOULD BE VERY TIME CONSUMING AND EXPENSIVE.
14    Q.  ARE YOU GOING TO CLAIM THAT AS DAMAGES IN
15 THIS LAWSUIT?
16    A.  I WOULD LEAVE THAT UP TO THE LEGAL
17 COUNSEL.
18    Q.  BUT YOU HAVEN'T DETERMINED THAT YET?
19    A.  THAT WOULD BE THEIR RECOMMENDATION
20 DECISION TO PRESENT TO ME FOR MY DECISION.
21    Q.  RIGHT.  OKAY.  NOW I ASK YOU A DIFFERENT
22 QUESTION ABOUT THE COALITION LETTER.  APART FROM
23 CORRECT CRAFT, DO YOU, WALTER MELOON, BELIEVE THAT
24 YOU WERE SOMEWHAT HARMED IN YOUR PERSONAL CAPACITY
25 BY THE DISTRIBUTION OF THE COALITION LETTER?

Page 49

1    A.  I THINK THAT IT DEFINITELY CAST SOME
2 DISPERSION ON MY CHARACTER AND THE COMPANY.
3    Q.  OKAY.  LEAVE THE COMPANY ASIDE.  DID YOU
4 HAVE CONVERSATIONS WITH ANYONE WHO TOLD YOU THEY HAD
5 SEEN THE COALITION LETTER?
6    A.  THERE WAS NO ONE OUT THERE THAT WAS --
7 FRANKLY I THINK THEY WOULD BE KIND OF DUMB IF
8 THEY DID.  I MEAN I WOULD JUST -- THAT IS NOT
9 SOMETHING IF I RECEIVED ONE I WOULD GO IN TELLING
10 THE PERSON THAT IT WAS WRITTEN ABOUT.
11    Q.  SO WHEN YOU SAID THAT YOU FELT THAT YOUR
12 PERSONAL REPUTATION HAD BEEN HARMED.  THAT IS, FOR
13 LACK OF A BETTER TERM, THAT IS KIND OF YOUR INTERNAL
14 FEELING ABOUT THAT?
15    A.  WELL, AND IT'S ON BEHALF OF THE COMPANY
16 ALSO BECAUSE I AM THE COMPANY.  I REPRESENT THE
17 COMPANY.
18    Q.  I UNDERSTAND THAT.  AND MY QUESTION IS --
19    A.  IF MY CHARACTER IS QUESTIONED CERTAINLY
20 THE CHARACTER OF THE COMPANY IS QUESTIONED.
21    Q.  I UNDERSTAND THAT, BUT MY QUESTION IS, IS
22 THAT BASICALLY YOUR INTERNAL FEELINGS ABOUT IT?
23    A.  I THINK THAT IS A REASONABLE ASSUMPTION,
24 YES, BECAUSE OF MY POSITION.
25    Q.  DID --

Page 50

1    (A DISCUSSION WAS HAD OFF THE RECORD.)
2    Q.  I SPEAK VERY FAST SOMETIMES AND IF THAT
3 HAPPENS PLEASE JUST LET ME KNOW.
4    A.  YOU NEED TO STAY IN THE SOUTH A LITTLE BIT
5 LONGER.
6    Q.  RIGHT.  ABSOLUTELY.  OKAY.  NOW YOU
7 ENTERED INTO A LICENSE WITH MASTERCRAFT CORRECT?
8    A.  YES.
9    Q.  AND DID YOU HAVE DISCUSSIONS WITH JOHN
10 DORTON THE PRESIDENT OF MASTERCRAFT IN CONNECTION
11 WITH THAT LICENSING?
12    A.  I TALK TO JOHN DORTON ON A REGULAR BASIS
13 ON MANY ISSUES.
14    Q.  DID YOU EVER TALK TO JOHN DORTON ABOUT THE
15 COALITION LETTER?
16    A.  I DON'T RECALL THAT JOHN EVER SAID
17 ANYTHING ABOUT IT.
18    Q.  DID YOU EVER TALK TO JOHN DORTON ABOUT
19 ATLANTIC TOWERS?
20    A.  I DON'T BELIEVE WE HAD A CONVERSATION LIKE
21 THAT.
22    Q.  DID YOU EVER SPEAK TO JOHN DORTON ABOUT
23 STEVE FELL?
24    A.  NOT TO MY RECOLLECTION.
25    Q.  HAS CORRECT CRAFT EVER MANUFACTURED ANY OF

Page 51

1 THE TOWERS ITSELF FOR RESALE?
2    A.  NO.
3    Q.  OKAY.  DO YOU KNOW A FELLOW BY THE NAME OF
4 ROBERT TODD?
5    A.  YES.
6    Q.  DID YOU EVER MEET HIM PERSONALLY?
7    A.  YES.
8    Q.  HE WAS NEVER AN EMPLOYEE OF CORRECT CRAFT;
9 IS THAT CORRECT?
10    A.  NO.
11    Q.  WHEN DID YOU FIRST MEET ROBERT TODD?
12    A.  IT WAS SOMETIME AFTER THE FIRST TOWER WAS
13 MADE.  THE EXACT DATE I DON'T REMEMBER.
14    Q.  AROUND THE 1996 TIME FRAME?
15    A.  I GUESS THAT WOULD BE ABOUT AS CLOSE A
16 DATE AS I CAN RECALL.
17    Q.  WAS THAT THE FIRST TIME ROBERT TODD HAD
18 EVER SUPPLIED ANYTHING TO CORRECT CRAFT?
19    A.  AS FAR AS I'M AWARE.
20    Q.  DID HE HAVE HIS OWN COMPANY THEN IN 1996?
21    A.  I BELIEVE HE DID.
22    Q.  AND WHAT WAS HE HIRED TO DO AT CORRECT --
23 STRIKE THAT.
24    DID CORRECT CRAFT HAVE SOME TYPE OF
25 CONTRACT WITH HIM TO BUILD A TOWER IN 1996?

Page 52

1    A.  YES.  I THINK HE BUILT THE FIRST TOWER FOR
2 US.
3    Q.  WHOSE IDEA WAS IT TO PUT THE SKI TOWER --
4 STRIKE THAT.
5    WHOSE IDEA WAS IT TO PUT THE TOWER ON A
6 SKI BOAT?
7    A.  I MEAN -- IT EVOLVED OUT OF SEVERAL
8 CONVERSATIONS AND MEETINGS.
9    Q.  THEY WERE ALL INTERNAL OF CORRECT CRAFT
10 THOSE MEETINGS?
11    A.  YES.
12    Q.  WHY WAS ROBERT TODD HIRED TO FABRICATE
13 THAT FIRST TOWER?
14    A.  WE DO NOT HAVE THE BENDING EQUIPMENT TO DO
15 IT.  WE DON'T DEAL IN THAT TYPE OF MATERIAL EXCEPT
16 FOR ENGINE STRINGERS.  WE WERE LOOKING FOR SOMEONE
17 WHO HAD THE ABILITY TO MAKE BENDS AND TO DO THE ARC
18 WELDING THAT WAS NECESSARY.  WE DON'T HAVE A SHOP TO
19 DO IT IN.  WE HAD TO GO OUTSIDE AND FIND AN OUTSIDE
20 SUPPLIER.
21    Q.  IF IT WASN'T ROBERT TODD IT WOULD HAVE
22 BEEN SOMEBODY ELSE?
23    A.  OH, YEAH.
24    Q.  AND JUST SO WE'RE CLEAR, IN 1996 THERE WAS
25 NO WRITTEN AGREEMENT BETWEEN ROBERT TODD AND CORRECT

Page 53

1 CRAFT TO KEEP THE SUBJECT MATTER OF THIS TOWER
2 CONFIDENTIAL?
3    A.  IF YOU SAY WRITTEN THERE WAS NO -- IT WAS
4 JUST BASED ON THE FACT THAT WE ASSUMED THAT BECAUSE
5 WE CAME TO HIM AND ASKED HIM TO DO IT THAT THERE WAS
6 A CERTAIN AMOUNT OF CONFIDENTIALITY THAT HE WOULD
7 ABIDE BY.
8    Q.  SO THE ANSWER IS, NO, THERE WAS NO WRITTEN
9 AGREEMENT?
10    A.  NOT AT THAT TIME THAT I AM AWARE OF.
11    Q.  CORRECT CRAFT ASSUMED THAT HE WOULD KEEP
12 IT CONFIDENTIAL?
13    A.  I THINK THAT IS A GOOD ASSUMPTION, YES.
14    Q.  DO YOU KNOW WHETHER THAT WAS EVER VERBALLY
15 COMMUNICATED TO MR. TODD THAT CORRECT CRAFT EXPECTED
16 HIM TO KEEP THE SUBJECT MATTER CONFIDENTIAL?
17    A.  I DON'T KNOW THAT SOMEONE HAD THAT
18 CONVERSATION WITH HIM.  THEY MAY HAVE.  BUT I'M NOT
19 AWARE OF THAT CONVERSATION.
20    Q.  THERE WAS NO WRITTEN AGREEMENT IN 1996
21 WHEREBY MR. TODD WOULD ASSIGN ANY RIGHTS THAT HE MAY
22 OR MAY NOT HAVE HAD IN THAT TOWER TO CORRECT CRAFT?
23    A.  NOT THAT I'M AWARE OF.
24    Q.  DO YOU KNOW WHETHER ANYONE AT CORRECT
25 CRAFT ASKED HIM TO SIGN ANY SUCH DOCUMENT IN 1996?

Page 54

1    A. I'M NOT AWARE OF ANY.
2    Q. DO YOU KNOW WHAT HIS ROLE WAS IN
3 DEVELOPING THE TOWER?
4    A. HE WAS THE SUPPLIER THAT HAS THE
5 FACILITIES TO MAKE THE ITEM THAT WE WANTED. AND WE
6 WENT TO HIM AND TOLD HIM WHAT WE WANTED AND HE BUILT
7 IT.
8    Q. DID HE CONTRIBUTE ANY IDEAS OR CONCEPTS TO
9 THE TOWER?
10    A. I BELIEVE IN THE AREA OF STRENGTHENING IT
11 TO CARRY LOADS AND THINGS LIKE THAT, BUT NOT IN THE
12 BASIC DESIGN THAT I'M AWARE OF.
13    Q. HE MAY HAVE, FOR EXAMPLE, SAID WE'VE GOT
14 TO MAKE THIS WELD STRONGER IN A CERTAIN POINT?
15    A. HE HAD THE EXPERTISE TO UNDERSTAND THE
16 FORCES THAT WOULD BE PLACED ON SOMETHING SIMILAR TO
17 THAT.
18    Q. AND I GUESS YOU KIND OF HIRED HIM FOR THAT
19 PARTICULAR EXPERTISE AS HOW YOU WANTED THE THING --
20    A. WE HIRED HIM TO BUILD WHAT WE DESIGNED AND
21 HE OFFERED THE OTHER INFORMATION.
22    Q. DO YOU KNOW HIS CURRENT ADDRESS?
23    A. I DO NOT KNOW HIS PERSONAL CURRENT
24 ADDRESS, NO.
25    Q. HAVE YOU SENT HIM ANY ROYALTY PAYMENTS

Page 55

1 LATELY?
2    A. BASED ON OUR AGREEMENT WITH HIM HIS
3 COMPANY PAYS THEIR BILLS.
4    Q. DO YOU KNOW WHERE CORRECT CRAFT SENDS
5 THOSE ROYALTY PAYMENTS?
6    A. I PERSONALLY DON'T KNOW THE ADDRESS.
7    Q. DO YOU KNOW WHETHER MR. TODD IS STILL
8 LOCATED -- LIVES IN FLORIDA?
9    A. HE DOES NOT LIVE IN FLORIDA.
10    Q. DO YOU KNOW WHERE HE LIVES?
11    A. HE LIVES IN TENNESSEE SOMEWHERE.
12    Q. AND YOU SEND THE PAYMENTS, DO YOU KNOW TO
13 HIS ATTORNEY OR TO HIM DIRECTLY?
14    A. I DON'T REMEMBER WHAT THE AGREEMENT WAS;
15 WHETHER IT WENT THROUGH THE ATTORNEY OR WHETHER IT
16 GOES DIRECT.
17    Q. BUT THERE ARE DOCUMENTS IN CORRECT CRAFT
18 THAT WOULD SHOW WHERE YOU SENT RECENT PAYMENTS TO
19 MR. TODD?
20    A. YES, I'M SURE THERE ARE.
21    Q. AND WHERE WOULD THOSE DOCUMENTS BE
22 LOCATED?
23    A. THEY WOULD BE IN ACCOUNTING.
24    Q. DO YOU SIGN THOSE CHECKS PERSONALLY?
25    A. I SIGN SOME OF THEM. WHEN I'M NOT THERE

Page 56

1 MY SECRETARY OR SOMEONE ELSE WILL SIGN THEM.
2    Q. IS MR. TODD'S ADDRESS ON THOSE CHECKS?
3    A. I'M ASSUMING THEY ARE, YES.
4    Q. WHEN WAS THE LAST TIME YOU SPOKE TO ROBERT
5 TODD?
6    A. PROBABLY ABOUT TWO WEEKS AGO, TWO, TWO
7 WEEKS.
8    Q. WHAT WAS THE SUBJECT OF THAT; WAS IT A
9 PHONE CONVERSATION?
10    A. YES.
11    Q. WHAT WAS THE SUBJECT OF THE PHONE
12 CONVERSATION WITH MR. TODD?
13    A. THAT HE CALLED AND SAID THAT HE AND HIS
14 WIFE AND KIDS WOULD LIKE TO GET SOME NAUTIQUE
15 FASHION WHICH IS FASHION THAT WE SELL WITH OUR NAME
16 ON IT. AND WE MADE UP A LITTLE BUNDLE OF SHIRTS FOR
17 HIM AND THE KIDS AND WIFE AND SHIPPED THEM OFF TO
18 HIM.
19    Q. AND DOES HE CALL YOU OFTEN?
20    A. WHEN YOU SAY OFTEN, I TALKED TO HIM MAYBE
21 THREE, FOUR TIMES A YEAR.
22    Q. HAVE YOU EVER SPOKEN TO HIM ABOUT THIS
23 CASE?
24    A. I DON'T RECALL A CONVERSATION ABOUT THIS
25 CASE, YOU KNOW, A SPECIFIC CONVERSATION, NO.

Page 57

1    Q. HAVE YOU EVER HAD A CONVERSATION WITH HIM
2 WHERE YOU DISCUSSED THE FACT THAT HIS TESTIMONY
3 MIGHT BE NECESSARY FOR THIS CASE?
4    A. NO, I'VE NOT HAD THAT CONVERSATION WITH
5 HIM.
6    Q. HAVE YOU ASKED YOUR ATTORNEYS TO HAVE THAT
7 CONVERSATION WITH HIS ATTORNEYS?
8    MR. GILCHRIST: YOU CAN ANSWER THAT "YES"
9 OR "NO."
10    A. WHAT WAS THE QUESTION AGAIN?
11    MR. GILCHRIST: HAVE YOU ASKED YOUR
12    ATTORNEYS TO HAVE THAT CONVERSATION?
13 BY MR. PESLAK:
14    Q. HAVE YOU ASKED YOUR ATTORNEYS TO HAVE THAT
15 CONVERSATION WITH HIS ATTORNEYS?
16    A. I'VE NOT ASKED MY ATTORNEYS TO DO THAT,
17 NO.
18    MR. PESLAK: TAKE A SHORT BREAK.
19       (A BREAK WAS TAKEN.)
20    Q. MR. MELOON, I JUST WANT ONE OR TWO
21 FOLLOW-UPS ABOUT YOUR PERSONAL FISHING NAUTIQUE THAT
22 YOU TESTIFIED TO EARLIER. DO YOU STILL HAVE THAT
23 BOAT?
24    A. NO.
25    Q. YOU SOLD IT?

Page 58

1   A.   YES.

2   Q.   DO YOU KNOW WHERE IT IS?

3   A.   I DON'T HAVE ANY IDEA, NO.

4   Q.   DO YOU HAVE ANY PHOTOGRAPHS OF IT?

5   A.   THERE MAY BE SOME IN THE ARCHIVES
6   SOMEWHERE.

7   Q.   IN THE ARCHIVES OF CORRECT CRAFT ARCHIVES?

8   A.   YES.

9   Q.   AND YOU HAVE ARCHIVES OF PHOTOGRAPHS OF
10  BOATS AND THAT SORT OF THING?

11  A.   WE HAVE PHOTOGRAPHS OF EVERYTHING THAT
12  YOU -- FROM YEAR TO YEAR YOU ARCHIVE THEM AND KEEP
13  THEM.  IT'S PART OF THE HISTORY OF THE COMPANY.

14  Q.   SO, IF THERE'S A PHOTOGRAPH OF THAT
15  PARTICULAR BOAT IN EXISTENCE, THE PLACE YOU WOULD
16  LOOK WOULD BE IN THE COMPANY ARCHIVES?

17  A.   (WITNESS NODS HEAD.) YES, IF THERE'S A
18  PHOTOGRAPH OF IT.

19       MR. PESLAK:  I UNDERSTAND THAT.  I'M
20  JUST -- MARK THIS AS DEFENDANT'S 4.

21  (EXHIBIT NUMBER 4 WAS MARKED FOR IDENTIFICATION.)

22  Q.   MR. MELOON, LET ME JUST TELL YOU WHAT
23  DEFENDANT'S EXHIBIT 4 IS AND THEN I WANT TO ASK YOU
24  A COUPLE QUESTIONS ABOUT IT.  THE DOCUMENT THAT WE
25  HAD MARKED EARLIER WHERE YOU MADE THE STATEMENT

Page 59

1   ABOUT LOOKS LIKE THE FISHING TOWER -- FISHING
2   NAUTIQUE WITH A TUNA TOWER, I JUST TOOK THAT
3   DOCUMENT BACK TO MY OFFICE ON FRIDAY AND I DID AN
4   INTERNET SEARCH TO TRY TO FIND A FISHING NAUTIQUE.
5   AND I CAME UP WITH THIS ON SUNDAY OFF THE INTERNET.
6   AND IT'S JUST SOME BOAT SOMEBODY HAS FOR SALE.  AND
7   IT'S IDENTIFIED AS A CORRECT CRAFT.  IS IT -- YOU'RE
8   LOOKING AT THE THIRD PAGE OF DEFENDANT'S EXHIBIT 3,
9   MR. MELOON.

10  A.   UH-HUH.

11  Q.   IS THAT YOUR RECOLLECTION OF WHAT A
12  CORRECT CRAFT FISHING NAUTIQUE LOOKED LIKE?

13  A.   YES.

14  Q.   AND THERE'S ALSO A TOWER ON THAT BOAT; DO
15  YOU SEE THAT?

16  A.   YES.

17  Q.   AND DOES THAT LOOK LIKE THE TOWER THAT YOU
18  HAD ON YOUR BOAT?

19  A.   IT'S VERY SIMILAR.

20  Q.   VERY SIMILAR.  AND IT'S MOUNTED IN A
21  SIMILAR PLACE ON THE BOAT AS YOUR TOWER WAS?

22  A.   YES.

23  Q.   OKAY.  THANK YOU.  I JUST WANT TO MAKE ONE
24  OTHER THING CLEAR.  GENERALLY IF SOMEONE BOUGHT ONE
25  OF YOUR FISHING NAUTIQUES AND THEY WANTED A TUNA

Page 60

1   TOWER THERE WOULD BE AN AFTERMARKET PRODUCT THEY
2   WOULD HAVE HAD TO BUY?

3   A.   USUALLY THE DEALER WOULD HAVE IT INSTALLED
4   BECAUSE THEY WOULD DEAL WITH CERTAIN COMPANIES.

5   Q.   OKAY.  BACK TO MR. TODD, EVENTUALLY HE
6   APPLIED FOR HIS OWN PATENT ON THE TOWER, CORRECT?

7   A.   YES.

8   Q.   AND HE FILED THAT APPLICATION IN HIS
9   OWN -- HIS NAME ONLY, CORRECT?

10  A.   YES.

11  Q.   AND EVENTUALLY AT A CERTAIN POINT IN TIME
12  CORRECT CRAFT FILED ITS OWN PATENT APPLICATION THAT
13  BECAME THE PATENT THAT IS AT ISSUE IN THIS CASE,
14  CORRECT?

15  A.   I BELIEVE SO, YES.

16  Q.   IN THE INITIAL APPLICATION THAT CORRECT
17  CRAFT FILED DIDN'T NAME MR. TODD AS AN INVENTOR,
18  CORRECT?

19  A.   I DON'T THINK WE DID.

20  Q.   HOW DID YOU FIRST BECOME AWARE THAT
21  MR. TODD HAD FILED FOR HIS OWN PATENT ON THE TOWER?

22  A.   I DON'T RECALL.  I WOULD ASSUME WE WERE
23  NOTICED BY THE ATTORNEYS.  THAT IS -- YOU KNOW, BUT
24  I DON'T RECALL.

25  Q.   RECEIVED A NOTICE FROM MR. TODD'S

Page 61

1   ATTORNEY?

2   A.   NO, FROM OUR ATTORNEYS.

3   Q.   MR. TODD WAS NOT SELECTED TO BE YOUR TOWER
4   SUPPLIER, CORRECT?

5   A.   NO, HE WAS NOT.

6   Q.   DO YOU KNOW WHETHER MR. TODD WAS SUPPLYING
7   TOWERS TO ANY OTHER BOAT COMPANY?

8   A.   I HAVE NO IDEA.

9   Q.   MR. MELOON, I'D LIKE TO ASK YOU A COUPLE
10  MORE QUESTIONS ABOUT WHAT WE MARKED EARLIER AS
11  EXHIBIT 2.

12      MR. GILCHRIST:  THIS LINE OF QUESTIONING
13  IS CONFIDENTIAL.

14  Q.   IF YOU CAN TURN TO THE THIRD PAGE OF
15  EXHIBIT 2.  AND THERE'S AN ENTRY THERE THAT UNDER
16  ITEM 2 THAT SAYS PATENT PROCESS?

17  A.   UH-HUH.

18  Q.   IT SAYS THE PATENT PROCESS HAS BEEN
19  STARTED ON THE TOW TOWER.  AND THIS IS OCTOBER 3,
20  1996?

21  A.   RIGHT.

22  Q.   SO, IS THIS IN FACT ABOUT THE TIME THAT
23  CORRECT CRAFT AT LEAST STARTED CONSIDERING APPLYING
24  FOR A PATENT ON THE TOWING TOWER?

25  A.   I BELIEVE THAT IT STARTED BEFORE THIS DATE

Page 62

1 AS FAR AS THE THOUGHT AND THE INTENT AND THE
2 DIRECTION.
3    Q.   OKAY.  BUT SOME TIME FALL OF 1996 MAYBE A
4 LITTLE EARLIER IS WHEN CORRECT CRAFT BEGAN THINKING
5 ABOUT APPLYING FOR A PATENT?
6    A.   THAT'S REASONABLE, YES.
7    Q.   AND THEN IF YOU COULD TURN TO THE PAGE
8 THAT HAS THE FAX NOTATION ON TOP OF 10 OF 21?
9    A.   WHICH PAGE IS THAT?
10    Q.   IT HAS AN ENTRY THAT SAYS MANAGEMENT
11 MEETING MINUTES JANUARY 23, 1997.
12    A.   OKAY.
13    Q.   AND ON THE BOTTOM IT SAYS MANAGEMENT
14 MEETING MINUTES FEBRUARY 6, 1997 AND SAYS BILL
15 SNOOK.
16    A.   UH-HUH.
17    Q.   IF YOU TURN TO THE NEXT PAGE AFTER THAT WE
18 HAVE ENTRY NUMBER 2 THAT SAYS PATENT.  IT SAYS BILL
19 HAS THE PAPERWORK ON HIS DESK.
20    A.   DOWN AT THE BOTTOM OF THE PAGE?
21    Q.   YEAH.  SO, I GUESS IT'S SAFE TO SAY THAT
22 SINCE FEBRUARY 1997 CORRECT CRAFT WAS STILL IN
23 THE -- HADN'T FILED FOR ITS PATENT APPLICATION YET?
24    A.   I DON'T KNOW WHAT PAPERWORK HE'S REFERRING
25 TO.  I'M ASSUMING THAT IF IT SAYS PATENT THAT IS

Page 63

1 WHAT THEY'RE TALKING ABOUT.
2        MR. PESLAK:  LET ME MARK THIS AS 5.
3    (EXHIBIT NUMBER 5 WAS MARKED FOR IDENTIFICATION.)
4    Q.   MR. MELOON, YOU HAVE IN FRONT OF YOU A
5 COPY OF UNITED STATES PATENT 5979350.
6    A.   UH-HUH.
7    Q.   DO YOU RECOGNIZE THAT DOCUMENT?
8    A.   YES.
9    Q.   THAT'S THE PATENT AT ISSUE IN THIS CASE?
10    A.   I BELIEVE SO, YES.
11    Q.   AND IF YOU LOOK AT THE FRONT PAGE IN THE
12 LEFT-HAND COLUMN IT HAS A FILE DATE OF MARCH 9,
13 1998; DO YOU SEE THAT?
14    A.   WHICH COLUMN WAS THAT NOW THE LEFT-HAND?
15    Q.   THE LEFT-HAND COLUMN.
16    A.   OKAY.
17    Q.   THERE'S AN ENTRY THAT SAYS 22 FILED MARCH
18 9, 1998?
19    A.   YES.
20    Q.   CAN YOU TELL ME WHY CORRECT CRAFT'S PATENT
21 WASN'T FILED UNTIL 1998 WHEN YOU BEGAN THE PROCESS
22 IN OCTOBER OF '96?
23    A.   BASED ON, YOU KNOW, OUR ATTORNEY'S ADVICE
24 AND THE WAY WE WERE DOING IT AND WORKING THROUGH THE
25 PROCESS THAT WOULD BE THE ONLY REASON.

Page 64

1    Q.   SO THERE'S -- WHATEVER THE ATTORNEYS WERE
2 DOING -- THERE'S NO DELAY ON CORRECT CRAFT'S END?
3    A.   I DON'T THINK THERE WAS A DELAY ON
4 ANYBODY'S END AT THAT TIME.  WE JUST A -- WE WERE
5 WORKING TOGETHER TO GET THE PATENT.
6        MR. PESLAK:  OKAY.  MARK THIS AS 6 AND 7.
7    (EXHIBITS NUMBER 6 AND 7 WERE MARKED FOR
8 IDENTIFICATION.)
9    Q.   MR. MELOON, YOU HAVE IN FRONT OF YOU TWO
10 EXHIBITS.  ONE THE COURT REPORTER MARKED AS D6 AND
11 THE OTHER AS D7.  THE FIRST ONE D6 APPEARS TO BE A
12 MEMO FROM BORDON LARSON TO YOURSELF DATED OCTOBER
13 20, 1997.  DO YOU RECALL RECEIVING THIS DOCUMENT?
14    A.   IT WAS ADDRESSED TO ME THAT WOULD BE THE
15 ONLY REASON -- OTHERWISE USUALLY EVERYTHING GOES IN
16 THE FILE THAT HAS MY NAME AND DATE ON IT.  IT HAS
17 GOT MY SIGNATURE AND THE DATE.  THIS ONE DOESN'T BUT
18 I'M ASSUMING THAT I DID BECAUSE IT WAS ADDRESSED TO
19 ME.
20    Q.   DO YOU RECALL ASKING MR. LARSON TO RECOUNT
21 FOR YOU THE HISTORY OF THE DEVELOPMENT OF CORRECT
22 CRAFT'S WAKEBOARDING TOWER?
23    A.   I MAY HAVE ASKED FOR A HISTORY OF IT BUT
24 AS TO THE EXACT CONVERSATION I DON'T RECALL.
25    Q.   DO YOU RECALL WHETHER THERE WAS AN

Page 65

1 INCIDENT OR SOMETHING THAT WAS HAPPENING THAT WOULD
2 HAVE SPURRED YOU TO ASK FOR, YOU KNOW, THIS
3 PARTICULAR MEMO FROM MR. LARSON?
4    A.   NO, OTHER THAN I PERIODICALLY WOULD GO
5 BACK AND ASK FOR AN UPDATE ON DIFFERENT PROJECTS
6 THAT THE MANAGERS WERE INVOLVED IN BECAUSE THAT IS
7 MY JOB.
8    Q.   IF YOU LOOK AT THE NEXT EXHIBIT,
9 DEFENDANT'S EXHIBIT 7, IT SAYS -- ANOTHER DOCUMENT
10 THAT WAS PRODUCED BY CORRECT CRAFT AND IT'S A NOTE
11 FROM MR. SNOOK.  DO YOU RECALL SEEING THIS DOCUMENT,
12 MR. MELOON?
13    A.   IT'S POSSIBLE I DID.  I DON'T RECALL THIS
14 EXACT DOCUMENT, NO.
15    Q.   AND THIS APPEARS TO BE DATED OCTOBER 21,
16 1997 WHICH WAS THE DAY AFTER DEFENDANT'S EXHIBIT 6.
17 DOES THAT REFRESH YOUR RECOLLECTION OF ANYTHING THAT
18 WAS GOING ON IN OCTOBER 1997?
19    A.   I HAVE NO IDEA WHAT WOULD HAVE BEEN GOING
20 ON AT THAT TIME, NO.
21    Q.   IF YOU LOOK AT EXHIBIT 7 THERE'S A
22 PARAGRAPH 4 AND ALSO 6 WHERE APPARENTLY MR. SNOOK IS
23 TALKING ABOUT T-TOPS; DO YOU SEE THAT?
24    A.   UH-HUH.  YES.
25    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT

Page 66

1 MAYBE THERE WAS SOME ISSUE THAT HAD DEVELOPED WITH
2 MR. TODD AT THAT POINT?
3    A.  NO, THAT NUMBER 4 DOESN'T.  THAT DOESN'T
4 RING THAT BELL.
5    MR. PESLAK:  JUST PUT THOSE ASIDE.  MARK
6    THIS AS NUMBER 8.
7 (EXHIBIT NUMBER 8 WAS MARKED FOR IDENTIFICATION.)
8    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
9 THE COURT REPORTER JUST MARKED AS DEFENDANT'S
10 EXHIBIT NUMBER 8.  AND DO YOU RECOGNIZE THIS
11 DOCUMENT?
12    A.  YES, THIS IS -- BECAUSE I WAS IN
13 ATTENDANCE AT THAT MEETING.
14    Q.  AND DOES THIS DOCUMENT REFLECT NOTES THAT
15 WERE TAKEN AT A MEETING THAT OCCURRED ON OR ABOUT
16 AUGUST 30, 1996 AT CORRECT CRAFT?
17    A.  IT APPEARS THAT IS WHAT IT IS, YES.
18    Q.  AND WAS THIS A MEETING TO DISCUSS CHANGES
19 TO CORRECT CRAFT'S PRODUCTS FOR 1998 MODEL YEAR?
20    A.  ACCORDING TO THE HEADING ON IT, YES.
21    Q.  WHO IS BOB BURNS?
22    A.  HE WAS SALES MANAGER AT THAT TIME.
23    Q.  AND HE'S NO LONGER WITH CORRECT CRAFT?
24    A.  NO.
25    Q.  AND DON BOSTICK?

Page 67

1    A.  DON BOSTICK IS HEAD OF TRANSPORTATION.
2    Q.  HE STILL WORKS AT CORRECT CRAFT?
3    A.  YES.
4    Q.  AND IS HE THE PERSON KIND OF IN CHARGE OF
5 SHIPPING THE GOODS OUT TO THE DEALERS?
6    A.  YES.
7    Q.  WHO IS JEFF HADLEY?
8    A.  HE'S OUR ACCOUNTANT OR BASICALLY OUR
9 COMPTROLLER.
10    Q.  IS HE STILL AT CORRECT CRAFT?
11    A.  YES.
12    Q.  CAN YOU -- LET'S BACK UP A SECOND.  DO YOU
13 RECALL AT THIS MEETING WHETHER THERE WAS A
14 DISCUSSION OF CORRECT CRAFT DEVELOPING A TOWER TO GO
15 ON ITS SKI BOATS?
16    A.  IF IT'S MENTIONED IN THESE NOTES.
17    Q.  OKAY.  LET ME DO IT THE EASY WAY THEN.  IF
18 YOU LOOK AT THE SECOND PAGE IN THE FOURTH PARAGRAPH
19 DOWN IT SAYS DISCUSSIONS CONCERNING A RADAR DOME SKI
20 PYLON.
21    A.  UH-HUH.
22    Q.  IS THAT WHAT EVENTUALLY BECAME YOUR FLIGHT
23 CONTROL TOWER?
24    A.  I THINK THAT IS A GOOD ASSUMPTION.
25    Q.  AND IF YOU COME DOWN TO THE NEXT TO THE

Page 68

1 LAST PARAGRAPH ON THIS PAGE.
2    A.  UH-HUH.
3    Q.  AND IT SAYS W.N. STATED WE SHOULD GO WITH
4 THE SIX FOOT PYLON.  DOES THAT HAVE ANYTHING TO DO
5 WITH THE TOWER THAT YOU'RE TALKING ABOUT THERE OR IS
6 THAT JUST THE EXTENDED PYLON?
7    A.  THAT IS AN EXTENDED PYLON.
8    Q.  THE THING THAT I DIDN'T QUITE UNDERSTAND
9 AND MAYBE YOU CAN HELP ME HERE IN THIS PARAGRAPH.
10 THE SECOND SENTENCE SAYS THE PROBLEM BEING MOUNTING
11 AND THOSE SITTING IN THE FRONT SEATS STANDING UP AND
12 HIT -- HITTING THEIR HEAD.  IS THAT A PROBLEM WITH
13 PYLONS?
14    A.  NO, WE WERE TRYING TO FIND A WAY TO SECURE
15 A SIX FOOT PYLON WITHOUT DOING DAMAGE TO THE
16 STRUCTURAL -- TO THE STRINGER SYSTEM, THE STRUCTURAL
17 PART OF THE STRINGER SYSTEM IN THE BOTTOM OF THE
18 BOAT.
19    Q.  SO THIS WOULD HAVE BEEN ANOTHER STRUCTURE
20 MOUNTED TO THE SIDE OF THE BOAT THAT WOULD HAVE COME
21 UP AND SORT OF PUT A PYLON ON TOP OF IT?
22    A.  NO, THIS WAS A PYLON THAT WAS SIX FOOT IN
23 THE AIR THAT CREATES A TREMENDOUS AMOUNT OF PRESSURE
24 ON THE STRUCTURE OF THE HULL DOWN IN THE BOTTOM.
25 IT'S LIKE A LARGE FULCRUM.  WHEN YOU HAVE A LARGE

Page 69

1 PERSON PULLING AGAINST IT, BOATS HAVE A TENDENCY TO
2 UNDER CERTAIN LOAD CONDITIONS TO BE PLACED UNDER
3 TREMENDOUS STRESS.
4    Q.  AND HOW WOULD THAT BE A PROBLEM WITH
5 SOMEONE STANDING UP AND HITTING THEIR HEAD?
6    A.  THEY WERE REFERRING THERE AS TO HOW WE
7 WOULD TIE THAT DOWN TO TAKE THE PRESSURE OFF OF THE
8 BOTTOM OF THE STRUCTURE OF THE BOAT.
9    Q.  OKAY.  SO THIS HAS NOTHING TO DO --
10    A.  DISTRIBUTE THE PRESSURE.  THAT IS ALL.
11    Q.  SO THIS ENTRY IN THESE NOTES HAS NOTHING
12 TO DO WITH THE TOWER?
13    A.  NOT WHILE WE WERE TALKING ABOUT A SIX FOOT
14 PYLON, NO.
15    Q.  OKAY.  IF YOU TURN OVER TO THE LAST PAGE
16 OF THIS EXHIBIT.  THE NEXT TO LAST PARAGRAPH SAYS WE
17 WILL GO OUT OF HOUSE TO GET THE RADAR DOME.  DO YOU
18 SEE THAT?
19    A.  UH-HUH.
20    Q.  AND WAS INITIALLY YOU REFERRING TO WHAT
21 BECAME THE FLIGHT CONTROL TOWER AS A RADAR DOME?
22    A.  THAT WAS THE ONLY THING WE HAD TO
23 REFERENCE IT BY.
24    Q.  WHY WERE YOU CALLING IT A RADAR DOME IN
25 PARTICULAR?

Page 70

1     A.  IF YOU LOOK AT SOME FISHING BOATS THEY USE
2  A STRUCTURE SIMILAR TO THAT TO PUT RADAR DOMES ON.
3     Q.  IT LOOKED LIKE A RADAR ARCH OR A RADAR
4  TOWER?
5     A.  SURE.  SAME THING.
6        MR. PESLAK:  NEXT NUMBER.
7     (EXHIBIT NUMBER 9 WAS MARKED FOR IDENTIFICATION.)
8     Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
9  THE COURT REPORTER JUST MARKED AS DEFENDANT'S
10 EXHIBIT 9.  AND THIS APPEARS TO BE A REPORT DATED
11 SEPTEMBER 27, 1996 AND ADDRESSED TO YOU.  DO YOU
12 RECOGNIZE THIS DOCUMENT?
13    A.  IT WAS ADDRESSED TO ME, YES.
14    Q.  AND DO YOU RECALL RECEIVING THIS DOCUMENT?
15    A.  YES, I WOULD ASSUME SO BECAUSE IT'S GOT MY
16 NAME ON IT, YES.
17    Q.  AND AT THE TOP THERE'S A HANDWRITTEN GARY,
18 IS THAT YOUR HANDWRITING?
19    A.  NO, THAT'S MY SECRETARY'S HANDWRITING.
20    Q.  IS THIS A DOCUMENT YOU WOULD HAVE SENT TO
21 GARY MELOON?
22    A.  HE WOULD HAVE BEEN COPIED ON IT.
23    Q.  THIS DOCUMENT APPEARS TO REFER TO A TEST
24 THAT OCCURRED AT CORRECT CRAFT OF I GUESS THE
25 INITIAL FLIGHT CONTROL TOWER?

Page 71

1     A.  IT APPEARS.
2     Q.  AND THAT WOULD HAVE BEEN THE TOWER THAT
3  WAS PURCHASED FROM ROBERT TODD?
4     A.  I BELIEVE THAT WOULD BE.
5     Q.  SO IT'S SAFE TO ASSUME THAT THE FIRST
6  TOWER FROM ROBERT TODD WAS RECEIVED AT CORRECT CRAFT
7  PRIOR TO SEPTEMBER 27, 1996?
8     A.  VERY CLOSE PROXIMITY TO THAT DATE BECAUSE
9  WE WERE UNDER SOME TIME RESTRAINTS.
10    Q.  DO YOU KNOW WHOSE BOAT THAT WAS INSTALLED
11 ON?
12    A.  I THINK IT WAS INSTALLED ON ONE OF OUR
13 ENGINEERING BOATS.  IT MAY NOT HAVE BEEN BUT THAT
14 WOULD BE THE MOST LIKELY BOAT TO PUT IT ON.
15    Q.  SO, JUST SO THE RECORD IS CLEAR, I ASSUME
16 CORRECT CRAFT HAS A BOAT OR BOATS THAT THEY USE FOR
17 TESTING DIFFERENT IDEAS AND PRODUCTS AND THAT SORT
18 OF THING?
19    A.  YES.
20    Q.  AND I -- AND THAT WOULD HAVE BEEN THE MOST
21 LIKELY PLACE YOU WOULD HAVE INSTALLED A NEW PRODUCT
22 LIKE THIS TO TEST?
23    A.  CORRECT.
24    Q.  DO YOU KNOW WHERE THIS TESTING TOOK PLACE?
25    A.  AT -- MORE THAN LIKELY IT WOULD BE ON LAKE

Page 72

1  CONWAY.
2     Q.  WHERE IS THAT?
3     A.  THAT IS IN SOUTHEAST OF ORLANDO OR
4  SOUTHEAST ORANGE COUNTY.
5     Q.  IS THAT A PUBLIC LAKE?
6     A.  OH, YES.
7     Q.  YOU DIDN'T ATTEND THIS FIRST TEST?
8     A.  NO.
9     Q.  DID -- IS DEAN LAVELLE SOMEONE THAT
10 CORRECT CRAFT HAD A RELATIONSHIP WITH?
11    A.  HE WAS A CONTRACT ATHLETE.
12    Q.  WHAT DOES THAT MEAN?
13    A.  WE HAVE ATHLETES THAT ARE UNDER CONTRACT.
14    Q.  PEOPLE THAT COME AND TEST VARIOUS PRODUCTS
15 FOR YOU?
16    A.  THEY USE OUR PRODUCTS.
17    Q.  AND DID MR. LAVELLE HAVE A WRITTEN
18 CONTRACT WITH CORRECT CRAFT?
19    A.  I'M CERTAIN THAT HE DID.
20    Q.  AND WAS HE UNDER ANY CONFIDENTIALITY
21 RESTRICTIONS IN 1996?
22    A.  OTHER THAN, YOU KNOW, A CONTRACTOR AND,
23 YOU KNOW, IN THE COMPANY HE IS A CONTRACTOR.  HE
24 WOULD HAVE CERTAIN -- WE WOULD EXPECT HIM TO KEEP
25 CERTAIN THINGS CONFIDENTIAL BECAUSE OF HIS LOYALTY

Page 73

1  TO THE COMPANY.  THAT IS AN ASSUMPTION THAT IS EASY.
2     Q.  HE IS NOT AN EMPLOYEE OF THE COMPANY
3  THOUGH, CORRECT?
4     A.  DEPENDS ON WHETHER HE WAS UNDER A WIN
5  INCENTIVE OR A PHOTO INCENTIVE OR SOMETHING TO THAT
6  NATURE.
7     Q.  DID YOU PAY HIM AS A W2 EMPLOYEE OR A 1099
8  EMPLOYEE?
9     A.  HE WOULD BE 1099.
10    Q.  DID -- DO YOU KNOW -- APART FROM I
11 UNDERSTAND WHAT YOU'RE SAYING THAT YOU WOULD EXPECT
12 HIM TO KEEP THINGS CONFIDENTIAL BUT DO YOU KNOW
13 WHETHER THERE WAS SPECIFIC WRITTEN PROVISIONS IN
14 WHATEVER CONTRACT YOU HAD WITH HIM IN 1996 THAT
15 REQUIRED HIM TO KEEP WHATEVER HE DID FOR CORRECT
16 CRAFT CONFIDENTIAL?
17    A.  IT COULD HAVE BEEN BUT I WOULDN'T, I
18 WOULDN'T SAY, YES, DEFINITELY.  THERE COULD HAVE
19 BEEN SOME MENTION OF IT.  BUT I, YOU KNOW.
20    Q.  IS HE STILL UNDER CONTRACT WITH CORRECT
21 CRAFT?
22    A.  NO, THE RELATIONSHIP WE HAVE WITH HIM NOW
23 IS BASICALLY -- HE IS RETIRED FROM COMPETITION AND
24 HAS HIS OWN LITTLE BUSINESS.  AND I'M ASSUMING HE
25 STILL USES OUR PRODUCTS ON OCCASION.  IT WAS

Page 74

1 AVAILABLE TO HIM. WE HAVE A TERM WHEN THEY QUIT
2 THERE ARE CERTAIN THINGS THAT ARE EXTENDED TO THEM.
3 AND I'M NOT SURE WHAT HIS CONTRACT HAD IN IT.
4    Q. WOULD YOU STILL HAVE A COPY OF THE
5 CONTRACT THAT YOU HAD WITH HIM IN 1996?
6    A. I ASSUME IT'S IN THE FILES.
7    Q. YOU HAVE A FILE ON MR. LAVELLE SOMEPLACE?
8    A. I'M SURE THERE IS.
9    Q. AND THAT COULD BE LOCATED IF WE ASKED FOR
10 IT?
11    A. I'M -- JUST BECAUSE HE HAD A RELATIONSHIP
12 WITH US THERE SHOULD BE SOMETHING. WHAT, I DON'T
13 KNOW HOW MUCH.
14    Q. I UNDERSTAND THAT. I'M NOT ASKING YOU TO
15 HAVE A PHOTOGRAPHIC MEMORY OF EVERY DOCUMENT THAT'S
16 IN CORRECT CRAFT.
17    A. SURE.
18    Q. DO YOU -- YOU'RE AWARE THERE WAS THIS
19 VIDEOTAPE MADE CALLED HIT-IT VIDEO.
20    A. I AM NOW.
21    Q. WHEN DID YOU FIRST BECOME AWARE OF THAT?
22    A. SOMETIME AFTER THE PATENT APPLICATION AND
23 EVEN AFTER IT WAS AWARDED I BELIEVE I'M NOT SURE.
24 BUT I WASN'T AWARE OF THAT UNTIL THAT TIME.
25    Q. DO YOU KNOW NOW THAT MR. LAVELLE WAS ONE

Page 75

1 OF THE PERFORMERS IN THAT VIDEO?
2    A. I BELIEVE SO, YES.
3    Q. DO YOU KNOW WHETHER OR NOT THAT HIT-IT
4 VIDEO WAS FILMED PRIOR TO OR AFTER THIS FIRST TEST
5 AT CORRECT CRAFT?
6    A. NO, I WOULD NOT HAVE ANY KNOWLEDGE OF
7 THAT.
8    Q. YOU NEVER SPOKE TO MR. LAVELLE ABOUT THAT?
9    A. NO.
10    Q. DID YOU EVER SPEAK TO MR. LAVELLE
11 PERSONALLY ABOUT THIS FIRST TEST?
12    A. NO.
13 (EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION.)
14    Q. MR. MELOON, I'LL SHOW YOU WHAT THE COURT
15 REPORTER JUST MARKED AS D10 WHICH IS A DOCUMENT THAT
16 WAS PRODUCED FROM CORRECT CRAFT. AND IT'S A
17 TWO-PAGE DOCUMENT THAT LOOKS LIKE A PART OF A
18 CALENDAR. DO YOU RECOGNIZE THAT DOCUMENT? ACTUALLY
19 IT'S THREE PAGES, I'M SORRY.
20    A. NO, I DO NOT.
21    Q. SO THAT IS NOT YOUR CALENDAR?
22    A. NO.
23    Q. AND IT'S NOT YOUR HANDWRITING ON THERE?
24    A. NO. IF IT WAS MY HANDWRITING YOU COULDN'T
25 READ IT.

Page 76

1    Q. DO YOU KNOW SOMEBODY BY THE NAME OF PAUL
2 BABINEC, B-A-B-I-N-E-C?
3    A. DOESN'T RING A BELL.
4    Q. WAS HE AN EMPLOYEE OF CORRECT CRAFT?
5    A. COULD BE.
6    Q. BUT YOU DON'T RECOGNIZE THE NAME?
7    A. NO.
8    Q. DO YOU KNOW SOMEONE BY THE NAME OF PAUL
9 NICKEL, N-I-C-K-E-L?
10    A. I KNOW A NICKEL BUT I DON'T KNOW IF THAT
11 IS THE REFERENCE TO THE NICKEL THAT I KNOW.
12    Q. WAS HE -- THE NICKEL THAT YOU KNOW, WAS HE
13 A EMPLOYEE OF CORRECT CRAFT?
14    A. NO.
15    Q. WHO WAS THE NICKEL THAT YOU KNOW?
16    A. A DEALER.
17    Q. A DEALER BY THE NAME OF PAUL NICKEL?
18        MR. GILCHRIST: OBJECT TO THE FORM.
19    Q. I'M SORRY. A DEALER BY THE NAME OF
20 NICKEL. HE MAY OR MAY NOT BE PAUL NICKEL. DO YOU
21 KNOW SOMEONE BY THE NAME ROBERT METCALF?
22    A. ROBERT METCALF, YES.
23    Q. WHO IS THAT?
24    A. I BELIEVE THAT IS THE MANUFACTURER OF
25 TOWERS.

Page 77

1    Q. ANOTHER COMPANY THAT MAKES TOWERS?
2    A. YES.
3 (EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION.)
4    Q. MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
5 THE COURT REPORTER JUST MARKED AS DEFENDANT'S
6 EXHIBIT NUMBER 11. DO YOU RECOGNIZE THIS DOCUMENT?
7    A. I'VE SIGNED IT SO.
8    Q. THAT IS YOUR HANDWRITING UP ON TOP?
9    A. IF IT'S NOT LEGIBLE THAT IS MINE.
10    Q. IS THAT LARRY'S -- DOES IT SAY LARRY SEND
11 THIS TO OUR ATTORNEY?
12    A. YES.
13    Q. AND LARRY IS LARRY MEDDOCK?
14    A. YES.
15    Q. WHO IS BOB GREENWOOD?
16    A. HE IS A SALES REP.
17    Q. DO YOU RECALL RECEIVING THIS PARTICULAR
18 DOCUMENT?
19    A. YES.
20    Q. AND DID YOU HAVE ANY DISCUSSIONS WITH BOB
21 GREENWOOD ABOUT WHO HE MET AT THE TRADE SHOW THAT IS
22 REFERRED TO HERE?
23    A. WELL, AT THE SHOW THAT THEY BROUGHT A
24 TOWER IN AND HE SAW IT ON THE BOAT.
25    Q. THAT IS MASTERCRAFT?

Page 78

1    A.   YEAH.  AND OF COURSE WE HAD EVERYBODY IN
2 THE FIELD, YOU KNOW, ON ALERT.
3    Q.   AND AT THE END -- SORT OF IN THE MIDDLE OF
4 THIS PARAGRAPH HERE MR. GREENWOOD APPEARS TO WRITE.
5 HE QUICKLY SAID, QUOTE:  THE GUY THAT USED TO MAKE
6 YOURS IS NOW MAKING OURS; DO YOU SEE THAT?
7    A.   UH-HUH.  YES.
8    Q.   DO YOU HAVE ANY IDEA WHO HE WAS REFERRING
9 TO AS THE GUY?
10       MR. GILCHRIST:  OBJECT TO THE FORM.
11   A.   IF HE'S REFERRING TO WHO MADE OURS,
12 SUNSHINE WELDING WAS MAKING OUR TOWERS.
13   Q.   FURTHER ON HE SAYS I GUESS I HAD A
14 QUIZZICAL EXPRESSION AND HE SAID, QUOTE:  THIS GUY
15 GOT SCREWED BY CORRECT CRAFT AND NOW HE'S MAKING
16 OURS.  DO YOU SEE THAT?
17   A.   YEAH.
18   Q.   DO YOU KNOW -- DO YOU THINK HE WAS
19 REFERRING TO SUNSHINE WELDING THERE?
20       MR. GILCHRIST:  OBJECT TO THE FORM.
21   A.   I DON'T THINK HE WAS THERE IN THAT
22 REFERENCE, NO.
23   Q.   DO YOU KNOW WHO HE'S REFERRING TO?
24       MR. GILCHRIST:  OBJECT TO THE FORM.
25   A.   NO.  I WOULD ASSUME THAT WOULD BE THE

Page 79

1 PERSON THAT PROTOTYPED OUR TOWER.
2    Q.   MR. TODD?
3    A.   THAT IS A CORRECT ASSUMPTION, YES.
4    Q.   WAS THIS LETTER THE FIRST INKLING THAT YOU
5 GOT THAT YOU MIGHT HAVE SOME PROBLEMS WITH MR. TODD?
6       MR. GILCHRIST:  OBJECT TO THE FORM.
7    A.   THIS IS THE FIRST INKLING THAT I HAD THAT
8 HE MAY BE IN THE TOWER BUSINESS.
9    Q.   OKAY.  AND DO YOU RECALL THE DATE ON THIS
10 LETTER JANUARY 9, 1998 IS ABOUT THE TIME YOU WOULD
11 HAVE RECEIVED THIS LETTER -- THIS MEMO?
12   A.   I DATED IT TO THE 20TH.
13   Q.   JANUARY 1998?
14   A.   THAT WAS THE DATE IT WAS WRITTEN BUT I
15 DATED IT THE 20TH AS IT LEFT MY DESK.
16   Q.   THAT IS WHAT I MEAN, JANUARY 20, 1998 IS
17 WHEN YOU WOULD HAVE SIGNED IT?
18   A.   YES.
19   Q.   MARK THIS AS 12.
20 (EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION.)
21   Q.   MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
22 THE COURT REPORTER JUST MARKED AS DEFENDANT'S
23 EXHIBIT 12.  AND IT APPEARS TO BE A LETTER FROM YOUR
24 ATTORNEYS TO MR. TODD.  ON THE SECOND PAGE YOU'RE
25 INDICATED AS A COPY RECIPIENT.

Page 80

1    A.   RIGHT.
2    Q.   DO YOU RECALL RECEIVING A COPY OF THIS
3 DOCUMENT AROUND JANUARY 1998?
4    A.   SPECIFICALLY, NO, BUT I'M SURE I DID.
5    Q.   AND DOES THIS LETTER REFRESH YOUR
6 RECOLLECTION AS TO AROUND THE TIME YOU THOUGHT YOU
7 WERE GOING TO HAVE A PROBLEM WITH MR. TODD?
8       MR. GILCHRIST:  OBJECT TO THE FORM.
9    A.   IT APPEARS SO.
10   Q.   DO YOU KNOW HOW -- STRIKE THAT.
11       IN THE SECOND PARAGRAPH THE LETTER SAYS
12 WE'VE BEEN ADVISED THAT YOU'RE CLAIMING PROPRIETARY
13 RIGHTS ON CORRECT CRAFT'S WAKEBOARD TOWER DESIGN AND
14 HAVE ASSERTED SOME SORT OF PATENT CLAIM AGAINST
15 CORRECT CRAFT'S CURRENT SUPPLIER OF THE TOWER
16 SYSTEM.  DO YOU KNOW HOW CORRECT CRAFT FOUND OUT
17 ABOUT WHATEVER MR. TODD WAS CLAIMING?
18   A.   I'M ASSUMING FROM OUR COUNSEL.  IT COULD
19 HAVE BEEN FROM THE NOTICE THAT WE GOT FROM BOB
20 GREENWOOD BUT EXACTLY, NO.
21   Q.   THERE'S ALSO A STATEMENT IN THAT PARAGRAPH
22 THAT SAYS CORRECT CRAFT HAS ALSO LEARNED THAT YOU
23 HAVE TOLD OTHERS THAT CORRECT CRAFT ALLEGEDLY STOLE,
24 END QUOTE, THE IDEA FOR THE TOWER FROM YOU?
25   A.   THAT'S CORRECT.

Page 81

1    Q.   DO YOU KNOW WHO THESE PEOPLE ARE THAT
2 MR. TODD TOLD THIS TO?
3    A.   WELL, THEY WERE MEMBERS OF A SUNDAY SCHOOL
4 IN THE FIRST BAPTIST CHURCH ON JOHN YOUNG.
5    Q.   A CHURCH THAT YOU BELONG TO?
6    A.   NO.
7    Q.   A CHURCH THAT MR. TODD BELONGS TO?
8    A.   HE WAS ATTENDING AT THAT TIME, YES.
9    Q.   AND WAS HE TEACHING SUNDAY SCHOOL?
10   A.   NO.
11   Q.   BUT HE TOLD SOMEONE IN THAT CHURCH THAT
12 CORRECT CRAFT STOLE THE IDEA FROM HIM?
13   A.   I BELIEVE THAT'S WHERE WE FIRST LEARNED OF
14 IT.
15   Q.   WAS THERE SOMEONE AT CORRECT CRAFT THAT
16 BELONGS TO THAT CHURCH?
17   A.   YES.
18   Q.   WHO IS THAT?
19   A.   I BELIEVE IT WAS DON BOSTICK.
20   Q.   AND DID MR. BOSTICK HEAR THAT PERSONALLY
21 FROM MR. TODD?
22       MR. GILCHRIST:  OBJECT TO THE FORM.
23 BY MR. PESLAK:
24   Q.   IF YOU KNOW?
25   A.   I DO NOT KNOW.

Page 82

1    Q.  BUT IT WAS MR. BOSTICK THAT REPORTED IT TO
2  YOU?
3    A.  HE MADE MENTION OF IT, YES, TO THE
4  MANAGERS.
5        MR. PESLAK:  MARK THIS AS 13.
6  (EXHIBIT NUMBER 13 WAS MARKED FOR IDENTIFICATION.)
7    Q.  MR. MELOON, I SHOW YOU WHAT THE COURT
8  REPORTER JUST MARKED AS DEFENDANT'S EXHIBIT 13 AND
9  ASK YOU WHETHER YOU HAVE EVER SEEN THIS DOCUMENT
10 BEFORE?
11   A.  I DON'T RECALL THAT I DID.  I KNEW THAT
12 THERE WAS SOME EVIDENCE OF A CLAIM BY HIM BUT THAT
13 WAS IT.
14   Q.  SO YOUR RECOLLECTION IS YOU NEVER SAW THIS
15 PARTICULAR LETTER FROM MR. TODD PRIOR TO TODAY?
16   A.  I CAN'T RECALL.
17   Q.  LET'S GO BACK JUST FOR SECOND TO
18 DEFENDANT'S EXHIBIT 12.
19   A.  (WITNESS COMPLIES.)
20   Q.  THIS IS THE LETTER FROM MR. ALLEN TO
21 MR. TODD DATED JANUARY 8, 1998.  AND THIS WAS STILL
22 A COUPLE OF MONTHS PRIOR TO CORRECT CRAFT FILING
23 THEIR PATENT APPLICATION, CORRECT?
24   A.  AS TO THE EXACT TIMING -- IF YOU HAVE THE
25 INFORMATION THERE.

Page 83

1    Q.  IF WE LOOK BACK AT DEFENDANT'S EXHIBIT
2  NUMBER 5 WHICH IS THE PATENT AND I THINK YOU
3  TESTIFIED BEFORE THE FILING DATE WAS MARCH 1998?
4        MR. GILCHRIST:  OBJECT TO THE FORM.
5    A.  ACCORDING TO THE DOCUMENT.
6    Q.  ASSUMING WHAT THE PATENT OFFICE PRINTED UP
7  WAS CORRECT, MR. ALLEN'S LETTER TO MR. TODD WAS
8  SEVERAL MONTHS PRIOR TO THE FILING OF THE PATENT
9  APPLICATION?
10   A.  BASED ON THE DATES OF THE DOCUMENT.
11   Q.  AND AT LEAST AS OF JANUARY 1998 YOU AT
12 LEAST HAD SOME AWARENESS THAT MR. TODD WAS CLAIMING
13 SOME PROPRIETARY RIGHTS IN THE TOWER, CORRECT?
14   A.  ACCORDING TO THE DATES ON THESE DOCUMENTS.
15       MR. PESLAK:  NEXT NUMBER IS 14?
16 (EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION.)
17   Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
18 THE COURT REPORTER JUST MARKED AS DEFENDANT'S
19 EXHIBIT 14.  AND THIS WAS A LETTER THAT WAS PRODUCED
20 BY CORRECT CRAFT IN THIS CASE AND IT APPEARS TO BE A
21 MAY 21, 1999 LETTER TO SUNSHINE WELDING.  DO YOU
22 RECOGNIZE THIS DOCUMENT?
23   A.  YOU SAY THIS CAME FROM OUR FILES?
24   Q.  DO YOU SEE THE NUMBERS ON THE BOTTOM?
25 IT'S KIND OF A SYSTEM; LAWYERS HAVE SOME THINGS WE

Page 84

1  KEEP ORGANIZED, CC443.
2    A.  RIGHT.  YES, I WAS AWARE OF THIS LETTER.
3    Q.  SO DID YOU -- DID CORRECT CRAFT RECEIVE
4  THIS FROM SUNSHINE WELDING?
5    A.  I BELIEVE THAT IS WHERE WE GOT IT FROM,
6  YES.
7    Q.  AND AT LEAST AS OF MAY 1999 MR. TODD WAS
8  THREATENING TO SUE SUNSHINE WELDING FOR MAKING
9  TOWERS TO SELL TO CORRECT CRAFT?
10   A.  THAT'S CORRECT.
11       MR. GILCHRIST:  OBJECT TO THE FORM.
12   Q.  AND WERE YOU AWARE THAT IN MARCH OF 1998
13 THAT AS PART OF CORRECT CRAFT'S APPLICATION TO THE
14 PATENT OFFICE THAT CORRECT CRAFT FILED SOMETHING
15 CALLED A PETITION TO MAKE SPECIAL BECAUSE OF ACTUAL
16 INFRINGEMENT?
17   A.  I DON'T RECOLLECT THAT BUT.
18 (EXHIBIT NUMBER 15 WAS MARKED FOR IDENTIFICATION.)
19   Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
20 THE COURT REPORTER HAS JUST MARKED AS DEFENDANT'S
21 EXHIBIT NUMBER 15.  AND IT'S CORRECT CRAFT'S
22 RESPONSE TO OUR FIRST SETS OF INTERROGATORIES.  AND
23 YOU CAN LOOK AT THE WHOLE DOCUMENT BUT IF YOU TURN
24 TO THE LAST PAGE IT APPEARS TO BE YOUR SIGNATURE?
25   A.  YES.

Page 85

1    Q.  IF YOU COULD TURN TO PAGE 12 THERE'S AN --
2  REVIEW THAT INTERROGATORY NUMBER 9 AND THE ANSWER.
3    A.  (WITNESS COMPLIES.)
4    Q.  DOES READING THE RESPONSE AND
5  INTERROGATORIES REFRESH YOUR RECOLLECTION AS TO
6  WHETHER YOU'RE AWARE THAT CORRECT CRAFT AT LEAST
7  FILED SOMETHING CALLED PETITION TO MAKE SPECIAL
8  BECAUSE OF ACTUAL INFRINGEMENT?
9    A.  ACCORDING TO THE DOCUMENT.
10       MR. PESLAK:  MARK THIS AS 16.
11 (EXHIBIT NUMBER 16 WAS MARKED FOR IDENTIFICATION.)
12   Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
13 THE COURT REPORTER HAS MARKED AS DEFENDANT'S EXHIBIT
14 NUMBER 16.  IT'S A DOCUMENT ENTITLED PETITION TO
15 MAKE SPECIAL BECAUSE OF ACTUAL INFRINGEMENT AND IT'S
16 A DOCUMENT THAT I GOT FROM THE PATENT OFFICE.
17       MR. GILCHRIST:  THIS PORTION WOULD NOT BE
18 CONFIDENTIAL.
19 BY MR. PESLAK:
20   Q.  HAVE YOU EVER SEEN THIS DOCUMENT BEFORE?
21   A.  I COULD HAVE BUT I DON'T RECALL IT
22 SPECIFICALLY.
23   Q.  I DON'T SEE ANY REFERENCE IN THIS DOCUMENT
24 TO ROBERT TODD OR TODD'S T-TOPS.  WOULD YOU AGREE
25 WITH THAT?

Page 86

1    A.  IF IT'S NOT IN THE DOCUMENT IT'S NOT
2 THERE.
3    Q.  AND THAT WAS MY REASON FOR ASKING
4 INTERROGATORY NUMBER 9.  SO, DO YOU HAVE ANY REASON
5 TO DISAGREE THAT WHAT YOU PREVIOUSLY SIGNED AS
6 CORRECT CRAFT'S RESPONSE TO INTERROGATORY NUMBER 9
7 THAT PETITION TO MAKE SPECIAL BECAUSE OF ACTUAL
8 INFRINGEMENT WAS FILED BECAUSE OF ROBERT TODD'S
9 ACTIVITIES?
10   A.  IF THAT IS WHAT THE DOCUMENTS INDICATE.
11   Q.  NOW -- SO AT LEAST AS OF THE TIME THIS
12 DOCUMENT WAS FILED, CORRECT CRAFT WAS REPRESENTING
13 TO THE PATENT AND TRADEMARK OFFICE THAT SOMEONE WAS
14 POTENTIAL INFRINGER OF CORRECT CRAFT'S RIGHTS AND
15 THAT PERSON WAS ROBERT TODD, CORRECT?
16       MR. GILCHRIST:  OBJECT TO THE FORM.
17   A.  THAT WOULD -- I'M ASSUMING THAT IS THE
18 PURPOSE OF THE DOCUMENTATION THAT YOU HAVE.
19   Q.  OKAY.
20 (EXHIBIT NUMBER 17 WAS MARKED FOR IDENTIFICATION.)
21   Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
22 THE COURT REPORTER JUST MARKED AS DEFENDANT'S
23 EXHIBIT NUMBER 17.  AND THIS APPEARS TO BE A LETTER
24 FROM AN ATTORNEY ROBERT WALTERS TO MR. ALLEN AND
25 DATED DECEMBER 16, 1999.  AND I'LL ASK WHETHER YOU

Page 87

1 HAVE EVER SEEN THIS DOCUMENT BEFORE?
2    A.  I DO NOT RECALL SEEING THIS.
3    Q.  DO YOU HAVE ANY DISCUSSION WITH ANYONE WHO
4 IS NOT AN ATTORNEY FOR CORRECT CRAFT CONCERNING A
5 TOWER THAT MR. TODD MAY HAVE SOLD TO LIBERTY TOOL
6 AND DYE?
7    A.  I DON'T RECALL ANY SUCH CONVERSATION.
8    Q.  YOU NEVER TALKED ABOUT THAT WITH ROBERT
9 TODD?
10   A.  NOT THAT I'M AWARE OF.
11   Q.  ARE YOU FAMILIAR WITH LIBERTY TOOL AND DYE
12 AT ALL?
13   A.  I AM NOW.
14   Q.  APART FROM WHAT YOU LEARNED IN THIS CASE,
15 DID YOU EVER HAVE ANY -- DID CORRECT CRAFT HAVE ANY
16 BUSINESS DEALINGS WITH LIBERTY TOOL AND DYE?
17   A.  I'M NOT AWARE OF IT, NO.
18   Q.  DID YOU EVER MEET SOMEBODY BY THE NAME OF
19 MIKE GAGLIANO?
20   A.  I DON'T BELIEVE SO, NO.
21   Q.  NEVER SPOKE TO HIM ON THE PHONE, MIKE
22 GAGLIANO?
23   A.  I DON'T RECALL THAT I HAVE.
24   Q.  SO YOUR KNOWLEDGE OF LIBERTY TOOL AND DYE
25 IS WHATEVER HAPPENED IN THIS CASE; IS THAT CORRECT?

Page 88

1    A.  YES.
2       MR. PESLAK:  NUMBER?
3 (EXHIBIT NUMBER 18 WAS MARKED FOR IDENTIFICATION.)
4    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
5 THE COURT REPORTER JUST MARKED AS DEFENDANT'S
6 EXHIBIT 18.
7       MR. GILCHRIST:  BACK ON THE CONFIDENTIAL
8    RECORD.
9    Q.  AND WE'RE GOING TO ASK YOU WHETHER YOU
10 HAVE EVER SEEN THIS DOCUMENT BEFORE?
11   A.  I BELIEVE I HAVE SEEN THIS ONE BEFORE.
12   Q.  AND IT'S A DOCUMENT FROM MR. TODD'S
13 ATTORNEY TO MR. ALLEN, CORRECT?
14   A.  YES.
15   Q.  AND IT'S DATED FEBRUARY 9, 2000.  DO YOU
16 RECALL SEEING IT AROUND THAT TIME IN FEBRUARY OF
17 2000?
18   A.  SOMEWHERE AROUND THAT TIME FRAME.
19       MR. GILCHRIST:  COUNSEL, I HAVE TWO
20    LETTERS ATTACHED TO MY EXHIBIT.
21   Q.  I'M SORRY.  MUST HAVE BEEN A STAPLING
22 ERROR IN MY OFFICE.  I APOLOGIZE.  I'M REFERRING TO
23 THE FIRST TWO PAGES OF EXHIBIT 18, THE FEBRUARY 9
24 LETTER.  AT THIS POINT IN TIME FEBRUARY OF 2000 HAD
25 NEGOTIATIONS ALREADY STARTED WITH MR. TODD?

Page 89

1    A.  I -- IN THE FORM OF CONVERSATION AND
2 CORRESPONDENCE IT APPEARS.
3    Q.  AT THE BOTTOM OF THE FIRST PAGE OF THE
4 FEBRUARY 9 LETTER IT SAYS OUR DISCUSSIONS WITH OTHER
5 MANUFACTURERS CONTEMPLATE A SIMPLE CASH TRANSACTION.
6 DO YOU SEE THAT?
7    Q.  ON THE FIRST PAGE?
8    Q.  AT THE BOTTOM.
9    A.  LAST PARAGRAPH, YEAH.
10   Q.  DO YOU KNOW WHAT OTHER MANUFACTURERS
11 MR. TODD WAS TALKING TO AROUND THAT TIME?
12       MR. GILCHRIST:  I WANT YOU TO EXCLUDE FROM
13    YOUR ANSWER ANYTHING YOU LEARNED FROM YOUR
14    ATTORNEYS.
15   A.  I HAVE NO IDEA.
16   Q.  WERE YOU HAVING ANY DIRECT CONVERSATIONS
17 YOURSELF WITH MR. TODD AROUND THIS TIME?
18   A.  (WITNESS SHAKES HEAD.)
19   Q.  EVERYTHING WAS BETWEEN THE ATTORNEYS?
20   A.  THAT IS RIGHT.
21   Q.  EVENTUALLY THE RESULT OF THOSE DISCUSSIONS
22 WAS THAT YOU ENTERED INTO AN AGREEMENT WITH
23 MR. TODD, CORRECT?
24   A.  WE ENTERED INTO AN AGREEMENT WITH
25 MR. TODD, YES.

Page 90

1   Q.  AND AS A RESULT OF THAT CORRECT CRAFT WAS
2 ASSIGNED OWNERSHIP IN MR. TODD'S PATENT, CORRECT?
3   A.  I BELIEVE THAT WAS THE RESULTS OF IT, YES.
4   Q.  AND MR. TODD WAS THEN NAMED AS A
5 CO-INVENTOR ON CORRECT CRAFT'S PATENT, CORRECT?
6   A.  I BELIEVE THAT IS IN THE RECORDS, YES.
7   Q.  AND MR. SNOOK AND MR. LARSON WERE NAMED AS
8 CO-INVENTORS ON MR. TODD'S PATENT?
9   A.  SAME ANSWER, YES.
10   Q.  HOW DID MR. TODD GO FROM BEING AN
11 INFRINGER TO AN INVENTOR?
12       MR. GILCHRIST:  OBJECT TO THE FORM.
13   A.  I'M ASSUMING THAT WOULD BE A LEGAL
14 PROCESS.
15   Q.  YOU THINK -- APART FROM THE LEGALITIES,
16 YOU THINK THERE'S SOMETHING WRONG WITH THAT?
17       MR. GILCHRIST:  OBJECT TO THE FORM.
18   A.  I DON'T HAVE AN OPINION ON THAT ONE WAY OR
19 THE OTHER FRANKLY.
20   Q.  YOU SAID YOU ENDED UP ALSO PAYING A SUM OF
21 MONEY TO MR. TODD, CORRECT?
22   A.  I BELIEVE THAT THE RECORDS INDICATE THAT.
23   Q.  SOMETHING $125,000 OVER A TWO YEAR PERIOD
24 I THINK?
25   A.  IF THAT IS WHAT THE RECORDS SAY, YES.

Page 91

1   Q.  WE'LL GO TO THE DOCUMENTS IN A SECOND BUT
2 IT WAS SOMETHING LIKE THAT.  SO, THE ONLY BUSINESS
3 MR. TODD HAD EVER DONE WITH YOU WAS YOU HIRED HIM TO
4 FABRICATE ONE TOWER, RIGHT?
5   A.  WE HIRED HIM TO BUILD US ONE TOWER WHICH
6 WE PAID HIM FOR.
7   Q.  ABSOLUTELY.  AND EVENTUALLY YOU AGREED TO
8 PAY HIM $100,000 PLUS PART OF THE ROYALTIES?
9 WHATEVER THE DOCUMENTS SHOW?
10   A.  IF THAT'S WHAT THE DOCUMENTS SHOW, YES.
11   Q.  DO YOU THINK THERE IS SOMETHING WRONG WITH
12 THAT?
13       MR. GILCHRIST:  OBJECT TO THE FORM.
14   A.  FRANKLY I DON'T HAVE A PERSONAL OPINION ON
15 THAT WHETHER IT WAS RIGHT OR WRONG OR NOT.  THAT WAS
16 THE AGREEMENT THAT WAS COME UP WITH.
17   Q.  WAS THERE EVER A FORMAL LAWSUIT FILED
18 EITHER BY MR. TODD AGAINST CORRECT CRAFT OR BY
19 CORRECT CRAFT AGAINST MR. TODD?
20   A.  I REALLY DON'T RECALL IF WE DID OR DIDN'T.
21 (EXHIBIT NUMBER 19 WAS MARKED FOR IDENTIFICATION.)
22   Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
23 THE COURT REPORTER HAS JUST MARKED AS DEFENDANT'S
24 EXHIBIT NUMBER 19.  AND I'M GOING TO ASK WHETHER YOU
25 RECOGNIZE THIS DOCUMENT?

Page 92

1   A.  YES.
2   Q.  AND IS THIS THE AGREEMENT THAT WAS REACHED
3 BETWEEN CORRECT CRAFT AND ROBERT TODD?
4   A.  ACCORDING TO MY SIGNATURE.
5   Q.  THAT IS YOUR SIGNATURE ON THE THIRD PAGE?
6   A.  YES.
7   Q.  AND TO THE BEST OF YOUR UNDERSTANDING THAT
8 IS ROBERT TODD'S SIGNATURE?
9   A.  THAT IS HIS SIGNATURE.
10   Q.  DID HE SIGN THAT IN FRONT OF YOU?
11   A.  I BELIEVE WE SIGNED THAT THE SAME DATE.
12   Q.  DID YOU HAVE A MEETING WITH MR. TODD
13 AROUND THAT TIME?
14   A.  NO, I THINK WHEN WE LEFT HERE WE HAD AN
15 AGREEMENT AND WE SO NOTED IT AND THIS WAS I THINK
16 WAS SIGNED IN TWO DIFFERENT PLACES.  BUT THAT IS HIS
17 SIGNATURE.  I RECOGNIZE IT.
18   Q.  WHEN YOU SAID YOU LEFT HERE YOU MEAN
19 MR. ALLEN'S OFFICE?
20   A.  YES.
21   Q.  WHERE YOU HAD A MEETING, CAME TO AN
22 AGREEMENT, ATTORNEYS WERE ALL HERE AND YOU HAD AN
23 AGREEMENT AND IT WAS DRAFTED UP AND EVERYBODY SIGNED
24 IT LATER ON?
25   A.  RIGHT.

Page 93

1   Q.  DID YOU HAVE ANY DIRECT DISCUSSIONS WITH
2 MR. TODD THAT DAY?
3   A.  THROUGH THE MEDIATOR.
4   Q.  THERE WAS A MEDIATOR?
5   A.  UH-HUH.
6   Q.  WHO WAS THE MEDIATOR?
7   A.  I DON'T RECALL HIS NAME.
8   Q.  WAS THAT ANOTHER ATTORNEY?
9   A.  I'M NOT SURE IF HE WAS AN ATTORNEY OR NOT.
10   Q.  DID -- HOW WAS THE MEDIATOR SELECTED?
11   A.  COUNSEL RECOMMENDED HIM BASED ON HIS
12 REPUTATION.
13   Q.  WERE THERE ANY WRITTEN SUBMISSIONS MADE TO
14 THE MEDIATOR PRIOR TO THAT MEDIATION?
15       MR. GILCHRIST:  EXCLUDE FROM THAT ANYTHING
16   THAT YOU LEARNED FROM YOUR ATTORNEYS.
17   A.  I HAVE NO IDEA.
18       MR. PESLAK:  COUNSEL, I'M GOING TO REQUEST
19   IF THERE WERE ANY DOCUMENTS PROVIDED TO THE
20   MEDIATOR BY CORRECT CRAFT OR MR. TODD THAT THEY
21   BE PRODUCED AND ANY DOCUMENT RELATED TO THIS
22   MEDIATION THAT OCCURRED BETWEEN CORRECT CRAFT
23   AND MR. TODD.
24       MR. ALLEN:  THAT IS NOT DISCOVERABLE.
25       MR. GILCHRIST:  THERE'S A MEDIATION

Page 94

1  PRIVILEGE IN THIS STATE.
2      MR. PESLAK:  ALL RIGHT.  DID -- WAS THERE
3  ANY STATEMENTS TAKEN THAT DAY BY THE MEDIATOR
4  OR MEDIATOR?
5      MR. GILCHRIST:  AGAIN, WE'RE GETTING INTO
6  AN AREA -- THERE'S A MEDIATION PRIVILEGE IN
7  THIS STATE THAT THINGS THAT OCCUR WITHIN THE
8  MEDIATION ARE ABSOLUTELY PRIVILEGED.
9  BY MR. PESLAK:
10  Q.  DID YOU GIVE A STATEMENT THAT DAY UNDER
11 OATH?
12      MR. GILCHRIST:  YOU CAN ANSWER THAT.
13  A.  I DON'T RECALL WHETHER WE DID OR NOT.  BUT
14 IF IT WAS REQUIRED I DID.  I DON'T REMEMBER WHETHER
15 IT WAS REQUIRED OR NOT AT THAT TIME.
16  Q.  THERE WAS A COURT REPORTER THERE THAT DAY?
17  A.  I DON'T RECALL WE HAD A COURT REPORTER.
18  Q.  HOW LONG DID THE MEDIATION LAST?
19  A.  SEVERAL HOURS.
20  Q.  AND SO DEFENDANT'S EXHIBIT NUMBER 19 IN
21 ANY EVENT WAS THE RESULT OF THAT MEDIATION?
22  A.  ACCORDING TO THIS DOCUMENT I BELIEVE THAT
23 IS CORRECT.
24  Q.  AND IN FACT CORRECT CRAFT HAS PAID THE
25 MONEY THEY OWE TO ROBERT TODD UNDER PARAGRAPH 1?

Page 95

1  A.  ACCORDING TO WHATEVER THE AGREEMENT WAS.
2 YES, SIR.
3  Q.  AND YOU STILL PAY HIM CONTINUING
4 ROYALTIES, FIVE PERCENT FOR THE NET COLLECTION?
5  A.  BASED ON WHATEVER THIS DOCUMENT SAYS, YES,
6 WE'RE FOLLOWING THAT.
7      MR. PESLAK:  MARK THIS AS 20.
8  (EXHIBIT NUMBER 20 WAS MARKED FOR IDENTIFICATION.)
9  Q.  MR. MELOON, I SHOW YOU WHAT'S BEEN MARKED
10 AS EXHIBIT 20, DO YOU RECOGNIZE THAT DOCUMENT?
11  A.  I BELIEVE I'VE SEEN THIS, YES.
12  Q.  IF YOU LOOK AT PARAGRAPH 3 IT SAYS
13 MR. TODD ACKNOWLEDGES UNDER OATH THAT ONLY TWO
14 COPIES OF THE EXPERIMENTAL PROTOTYPE, OPEN PAREN, OR
15 SIMILAR STRUCTURE INCORPORATING THE TOWER CONCEPT,
16 CLOSE PAREN, WAS BUILT BY HIM PRIOR TO MARCH 9,
17 1997; DO YOU SEE THAT?
18  A.  YES.
19  Q.  I KNOW YOU TESTIFIED THAT CORRECT CRAFT
20 HIRED MR. TODD TO BUILD ONE TOWER AND CORRECT CRAFT
21 PAID FOR THAT.  DO YOU KNOW WHAT'S REFERRED TO HERE
22 AT WHAT'S APPARENTLY THE SECOND TOWER?
23  A.  I HAVE KNOWLEDGE OF THAT NOW AFTER THIS.
24  Q.  DID YOU KNOW ABOUT IT THEN WHEN YOU
25 ENTERED INTO THIS AGREEMENT WITH ROBERT TODD?

Page 96

1      MR. GILCHRIST:  WHICH AGREEMENT?
2  Q.  EXHIBIT 19?
3  A.  IF THAT WAS -- DEPENDING ON THE DATES OF
4 THE INFORMATION THAT WAS PASSED TO US ABOUT ANY
5 OTHER TOWERS.  AND I'M NOT SURE WHAT THOSE DATES
6 WERE.  WHETHER I WAS AWARE OF IT PRIOR TO THIS OR AT
7 THIS TIME, FRANKLY I DON'T RECALL THE DATES.
8  Q.  BUT IN ANY EVENT, THE SECOND TOWER IS A
9 LIBERTY TOOL AND DYE TOWER?
10      MR. GILCHRIST:  OBJECT TO THE FORM.
11  A.  AS I UNDERSTAND THAT'S CORRECT.
12  Q.  THIS IS 21?
13  (EXHIBIT NUMBER 21 WAS MARKED FOR IDENTIFICATION.)
14  Q.  MR. MELOON, I SHOW YOU WHAT THE COURT
15 REPORTER MARKED AS EXHIBIT 21.  IT'S A DOCUMENT BY
16 CORRECT CRAFT APPEARS TO BE THE PHOTOGRAPH OF THE
17 BACK END OF A BOAT.  DO YOU KNOW WHAT THIS IS?
18  A.  IT'S THE BACK END OF A BOAT.
19  Q.  DO YOU KNOW WHOSE BACK END IT IS?
20  A.  I CAN'T IDENTIFY IT FROM THIS.  AND IT
21 BEING AN OUTBOARD I DON'T HAVE ANY IDEA.
22  Q.  I'LL STOP BEING FACETIOUS NOW AND ASK YOU
23 THE REAL LAWYER QUESTIONS HERE.  HAVE YOU EVER SEEN
24 THIS DOCUMENT BEFORE?
25  A.  I DON'T RECALL SEEING THIS ONE.  IT WELL

Page 97

1 COULD HAVE BEEN IF IT WAS ATTACHED TO SOME OTHER
2 DOCUMENTS.  BUT NOT THIS ONE AS AN INDIVIDUAL PIECE.
3  Q.  HAVE YOU EVER SEEN -- DO YOU RECOGNIZE
4 THIS BOAT; COULD YOU IDENTIFY WHOSE IT IS?
5  A.  NO, I COULDN'T IDENTIFY WHOSE BOAT THAT
6 IS.
7  Q.  OKAY.  FAIR ENOUGH.  I MAY HAVE ASKED YOU
8 THIS MORNING EARLIER HOW MANY OFFERS TO LICENSE THAT
9 CORRECT CRAFT SENT OUT IN THE TIME FRAME NOVEMBER,
10 DECEMBER 1999.  HAS CORRECT CRAFT MADE OTHER OFFERS
11 TO LICENSE ITS WAKEBOARDING PATENT SUBSEQUENT TO
12 DECEMBER 1999?
13  A.  I'M SURE WE HAVE.
14  Q.  AND WERE THOSE OFFERS MADE AFTER DECEMBER
15 1999, WERE THEY REVISED OFFERS TO THE SAME PEOPLE
16 YOU HAD MADE OFFERS TO IN NOVEMBER, DECEMBER 1999 OR
17 WERE THERE OFFERS MADE TO DIFFERENT COMPANIES
18 AFTERWARDS?
19  A.  I COULDN'T RECALL.  I ASSUME THEY WERE
20 DIFFERENT COMPANIES.
21  Q.  DO YOU HAVE SOME APPROXIMATE RECOLLECTION
22 AS TO HOW MANY COMPANIES TOTAL CORRECT CRAFT HAS
23 OFFERED A LICENSE TO UNDER THE 350 PATENT?
24  A.  IT WOULD BE A GUESS.
25  Q.  WHAT'S YOUR BEST GUESS?

Page 98

1    A.  AN APPROXIMATE.  MAYBE ALL TOTAL TO DATE
2  20, 25.
3    Q.  THAT INCLUDES ALL THE TOWER COMPANIES ALL
4  THE BOAT COMPANIES?
5    A.  I WOULD ASSUME, YES.
6    Q.  AND HOW MANY PEOPLE HAVE ACTUALLY SIGNED
7  LICENSES?
8    A.  I DON'T HAVE THAT EXACT NUMBER.
9    Q.  ARE YOU STILL IN ACTIVE NEGOTIATIONS WITH
10  ANY COMPANY FOR A LICENSE?
11    A.  I BELIEVE WE ARE.
12    Q.  WHO ARE YOU TALKING TO RIGHT NOW?
13    A.  I'M NOT SURE AS TO THE NAMES.  BECAUSE I'M
14  JUST KEPT INFORMED AS COUNSEL IS CONTACTED BY THEM
15  OR CONTACTS THEM AND THEY GIVE ME COPIES.
16    Q.  SO, MR. ALLEN'S OFFICE IS KIND OF CARRYING
17  THE BALL ON THAT RIGHT NOW?
18    A.  YES.
19  (EXHIBIT NUMBER 22 WAS MARKED FOR IDENTIFICATION.)
20    Q.  WHAT YOU HAVE IN FRONT OF YOU IS WHAT THE
21  COURT REPORTER JUST MARKED AS DEFENDANT'S EXHIBIT
22  22.  DO YOU RECOGNIZE THAT DOCUMENT?
23    A.  YES.
24    Q.  AND CAN YOU IDENTIFY IT FOR ME PLEASE?
25    A.  IT'S A LICENSE WITH METCALF ENTERPRISE

Page 99

1    Q.  AND IS METCALF A TOWER COMPANY OR BOAT
2  COMPANY?
3    A.  THEY'RE A TOWER COMPANY.
4    Q.  AND THAT IS YOUR SIGNATURE ON PAGE 3?
5    A.  YES, IT IS.
6  (EXHIBIT NUMBER 23 WAS MARKED FOR IDENTIFICATION.)
7    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
8  THE COURT REPORTER JUST MARKED AS DEFENDANT'S
9  EXHIBIT 23; DO YOU RECOGNIZE THAT DOCUMENT?
10    A.  YES.
11    Q.  AND WHAT IS IT, DEFENDANT'S EXHIBIT 23?
12    A.  IT'S A LICENSE.
13    Q.  AND THIS PARTICULAR DOCUMENT ISN'T SIGNED
14  BY YOU ON PAGE THREE BUT I ASSUME AT ONE POINT YOU
15  SIGNED THIS LICENSE?
16    A.  I DON'T THINK I'VE SIGNED THE LICENSE.
17    Q.  OKAY.  THIS COMPANY IS CALLED --
18    A.  TO DATE I'M NOT SURE WHETHER WE HAVE OR
19  NOT.
20    Q.  -- THIS COMPANY IS BOSS ACCESSORIES?
21    A.  RIGHT.
22    Q.  AND IS THERE SOME REASON WHY YOU HAVEN'T
23  SIGNED THE LICENSE WITH THEM?
24    A.  I BELIEVE BECAUSE WE HAVEN'T COME TO AN
25  AGREEMENT YET.

Page 100

1    Q.  IS THIS A DOCUMENT THAT WAS PRESENTED TO
2  BOSS ACCESSORIES AS A PROPOSED LICENSE AND THEY
3  SIGNED AND SENT IT BACK TO YOU?
4    A.  I ASSUME IT IS, YES.
5    Q.  OKAY.  BUT AS FAR AS YOU'RE CONCERNED YOU
6  NEVER HAD AN AGREEMENT WITH BOSS ACCESSORIES?
7    A.  I DON'T THINK I'VE SIGNED ONE YET.
8    Q.  IS THERE SOME PARTICULAR REASON WHY YOU
9  HAVEN'T REACHED AN AGREEMENT WITH BOSS ACCESSORIES?
10    A.  OBVIOUSLY WE HAVEN'T COME TO TERMS.
11    Q.  IF THEY SIGNED YOUR PROPOSED LICENSE, WHY
12  HAVEN'T YOU COME TO TERMS?
13    A.  I THINK THERE WERE SOME CHANGES OR
14  DIFFERENCES.  IF I HAVEN'T SIGNED IT THAT IS THE
15  REASON THEY MAY HAVE MADE SOME CHANGES.
16    Q.  THEY MAY HAVE MADE SOME CHANGES.  IF YOU
17  LOOK ON THE FIRST PAGE THEY SEEM TO HAVE CHANGED THE
18  DATE FROM JULY 1, 2000 TO DECEMBER 11, 2001?
19    A.  THAT'S CORRECT.
20    Q.  IS THAT AN ISSUE WITH YOU -- CORRECT CRAFT
21  I MEAN?
22    A.  I BELIEVE SO AT THIS TIME.
23    Q.  SO IS THE ISSUE THAT THEY JUST WANT A
24  LICENSE GOING FORWARD AND DON'T WANT TO PAY BACK
25  ROYALTIES?

Page 101

1    A.  THAT APPEARS THAT THAT IS WHAT THIS IS.
2    Q.  AND YOU HAVEN'T COLLECTED ANY ROYALTIES
3  FROM THEM?
4    A.  I DON'T BELIEVE THAT WE HAVE.
5    Q.  SO WOULD YOU HAVE RECEIVED THIS DOCUMENT
6  FROM BOSS ACCESSORIES BACK IN DECEMBER OF 2001?
7    A.  I BELIEVE THAT COUNSEL DID.
8    Q.  MR. ALLEN WOULD HAVE RECEIVED IT?
9    A.  AND THEY GAVE ME A COPY OF IT.
10      MR. PESLAK:  OKAY.  MARK THIS AS 24.
11  (EXHIBIT NUMBER 24 WAS MARKED FOR IDENTIFICATION.)
12    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
13  THE COURT REPORTER JUST MARKED AS DEFENDANT'S
14  EXHIBIT 24 AND DO YOU RECOGNIZE THIS DOCUMENT?
15    A.  I BELIEVE I'VE SEEN THIS.
16    Q.  OKAY.  AND LOOK ON THE THIRD PAGE, AGAIN,
17  THIS IS THE DOCUMENT NOT SIGNED BY YOU?
18    A.  CORRECT.
19    Q.  IS THERE A VERSION OF THE -- THE COMPANY
20  HERE WOULD BE -- THE LICENSEE IS AIR BOOM, INC.,
21  CORRECT?
22    A.  CORRECT.
23    Q.  AND IS THERE A VERSION OF THE LICENSE WITH
24  AIR BOOM SIGNED BY YOU?
25    A.  I DON'T BELIEVE THERE IS.

Page 102

1    Q.  SO THE SITUATION WITH AIR BOOM IS THE SAME
2  AS IT IS WITH BOSS ACCESSORIES?
3    A.  I DON'T KNOW THAT THE ISSUES ARE EXACTLY
4  THE SAME.
5    Q.  I'M SORRY.  LET ME CORRECT THAT.  WHAT I
6  WAS REFERRING TO WAS THERE'S STILL SOME OUTSTANDING
7  ISSUES IN CORRECT CRAFT'S MIND WITH THE LICENSE WITH
8  AIR BOOM?
9    A.  THERE'S STILL SOME CONVERSATIONS WE'VE
10  HAD, YES.
11    Q.  AND, AGAIN, THE DOCUMENT THAT WE MARKED AS
12  DEFENDANT'S EXHIBIT 24 WHICH IS SIGNED BY AIR BOOM
13  IS A DOCUMENT THAT WAS SENT BACK TO CORRECT CRAFT
14  SIGNED BY AIR BOOM BUT CORRECT CRAFT STILL HASN'T
15  AGREED TO LICENSE THEM?
16    A.  I BELIEVE THAT'S CORRECT.
17    Q.  OKAY.  AND IS THE ISSUE WITH -- IS THERE
18  ALSO AN ISSUE WITH AIR BOOM THAT AIR BOOM DOESN'T
19  WANT TO PAY FOR BACK ROYALTIES; THEY JUST WANT A
20  LICENSE GOING FORWARD?
21    A.  BASED ON THE DATE THAT WOULD BE A GOOD
22  ASSUMPTION I BELIEVE.
23    Q.  AND WE CAN ALSO ASSUME THAT AIR BOOM
24  HASN'T PAID YOU ROYALTIES YET?
25    A.  I DON'T THINK SO.

Page 103

1  (EXHIBIT NUMBER 25 WAS MARKED FOR IDENTIFICATION.)
2    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
3  THE COURT REPORTER JUST MARKED AS DEFENDANT'S
4  EXHIBIT 25.  AND I'LL ASK WHETHER YOU RECOGNIZE THAT
5  DOCUMENT?
6    A.  YES.
7    Q.  AND IT'S A LICENSE BETWEEN CORRECT CRAFT
8  AND ROBERT TODD?
9    A.  YES.
10    Q.  AND THIS ONE IS SIGNED BY BOTH YOURSELF
11  AND MR. TODD, CORRECT?
12    A.  THAT'S CORRECT.
13    Q.  HAS MR. TODD EVER PAID ANY ROYALTIES TO
14  CORRECT CRAFT UNDER THIS LICENSE?
15    A.  I BELIEVE HE HAS.
16    Q.  CURRENTLY HE'S OUT OF THE TOWER
17  MANUFACTURING BUSINESS, ISN'T HE?
18    A.  YES.
19    Q.  HE OWNS A FARM OR SOMETHING IN TENNESSEE?
20    A.  I BELIEVE HE DOES.
21  (EXHIBIT NUMBER 26 WAS MARKED FOR IDENTIFICATION.)
22    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
23  THE COURT REPORTER JUST MARKED AS DEFENDANT'S
24  EXHIBIT 26.  DO YOU RECOGNIZE THAT DOCUMENT?
25    A.  YES.

Page 104

1    Q.  AND THAT REPRESENTS YOUR LICENSE AGREEMENT
2  WITH MASTERCRAFT?
3    A.  I BELIEVE THIS IS A COPY OF THAT DOCUMENT.
4  THOUGH I'VE NOT -- THIS IS NOT A SIGNED COPY BY ME
5  OR MASTERCRAFT.
6    Q.  OKAY.  I JUST WANT TO ASK YOU A QUESTION
7  ABOUT A COUPLE OF PROVISIONS.  THESE ARE DOCUMENTS I
8  HAVE -- IT WASN'T A SIGNED COPY THAT MAY OR MAY
9  NOT -- MY LOCAL COUNSEL CAME AND LOOKED AT THESE
10  DOCUMENTS AND MARKED THEM IN MR. ALLEN'S OFFICE.
11  MAYBE HE JUST MISSED THE COPY.  THERE'S A PROVISION
12  IN AT LEAST THIS UNSIGNED COPY OF THE MASTERCRAFT
13  LICENSE ON PAGE 11; INFRINGEMENT BY THIRD PARTY BOAT
14  MANUFACTURERS.  DO YOU SEE THIS PROVISION?
15    A.  YES.
16    Q.  HAS CORRECT -- EXCUSE ME.  HAS MASTERCRAFT
17  PROVIDED CORRECT CRAFT WITH ANY NOTICE UNDER THIS
18  PROVISION THAT IT BELIEVES THIRD PARTY BOAT
19  MANUFACTURER IS INFRINGING IN CORRECT CRAFT'S
20  PATENT?
21    A.  NOT THAT I AM AWARE OF.
22    Q.  AND NOW THE LAST PROVISION IN THE LICENSE
23  IS PARAGRAPH 17 A RELEASE?
24    A.  IT APPEARS, YES.
25    Q.  AND IS IT YOUR RECOLLECTION THAT

Page 105

1  MASTERCRAFT PAID THE $32,500 AT OR ABOUT THE TIME
2  THEY SIGNED THE LICENSE?
3    A.  THAT IS MATTER OF RECORD, YES.
4    MR. GILCHRIST:  COUNSEL, FOR YOUR BENEFIT
5  I'VE GOT MADE A COPY OF THE AIR BOOM EXECUTED
6  LICENSE AGREEMENT.
7    MR. PESLAK:  OKAY.
8    MR. ALLEN:  IT'S STAMPED CONFIDENTIAL.
9    MR. PESLAK:  WE'LL KEEP IT CONFIDENTIAL.
10  WE CAN BREAK FOR A COUPLE MINUTES.
11    (A BREAK WAS TAKEN.)
12    MR. PESLAK:  OKAY.  BACK ON THE RECORD.
13    MR. GILCHRIST:  HERE'S A COPY.
14    MR. PESLAK:  OKAY.  MARK THIS AS 27.
15  (EXHIBIT NUMBER 27 WAS MARKED FOR IDENTIFICATION.)
16    Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
17  THE COURT REPORTER JUST MARKED AS EXHIBIT 27.  AND
18  IS EXHIBIT 27 A SIGNED COPY OF THE LICENSE WITH AIR
19  BOOM?
20    A.  IT APPEARS, YES, ACCORDING TO THE
21  DOCUMENT.
22    Q.  SO WHATEVER ISSUES CORRECT CRAFT HAD WITH
23  AIR BOOM HAVE NOW APPARENTLY BEEN RESOLVED?
24    A.  ACCORDING TO THIS I WOULD SAY SO.
25    MR. PESLAK:  MARK THIS EXHIBIT 28.

Page 106

1 (EXHIBIT NUMBER 28 WAS MARKED FOR IDENTIFICATION.)
2   Q.  MR. MELOON, YOU HAVE IN FRONT OF YOU WHAT
3 THE COURT REPORTER JUST MARKED AS EXHIBIT 28.  THAT
4 IS A LETTER I RECEIVED FROM YOUR COUNSEL LAST WEEK
5 AND SET FORTH SOME ROYALTY INFORMATION IN THE SECOND
6 PARAGRAPH; DO YOU SEE THAT?
7   A.  YES.
8   Q.  DID YOU PROVIDE THAT INFORMATION TO YOUR
9 ATTORNEY?
10   A.  I'M SURE OUR ACCOUNTING DEPARTMENT DID.
11   Q.  AND TO THE BEST OF YOUR KNOWLEDGE THIS IS
12 THE TOTAL OF THE MONIES THAT CORRECT CRAFT HAS
13 RECEIVED TO DATE FROM VARIOUS LICENSEES ON THE 350
14 PATENT?
15   A.  ACCORDING TO THIS DOCUMENT.
16   Q.  DOES THE MASTERCRAFT TOTAL OF $99,000
17 INCLUDE THE $32,500 THAT WAS PAID UNDER THE RELEASE
18 OF THE MASTERCRAFT LICENSE?
19   A.  I BELIEVE IT DOES.
20   Q.  HAS -- I KNOW RECENTLY THERE WAS A
21 JUDGMENT ENTERED AGAINST WAKE DESIGNS IN THIS CASE.
22 DO YOU KNOW WHETHER WAKE DESIGNS HAS PAID ANY MONEY
23 TO CORRECT CRAFT?
24   A.  I'M NOT AWARE THAT IT HAS.
25   Q.  NOW I THINK YOU ALSO TESTIFIED TWO MINUTES

Page 107

1 BEFORE THE BREAK THAT YOU THOUGHT THAT MR. TODD HAD
2 PAID SOME ROYALTIES TO CORRECT CRAFT.  IS -- WERE
3 THOSE ROYALTIES JUST GIVEN AS A CREDIT?
4   A.  NO, IF THEY WERE ACTUAL ROYALTIES IT WOULD
5 BE INCLUDED IN THIS ACCOUNTING I'M SURE.
6   Q.  SO IT WOULD HAVE BEEN INCLUDED HERE, SO
7 MOST LIKELY HE HAS NOT PAID ANY?
8   A.  ACCORDING TO THE DOCUMENT HERE, NO.
9     MR. GILCHRIST:  LET ME STEP IN.  AS I LOOK
10   AT THE ROYALTY INCOME LEDGER REPORT IT LOOKS
11   LIKE HE HAS PAID.
12   A.  OH, OKAY.  I WONDER WHY THAT WASN'T
13 INCLUDED.
14     MR. GILCHRIST:  THE TOTAL IS FIVE HUNDRED
15   DOLLARS IT LOOKS LIKE.
16   A.  UH-HUH.
17     MR. PESLAK:  CAN WE MARK THAT COUNSEL?
18     MR. GILCHRIST:  IT HAS OTHER INFORMATION
19   ON IT.  IF I CAN REDACT IT.  IT HAS CREDIT CARD
20   INFORMATION AND INCOME, ROYALTY INCOME; IT'S
21   NOT RELATED TO THE TOWER.  IF YOU'LL PERMIT ME
22   TO REDACT THAT, WE CAN MARK IT.
23     MR. PESLAK:  SURE.
24 BY MR. PESLAK:
25   Q.  LET ME ASK ANOTHER QUESTION BEFORE YOU DO

Page 108

1 THAT.  JUST SO THE RECORD IS CLEAR, DOES THE
2 DOCUMENT THAT YOUR COUNSEL SHOWED YOU REFLECT THAT
3 MR. TODD HAS INDEED PAID FIVE HUNDRED DOLLARS IN
4 ROYALTIES UNDER HIS LICENSE AGREEMENT WITH CORRECT
5 CRAFT?
6   A.  ACCORDING TO THE DOCUMENT.
7   Q.  DOES THAT DOCUMENT REFLECT THAT ANY OTHER
8 COMPANY OTHER THAN MR. TODD'S COMPANY AND THE FIVE
9 COMPANIES THAT ARE SHOWN ON EXHIBIT 28 HAVE PAID ANY
10 ROYALTIES?
11   A.  THERE'S ONE HERE THAT I DON'T RECOGNIZE.
12   Q.  AND WHAT COMPANY IS THAT?
13     MR. GILCHRIST:  THAT HAS NOTHING TO DO
14   WITH THE TOWER ROYALTY, CORRECT?
15   A.  IT DOESN'T APPEAR TO.  I'M NOT SURE.
16   Q.  MY QUESTION WAS WHETHER THAT DOCUMENT
17 REFLECTED ANY OTHER COMPANIES WHO HAVE PAID
18 ROYALTIES UNDER THE 305 PATENT TO CORRECT CRAFT?
19   A.  THERE'S ONE HERE THAT I DON'T RECOGNIZE.
20 OKAY.  YEAH, ACCORDING TO THAT IT'S NOT.
21   Q.  BACK WHEN THE RE-ISSUE PROCEEDING WAS
22 GOING ON AT THE PATENT OFFICE, MR. MEDDOCK SUBMITTED
23 A DECLARATION AND IN HIS DECLARATION HE STATED THAT
24 CORRECT CRAFT WAS ALSO IN LICENSING DISCUSSION WITH
25 REGAL BOATS AND U.S. MARINE SLASH, BAYLINER.

Page 109

1 WHATEVER HAPPENED WITH THE NEGOTIATIONS WITH THOSE
2 TWO COMPANIES?
3   A.  I'M NOT AWARE THAT THEY HAVE COME TO A
4 CONCLUSION.
5   Q.  SO THOSE ARE STILL OUTSTANDING
6 DISCUSSIONS?
7   A.  AS FAR AS I KNOW.
8     (A DISCUSSION WAS HAD OFF THE RECORD.)
9     MR. PESLAK:  I THINK I'M JUST ABOUT DONE.
10   IF YOU GIVE ME FIVE MINUTES TO REVIEW MY NOTES
11   AND DOCUMENTS HERE.
12 (EXHIBIT NUMBER 29 WAS MARKED FOR IDENTIFICATION.)
13   Q.  MR. MELOON, I SHOW YOU WHAT THE COURT
14 REPORTER JUST MARKED AS DEFENDANT'S EXHIBIT 29 JUST
15 BEEN PRODUCED BY YOUR COUNSEL IN A REDACTED FORM.
16 IS THAT THE DOCUMENT THAT YOU WERE JUST REFERRING TO
17 PRIOR TO THE BREAK IN YOUR TESTIMONY WITH RESPECT TO
18 ROYALTIES THAT HAVE BEEN PAID TO CORRECT CRAFT?
19   A.  IT APPEARS THIS IS THE SAME DOCUMENT.
20   Q.  IS THAT SOMETHING THAT WAS PRODUCED FROM
21 CORRECT CRAFT'S ACCOUNTING SYSTEM?
22   A.  I WOULD ASSUME THAT IT WAS.
23   Q.  DO YOU KNOW WHO PREPARED THAT DOCUMENT?
24   A.  THIS DOCUMENT WOULD HAVE COME OUT OF
25 ACCOUNTING.

Page 110

1  Q.  SOMEONE IN YOUR ACCOUNTING DEPARTMENT?

2  A.  YES.

3  Q.  AND DID YOU REQUEST THAT THEY PREPARE IT?

4  A.  THAT IS THE ONLY REASON IT WOULD GET DONE

5 TODAY ANYHOW.

6  Q.  I JUST WANT TO ASK YOU A COUPLE OF

7 QUESTIONS IN ONE OF THE INTERROGATORY ANSWERS I HAD

8 ASKED FOR WHAT TYPE OF DAMAGES CORRECT CRAFT IS

9 GOING TO BE SEEKING IN THIS CASE.  AND IN ONE OF THE

10 RESPONSES IT SAYS PLAINTIFF WILL SEEK DAMAGES AS

11 LOST PROFITS, UNJUST ENRICHMENT, OR REASONABLE

12 ROYALTY PURSUANT TO THE COMMON LAW OF FLORIDA.  AND

13 HOW WOULD YOU GO ABOUT DETERMINING WHAT YOUR PROFIT

14 IS ON A SALE OF A TOWER, MEANING CORRECT CRAFT?

15  A.  WE USED TO ENTER ACCOUNTING PROCEDURES

16 WHEN YOU FIGURE IN COST AND PROFIT AND SALES.

17 PROFIT IS BASED ON YOUR SALES.

18  Q.  WHEN YOU SELL A TOWER TO A DEALER APART

19 FROM A BOAT, WHAT PROFIT DOES CORRECT CRAFT MAKE ON

20 THAT SALE?

21  MR. GILCHRIST:  YOU CAN ANSWER THAT

22 SUBJECT TO CONFIDENTIALITY.

23  A.  I BELIEVE THAT THE GROSS PROFIT ON THAT IS

24 SOMEWHERE IN THE NEIGHBORHOOD OF ABOUT 30, 35

25 PERCENT.  34, 35 PERCENT.

Page 111

1  Q.  AND DO YOU KNOW WHAT THE SELLING PRICE IS?

2  A.  DEALER NET ON THAT I BELIEVE IS IN THE

3 NEIGHBORHOOD OF DEPENDING ON THE TOWER 15 TO 1600,

4 MAYBE 1700, SOMEWHERE JUST IN THAT NEIGHBORHOOD.

5  Q.  AND DEALER NET MEANS THE PRICE YOU SELL TO

6 THE DEALER?

7  A.  THAT IS -- YES.

8  Q.  AND YOUR PROFIT ON THAT IS APPROXIMATELY

9 35 PERCENT OF THE DEALER NET PRICE?

10  A.  APPROXIMATELY, YES.

11  Q.  AND WHAT COMPONENTS OF COST DO YOU INCLUDE

12 TO COME UP WITH THAT 35 PERCENT?  YOU DON'T HAVE TO

13 GIVE ME NUMBERS BUT JUST WHAT'S INCLUDED?

14  A.  YOU HAVE ACCOUNTING.  THEY NATURALLY WHEN

15 THEY GET A PIECE OF EQUIPMENT THAT COSTS X AMOUNT OF

16 DOLLARS THEY APPLY THEIR RULES TO IT TO ESTABLISH IT

17 BASED ON WHAT THE COMPANY'S GOALS ARE FOR THE

18 PROFIT.

19  Q.  SO ARE THERE DOCUMENTS IN THE COMPANY THAT

20 YOU WOULD LOOK FOR TO -- IF YOU WERE TRYING TO

21 FIGURE OUT WHAT THE PROFIT AT THIS TIME IS ON THE

22 TOWER ARE THERE DOCUMENTS YOU WOULD ASK THE

23 ACCOUNTING DEPARTMENT FOR?

24  A.  NO, I WOULD GO TO ACCOUNTING AND ASK THEM

25 HOW THEY ESTABLISHED THAT PRICE AND WHAT THE MARGINS

Page 112

1 WERE THEY PUT IN.

2  Q.  BUT SITTING HERE TODAY YOU DON'T KNOW WHAT

3 ALL THOSE NUMBERS ARE?

4  A.  NOT EXACTLY, NO.

5  Q.  WHEN YOU SELL A TOWER IN COMBINATION WITH

6 THE BOAT IS THERE A DIFFERENT PROFIT MARGIN ON THE

7 TOWER?

8  A.  IT DEPENDS ON WHETHER IT'S STANDARD

9 EQUIPMENT OR OPTIONAL EQUIPMENT.

10  Q.  AND WHAT DO YOU MEAN BY THAT STANDARD

11 VERSUS OPTIONAL EQUIPMENT?

12  A.  IF IT'S STANDARD WHEN YOU BUY IT YOU GET

13 IT.  IT'S A PART OF IT.  IF IT'S OPTIONAL, YOU BUY

14 IT THEN YOU HAVE TO GO BY THE TOWER AND PUT IT ON.

15 THAT MAKES IT OPTIONAL.

16  Q.  SO IN THE CUSTOMER'S PERSPECTIVE THEY CAN

17 BUY A BOAT WITH A TOWER FOR ONE PRICE OR A BOAT

18 WITHOUT A TOWER AND HAVE AN ADD ON PRICE?

19  A.  DEPENDING ON THE MODEL OF THE BOAT, YES.

20  Q.  AND DOES ONE OF THOSE OPTIONS HAVE A

21 HIGHER PROFIT THAN IF YOU JUST SOLD THE TOWER TO THE

22 DEALER?

23  A.  I IMAGINE ON THE SERVICE PARTS LIST IT

24 WOULD BE HIGHER.

25  Q.  A HIGHER SELLING PRICE?

Page 113

1  A.  YES.

2  Q.  OKAY.  AND IS YOUR PROFIT THEN HIGHER

3 SELLING IT TO THE DEALER AS OPPOSED TO SELLING IT AS

4 PART OF THE BOAT AS AN OPTION OR STANDARD?

5  A.  IF IT'S ON THE BOAT IT'S AT ONE PRICE.

6 AND IF IT'S SERVICE PARTS IT'S SEPARATE BECAUSE IT

7 DOESN'T GO WITH THE BOAT.

8  Q.  WHEN YOU SELL A BOAT WITH A TOWER IN THE

9 NORMAL COURSE OF BUSINESS DO YOU BREAK OUT THE

10 PROFIT ON THE TOWER VERSUS THE BOAT?

11  A.  YOU TAKE THE COST OF THE TOTAL PIECE OF

12 EQUIPMENT INCLUDING EVERYTHING IN IT AND THEN YOU

13 APPLY YOUR FORMULAS TO THAT.

14  Q.  BUT WHAT I'M REALLY ASKING IS DURING THE

15 NORMAL COURSE OF BUSINESS DOES SOMEONE AT CORRECT

16 CRAFT LOOK AT THE PROFIT ON A TOWER SEPARATE FROM A

17 BOAT IF IT'S SOLD WITH THE BOAT IN COMBINATION WITH

18 THE TOWER?

19  A.  I DIDN'T QUITE FOLLOW THAT.

20  Q.  OKAY -- NO, JUST -- YOU AS PRESIDENT OF

21 THE COMPANY YOU SELL A BOAT WITH A TOWER?

22  A.  RIGHT.

23  Q.  DO YOU EVER ASK FOR SOMEBODY TO JUST TELL

24 YOU WELL, WHAT WAS THE PROFIT ON THAT TOWER APART

25 FROM THE BOAT?

Page 114

1    A.  WE HAVE A COST ACCOUNTING DEPARTMENT THAT
2 TRACKS ALL OF THAT.  THAT IS AVAILABLE AT ANY TIME.
3    Q.  DO YOU IN THE NORMAL COURSE OF EVENTS CARE
4 ABOUT THE PROFIT PER TOWER THAT IS SOLD IN
5 COMBINATION WITH THE BOAT?
6    A.  I CARE ABOUT THE PROFIT ON EVERYTHING THAT
7 IS SOLD BECAUSE THAT IS MY JOB.
8    Q.  I'M TALKING ABOUT IF YOU SELL A BOAT IN
9 COMBINATION -- I'M NOT TRYING TO BE DIFFICULT HERE.
10    A.  I UNDERSTAND.  I JUST.
11    Q.  I UNDERSTAND YOU CARE ABOUT THE PROFIT
12 AND, YOU KNOW.  IF YOU SELL A BOAT IN COMBINATION
13 WITH A TOWER I ASSUME YOUR MAIN CONCERN IS HOW MUCH
14 PROFIT YOU MADE ON THAT SALE?
15    A.  THAT AND EVERY OTHER SALE, YES.
16    Q.  AND DO YOU EVER HAVE A CIRCUMSTANCE TRY TO
17 FIGURE OUT HOW MUCH YOU'RE MAKING ON TOWERS THAT ARE
18 SOLD WITH THE BOAT?  JUST ON THE TOWER?
19    A.  YEAH.  WE KNOW WHAT THOSE NUMBERS ARE.
20    Q.  AND THAT INFORMATION IS IN THE ACCOUNTING
21 DEPARTMENT?
22    A.  YES.
23    Q.  AND I ASSUME CORRECT CRAFT HAS A
24 COMPUTERIZED ACCOUNTING DEPARTMENT?
25    A.  YEAH, WE DO.

Page 115

1    Q.  AND YOU HAVE A BREAK DOWN OF ALL OF YOUR
2 COSTS THAT GOES INTO EVERYTHING YOU SELL INCLUDING
3 TOWERS?
4    A.  (WITNESS NODS HEAD.)
5    Q.  AND IN TERMS OF YOUR RESPONSE TO THIS
6 INTERROGATORY AND THE DAMAGES YOU ARE SEEKING ON THE
7 PATENT INFRINGEMENT CLAIM, YOU MAKE REFERENCE TO A
8 REASONABLE ROYALTY AND DO NOT MAKE REFERENCE TO A
9 LOST PROFIT CLAIM UNDER THE PATENT INFRINGEMENT
10 INTERROGATORY RESPONSE.
11    A.  THAT WAS MY INTERROGATORY RESPONSE?
12    Q.  I'LL SHOW IT TO YOU IF YOU WANT.  I'LL
13 MARK THIS -- BACK TO DEFENDANT'S EXHIBIT NUMBER 15
14 AND IF YOU LOOK AT PAGE 6, TAKE A MINUTE TO REVIEW
15 THAT.  COUNT THREE IS THE PATENT INFRINGEMENT COUNT.
16 AND YOU REFERENCE THERE AS TO REASONABLE ROYALTY; I
17 DON'T SEE A REFERENCE TO LOST PROFIT CLAIM.
18    MR. GILCHRIST:  OBJECT.  I THINK IT DOES.
19 HE SAID IN NO EVENT LESS THAN A REASONABLE
20 ROYALTY.
21    Q.  I GUESS MY QUESTION IS, IN TERMS OF YOUR
22 DAMAGE CLAIM IN THIS CASE WERE YOU SEEKING TO
23 RECOVER THE PROFIT THAT CORRECT CRAFT WOULD HAVE
24 MADE ON TOWER SYSTEMS SALES OF TOWERS?
25    A.  WHATEVER THIS DOCUMENT STATES HERE IN THE

Page 116

1 INTERROGATORY THAT IS WHAT WE WOULD BE SEEKING.
2    Q.  OKAY.  I'M JUST ASKING A SPECIFIC QUESTION
3 MAYBE YOU CAN ANSWER IT OR YOU CAN'T ANSWER IT?  ARE
4 YOU SEEKING TO RECOVER THE PROFITS YOU WOULD HAVE
5 MADE ON TOWER SYSTEMS SALES OF TOWERS.
6    A.  IF THAT IS WHAT THIS DOCUMENT CLAIMS, YES.
7    Q.  LET ME ASK YOU THIS, DO YOU HAVE ANY SALES
8 OR MARKETING FUNCTION FOR SELLING TOWERS INTO THE
9 AFTERMARKET?
10    A.  YES, WE DO SELL IN THE AFTERMARKET.
11    Q.  THAT IS THROUGH THE DEALERS, RIGHT?
12    A.  YES.
13    Q.  AND I THINK YOU TESTIFIED EARLIER THAT YOU
14 AS CORRECT CRAFT HAVE NO REAL WAY OF TRACKING WHAT
15 THE DEALERS DO WHEN THEY RESELL THOSE TOWERS, RIGHT?
16    A.  NO, ONCE WE SELL TO THEM THEY'RE
17 INDEPENDENT BUSINESSES.
18    Q.  WHATEVER THE 35 PERCENT NUMBER WOULD APPLY
19 TO YOU SPOKE ABOUT EARLIER IN TERMS OF PROFIT MARGIN
20 ON THOSE TOWERS, THAT WOULD BE WHAT YOU WOULD SEEK
21 AS A LOST PROFIT CLAIM IN THIS CASE FOR TOWERS THAT
22 WERE SOLD BY TOWERS SYSTEMS IN THE AFTERMARKET?
23    A.  IF THAT IS -- IF THAT WAS THE NUMBER THAT
24 REPRESENTED OUR LOST PROFIT, I THINK SO, YES.
25    Q.  DOES CORRECT CRAFT DO ANY MARKETING OR

Page 117

1 PROMOTIONAL ACTIVITY TO SELL THOSE TOWERS INTO THE
2 AFTERMARKET?
3    A.  WE DO BY VIRTUE OF THE FACT WE HAVE THEM
4 AVAILABLE AND LIST THEM AS SERVICE PARTS AND THE
5 DEALERS ARE AWARE OF IT.
6    Q.  IS THAT LISTED ON YOUR WEB SITE AS A
7 PRODUCT FOR SALE?
8    A.  NOT ON THE PUBLIC WEB SITE, NO.
9    Q.  DID CORRECT CRAFT EVER INSTRUCT IT'S
10 DEALERS NOT TO SELL THOSE TOWERS TO OTHER THAN
11 CORRECT CRAFT BOAT OWNERS?
12    A.  I DON'T KNOW THAT IT WOULD -- IF WE DID IT
13 WOULD DO ANY GOOD.
14    Q.  I UNDERSTAND THAT.  BUT DO YOU KNOW
15 WHETHER THAT WAS EVER DONE?
16    A.  I DON'T RECALL THAT WE HAVE TOLD THEM NOT
17 TO.
18    Q.  HAVE YOU EVER SPOKEN TO ANY DEALERS WHO
19 HAD ACTUALLY SOLD THE TOWERS TO OTHER THAN CORRECT
20 CRAFT BOAT OWNERS?
21    A.  NOT ON A SPECIFIC BASIS.
22    Q.  AND THERE IS NO DOCUMENTS AT CORRECT CRAFT
23 THAT YOU'RE AWARE OF THAT WOULD INDICATE ONE WAY OR
24 THE OTHER HOW MANY OF THOSE TOWERS WERE SOLD TO
25 OTHER THAN CORRECT CRAFT BOAT OWNERS?

Page 118

1    A.  NO, NOT IN OUR RECORDS.
2    Q.  IS SUNSHINE WELDING YOUR ONLY TOWER
3  MANUFACTURER?
4    A.  AT THE PRESENT TIME, YES.
5    Q.  AND DO YOU KNOW WHAT THEIR CAPACITY IS?
6    A.  NO, I COULDN'T GIVE THE NUMBERS.
7    Q.  DO YOU KNOW HOW MANY EMPLOYEES THEY HAVE?
8    A.  NO.
9    Q.  DO YOU KNOW WHETHER THEY SELL PRODUCTS
10  OTHER THAN -- STRIKE THAT.
11      DO YOU KNOW WHETHER THEY MANUFACTURE
12  PRODUCTS OTHER THAN YOUR TOWERS?
13    A.  THEY DO MANUFACTURE OTHER PRODUCTS, YES.
14    Q.  DO YOU KNOW WHETHER THEY SELL YOUR TOWERS
15  TO ANYONE ELSE?
16    A.  NOT BY OUR PERMISSION.
17    Q.  SO THEY AREN'T LICENSED TO SELL THE
18  TOWERS?
19    A.  WE'VE TALKED TO THEM AND TOLD THEM IF
20  THERE WERE ANY SALES THAT WE WOULD EXPECT THEM TO
21  SIGN A LICENSE.
22    Q.  DO YOU KNOW WHETHER IN THE LAST THREE
23  YEARS THEY WOULD HAVE HAD THE CAPACITY TO MAKE AN
24  ADDITIONAL HUNDRED TOWERS A YEAR?
25    A.  NOT BASED ON THE DELIVERY SCHEDULES WE'VE

Page 119

1  HAD THEM ON.
2    Q.  THAT WOULD HAVE BEEN A PROBLEM?
3    A.  YES, IT WOULD HAVE BEEN A PROBLEM.
4    Q.  AND DO YOU HAVE A BACK UP VENDOR?
5    A.  NO, WE DO NOT.
6    Q.  DO THEY DELIVER ALL THE TOWERS TO YOU
7  FIRST AND THEN YOU SEND THEM TO THE DEALER?
8    A.  YES.
9    Q.  SO THAT PROFIT MARGIN WOULD INCLUDE A
10  DEDUCTION FOR THE FREIGHT BOTH WAYS?
11    A.  WHATEVER THE LAID DOWN COST IS IN OUR
12  PLACE OF BUSINESS.
13    Q.  DO YOU HAVE ANY PLANS TO QUALIFY ANOTHER
14  VENDOR TO PRODUCE THOSE TOWERS FOR YOU?
15    A.  WE CONSIDERED IT.  BUT THEY HAVE BEEN A
16  GOOD SUPPLIER.
17    Q.  AND HOW MANY TOWERS -- APPROXIMATELY HOW
18  MANY TOWERS A YEAR HAVE THEY SUPPLIED TO CORRECT
19  CRAFT ON AVERAGE OVER THE LAST THREE YEARS?
20    A.  I WOULD GUESS THAT PROBABLY SOMEWHERE IN
21  THE NEIGHBORHOOD OF ON AVERAGE MAYBE IN EXCESS OF A
22  THOUSAND.
23    Q.  A THOUSAND PER YEAR?
24    A.  PLUS OR MINUS, YEAH.  BUT THOSE ARE THAT
25  STRICTLY GUESSTIMATES.

Page 120

1    Q.  AND THAT INCLUDES TOTAL THE ONES YOU SOLD
2  ON YOUR BOATS PLUS WHATEVER WOULD GO INTO THE
3  AFTERMARKET?
4    A.  MAYBE A LITTLE HIGHER WITH THE
5  AFTERMARKET.
6    Q.  SO, APPROXIMATELY THEN HOW MANY BOATS WITH
7  TOWERS DID YOU SELL PER YEAR FOR THE LAST THREE
8  YEARS?
9    A.  I WOULD SAY PROBABLY 50 TO 60 PERCENT OF
10  OUR ANNUAL SALES.
11    Q.  OTHER THAN LISTING THE TOWERS ON YOUR
12  SERVICE PARTS LIST, HAVE YOU DONE ANYTHING ELSE TO
13  PROMOTE AFTERMARKET SALES OF THOSE TOWERS?
14    A.  ANY ADVERTISING YOU DO WITH THE TOWERS ON
15  THE BOAT SO PURCHASES, SALES.
16    Q.  BUT I MEAN IN TERMS OF SPECIFICALLY
17  PROMOTING THAT THESE TOWERS ARE AVAILABLE, YOU KNOW,
18  WITHOUT THE BOAT.  HAVE YOU DONE ANY SPECIFIC
19  ADVERTISING TO THAT?
20    A.  NO, BECAUSE MOST OF OUR ADVERTISING IS
21  BASED AROUND THE LARGER PRODUCT.
22    Q.  YOU WANT TO SELL A BOAT WITH A TOWER?
23    A.  PREFERABLY.
24    Q.  MAKE A LOT MORE MONEY ON THAT, RIGHT?
25    A.  (WITNESS NODS HEAD.)

Page 121

1    Q.  SO THEN JUST SO WE'RE CLEAR, WOULD THERE
2  BE ANY -- OTHER THAN THE SERVICE PARTS THAT SHOW THE
3  PRICE OF THE TOWER, IS THERE ANY OTHER WRITTEN
4  PROMOTIONAL MATERIAL INVOLVING JUST THE TOWERS?
5      MR. GILCHRIST:  JUST THE TOWERS WITHOUT A
6  BOAT?
7      MR. PESLAK:  JUST TOWERS WITHOUT A BOAT.
8    A.  WE MAY SHOW IT AS A PART OF A PAGE
9  EXPLAINING ACCESSORIES OR STANDARD EQUIPMENT OR
10  SPECIAL EQUIPMENT OR SOMETHING OF THAT NATURE IN THE
11  CATALOGS.  BUT THIS IS A FUNCTION OF MARKETING.
12    Q.  BUT THAT IS REALLY IN CONNECTION WITH
13  MARKETING THE BOATS?
14    A.  YES.
15    Q.  I DON'T HAVE ANYMORE QUESTIONS?
16      MR. GILCHRIST:  WE'LL READ.
17  (THE DEPOSITION WAS CONCLUDED AT 12:22 P.M.)
18          *****
19
20
21
22
23
24
25

Page 122

```
1
2
3
4              J U R A T
5  DEPOSITION OF WALTER MELOON
6     TAKEN JUNE 18, 2002
7        BARBARA PERRY & COMPANY, INC.
         201 NORTH PALMETTO AVENUE
8        ORLANDO, FLORIDA  32802
9
10    PAGE 05 - 121, INCLUSIVE.
11    ERRATA ATTACHED:  YES___  NO___
12
13
14
                SIGNATURE OF DEPONENT
15
16        SWORN TO AND SUBSCRIBED BEFORE ME
17
         THIS ____ DAY OF _____, 2002
18       IN _____.
19       NOTARY PUBLIC
         MY COMMISSION EXPIRES:
20
21
22
23
24
25
```

Page 124

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 123

```
1         CERTIFICATE OF OATH
2  STATE OF FLORIDA:
   COUNTY OF ORANGE:
3
        I, SHELLEY N. TROISE, DO HEREBY CERTIFY
4  THAT I PLACED UNDER OATH THE DEPONENT, WALTER
   MELOON, AT THE TIME AND PLACE THEREIN DESIGNATED.
5       WITNESS MY HAND AND OFFICIAL SEAL THIS 8TH
   DAY OF JULY, 2002.
6
7         SHELLEY N. TROISE
          MY COMMISSION EXPIRES:  5/21/04
8
9    CERTIFICATE OF REPORTER WITH ACKNOWLEDGMENT
10      I, SHELLEY N. TROISE, CERTIFY THAT I WAS
   AUTHORIZED TO AND DID STENOGRAPHICALLY REPORT THE
11 FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREIN
   DESIGNATED; AND THAT THE FOREGOING PAGES NUMBERED 05
12 THROUGH 121, INCLUSIVE, ARE A TRUE, COMPLETE, AND
   ACCURATE TRANSCRIPTION OF MY SAID STENOTYPE NOTES
13 TAKEN THEREIN.
        I FURTHER CERTIFY THAT I AM NOT OF
14 COUNSEL, FOR, RELATED TO, OR EMPLOYED BY ANY PARTY
   HERETO OR ATTORNEY INVOLVED HEREIN, NOR AM I
15 FINANCIALLY INTERESTED IN THE OUTCOME OF THIS
   ACTION.
16      DATED THIS 8TH DAY OF JULY, 2002.
17
18
          SHELLEY N. TROISE
19
20
21
22
23
24
25
```