1

```
1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                      ORLANDO DIVISION

3
                          CASE NO. 6:050-CV-686-ORL-31-JGG
4
    BORDEN M. LARSON
5
           Plaintiff,
6
    vs.
7
    CORRECT CRAFT, INC.
8   ROBERT TODD AND WILLIAM SNOOK

9          Defendants.
    _____/
10
    CORRECT CRAFT, INC.
11
           Counter-Claimant,
12
    vs.
13
    BORDEN M. LARSON
14
           Counter-Defendant.
15  _____/

16

17          VIDEOTAPED CORPORATE DEPOSITION OF
                   WALTER GARY MELOON
18              VOLUME I (Pages 1-128)

19

20     EXAMINATION OF A WITNESS BEGINNING AT 11:20 A.M. ON

21  SEPTEMBER 29, 2006, AT 1516 EAST HILLCREST STREET, SUITE 300,

22  ORLANDO, FLORIDA, BEFORE MICHELLE A. MANNI, COURT REPORTER AND

23  NOTARY PUBLIC IN AND FOR THE STATE OF FLORIDA AT LARGE.

24

25
```

Page 2

1    A P P E A R A N C E S
2
BEECHER A. LARSON, ESQUIRE
3    Law Offices of Beecher A. Larson
     1201 Ridge Road
4    Longwood, Florida 32750
     On behalf of the Plaintiff
5
6    TODD K. NORMAN, ESQUIRE
     Stump, Storey, Callahan, Dietrich & Spears, P.A.
7    37 North Orange Avenue, Suite 200
     Orlando, Florida 32801
8    On behalf of the Defendants
9
     ALSO PRESENT: Borden M. Larson, Videographer
10
        William Snook
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1         I N D E X
2    WALTER GARY MELOON                    Page
3    DIRECT EXAMINATION                      6
     BY MR. LARSON
4
5
         E X H I B I T S
6                                         Page
7    Exhibit No. 1                          6
     Exhibit No. 2                         15
8    Exhibit No. 3                         16
     Exhibit No. 4                         16
9    Exhibit No. 5                         66
     Exhibit No. 6                         98
10   Exhibit No. 7                        127
11
12
13
14        S T I P U L A T I O N S
15   It is hereby stipulated and agreed by and between counsel
16   present at this deposition and by the deponent that the
17   reading and signing of this deposition is expressly reserved.
18
19        * * * * * * *
20
21
22
23
24
25

Page 4

1         P R O C E E D I N G S
2    THEREUPON:
3         WALTER GARY MELOON,
4    having been first duly sworn to tell the truth, the whole
5    truth, and nothing but the truth, testified as follows:
6         MR. LARSON: Ma'am, for the videotape, it asks you
7    to go through these.
8         MR. NORMAN: Usually the videographer does these.
9    Since we don't have a -- and I'll just put this on the
10   record. As I came here this morning, I was informed that
11   the plaintiff, Mr. Borden Larson, is the videographer for
12   our deposition this morning. I object because I don't
13   believe he's a licensed videographer. So I object to the
14   proceeding. But with that said, I'm going allow it to go
15   forward subject to my objection.
16        I have, I believe -- and Mr. Lar -- Mr. Beecher
17   Larson can correct me if I'm wrong -- reached a
18   stipulation to him that he would provide me at his cost a
19   copy of the video, where I'd normally purchase it from a
20   videographer.
21        With that said, I understand that Mr. Larson would
22   like the court reporter to read what otherwise the
23   videographer would read in under the Federal rules, and I
24   believe that to be the list of those things.
25   (Brief discussion off the record.)

Page 5

1         MR. NORMAN: And to be clear, the deposition of
2    Correct Craft corporate representative. We have
3    designated two corporate representatives for this day.
4    All but category -- and I'm referring now the -- the
5    notice of taking corporate deposition filed in this case
6    September 16th, 2006. I think they filed it there.
7         In that they ask for seven categories of testimony,
8    a corporate representative on seven categories of
9    testimony. Mr. Meloon will be testifying to all those
10   categories except Number 4, to which Mr. Snook is here and
11   present and will be designated for the corporate
12   representative to testify on that matter.
13        MR. LARSON: Those are the things you have to read
14   into the tape.
15        THE COURT REPORTER: Okay.
16        MR. LARSON: It will be your name, the date, the
17   time, the address, the deponent.
18        THE COURT REPORTER: Okay. My name is Michelle
19   Manni. I'm the court reporter. Today's date is September
20   29th, 2006. The time 11:20 a.m. We are here at 1516
21   East Hillcrest, Orlando, Florida, the deposition of
22   corporate representative, Gary Meloon, the deponent.
23        MR. LARSON: Can we swear in the witness?
24        THE COURT REPORTER: We already did. Or do you want
25   me to do it again?

Page 6

1      MR. LARSON:  If he's been sworn in, that's fine.
2      THE COURT REPORTER:  Okay.
3            DIRECT EXAMINATION
4  BY MR. LARSON:
5      Q.   Mr. Meloon, I'm going to show you a document, and
6  we're going to mark it as Exhibit 1.  Are you familiar with
7  that?
8      A.   Yes, I am.
9  (Exhibit No. 1 was marked for identification.)
10  BY MR. LARSON:
11      Q.   And this is your notice of deposition for coming
12  here today?
13      A.   Yes.  That is correct.
14      Q.   And on the first page at the bottom, it says that
15  the matters to the exam is on, 1, Correct Craft's answers to
16  Larson's First Amended Complaint, and you're going to testify
17  to that?
18      A.   Yes.
19      Q.   Okay.  And on the second page, Number 2 is Correct
20  Craft's Affirmative Defenses to Larson's First Amended
21  Complaint?
22      A.   Yes.
23      Q.   You're going to testify to that.  The third is
24  Correct Craft's Counterclaim to Larson's First Amended
25  Complaint?

Page 7

1      A.   Yes.
2      Q.   The fourth is the purpose and job duties for which
3  Correct Craft hired Borden?
4      A.   No, I will not.
5      Q.   Okay.  Mr. -- Mr. Snook is going to testify to that?
6      A.   Yes, he will.
7      Q.   Okay.  And five, any statements that Correct Craft
8  may have made to employees that they follow Christian or
9  Biblical principals?
10      A.   Yes.
11      Q.   And six, any statements that Correct Craft may have
12  made to its employees that they will act and behave ethically?
13      A.   Yes.
14      Q.   Yes means that you will testify to that?
15      A.   Yes.
16      Q.   And seven, the testimony given by Correct Craft in
17  the Correct Craft versus Tower System Trial, you will testify
18  to that?
19      A.   Yes.
20      Q.   Okay.  You have been deposed before?
21      A.   Yes, I have.
22      Q.   Okay.  I don't have -- I don't have any rules except
23  it's very hard to not speak in conversational tone because
24  you're right next to me.  My only request is let's not try to
25  step on each other, because it makes the transcript very, very

Page 8

1  difficult to read.  You know, if I talk and you talk over me,
2  and you look at the transcript later, it's really, really
3  difficult, and probably difficult for them to write.
4      So if you want to say something, and I'm talking,
5  and you're trying to get in, and I'm doing the same thing,
6  trying to get in, you really have to hold it.  And because the
7  people who do that well and you read the transcripts, they
8  really read nicely.  And that's what you're making here today
9  now, a record.
10      Mr. Meloon, for the record, why don't you give me
11  your name and address?
12      A.   Walter Gary Meloon, 6101 Matchett Road, Orlando,
13  Florida 32809.
14      Q.   And are you familiar with a company called Correct
15  Craft, Incorporated?
16      A.   Yes, I am.
17      Q.   And how are you familiar with them?
18      A.   I'm an employer -- an employee of theirs.
19      Q.   Are you a shareholder?
20      A.   Yes, I am.
21      Q.   How much stock do you own?
22      A.   Probably roughly 936 shares.
23      Q.   Out of how many total?
24      A.   I think it's two hundred -- thousand.
25      Q.   And are you familiar with the plaintiff in this

Page 9

1  case, Borden Larson?
2      A.   Yes, I am.
3      Q.   And how are you familiar with him?
4      A.   From past employment at Correct Craft.
5      Q.   And are you familiar with the wakeboard tower
6  invention?
7      A.   Yes, I am.
8      Q.   And that is the matter that we're here today on?
9      A.   Yes, sir.
10      Q.   Are you familiar with the claims that Borden Larson
11  is making?
12      A.   Yes, I am.
13      Q.   And why don't you explain to me in your own words
14  what those claims are?
15      A.   Okay.  The claims as I understand them --
16      Q.   And I don't mean to put you on the spot.
17      A.   Right.
18      Q.   I just want it in your own records, because I'm
19  going to go through them --
20      A.   Correct.
21      Q.   -- very in detail.  I'm not asking you here to --
22      A.   Okay.
23      Q.   You're stepping on me.
24      A.   The best of my ability is -- is -- is that Borden is
25  here claiming that he has rights to the patent on the tower

Page 10

1  invention.
2     Q.  And what is Correct Craft's position?
3     A.  That based on his employment, he had no rights to
4  that invention, that those were belonging to the corporation
5  that he worked for at the time.
6     Q.  And how do you substantiate that based on his
7  employment?  Based on what type of employment?
8     A.  The job that he was hired to do.
9     Q.  Which job was that?
10    A.  For the research and design and development
11 department.
12    Q.  So you're saying that he was hired in what
13 department?
14    A.  I believe at the time it was research and
15 development.
16    Q.  Have you reviewed any material before you testify --
17 came here to testify today?
18    A.  Yes, I have.
19    Q.  What did you review?
20    A.  The notice of deposition that's in front of me at
21 this time, as well as several of the claims and counterclaims
22 that have been brought forth during the whole proceedings.
23    Q.  Did you take any notes of what you reviewed?
24    A.  Not that I remember, no.
25    Q.  Did you have any question and answer sessions with

Page 11

1  anybody?
2     A.  Yes, I have.
3     Q.  And who was that with?
4     A.  With our attorneys that are representing us.
5     Q.  Did they -- did you take any notes of those
6  conversations?
7     A.  No, I did not.
8     Q.  Were there any answers suggested to you by those
9  attorneys?
10    A.  No, there were not.
11    Q.  Now, you say that Correct Craft has rights to this
12 patent.  Are you -- based what Borden was hired for, and
13 you're saying that he was hired for -- what was that again?
14    A.  Research and development.
15    Q.  Now, did you review the trial transcript at all, or
16 your testimony, in the Tower System case before coming here
17 today?
18    A.  I do not -- no.  I have not looked at that in quite
19 some time.
20    Q.  Would it surprise you that you never once in that
21 testimony at the Tower System trial ever say that Borden was
22 hired for research and development?
23       MR. NORMAN:  Objection.  Assumes facts not in
24    evidence.
25       THE WITNESS:  Could you repeat that again?  I'm

Page 12

1     sorry.
2  BY MR. LARSON:
3     Q.  Would it surprise you that you never testified once
4  in the Tower System trial that Borden was hired for research
5  and development?
6       MR. NORMAN:  Objection.  Assumes facts not in
7     evidence.  He can answer if he can.
8     A.  I guess it wouldn't surprise me not -- not having
9  reviewed them and not being familiar with the testimony, yes.
10    Q.  Isn't it true that your testimony and your constant
11 position was Borden was just your designer?
12       MR. NORMAN:  Objection.  Speculative.
13    A.  No, I wouldn't.
14 BY MR. LARSON:
15    Q.  Now, Borden was terminated in 2001?
16    A.  I believe so.
17    Q.  Did you give him a promotion after he was
18 terminated?
19    A.  Not -- not that I'm aware of.
20    Q.  Who have you discussed with the fact that Borden was
21 hired for research and development?
22    A.  Probably, besides the attorneys, probably Bill
23 Snook.
24    Q.  And what was your discussion with him about that
25 topic?

Page 13

1     A.  With the attorneys or with --
2     Q.  With Mr. Snook.
3     A.  Okay.  Just trying to, I guess, get a better
4  recollection as the corporate representative to collect as
5  much information, so I could testify to the facts of what the
6  corporation had claimed or gained at that time.
7     Q.  And what did Mr. Snook tell you?
8     A.  That he was the one that had hired Borden Larson,
9  and it was into the department which he was a manager of,
10 which, I believe, was the research and development.  It may
11 have had another name at the time, but that's what I'm most
12 familiar with.
13    Q.  And what was his job in that department?
14    A.  Borden Larson or Bill Snook?
15    Q.  Borden Larson's.
16    A.  Borden's was to do drafting, design, oversee
17 different areas and components of the boat as related to the
18 research and development department.
19    Q.  Had anyone at that time ever thought about putting a
20 tower on top of a boat?
21    A.  At his time of employment first?
22    Q.  Um-hmm.
23    A.  No.
24    Q.  So Borden couldn't have been hired to put a tower on
25 a boat if somebody hadn't even thought about doing that, could

Page 14

1 he?
2    A.   I don't know that that would have been outside of
3 the scope of he would have been hired for.
4    Q.   But was he specifically hired to go put a tower on a
5 boat?
6    A.   No, he was not.
7    Q.   When was the first time anyone at Correct Craft ever
8 thought about putting a tower on a boat?
9    A.   I'm going to say it was probably well into the late
10 90's, mid to late 90's.
11    Q.   And was Borden Larson the first one that you knew of
12 that thought about putting a tower on a boat?
13    A.   I believe it may have been him at the time that had
14 come up with the original concept of some type of application
15 on the boat, yes.
16    Q.   And prior to him doing that, there had never been a
17 department or a job duty to tell Borden to go and put a tower
18 on a boat.
19    A.   I don't know if there was a -- a department designed
20 or created at Correct Craft for that specific thing.  The best
21 that I recall is that there was discussions of doing something
22 to the boat to affix a tow point higher than what we had been
23 doing at that time.
24    Q.   But was that -- were those discussions in response
25 to Borden's idea, or did they predate Borden's idea?

Page 15

1    A.   I believe they predated Borden's idea.
2    Q.   And do you have any documentary evidence that says
3 that?
4    A.   Not here before me, no.
5    Q.   Have you ever seen any documentary evidence that
6 says that?
7    A.   I don't know if there has been documentation or
8 evidence to state that.  I'm just recalling from possible
9 meetings and conversations that took place around and about
10 that time with what was going on in the industry.
11 (Exhibit No. 2 was marked for identification.)
12 BY MR. LARSON:
13    Q.   I'm going to put a couple exhibits into evidence
14 here, actually, three of them, and you may or may not
15 recognize these if you don't live with these everyday, and I
16 don't mean to put you on the spot with them, but I'm going to
17 show you this and see if you can identify this.
18    A.   Yes, I have.
19       MR. NORMAN:  This will be two?
20       MR. LARSON:  This will be two.
21       MR. NORMAN:  I didn't mean to cut you off.
22    A.   This is something that I have seen and have had
23 opportunity to review.
24 BY MR. LARSON:
25    Q.   Okay.  And what is that?

Page 16

1    A.   It is the first amended complaint for damages.  I
2 guess that's what it's called, and I believe the counterclaim
3 also listed in here as well.
4    Q.   So for lack of better term, this is Borden's
5 complaint against Correct Craft?
6    A.   Yes, it is.
7    Q.   And Correct Craft has answered this complaint?
8    A.   I believe we have answered all of the allegations in
9 there, yes, sir.
10 (Exhibit No. 3 was marked for identification.)
11 BY MR. LARSON:
12    Q.   I'm going to show you another document, which we'll
13 mark as Exhibit Number 3, and ask if you can identify that?
14    A.   Yes.  I have seen and these are our answers to his
15 first complaint.
16    Q.   Okay.  Now, if you would take both of those and put
17 them side by side, you can see that up here, Paragraph Number
18 1, you answer over here in Paragraph Number 1; correct?
19    A.   Yes.
20 (Exhibit No. 4 was marked for identification.)
21 BY MR. LARSON:
22    Q.   And I'm going to show you a document now that I want
23 to mark as Exhibit 4, and what I've done is taken your
24 answers, and I've put them into the same document.  So here
25 Number 1 is the allegation, and here is your answer.  Can you

Page 17

1 check and see if those are the same?
2    A.   Yes.  Based on the first two, yes, they are the
3 same.
4    Q.   Okay.  What I would like to do is I would like to
5 use this document Number 4 as our working document.
6    A.   Okay.
7    Q.   And there could have been mistakes made in the
8 insertion of these answers into -- the insertions of the
9 answers in Document 3 and in Document 2.
10       MR. NORMAN:  Wait, if it's possible it could have
11 errors, why don't we just have him -- I mean, I don't care
12 whatever he wants use, but why don't we just have him go
13 line by line just as it is.
14       MR. LARSON:  It is very difficult to do that.
15       MR. NORMAN:  It's really not that difficult.  The
16 reason I say that is because I'm pretty sure he's probably
17 done that process himself.  So however the witness wants
18 to do it is fine with me, but it's just that, you know,
19 make sure that the answers are accurate.  Make sure that
20 you look at that.
21       THE WITNESS:  Yeah.  I mean, if you don't have a
22 problem, Mr.  Larson, I would prefer to go back and forth,
23 because that's how I have been reviewing the documents.
24       MR. LARSON:  Okay.
25 BY MR. LARSON:

Page 18

1   Q.   Now, I want to draw your attention down to Exhibit
2   -- I mean, Paragraph Number 10.  You're at 49.  Paragraph 10.
3   A.   Oh, I'm sorry.  Paragraph 10.  Sorry about that.
4   Q.   This is why I like to do it in one.
5   A.   Okay.  Yes.
6   Q.   Now, in Paragraph 10 it says:  "On February 26, '86,
7   defendant Correct Craft hired plaintiff Larson as an hourly
8   employee in the general capacity of a draftsman, and he began
9   to do: -- he began to document parts in the stockroom with
10  mechanical drawings."
11      Now, your answer you say is:  "Denied as framed."
12  A.   Correct.
13  Q.   What do you mean it's denied as framed?
14  A.   I -- I believe what we were trying to accomplish
15  there by saying denied as framed is that within the scope of
16  his work at Correct Craft, his general capacity was just not
17  within the draftsman's position there within our research and
18  development department.
19  Q.   Okay.  So you're saying that he had more duties at
20  that time than just being a draftsman?
21  A.   Yes.
22  Q.   And what were those duties?
23  A.   Trying to remember now, as to best of my memory is
24  that at that time, we had a very small, limited research and
25  development team, so those members of that department wore

Page 19

1   many hats and did many jobs from -- not only from doing what
2   Borden did as a draftsman, but from designing to implementing
3   the product into the -- the new product into the production
4   line, overseeing model changeover, testing and evaluating of
5   product as it came in for the production line as implemented,
6   like I said, at model changeover time.
7   Q.   Now you talk about new products.  What do you mean
8   by new products?
9   A.   Whether it was innovative products that came in to
10  enhance the boat, hull designs, interior layouts, striping
11  colors, those items.
12  Q.   Well, was Borden designing trailers?
13  A.   I don't recall if he was.  We were doing our own
14  trailer manufacturing, I believe, at that time, so it might
15  have fallen under.  As we designed longer, wider boats,
16  different hull configurations, the bunk placements had to be
17  configured so that it did not to damage the bottom of the
18  boat.  So it may have been within that realm that he was doing
19  the same thing at that time.
20  Q.   But you don't know that.  You're speculating?
21  A.   Yes, sir, I am speculating.
22  Q.   Now, also a new product, you guys sold hats and
23  shirts.  Was he designing hats and shirts?
24  A.   I -- I do not know.  I would be speculating.
25  Q.   Do you know where he -- where his actual physical

Page 20

1   office was at that time when you hired him?
2   A.   No, I do not.  No, I do not remember where his
3   physical office was at that time.
4   Q.   Do you know where Mr. Snook's office was at the
5   time?
6   A.   I don't have any recollection, no.
7   Q.   Do you know whether he was working part-time or
8   full-time at that time?
9   A.   I believe he was working full-time.
10  Q.   Do you know where the trailer shop was at that point
11  in time?
12  A.   Yes, I do.
13  Q.   Where was that?
14  A.   That was located at our location.  The physical
15  address I'm not 100 percent sure of, but it was what we call
16  Plant 2.  It was two rather large buildings south of our
17  manufacturing operations on Orange Avenue that we did our
18  trailer manufacturing as well as our shipping of our product
19  there.
20  Q.   Did Mr. Snook ever have an office in the trailer
21  shop?
22  A.   It's possible, yes.
23  Q.   But you don't know that?
24  A.   I do not recall.
25  Q.   Did Borden Larson ever work for you part-time?

Page 21

1   A.   Not that I'm aware of.
2   Q.   Did he ever go to college while he was working for
3   you?
4   A.   I do believe that is correct.  He was or did.
5   Q.   And do you know what happened when he graduated from
6   college?
7   A.   I have no recollection, no.
8   Q.   Did you offer him a full-time job after he graduated
9   from college?
10  A.   I'm not familiar with that.
11  Q.   Now, let's look at Paragraph Number 11.  In
12  Paragraph Number 11, says:  "Over the years, Larson's
13  employment continued in a general capacity and his duties were
14  to draw, devise, and construct general methods to manufacture
15  the boats involving the hull, deck, stringers, dash, seating,
16  graphics, striping patterns, and hardware arrangements."
17      And your answer says you admit that those are some
18  of his duties.  Other duties were product development,
19  creation of products and new designs.
20  A.   That is correct.
21  Q.   Product development, we're talking about creating
22  new hulls and new decks; is that correct?
23  A.   Not just limited to that scope, no.  It was new
24  hulls, new decks, and keeping up with the competition and what
25  may be taking place in the marketplace at that time.

Page 22

1  Q.  What does that mean?
2  A.  Well, you know, the company originally started out
3  as a basically wood boat construction and evolved into
4  fiberglass and got eventually involved with water-skiing and
5  then wakeboarding and now into the general recreation boating.
6      So at that timeframe when he was being hired, in the
7  late 80's, water-skiing was still very prevalent and very
8  popular, and a large number of our boats were produced for
9  that; and the market changed, and therefore, so did the
10  product, itself, have to change to meet the market demands.
11  Q.  So in other words, Borden was hired to change the
12  hulls and the decks of boats as the market would change?
13  A.  Correct.  And any other items of things that might
14  go along with that.
15  Q.  What does that mean?
16  A.  Well, I believe at one point in time that when
17  skiing was very prevalent, there was skiboard racks and
18  development of ski racks that were put inside the boat to
19  store and house skis for the competition skiers as well as the
20  general recreation skiers.
21      And so, you know, those kind of things as the
22  market, you know, was demanding or changing, and in certain
23  areas we develop, not just outside the hull and deck, things
24  that would accommodate those people in the lifestyle in which
25  they were using the boat.

Page 23

1  Q.  So you're saying that Borden was hired to make hulls
2  and decks and skiboard racks?
3  A.  And any other accessories and exemplary, you know,
4  items that might go along with -- with the use of a boat.
5  Q.  Like what?
6  A.  Oh, goodness, I mean, the flight control tower,
7  which we're here today, those -- those were the things that we
8  looked to him as a designer and employee with creative
9  abilities to -- to go out and design on behalf of Correct
10  Craft.
11  Q.  But Correct Craft never told Borden to go design a
12  flight tower?
13  A.  I would have to say that that's not to my knowledge,
14  no.
15  Q.  What is to your knowledge?
16  A.  That it was instructed of the research and
17  development department to go out and look at a means of
18  attaching the tow point on the boat at that time for
19  wakeboarding differently than we had and whatever means and
20  capacity in which they came up with.
21  Q.  And at what point in time are you talking about?
22  A.  Probably mid to -- to late 90's.
23  Q.  And how was that discussion of this tow point
24  communicated to Borden?
25  A.  I'm not absolutely 100 percent sure other than that

Page 24

1  the manager of the department would have gone back to his
2  respective employees and started working on that process.
3  Q.  And who was the manager of this department?
4  A.  That was Bill Snook.
5  Q.  But you don't know whether or not he went back to
6  his department to start work on this process?
7  A.  I have no knowledge that, no.
8  Q.  And what process do you say he was supposed to go
9  back that you don't have any knowledge of?
10  A.  Whether he left that meeting and went back and
11  instructed or delegated the different responsibilities that
12  would be asked of him to his department.
13  Q.  Now, what meeting are you talking about?
14  A.  Well, it could have come from several different
15  meetings, from focus groups to manager's meetings, or other
16  just similar kind of formal meetings that we may have had at
17  the company during that time of that -- that model changeover
18  and things of this nature.
19  Q.  So you don't know of any specific meeting?
20  A.  Not off the top of my head, no.
21  Q.  How is that that you know that there was a meeting
22  if you don't know of any specific meeting?
23  A.  Because I know at that time, we had the -- at that
24  time we were the sole exclusive boat for the World Wakeboard
25  Association to pull their Wakeboard World Championships and

Page 25

1  Wakeboard National Championships.
2      And as wakeboarding was becoming ever more popular
3  and demanding, the athletes were looking for a way to attach
4  the rope higher than what had been typically attached to a
5  ski pylon in a boat so that they could do their aerial
6  maneuvers that gave them the leverage or spring to do these
7  things.
8      And we had been asked by the Wakeboard World
9  Association, due to the pressure put on by the athletes, that
10  Correct Craft at that time would not adopt what they called an
11  extended pylon, because we felt it was an unsafe mechanism to
12  be attached to a boat.  We were about to lose that exclusive
13  position in the world of towing of the premier athletes.
14      And so therefore, when this came back from the World
15  Wakeboard Association to Correct Craft, we -- we had meetings.
16  And then, again, I'm sorry if I'm being vague on whether they
17  were managers' meetings, which more than likely they were, as
18  well as product design meetings during model changeover, as
19  how could we maintain that position and not compromise the
20  safety of the boat.
21  Q.  Do you have any evidence if Borden ever went to
22  those meetings?
23  A.  At product design and model changeover, yes, I
24  believe, and I don't know that there's evidence.  I would have
25  just assumed as his role there, he would have been involved

Page 26

1  with those meetings.

2  Q.  I'm talking specifically, do you have any evidence
3  that Borden was at the meetings where this World Wakeboarding
4  Association told Correct Craft that they had to do something
5  with the pylon?

6  A.  No, I do not.

7  Q.  Do you have any evidence at all that those meetings
8  even took place except for your testimony?

9  A.  No, I do not.

10  Q.  Now, if this is the truth, why didn't you say this
11  at the Tower System trial?

12  MR. NORMAN:  Objection.  Mischaracterize's his prior
13  testimony.  Badgering the witness.  Go ahead and answer
14  it, if you can.

15  A.  I'm not sure that it was ever asked or prosed in
16  that manner that would have given that explanation.

17  BY MR. LARSON:

18  Q.  Now, did -- did Mr. Snook ever work on engineering
19  an extended pylon for you or for Correct Craft?

20  A.  It's possible that he did, yes.

21  Q.  So you're not sure if he did or if he did not?

22  A.  On extended pylon?

23  Q.  Yes.

24  A.  I'm not sure, no.  I know we had an extended pylon.
25  It was used in the SeaWorld ski shows to get the rope up and

Page 27

1  above the windshield for a maneuver that they were doing; and
2  whether that was something that Mr. Snook worked on or not, I
3  do not know.

4  Q.  Do you know where it came from?

5  A.  I'm assuming it came out of our engineering
6  department.

7  Q.  Now, you mentioned that it came out of your
8  engineering department.  What's the difference between the
9  engineering department and the research development
10  department?

11  A.  There is none.  It is research and development.

12  Q.  So engineering is research and development, or
13  research and development is engineering?

14  A.  They're both one in the same.  We -- we have
15  probably used the terms over the years to describe that
16  department in multiple ways.

17  Q.  So in this case, you're stating that many different
18  times that Borden Larson was a supervisor in research and
19  development?

20  A.  He was a supervisor over the department in which
21  what I'm calling research and development, yes, sir.

22  Q.  So that means that Borden Larson was a supervisor of
23  Mr. Snook?

24  A.  I don't believe so, no, because he was the manager
25  at the time.

Page 28

1  Q.  Who was the manager at the time?

2  A.  Bill Snook.

3  Q.  So Bill Snook was the manager of research and
4  development?

5  A.  I believe so, yes.  That is correct.

6  Q.  And he's also the manager of engineering?

7  A.  Well, he's a degreed engineer, and I guess we always
8  called him chief engineer, engineering department.  I'm not
9  absolutely understanding what you're -- what you're asking, I
10  guess.

11  Q.  Do you have knowledge that when Borden Larson
12  created his first drawings for this tower, that he wasn't
13  working for Bill Snook?

14  A.  No, I do not know that.

15  Q.  Would that be significant to you?

16  A.  Not necessarily, no.

17  Q.  Do you have knowledge that Borden Larson was
18  actually working for Mike Elrod?

19  A.  Do I have knowledge of that?

20  Q.  When he conceived the tower.

21  A.  Only through conversations, I think, with my
22  attorney is where I may have learned that.

23  Q.  So in other words, you do know that Borden Larson
24  was not working for Bill Snook when the tower was conceived?

25  A.  No.  I do not have knowledge of that, because if

Page 29

1  there was a change in his direct report, so there would have
2  been a direct report different for Mr. Snook at the time too.
3  There was some restructuring during that time, and if I
4  remember correctly, the research and development may have been
5  put under the production department, but I don't -- I don't
6  have a recollection of that or knowledge other than
7  conversations.

8  Q.  I want to go back here to Paragraph 11.  We're
9  talking here about Paragraph 11.

10  A.  Um-hmm.

11  Q.  And we're talking about product development.  Now,
12  wasn't Borden the supervisor of the plug and mold shop?

13  A.  I believe so.  I don't know.  I mean, I -- I, again,
14  in going through all this to try to gain as much knowledge as
15  I could, I do remember that coming up as -- and I don't know
16  if that was from our side or his side of what his description
17  of what his -- his job was, but I have heard that being used
18  once or twice.

19  Q.  Do you remember the time that I took the deposition
20  of Mr. Herb Allen?

21  A.  Yes, I do.

22  Q.  And you were present at that deposition?

23  A.  That is correct.

24  Q.  Have you read that deposition?

25  A.  Not in recent, I have not.

Page 30

1  Q.  Did you not, at the end of that deposition, nod with
2  approval that Borden Larson was the supervisor of the plug and
3  mold shop, and that appears in the transcript of that
4  deposition?
5  A.  I -- if that's what the deposition says, then, yes,
6  I must have.  I don't recall that off the top of my head
7  but --
8  Q.  So the issue at that time was whether Borden Larson
9  was a supervisor of research and development or the supervisor
10  of the plug and mold shop, and you nodded with approval that
11  he was not the supervisor of research and development.  He was
12  the supervisor only of the plug and mold shop.
13     MR. NORMAN:  Objection.  Mischaracterizes prior
14     testimony.  Assumes facts not in evidence.  You can
15     answer, if you can.
16  A.  I guess without reviewing that to see if that's
17  exactly how it's worded, I have no idea.  I don't remember.
18  BY MR. LARSON:
19  Q.  But that could be possible?
20  A.  If the deposition calls that out, yes, sir.
21  Q.  Now, the plug and mold shop, is that basically a
22  carpentry shop?
23  A.  No.  That was, again, of my knowledge and -- and
24  understanding, the plug and mold shop was a function of -- and
25  again I may get into semantics here with words, whether it was

Page 31

1  the engineering department, the research and design, or the
2  product design and development department.  I mean, I think,
3  it was, again, the job description was very broad when put
4  under that category of engineering or research and design as
5  to what the functions and abilities of those employees were
6  and did.
7  Q.  But you're guessing today, are you not?
8  A.  I would have to say, yes, I am.  I'm -- I'm not
9  100 percent sure whether the plug and mold, as you call it,
10  was a separate department outside of research and development.
11  Q.  Have you ever been in that plug and mold shop?
12  A.  Many times.
13  Q.  Did they have pipe bending equipment in there?
14  A.  Not to my recollection at that -- at that shop, no.
15  Q.  Did they have laboratories?
16  A.  As crude as they may be, yeah.  I think we did have
17  laboratories.
18  Q.  What kind of laboratory was there?
19  A.  Well, I know that we constantly monitor the gelcoats
20  and resins to make sure that they meet the blends and cure
21  times and such as that we're looking for, so when we're
22  building molds or plugs or even the actual product that we
23  understand the cure rate and cure times of the product that
24  we're working with.
25  Q.  So the -- so the plug and mold shop had resins?  Had

Page 32

1  plugs?
2  A.  Yes.
3  Q.  And it had molds?
4  A.  Yes.
5  Q.  And Borden was in charge of that department,
6  building plugs and building molds?
7  A.  Yes.  That was, I believe.
8  Q.  Did you have a welder in the plug and mold shop?
9  A.  Not in that building, we did not.
10  Q.  So the plug and mold shop was not welding up
11  trailers?
12  A.  No.
13  Q.  The plug and mold shop ever weld up one of these
14  towers?
15  A.  Not that I'm aware of, no.
16  Q.  And isn't it true that these towers never even went
17  to the plug and mold shop?
18  A.  That is true.
19  Q.  And if you talked to all the employees of the plug
20  and mold shop, they had no function whatsoever with this
21  tower?
22     MR. NORMAN:  Objection.  Assumes facts not in
23     evidence.
24  A.  I would -- I don't know if you would -- if they
25  would all admit to that or not.  I don't know.

Page 33

1  BY MR. LARSON:
2  Q.  But you would admit to that?
3  A.  That it was not a part of the -- that the towers ran
4  through that part of us, no, they did not.
5  Q.  Now, back in Question 11, you admit that some of
6  Borden's duties was creation of products.  We talked about
7  product development.  Now we're talking about creation of
8  products.  Now, the products you're talking about Borden
9  creating are new hull shapes and new deck shapes for new model
10  years of boats; is that correct?
11  A.  As well as the components that go in and on the
12  boats themselves, yeah.
13  Q.  What kind of components?  Did he make engines?
14  A.  No.
15  Q.  Did he make rudders?
16  A.  No, he did not.
17  Q.  Did he make steering wheels?
18  A.  No, he did not.
19  Q.  Did he make windshields?
20  A.  He did not make them.  Was he involved with design
21  and the arch or rake of a -- of a windshield?  I would say,
22  possibly, yes.
23  Q.  And where were the windshields made?
24  A.  I'm not 100 percent where we were making them.  They
25  weren't made by us.  They were made by an outside vender.

Page 34

1  Q.  Weren't you in charge of product procurement at that
2  time?
3  A.  Yes, I was.
4  Q.  And you don't know where the windshields were made?
5  A.  We use several sources, and I don't know if this
6  particular time and during his employment we were using Water
7  Bonnet, Taylor Made, or both, because we have used them both
8  in the past and simultaneously together.  But I'm not sure
9  which -- where they would have been coming from.  I mean, if
10  you're just saying general, it's -- they came from two
11  different sources during that period of time.
12  Q.  And didn't the windshield companies come with their
13  own designers?
14  A.  I believe they may have had some designers or
15  engineers on staff that they worked with.
16  Q.  Now, if Borden didn't make steering wheels, didn't
17  make rudders, did he make stuffing boxes?
18  A.  No.
19  Q.  Transmissions?
20  A.  No.
21  Q.  Propellers?
22  A.  No.
23  Q.  Cleats?
24  A.  I don't believe he made the cleats, no.
25  Q.  What about the pylons?  Did he make the pylons in

Page 35

1  the plug and mold shop?
2  A.  They did not do those in the mold and plug shop.
3  Q.  Where were they done?
4  A.  They were done in an adjacent building at that time
5  in our trailer shop.
6  Q.  And that's where Mr. Snook worked?
7  A.  I think Mr. Snook worked in various areas of our
8  company, whether it was always in the trailer shop, plug and
9  mold, or down in the manufacturing.  He had a specific office,
10  but I don't know where that office resided at that time, and
11  his duties meant that he was all over the place as well as on
12  the lake testing product as well.
13  Q.  But Borden didn't create pylons?
14  A.  When you say create, you mean the actual physical
15  building of them and milling of the pylons?
16  Q.  Well, let's say that.
17  A.  No.  He was not responsible for that, no.
18  Q.  Did he go out and do testing on the pylons, whether
19  they were strong?
20  A.  I cannot answer that without speculation.
21  Q.  Do you know if Mr. Snook did testing on pylons?
22  A.  I believe that he was in charge of that, and again, I do
23  whether he did that directly himself or delegated that, I do
24  not know.
25  Q.  So did Borden Larson have a welding crew to weld up

Page 36

1  anything to put on these boats?
2  A.  Did they report to him directly?
3  Q.  My question is:  Did he a have a welding crew?
4  A.  There is a welding crew then and currently at
5  Correct Craft, yes.
6  Q.  And does that welding crew report to Borden?
7  A.  That crew did not report to him, no.
8  Q.  Had it ever report to Borden?
9  A.  Not to my knowledge.
10  Q.  Now, the other part of your answer in 11 says new
11  designs?
12  A.  Yes.
13  Q.  Are you talking about new hull designs and new deck
14  designs for new model years?
15  A.  That is correct.
16  Q.  Then why don't you explain to us how a plug is
17  created.  If a new design for a boat is created, what is the
18  process of taking the design and reducing it to a plug and
19  making a mold?  Because, you know, if we're talking to the
20  jury here, they don't know what a plug is.  I only know
21  because I came out of the boat business, and everybody around
22  this table knows what a plug is.  No one else does.  Why don't
23  you explain to us what a plug is?
24  A.  All right.  If you want me to go back to how one is
25  created or --

Page 37

1  Q.  Sure.
2  A.  -- to a thought is, basically, it would be a sketch
3  or rendering that would be done on a piece of paper to show
4  the styling lines and the -- the look of the boat profile as
5  well  a head-on, rear view, overview, of what the boat would
6  look like.  And at that point then -- and again, I may be very
7  vague and not actual with it, but at that point then you would
8  start to draft that part, give it dimension, and put it into
9  real terms of 21 feet.  This line would go so far, and -- and,
10  you know, start to curve and arc at a certain, you know,
11  radius.
12       At that point in time then you would go -- in the
13  old days before CAD and computers, you would go from that,
14  that layout, which would be like a complete ribbed looking
15  type thing to doing a loft, and a loft would be then building
16  the boat kind of out of air and putting the plug around it.
17       And the plug is actually what they call a male part,
18  which would be what the running surface or deck of a boat
19  would look like.  And from there then you would build your
20  mold, which is a female part, and which then you pull your --
21  your production pieces off of.
22  Q.  So if -- if a new design -- you're saying your new
23  design.  So Borden's job was to make a new design, and let's
24  say you wanted to make a boat that was two feet bigger than
25  your existing boat, what would be the process by which Borden

Page 38

1 would use to, let's say, take an existing boat and stretch it
2 by two feet?
3     A.  A multiple of ways.  There's always the quick and
4 easy way, and you just, you know, Bondo and patch up and, you
5 know, extend the boat by two feet, and then go and test that,
6 that test field, to see how the boat runs and performs.
7 That's a quick and easy way.
8          To convert that into then a plug, you'd probably
9 have to go back through the same series of sketches and
10 layouts and loftings to get the plugs so that those dimensions
11 were 100 percent symmetrical and what you're looking for, and
12 then build your plug and then your molds from that.
13    Q.   So if the idea was to stretch the boat by two feet,
14 are you saying you would just stretch it from the back end?
15 You would add two feet on the back end?
16    A.   Not necessarily, no.  I mean, if you were just
17 wanting to -- and depending on where you wanted that space, if
18 you wanted it in the front or the cockpit area, if it was an
19 open bow, or cockpit area, you know, you would -- you would
20 add the length to it by building on the front of the boat
21 possibly as well.
22    Q.   Is it also possible that you would take a boat and
23 cut it apart in 20 slices and add two inches between each
24 slice?
25    A.   I think that's possible, yeah.

Page 39

1    Q.   Was it actually ever done that way?  You actually
2 cut it apart and add the inches?
3    A.   Oh, I don't know.  I don't know if that has ever be
4 done at Correct Craft.
5    Q.   But if you had a drawing, isn't that how you could
6 do it in a drawing?
7    A.   Yes, sir.  That is correct.  You would put that in
8 increments over the length of the boat, and depending if you
9 wanted four inches in the bow and the other 16 inches, or
10 whatever the dimensions you were looking for, in the cockpit
11 area.  Then you would space those out in the drawing that way.
12 That is correct.
13    Q.   But isn't the science of taking a new boat to
14 production, doesn't it start with last year's boat and saying,
15 What are we going to do with last year's boat to make next
16 year's boat?
17    A.   That is one of the ways, yes.
18    Q.   Is that often the way?
19    A.   Often in what time frame, I guess?
20    Q.   Well, throughout the whole time Borden worked there.
21    A.   Okay.
22    Q.   I mean, how -- how often do you go and build an
23 absolute brand new boat from scratch without taking an
24 existing boat and say, We're going use this as the mule, so to
25 speak, and we're going go to modify it?

Page 40

1    A.   In the last five to six years, it's pretty been
2 frequently with us.  We have come from totally fresh new
3 designs and recreated the boats based on that versus
4 stretching a boat or widening a boat.  So I would say in the
5 last six years, it's been more prevalent than maybe in past
6 years.
7          But during the course of Borden's employment, I
8 would have to really think long and hard to figure out, did we
9 come up with any new designs that would have been different
10 from taking an existing boat and starting from there and --
11 and doing that and bringing a new product off of that, that
12 design.
13    Q.   So in other words, there's two ways a build a new
14 design.  One is to take an existing design and modify it, and
15 the other way is to start -- go right back to the drawing
16 board and start from scratch?
17    A.   Yes, sir.  That is correct.
18    Q.   But either way you're not building something that
19 never existed before.  A boat is a boat, is it not?
20    A.   In that statement, that is true, yes.
21    Q.   I mean, didn't Noah build probably one of the first
22 boats?
23    A.   That is correct.
24    Q.   There's not much difference between a boat today and
25 what Noah built except maybe its hydrodynamic function?

Page 41

1          MR. NORMAN:  Objection.  Vague.
2    A.   I guess we could argue that fact because there has
3 been patents on hull designs for the specific functions of
4 that boat or the weight characteristics which it gives that --
5 that are unique to that product and not found on other boats,
6 I would say.
7 BY MR. LARSON:
8    Q.   But the boats all float?
9    A.   Yes.
10    Q.   They all have hulls?
11    A.   Yes.
12    Q.   They all decks?
13    A.   Yes.
14    Q.   They all have transoms?
15    A.   Yes.
16    Q.   They all have a helm area?
17    A.   Yes.
18    Q.   Just a matter of whether it's bigger or smaller or
19 whether it's fancy or not fancy?
20    A.   Yes.
21    Q.   And so Borden's job was to come up with new boat
22 designs for the company?
23    A.   Yes.
24    Q.   And to modify existing boat designs?
25    A.   Yes.

Page 42

1   Q.  And when was his job ever to make this towing tower?
2   A.  I personally feel that it was during his whole time
3 of employment to come up with new, innovative, creative things
4 that gave us a competitive edge in the marketplace.
5   Q.  But he worked there what, 14 years, was it?
6   A.  I believe.
7   Q.  So did you ever yell at him because he hadn't come
8 up with the tower?  You know, if that was his job to come up
9 with the tower, why did it take him 14 years to do it?
10      MR. NORMAN:  Objection.  Mischaracterizes his prior
11   testimony.
12   A.  I don't think I ever yelled at Borden, but I -- I
13 never yelled at him for that specific thing.
14 BY MR. LARSON:
15   Q.  So if his purpose was the make this tower, why did
16 it take him 14 years to make it?
17      MR. NORMAN:  Objection.  Mischaracterizes his prior
18   testimony.
19   A.  I don't know that I can answer to that.
20 BY MR. LARSON:
21   Q.  Did you ever go -- did anyone at Correct Craft ever
22 go to Borden and say, "Hey, you got to solve this problem of
23 this, you know, towing problems"?
24   A.  I do not know that personally, no.
25   Q.  I'm going to go to Paragraph 12 now, and this says:

Page 43

1 "At no material times during plaintiff's employment was the
2 plaintiff Larson specifically employed by defendant Correct
3 Craft for the purpose of inventing, or inventing a new water
4 ski towing method, or inventing a new storage system for water
5 skis or wakeboards, or inventing a method to improve the
6 aerial characteristics of a performer using a water sports
7 implement."
8      Now, let's talk about the first word after the word
9 "Larson."  It says, "specifically employed."
10      And you deny that whole paragraph?
11   A.  Yes.
12   Q.  When can you tell me that Borden was specifically
13 employed to invent?
14   A.  Again, based on my recollection, he was hired by the
15 manager of that research and development department, which was
16 where we looked for those type of inventing items, designs,
17 the creativity to -- to come out of.  So I -- I'm assuming
18 that that would have been from the day he started with us that
19 his primary goal was to do one of those, one of those tasks.
20   Q.  One of what tasks?
21   A.  Of inventing, creating, designing new products, new
22 designs, new items that gave us a competitive edge in the
23 marketplace.
24   Q.  Now, so you say he was specifically employed to
25 invent.  Did you -- did anyone at Correct Craft go to him over

Page 44

1 those 14 years and say, "Borden, you haven't invented anything
2 yet.  How come you're not inventing?"
3   A.  I do not believe that nobody ever went to him and
4 said he's not inventing, because I believe at the time he may
5 have designed and invented some things that we used in the
6 boats that were unique to Correct Craft at that time.
7   Q.  Like what?
8   A.  I believe a Gul-wing seat, a love seat, a hidden --
9 I forget the description of it right now.  It was a hidden
10 hinge to flip up the love seat, and it may have been called
11 the Gul-wing hinge, so I may be referring to one and the same
12 thing.  I can't remember.
13   Q.  So are you saying that there was no such thing as a
14 Gul-wing seat before Borden designed this thing?
15   A.  I have no knowledge of that, no, if there was or was
16 not.
17   Q.  And what about hinges?  Were there never hinges
18 before Borden designed this hinge?
19   A.  No.  There were.  There's hinges in existence before
20 that.
21   Q.  So Borden took an existing hinge and modified it for
22 your purpose?
23   A.  I don't -- I don't know that he took a hinge and
24 modified it for our purpose, and -- and in the terms of a
25 hinge, this maybe a long, a stretch of what a hinge is, but it

Page 45

1 was a mechanism that allowed for something to -- to be able to
2 rotate or to open, such as a hinge would do, and therefore,
3 I'm calling it a hinge.
4   Q.  So isn't it true actually Bill Snook designed the
5 hinge, not Borden?
6   A.  I do not know that for a fact.
7   Q.  So it could be true?
8   A.  It could be true, yes.
9   Q.  So you're guessing today?
10   A.  Yeah.  I guess, if you're -- yeah.  I mean, I'm just
11 trying to -- to draw on things that came out of that
12 department and pieces and parts that they may have either
13 collaborated on, worked on, solely designed himself and then,
14 you know, with Bill's direction.  I don't know.  So I guess I
15 am kind of guessing at this time.
16   Q.  How are we supposed to know when you're talking true
17 specifically that you know and when you're guessing?
18   A.  I guess to my knowledge is that most of these
19 questions might need to be asked of Mr. Snook and not myself
20 because of his employment with Borden and not my direct report
21 or working with him other than in the materials department.
22   Q.  Let's go back to this Gul-wing seat.
23   A.  Yes.
24   Q.  Are you saying that there were never seats before
25 Borden made a Gul-wing seat?

Page 46

1    A.   No.  There was seats before that.
2    Q.   So this is a modification of an existing seat?
3    A.   Yes.  You could say that.
4    Q.   And you never applied for patents on it?
5    A.   That I'm not aware of, no.
6    Q.   But you're not telling the world that this is brand
7  new, never been developed in the whole universe until Borden
8  came up with this?
9    A.   I -- I do believe we did make that a notable selling
10  feature of the boat, that it was something unique to Correct
11  Craft that our competitors did not have, so whether we told
12  the world or just our customer base through our catalogs and
13  product collateral that we may have put out.
14    Q.   But the income stream for Correct Craft during this
15  period of time was selling of boats, was it not?
16    A.   Yes.
17    Q.   You didn't make an income stream from licensing out
18  inventions, did you?
19    A.   No.
20    Q.   So if you say Borden's job was to invent, doesn't
21  that mean that you had a department that invented and had
22  licensing revenues coming in?
23       MR. NORMAN:  Objection.  Mischaracterizes his prior
24  testimony.  Go ahead.
25    A.   Again, I don't know that I can answer that question

Page 47

1  without speculation.
2  BY MR. LARSON:
3    Q.   Why don't you speculate?
4    A.   Could you rephrase that then, I'm sorry, or
5  requestion that again?
6    Q.   Did Correct Craft at that period of time --
7       MR. LARSON:  We want to take a little break and
8  change the videotape.
9  (Pause in the proceedings.)
10       THE COURT REPORTER:  Okay.  We're back on the
11  record.  It's September 29th, 2006.  The time is 12:20
12  p.m.  Okay.  We're at 1516 East Hillcrest, Orlando,
13  Florida.  This is the deposition of corporate
14  representative Gary Meloon, deponent.
15  BY MR. LARSON:
16    Q.   Okay.  Mr. Meloon, I'm going to go back on a
17  question.  You were talking about the skiboard racks that you
18  say Borden designed.  A half hour ago we were talking about
19  that?
20    A.   Correct.
21    Q.   Do you know a guy by the name of Jerry Davis?
22    A.   Yes, I do.
23    Q.   Isn't it possible that Jerry Davis designed those
24  skiboard racks and not Borden?
25    A.   It could be, yes.

Page 48

1    Q.   Do you know that as a fact, or you just think he
2  could?
3    A.   I do not know as a fact if he did or not.  I do know
4  he manufactured a ski rack for us at a period of time, but
5  whether he was the designer and inventor of that, I do not
6  know.
7    Q.   So you can't really say today that Borden Larson
8  designed them as opposed to Mr. Davis?
9    A.   That is correct.
10    Q.   Okay.  Now, in Paragraph 12, you're denying that
11  Borden was specifically employed to invent a new water ski tow
12  method?
13    A.   We are denying that claim as in, I believe, the
14  material times that it is referencing.
15    Q.   Okay.  But in our -- in Borden's Paragraph 12, he
16  has, you know, specific things separated by commas.  The first
17  thing, "specifically employed for the purpose of inventing,"
18  we talked about.  I don't think we completely covered it, but
19  we talked about it.
20       The next thing, "or inventing a new water ski towing
21  method."  Now, is not the tower a new water ski towing method?
22    A.   Yes, it is.
23    Q.   Now, when did you specifically hire Borden to create
24  a new water ski towing method?
25    A.   I guess I'll go back to what I originally said is

Page 49

1  that when his original employment at Correct Craft based on
2  the department he was in, originally hired for, and his
3  purpose of his duties was to design new things for the
4  company, and those things could be a variation of ski racks to
5  wakeboard towers.
6    Q.   So in other words, you didn't tell Borden what to
7  design.  You just said, "Design things, and we hope they're
8  new."  And the tower came about?
9    A.   I don't know if that's how it was instructed to him
10  by his manager when -- when hired at the time or not, no.  I
11  do not know that was his instructions.
12    Q.   But no one at Correct Craft ever specifically went
13  to him and said, "Borden, we want you to work on inventing a
14  new water ski towing method"?
15    A.   That I do not know.  I would have to refer to his --
16  his manager at the time as if those directions were given.
17    Q.   But you can't, as you're sitting here today, you
18  can't testify that they ever were?
19    A.   I'm -- I'm going to have to say I can only believe
20  that they were at some point in time conveyed to him.  As I
21  had stated earlier, when the World Wakeboard Association came
22  back to us and stated that we needed to do something so that
23  we maintain our position in the exclusive towboat rights for
24  those two tournaments, and I -- I'm just -- I find it hard to
25  believe that there was no communications at any point in time

Page 50

1 or meetings that we were in that it was not conversed or
2 stated to him that that was something we needed to look at,
3 not necessarily a tower, but some way of attaching the rope at
4 a higher point than what we had at the time.
5    Q.  Now, what is the date when this, the World --
6    A.  -- Wakeboard Association?
7    Q.  What is the date when the World Wakeboard
8 Association had this communication with someone at Correct
9 Craft and communicated that they needed something different?
10    A.  It was mid to -- to -- mid to late 90's, I believe
11 it was.
12    Q.  So you're saying a five-year period?
13    A.  Yeah.  Because I -- I believe it could have been as
14 early as '95, '94 possibly, but no earlier than that, and
15 certainly no later than the beginning of 1996 to mid '96
16 probably.
17    Q.  So what is the range now?
18    A.  If I gave you a specific range, it would be '94 to
19 '96.
20    Q.  So somewhere in the period of '94 to '96.  We're now
21 down to two years?
22    A.  Yeah.
23    Q.  Somewhere in this two-year period, you're saying
24 someone from the World Wakeboard Association came to Correct
25 Craft, and what did they tell them?

Page 51

1    A.  That, as I had stated before, that we were going to
2 lose our position as an exclusive towboat to two prestigious
3 world tournaments, the Wakeboard Worlds and the Nationals, at
4 which we had had since the inception of basically wakeboarding
5 in pulling those two events, and it was a position that was
6 premier to us, and we wanted to -- to hold on to that.
7    Q.  Now, Correct Craft keeps meeting minutes, the
8 management meeting minutes, do they not?
9    A.  Yes, they do.
10    Q.  And memorialize important facts?
11    A.  Yes.
12    Q.  And they don't write down trivial facts in the
13 meetings, in the minutes?
14    A.  I don't want to say they don't, because there may be
15 times that there has been trivial facts written down that I'm
16 not aware.
17    Q.  But they write down important facts?
18    A.  Yes.  Actions taken.
19    Q.  And what about ideas thought of?
20    A.  It is very possible that ideas thought of or
21 discussions of that nature would be written down for future
22 reference for the managers.
23    Q.  And if something would happen that was a -- that was
24 a big event, you would have a meeting?
25    A.  A managers' meeting for that?

Page 52

1    Q.  Some type of meeting?
2    A.  Yes.  There probably would have been a management
3 meeting of that nature.  They bring in the research and design
4 team to -- to be a part of that.  Now, whether that was the
5 whole department or just the department head, I don't -- I
6 don't remember.
7    Q.  And if a design -- and if an idea was coming up here
8 that would revolutionize the whole, you know, wakeboarding
9 world, that's important enough to have a meeting, was it not?
10    A.  I don't know at the time that we could -- I would be
11 speculating that we would have thought that it would have
12 revolutionized the -- the wakeboard community.  I think I
13 would be speculating to that effect.  But if there was some
14 discussion of us losing our premier position as an exclusive
15 towboat, that would have been a meeting in itself, yes.
16    Q.  But there's no minutes of that meeting?
17       MR. NORMAN:  Objection.  Assumes facts not in
18    evidence.  Go ahead and answer.
19    A.  Yeah.  I -- I'm assuming there aren't minutes, if
20 that's what you're saying.  I don't know that for a fact.
21 BY MR. LARSON:
22    Q.  So in other words, Correct Craft is being threatened
23 that they're going to lose the sponsorship of two big
24 tournaments?
25    A.  Yes.

Page 53

1    Q.  And on that day, you took no notes?
2       MR. NORMAN:  Objection.  Assumes facts not in
3    evidence.
4    A.  I -- I -- I can only speculate, again, if we did or
5 did not.
6 BY MR. LARSON:
7    Q.  Were you present at those meetings?
8    A.  I possibly could have been at some and not all.
9    Q.  Which one were you present at?
10    A.  I do not remember.
11    Q.  Do you remember what room you were in?
12    A.  I'm probably going to say that meetings of that
13 nature typically took place in the managers' conference room.
14    Q.  But that's a pretty big deal there when you're going
15 to lose sponsorship of two tournaments, and you don't really
16 remember what room you're in?
17    A.  Like I say, most meetings of those magnitude would
18 have been in the managers' conference room.  If we exceeded
19 the capacity of that conference room, we then move to the
20 board room at this time to allow for addition personnel to
21 come in and be present.
22    Q.  So who from the World Wakeboard Association was
23 there at that meeting?
24    A.  I do not know that anybody was there representing
25 the World Wakeboard Association.

Page 54

1    Q.  How did Correct Craft become aware that the World
2  Wakeboard Association was going to drop them as the towboat
3  then?
4    A.  There was some kind of communication.  I'm not sure
5  exactly which, whether it was in writing, a phone call, or in
6  person that Jimmy Redman, who the president of Wakeboard World
7  Association, made contact either through one of several
8  sources, Larry Meddock, our vice president of marketing and
9  special events, and/or my father, Walt Meloon, who was
10  president and CEO of the company.
11    Q.  So you must have or Correct Craft must have taken,
12  you know, swift action if you're going to lose, you know,
13  sponsorship in two events?
14    A.  I believe there was a sense of urgency to -- to get
15  onto something as soon as possible, yes.
16    Q.  And what kind of memos were written about this sense
17  of urgency?
18    A.  I -- I do not know.
19    Q.  Have you ever seen any memos about the sense of
20  urgency?
21    A.  Not to my recollection do I remember right now
22  seeing one, no.
23    Q.  Did you ever make a phone call to anybody about the
24  sense of urgency?
25    A.  I don't believe I ever made a phone call to anyone,

Page 55

1  no.
2    Q.  Did you ever receive a phone call from anybody?
3    A.  I don't recall, no.
4    Q.  Who told you this event even happened?
5    A.  It was either Larry Meddock, the vice president of
6  special events -- marketing and special events, or my father,
7  the president and CEO of the company at the time.
8    Q.  So you don't know who told you?
9    A.  I -- I do not remember, no.
10    Q.  Did they both tell you?
11    A.  It's very possible that they could have.  They were
12  probably both present at that time.
13    Q.  At what time?
14    A.  When I was made aware of this.
15    Q.  And who told you first?  If both of them told you,
16  who told you first?
17    A.  I don't remember.
18    Q.  And why were they telling you this?
19    A.  Probably only from a standpoint of working with as
20  -- as the person in charge of the materials at Correct Craft,
21  probably that I would, you know, be needing to be working with
22  the research and development team on any new designs or
23  materials that may might require to be purchased or had to
24  develop anything that they needed to come up with so that we
25  maintain those positions in those two tournaments.

Page 56

1    Q.  And what did you do then?
2    A.  To be honest with you, I don't remember exactly the
3  course of action I may have taken at that time.
4    Q.  So Correct Craft is facing losing two events, and
5  you don't even know what you did?
6    MR. NORMAN:  Objection.  Badgering the witness.  Go
7  ahead and answer, if you can.
8    A.  I mean, again, I can -- can give a rough outline
9  that would be some speculation.  Possibly, but more than
10  likely, is began working directly with the research and
11  development team on any ideas, concepts, contacting of
12  venders, looking at material requirements that might need to
13  be had if we, you know, that -- that was generally my job
14  description was working with them, getting venders'
15  certification, if a vender was not already certified or on
16  board with us, and getting certain, like I said, certification
17  so that we would do business with them.
18  BY MR. LARSON:
19    Q.  But we're talking about what you did specifically
20  after either your dad or Larry Meddock told you that the World
21  Wakeboard Association was going to drop you if you didn't do
22  something.  I want to know what you did after that.
23    A.  Again, I don't recall exactly what, at that point,
24  after I was told that, what my course of action was.
25    Q.  Do you know what Bill Snook did after that?

Page 57

1    A.  No, do not.
2    Q.  Do you know what Borden did?
3    A.  I do not know with all certainty what he did either.
4    Q.  Do you know what your dad did?
5    A.  The best I remember is that he, I think, either
6  wanted to form a focus group or put together something so that
7  we could look at it.  It may have been a focus group that was
8  comprised of, you know, counsel we had time or professional
9  athletes that we hired at the time to come in and give
10  suggestions and ideas and thoughts on what was working out
11  there in the marketplace and what was not working out there in
12  the marketplace.
13    Q.  But what would that have to do with the World
14  Wakeboard Association dropping you from two tournaments?
15    A.  Well, working with the athletes to see why we could
16  not maintain our position with our current stand that we did
17  not want an extended pylon to be extended -- put onto our
18  boats because of the safety liability that it would pose as
19  well as, you know, what was the real need for getting the rope
20  attachment higher for them to do things with.
21    Q.  But we're talking here about what your dad did, and
22  you're saying that this is what he could have done.  You don't
23  know if he did any of this.  You said, My dad could have had a
24  focus group.  He could have brought the athletes in.  He
25  could have done this, could have done this.

Page 58

1    You don't know what your dad did.
2    MR. NORMAN:  Objection.  Mischaracterizes his prior
3  testimony.
4    A.  You're right.  I do not know absolutely what he did.
5 BY MR. LARSON:
6    Q.  And you don't know what Larry Meddock did?
7    A.  Not without, again, speculating.
8    Q.  Let's move down to Number 13.  It says:  "At no
9  material times during plaintiff's employment did defendant
10  Correct Craft require, request, or ask Larson to sign, agree,
11  or execute a contract, agreement, term of employment,
12  intellectual property agreement, invention agreement, job
13  description, or any other agreement or understanding that
14  required or demanded that things invented on the job belonged
15  to and became the property of the defendant Correct Craft."
16    And you deny that.
17    A.  That is correct.
18    Q.  Let me tell you, let me ask you, when did you ask
19  Borden -- let's just start at the beginning right after --
20    A.  -- to sign and agree?
21    Q.  Yeah.  When did you ask him to sign or agree or
22  exercise -- execute a contract?
23    A.  I don't know that we did.
24    Q.  Why are you denying it then?
25    A.  Because under the law, we do not have to require

Page 59

1  those things for intellectual properties to be part of the
2  company's.
3    Q.  And what law is that?
4    A.  I'm not 100 percent sure.  I believe it was based on
5  legal advice that our counsel had given us.
6    Q.  And did you hear that legal advice?
7    A.  At the time that this was drafted?
8    Q.  No.  At the time that you're saying that based on
9  legal advice.  I'm asking you if heard the legal advice?
10    A.  No.  I did not that hear that legal advice when we
11  -- these were done three years ago, no.
12    Q.  I'm not asking whether or not you agreed or what the
13  law was three years ago.  This is at during the time Borden
14  was employed, when he was hired in 1986.  When he was hired in
15  1986, did you require him to sign or agree or execute a
16  contract or agreement that says everything he invented on the
17  job belonged to Correct Craft?
18    A.  No, we did not.
19    Q.  Then why are you denying that?
20    A.  Because Borden's job was to do those things.  He was
21  hired to do those things as we saw that he came in and out of
22  his daily job responsibilities.
23    Q.  I don't think you're answering my question.
24    A.  Then I'm not -- I'm sorry.  I'm not sure if I
25  understand what your question is.

Page 60

1    Q.  When Borden was hired in 1986, did you hand Borden a
2  contract and say, "Borden, everything you invent here belongs
3  to us and sign here that you agree to that"?
4    A.  No, we did not.
5    Q.  Why didn't you?
6    A.  I can't answer that question as to why we did not.
7    Q.  Okay.  But what you stated here is that you deny it.
8  You said, "I did make him sign it."
9    MR. NORMAN:  Objection.  Mischaracterizes the
10  statement and the document.
11    A.  Yeah.  Because I don't think we ever did ask or
12  request him to.
13 BY MR. LARSON:
14    Q.  So would you like to change the answer of this and
15  say "admit"?
16    A.  No.
17    Q.  But if you never asked him to, you're saying that
18  you did ask him to.  Let's just read this, very simply:  "At
19  no time -- at no material time during plaintiff's employment
20  did Correct Craft require, request, or ask Larson to sign."
21    Let's just stop right there.
22    MR. NORMAN:  Well, conjunctive though.  It's or, so
23  it's got to be all of those.  They never asked him to do
24  anything of those things.
25 BY MR. LARSON:

Page 61

1    Q.  Okay.  "To sign, agree, or execute a contract,
2  agreement, term -- " and to paraphrase, that things on the job
3  belong to --
4    MR. NORMAN:  Well, don't paraphrase.  List all the
5  things.
6    MR. LARSON:  I've already read it.
7    MR. NORMAN:  Okay.
8    MR. LARSON:  I read it into the record once.  I
9  don't need to read it into the record.  I'm trying -- I'm
10  just trying to get -- understand why you're denying
11  something that you say you really should have admitted.
12    MR. NORMAN:  He doesn't say that.  And that
13  mischaracterizes his testimony and is not a pending
14  question, and if you point out to me, I can explain it to
15  you, because it's pretty obvious from the question, but go
16  ahead.  Do what you like.
17 BY MR. LARSON:
18    Q.  Did Correct Craft ask Borden to sign this, to sign
19  an agreement?
20    MR. NORMAN:  Sign what kind of agreement, sir?
21    MR. LARSON:  An intellectual property agreement.
22    MR. NORMAN:  Of any type?
23    MR. LARSON:  Of any type.
24    A.  No.
25 BY MR. LARSON:

Page 62

1    Q.    Okay.  Let's go down to 14.  It says:  "In about
2  June of '96, the plaintiff Larson was working on a drawing for
3  the defendant's Sport Nautique pleasure boat and was thinking
4  of a message -- method to increase storage space.  The
5  defendant Correct Craft had not assigned the plaintiff the
6  duty to design, invent, or increase storage space on the
7  boat."
8        And your answer is:  "Without knowledge, accordingly
9  denied."
10       Now, do you know what Borden was doing in June of
11 '96?
12   A.    No, I do not.
13   Q.    Do you know if he was working on a drawing for
14 increasing storage space?
15   A.    No, I do not.
16   Q.    Do you know what Correct Craft had actually assigned
17 him to do that day?
18   A.    I do not.
19   Q.    Have you looked for the records to determine what
20 Correct Craft has assigned Borden to do in June of '96?
21   A.    No, I have not.
22   Q.    Haven't we asked you for those records?
23   A.    You may have asked those of the corporation or of
24 our attorneys but not -- I have not been involved with that.
25   Q.    Who's been involved with getting the documents from

Page 63

1  the corporation?
2    A.    That would be Angela Pilkington.
3    Q.    She's the only person in the corporation that asked
4  to get documents?
5    A.    Again, I'm just -- that's normally who provides our
6  attorneys when requested of this information.  Now, did she
7  delegate that, or was she absent that day and somebody else
8  may have done it?  It's possible.
9    Q.    Would it be possible for you to go back and find out
10 what Borden's job duties were in June of '96?
11   A.    Yes, I could.
12   Q.    How would you go about doing that?
13   A.    Probably within his employment file.
14   Q.    What kind of employment file?
15   A.    Each employee at Correct Craft has got an employment
16 file from date hired to date of separation and job
17 descriptions, performance, raises, bonuses, things of this
18 nature are all part of that employee's employment file.
19   Q.    So daily job duties are in the employment file?
20   A.    I believe from time to time they are listed in there
21 as to what employees' jobs require them to do, yes.
22   Q.    Have you ever looked in Borden's employment file?
23   A.    Yes, I have.
24   Q.    Did you find what he was doing in June of '96 in
25 there?

Page 64

1    A.    Not specifically June of '96, no.
2    Q.    So in other words, where you told me you would go
3  look, you couldn't find what you were looking for?
4    A.    I'm sorry.  I'm not.
5    Q.    So you have already looked in his employment file?
6    A.    I'm sorry.  Yes.
7    Q.    You have already looked in there, and what he was
8  working on in June of '96 is not in there?
9    A.    That I do not know, because I did not look at it in
10 its entirety.
11   Q.    How many pages is it?
12   A.    I -- I would be speculating.  I don't know.
13   Q.    Is it hundreds and hundreds of pages?
14   A.    I would -- no.  I do not believe it's hundreds and
15 hundreds.
16   Q.    More like 50?  66 to be exact?
17   A.    No less than 50, no more than a hundred.
18   Q.    And you looked in there and you -- you want to look
19 at it now?
20   A.    If it's available, I can.
21   Q.    Let's do that later.  That's going to, you know,
22 confuse this whole issue.
23   A.    Okay.
24   Q.    What do you know about what Borden's assignments
25 were for June of '96?

Page 65

1    A.    I have no knowledge of what his assignments were.
2    Q.    But someone at Correct Craft does?
3    A.    Yes.
4    Q.    Why did Correct craft say then without knowledge?
5    A.    I believe at the point in the phrase where what the
6  defendant was thinking, we have no knowledge of what he was
7  thinking at that time.
8    Q.    What about working?  It says Larson was working on a
9  drawing?
10   A.    I understand that, but I believe our position was it
11 was without knowledge what he was thinking of, whether it was
12 a drawing or -- any other job performance.  I don't know if
13 we understand what, without knowledge, what he was thinking,
14 so accordingly denied that.
15   Q.    But what about working on?  It says he was working
16 on a drawing?
17   A.    Um-hmm.
18   Q.    You're the people who tell him what to do.  He was
19 doing it for -- he was doing it for Correct Craft.  Correct
20 Craft doesn't know what he's doing?
21       MR. NORMAN:  Object to the form of the question.  Go
22 ahead and answer.
23   A.    Probably I would want to refer that back to -- to
24 Mr. Snook as his direct report as to what he was doing.
25 BY MR. LARSON:

Page 66

1    Q.  But in June of '96, Borden wasn't working -- wasn't
2  reporting to Mr. Snook, was he?
3    A.  I can only go on what you've told me.  I do not -- I
4  do not know that for a fact.
5    Q.  You haven't looked in Mr. Larson's personnel file?
6    A.  Again, a few minutes ago said I had.  It was just a
7  brief glance at it to see a certain document I was looking
8  for.
9    Q.  I'm going to offer what's been purported as
10  Mr. Borden Larson's personnel file.  This is going to be
11  Exhibit --
12    A.  -- five.
13    Q.  Five?
14    A.  Um-hmm.
15  (Exhibit No. 5 was marked for identification.)
16  BY MR. LARSON:
17    Q.  Somehow I only have one copy of this.  Why don't you
18  take a look through there and see if you can find out what
19  Borden was doing in June of '96.
20    MR. NORMAN:  You can use post-it tabs.  You're
21  giving yourself a lot of spots.
22    Can we have some post-it tabs?  Can I grab these?
23    MR. LARSON:  Yeah, yeah.
24    THE WITNESS:  Thank you.
25    MR. NORMAN:  You're going to run out of fingers

Page 67

1  soon.
2  BY MR. LARSON:
3    Q.  Okay.  My question now is:  Does this personnel file
4  or employee -- what do we call this?
5    A.  Personnel file.
6    Q.  Okay.  Is there anything in here that memorializes
7  what Borden Larson was doing in June of 1996?
8    A.  There's nothing that states exactly what his job
9  responsibilities based on June 1996, no.
10    Q.  Okay.  So going back to our question now, 14:  "In
11  or about June of '96, the plaintiff Larson was working on
12  drawings for the Sport Nautique Pleasure Boat."
13    You have nothing in that file that indicates that he
14  was working on the drawings for that boat?
15    A.  If I'm understanding the question, so let me see if
16  I can understand it.  Based on June 1996, I don't believe
17  there would be a daily log of what he was doing and working
18  on.  There are job descriptions as what his job was within his
19  file.  Now, whether that was a span of '88 or beginning of
20  employment until separation, or June of '96, I could not tell
21  you that.
22    Q.  Okay.  You mentioned a daily log.  Was there ever a
23  daily log as to what Borden Larson did at Correct Craft?
24    A.  I would have to refer that to his manager.
25    Q.  Have you ever seen daily logs for any employee?

Page 68

1    A.  I have requested those of employees that have worked
2  for me in the past, yes.
3    Q.  Before Correct Craft answered this question, did
4  they ask Borden's manager for a daily log?
5    A.  I do not know.
6    Q.  So it could be possible then when Correct Craft says
7  without knowledge, had they gone to a manager, they could have
8  found a daily log?
9    A.  I'm assuming that they did go to the manager and ask
10  what that manager's knowledge of what he was working on at
11  that time.
12    Q.  But who could come?
13    A.  I would -- I would have to say that the manager
14  would be able to better answer that question.
15    Q.  But his manager was Mr. Elrod, was he not?
16    A.  Now, that I have reviewed his file, that does seem
17  to be correct.  It was his -- his manager at the time.
18    Q.  And I'm trying to take a deposition of the corporate
19  representative that could answer these questions.  Is there
20  any reason Mr. Elrod isn't here to answer these questions?
21    A.  Yes, there is.
22    Q.  Why is that?
23    A.  He is deceased.
24    Q.  Oh, I'm sorry.  Have you looked for Mr. Elrod's
25  daily logs that he would have kept?

Page 69

1    A.  I personally, no, have not.
2    Q.  Okay.  Let's go look at the next one, Number 15.  15
3  says:  "While alone in his office, the plaintiff -- plaintiff
4  Larson thought about placing a tall welded tubular structure
5  up, and over, the helm area of the boat to which water skis
6  could be attached or hung.  The defendant had not assigned the
7  plaintiff such a task."
8    Now, Correct Craft again says:  "Without knowledge,
9  accordingly denied."
10    Did Correct Craft go and do a search of whether or
11  not Borden was given a task to create this tall welded tubular
12  structure up and over the helm area of a boat to which water
13  skis could be attached?
14    A.  I do not know that that was done or not.
15    Q.  You don't know if what was done?
16    A.  That any searches had been done.  I know why we
17  answered to without knowledge and accordingly, but I do not
18  know if any searches were done to look for any documentation
19  that you asked.
20    Q.  Why did Correct Craft state without knowledge?
21    A.  Because, again, we -- we were not aware of what
22  Mr. Larson was thinking on or around that time.
23    Q.  Okay.  But the second sentence here in Paragraph 15
24  doesn't talk about thinking.  It says:  "The defendant had not
25  assigned the plaintiff such a task."

Page 70

```
 1        Now, you don't know what you assigned Borden Larson?
 2    A.  I personally do not.  That would be, again, his
 3  manager who would have been in charge of him at that time.
 4    Q.  But Correct Craft is -- here Correct Craft is
 5  denying to have no knowledge of what assignment was given to
 6  Borden Larson that day and whether that assignment was about
 7  placing this tall tubular structure over the helm area; is
 8  that correct?
 9        THE WITNESS:  Can we confer?
10        MR. NORMAN:  Yeah, sure.
11        MR. LARSON:  No, you can't confer.
12        MR. NORMAN:  Well, are you trying to ask me.
13        MR. LARSON:  Basically, what I'm asking --
14        MR. NORMAN:  I know.  But are you trying to ask me a
15  question of privilege or something?
16        THE WITNESS:  Yes.  I would like to -- to ask you a
17  something in that text.
18        MR. NORMAN:  I mean, unless you'd like to go -- he
19  can't answer it if he's got a question about whether it's
20  privileged or not, obviously.
21        MR. LARSON:  I'm asking him for what's in Correct
22  Craft's knowledge.
23        MR. NORMAN:  Right.
24        MR. LARSON:  And what's in Correct Craft's knowledge
25  whether or not an assignment was given to Borden.
```

Page 71

```
 1        MR. NORMAN:  Right.
 2        MR. LARSON:  Why would that ever be privileged?
 3        MR. NORMAN:  I wouldn't know without talking to him.
 4        THE WITNESS:  And probably if -- I can go ahead.
 5        MR. NORMAN:  If you can answer without divulging
 6  privileged information, you should feel free do so.  If
 7  you can't, then we can confer.
 8        THE WITNESS:  Okay.  Your question was in the second
 9  sentence there, "The defendant had not assigned the
10  plaintiff such a task"?
11        MR. LARSON:  Yes.
12        THE WITNESS:  How can we answer without knowledge
13  and accordingly deny that statement?
14  BY MR. LARSON:
15    Q.  No.  I'm saying -- what I'm saying is that the
16  defendant had not assigned such a task, and you say, "Without
17  knowledge."
18        So are you saying that you didn't know whether or
19  not you gave Borden that task or not?
20    A.  I do not know that, no.
21    Q.  Does Correct Craft know that?
22    A.  I do not know that if anybody is any longer employed
23  or alive that might know that.
24    Q.  Do you have any documentation that would prove that
25  Correct Craft gave Borden Larson that job to make this tall
```

Page 72

```
 1  tubular structure up over the helm area?
 2    A.  I do not, no.
 3    Q.  And what about Correct Craft?
 4    A.  I do not know if we had a file or -- or
 5  documentation in which that was stated, no.
 6    Q.  So there's no evidence that you can find that
 7  Correct Craft ever gave Borden the job duty to make this tall
 8  tubular structure?
 9        MR. NORMAN:  Objection.  Mischaracterizes his prior
10  testimony.
11    A.  I do not know that for certainty whether Correct
12  Craft or I ever had any documentation to that, no.
13  BY MR. LARSON:
14    Q.  Okay.  Let's go to 16.  16 says:  "The plaintiff
15  Larson sketched on a sheet of paper a tall welded metal
16  tubular tower up and over the helm area of the boat and
17  attached the tower over the left and right sides of the boat."
18        And your answer is:  "Without knowledge, accordingly
19  denied."
20        Did you ever see a drawing, a sketch, that Borden
21  made with a tubular structure on top of a boat?
22    A.  Yes, I did.
23    Q.  And why is Correct Craft --
24    A.  I would like to change to admit.
25    Q.  You would like to say, "admit"?
```

Page 73

```
 1    A.  Yes.
 2    Q.  Do you know why they said, "Without knowledge"?
 3    A.  Again, that person is no longer employed, and I'm
 4  not sure why they would have said that.
 5    Q.  And who is that person that's no longer employed?
 6    A.  I'm going to assume it was Terry McNew (ph), the
 7  president and CEO.  It may not have been.  It may have been --
 8  to be honest with you, I'm speculating.  I'm going to have to
 9  leave it at that.  I don't know.
10    Q.  So in other words, Correct Craft today does not know
11  who gave this answer back when this answer was given?
12    A.  If I had a time reference, I might be able to give
13  you an answer, but I do not know without a time frame as to
14  when these answers were given.
15    Q.  Why don't you look at the -- why don't you look at
16  the signature on the back of the answers.  These are your
17  answers.  Look at the signature on the back of the answers.
18    A.  Brian Gilchrist.
19    Q.  Okay.  He was your attorney?
20    A.  Correct.
21    Q.  Are you saying Brian Gilchrist is making answers for
22  Correct Craft?
23    A.  Without talking to him, I would not know.
24    Q.  So Brian Gilchrist never sat down with you and says,
25  "Let's go through and answer these questions"?
```

Page 74

1   A.  Not with I, no, sir.
2   Q.  Do you know who he sat down with?
3   A.  No, no, sir.  I do not know 100 percent.
4   Q.  How about a partial percent?
5   A.  If you're asking me to speculate, I would assume it
6  was Terry McNew at the time, the president and CEO.
7   Q.  And Terry McNew was not employed by Correct Craft
8  during the period that any of this happened?
9   A.  Correct.
10   Q.  Why would Brian Gilchrist be asking Terry McNew
11  things that Terry McNew had no knowledge of?
12   A.  I do not know that answer.
13   Q.  And why would Correct Craft go into litigation, have
14  someone answering questions who had no knowledge?
15   A.  Again, I could not answer that question.
16   Q.  Did you ever sit with Terry McNew and go over these?
17   A.  No, sir, I did not.
18   Q.  Do you know if anyone else sat with Terry McNew?
19   A.  That I do not know either.
20   Q.  But you signed the interrogatories and, you know,
21  our first request for interrogatories.  You're the one that
22  signed them?
23   A.  Yes, sir.  That is correct.
24   Q.  Why didn't Terry McNew sign them?
25   A.  Was he -- when were those, the time frame those were

Page 75

1  signed?
2   Q.  I can't really tell you off the top of my head.
3   A.  He's no longer employed.  He's been --
4   Q.  I know that.
5   A.  So I'm not sure if that was after his leaving, and
6  signing of corporate documentation of that nature was then
7  assigned to me.
8   Q.  Okay.  But for 16, you would like to now admit that?
9   A.  Yes, sir.
10   Q.  So you're admitting that Borden actually sketched on
11  a sheet of paper this tower up over the helm of the boat that
12  attached at the left and right side of the boat?
13   A.  A drawing that Borden brought to me at some point in
14  time had a tower, tubular tower, sketched over a deck.
15   Q.  And tell me about that time he brought it to you.
16   A.  Tell you?  I'm sorry.
17   Q.  Tell me about the time that Borden brought this
18  drawing to you.
19   A.  It was probably in a time frame was when we were
20  going to need the materials to harden it out, to spec out the
21  materials and venders for building of this tube or of this
22  tower.
23   Q.  And was it -- is it a tower on top of a boat?
24   A.  It was on top of a sketch of a boat, yes.
25   Q.  How many views of the tower were there?

Page 76

1   A.  I do not remember.
2   Q.  Do you know if you're looking at the top view or
3  right side or front?
4   A.  I could not recall now if it was top or side view.
5   Q.  Did he give you that copy of that drawing?
6   A.  I -- I remember being shown.  Whether it was left in
7  my possession or not, I do not remember.
8   Q.  Do you have any drawings in your possession?
9   A.  No, I do not.
10   Q.  Okay.  Let's go down for 17.  It says:  "For visual
11  effect, plaintiff Larson sketched wakeboards mounted on the
12  side of the tower.  Defendant Correct Craft had not assigned
13  the plaintiff to sketch -- the task to sketch, design or
14  invent a tall welded metal tubular tower, over the boat, to
15  mount water skis or wakeboards."
16       Now, Correct Craft also says:  "Without knowledge,
17  accordingly denied."
18       Have you ever seen a sketch with wakeboards mounted
19  on it?
20   A.  I believe that maybe at some point in time I had
21  seen a sketch with wakeboards on it.
22   Q.  Had other people at Correct Craft, do you know, seen
23  a sketch with wakeboards mounted on it?
24   A.  I'm only assuming that they did, yes.
25   Q.  Have you seen them in meetings?

Page 77

1   A.  I believe there was a meeting that there was
2  sketches of that nature, and that was brought up.
3   Q.  Do you know why Correct Craft would then deny
4  knowledge of this sketch with wakeboards?
5   A.  No, I do not.
6   Q.  Would you like to admit that today?
7   A.  I'm not sure why it was not without knowledge and
8  accordingly denied, and I don't feel comfort in changing that
9  answer, no, sir.
10   Q.  Okay.  The second sentence says:  "Defendant Correct
11  Craft had not assigned plaintiff the task to sketch, design,
12  or invent a tall welded metal tubular structure over the boat
13  to mount skis or wakeboards."
14       Have you looked for any assignments that Correct
15  Craft ever gave to Borden to make or invent that tower?
16   A.  No.
17   Q.  You haven't looked for them?
18   A.  I'm not aware of any as -- as -- as if there was
19  assigned job responsibilities to that degree, no.
20   Q.  Okay.  So Correct Craft still has no knowledge of
21  any of any that.  Okay.
22       Let's go on to 18:  "The plaintiff Larson then
23  sketched a spot on the top of the tower to attach to a tow
24  rope for pulling water skiers."
25       Have you ever seen a drawing with a spot on the top

Page 78

1 for attaching a rope?
2    A.  I believe so, yes.
3    Q.  But Correct Craft says, "Without knowledge."  Why
4 would they say without knowledge when you have seen that
5 sketch?
6    A.  And again, it's an assumption that I want to make,
7 or speculation, is that without knowledge is because I don't
8 know that that rope attachment was there when the original
9 drawing was done, or if those were an afterthought for -- for
10 the tower.
11    Q.  Now, what are you talking about the original
12 drawings and an afterthought?  Are we saying there's two sets
13 of drawings now?
14    A.  No.  I'm just saying that that may have been in
15 addition to that tower as part of collaborative efforts.  It
16 may have been a part of -- and I think without knowledge
17 knowing whether Larson was the one who sketched it up there or
18 someone else possibly.
19    Q.  But you're guessing?
20    A.  Yes.
21    Q.  But you have seen a sketch with a spot on top of it?
22    A.  I -- yes.  I do remember something on top of a
23 tower.
24    Q.  And you're denying knowledge because you don't know
25 who put the spot on there?

Page 79

1    A.  That is correct.
2    Q.  So Correct Craft is out -- I withdraw that.
3        Did you ever ask anybody who put the spot on the
4 tower?
5    A.  Not that I remember, no.
6    Q.  But now Correct Craft is applied for patents on this
7 tower with the spot on it; is that correct?
8    A.  That is one of the, I think, many points in the
9 patent, yes.
10    Q.  How is it that you're applying for patents on a
11 tower with a spot on it when you don't even know who made the
12 spot?
13    A.  I'm assuming only one of three people could have
14 been the one that had put that up there for that, that
15 reference point.
16    Q.  But you don't know?
17    A.  No, I do not know for certain.
18    Q.  But you still went and applied for a patent on
19 something that you don't know who even put the spot on it?
20    A.  Well, at that time, no, we did not know, and we did
21 not apply for a patent at that point time in reference.
22    Q.  But at that time -- what do you mean, at that time?
23 In 1996, at that time, you didn't know who put the spot on it?
24    A.  I'm not certain, no.
25    Q.  So Borden comes and brings you a drawing that -- did

Page 80

1 he say that only he drew it?
2    A.  I don't remember if he said only he drew it, no.  I
3 do not know that.
4    Q.  Now, if Borden brought you a drawing, would someone
5 else have drawn the drawing for him?
6    A.  No, possibly not.
7    Q.  Very unlikely?
8    A.  Very unlikely.
9    Q.  And the drawing that Borden drew -- brought you had
10 a spot on top of it?
11    A.  There was a drawing that had a spot on top of it,
12 whether it was an original drawing or a secondhand drawing,
13 there may have been versions of that drawing from a tower to
14 the wakeboard storage with wakeboards being and a tow point on
15 there.  I -- I'm very fuzzy on whether it was these exact
16 drawings that we originally saw, or as we developed it, other
17 things came about.
18    Q.  I want to talk about the first time Borden brought
19 you this drawing.
20    A.  I don't remember a spot being on top of it.  To the
21 best of my knowledge right now, I do not know that there was a
22 spot.  I do remember seeing a spot at some point in time drawn
23 on top of the tower itself, the tower at the time.
24    Q.  Did you see a tow rope attached to the top of the
25 tower?

Page 81

1    A.  I don't recall if there was or not, no.  I don't
2 remember.
3    Q.  Do you remember what room you were in when Borden
4 showed this to you?
5    A.  I would be guessing.  It was either in my office or
6 in a managers' meeting where this first came up.
7    Q.  And who was in the rooms with you?
8    A.  Probably the present management team at that time.
9    Q.  But you don't know?
10    A.  I'm not 100 percent certain, no.
11    Q.  So if you don't know who was in the room and what
12 room you're in, you know, your memory of whether or not this
13 tower had a spot and a rope on it is likely just as cloudy?
14    A.  Yeah.  If the original drawing or not did not have
15 it, I do not remember.
16        THE COURT REPORTER:  Can I -- disk.
17        MR. LARSON:  Sure.
18        THE COURT REPORTER:  Okay.  Off the record at
19 1:09 p.m.
20 (Pause in the proceedings.)
21        THE COURT REPORTER:  Okay.  Back on the record.
22 Court reporter, Michelle Manni.  Today is September 29th,
23 2006.  The time is 1:15 p.m.  We are at 1516 East
24 Hillcrest, Orlando, Florida.  This is the deposition of
25 corporate representative Gary Meloon, deponent.

Page 82

BY MR. LARSON:

1    Q.   So, Mr. Meloon, let's go look at Number 19 now.
2       19 says:  "The plaintiff realized -- then realized
3  that by attaching the towrope on top of the tower, a tall
4  pylon commonly mounted in the center of the boat and used to
5  attach the towrope could be eliminated, period.  The defendant
6  Correct Craft had not assigned the plaintiff the task of
7  eliminating the pylon?"
8       Correct Craft says:  "Without knowledge, accordingly
9  denied."
10   A.   Correct.
11   Q.   So Correct Craft has looked for this assignment to
12  eliminate the pylon, and you couldn't find it, or you don't
13  know anything about it?
14   A.   I -- I have no knowledge of that if we looked for
15  it.
16   Q.   Okay.  Let's go to the next one.  Number 20 says:
17  "The plaintiff's -- the plaintiff Larson's tower was an
18  invention or discovery of a new and useful process, or of a
19  new and useful machine and manufacture, or of a new and useful
20  improvements thereof."
21       And Correct Craft says:  "Without knowledge,
22  accordingly denied."
23   A.   That is correct.
24   Q.   Now, the tower that was designed is being

Page 83

1  manufactured today in one form or another; is that not true?
2    A.   There are towers being manufactured today, yes.
3    Q.   That were based on, you know, the design that Borden
4  created at that point in time?
5    A.   On the concept that he came up on that sketch, yes.
6    Q.   Okay.  And was that concept not new at that point in
7  time?
8    A.   That concept was, yes, at that time.
9    Q.   It was brand new, was it not?
10   A.   Yes.
11   Q.   Why is Correct Craft denying knowledge that it was
12  new or not?
13   A.   I would -- I'm going to say that why we denied that
14  without knowledge, accordingly denied is that at that point in
15  time, I don't think anyone knew what the tower was going to
16  mean to the -- the wakeboard industry at the time.
17   Q.   But it was new even at that time?
18   A.   The concept was, yes.
19   Q.   And it was also useful?
20   A.   Well, that had not been tested based on his
21  conceptual design yet.  No.  We did not know that it was going
22  to be useful or not.
23   Q.   But you have -- Correct Craft has gone out and
24  patented this tower?
25   A.   After further development and testing of that

Page 84

1  product, yes, sir.
2    Q.   Do you know where the language comes from that
3  Paragraph 20 was written on?
4    A.   "The plaintiff Larson's tower was an invention or
5  discovery of," that?
6    Q.   Yeah.
7    A.   I have no idea where that language came from, no
8  sir.
9    Q.   Sounds like pretty much legalese language?
10   A.   That's what I would assume, yes.
11   Q.   You wouldn't -- would you debate whether or not that
12  comes out of the patent law?
13   A.   No, I would not debate that, no.
14   Q.   Would you debate that the only way you get a patent
15  is if the discovery meets every requirement in Number 20?
16   A.   I would not debate that, because I'm not in
17  knowledge of what the patent laws read in that sense, no, sir.
18   Q.   But you had patent lawyers helping you answer this
19  complaint, did they not?
20   A.   They did at that time, yes.
21   Q.   And you're denying knowledge that this tower was
22  even an invention?
23   A.   I think we're denying that -- that it was an
24  invention based on a sketch until we had done further testing
25  and development.

Page 85

1    Q.   The sketch, Borden Larson's sketch --
2    A.   Um-hmm.
3    Q.   -- did it have four legs?
4    A.   Yes, it did.
5    Q.   And the four legs held a horizontal member about
6  6 feet above the deck?
7    A.   I believe that is correct, yes.
8    Q.   And on top of the horizontal member was a place to
9  attach a towrope?
10   A.   At some point in time, there was a sketch that I do
11  remember having a tow pylon mounted to that, yes.
12   Q.   Are all towers today an apparatus by which you can
13  attach a towrope above the helm area of the boat?
14   A.   Yes.
15   Q.   So all towers today do not vary one iota in a
16  purpose of what the original sketch was designed to do?
17   A.   Let me see if I can rephrase that to make sure I
18  understand.  The towers today resemble, you said, what that
19  original concept drawing had.  Is that what you asked?  I'm
20  sorry.
21   Q.   Well, let me just ask it again.  You want to take a
22  break?
23   A.   No, I'm good.
24   Q.   The drawings that Borden created, were they not just
25  an apparatus by which you could firmly attach a towrope at a

Page 86

1 high elevation above the helm of the boat?

2    A.   Yes.

3    Q.   And today there's a lot of different ways that those

4 towers are created?

5    A.   Yes.

6    Q.   And some of the legs are straight; some of the legs

7 are curved; is that correct?

8    A.   Yes.

9    Q.   And some have big arches to them?

10    A.   Yes.

11    Q.   Some have --

12    A.   Sorry. Go ahead.

13    Q.   And Correct Craft is asking for royalties on all

14 those towers today?

15    A.   Yes.

16    Q.   Regardless of how they're designed?

17    A.   Yes.

18    Q.   And regardless of how many legs they have?

19    A.   Yes.

20    Q.   And regardless what material they're made from?

21    A.   Yes.

22    Q.   And regardless if they're slanted aft or slanted

23 forward?

24    A.   Yes.

25    Q.   And that is because all of those towers, regardless

Page 87

1 of how they're made, fulfill one purpose, and why don't you

2 tell me what that purpose is?

3    A.   The purpose was to get the rope attachment higher

4 off the floor of the boat.

5    Q.   But you could have done that with an extended pylon?

6    A.   That is correct.

7    Q.   So this has other purposes?

8    A.   Yeah. Well, today, yes, they have many purposes

9 beyond what we thought they had back then.

10    Q.   What are the purposes today?

11    A.   They put lights on them. They put speakers. Some

12 people have mounted seats up there, which is not prescribed

13 practice, but they have.

14    Q.   So you don't recall Borden's drawings that were

15 brought to you that had speakers mounted on top?

16    A.   Not that I remember, no.

17    Q.   You don't recall musical notes that he drew -- wrote

18 in there to depict music coming out of the speakers?

19    A.   Not -- no, I do not recall that at all.

20    Q.   You don't recall lights that he put up there aiming

21 back for late night skiing?

22    A.   No, I do not particularly, not that, no, I do not

23 recall.

24    Q.   But Correct Craft doesn't have Borden's original

25 drawings anymore, do they?

Page 88

1    A.   That I do not know.

2    Q.   The drawings done in June of '96, you have destroyed

3 them, have you not?

4    A.   I have no knowledge of that, no.

5    Q.   Have you reviewed the transcripts of the Correct

6 Craft versus Tower case?

7    A.   Not in some time, I have not.

8    Q.   So -- strike that. So getting back to Number 20,

9 you're denying knowledge of that because you're saying in 1996

10 when Borden Larson showed you this drawing, you go, "I don't

11 know if it's an invention at that point in time, and I don't

12 know if it's new, and I don't know if it's useful in '96"?

13    A.   I believe for the original drawing, there was quite

14 a lot of ridicule as to what that sketch and concept depicted,

15 and that is why we felt at that time that that original sketch

16 was possibly not a -- a -- a discovery of a new and useful

17 process at that point in time.

18    Q.   When did it become a discovery?

19    A.   I'm not 100 percent sure of the exact date and time.

20 I'm going to assume at some point in time when we decided to

21 -- to have a tower constructed and tested that we found out

22 the attributes and benefits of that concept drawing.

23    Q.   But didn't Borden tell you what the attributes and

24 benefits were going to be?

25    A.   They were proposed, yes.

Page 89

1    Q.   So you went out and confirmed what he was saying?

2    A.   Correct.

3    Q.   And he was right?

4    A.   Yes.

5    Q.   So in other words, Borden's drawing was a useful

6 invention, you just didn't know it?

7    A.   Correct.

8    Q.   So are you denying Borden's right of inventorship

9 just because you couldn't understand the concept?

10    A.   I'm not sure what the question is. I'm not --

11    Q.   Well, you're saying Borden showed you a drawing and

12 said, "Hey, this is a new and useful concept."

13        And you didn't understand it?

14    A.   Correct.

15    Q.   Borden understood it, but you didn't?

16    A.   Yes.

17    Q.   But Borden's an inventor, is he not?

18    A.   He is one of the inventors, yes, sir.

19    Q.   Who else brought that drawing in that day?

20    A.   I don't remember who else was with him or how that

21 development came, no, sir, I do not know.

22    Q.   Then how do you know that someone else besides

23 Borden was an inventor when he brought that in to you?

24    A.   Because of the assignments of the patent.

25    Q.   The assignments of the patent happened years later.

Page 90

1 We're talking about in 1996 between June and August, let's
2 say, when Borden brought you in that drawing, who else could
3 have been an inventor at that point in time?
4    A.  I'm not sure.
5    Q.  Did you accuse Borden of copying from someone?
6    A.  No.
7    Q.  Did you believe he copied it from someone?
8    A.  No.
9    Q.  Did you ask him, "Borden, where did you get this
10 from?  You couldn't have done this yourself"?
11   A.  No.
12   Q.  Did you say, "Borden, what a hokey idea that, you
13 know -- "
14   A.  To be honest, yes.
15   Q.  So at that point you wouldn't attribute it to
16 anybody but Borden?
17   A.  Not because of that, no.  It was just an unusual
18 concept at the time.
19   Q.  But at that time you had no reason to believe that
20 anybody contributed to that other than Borden?
21   A.  Oh --
22   Q.  We're talking about at the point in time when Borden
23 showed you the drawing.
24   A.  Correct.
25   Q.  Did you have any reason to believe that anybody

Page 91

1 contributed besides Borden?
2    A.  I had no idea or concept of what anybody else
3 contributed to that idea, no, I do not.
4    Q.  And the only reason now you say that other people
5 were involved is because they came to you later and says, "Oh,
6 I did something"?
7    A.  And that they were involved with the process at some
8 point in time in the conception, conception of the this tow
9 tower.
10   Q.  The conception or construction of it?
11   A.  Both actually, construction and conception.
12   Q.  Well, were they with Borden when he brought his
13 sketch in to you?  Were they there that day?
14   A.  One party was not, and I do not remember if the
15 other was with him or not.
16   Q.  Well, what parties are you talking about?
17   A.  Robert Todd was not present, and I do not remember
18 if Bill was present at the time that I saw the original sketch
19 or not.
20   Q.  But if he was present, wouldn't he have said, "Hey,
21 I drew this too"?
22   A.  I guess if he actually drew it, yes, he would have
23 said that, yes.
24   Q.  But you don't recall him being there?
25   A.  I don't remember, no, sir.

Page 92

1    Q.  Now, in 21 it says:  "Patent Law in the United
2 States, and in the State of Florida, provides that title,
3 right to manufacture, use, and sell an invention belongs to
4 the inventor."
5        You deny that.
6    A.  That is correct.
7    Q.  Why do you deny that?
8    A.  Well, I believe in the context of why we were
9 denying that particular claim is due to that the inventor was
10 working for and employed by us at the time, and so, therefore,
11 anything created and designed on his time of employment with
12 us did not belong to him but to the corporation.
13   Q.  And where did you come to that belief from?
14   A.  In conversations with counsel.
15   Q.  And what specifically did they tell you?
16       MR. NORMAN:  Objection.  Calls attorney-client
17 privilege information, and so I instruct the client not to
18 answer.
19       MR. LARSON:  They shared the same attorney.  They
20 waived all the privilege.
21       MR. NORMAN:  And I don't agree with you, sir.
22 BY MR. LARSON:
23   Q.  Can you tell me what attorney told you that?
24   A.  I believe --
25       THE WITNESS:  Am I able to answer?

Page 93

1        MR. NORMAN:  You can say the name.
2    A.  Okay.  I believe it was Brian Gilchrist and Doug
3 Spears had both stated that.
4    Q.  What about Herb Allen?
5    A.  He may have been one at some point in time, yes,
6 sir, but I only know the two for sure.
7    Q.  Okay.  So you believe the attorneys that they say
8 that if Florida an employee, anything they invent on the job
9 belongs to the company?
10   A.  That is correct.
11   Q.  You believe that?
12   A.  Well, I mean, that's what I pay them for, to tell me
13 the truth and tell me what the law says, so, yeah.
14   Q.  Did they ever show you the law?
15   A.  I do not remember if I saw the statute or not in its
16 entirety, but I do believe there was paraphrases of it, yes.
17   Q.  Did they ever show you any case law?
18   A.  Not that I'm aware of, no.
19   Q.  Did they ever paraphrase case law?
20   A.  If they did, I can't recall.  I think they may have
21 referenced some different situations or scenarios, and I don't
22 know if those were case laws or just suggestions.
23   Q.  Okay.  If you believe that anything an employee does
24 or invents on the job belongs to the company, why did you have
25 Borden sign a series of assignments giving you rights to these

Page 94

1 inventions if you already own them?
2    A.  From what I understand, it was just a -- a matter of
3 law.  It was not any significant reason other than just
4 formalities.
5    Q.  Did you tell that to Borden?
6    A.  I never had conversations with him about that, no.
7    Q.  Do you know if anyone told that to Borden?
8    A.  I have no knowledge of that, no.
9    Q.  Now, those assignments that Borden signed, Correct
10 Craft has the original copies back from the recording at the
11 patent and trademark office, do you not?
12    A.  I believe we do, yes.
13    Q.  And you're holding them a fireproof vault?
14    A.  I would assume that those type of things are in a
15 secure, yes, fireproof safe, yes, sir.
16    Q.  Why would you have to secure them if you don't even
17 need them?
18    A.  The patents?
19    Q.  The assignments.
20    A.  Oh, the assignments.  I'm sorry.  I'm sorry.  I
21 misunderstood the question.  I'm sorry.  I thought your were
22 referring to the patent documentation.  I don't know if we do
23 have those assignments on file and whether they may be kept in
24 a safe location or not.
25    Q.  Have you ever seen those assignments coming back

Page 95

1 from the recording at the patent and trademark office?
2    A.  I have seen copies.  I don't remember if they were
3 originals or not.
4    Q.  You haven't seen letters of direction that say,
5 "Keep these in a safe place"?
6    A.  No, sir.  I would not have seen that.
7    Q.  You haven't seen Larry Meddock, saying, "Put this in
8 the fire safe"?
9    A.  No, I do not.
10    Q.  But you could go back after today, and you could
11 check on that, couldn't you?
12    A.  I could, yes.
13    Q.  Would it surprise you that the assignments are kept
14 in a fireproof safe?
15    A.  I don't know that it would or would not surprise me,
16 no.  I would not know why someone would instruct you or not
17 instruct you to keep them.  I have no knowledge of that.
18    Q.  But you don't keep documents in the fireproof safe
19 that aren't important, do you?
20    A.  I would assume, no.
21    Q.  So if they're in there, you would think they're
22 important?
23    A.  Correct.
24    Q.  And if you already own the invention, you certainly
25 wouldn't need an assignment, would you?

Page 96

1    A.  That I could not answer due to not knowledge of the
2 law.
3    Q.  Now, the next paragraph here in 22, it says:  "The
4 Patent Law in the United States, and in the State of Florida,
5 also provides that an employer is not entitled to a patent
6 covering an invention made by an employee, in the absence of
7 an express agreement to that effect, but is only entitled to a
8 shop right, which is nonexclusive, nontransferable license
9 thereunder."
10    You deny that.
11    Now, do you know what a shop right is?
12    A.  Not 100 percent.
13    Q.  You're hiring very fancy intellectual property
14 attorneys, are you not?
15    A.  Yes.
16    Q.  They never told you what a shop right is?
17    A.  I mean, I believe they have given me a description
18 of it, and if I try to recite it, it may not be correct in its
19 entirety.
20    Q.  Well, why don't you try?
21    A.  A shop right would possibly be a employee whose
22 day-to-day tasks and duties and responsibilities is not within
23 the scope of something that they come up with, and for
24 instance, say, the receptionist were to have drawn this tow
25 tower and came to us and said, "Hey, I was just thinking, man,

Page 97

1 this would be a great thing to put on the boats, and this is,
2 you know, what I came up with."  That's my understanding.
3 Now, whether that's the legal description of it or not, I'm
4 not 100 percent sure as to what a shop right is.
5    And a person whose job and description it is to
6 design, develop, come up with creative new innovative things
7 for the company, it is then part of their day-to-day job, in
8 which they're getting paid for, to do for the company, to
9 design and create, come up with visions and things of this
10 nature, innovations; and therefore, it is a part of the
11 company.  And again, I may be totally off base on that.  I
12 apologize.
13    Q.  But when has Correct Craft ever told Borden that he
14 has to create something new?  He was creating boats.  The boat
15 last year is the same as the boat this year except it has
16 lines that are different.
17    MR. NORMAN:  Is there a pending question?
18    MR. LARSON:  Yeah.
19 BY MR. LARSON:
20    Q.  Isn't that what Borden was hired to do, is to modify
21 existing boats?
22    A.  I would not say that is what he was hired to do.  It
23 may be one of the multiple things that he was to do while
24 employed at Correct Craft.
25    Q.  But when did Correct Craft ever tell him, "Borden, I

Page 98

1 want you to go do something that's never ever been done
2 before"?
3    A.  I don't know that we ever did do that.  That would
4 have to be referred back to his managers if that was the
5 direction and goal.  My understanding is that he came to them
6 with multiple creations and ideas and innovations as part of
7 what he was doing for the company, which led to his promotion
8 as the supervisor of the research and development or research
9 and design team at that time.
10    Q.  That's when he became Mr. Snook's boss?
11    A.  No.  I don't believe ever he was, and I may be
12 wrong.  I don't believe he ever was Mr. Snook's boss.
13    Q.  How could he not be Mr. Snook's boss if he was in
14 charge of all research and development, as you say?
15    A.  He was a supervisor underneath Mr. Snook, and at one
16 time until then at some point became a direct report to
17 Mr. Elrod.
18       MR. LARSON:  I'm going to enter this case of Teets
19    versus Chromalloy Gas Turbine as Exhibit 6, I believe.
20 (Exhibit No. 6 was marked for identification.)
21 BY MR. LARSON:
22    Q.  Mr. Meloon, have you ever read that case?  Well, let
23 me ask you this way:  Have you heard Teets versus Chromalloy
24 Gas Turbine?
25    A.  For some strange reason, the name, yes, and I don't

Page 99

1 know where I may have come across that.
2    Q.  Well, this is a decision.  And this is isn't a
3 question that is a preamble.  This is a decision out of the
4 Federal Court of Appeals.  The plaintiff was Michael Teets who
5 was an inventor, and he was suing this company, versus, it was
6 Chromalloy Gas Turbine, and this is a decision from the
7 Federal Court, and I want to ask you some questions about
8 this.  Why don't you turn to page three, three of six.
9       Now, the second paragraph starts with the word,
10 "Ownership springs from invention."  You see where it says
11 that?
12    A.  Um-hmm.
13    Q.  "The patent law -- laws reward individuals for
14 contributing to progress of science and the useful arts."
15       Now, did Borden receive any reward for contributing
16 to this tower?
17    A.  I have no knowledge whether he did or did not.  I
18 mean, I was not in charge of his reviews or anything of that
19 nature, so unless without reviewing his file to confirm that.
20    Q.  But Correct Craft today is receiving great rewards
21 for that tower; is that not correct?
22    A.  We are receiving rewards for the tower, yes.
23    Q.  You're making a hundred thousand a month at least?
24    A.  I'm not aware of the amount.  No, sir.  I do not
25 know.

Page 100

1    Q.  You're Uncle Ralph has a DVD saying you're making a
2 million and a half a year.  Would you dispute that?
3    A.  I would not dispute that he has a DVD that states
4 that, no, I would not.
5    Q.  So if ownership springs from invention, if Borden
6 Larson was the invention (sic), did he ever end up owning this
7 tower?
8       MR. NORMAN:  Objection.  Calls for a legal
9    conclusion.  Why don't you let him read the whole case and
10   see what it says?
11      MR. LARSON:  He can read the whole case.
12      MR. NORMAN:  Read the whole thing.  Read the
13   conclusion where it says the guy who invented it worked
14   with his boss and didn't get the rights to it.
15      MR. LARSON:  Yeah.
16      MR. NORMAN:  Read the whole case.
17      THE WITNESS:  Where is that at?
18      MR. NORMAN:  That's the whole case.
19      MR. LARSON:  Right.
20      MR. NORMAN:  He's asking you to read one sentence
21   out of it.  Read the whole case.
22      MR. LARSON:  No.  I'm going to go through it.  This
23   is my deposition.
24      MR. NORMAN:  You can do it however you like.
25      MR. LARSON:  You can cross-examine him all you want.

Page 101

1 BY MR. LARSON:
2    Q.  The first sentence says:  "Ownership springs from
3 invention," just that.  Now, Borden was one of the inventors
4 but never ended up owning it, did he?
5       MR. NORMAN:  Objection.  Calls for a legal
6    conclusion.
7       MR. LARSON:  No, it doesn't.
8       MR. NORMAN:  Yes, it does.
9 BY MR. LARSON:
10    Q.  Does Borden own the invention today?
11      MR. NORMAN:  Objection.  Calls for a legal
12   conclusion.
13 BY MR. LARSON:
14    Q.  Does Borden own the wakeboard tower invention today?
15    A.  I am not versed in what the law and what ownership
16 springs from invention even entails, so I have no idea whether
17 he does or does not.
18    Q.  Does Correct Craft own the patents on the invention
19 today?
20    A.  From my understanding, yes, we do.
21    Q.  How did they get those patents.
22      MR. NORMAN:  Objection.  Calls for a legal
23   conclusion.
24    A.  Again, I would have to defer to counsel as to how
25 that comes about.  The legalese and legalism of the justice

Page 102

1 system and the patents, I'm not familiar with.
2 BY MR. LARSON:
3    Q.   So you don't know how Correct Craft ended up owning
4 these patents?
5    A.   It's -- without legal knowledge or understanding of
6 the law, my -- my layman's term would be is that because he
7 was an employee of Correct Craft, those things that he did
8 belong to Correct Craft.  Those are our intellectual
9 properties, designs, creations, whatever it may have been.
10 That's -- that's my layman's understanding of our ownership of
11 coming to having ownership of the flight control tower.
12    Q.   Okay.  Let's go to the next paragraph.  It says:
13 "Consistent with the presumption that the inventor owns his
14 invention, an individual owns the patent rights even though
15 the invention was conceived and/or reduced to practice during
16 the course of employment."
17    MR. NORMAN:  Is there a pending question?
18    MR. LARSON:  I asked if he saw that.
19    MR. NORMAN:  If he saw the sentence in there?
20    MR. LARSON:  If he read it.
21    A.   Yeah.  I'm reading that now, but I'll also read the
22 next one too.
23 BY MR. LARSON:
24    Q.   Okay.  Well, let's just read one at a time.  Now,
25 did anyone ever tell you in this whole process what that

Page 103

1 sentence says, that an individual owns his patent rights even
2 though the invention was conceived and/or reduced to practice
3 during the course of employment?  Did anybody ever tell you
4 that?
5    A.   Not that I'm aware of, no.
6    Q.   So these fancy lawyers that you paid didn't even
7 tell you that?
8    MR. NORMAN:  Objection.  Vague.  Object to the use
9    of the word "fancy," but go ahead and answer it if you
10    can.
11    A.   I don't know that I -- I can answer that, again,
12 because "consistent with the presumption that the inventor
13 owns his invention," again, you're presuming that the guy owns
14 it, and I don't understand the legalese of what that -- what
15 you're trying to derive at in this case.
16 BY MR. LARSON:
17    Q.   Does it say anywhere here that a corporation owns
18 it, or does an individual own it?
19    MR. NORMAN:  Read all the way down to the bottom of
20    the page and see if it says that anywhere.
21    MR. LARSON:  I don't need you to coach my witness.
22    MR. NORMAN:  Well, you're asking if he sees it
23    anywhere.  I'm just instructing the witness to read the
24    whole page.
25    I apologize for my cell phone going off.

Page 104

1    You're trying to confuse him about the law, and I
2 think it's on the same page you're reading from.
3    MR. LARSON:  Let me --
4    MR. NORMAN:  It's improper, sir.
5    MR. LARSON:  You can -- you can cross-examine him.
6    MR. NORMAN:  No.  I can object too, and it's
7 improper, and it's uncivil and unprofessional, but you can
8 go ahead and do as you like.
9    THE WITNESS:  I'm sorry.  Can you state the question
10 for me again, please.
11    MR. NORMAN:  You're going to read the whole page,
12 and he's going to ask you a question from it.
13    MR. LARSON:  That's not my question.
14    MR. NORMAN:  Well, go ahead then.
15 BY MR. LARSON:
16    Q.   So my question is, in that first sentence, no one
17 ever told you that an employee owns the patents even though
18 they're conceived or reduced to practice in employment?
19    MR. NORMAN:  Objection.  Calls for a legal
20 conclusion.
21    MR. LARSON:  No.  I asked him if anybody told him
22 that.  That's not a legal conclusion.
23    MR. NORMAN:  And I made my objection, sir.
24    MR. LARSON:  You're disrupting my deposition.
25    MR. NORMAN:  I can make objections.

Page 105

1    MR. LARSON:  Then do it.
2    MR. NORMAN:  I did.
3 BY MR. LARSON:
4    Q.   Did anybody ever tell you that, Mr. Meloon?
5    A.   I don't recall if they did or not, no.  I do not
6 know if they directly spoke to me about that particular
7 sentence or not.  I don't -- they did not speak to me to that.
8    Q.   But you -- but you believe as a corporate
9 representative that is owning and acquiring patents, this is
10 something worthwhile that you should know?
11    A.   I guess if it is pertinent to our case, yes, I would
12 assume so.
13    Q.   Now, when you were talking to the lawyers who were
14 telling you about what the patent law was, did you ever advise
15 Borden that he should go find his own lawyer to go talk about
16 what the patent law advises his rights to be?
17    A.   I don't believe I was ever having conversations
18 during that time frame with the attorneys about patent law and
19 what it pertained to, no.
20    Q.   I'm asking about Correct Craft.  You're the
21 corporate representative here today.  When I say "you," you
22 know --
23    A.   Okay.  I'm sorry.  Thank you.  I'm sorry.  I was --
24 I was not interpreting it.
25    Q.   I know.  It's sometimes difficult.  Do you know at

Page 106

1 any point that Correct Craft told Borden Larson, "Hey, you
2 know, we have got lawyers here talking about our rights to the
3 patents. I think you should go get your lawyer, because, you
4 know, who knows. I think you should just go get a lawyer
5 maybe and see what your rights might be"?
6    A.  I do not know that for sure, no.
7    Q.  Do you think that would have been a nice thing to
8 do?
9    A.  I -- I don't know if it would have been a nice thing
10 to do or not. I guess if there was some concern or thought
11 that there could be a difference in the way the law is
12 written, it might have been construed as that, yes.
13    Q.  And as you're sitting here today, do you think it
14 could have been a good thing to do?
15    A.  Not knowing -- not knowing the legal understandings
16 of all this, no, I don't know, I mean.
17    Q.  So in other words, Correct Craft can have lawyers to
18 advise them on they're rights to Borden's drawing, but you
19 don't think Borden can have a lawyer to advising him on his
20 rights?
21       MR. NORMAN:  Objection. Mischaracterizes prior
22 testimony.
23       MR. LARSON:  No. I'm trying to --
24       MR. NORMAN:  No. Let me finish my objection, and he
25 can answer. Don't interrupt my objection, sir.

Page 107

1 Mischaracterizes prior testimony. Assumes facts not in
2 evidence. Answer if you can.
3    A.  I don't think I can answer that properly.
4 BY MR. LARSON:
5    Q.  So my question very simply, I'll break it down in
6 two questions. Correct Craft never told Borden Larson, "We
7 have issues regarding ownership of these inventions. I think
8 you should talk to a lawyer, because we're talking to one"?
9       MR. NORMAN:  Objection. Asked and answered.
10 Assumes facts not in evidence.
11    A.  Did we ever instruct him to go see an attorney based
12 on that he might have ownership of that?
13 BY MR. LARSON:
14    Q.  For any reason, did you say, "Borden, I think you
15 should go see an attorney because we have one"?
16    A.  I don't believe so, no.
17    Q.  Why not?
18    A.  I can't answer that question as to why not. I can
19 only make an assumption and speculation as to why not.
20    Q.  I want you to turn to page of this 4 of 6, and, of
21 course, your attorney can go over all this he wants with you.
22 You can take it home with you and read it. In the middle
23 paragraph here, under these rules, in the middle paragraph
24 after that one parentheses, the left -- right parentheses.
25    A.  Um-hmm.

Page 108

1    Q.  Is says: "Under these rules -- " because there's a
2 whole bunch of rules before this, "Under these rules, a
3 Florida employer cannot claim ownership of the employee's
4 invention, quote, unless a contract of employment by express
5 terms or unequivocal inference shows that employee was hired
6 for the express purpose of producing the things patented."
7       Did I read that correctly?
8    A.  I mean, I don't want to be nitpicky, but you said
9 "things," and it's not plural. It's thing, so.
10    Q.  Okay. Thing, the thing, patented. Okay. The thing
11 patented.
12    A.  Yes. You did read that correctly at that point,
13 yes.
14    Q.  Okay. Had anybody ever told you what that sentence
15 says?
16    A.  I have no knowledge of whether the attorneys stated
17 this case law to the corporation at that time or not when we
18 were filing for patent.
19    Q.  Okay. Now, it says "unless a contract of
20 employment." Now, did you have a contract of employment with
21 Borden?
22    A.  Other than we offered and tendered him a job, and he
23 came and accepted the pay each week. I mean, that's --
24    Q.  So it's at-will employment?
25       MR. NORMAN:  Objection. Calls for a legal

Page 109

1 conclusion.
2    A.  Yeah. Because I don't know what that means. I'm
3 sorry.
4 BY MR. LARSON:
5    Q.  Okay. But you didn't have a piece of paper that
6 says, you know, here's the terms of our employment?
7    A.  I don't know if this is the correct description of
8 what you're asking for. I mean, we had an employee handbook.
9 We did have some employee guidelines and things that -- that
10 are part of employment, so, you know, in a sense, is that a
11 contract or not, I don't know.
12    Q.  But isn't there a provision in that handbook that
13 says it's not a contract?
14    A.  It could be. I would have to go back and look at
15 the time he was hired if that statement is in there.
16    Q.  I have it with me. I'll show to you in a bit.
17    A.  Okay.
18    Q.  Let's go back to the sentence, "unless the contract
19 or employment by express terms or unequivocal inference shows
20 that the employee was hired for the express purpose of
21 producing the thing patented. Now, let me ask you this, Where
22 did -- where did Correct Craft hire Borden for the express
23 purpose of making that tower?
24    A.  I'd have to probably defer that to the manager that
25 hired him and was working for him at that time.

Page 110

1  Q.  I'm asking you as a corporate representative.  Have
2  you ever seen anything where Correct Craft hired Borden for
3  the express purpose of making that tower?
4      MR. NORMAN:  And to that, anything having to do with
5  what he was hired for and his job duties would be the
6  corporate representative Mr. Snook.  So this is beyond the
7  scope of what he's being offered for, but with that, you
8  can go ahead and ask your question.
9      MR. LARSON:  Well, Mr. Snook was only going to talk
10  about one thing.
11     MR. NORMAN:  Right.  His job duties.
12     MR. LARSON:  Right.
13     MR. NORMAN:  And what he was hired for, and that is
14  what Mr. Snook is going to testify about.  You can ask
15  this witness any questions you want, but I would note that
16  it's beyond the scope of his request, of what he's being
17  offered for, and that Mr. Snook is the person who's going
18  to be -- to bind the corporation on that issue.  But go
19  ahead and ask all the questions you like.
20  BY MR. LARSON:
21  Q.  So, Mr. Meloon, you don't have any evidence as you
22  sit there that Correct Craft hired Borden for the express
23  purpose of making that tower?
24  A.  I do not have any personally, no.
25  Q.  Have you ever seen anything?

Page 111

1  A.  No, I have not.
2  Q.  Have you looked for something that says that?
3  A.  No, I have not.
4  Q.  So in this whole lawsuit, in all the meetings that
5  you had with everybody and all the attorneys, you have never
6  even looked for something that says, "We expressly are hiring
7  Borden to make this tower"?
8  A.  That is correct.
9  Q.  No one at Correct Craft ever even looked for that?
10  A.  I can't answer no one at Correct Craft ever did, no.
11  Q.  But you don't know of it ever being searched for?
12  A.  Correct.
13     MR. LARSON:  Okay.  Let's go on with the paragraph
14  in this complaint.  We've gotten through 21 and 22.  Now
15  we're at 23.
16     I have a copy of this for you.
17     MR. SNOOK:  That's okay.
18     MR. LARSON:  You're having enough fun over there.
19     MR. NORMAN:  Where are we?  I'm sorry.
20     MR. LARSON:  23.
21  BY MR. LARSON:
22  Q.  "On August 30th, 1996, two months after the
23  plaintiff conceived the tower idea, plaintiff Larson presented
24  his idea for the first time to the Correct Craft managers at
25  the model change meeting for the Sport Nautique skiboat."

Page 112

1      And Correct Craft's answer is:  "Admit that Larson,
2  as supervisor of product development, presented new ideas to
3  Correct Craft, otherwise denied."
4      Now, are you denying that Borden never even
5  presented these sketches?
6  A.  No.
7  Q.  Why are you saying it that way?
8  A.  Because it says "for the first time to Correct Craft
9  managers."  And that "otherwise denied" is referring to that
10  that may not have been the only time that the Correct Craft
11  managers or manager, somebody within the management team may
12  have seen that.  We are admitting that he did conceive the
13  tower idea and that he presented the idea, and but whether
14  that was the first time or not, we're denying.  We're denying
15  that.
16  Q.  When do you think he presented it before then?
17  A.  I'm not -- I don't know.
18  Q.  Are you saying that he presented it before then, and
19  this is the second time?
20  A.  I'm not sure.  What I'm saying is that for the first
21  time the Correct Craft managers at the model change meeting
22  saw this idea, that we are otherwise denying that, because
23  there could have been some other time or references in which
24  this drawing may have been seen and shown to individuals at
25  some point in time other than just the management team.

Page 113

1  Q.  But do you know that, or are you just guessing?
2  A.  I'm assuming that on August the 30th, if two months
3  had gone by from him conceiving this idea, that's a long time
4  for him to have sat on something of this nature without the
5  management team being aware of something of this nature.
6  Q.  Why would -- why is that unusual?
7  A.  Based on that time frame, as I said earlier, you
8  know, we were looking to come up with some way of attaching
9  that tow point higher than what it normally was, and to me,
10  this was something of -- of an urgency to the company to come
11  to market with particularly at that time.
12  Q.  Now, Borden was a pretty punctual employee when he
13  worked for Correct Craft?
14  A.  From what I recall, yeah.
15  Q.  And if he had come up with this idea, and it solved
16  these problems, you don't think he would have brought it to
17  you immediately?
18  A.  I would have thought yes.  I would have thought so,
19  yes.
20  Q.  So you don't know why he would have sat on this for
21  two months.
22     MR. NORMAN:  Objection.  Mischaracterizes prior
23  testimony.
24  A.  I have no knowledge why, yes.
25  BY MR. LARSON:

Page 114

1    Q.   Did you ever ask him?
2    A.   No, I did not.
3    Q.   When you saw this the first time, did you jump up
4 and say, "Eureka, you solved all the problems"?
5    A.   No, I did not.
6    Q.   Did anybody else jump up?
7    A.   Not that I'm aware of, no.
8    Q.   Did you say, "It's about time, Borden. You solved
9 the problems that the Wakeboard Association gave to us two
10 years ago"?
11   A.   I don't --
12       MR. NORMAN:  Objection.  Mischaracterizes his prior
13   testimony.  Go ahead.
14   A.   I don't recall if I did or not, no.  I don't believe
15 there was, no.
16 BY MR. LARSON:
17   Q.   Did you congratulate him and say, "Borden, you
18 solved the problem we've been struggling with for two years?
19       MR. NORMAN:  Objection.  Mischaracterizes prior
20   testimony.
21   A.   I don't recall doing that, no.
22 BY MR. LARSON:
23   Q.   Do you know if anybody congratulated him because he
24 solved the problem you had been struggling with for two years?
25       MR. NORMAN:  Objection.  Mischaracterizes his prior

Page 115

1    testimony.
2    A.   That I could not answer, no.
3 BY MR. LARSON:
4    Q.   So is it safe to assume he never knew you were
5 struggling with this idea from the Wakeboard Association?
6        MR. NORMAN:  Objection.  Mischaracterizes his prior
7    testimony.
8    A.   It's -- it's a vague possibility, yes.
9 BY MR. LARSON:
10   Q.   How vague?
11   A.   I don't know.  I mean, it's -- I don't know how
12 vague it is, a percentage or an assumption that he would not
13 have known that.  I just -- I just find it very hard to
14 believe that he would not have known about it.
15   Q.   Okay.  In your answer you say:  "Admit that Borden
16 is supervisor of product development."
17       Now, where did you get this title, supervisor of
18 product development?
19   A.   I believe that was his promotion that he was given
20 at the time, and again, loosely describing that department,
21 whether it was research and design, product development,
22 engineering, it -- that was a promotion that he was given in
23 or around I think 1996, I believe.
24   Q.   Okay.  Let's get this straight once and for all.
25 What are the different titles that you're using for this

Page 116

1 department.  I'm seeing research and design.  We have heard
2 research and development.  Are those the same thing?
3    A.   Yes, sir.
4    Q.   Can we use those interchangeably, or should we not
5 use them interchangeably?
6    A.   I -- I think we could.
7    Q.   Okay.  So you can call this research and design?
8    A.   Um-hmm.
9    Q.   Okay.  We can also call it research and development?
10   A.   Um-hmm.
11   Q.   And you're saying that he was the supervisor of the
12 department?
13   A.   I believe so.
14   Q.   Now, here you're saying he's the supervisor of
15 product development?
16   A.   Right.
17   Q.   So he has three titles all interchangeable based on
18 who you're talking to?
19   A.   I -- yes.
20   Q.   Did you ever ask Borden what he thought his title
21 was?
22   A.   No, sir, I did not.
23   Q.   Now, as he was given these three different titles,
24 how did you communicate it to Borden that, "Borden, you have a
25 new title today"?

Page 117

1    A.   I don't think it was ever communicated that he had
2 three titles.
3    Q.   What was communicated?
4    A.   That he was supervisor of the product development.
5    Q.   But that's really the plug and mold shop, is it not?
6    A.   That may have been one of the areas of
7 responsibilities, yes.
8    Q.   Only one?
9    A.   Yeah.
10   Q.   And what were his other areas?
11   A.   I would have to go back and look.  I think it was
12 design and develop new products.
13   Q.   But new products, again, are boats?
14       MR. NORMAN:  Objection.  Mischaracterizes prior
15   testimony.  Go ahead and answer if you can.
16   A.   That and other things that we've discussed, yes,
17 that was one of the new product design and developments, yes.
18 BY MR. LARSON:
19   Q.   But what else?  I mean, when I hear the word "new
20 products," this could be jet fighters for all I know.  I don't
21 know what the word "new products" means.  You're a boat
22 company.  You make boats.
23   A.   That's correct.
24   Q.   Borden was working in the plug and mold shop making
25 molds, making plugs and then molds for the next model years.

Page 118

1    MR. NORMAN:  Is there a pending question?
2 BY MR. LARSON:
3    Q.  Was he ever making jet fighters?
4    A.  No.
5    Q.  Was he ever making T-shirts?
6    A.  No.
7    Q.  Ever making trailers?
8    A.  No.
9    Q.  Ever welding?
10   A.  No.
11   Q.  Ever bending pipe?
12   A.  I don't know that he did not ever do that in the
13 scope of his job description.
14   Q.  Now, here's the personnel file.  You have got a
15 whole bunch of tags here, and I'm sure you have something to
16 say about the tags.  Can you show me through his personnel
17 file where at least Correct Craft says his job now is either
18 research and design, research and development, or supervisor
19 of product development, whatever it may be?
20   A.  Okay.  The cover letter basically states that he was
21 assigned to Department 97.
22   Q.  Okay.  And what does that mean?
23   A.  I believe, if I remember correctly, that 97 was the
24 research and development department.
25   Q.  But you're guessing?

Page 119

1    A.  I'd have to go back and look at those nomenclatures
2 and see how they line up with one another, but I believe 97
3 was research and development.
4    Q.  And you're -- and what date is that research and
5 development?
6    A.  That is on his cover letter that went into his
7 employee file of a hire date 3/17/96 -- or '86, 3/17/86.
8    Q.  Okay.  So when he was hired, he went into Department
9 97, which you believe was R&D, but it could maybe be something
10 else?
11   A.  It's possible, yes, but I do believe it is.  I
12 believe it was the research and development team.
13   Q.  Is that the same department as engineering?
14   A.  Yes.  Again, I guess, you know, we've gone through
15 the exercise of the different titles.  Engineering usually was
16 referred to as one of those areas described where new product
17 design and development took place.
18   Q.  So in other words, you're now using Department 97,
19 which is research and development, you're now using that
20 interchangeably with engineering?
21   A.  Yes.
22   Q.  So he's the supervisor of engineering now too?
23   A.  No, no.  He was -- I don't believe he was originally
24 hired as a supervisor of engineering when he came in.
25   Q.  Have you found anything else in there that gives

Page 120

1 Borden the title of either supervisor of research and design,
2 research and development, supervisor of product development,
3 plug and mold shop, or engineering?
4    A.  There's a form.  I'm not sure.  I guess it's a rate
5 of pay form, showing effective dates and changes, and in there
6 it does state that on 4/1/96, he was promoted to supervisor,
7 and again, the department heading is using the numerals 97,
8 the numbers 97.  Back on a --
9    Q.  Okay.  But let's go back to that.
10   A.  Yes.
11    MR. NORMAN:  You don't want to give you the rest of
12 them right now then.  You want him --
13    MR. LARSON:  No.
14    MR. NORMAN:  -- to stop.  Is that what you --
15 because you said, you asked him to list off all the other
16 places he saw that.
17    MR. LARSON:  And I asked him.  I know.
18    MR. NORMAN:  And he finished, but you cut him off,
19 and I just want the record to be clear that you cut him
20 off.  You want him to stop.
21    MR. LARSON:  I'm going to give him a chance to go
22 through them all.
23    MR. NORMAN:  Okay.
24    MR. LARSON:  I just want to clarify this.
25    MR. NORMAN:  All right.

Page 121

1 BY MR. LARSON:
2    Q.  So, Mr. Meloon, what you're looking at is his pay
3 history from the date of hired all the way to the date that
4 you fired him?
5    A.  This particular sheet does not show from his
6 original date of hire.  It may be his first pay increase after
7 he was hired until his separation with the company, yes.
8    Q.  But the first date is 1987, so it's very early in
9 his --
10   A.  It's one year after his 90-day employment.
11   Q.  Okay.  And the last notation on there is '99?
12   A.  Correct.
13   Q.  And up at the top, it just says Department 97?
14   A.  That is correct.
15   Q.  But that 97 was written on there when that sheet was
16 originally started to be written in '87?
17   A.  That is correct.
18   Q.  And that doesn't necessarily mean that he stayed in
19 Department 97 since all those changes were made all the way
20 down there?
21   A.  That would be an inference or assumption I guess you
22 would be making, yes.
23   Q.  But that's a pretty correct assumption?
24   A.  It's -- it's -- I would say, yes.
25   Q.  Because in -- in January of '96, wasn't he moved

Page 122

1 from under Mr. Snook to Mr. Elrod?
2    A.  I don't know the time frame he was moved under.  I
3 would have to see if I got that.  I think I may have it
4 flagged.  You are correct there is a page in here, says it's
5 effective January '96, Borden Larson started reporting
6 directly to Mike Elrod instead of Bill Snook.
7    Q.  Okay.  And what department was Mike Elrod in?
8    A.  He was the V.P. of manufacturing.
9    Q.  Was that 97?
10   A.  That is not 97, no.
11   Q.  So that sheet there that shows that he was in 97 is
12 somewhat misleading, because he wasn't in 97 this whole time.
13 We know at least he went over into manufacturing in January of
14 '96.
15   A.  His direct report was manufacturing.  I do not know
16 that his job or department changed from 97 to another or
17 engineering to manufacturing due to that.
18   Q.  But we don't know that it didn't either then?
19   A.  No.  That is correct.  We do not.
20   Q.  But who would know that better than you sitting here
21 as the corporate rep?
22   A.  Probably --
23       MR. NORMAN:  Again, he's the corporate rep, not on
24   job duties, so it might be Mr. Snook, but he could answer
25   his question if it's clear.

Page 123

1       MR. LARSON:  But Mr. Snook wasn't even supervisor of
2   him then.  So how would Mr. Snook even know?
3       MR. NORMAN:  He's our corporate representative for
4   job duties.  We've educated him on the issue.  But go head
5   and answer.
6    A.  I would have to defer that to Mr. Snook.
7 BY MR. LARSON:
8    Q.  Okay.  Did you find anything else in there that
9 gives Borden, Borden Larson, the title of research and design,
10 research and development, supervisor of product development,
11 plug and mold shop, or engineering?
12   A.  There's a sheet here that is -- calls out that
13 Borden Larson is supervisor of the product design and
14 development department and has duties and responsibilities
15 listed out as to what those are.
16   Q.  What is the page number on the bottom of that?
17   A.  That is CC, a whole bunch of zeros, 38.
18   Q.  Okay.  Do you know the date that that piece of
19 paper was written?
20   A.  I do not know.
21   Q.  Do you know who wrote it?
22   A.  I'm going to only assume that it was Mike Elrod.
23   Q.  Do you know what computer it was written on?
24   A.  That I do not know.
25   Q.  Do you know if it was ever given to Borden?

Page 124

1    A.  I would only assume that it was given to him as part
2 of his promotion and now job responsibilities of what he was
3 to be supervising.
4    Q.  Do you not normally have an employee sign off when
5 he receives things?  I see a signature throughout a lot of
6 papers in here.  Is there any reason why he didn't sign off on
7 that?
8    A.  I have no knowledge why he would not.
9    Q.  Could this have been put into the file after Borden
10 was fired?
11   A.  No, sir.
12   Q.  Why not?
13   A.  I just cannot believe that we would have a practice
14 of something like that, putting something in the file after
15 somebody had been -- a separation with an employee.
16   Q.  Can you turn to page 7 of that?
17   A.  Yes.
18   Q.  Have you ever seen that letter?
19   A.  Other than when I reviewed his file earlier.
20   Q.  So this Letter Number 7 is a letter dated
21 August 3rd, 2002; is that correct?
22   A.  That is correct.
23   Q.  And if you go to sheet above it, before it, there's
24 also a number here.  It says six?
25   A.  Yes.

Page 125

1    Q.  And that's an envelope?
2    A.  That is the certified receipt mail envelope, yes.
3    Q.  And you would believe that that envelope is what
4 this letter came in?
5    A.  I would assume so.  I'm not 100 percent sure.
6    Q.  Now, in this letter that's Number 7 it says, "I
7 would like to request a copy of my Correct Craft employment
8 file.  Also please send a sheet count, and I will pay for the
9 materials, labor, and postage to send me these copies.  Thanks
10 for this consideration.  Regards, Borden Larson."
11       Correct Craft never honored that letter, did they?
12   A.  I do not know that.
13   Q.  If they did honor it, wouldn't there be something in
14 here that says sent to him with a date?
15   A.  I'm sorry.  Say that again.
16   Q.  If someone had honored that letter, wouldn't there
17 be --
18   A.  -- a response?
19   Q.  -- a response?  Wouldn't someone say, sent it and
20 they initialed it and wrote on that letter and says, "I sent
21 it on and dated it"?
22   A.  I don't know that that would have been part of his
23 employment file, no.
24   Q.  Wouldn't there be a cover letter in here, in the
25 employment file, that says, "Okay, I responded to Mr. Larson's

Page 126

1 file"?
2    A.  I don't know.
3    Q.  Why did this letter go in his employment file?
4    A.  Any correspondence, I guess, coming from and request
5 of certain things like this go into their file.
6    Q.  Do you know that correct -- do you know that Correct
7 Craft has given me two copies of his employment file?
8        MR. NORMAN:  Objection.  Assumes facts not in
9    evidence.
10    A.  I have no knowledge of that.
11 BY MR. LARSON:
12    Q.  Do you know that one copy has this letter in it and
13 one copy doesn't?
14        MR. NORMAN:  Objection.  Assumes facts not in
15    evidence.
16    A.  I do not know that.
17 BY MR. LARSON:
18    Q.  Now, if Correct Craft will go put this letter into
19 the file, and I have a copy of it that doesn't have it, and
20 now the letter shows up, you don't think Correct Craft would
21 come and put this thing in here about supervisor of plan and
22 development department?
23        MR. NORMAN:  Objection.  Assumes facts not in
24    evidence.
25    A.  I do not know.

Page 127

1 BY MR. LARSON:
2    Q.  But it could certainly happen?
3        MR. NORMAN:  Objection.  Assumes facts not in
4    evidence.
5    A.  I can't answer that.
6        MR. LARSON:  While we're talking about that product
7    design and development department, I'm going to show you
8    the handbook now.  Let me mark this, I think, what, 7?
9        THE WITNESS:  That is correct, 7.
10 (Exhibit No. 7 was marked for identification.)
11 BY MR. LARSON:
12    Q.  Can you look through there and see if you can find
13 the product design and development department?  Well, why
14 don't -- for the record, why don't you explain what this is?
15 Because we know the transcript is not going to read until we
16 know what we're looking at.
17    A.  Okay.  You have handed me what I believe is a
18 Correct Craft Employee Handbook in and around the time of the
19 employment of Mr. Larson.
20    Q.  Now, up on the top it says, prior to 8/15/02?  Do
21 you know whose handwriting that is?
22    A.  I have no knowledge of whose handwriting that is.
23    Q.  Now, when you reviewed Borden's personnel file, did
24 you find this in that file, in his personnel file?
25    A.  I did not look at the whole file, so I do not know

Page 128

1 if it was in there or not.
2    Q.  Okay.  For the record, I'll tell you that this is
3 where I got this copy.
4    A.  From his file?
5    Q.  From what you portray is his file.
6    A.  Okay.
7    Q.  So why don't you go through it and put on the record
8 what this document is.
9    A.  This is an employee handbook that was used, based on
10 a handwritten note of whom I do not know who it is,
11 handwriting, prior to August 15th, 2002.
12        MR. LARSON:  And I just want you to go through here.
13    We have to change the tape.
14        (Proceedings continued in Volume II.)
15            * * * * * * *
16
17
18
19
20
21
22
23
24
25

129

1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                      ORLANDO DIVISION

3
                           CASE NO. 6:050-CV-686-ORL-31-JGG
4
     BORDEN M. LARSON
5
             Plaintiff,
6
     vs.
7
     CORRECT CRAFT, INC.
8    ROBERT TODD AND WILLIAM SNOOK

9            Defendants.
     _____/
10
     CORRECT CRAFT, INC.
11
             Counter-Claimant,
12
     vs.
13
     BORDEN M. LARSON
14
             Counter-Defendant.
15   _____/

16

17           VIDEOTAPED CORPORATE DEPOSITION OF
                    WALTER GARY MELOON
18              VOLUME II (Pages 129-268)

19

20     EXAMINATION OF A WITNESS BEGINNING AT 11:20 A.M. ON

21   SEPTEMBER 29, 2006, AT 1516 EAST HILLCREST STREET, SUITE 300,

22   ORLANDO, FLORIDA, BEFORE MICHELLE A. MANNI, COURT REPORTER AND

23   NOTARY PUBLIC IN AND FOR THE STATE OF FLORIDA AT LARGE.

24

25

Page 130

1                    I N D E X
2  WALTER GARY MELOON                    Page
3  FURTHER DIRECT EXAMINATION            131
     BY MR. LARSON
4  CERTIFICATE OF OATH                   268
     CERTIFICATE OF REPORTER             268
5
6
               E X H I B I T S
7                                        Page
8  Exhibit No. 8        134
     Exhibit No. 9        154
9  Exhibit No. 10       168
     Exhibit No. 11       174
10 Exhibit No. 12       180
     Exhibit No. 13       189
11 Exhibit No. 14       197
     Exhibit No. 15       200
12 Exhibit No. 16       207
     Exhibit No. 17       217
13 Exhibit No. 18       223
14
15
16
17          S T I P U L A T I O N S
18    It is hereby stipulated and agreed by and between counsel
19 present at this deposition and by the deponent that the
20 reading and signing of this deposition is expressly reserved.
21
22              * * * * * * *
23
24
25

Page 131

1          (Proceedings continued from Volume I)
2          THE COURT REPORTER:  Okay.  We're back on the
3  record.  The time is 2:22.  Michelle Manni, court
4  reporter.  It's September 29th, 2006.  We're at 1516 East
5  Hillcrest, Orlando, Florida.  This is the deposition of
6  corporate representative Gary Meloon.
7          FURTHER DIRECT EXAMINATION
8  BY MR. LARSON:
9      Q.  So, Mr. Meloon, I have given you Exhibit 7, which
10 you have, I think, identified as employee handbook, and I
11 don't know if you quite explained what it is.
12     A.  This was the handbook that was used prior to August
13 the 15th of 2002, basically introducing any new employees to
14 the company and our policies and different things of their
15 employment based on code of conduct to reimbursement of
16 employee expenses, company premises, and work areas.  It
17 outlined what those were.
18     Salary, administration, employee benefits, what to
19 do when you're absent from work, and a history of the company,
20 a list of managers, supervisors, talked about things that the
21 company did from time to time, speakers and movies, outline
22 your probationary period time, hours of work, termination of
23 employment, and medical procedures.
24     Q.  Now, if we turn over to pages 6 and 7?
25     A.  Yes.  Yes, 6 and 7.

Page 132

1      Q.  We have a list of managers on page 6 and a page -- a
2  list of supervisors on page 7; and on page 6, the managers I
3  see, Bill Snook here as engineering manager --
4      A.  Correct.
5      Q.  -- in this picture.  Is there anywhere on this page
6  where it even talks about a department of research and design,
7  research and development, product development, or plug and
8  mold shop?
9      A.  No, it does not.
10     Q.  Now, let's turn to the next page.  Now, we have nine
11 photos of supervisors, and in the middle of the bottom it
12 says, "Borden Larson, designer."  Is there anywhere on here
13 where it talks about the departments research and design,
14 research and development, supervisor of product development,
15 or plug and mold shop?
16     A.  No, it does not.
17     Q.  What is Borden Larson's title?
18     A.  On this page it's -- under his name it says
19 "designer."
20     Q.  Now, is designer singular or plural?
21     A.  It is singular.
22     Q.  It doesn't say he's the head of the design
23 department, does it?
24     A.  No, it does not.
25     Q.  And if he was, it would certainly say that, would it

Page 133

1  not?
2      A.  I don't know that it would, no.
3      Q.  Now, right next to him I see a guy Scott -- I don't
4  know how to pronounce the name -- Mohr?
5      A.  Yes.  That is correct.
6      Q.  Here he's the director of promotions and special
7  events.
8      A.  Correct.
9      Q.  Well, he's the director of a whole department.  Now,
10 if Borden was the director of design, of the design
11 department, whoever typed this up could certainly have put
12 that in there.
13         MR. NORMAN:  Objection.  Mischaracterizes his prior
14 testimony.
15     A.  Without -- I don't want to seem cute or off-color,
16 but I mean, unfortunately, I think it's more semantics of how
17 we used titles and names at Correct Craft, such as director of
18 promotions and special events.
19 BY MR. LARSON:
20     Q.  Well, I don't know what you mean by that.
21     A.  Well, certainly he was not a corporate director as
22 in the sense of most Corporate America.
23     Q.  I understand that.  I understand that.  But -- but,
24 you know, he was like a supervisor, a manager, or something.
25 Someone used the word "director," but he's in charge of these

Page 134

1 promotions and special events.
2    A.   That is correct.
3    Q.   But when we go over to look at Borden, it doesn't
4 say he's in charge of design.  He's just a designer, one
5 designer.
6    A.   But on this page it's a list of the corporate
7 supervisors who had possibly multiple employees under their
8 direction as well as possible department headings other than
9 just designer in Borden's case.
10    Q.   But it doesn't indicate what employees Borden had
11 or -- and it certainly doesn't indicate that he's in charge of
12 research and design, research and development, supervisor of
13 product development, or the plug and mold shop.  None of those
14 are in there?
15    A.   None of those are under the description.  No, they
16 are not.
17    Q.   Okay.  Can you find those departments anywhere in
18 this personnel handbook?
19    A.   I -- I would have to look.
20    MR. LARSON:  Why don't you just take a few moments.
21 While he's looking, I'm going to mark this next exhibit as
22 Number 8.  Give me a scissors.  Thank you.
23 (Exhibit No. 8 was marked for identification.)
24    A.   There's no reference in the employee handbook as to
25 any job description of any sort.

Page 135

1 BY MR. LARSON:
2    Q.   Now, when an employee gets hired, is not -- is the
3 handbook not the information that is most important to their
4 job?
5    A.   Not to the job, no.  The employee handbook is
6 referenced to only be those policies, and not all inclusive
7 policies, as to employment at Correct Craft.
8    Q.   But if a new employee was hired, they were given
9 that; correct?
10    A.   Yes.  So that they knew what the policies and
11 procedures were.
12    Q.   And also who the managers were who were running the
13 company?
14    A.   That is correct.
15    Q.   So a new employee is hired, and they would see
16 Borden Larson, and they say, "Hey, you're the designer"?
17    A.   That is correct.
18    Q.   And if people were going around saying, "Oh, no.
19 I'm the supervisor of research and development."
20    And they're going to go, "Wait a minute.  The
21 handbook says you're the designer.  What's up?"
22    You don't think that would cause a little bit of
23 misunderstanding?
24    A.   I think it could, but as I said, I think, you know,
25 more semantics than anything else of what we called positions

Page 136

1 at Correct Craft may not have been in standing with Corporate
2 America sometimes as how we label positions, their job
3 descriptions.
4    Q.   But today you're standing on those -- on those
5 titles, stating that it was Borden's job duty, because he was
6 the director or the supervisor of all these different
7 departments to give you title to these inventions, are you
8 not?
9    A.   Well, one department with multiple names that had
10 been used, yes.
11    Q.   Or multiple departments with different names and
12 with managers that we don't even know who's manager anymore?
13    MR. NORMAN:  Is there a pending question?
14    MR. LARSON:  I'll ask another one.  I'm going to
15 show you another document.  I have entered this as
16 Exhibit 8, and I'm sorry I don't have a binder for it.  I
17 just picked these up this morning from the -- from the
18 copy store.
19    MR. NORMAN:  They're bound in cellophane.
20    MR. LARSON:  They're bound, yeah.  Why destroy --
21 why destroy both of them.
22 BY MR. LARSON:
23    Q.   Mr. Meloon, I'm just going to represent to you what
24 this is, and you can look at it and tell me if you think
25 that's what it is or not, and we can just have a discussion on

Page 137

1 it like that.
2    A.   Um-hmm.
3    Q.   What that is a copy of the Correct Craft versus
4 Tower System trial.  It's four days, and these opaque papers,
5 I don't know why the copy center didn't throw bright blue or
6 something in there, but these, these tan papers in here, these
7 tan pages, separate the day.
8    A.   Okay.
9    Q.   So Day 1, Day 2, Day 3, Day 4, and they're two-sided
10 copies, and I don't know they copied them correctly, so when
11 you flip the page over, you can read it properly, because
12 sometimes the collators don't know how people use paper.
13    Now, I want you to turn to where I have a tab, and
14 that's actually the second day of the trial, and at page 110.
15 This is your testimony.  You're being cross-examined by
16 Mr. Shannin.  Line 6 and line 5, it says:  "How is it that you
17 came out to find about -- find out about him?"
18    And we're talking about Mr. Todd.
19    "Through Borden Larson, our designer," is your
20 answer.
21    A.   Um-hmm.
22    Q.   Now, if Borden Larson was the supervisor of product
23 and development, you would have said that, would you not?
24    A.   Not necessarily, no.
25    Q.   So in other words, we don't know what his title is

Page 138

1 on any given day; is that correct?
2      MR. NORMAN: Objection. Mischaracterizes prior
3   testimony.
4      A. I would not say that, no, we do not know what his
5 title is. I think, we have used many different references to
6 that, trying to depict what, I guess, we wanted it to be at
7 the time.
8 BY MR. LARSON:
9      Q. And today you want it to be something else, and so
10 you're depicting something else?
11      MR. NORMAN: Objection. Is there a question to
12   that?
13 BY MR. LARSON:
14      Q. Is that correct?
15      MR. NORMAN: Objection. Mischaracterizes prior
16   testimony.
17      A. I don't want to say that I'm changing what his job
18 description was to fit the mold, no. I'm just doing it the
19 best of my recollection that he was supervisor of product and
20 design or research and development or whatever we may have
21 called it at the time, so you know.
22 BY MR. LARSON:
23      Q. And what are you calling it today? I want to know
24 what you call it today.
25      A. I would have called it research and design.

Page 139

1      Q. Research and design. Okay. But during this trial,
2 you didn't say this. You called him Borden Larson, our
3 designer?
4      A. That is correct.
5      Q. So how are we supposed to know, Mr. Meloon, when you
6 are testifying, whether or not your answer is the right
7 answer, is only one of the answers you want to give on
8 different days? How are we supposed to tell when you're
9 testifying truthfully?
10      MR. NORMAN: Object. Objection. Badgering the
11   witness. It's improper, vague. Go ahead and answer if
12   you could.
13      A. Well, I -- I am being very truthful in forthright.
14 It is a time period that we're now looking at over close to
15 ten years ago, and this trial was sooner than that, but it was
16 sometime in the past, and I am giving the best truthful
17 answers that I can, best of my recognition of what the events
18 took place.
19 BY MR. LARSON:
20      Q. So this trial was, I believe, in 2002?
21      A. I believe you're right there.
22      Q. So in 2002 testified that Borden Larson was the
23 designer?
24      A. Yes.
25      Q. And in your handbook that you just went through, it

Page 140

1 says in here that Borden Larson is a designer, not that he's
2 in charge of any design department. He's a singular designer,
3 which is on page 7 --
4      MR. NORMAN: Is there a pending question?
5 BY MR. LARSON:
6      Q. -- Borden Larson, designer.
7      MR. NORMAN: Is there a pending question?
8 BY MR. LARSON:
9      Q. Right?
10      MR. NORMAN: Mischaracterizes prior testimony. Go
11   ahead.
12      A. As the description supervisor, he would be more than
13 supervising himself, so he was a supervisor of the design
14 department.
15 BY MR. LARSON:
16      Q. It doesn't say that.
17      MR. NORMAN: Objection. Mischaracterizes the
18   document itself.
19 BY MR. LARSON:
20      Q. Do you know who he was supervising?
21      A. I do not recall who made up that department at that
22 time.
23      MR. LARSON: Okay. Let's go on to Paragraph 24 in
24   Exhibit, I believe we're looking at 2 and 3.
25      THE WITNESS: What was that again? 24?

Page 141

1      MR. NORMAN: 24.
2      MR. LARSON: 24.
3      THE WITNESS: Okay.
4 BY MR. LARSON:
5      Q. 24 says: "At the August 30th, 1996 meeting, Correct
6 Craft president, Mr. Walter Meloon, thought the tower idea had
7 some promise and asked that a prototype be built and tested."
8      You say: "Admit that Correct Craft tested the ideas
9 of its product and development and engineering department,
10 otherwise denied."
11      Now, this Walter Meloon is your dad?
12      A. That is correct.
13      Q. So are you denying that your dad thought it had
14 promise?
15      A. Yes, we are.
16      Q. Okay. But your dad was the one here who you have
17 also heard testify at other times -- strike that. Have you
18 heard your dad testify at times that he gave Bill Snook and
19 Borden the task to go redesign the pylon?
20      A. I do know there was a time in which he instructed
21 the research and design, or R&D department, to go and look at
22 a different design or pylon, yes.
23      Q. And do you -- have you heard that he's actually
24 testified that Bill Snook and Borden went into the little room
25 and worked on that design and came out with this tower idea?

Page 142

1    A.  I believe if my recollection is right that there was
2  some testimony to that effect that -- that they came back with
3  the design.
4    Q.  So you have heard that your dad is out saying that
5  he actually gave Bill Snook and Borden the job to go redesign
6  the pylon?  You have heard that?
7    A.  I -- I -- I know at some point in time, he had spoke
8  to -- to Mr. Snook.  Now, whether Borden was present or not or
9  it was implied that, because at that point in time or the
10  relationship between the two or what they worked on, it may
11  have been implied that Borden was notified of that or told
12  that.
13    Q.  But have you heard your dad say that Mr. Snook and
14  Borden went back to their little room and worked on it and
15  came out with this tower design?
16    A.  I cannot remember that exact, no.
17    Q.  But you heard something to that effect?
18    A.  Something to that effect, yes.
19    Q.  Okay.  So do you accept that as true?
20    A.  I would, yes.
21    Q.  Okay.  And if you accept that as true, on the
22  August 30th meeting, apparently, Borden and Snook are coming
23  out and saying, "Hey, Walt, we're out from our little room.
24  We have done what you told us to do.  Here's our thing.  We've
25  solved your problem."

Page 143

1        And what does your dad do?  You just told me that he
2  didn't even think it was a good idea.
3    A.  I think --
4    MR. NORMAN:  Objection.  Mischaracterizes his prior
5    testimony.
6    A.  I think what we otherwise deny is that my father
7  thought it had some promise, because we all were skeptic of
8  the original drawing because of what we thought it
9  represented.
10  BY MR. LARSON:
11    Q.  He's testified that he almost shrieked in delight
12  that Mr. Snook and Mr. Larson came back from their little room
13  solving this problem.
14    MR. NORMAN:  Objection.  Mischaracterizing the
15    question why the guy shrieked in delight, but go ahead.
16    A.  Without reviewing the testimony and being confirmed
17  of what he may have said or not, I can't recall.
18  BY MR. LARSON:
19    Q.  Well, we can have it.  It's in the transcripts that
20  we'll go through.
21    A.  Okay.
22    Q.  If we have time today, we can get to that, but it's
23  in -- it's in 8.  I'm just asking you if you know that your
24  dad's out saying this type of thing?
25    A.  I was not aware that he shrieked that, no.

Page 144

1    Q.  Because I understand that a month ago you were down
2  talking to Borden, and Borden says, "Hey, you know, Gary tells
3  me that my dad told Bill and Borden to go build this thing."
4  And so you guys actually discussed this when you had dinner a
5  month ago or lunch.
6    MR. NORMAN:  Is there a pending question?
7  BY MR. LARSON:
8    Q.  Isn't that true?
9    A.  We did have lunch about a month ago, yeah.
10    Q.  And you discussed the fact that your dad is out
11  saying that he told Bill and Borden to go invent this thing?
12    A.  That is correct.  That is my father's recollection
13  as to what the events took place, that he gave them the
14  directive, yes.
15    Q.  Why wasn't your dad an inventor on this then?
16    MR. NORMAN:  Objection.  Calls for a legal
17    conclusion.
18    A.  Yeah.  I have no idea why, what the legal
19  ramifications would be that he would or would not have
20  qualified.
21  BY MR. LARSON:
22    Q.  Let's go back to your answer.  It says, "Admit that
23  Correct Craft tested the idea of its product development and
24  engineering department, otherwise denied."
25        So you're denying that Borden even brought this in

Page 145

1  there?
2    A.  No.  The part we're denying is whether my father
3  thought at that point in time it had promise.
4    Q.  Okay.
5    A.  He did ask him to do the prototype and test.
6    Q.  Okay.  But now, again, we're talking about another
7  department here.  We're talking about product development.
8  I'm going to write that down.  That is now a fifth department
9  I have written down here.
10    MR. NORMAN:  Where did that come from?
11    MR. LARSON:  I don't know.  I'm trying to find out.
12    MR. NORMAN:  No.  You're -- I think you're the only
13    one that's ever said it, but go ahead.
14  BY MR. LARSON:
15    Q.  I have got product development written down,
16  research and design, research and development, and supervisor
17  of product and development.  Okay.  So supervisor of product
18  development?
19        Okay.  So it tested the idea of its product
20  development and engineering departments.  Are you saying that
21  this came out of two departments or one department?
22    A.  Again, at that time in 1996, if I remember
23  correctly, the two departments had been split, where Borden
24  was reporting originally to Bill Snook as our chief engineer
25  of multiple names we have given this department, to having a

Page 146

1 direct report, and I think at that time engineering stayed
2 with -- with Bill Snook and product development went with
3 Borden under Mike's guidance and direction.
4    Q.   So -- but you only learned this morning that Borden
5 had gone under Mike Elrod?
6    A.   That is -- that is correct.
7    Q.   So this testimony is something that you're
8 fashioning today based on something that you only learned this
9 morning?
10    A.   That's a fair statement I believe, yes.
11    Q.   Okay.  Well, is your testimony true, or are you just
12 testifying to what you think was going on at that time based
13 on what you now learned based on these documents?
14    A.   Based on these documents, that's what I have put
15 together, yes.
16    Q.   Okay.  So you're putting together testimony today on
17 what you think happened, but you're really not sure back then
18 what happened?
19    A.   Well, based on the employment files we just went
20 through, I -- I see that being where the two departments were
21 evidently split, engineering and then product and development,
22 so, I guess.
23    Q.   But how do you know you ever even split?  Maybe, who
24 says Mike Elrod wasn't working under Mr. Snook?
25    A.   Based --

Page 147

1        MR. NORMAN:  Objection.  Calls for speculation.
2 BY MR. LARSON:
3    Q.   Or Mr. Snook was working under Mr. Elrod?
4        MR. NORMAN:  Objection.  Calls for speculation.
5    A.   Yeah.  I guess I don't know that for a fact.
6 BY MR. LARSON:
7    Q.   All that memo says is that Borden now reports to Mr.
8 Elrod instead of Snook.  It doesn't talk about splitting of
9 departments, does it?
10    A.   No, that memo does not say that.
11    Q.   Okay.  Let's go to 25:  "In response, plaintiff
12 Larson found several local welding companies and gave these
13 numbers to Correct Craft management.  One company was called
14 Todd's T-Tops and Towers and was owned by defendant Todd."
15        Correct Craft denies that.  What are you denying?
16 Are you denying Larson found the shops?  Are you denying that
17 he gave you the number, or are you denying that one of them is
18 called Todd's T-Tops?
19    A.   The part that we are denying, I guess, and because
20 it's a whole statement together, 25, we're denying that he had
21 found several local welding companies.  We are not denying
22 that he found one, and -- and I don't remember if it was
23 Todd's T-Tops or another company, Robert's.  I can't think of
24 what the -- exactly what it is off the top of my head, but
25 there was another, there was a third company called Robert's

Page 148

1 something, up in North Orlando.
2    Q.   Have you reviewed any documents before you testified
3 today?
4    A.   I have reviewed some, yes.
5    Q.   Did you review these answers with anybody who has
6 knowledge of these factors?
7    A.   Yes, I have.
8    Q.   I'm going to show you, again, Exhibit 8, and you
9 don't have to get yours out.  You can just use mine.  This is
10 the trial testimony, the second day.  And here in number -- in
11 Number 6, you were saying:  "Through Mr. Larson, our
12 designer."
13        Well, the question is:  How did you find Todd?
14        If we go back down here, up above here, you're going
15 to say -- a few questions regarding some of the areas you
16 testified today in particular, like back to our conversation.
17 In fact, why don't you read this?
18    A.   Sure, sure.  A few questions regarding some of the
19 areas.
20        MR. NORMAN:  You don't have to read it aloud.
21        THE WITNESS:  Oh.
22        MR. NORMAN:  You'll drive her nuts.
23        THE WITNESS:  Okay.
24        MR. NORMAN:  I mean, unless --
25        MR. LARSON:  No.  That's okay.  And all the way

Page 149

1 down.
2        THE WITNESS:  Okay.  I'm sorry.  Next page?
3 BY MR. LARSON:
4    Q.   Well, from reading that, do you get the gist that
5 Borden gave you a card that had Robert Todd's name on it?
6    A.   From reading the testimony, yes, I do recall and --
7    Q.   And it also had Sunshine Welding on it?
8    A.   There was, from based on the testimony, there was a
9 Rolodex card that had Sunshine Welding and another company on
10 there as well.
11    Q.   And is there another one?
12    A.   Yes.  There is a third one.
13    Q.   Okay.  And let's go back, and who gave you that
14 card?
15    A.   Borden Larson did.
16    Q.   Okay.  And why are you denying today that he gave
17 you a card that had several welding companies on it then?
18        MR. NORMAN:  Objection.  Mischaracterizes his prior
19 testimony.
20 BY MR. LARSON:
21    Q.   Let's go back to -- let's go back to 25.  Here we
22 say:  "In response, plaintiff Larson found several local
23 welding companies and gave these to members of Correct Craft
24 management."
25        Are you not a Correct Craft management?

Page 150

1   A.  Yes, I am.
2   Q.  And here your testimony is two years ago or three
3  years that Borden gave you a Rolodex card that had three
4  welding companies on it; is that correct?
5   A.  That is correct.
6   Q.  Why are you denying today exactly what you testified
7  to at the trial three years ago?
8   A.  I'm not sure.  I'm not saying that I deny that today
9  based on testimony that I'm reading here.
10   Q.  You denied that just five minutes ago when I read
11 this first before I had to go to the transcripts.
12   A.  Because I did not recall.
13   Q.  How are we supposed to get the truth in this case,
14 Mr. Meloon, when you can't recall the truth?
15      MR. NORMAN:  Try not to be abusive to the witness.
16  You don't have to talk to him like that.  I object to the
17  question.  It badgers the witness, but go ahead and answer
18  if you like.
19 BY MR. LARSON:
20   Q.  I mean, how are we supposed to get the truth, Mr.
21 Meloon?
22      MR. NORMAN:  Is there a pending question?
23      MR. LARSON:  That is a question.
24      MR. NORMAN:  How are we supposed to get the truth?
25      MR. LARSON:  Yes.

Page 151

1      MR. NORMAN:  That's the question?
2      MR. LARSON:  That's the question.
3      MR. NORMAN:  I object to the question.
4      MR. LARSON:  Okay.  You can answer it.
5      MR. NORMAN:  It's vague, unprofessional,
6  inappropriate, badgering the witness.  Go ahead and answer
7  if you want.
8   A.  Well, it's how we get to the truth is -- is
9  hopefully by going through this process and understanding what
10 took place and recollections of three and ten years ago, you
11 know, to the best of my ability at this time is what I just
12 said five minutes ago.  Now re-reading that, it -- I stand
13 corrected.
14 BY MR. LARSON:
15   Q.  But from -- but from the notice of deposition that I
16 sent, in Number 7, I say:  "The testimony given by Correct
17 Craft in the Correct Craft versus Tower System trial."
18      You know exactly what questions I'm going the ask
19 you.
20   A.  No, I do not.
21      MR. NORMAN:  Objection.
22 BY MR. LARSON:
23   Q.  You knew I was going to ask you questions from this
24 trial.  In fact, I sent you that transcript just a month ago.
25 You have a whole copy of that, and you have never read it?

Page 152

1   A.  I -- I have not.  Yes, I have read it.
2   Q.  Have you?  When's the last time you read it?
3   A.  It was more than a month ago.
4   Q.  How long ago?
5   A.  I do not -- I cannot recall.
6   Q.  In the last two months?
7   A.  It's probably been well within a year that I read
8  those, those documents.
9   Q.  Why did you read that trial transcript?
10   A.  Honestly, I don't -- I don't know.  I guess at the
11 time I was not aware I was going to be called as a corporate
12 representative due to the lack of representation we have at
13 the company today due to the restructuring that's going on.
14 What I have reviewed is what we thought we came here to -- to
15 answer and go through, and I tried to do that to the best of
16 my ability.
17   Q.  My question is:  Why did you review that like a year
18 ago?  That's my question.
19   A.  It was -- it was more than a year ago.  I cannot
20 remember if it was 6 months, year, 12, 18.  I do have that.
21   Q.  Do you know who gave it to you?
22   A.  No, I do not.
23   Q.  Do you still have a copy of it?
24   A.  I do not know if I do or not, because of our move
25 from the old building to the new, it may have been lost.

Page 153

1   Q.  Did you read it at home or at work?
2   A.  Probably a little of both.
3   Q.  Okay.  Let's go to -- let's go to 26:  "On September
4  9th, 1996, plaintiff Larson created two concept/design
5  drawings, which were sent to defendant Todd for him to use in
6  the fabrication of the first experimental prototype tower.
7  Plaintiff's drawings clearly indicate they were drawn by B.
8  Larson with the date of 9/9/96."
9      And you deny that.  What part of that do you deny?
10 You don't deny he created two concept drawings, do you?
11   A.  Without -- again, without prior looking at something
12 to confirm that those documents are existing, I believe that's
13 why it was denied at that time.
14   Q.  So in other words, so you're saying Correct Craft
15 did no investigation before they denied that?
16      MR. NORMAN:  Objection.  Mischaracterizes his prior
17 testimony.
18      MR. LARSON:  It's not his prior testimony.  It's his
19 current testimony.
20      MR. NORMAN:  Just -- no, no.  Testimony from a
21 moment ago, in which he said that that was the reason they
22 were denying it, not that they didn't do any research, but
23 that they looked at that sentence and denied it for that
24 very reason.
25 BY MR. LARSON:

Page 154

1   Q.  Okay.  Did Correct Craft do any research at all
2 before they answered this complaint?
3   A.  Not that I'm aware of, but they could have.
4   Q.  And if they had done some research, would someone
5 have told you about that?
6   A.  Yes.
7   Q.  Who would have told you?
8   A.  Probably a number of people from Angela Pilkington
9 to Bill Snook, possibly Mike Elrod, and I'm not sure if there
10 would have been anybody else that might have been involved
11 with the research of that documentation.
12     MR. LARSON:  Okay.  I'm going to enter another
13   exhibit here.  This will be 9.
14 (Exhibit No. 9 was marked for identification.)
15     MR. LARSON:  For the record, these are five
16   different sketches.  We're not stating that they're done
17   all the same date.  They're just five different drawings.
18   We'll talk about them independently.
19 BY MR. LARSON:
20   Q.  Now, Mr. Meloon, the front page of what's been
21 marked as Exhibit 9 is a sketch, is it not?
22   A.  That is correct.
23   Q.  Have you ever seen this one before?
24   A.  Yes.  I do recollect this one.
25   Q.  Do you know -- do you -- can you -- do you know

Page 155

1 whose handwriting is it on it?
2   A.  I believe it is to be Borden Larson's handwriting.
3   Q.  And can you tell me what date it's dated?
4   A.  9/9/96.
5   Q.  And if you look at Paragraph 26, does it say 9/9/96?
6   A.  It does refer to September 9th, 1996, yes.
7   Q.  And this number on here, the CC0550, does that
8 depict that those are Correct Craft documents?  I may be
9 asking a question you don't know.
10   A.  Yeah, I do not know.
11   Q.  Okay.  Is this not a drawing that -- do you see
12 where it's signed by someone?
13   A.  Yes, I do.
14   Q.  And what does it say?
15   A.  B. Larson.
16   Q.  Has a scale?
17   A.  I'm sorry.  Say that again.
18   Q.  Does it have a scale?
19   A.  Yes, it does.  It has a scale up at the top, yes.
20   Q.  One inch equals one foot?
21   A.  Approximately, yes.
22   Q.  You see the top view of the tower?
23   A.  I am assuming that is the top view, yes.
24   Q.  And if you turn the page, do you see anybody's -- do
25 you see any date on this?

Page 156

1   A.  Yes, I do, 9/9/96.
2   Q.  Do you see anybody's name?
3   A.  B. Larson.
4   Q.  Did Borden make these sketches for you?
5   A.  Yes.  These are his sketches.
6   Q.  He gave them to you?
7   A.  I may have gotten a copy at some point in time, yes.
8   Q.  And these are sketches that you faxed to Robert
9 Todd?
10   A.  I believe they were the one, if not several of these
11 might have been the ones that I faxed to Robert Todd, yes.
12   Q.  Going back to Question 26 --
13   A.  Yes.
14   Q.  -- are these two concept drawings?
15   A.  No, they are not.  That's where we denied it.  This
16 is one single concept drawing.  There's two different views
17 but not two concepts there.
18   Q.  So you couldn't say, "Denied that there's not two
19 concepts.  There's only one concept"?
20   A.  My understanding is if we are to do it, we are to
21 either admit to part or deny all in some situations, so that's
22 why I believe it was answered denied in Number 26.
23   Q.  But you could have admitted that we had two drawings
24 of one concept?
25   A.  Yes.

Page 157

1   Q.  But you didn't do that?
2   A.  I don't know that that was our job.
3   Q.  Whose job was it?
4   A.  I mean, the complaint is showing that -- that there
5 were two different confined concept/design drawings, and it's
6 one drawing depicting --
7   Q.  Well, Mr. Meloon, if you really read that, it says:
8 "Plaintiff Larson created two concept/design drawings."  It
9 doesn't say "two concepts."  It says "two drawings."
10     MR. NORMAN:  Is there a pending question?
11 BY MR. LARSON:
12   Q.  So these are two drawings.  These aren't two
13 concepts.  These are two drawings of one concept, so why did
14 you deny it?
15   A.  I think I have already answered that.
16   Q.  No.  You parched the words.  You said, "This is not
17 two drawings -- it's not two concepts.  It's one concept but
18 two drawings, and that's why we denied it."
19     It's not two concepts.  It's one concept.  It's two
20 drawings, and that's exactly what that says, is it not?
21     MR. NORMAN:  Objection.  Asked and answered.
22   A.  It does read "two concept/design drawings."
23 BY MR. LARSON:
24   Q.  It doesn't say "two concepts."  Is concept singular
25 or plural?

Page 158

1   A.  It is plural.
2   Q.  Then why did you tell me it was plural?
3       MR. NORMAN:  Objection.  Mischaracterizes his prior
4   testimony.
5 BY MR. LARSON:
6   Q.  You did tell me it was plural, did you not?
7       MR. NORMAN:  Objection.  Mischaracterizes his prior
8   testimony.
9   A.  I've answered that.  We --
10 BY MR. LARSON:
11  Q.  You told me it's plural.  It's not.
12  A.  We denied based it based on that the implied was
13 that there were two different conceptual drawings.
14  Q.  That's not what it says here.  It says "two
15 drawings," and there are.
16  A.  That is correct.
17  Q.  Okay.  So today would you like to admit it today
18 with our understanding that there's two drawings of one
19 concept?
20  A.  I'm not sure that without further counsel I would
21 want to.
22  Q.  Okay.  I understand that.  Okay.  Now, let's just go
23 through the drawings while we have them.  When's the first
24 time you ever saw drawing -- the top page, which is 1593, the
25 bottom page number?

Page 159

1   A.  1593, the first time?
2   Q.  Um-hmm.
3   A.  Somewhere in around I'm going to say between May of
4 '96 and June or August of '96, probably.
5   Q.  Okay.  And what were the circumstances when you saw
6 this?
7   A.  I want to say it was probably based on needing to
8 get the tower built for prototyping and testing as well as
9 starting to do the certification process of possible venders
10 that we would go outside and do sources with.
11  Q.  Okay.  And the second page, which is 1594, the same
12 answer?
13  A.  Yes.  That is correct.
14  Q.  Now, on this I see up at the top, it says, "We will
15 be attaching racks on these tubes."  Do you understand what
16 that means?
17  A.  I might not have at the time.  I mean, in today's
18 context, I understand what it means.
19  Q.  What does it mean today?
20  A.  Racks or wakeboard racks or ski racks, things to
21 attach and get them up and out of the boat and onto the tower.
22  Q.  Okay.  And did you ever see a drawing from Borden
23 that had the racks on the top?
24  A.  Not that I remember during this time frame, no.
25  Q.  But that doesn't mean that they didn't exist, does

Page 160

1 it?
2   A.  That is correct, yes.
3   Q.  Now, these aren't the drawings that Borden brought
4 into that first meeting, are they?
5   A.  I believe they may have been, yes.
6   Q.  I thought that Borden, I thought the drawings that
7 he had in the first meeting were mounted on a boat?
8   A.  That was my recollection.
9   Q.  Okay.  And these aren't mounted on a boat?
10  A.  No, these are not.  These are freestanding on the
11 page.
12  Q.  Now, let's go turn -- let's go turn to the page
13 that's marked on the bottom as 9801?
14  A.  Yes.
15  Q.  Have you ever seen this drawing before?
16  A.  I believe that's where we were discussing earlier,
17 seeing an attachment point for the rope.  This may have been
18 where I saw it for the first time.
19  Q.  And this is the side profile?
20  A.  Yes, it is.
21  Q.  And it has an arrow that shows that it's going to
22 bend forward?
23  A.  That is the -- yes.
24  Q.  And it has like little breaks in the -- in the two
25 legs that you see, because it's not in perspective, you don't

Page 161

1 see four?
2   A.  That is --
3   Q.  There's little breaks there saying that these are
4 going to be pins or hinges?
5   A.  There are some break points there.  As to what the
6 devices were, I don't -- I don't recall what they were.
7   Q.  But it's some type of device to remove it off the
8 boat?
9   A.  Correct.
10  Q.  So you and I sitting here as a novice can look at
11 that and say, "Hey, whoever drew this wants this to be able to
12 move -- removed from the boat"?
13  A.  Yes.
14  Q.  And whoever drew this, you know, you and I, again,
15 as novices, says, "Hey, this thing has an arrow up there that
16 has an arch to it, an arc, and so that thing -- this thing
17 here is going to pivot on the front leg and bend forward"?
18  A.  I would assume that, yes.
19  Q.  Okay.  So it doesn't take a real skilled person to
20 depict what this drawing is trying to depict, does it?
21  A.  Well, you know, I just said as novice we can depict
22 these things, but, you know, maybe that's because of my prior
23 knowledge and understanding of what we are doing and
24 accomplishing.  I don't know if you handed this just to
25 anybody on the street, would they understand that those break

Page 162

1 points were for removal or -- or forwarding, you know, moving
2 forward. I -- I would assume that they might.
3    Q.   But if you handed this to a skilled welder and a
4 skilled engineer and said, "This is going to be a tower on a
5 boat, and we're going to tie a towrope to the top," you would
6 believe that that engineer and that welder would understand
7 what this is?
8    A.   Possibly not.
9    Q.   And that's because why?
10    A.   Because they're probably thinking if you're
11 attaching something for towing purposes, it would be one solid
12 piece, not broken pieces there for structural integrity and
13 liability possibly based on what kind of a mounting system
14 those -- those hinge points were.
15    Q.   So in other words, those guys could get rid of the
16 hinge and bolt it straight on the boat; right?
17    A.   That is correct.
18    Q.   Okay. And so let's go turn to the next page. Have
19 you seen this drawing before?
20    A.   I believe, yes, I have.
21    Q.   Now, you don't dispute that any of these drawings
22 are Borden Larson's drawings, do you?
23    A.   I don't dispute them, but I don't have references I
24 did on the first one that have his initials and his
25 handwriting on it.

Page 163

1    Q.   But my question is: You don't dispute that these
2 are his drawings?
3    A.   No, I wouldn't dispute that.
4    Q.   And you look at theses numbers and the way he
5 dimensions and say, "That's the way he dimensions"?
6    A.   I'm trying to go back and reference that now.
7    Q.   If you look at the first one, Mr. Meloon, if you
8 look at how he draws the arrow at the end of his dimensions, a
9 slash.
10    A.   Um-hmm.
11    Q.   Go look. Go look at the last drawing. Are the
12 dimensions done the same with the slash?
13    A.   They are, yes.
14    Q.   Is that unique to the way Borden dimensions
15 drawings?
16    A.   I would not know if that is unique to him or
17 designers in total.
18    Q.   Have you ever studied mechanical drawing?
19    A.   No, I have not.
20    Q.   Let's look at the last page. Have you seen this
21 document before?
22    A.   Yes, I have.
23    Q.   And do you dispute that this is Borden Larson's
24 drawing?
25    A.   No, I do not.

Page 164

1    Q.   Now, do you see hinges on this one?
2    A.   I do not see anything referencing a hinge on this
3 one, no.
4    Q.   And the one before that, do you see a hinge on that
5 one?
6    A.   It's hard to depict, but I don't see a break point
7 as we did on the other one, no.
8    Q.   But you do see feet?
9    A.   Yes.
10    Q.   And on the one on lined paper, you see feet?
11    A.   Yes.
12    Q.   And the middle one, you see hinges?
13    A.   That is correct.
14    Q.   With arrows?
15    A.   Um-hmm.
16    Q.   The towrope attached that squiggles?
17    A.   Um-hmm.
18    Q.   Going towards the front, this one. Now, this one
19 has an indication that says "standard tower pipe." Do you
20 know what that means?
21    A.   No, I do not.
22    Q.   How much pipe have you purchased in your day?
23    A.   It would be hard to quantify how much, but I don't
24 understand the terminology "standard tower pipe."
25    Q.   You have bought a lot of pipe for Correct Craft?

Page 165

1    A.   I purchase pipe as part of my responsibilities, yes.
2    Q.   And how do you buy pipe for towers?
3    A.   Basically, we never bought pipe for towers. We
4 basically specced it out to the fabricators.
5    Q.   So in other words, if I go through this trial
6 transcript again and find out where you were bringing all the
7 pipe in, would I be wrong to point that out to you?
8    A.   No.
9    Q.   Would you want to look through it yourself, or do I
10 have to do it?
11    A.   I don't know where it would be in that testimony, so
12 if you know and could direct me to it.
13    Q.   I'll save that for another time. Your dad had a
14 Fish Nautique, did he not?
15    A.   Yes, he did.
16    Q.   Had a tower on it?
17    A.   Yes, he did.
18    Q.   If you went out and measured the pipe on there,
19 could you figure out what kind of pipe they made that tower
20 with?
21    A.   I have no idea.
22    Q.   All right. If you went out and measured it, could
23 you figure it out?
24    A.   Other than just the circumference, I don't know what
25 the thickness of the wall or any other measurements that they

Page 166

1 might use for pipe in that particular application would be.

2    Q.  But a tower builder would know, wouldn't they?

3    A.  Yeah.  They could probably measure the pipe, and

4 again, the wall thickness would depend on a cross-section of

5 it not just a measurement.

6    Q.  Do you know that after this was being built,

7 Mr. Snook actually wanted this to be built out of thinner and

8 smaller pipe than Borden wanted it to be built out of?

9    A.  I'm not 100 percent aware of that or recollect that,

10 no.

11    Q.  Do you recognize that writing right there?

12    A.  Yes.

13    Q.  Whose writing is that?

14    A.  That's mine.

15    Q.  So it says "Jim"?  That's your writing?

16    A.  Yes.

17    Q.  So it says, "Jim, cheaper if you stay with something

18 heavier wall thickness and pipe."

19      So here you're -- so here you're talking about pipe?

20    A.  Correct.

21    Q.  And you're telling me you don't know anything about

22 pipe, and here you're telling Jim something about pipe.

23      MR. NORMAN:  Objection.  Mischaracterizes prior

24    testimony.  Is there a pending question?

25 BY MR. LARSON:

Page 167

1    Q.  Yeah.  Tell me what you know about pipe the day

2 you're talking to Jim?

3    A.  I knew nothing of pipe.  I was relying on the

4 engineering specs or design specs that they had asked for to

5 have them quote on that.

6    Q.  Who's they?

7    A.  At that point in time, it probably was Bill and

8 Borden.

9    Q.  But here you're talking about heavier wall thickness

10 and pipe sizes, so you knew something about that that day?

11    A.  Only from what they had instructed me.

12    Q.  Have you forgotten what they instructed you by

13 today?

14    A.  Yes.

15    Q.  Okay.  Fair enough.  Okay.  We took care of 26 by

16 looking at these drawings.  Let's go to 27.  It says: "By

17 September 27, 1996, the prototype had been built and mounted

18 on a boat and tested, and thereafter the plaintiff's

19 supervisor, the defendant Snook, reported to Correct Craft's

20 management team that the plaintiff's tow tower had notable

21 advantages over conventional towing methods."

22      Now, you're denying that.  So are you denying that

23 -- that the tow tower didn't -- are you saying the tow tower

24 didn't have any advantages?

25    A.  No.  I would not say that the tow tower did not have

Page 168

1 notable advantages.  I would not deny that.

2    Q.  Why you denying it then?

3    A.  It may have been the time reference that had been

4 stated there and the prototype being built and mounted in the

5 test time in which that went by for Bill to have made those

6 comments.

7    Q.  So like before I asked you, do you have any

8 knowledge that Correct Craft did any research before the

9 answer of this complaint?

10    A.  I cannot answer that with full knowledge, no.

11      MR. LARSON:  I'm going to show you another document

12    that we are now at Exhibit 10.

13 (Exhibit No. 10 was marked for identification.)

14 BY MR. LARSON:

15    Q.  This is a memo I believe that Mr. Snook wrote to

16 Mr. Meloon.  That is your dad; is that correct?

17    A.  Yes, it is.

18    Q.  Have you ever seen this before?

19    A.  I do remember seeing something like this in the

20 past, yes.

21    Q.  Something like this or exactly this?

22    A.  I believe this was the document I have seen in the

23 past, yeah, referencing Dean Lavelle.

24    Q.  Okay.  Now, in Paragraph 26 -- 27 --

25    A.  Um-hmm.

Page 169

1    Q.  -- it's saying:  "The tow tower had notable

2 advantages over conventional towing methods."

3      MR. NORMAN:  I'm sorry.  Where are you pointing?

4      MR. LARSON:  I'm looking at the last sentence in 27.

5      MR. NORMAN:  Okay.

6    A.  That it was reported to the team that -- management

7 team that the plaintiff's tow tower had notable advantages

8 over conventional towing methods.  Correct.

9 BY MR. LARSON:

10    Q.  Now, if you look at this memo --

11    A.  Um-hmm.

12    Q.  Well, let's compare this.  What date do I say in 27?

13    A.  September 27th, 1996.

14    Q.  What's the date of Exhibit 10?

15    A.  9/27/96.

16    Q.  Is it the same date?

17    A.  Yes, it is.

18    Q.  Did anybody from Correct Craft go look for this memo

19 before they denied this paragraph?

20    A.  I do not know that.

21    Q.  Do you think they should have?

22    A.  I believe so, yes.

23    Q.  Are you going to go back and find out if they did

24 after today?

25    A.  Yes.

Page 170

1   Q.   Who are you going to ask?
2   A.   Probably the only person in existence still that
3 would have knowledge of that would be Angela Pilkington.
4   Q.   But if I'm writing Paragraph 27 and it talks about
5 Mr. Snook, why wouldn't you go to him?  Seeing he wrote this
6 memo, why wouldn't you go to him?  Why would you go to Angela
7 when there's stuff about Mr. Snook?
8      MR. NORMAN:  The question you're asking, you're
9 asking, In answering the complaint, who would know whether
10 they did any investigation.  You changed the question on
11 him, and then asked him why he didn't answer it
12 differently.
13 BY MR. LARSON:
14   Q.   Do you know what question I asked?  Should I ask
15 them again?
16      MR. NORMAN:  Please.
17   A.   I -- I took it as you asked two separate questions.
18 BY MR. LARSON:
19   Q.   I did.  My second question was:  Why wouldn't you go
20 to Mr. Snook?  Why would you go to Angela to talk find about a
21 paragraph that doesn't even talk about Angela?  Where does it
22 say anything about Angela in there?
23   A.   It does not.
24   Q.   Who does it talk about?
25   A.   It talks about Snook.

Page 171

1   Q.   Now, why wouldn't you go to him and ask him about
2 that?
3   A.   Because you asked me what I -- who would I go back
4 to to see if they did any research on this to make sure they
5 answer this, and that would be Angela.  If you're asking me,
6 reading the statement, who would I go to, I would go to Snook.
7   Q.   Okay.  Have you ever gone to Snook about this?
8   A.   No, I have not.
9   Q.   So you have read this before you came here?
10   A.   I have reviewed this before I came here, yes.
11   Q.   And when you got to this paragraph, you didn't go to
12 Snook and say, "Hey, is this true or not true?"
13   A.   No, I did not.
14   Q.   Who did you go to about that paragraph to see if it
15 was true or not?
16   A.   I conferred with counsel on that.
17   Q.   So counsel's going to tell you what happened in
18 Correct Craft in 1996?
19   A.   We discussed that statement, and it was denied.
20   Q.   And did counsel say, "Hey, I think you better go to
21 Snook"?
22      MR. NORMAN:  Objection.
23      MR. LARSON:  Okay.  I'll move on.
24 BY MR. LARSON:
25   Q.   This memo here, in the second paragraph, the way I

Page 172

1 read it, it says:  "The tow tower has notable advantages over
2 the extended pylon."
3      Is that what it says?
4   A.   Yes, it does.
5   Q.   So that's what Mr. Snook is writing if you assume
6 that this is actually a letter from him?
7   A.   Correct.
8   Q.   Now, if you go back to 27, isn't that what 27 is
9 saying, the tow tower has notable advantages over conventional
10 towing methods?
11   A.   It does.
12   Q.   An extended pylon is what was conventional?
13   A.   Um-hmm.
14   Q.   Now, why would you deny that?
15   A.   I have no reason to based on what we're seeing here
16 today.
17   Q.   Would you like to admit it?
18   A.   Yes, I would.
19   Q.   After you leave today, could you take this home and
20 go back through it and see if there are other things on here
21 that you would like to admit, so we don't have to go through
22 here page by page?  You don't have to that if you don't want
23 to.  I'm just asking if you would like to do that.
24   A.   I mean, does that mean that this deposition is ended
25 today, and we will be recalled or  --

Page 173

1      MR. NORMAN:  No.
2      MR. LARSON:  Well, I don't know.  It depends if my
3   time gets extended or not, but I'm just going -- you know,
4   we're laboring through things where the documents are
5   exactly perfect, and you're saying that you don't even
6   know if anyone ever looked at the document.
7      MR. NORMAN:  Is there a pending question?
8 BY MR. LARSON:
9   Q.   I want to know if you, as a corporate
10 representative, want to go back and redo your answer with the
11 documents.  You have given me 24,000 documents.  I know these
12 documents better than you, do I?
13   A.   You seem to know them very well.
14   Q.   Is there any reason I should know them and you
15 shouldn't as a corporate representative?
16      MR. NORMAN:  Objection.  Badgering the witness.
17   A.   Again, I don't want to be cute on this or seem out
18 of line, but, I mean, this is what you do for a living.  I do
19 something totally different, and, you know, I had a limited
20 time to prepare for this and did the best of my ability in
21 reviewing all of the answers and information that was provided
22 to me.
23 BY MR. LARSON:
24   Q.   And I can understand that, and I accept that,
25 because I have tried to review 24,000 documents, and I can't

Page 174

1 do it either. Okay. Let's go to the next one, 28: "On or
2 about October 3rd, Gary Meloon, Correct Craft's director of
3 marketing, began the patent process for the tow tower and
4 asked that drawings be created for the patent attorneys."
5      Now, that's denied too. Now we're talking about
6 you?
7   A.   Yes.
8   Q.   Now, why are you denying this?
9   A.   I do not ever recall being involved with the patent
10 process. I may have, at one point in time, asked for drawings
11 on behalf of the corporation because nobody had gotten them in
12 a format that the attorneys were looking for, and so I may
13 have spearheaded it at some point in time, but I was not
14 involved to -- from the beginning of the process.
15   Q.   Did you review any documents to look for that to see
16 if that was true or not?
17   A.   No, I did not.
18   Q.   Is there any reason you didn't?
19   A.   Just based on the time in which I was notified to be
20 the corporate representative and the documents given to me, I
21 did not have a chance to review all documents to look for
22 that, and to be honest, I do not know where I would begin to
23 look.
24 (Exhibit No. 11 was marked for identification.)
25      MR. LARSON:  I'm going to show you what I marked as

Page 175

1 11.
2      THE WITNESS:  Okay.
3 BY MR. LARSON:
4   Q.   Have you ever seen that before?
5   A.   Yes.
6   Q.   And what is this?
7   A.   It is a memo with a request.
8   Q.   It's a memo to whom?
9   A.   To Mr. Larson, Borden Larson.
10   Q.   What's the date on it?
11   A.   It's October 7th, 1996.
12   Q.   Now, in paragraph 28 it says, October 3rd, so
13 apparently --
14   A.   I'm sorry. Say that again.
15   Q.   In paragraph 28 I say October 3rd. I apparently
16 have a typo in there is what I have.
17   A.   Okay.
18   Q.   So it's October 7th?
19   A.   Correct.
20   Q.   So let's say it's October 7th, and I'll change.
21 I'll change mine to October 7th. "Gary Meloon, Correct
22 Craft's director of marketing," well, that's what your title
23 is today. It wasn't your title back then?
24   A.   No. That was my title at that -- no, it wasn't.
25   Q.   You were director of purchasing?

Page 176

1   A.   Yes.
2   Q.   Material procurement?
3   A.   That's right.
4   Q.   Time flies, huh?
5   A.   Yeah. And then that may be why they denied it at
6 that time due to the date and the title.
7   Q.   Okay. But if we look here, is this not a memo from
8 you to Borden?
9   A.   Yes, it is.
10   Q.   And the subject is, "Drawings and description of tow
11 tower for patent"?
12   A.   Correct.
13   Q.   So if you look at the allegation here, well, it
14 says: "Please update me as to the progress of the above
15 subject. We need to start this process as soon as possible."
16      You're talking about the patent process?
17   A.   That is correct.
18   Q.   Okay. So if you look at the allegation, 28, the
19 allegation says:  "To begin the patent process for the tow
20 tower." That's what this memo is about.
21   A.   Yeah. And if we change, like you said, the 7th and
22 the title, I have no problem it.
23   Q.   You would admit that?
24   A.   Yes.
25   Q.   Now, attached to here is a memo from Borden and

Page 177

1 another drawing, and I'm not -- and I'm not claiming all these
2 are attached to there. All I know is I get these from Correct
3 Craft. I'm not sure if the four of them were attached to
4 Borden's memo to you.
5   A.   Correct.
6   Q.   You know, because certainly, your memo didn't have
7 Borden's memo attached?
8   A.   Correct.
9   Q.   And Borden's memo, I don't know had these attached.
10 This is how it came to me.
11   A.   Correct.
12   Q.   Okay. So in 28 there's no reason you couldn't admit
13 that?
14      MR. NORMAN:  Objection. He just described why it
15 wasn't admitted.
16      MR. LARSON:  Pardon me?
17      MR. NORMAN:  He just said why it wasn't admitted.
18 He said the two things.
19   A.   Yeah. If we change the date and the title, I have
20 no problem with admitting that. Correct.
21 BY MR. LARSON:
22   Q.   Okay. So you were the director of what back then?
23   A.   I was materials manager.
24      MR. LARSON:  Okay. Okay. We have to change the
25 tape.

Page 178

1 (Pause in the proceedings.)
2    THE COURT REPORTER: Okay. Back on the record.
3 This is Michelle Manni, court reporter. It's September
4 29th, 2006. The time is 3:29 p.m. We're here at 1516
5 East Hillcrest, Orlando, Florida, deposition of corporate
6 representative Gary Meloon.
7 BY MR. LARSON:
8    Q. Mr. Meloon, I want to refer you now to Paragraph 29,
9 and maybe we got behind ourselves or ahead of ourselves,
10 whichever way it is.
11    A. Um-hmm.
12    Q. But in paragraph 29 we're talking about: "On
13 October 7, Gary Meloon wrote plaintiff a memorandum asking him
14 to provide a drawing and description of the tow tower for the
15 patent process."
16    So this is the memo here that we see in Exhibit 11;
17 isn't it?
18    A. That is correct.
19    Q. So we're not quite sure what 28 was?
20    A. Yeah. It's confusing because it's kind of worded
21 the same but differently.
22    Q. Right.
23    A. Yeah.
24    Q. It could have been my error when I drafted this.
25    A. Right.

Page 179

1    Q. 28 and 29 could have been absolutely identical, and
2 I could have deleted one, but if we look at 29, this memo is
3 what we're talking about?
4    A. Yes, sir.
5    Q. And with the additions of what we also talked about,
6 you can probably admit that, because you're saying: "Without
7 knowledge, accordingly denied."
8    A. Correct.
9    MR. NORMAN: But read the rest of the sentence.
10 It's not just that memo.
11    MR. LARSON: Yeah.
12    MR. NORMAN: "Plaintiff relied on written words,
13 actions." I mean, you got to read it before he admits it.
14    THE WITNESS: Oh, okay. I'm sorry. You're
15 absolutely right. I didn't. I didn't. I stopped at
16 "possible, as soon possible," which is in that memo;
17 correct, but, "The plaintiff Larson relied on written
18 words."
19 BY MR. LARSON:
20    Q. Right. But you could admit so much of that but deny
21 what Larson relied on?
22    A. Correct.
23    Q. You could do that?
24    A. Yeah.
25    Q. Okay. Okay. I want to change focus just slightly,

Page 180

1 because I'm getting ahead of myself right here and not far
2 ahead, but there was -- there was a meeting at some point
3 where Borden brought these drawings out; is that correct?
4    A. Yes, sir.
5    Q. Okay. And it was a meeting with a bunch of people?
6    A. I believe so, yes.
7    Q. You were in that meeting?
8    A. I believe I was too.
9    Q. Tell me what happened at that meeting.
10    A. If it's the meeting I'm remembering, I believe at
11 that time it was possibly the drawings were slightly ridiculed
12 and a lot of joking going about that it looked like a poling
13 platform on something that would be on flats boat not a
14 skiboat. And at that time is when we started, I guess, as a
15 team, focusing on what and how that could be used, possible
16 names may have been mentioned at that time, some creative
17 names that could be used to market that in the marketplace at
18 that time, and that's about all I think I recall if that is
19 the exact meeting we had.
20 (Exhibit No. 12 was marked for identification.)
21 BY MR. LARSON:
22    Q. Okay. I'm going to show you what I marked as
23 Exhibit 12 and ask if you can identify that. Are these the
24 minutes of that meeting?
25    A. Yes, it is.

Page 181

1    Q. Now, in the first paragraph it says: "Borden
2 presented a memo of considerations given to the redesign of
3 the Sport Nautique." Is that correct?
4    A. Yes.
5    Q. "The memo included a lot of ideas, and Borden is
6 looking for feedback to see what we are looking for next year
7 on the Sport."
8    So again, looking at what Borden's job duties are,
9 what he's doing is he's taking your existing Sport Nautique
10 and redesigning it in some fashion?
11    A. That's one way to look at it, yes.
12    Q. And if we flip the page on this memo, and we come
13 down to the middle of the paragraph, there's a two-sentence
14 paragraph. It says: "Discussions concerning radar dome ski
15 pylon. Borden's drawings were 4-1/2 foot and 6 foot. Skylons
16 are 8 foot."
17    Is this radar dome ski pylon what, at least on that
18 day, they started calling these drawings that Borden
19 presented?
20    A. It's -- it's possible. I do recall radar dome being
21 used at some point in time in conversations, meetings. I also
22 remember it as being poling platforms.
23    Q. And even tuna towers, I've seen it.
24    A. Tuna tower, yeah. Correct.
25    Q. Now, the drawings here were of a 4-1/2-foot and a

Page 182

1 6-foot, and I will say "tower." It doesn't say that, but I
2 think we can all safely assume that we're talking about a
3 tower.
4         Now, do you know where these drawings are, the
5 4-1/2-and 6-foot tower? Looks like two different concepts
6 were presented on that day.
7    A.  I have no knowledge where those drawings are, and I
8 don't even have a recollection of seeing two different
9 drawings showing two different heights to be honest with you.
10   Q.  When your company keeps these minutes, if documents
11 are handed around the room, are they attached to the master
12 set of minutes?
13   A.  If there were drawings and things of this nature?
14   Q.  Yes.
15   A.  No, sir, not necessarily, there would not be.
16   Q.  But the drawings -- and I hate to jump around here.
17 Okay. Well, we have an exhibit here of the drawings, and I
18 don't think in that exhibit there are a 4-1/2-and 6-foot
19 design. I think there might be one, or there might be the
20 other.
21   A.  Correct.
22   Q.  But again -- and I don't mean to testify here -- I
23 think the drawings you're looking at right there are not the
24 ones that were shown at this meeting.
25   A.  It's very possible. That is correct.

Page 183

1    Q.  The drawings that were shown in this meeting,
2 Mr. Snook was asked at his deposition, and he says, Yeah. I
3 don't know where they are, and they looked, and they have
4 never been able to find them, these drawings right here.
5        MR. NORMAN:  Is there a question?
6        MR. LARSON:  No. I'm just trying to explain here --
7        MR. NORMAN:  Okay. That's fine.
8        MR. LARSON:  -- what's going on here on 24,000
9 pages.
10       MR. NORMAN:  I just wanted to make sure I didn't
11 miss something.
12       MR. LARSON:  No, no.
13       MR. NORMAN:  All right.
14 BY MR. LARSON:
15   Q.  Now, if Borden was coming to present an idea of a
16 tower, and it's going to be on a boat, you would think that he
17 would have the tower drawn on a boat. It wouldn't be these
18 drawings that we saw here that are stick figures --
19   A.  Right.
20   Q.  -- without a boat? I mean, you're certainly not
21 going to walk into a management meeting here with Exhibit 9
22 and show your top view and say, "Hey, guys, here's our tower."
23 He would have that on a boat, would he not?
24   A.  That could be, I guess, one way or the other. I
25 mean, I have no idea how -- how prepared Borden was or would

Page 184

1 have been for that meeting.
2    Q.  But over -- but over here we have a side view of a
3 boat that is on a boat?
4    A.  Correct. A tower on a boat, yes.
5    Q.  Okay. But now I want to go back here to this -- to
6 these -- to Exhibit 12, and down here at the bottom, the
7 paragraph second from the bottom, it says "W.N." Now, that's
8 your dad?
9    A.  Um-hmm, yes.
10   Q.  "Stated we should go with the 6-foot pylon."
11       And I just want to stop there and talk about this.
12 Now, a half hour ago I asked you, I go, Well, you heard your
13 dad going out and saying that the guy from the Wakeboard
14 Association told me that you were going to be out of business
15 unless you do something with this pylon. You got to recreate
16 the pylon, and he went to Mr. Snook and charged him with the
17 task of recreating the pylon. And Mr. Snook and Borden went
18 into their room, and they came out of their little room, and
19 they came to the meeting with these drawings, and we all kind
20 of yelled, Eureka, you solved the problem.
21       Now, if that was true, here your dad, at this big
22 eureka moment, stated, "Oh, we'll go with the 6-foot pylon."
23       That doesn't make sense, does it?
24   A.  Not unless it's referencing back to the 4-1/2 and 6
25 foot, if that's -- we're assuming that that's because Borden's

Page 185

1 original drawings here on 9/9/96 were of towers, that what he
2 brought to that meeting were towers, that they could have been
3 a 4-1/2-to 6-foot extended pylon or a pylon of some nature
4 existing on the boat.
5    Q.  So you're saying that what your dad is saying here
6 is that he's calling the tower a pylon. It's misspelled here.
7 It's miswritten.
8    A.  Yeah. I think if I had to look at this as one way
9 is that we -- the pylon is what you attach the rope to, and he
10 may have been asking to get it 6 feet off the floor and not in
11 a -- in an extended pylon type way but in a tower.
12   Q.  You know, I think -- I think the pylon is more of a
13 specific item, the poles mounted in there. I don't think your
14 dad would make a mistake to call just the -- the tow bit on
15 top of the pylon the pylon.
16       Well, let's just read the rest of it. "The problem
17 would be in mounting and those sitting in the front seat
18 standing up and hitting their head."
19       So certainly he's talking about a tower?
20   A.  I mean, yes. Going on to the next one, you would
21 say that it would be a tower.
22   Q.  Yeah. "This pylon would be 6 feet above the floor.
23 The pylon would be supported from the sides of the deck."
24       The traditional pole pylon is not that. He's
25 talking about the tower, but they call it a pylon; right?

Page 186

1    A.  Yes.
2    Q.  "There would be no slalom skiing on the high pylon."
3        Do you know what that means, why he would say that,
4  except a slalom skier wouldn't want to ski up that high?
5    A.  Correct.
6    Q.  Okay.  But now, where do you see in here that Borden
7  and Mr. Snook have just come back from their little room
8  solving our problem?
9    A.  I don't see anything specific to that, no.
10   Q.  Now, don't you think that if Borden and Mr. Snook
11 had gone into their little room and solved this problem, they
12 wouldn't have come out and gone directly to your dad, and
13 said, "Hey, Walt, we really got something here," and your dad
14 would have been on board even before that meeting?  Don't you
15 think that's how it would happened?
16   A.  I think it would be fair to say that they may have
17 approached him before the meeting.  Whether he was on board or
18 not, I would be speculating.
19   Q.  But you see nothing in this memo here that talks
20 anything at all about Borden coming in after been given this
21 job or Mr. Snook and Borden coming in together after coming
22 out of their little room after they put their heads together.
23 It says nothing about that, does it?
24   A.  The minutes of that meeting do not reflect anything
25 of that nature.

Page 187

1    Q.  And don't you think that's an important item given
2  the fact that your dad now is saying that's exactly what
3  happened?
4    A.  I mean, the minutes are -- are a compulate (sic),
5  compultation (sic), compilation, or whatever the word may be,
6  of things that may have been presented and done not
7  necessarily everything that was discussed in its entirety.
8    Q.  So the -- so the minutes might not be totally
9  accurate?
10       MR. NORMAN:  Objection.  Mischaracterizes his prior
11 testimony.
12   A.  I think they're accurate as they were written by the
13 person who was taking minutes.
14 BY MR. LARSON:
15   Q.  Now, you know that your dad asked both Mr. Snook and
16 Borden to write memos a year later asking them where the tower
17 came from, don't you?
18   A.  I have heard of that.
19   Q.  Why would your dad be asking them where the tower
20 came from when he's been out telling everybody that he told
21 them to go design the tower, and they went into their little
22 room and did this?
23   A.  I don't know that he instructed them to design a
24 tower other than to design a mechanism or a way of attaching
25 the rope higher off the floor without using the conventional

Page 188

1  methods that were done at that time.
2    Q.  Okay.  That's fair.  But again, why is he asking
3  Borden and Mr. Snook where the tower came from when he was the
4  one who now at least is saying, "I told them to go in there
5  and figure this out"?
6    A.  I have no idea.
7    Q.  Does it sound -- sounds unusual to you?
8    A.  It certainly does leave some question as to what he
9  was driving at when asking for how the tower was come about.
10   Q.  But does it also leave in your mind some question as
11 to the voracity of his testimony when he's saying that he told
12 them to go into the little room?
13   A.  No.
14   Q.  So you believe he said, "Go into a little room"?
15   A.  Well, I don't know if he said, "Go into a little
16 room," no.
17   Q.  So you've never read that testimony?
18   A.  If he said, "Go into a little room," I -- I do not
19 recall that.
20   Q.  Well, he didn't say, "Go into a little room."  He
21 says, "You guys go, and they went into a little room, and they
22 worked on it and worked on it, and they came back out, and
23 here's the tower."
24   Q.  Where did the little room come from?  I'm not -- I'm
25 not sure.  Okay.  Because I have no idea, I mean.

Page 189

1    Q.  Okay.  Now, after that meeting, there was a tower
2  built; right?
3    A.  I would have to look back and make sure.
4    Q.  Well, the tower did get built?
5    A.  Correct.  The tower did get built.
6    Q.  Yeah.  And Todd built the tower?
7    A.  Yes, Todd did.
8    Q.  And people went out and rode on it and says, "Hey,
9  this thing is cool"?
10   A.  Yes.
11   Q.  And then they had a focus group?
12   A.  Correct.
13   Q.  And the focus group came together to say, "Hey, how
14 cool is it, and what are we going to do about it?"  Were you
15 at the focus group?
16   A.  Yes, I was.
17       MR. LARSON:  I'm going to show you what I'm marking
18 now as 12.
19       MR. NORMAN:  That last one was 12.  Should be 13.
20       THE WITNESS:  Yeah.  It should be 13, yeah, 13.
21       MR. LARSON:  You guys, I can count.
22 (Exhibit No. 13 was marked for identification.)
23       THE WITNESS:  Thank you.
24       MR. NORMAN:  Thank you.
25       MR. LARSON:  Let me know when you're ready.

Page 190

1 BY MR. LARSON:
2    Q.  Okay.  I just showed you a document.  Do you know
3 what this is?
4    A.  It looks to be the agenda for that day's focus group
5 that we brought in.
6    Q.  Okay.  Now, I just have a few comments about this.
7 Borden's title has been many different things, and I know I
8 may be belaboring the point, but I think it's very important.
9 And in the personnel handbook that we just looked at, it said
10 "designer," but then you go, Well, it's under the thing
11 supervisor, so he's supervising the design department of some
12 type.
13        But down here at Number 2, Number 2, the second
14 thing down, there's four -- four points there.  Number 2 at
15 this wakeboard focus group, we got:  "Discussed Design
16 Concept," and Mr. Bill Snook is leading that discussion.
17        Now, if Borden was in charge of all the design that
18 went on in this whole company, what's Mr. Snook leading the
19 discussion for?
20    A.  I think there's two reasons.  One, I don't know that
21 Bill -- Borden was in charge of all design.  He was -- he was
22 supervisor of design -- of design is his title raised on that.
23    Q.  Well, I'm not saying he's in charge of all design.
24 It seems that that's what his position is today.  He's in
25 charge of all the design.  He's in charge of all product and

Page 191

1 development, in charge of all research and design, all
2 research and development and the plug and the mold shop and
3 engineering.
4        So I don't know what he's in charge with, but his
5 title says designer.  In your expert reports, the experts are
6 saying he's in charge of the whole design department.  Well,
7 if he's in charge of the whole design department, why is Bill
8 Snook leading this discussion on design?
9    A.  I can only speculate.  I do not know.
10    Q.  And what's your speculation?
11    A.  It could have been a number of things.  There may
12 have been some other project that Borden was working on at
13 that timeline and was not available to be away to host and be
14 at a focus group of this nature.  He may have been out sick
15 that day.  I don't know.  There could have been a number of
16 reasons why.  I don't know any of them to be --
17    Q.  How about one of the reasons is that he wasn't
18 really in charge of anything, and he designed what people told
19 him to design, and Bill Snook was in charge?  How does that
20 sound?  That's possible?
21    A.  Anything's possible, yeah.
22    Q.  Is that probable?
23    A.  I don't know that that's probable, no.  I would be
24 very skeptical to say yes.
25    Q.  Well, do you know if Borden even went to this focus

Page 192

1 group?
2    A.  I have no recollection if he did or not.
3    Q.  Okay.  Well, at the focus group, what we're doing,
4 the purpose is:  "To review our wakeboard status and boat
5 design."
6        So you're saying that here you have a design
7 meeting.  Now, who came to the focus group?  I mean, I have
8 the minutes on it, but that's what -- normally, who goes to
9 focus groups?
10    A.  Depending on what focus group we're looking for.
11    Q.  In one this one, this one.  Normally, who would go
12 to this?  Who would you bring in?
13    A.  Well, this one we would have brought in probably our
14 dealer counsel group at that time.
15    Q.  And who are they?
16    A.  At that time, I would only be guessing.  I can only
17 remember a few of them off the top of my head, only because
18 they seem to always be on our -- our counsel groups and that
19 would be the dealership represented by James Johnson, Sail and
20 Ski; probably Jeff and Patty Smith from Silver Spray; and the
21 third one that I can only assume, again, would be a Tim
22 Sherwin from California Correct Craft.
23        Those are usually our three largest dealers, and
24 they represent, most of the time, our dealer counsel and will
25 come to focus groups like this.

Page 193

1    Q.  Okay.
2    A.  Outside of that, there would have been a variety of
3 managers.  Certainly Larry Meddock, our vice president of
4 marketing, would have been there.  Definitely Bill Snook was
5 as educated on this.
6    Q.  And you're bringing all these people together
7 because they understand the -- the market that these boats are
8 sold into?
9    A.  Most definitely.
10    Q.  And they understand what competitors are doing?
11    A.  Yes.
12    Q.  And they understand design flaws in your boats and
13 design flaws in competitor boats?
14    A.  That might be pushing it, the design flaws.  They
15 understand our -- our shortcomings, you might say.
16    Q.  And they tell you about those?
17    A.  Oh, yeah.  Very, very pointedly sometimes, yes.
18    Q.  Okay.  So here you bring in all the smart money that
19 you know throughout the country to come in and talk about this
20 wakeboard focus group, and the Agenda Number 1 is Meet and
21 Greet?
22    A.  Um-hmm.
23    Q.  Introduction of the players, and the next thing is
24 discuss design concept, and Bill Snook is leading that.  It's
25 like the first thing.  The third thing, discussion on

Page 194

1 accessories, stereos and racks. So here you're having this
2 whole group session on what -- what we should do with the
3 design of the boat next year? How is our design done for the
4 last year?
5    A. I think the purpose of this particular meeting was
6 to introduce them to the things that we were doing with that
7 particular boat, the Sport Nautique, which was the boat of
8 choice at that time for the Wakeboard Worlds and Wakeboard
9 Nationals to be the towboat. It was the premier towboat for
10 wakeboarders, and so we were showing them what we could have
11 done to gain competitive advantages in the marketplace with
12 the innovations that had taken place since last year's Sport
13 Nautique, the '95 one.
14    Q. Okay. But then down here at the bottom, I guess you
15 went out and rode the boat, and you came back, and Number 5:
16 "The ultimate wakeboard boat, dimensions," all the bullets
17 here, "dimensions; hull shape; deck shape; windshield;
18 specific amenities, stereos; graphics; colors; windshield."
19       Are you saying from this that those ideas are open
20 for discussion, and you're willing to accept ideas from
21 everyone who came to the focus group? Like dimensions, like,
22 you know, we got a 22-foot boat, and someone's going to say,
23 "Yeah. It's a little bit too small when you got eight kids,
24 you know. Can we make it bigger?" Is that the type of
25 discussion that's going on here?

Page 195

1    A. I think we were asking them if they had the -- had a
2 clean slate of paper, what would be the ultimate wakeboard
3 boat.
4    Q. Um-hmm.
5    A. And that may be taking our boat, for instance, and
6 either improving upon it or a competitor's boat or just, like
7 I said, a clean slate of paper, and nobody has it out there,
8 but here's what we would design if we were designers.
9    Q. Okay. And the second bullet, hull shape, you know,
10 what kind of hull shape? You want it to ride nice? You want
11 it to, you know, make a wake, you know?
12    A. Exactly. Same thing, you know, again, starting --
13    Q. Deck shape, you know, do you want a bowrider? You
14 want, you know, what do you want?
15    A. Right.
16    Q. Windshield. So here you're asking all this smart
17 money from all over the country what they would want in, let's
18 say, your next generation of boat; is that right?
19    A. Yes.
20    Q. Where's Borden? He's supposed to be the head of
21 product development, the head of research and design, the head
22 of research and development, the supervisor of product
23 development, and your experts -- your experts now say he's the
24 head of the design department. Where's Borden? From all
25 those titles, it looks like he should be running the company.

Page 196

1    A. As I answered before, I have no idea why he was, if
2 he was not there.
3    Q. If those were his titles, and he wasn't running
4 this, wouldn't that be -- wouldn't that be grounds for firing
5 him? If that was what his job was and he's shirking his
6 duties and he's not running this group, why wouldn't you fire
7 him right on the spot?
8    A. I -- I can't answer that question. I don't know
9 why.
10    Q. Well, if his duties were to do all this and he
11 wasn't there, isn't that grounds for firing him?
12    A. I guess I would have to, again, refer to the manager
13 of him at that time as to why he was not there and not running
14 the meeting or involved with it.
15    Q. How could he have a manager if he was on top, in
16 charge of product development, research and design, research
17 and development, supervisor of product development, supervisor
18 of the plug and mold shop, and he was the head of design? Who
19 could even be his boss?
20       MR. NORMAN: Objection. Mischaracterizes his prior
21    testimony. Asked and answered.
22 BY MR. LARSON:
23    Q. Do we even know? Do we even know who his supervisor
24 was after all of those different titles?
25       MR. NORMAN: Objection. Asked and answered.

Page 197

1    A. Yeah. As based on what we had said earlier on that
2 sheet that was in his employee file that during this time
3 frame, '96, January of '96, he was reporting directly to Mike
4 Elrod, vice president of manufacturing.
5 BY MR. LARSON:
6    Q. So Borden was working in the plug and Mold shop in
7 the factory, is truly what he was doing; is that correct?
8       MR. NORMAN: Objection. Mischaracterizes his prior
9    testimony.
10    A. I would have to say, based on his job description of
11 his promotion in '96, no, that was just not plug and mold. It
12 was many other facets of product development or research and
13 design, or any of the other titles that we've listed there a
14 minute ago.
15    Q. But when it comes to your meetings, he's not there?
16       MR. NORMAN: Objection. Assumes facts not in
17    evidence.
18    A. Yeah. I can't answer that he wasn't there.
19       MR. LARSON: But you know he wasn't leading the
20    meeting.
21       I'm going to mark Exhibit 14.
22 (Exhibit No. 14 was marked for identification.)
23       MR. LARSON: Not that one. It's got holes.
24       MR. NORMAN: Oh, sure.
25       MR. LARSON: It has my writing, handwriting on

Page 198

1 there.
2     THE WITNESS: Don't want to give that one away.
3     MR. LARSON: No, no, no. That's secret. That's
4 heavy-duty stuff.
5 BY MR. LARSON:
6     Q. I showed you Exhibit 14. Do you know what this is?
7     A. It looks to be the minutes of that focus group that
8 we had on that October 22nd.
9     Q. Why don't you take a look at it and look for areas
10 where Borden was involved, and where Borden was involved in
11 the duties of design, development, plugs and molds, all those
12 different duties?
13     A. Okay. Now, restate that question again for me, so I
14 can make sure I'm looking for the right information.
15     Q. I want information from these minutes that Borden
16 Larson was involved in any of the discussion or any of the
17 decision regarding design or development of anything,
18 including the tower, the boat, the lines, the graphics,
19 anything having to do with what you would normally think would
20 be under his job duties of all these different job titles that
21 we have or someone has given him?
22     A. Thank you. All right. I do see one reference in
23 where they do say Borden was at that meeting, because he is
24 quoted as saying, We cannot eliminate the locker.
25     Q. Okay. Where does it say that?

Page 199

1     A. It's on page, the bottom of 1602. It's the second
2 paragraph, I guess, ski locker, and it talks about: "Change
3 to be a color (sic) -- change to be a cooler since we have
4 racks or make wider to accommodate wakeboards. There will be
5 no skis in a Sport Nautique. Borden say we can't eliminate
6 this locker."
7     So he was at least present at that point in time if
8 not to the water for the discussion once they came back from
9 the product launch.
10     Q. Okay. But throughout here, you see an awful lot of
11 people talking about the tower; is that correct?
12     A. Correct.
13     Q. And you see a lot of people talking about striping
14 on the boat and how it's going to look, graphics on the tower?
15     A. Yeah.
16     Q. And if Borden was truly in charge of product design,
17 don't you think he would have something more to say than the
18 locker?
19     A. It's hard to speculate what he would have or would
20 not have said in that setting at that time for me to -- to be
21 accurate.
22     Q. But we know he was at the meeting, but didn't run
23 it?
24     A. Typically, the focus groups had been run by either
25 the president of the company or Larry Meddock or vice

Page 200

1 president of marketing. They typically run those sessions and
2 have, and, well, up til the separation of the company, they
3 did.
4     Q. But according to the agenda in Exhibit 13, the only
5 one running this was Bill Snook?
6     MR. NORMAN: Objection. Mischaracterizes prior
7 testimony and document itself.
8     A. In -- the Point Number 2 of discussion design
9 concept, that is the only name referenced on the whole
10 document as to who was involved at that point in time.
11 BY MR. LARSON:
12     Q. And we don't anywhere where Borden was involved?
13     A. Other than the minutes.
14     MR. LARSON: Okay. I'm going to show you another
15 document, and I know it's hard to get these things sprung
16 on you, because there's a lot of them, and I looked at
17 them, and I don't know if you looked at them. This is
18 going to be Exhibit 15.
19 (Exhibit No. 15 was marked for identification.)
20 BY MR. LARSON:
21     Q. Have you seen this memo before?
22     A. I do remember recalling this memo at some point in
23 time, yes.
24     Q. But it wasn't given directly to you, at least
25 according to the top up there?

Page 201

1     A. Correct. I was not one of the original recipients.
2     Q. Do you even know how you got ahold of it?
3     A. At some point possibly reviewing some of the
4 documents, I mean.
5     Q. Okay. Who's Scott Mohr?
6     A. Scott Mohr was an employee that was with the company
7 who held a variety of different positions all the way up as to
8 the last of -- was it August 15th, 2002, as director of
9 promotions and special events. That title is a very vague
10 title based on his -- what his job duties day to day were, but
11 primarily he was our wakeboard guru and team manager for our
12 athletes.
13     Q. So what is the gist of this memo?
14     A. The gist of this memo is basically, I guess, coming
15 back after the original test with Dean Lavelle, where he then
16 took -- obviously, based on this, put it into some of the
17 other riders' hands and got positive feedback based on what
18 the tower could do from a rider's perspective, and it says
19 that, you know, from a pulling point, he no longer had a
20 slingshot sensation. It was a solid pull, which was what they
21 were looking for, so they wouldn't be snapped in the air.
22     Q. So he's saying the thing's working?
23     A. The thing's working.
24     Q. And the date of this is -- what is that?
25     A. 10/29/96.

Page 202

1  Q. So this is a couple months after that August 30th
2  meeting, in fact, almost two months to the day after the
3  August 30th meeting?
4  A. I believe that is correct. Yes, that is. That is
5  true.
6  Q. So Exhibit 12 is the minutes of the August 30th
7  meeting where Borden presented his sketches. Two months later
8  this tower had been built, and it had been tested, and Scott
9  Mohr now is reporting?
10  A. He was giving an endorsement of it, yes.
11  Q. Well, it not might even be a total endorsement,
12  because at the bottom paragraph, he goes, "An alternative idea
13  could be a pylon similar to what we presently build except the
14  rope attachment is just over the top of the windshield."
15  A. Yeah.
16  Q. So he's giving it a couple of options, I think?
17  A. Um-hmm.
18  Q. But here's my question: Now, who does -- well, who
19  does Scott Mohr work for at this period of time?
20  A. I believe at that period of time he was still
21  reporting to Larry Meddock.
22  Q. Okay. And he's out evaluating this tower?
23  A. Correct.
24  Q. Now, if Borden had been assigned the duty to create
25  this new towing mechanism and had gone into the little room

Page 203

1  with Mr. Snook and then come out with this, and they were on
2  this design team to create this new tower, why wasn't Scott
3  Mohr reporting the Borden? Borden's not even copied in the
4  memo.
5  A. I can't answer why he only gave it to those parties
6  listed there. I have no idea.
7  Q. Well, Scott certainly knew Borden, did he not?
8  A. Yes.
9  Q. We looked at that personnel handbook, and his
10  picture was right next to Borden?
11  A. Correct.
12  Q. Scott would know who his -- the people who needed to
13  know this were, would he not?
14  A. I believe so, yes.
15  Q. Did he get chastised for sending this to people who
16  were not needing to know?
17  A. No.
18  Q. So he sent this to W.N., which is your dad?
19  A. Um-hmm.
20  Q. He sent it to Larry Meddock?
21  A. Um-hmm.
22  Q. Bob Burns?
23  A. Yes.
24  Q. And he sent it to Bill Snook?
25  A. Um-hmm.

Page 204

1  Q. Didn't send it to Borden?
2  A. Um-hmm.
3  Q. But Borden's in charge of product development,
4  research and design, research and development, supervisor of
5  product development, the plug and mold shop, and he is the
6  head of all design. And you're saying that someone working on
7  this tower didn't even bring it to the guy who is in charge of
8  everything?
9      MR. NORMAN: Objection. Mischaracterizes prior
10  testimony.
11  A. I -- I think that's a little out of characteristic
12  that he was not in charge of everything. I testified that
13  that number of names that we've described the department that
14  he was a supervisor of had many different names during that
15  period of time, and it may have even been referred to
16  different names at the same time. And these four gentleman
17  that are here are basically over the primary areas of which
18  marketing of something of this nature that were designed or
19  testing for liability purposes would need to know what input
20  is at this point in time.
21  Q. This doesn't have anything to do about liability.
22  There is nothing about liability on here. It's whether the
23  thing's working or not. I mean, if Borden was in charge of
24  developing a new towing technique, Borden should have gotten
25  that memo, or should he not have?

Page 205

1  A. I -- I cannot answer that question.
2  Q. But you're say -- are you saying that Borden was in
3  charge and tasked with developing a new towing technique?
4  A. He was in charge of -- of the design department or
5  product development in which the tower design came out of.
6  Q. But he wasn't tasked with doing that, was he?
7  A. It was just part of his job description of coming up
8  with innovations and creating new things for the company.
9  Q. Whatever he might think of on a day-to-day basis?
10  A. Absolutely.
11  Q. And so you say Correct Craft owns anything he
12  thought of just because, "Borden, go in there and think, and
13  anything you come up with is ours"?
14  A. Yes.
15  Q. Did you ever tell him that's what his job duties
16  were?
17  A. No. I was not his direct report.
18  Q. Did anybody at Correct Craft ever tell him, "Borden,
19  you're supposed to go in there and think, and come up with new
20  things, and anything you do is ours"?
21  A. I cannot answer that question, because I have no
22  knowledge of that.
23  Q. But after he presented these towers, he wasn't even
24  in the loop regarding the rest of the tower development, was
25  he?

Page 206

1      MR. NORMAN: Objection. Mischaracterizes his prior
2    testimony.
3      A.  Yeah.  I don't think that is unusual in corporations
4    that once the torch has been passed to continue working on
5    projects at hand and letting other people develop, market, and
6    sell that -- that implement or item.
7 BY MR. LARSON:
8      Q.  But if Borden was leading the project, it was his
9    torch to pass.  At what point did he pass the torch and say
10   "I'm out of it.  It's on to you"?
11     A.  I have no idea when that time that came or passed.
12     Q.  Do you have any idea that he ever passed the torch
13   and said, "I've done my work.  I sat with Bill Snook.  We've
14   gone all over the room.  We've done everything we can.  It's
15   now yours"?
16     A.  I have no knowledge of that, no.
17     Q.  And even if he had done that, would you not think
18   he'd say, "This is our baby.  Bill and I worked on this in the
19   little room.  Please report back to me"?
20     MR. NORMAN:  Objection.  Calls for speculation.
21     A.  I can't tell you what Borden may have thought or not
22   thought at that time.
23 BY MR. LARSON:
24     Q.  But no one reported back to Borden, did they?
25     A.  I do not know that.

Page 207

1      Q.  Now, you just said a minute ago that Borden, his job
2    duty was to go and think of anything he wants and all these
3    things he thinks up belongs to the company or something to
4    that effect?  I don't mean to say that's exactly --
5      A.  That's paraphrasing, yes.
6      Q.  Okay.  However, if that's -- if that's true, and
7    that is what the company believes, why do they now have these
8    intellectual property agreements, that I got in the mail
9    yesterday, that they're having all the employees sign?
10     A.  What are they again?  I'm sorry.
11     MR. LARSON:  Intellectual property agreements.  This
12   is what I call them.  What was our last exhibit?
13     MR. NORMAN:  15.
14     THE WITNESS:  15, yes.
15     MR. LARSON:  I'm going to mark 16.
16 (Exhibit No. 16 was marked for identification.)
17     THE WITNESS:  Now, when did you receive these?  I'm
18   sorry.
19     MR. LARSON:  I received this yesterday from your
20   attorney.  I sent them a document request, and I asked
21   them if they had a intellectual property agreement that
22   they are presently having employees sign, and this is they
23   sent to me.
24 BY MR. LARSON:
25     Q.  Have you seen this document before?

Page 208

1      A.  I have not, no.
2      Q.  Did you know that your company is having employees
3    now sign these agreements?
4      A.  I had been made aware at some point in time that we
5    did have a employee confidentiality agreement that was signed,
6    was not aware of the other terms on here as proprietary
7    information and inventions agreement.  Like I said, I knew of
8    an employee confidentiality and proprietary Information, I
9    should say, an inventions agreement.  I was not aware that
10   that was a contract that we were having employees sign at this
11   time.
12     Q.  Do you know who drafted this?
13     A.  I have no idea.
14     Q.  Who at Correct Craft would be involved in getting a
15   document like this drafted?
16     A.  Probably, as we call the department today, the
17   manager of the PD&D, product design and development?
18     Q.  And who is that today?
19     A.  Today it is Steve Mask.
20     Q.  Now, if Correct Craft owns everything that an
21   employee makes on a job, do you see any need to have an
22   agreement like this?
23     MR. NORMAN:  Objection.  Calls for a legal
24   conclusion.
25     A.  Yeah.  I would not.  I would not know why the law

Page 209

1 would say that we own something, and then you would have to
2 have a document.  I would have no clue as to that.
3 BY MR. LARSON:
4      Q.  Now, there came a time when people at Correct Craft
5    wanted to know how this tower idea came about; is that
6    correct?
7      A.  You had mentioned that earlier, yes, that there was
8    a memo or something stating that.
9      Q.  Well, do you personally know that there came an
10   issue as to who invented it?
11     A.  I did not know there was an issue, no.
12     Q.  You didn't know.  You didn't know that Robert Todd
13   was claiming that Correct Craft stole the idea from him?
14     A.  I do not recall that, no.
15     Q.  You do not recall that?
16     A.  That Robert Todd said we stole it from him, no, I do
17   not.  I do not recall that, no.
18     Q.  Have you ever heard that?
19     A.  That he made those claims?
20     Q.  Um-hmm.
21     A.  No, I do not.
22     Q.  You're not aware that Robert Todd patented a design
23   patent?
24     A.  I do know Robert Todd had a design patent, yes.
25     Q.  And do you know that that design patent occurred

Page 210

1 before your utility patent?
2    A.  I was not aware of time frame.  I knew it was in or
3 close to, yes.
4    Q.  And are you aware that Robert Todd, the moment he
5 got his design patent, wrote your company a letter saying that
6 you were infringing on his patent, on his design?
7    A.  That I was not aware of, no.
8    Q.  Are you aware that -- back up.  You hired Robert
9 Todd to make a prototype?
10    A.  That is correct.
11    Q.  And you paid him a thousand bucks or something like
12 that?
13    A.  It was some number, yeah.
14    Q.  So for a thousand bucks, you got, you know,
15 expertise on how to do the welds and some ideas on maybe
16 bending things, and he welded up a prototype?
17    A.  Correct.
18    Q.  So you got your moneys' worth, or you got what you
19 paid for?
20    A.  Yes.
21    Q.  He got what he was offered?
22    A.  Correct.
23    Q.  The deal was done?
24    A.  Yeah.
25    Q.  You ended up then paying him $350,000 for -- to buy

Page 211

1 his design patent out?
2    A.  I have no idea what we paid him.  I don't know the
3 dollar amount.
4    Q.  But you have agreed to pay.  Do you know how much
5 you agreed to pay him?
6    A.  I have heard some loose numbers, never been
7 confirmed or seen a contract or any kind of -- anything
8 between us and him as payments, no.
9    Q.  Okay.  If Correct Craft would have paid Mr. Todd
10 $355,000 to buy his design patent out, would you not think
11 that you're paying him twice, because you already paid him a
12 thousand bucks to make the tower and to help you with a
13 couple welding choices and a couple angles?  He's already done
14 all his work, hasn't he?
15    A.  At that point, yes.
16    Q.  And he came back and sold you exactly what he
17 already had done for another $355,000?
18    A.  I don't know that that's true or not.
19    Q.  You don't know that he -- you know that he sold it
20 to you for some number?
21    A.  The original prototype, yes.  But I'm not
22 understanding what he told us second time.  I don't
23 understand.
24    Q.  He sold you his design patent?
25    A.  That's a possibility, yes.

Page 212

1    Q.  And what did he have in that design patent that was
2 anything different from the original prototype that you had
3 already paid him to make?
4        MR. NORMAN:  Objection.  Calls for a legal
5    conclusion.
6    A.  Yeah.  I'm not sure.  I don't know what would have
7 been different from original prototype to a design.  I have no
8 idea.
9 BY MR. LARSON:
10    Q.  Well, that's my question.  I want to know, didn't
11 you think you were paying him twice for the same thing?
12        MR. NORMAN:  Objection.  Calls for a legal
13    conclusion.
14        MR. LARSON:  It isn't.  This is a business
15    situation.
16        MR. NORMAN:  Usually, what's the difference between
17    his design and theirs is a legal description in patent
18    law.
19 BY MR. LARSON:
20    Q.  Were the designs identical?  The design on Robert
21 Todd's design patent and these figures that you have on your
22 utility patent, are they not identical?
23    A.  From his design patent to the prototype?
24    Q.  No.  To the figures that you have in your utility
25 patent.

Page 213

1    A.  I may be -- and forgive my ignorance on this.  From
2 what I understand, he had a design.  We had a utility patent.
3 They're totally two different animals in which we going
4 after.  He was doing it on the aesthetics and design of what
5 he put into that tower when he designed it, and a utility
6 patent is patenting the functionality of what is being
7 accomplished by having that tower on the boat for the rider at
8 the end of the rope.  And I may be very vague in that and --
9 and --
10    Q.  No.  That was very articulate, actually.  You know,
11 you're telling me you don't know the patent law.  You know the
12 patent law very well, but that wasn't my question.
13    A.  Okay.
14    Q.  My question was -- my question was this:  Did you
15 really get what you paid for?
16    A.  I'm assuming we did.
17    Q.  For 350,000?
18    A.  I would have to say that those making the decision
19 at that time felt that that was -- they were getting what they
20 paid for, yes.
21    Q.  And that was because if you didn't buy it, your
22 utility patent would have been invalidated?
23        MR. NORMAN:  Objection.  Calls for a legal
24    conclusion, speculation.
25    A.  That I have no idea.  Yeah.  I have no idea.

Page 214

1 BY MR. LARSON:
2    Q.  Now, you paid Mr. Todd a thousand dollars to make
3 the prototype, and then you paid him another 350 grand.  Now,
4 Borden Larson drew up the concepts, and correct me if I'm
5 wrong.  You haven't paid him a thing.
6        MR. NORMAN:  Objection.  Mischaracterizes his prior
7    testimony.  Assumes facts not in evidence.
8 BY MR. LARSON:
9    Q.  Is that correct?
10   A.  When you say we haven't paid him a thing, I mean, he
11 was employed at Correct Craft and received payment for
12 services rendered while he was there.
13   Q.  And you're getting the benefit of that from the shop
14 right, are you not?
15       MR. NORMAN:  Objection.  Calls for legal conclusion.
16   A.  That I cannot tell you whether that is correct or
17 not.
18 BY MR. LARSON:
19   Q.  You know the patent law.  You've recited it to me
20 very articulately.  Are you not -- are you not getting the
21 benefit of Borden Larson's contribution through your right to
22 a shop right.
23       MR. NORMAN:  Objection.  Calls for a legal
24   conclusion.
25   A.  I think, as I said earlier, I was not very clear as

Page 215

1 what a shop right was, so I -- I may not be understanding what
2 your question is.  Is --
3 BY MR. LARSON:
4    Q.  Well, are you getting not -- you're building towers,
5 and you're putting them on the boats; right?
6    A.  Yes.
7    Q.  Paying anybody royalties?
8    A.  Are we paying anybody royalties?  No.
9    Q.  Okay.  That's your shop right.  Your shop right is
10 that.  Correct me if I'm wrong.
11       MR. NORMAN:  You would like him to assume that for
12   the purpose of your next question?
13       THE WITNESS:  Yeah.
14       MR. LARSON:  Well, I'd like for him to assume what
15   the law is.
16       MR. NORMAN:  Well, then you're going to instruct him
17   what the law is, and he's going to assume you're correct
18   on the law.
19       MR. LARSON:  I thought he had really good lawyers
20   that were instructing him on the law.
21       MR. NORMAN:  He's got really good lawyers.  They
22   don't necessarily need to instruct him on what the law is
23   so he can answer a question.  He's a lay witness.  He's
24   going to answer lay questions.  He's not -- he's not an
25   attorney.  That's why he hires really good lawyers because

Page 216

1    he's not one.
2        MR. LARSON:  So he still doesn't know what the law
3    is.  Okay.
4        MR. NORMAN:  That may be true of more than one
5    person in this room, sir.
6 BY MR. LARSON:
7    Q.  So you don't know that Mr. Todd sent letters to
8 Correct Craft saying that they were infringing on his patent?
9    A.  I do not know of letters that were drafted by him
10 and sent to us.  No, I do not.
11   Q.  Okay.  As a corporate representative, do you know
12 that Correct Craft knows that?
13   A.  I --
14       MR. NORMAN:  And I would just object.  This goes
15   beyond the scope of the things he was asked to testify
16   about as far as I know, but with that said, he can answer
17   if he has any knowledge.  I don't know that he's the
18   corporate representative on that issue.  You could.  I
19   didn't see anything in there that indicated about
20   Mr. Todd's lawsuit.
21       MR. LARSON:  Well, if we still went through this
22   paragraph by paragraph, we would get there except it's so
23   laborious to wonder why you're denying things when the
24   paper is clear, I mean, you know.
25       MR. NORMAN:  Right.  You know, in fact, if you

Page 217

1    wanted to send him interrogatories and ask him that
2    question, you could have done it long ago, and we would
3    have told you.  I could tell you for all those things
4    you've covered why they denied them.  There were clear
5    reasons on all of them.  He may not know them all.  He's
6    tried his best.  When you got to remember 144 paragraphs,
7    it's kind of hard.
8 (Exhibit No. 17 was marked for identification.)
9 BY MR. LARSON:
10   Q.  I've shown you -- I've now given you Exhibit 17.
11 Have you seen that before?
12   A.  No, I have not.
13   Q.  You want to review it?
14   A.  Sure.
15       MR. NORMAN:  Do you know, do we have the room until
16   5 o'clock or til whenever we need it?  Do you have any
17   idea?  You don't report here though, do you?  That's why I
18   didn't think she would know.
19       Just so you know, I mean, the way I timed it, the
20   depo started at 6:20 (sic).  The Federal rules give you
21   seven hours.  So I'm guessing you have about two hours
22   left, just so you know.
23       MR. LARSON:  I was looking at like 7 o'clock.  I
24   thought we started at 11.
25       MR. NORMAN:  You did.  You did.  It's seven hours

Page 218

1    under the Federal rules.  It would be 6 o'clock.  It was
2    actually 11:20.  That's why I say 6:20.
3        THE COURT REPORTER:  I'm going to have to take a
4    break.
5        MR. NORMAN:  Before 7 o'clock, you mean?
6        THE COURT REPORTER:  Right now.  Right now.
7    (Pause in the proceedings.)
8        THE COURT REPORTER:  Okay.  Michelle Manni, court
9    reporter.  Today is September 29th, 2006.  The time is
10   4:48 p.m.  We're here at 1516 East Hillcrest, Orlando,
11   Florida, deposition of corporate representative Gary
12   Meloon.
13   BY MR. LARSON:
14   Q.  So, Mr. Meloon, you were looking at Exhibit 17?
15   A.  Yes.
16   Q.  And in here Borden Larson is writing to your dad?
17   A.  That is correct.
18   Q.  And the subject is the inception of this tower?
19   A.  Yes, sir.
20   Q.  And in the second paragraph it says, "I was
21   struggling with a better way to store skis and wakeboards, and
22   I thought about sticking them on top of the bimini top."
23       Is that what it says?
24   A.  Yes, it does.
25   Q.  Have you heard that before?

Page 219

1    A.  I have heard that at some point in time, yes.
2    Q.  Now, it doesn't say here that Borden was working on
3    trying to create a new way to tow skiers, does it?
4    A.  Not in that first sentence, no.
5    Q.  Okay.  And it doesn't say he was working with Bill
6    Snook in his little -- I mean, Snook in his little room, does
7    it?
8    A.  Not on this document, no.
9    Q.  And it doesn't say that he was writing to your dad.
10   Now, if your dad had told Mr. Snook and Borden to go and work
11   on this project, wouldn't Borden be writing him back and
12   saying, "I was working on that project that you gave me to
13   solve this problem of the towing pylon, and this is how we did
14   it"?  It doesn't say that either, does it?
15   A.  No, it does not.
16   Q.  The last paragraph says -- well, to back up again,
17   the first paragraph says he did this in the month of June?
18   A.  The very first paragraph states that, yes.
19   Q.  Of 1996?
20   A.  Correct.
21   Q.  But he didn't really present this, in the management
22   meeting minutes that we saw earlier today, he didn't present
23   this until August 30th?
24   A.  That is correct also.
25   Q.  And if we look at the second to the last paragraph,

Page 220

1    he says, "I stuck my sketch off to the side, thinking it was a
2    bit too extreme.  A day or two before we were going to go into
3    the '98 model year meeting, I ran the sketches by Bill Snook."
4        Now, what your dad is out telling people is that he
5    told Bill Snook to go modify and figure out a new way to tow
6    skiers, and Bill and Borden went into a little room, and they
7    came back out with this.  Well, here it looks like Borden did
8    this on his own two months before Bill even knew about it.
9    Isn't that what that says?
10   A.  That was this statement, this memo says, yes.
11   Q.  Now, you ever speak to your dad about this memo?
12   A.  No, I have not.
13   Q.  Did your dad ever speak to anybody else about this
14   memo?
15   A.  I have no knowledge of that or not.
16   Q.  But your dad's not running around calling Borden a
17   liar and he's trying to -- Borden's trying to take credit for
18   something.  I mean, "I told Borden to do this."  Your dad's
19   not running around saying that, is he?
20   A.  No.
21   Q.  Well, why wouldn't he say that?  This is -- your dad
22   is out saying now that he told Bill to go design -- redesign
23   the towing pylon, and Bill and Borden went into a little room
24   and came out with the design.  But that's not what this says.
25   Why wouldn't -- why wouldn't your dad fire Borden back then

Page 221

1    for lying?
2    A.  I can't speculate on what he thought or was going to
3    do or did not do at that time.
4    Q.  And nobody was angry at Borden for the way he said
5    this happened?
6    A.  Not that I'm aware of, no.
7    Q.  And you don't know that your dad wrote Borden back
8    and says, "You're crazy.  That's not how it happened.  This is
9    how it happened.  I told Bill to do it, and you and Bill went
10   into the room, and you came back out with this."
11   A.  I don't know that that ever happened, that there was
12   any letters or correspondence back to Borden from my father.
13   Q.  And if -- but if Borden was saying something that
14   was false, wouldn't your dad normally respond?
15   A.  Possibly so, whether in writing, I don't think so,
16   but maybe verbally.
17   Q.  Okay.  Let's look at the next page on here.  Have
18   you seen that before?
19   A.  I believe I have seen this, yes.
20   Q.  You want to review momentarily?
21   A.  I have already done that, yes.
22   Q.  Okay.  And what we have here is Bill Snook writing a
23   similar memo.  We don't know who it's to.  I'm assuming it's
24   back to your dad.  We'll ask Bill in a moment about that.  But
25   here, Number 1, Bill Snook's writing:  "Borden presented me a

Page 222

1 concept sketch of the flight control tower in early August of
2 '96."
3        That doesn't say that, "Oh, Bill and I -- Borden and
4 I were working in our little room based on what Walt told us,
5 and we came out with this tower."
6        It doesn't say that, does it?
7 A.   No, it does not.
8 Q.   So Bill's confirming what Borden wrote in the memo
9 before?
10 A.   In this first statement, yes.
11 Q.   And the second thing: "The sketch was refined and
12 presented at our product planing meeting in late August of
13 1996." That still doesn't say that we were doing this based
14 on some, you know, previous order to go create an alternative
15 to the pylon. It doesn't say that does it?
16 A.   No, it does not.
17 Q.   Does it say anywhere in here?
18 A.   Not that I can pick out in any of the -- the points
19 there in the first six or the paragraph below, no.
20 Q.   In the last paragraph there, it says, "The concept
21 of the fight control tower clearly originated with Borden
22 Larson late during the summer of 1996."
23 A.   That is correct.
24 Q.   Now, do you know that people today are saying that
25 that's not true?

Page 223

1 A.   I'm not aware of that, no.
2        MR. LARSON:  Okay.  I'm going to go show you another
3 series of documents, and what number are we at?  We're at
4 18.
5        THE WITNESS:  18, yes.
6 (Exhibit No. 18 was marked for identification.)
7 BY MR. LARSON:
8 Q.   Okay.  These have been represented to me as
9 management minutes having to do with this tower, and why don't
10 you take a point -- a moment and look at this, and what I'm
11 going to ask you is:  Where is Borden's involvement in any of
12 these minutes?  Take your time.  Any of these meetings, where
13 is Borden's involvement?
14        I believe there's one -- there's eight different
15 days here, meetings on eight different days.
16 A.   In this package I just received?
17 Q.   Yes, yes.
18 A.   Okay.
19 Q.   There's October 3rd, '96; October 10th; October
20 24th; October 31; November 8th; January 16, '97; January 23rd;
21 and I think February 6th of '97.  I want know where Borden was
22 involved in any decision regarding the whole tower system?
23 A.   (Witness complies.)
24 Q.   Okay.  Mr. Meloon, have you found any mention of
25 Borden Larson's involvement in any of the these meetings?

Page 224

1 A.   I saw just one mention of his involvement in one of
2 the meetings.
3 Q.   Which one is that?
4 A.   It's on page 1614.  It references both he and I, the
5 tooling for some tanks, Borden and Gary is 1,600 each or
6 3,200.  It's right at the top of the page.
7 Q.   Now, if Borden had involvement in this tower, he
8 would certainly be in these meeting minutes?
9 A.   Not necessarily.  Would he be mentioned in the
10 meetings or involved with the meetings?
11 Q.   Well, let's talk about involved with the meetings
12 first, because he has to be involved to be mentioned perhaps.
13 A.   Not necessarily at management meetings.  Those were
14 primarily confined to management not supervisors.
15 Q.   But in the first one here on the first page, you're
16 talking about the tow tower?
17 A.   Yes.
18 Q.   And if Borden was this director of this whole
19 concept of the tower, he should have been there for this
20 meeting.  You could have brought him in?
21        MR. NORMAN:  Objection.  Asked and answered, and
22        mischaracterizes his prior testimony.
23 A.   Not on the subject of what's referenced under my
24 name, no, it would not be unusual for him not to be present at
25 that meeting.

Page 225

1 BY MR. LARSON:
2 Q.   Well, what about the third paragraph?  Your Dad's
3 talking, "It's as big as it needs to be," discussions, size,
4 shape, and strength.
5        Now, if Borden is the director or manager of design,
6 shouldn't he be there talking about size, shape, and strength?
7 It looks like your dad's being the designer.  The next
8 sentence, W.N. suggested changing the footprint, bringing it
9 down an inch and a half.
10        Is your dad really in charge of research and
11 development, and Borden is really his -- his subordinate?
12 Isn't that truly what's going on here?
13 A.   There's two -- two answers to that statement.  Is he
14 in charge of the design department?  You can answer that yes.
15 As CEO and president, he has areas and responsibilities to all
16 departments within the company, but the direct day-to-day
17 operations, no.
18 Q.   But here he's making -- he's -- he's making
19 statements as to the size, shape, and strength.  He wants to
20 bring it down an inch and a half.  We're not talking about
21 day-to-day running.  We're talking specific tasks of the tow
22 tower that, according to all your legal pleadings, Borden is
23 in charge of.  Here your dad's making design and shape.
24        MR. NORMAN:  Is there a question pending?
25 BY MR. LARSON:

Page 226

1  Q.  Isn't that true?
2  A.  Is he making decisions for that?
3  Q.  Sure.
4  A.  No.  I think it's discussions.  He's making his
5  opinion.  As it's stated here, his opinion is that it should
6  be this.  It doesn't mean that he's making the decisions that
7  it should be.
8  Q.  But shouldn't he be telling that to Borden, and
9  saying, "Borden, you're the designer.  I want to talk to you
10  about the size, shape, and strength, and the footprints got to
11  be down an inch and a half"?
12     If Borden is the chief designer, shouldn't your dad
13  be telling him?
14     MR. NORMAN:  As management, is that what you're
15  asking him?
16     MR. LARSON:  Sure.  They're talking about the tow
17  tour.
18     THE WITNESS:  Yeah.
19  BY MR. LARSON:
20  Q.  Okay.  Let's go look at page number 1609, patent
21  process.  Patent process started.  Drawings are presented to
22  the patent attorneys.
23     Did you have notion to tell Borden he should go out
24  and find an attorney?
25  A.  I have no knowledge that, no.

Page 227

1  Q.  Okay.  The next one on 1609, Bill Snook's talking,
2  warning labels for the pylon.  The first sentence on that
3  paragraph:  "Half the managers don't feel comfortable showing
4  the tow tower at the Wakeboard Worlds, because there has not
5  been enough testing."
6     Well, what did Borden think?  If he was the designer
7  on this project, he was is chief designer, what did Borden
8  say?
9  A.  I --
10  Q.  We don't know?
11  A.  I don't know what Borden would think.  I can't
12  speculate to what he would have thought.
13  Q.  So in other words, he wasn't the chief designer on
14  this project?
15     MR. NORMAN:  Objection.  Mischaracterizes his prior
16  testimony.  Assumes facts not in evidence.
17  BY MR. LARSON:
18  Q.  Page 1610:  October 24th, your dad's talking,
19  talking about building one in house.  Why isn't Borden doing
20  this if he's in charge of research and development?
21  A.  Again, due to it was a management meeting, it was
22  just limited to the managers of each department not
23  supervisors.
24  Q.  So after this meeting did you go out and tell
25  Borden, "We're going to build one in house.  Let's see what

Page 228

1  you can get going to do it"?
2  A.  It's possible that that was communicated to Borden
3  from somebody in that meeting.
4  Q.  It's possible, but it never really happened?
5  A.  That we were going to build it in house?
6  Q.  That Borden was going to build it.  Borden was in
7  charge of building these things, according to what you're
8  saying.
9     MR. NORMAN:  Objection.  Mischaracterizes his prior
10  testimony.
11  A.  Yeah.  I don't know that I've ever said that he was
12  in charge of the building of them.
13  BY MR. LARSON:
14  Q.  If Borden's in charge of product development,
15  research and design, research and development, he's certainly
16  in charge of building these, is he not?
17  A.  No.  That would not be a responsibility of somebody
18  in charge of product design and development, no, to actually
19  replicate them and manufacture them, no.
20  Q.  But were you talking about actually making them at
21  this time, or are you still testing?
22  A.  In context through the October 24th minutes where we
23  were going to build one in house to see if we can do it, was
24  by W.N. Meloon.  That was in reference to the economics of
25  whether bringing it in house or sourcing it out.

Page 229

1  Q.  What about the development part of research and
2  development?  Isn't the development making a part?  I mean, if
3  you're in the plug and mold shop, and you're developing boats,
4  isn't the development part of the research and development,
5  making the part?
6     And here, instead of the being in the plug and mold
7  shop, we're off in some other shop.  If Borden's job title is
8  product and development, and you're making a part, seems to me
9  that he should be involved in this development of making this
10  part.  And now you're saying, "Oh, that's not his job duty."
11     MR. NORMAN:  Is there a pending question?
12  BY MR. LARSON:
13  Q.  Yeah.  Is that what you're saying?
14     MR. NORMAN:  Objection.  Compound question.
15  A.  That's what you're saying.
16  BY MR. LARSON:
17  Q.  Isn't -- you say Borden's job title was product and
18  development.  What does development mean?
19  A.  Product development would be developing new
20  products, whether it's from a concept design on a sketch, as
21  he did with the tower.
22  Q.  Well, let's just talk about the tower.
23  A.  Okay.
24  Q.  I mean, where did Borden's job duties stop?  If you
25  say he's in charge of product and development, the development

Page 230

1 side, where does Borden's job duties stop on the development
2 side?
3    A.   Probably --
4    Q.   It looks to me on October and November, you're still
5 developing this product.
6       MR. NORMAN:  Objection mischaracterizes prior
7    testimony.
8    A.   So the question on the table is, Where does his job
9 responsibilities stop?
10 BY MR. LARSON:
11    Q.   Um-hmm.
12    A.   With development?
13    Q.   Um-hmm.
14    A.   I would -- I would say it would stop at the point in
15 which the development or manufacturing of that product fell
16 outside our capabilities or his capabilities based on the
17 equipment and needs that we had at the time.
18    Q.   Okay.  So on page 1612, on November 8th, you're
19 talking about bringing materials in to be produced in house.
20 So in other words, you're saying that this is still capable of
21 being done in house, which means Borden was still in charge of
22 development?
23    A.   Correct.
24    Q.   Why isn't he in charge then?
25    A.   Because at some point, he hands it over to the

Page 231

1 manufacturing side of the business to produce and replicate on
2 a daily basis.
3    Q.   They're not.  According to these minutes here, they
4 haven't even made one of them, much less being able the
5 replicate it and make two.
6       MR. NORMAN:  Objection.  Mischaracterizes prior
7    testimony.
8 BY MR. LARSON:
9    Q.   That means it's still in development, is it not?  It
10 says here, Randy's welds need to be improved before he's
11 actually building the tower.  Bill Snook's confident that he
12 can bring the welds up to par.
13       Sounds to me it's still in development.  Now, if
14 Borden is the head of product of development, why isn't he in
15 charge of this product?
16    A.   I guess I'm going to have to refer to the -- to the
17 manager of why he was not involved, other than my
18 understanding of how we do things at Correct Craft.  It
19 clearly, at that point, his involvement with the building of
20 the tower had been relinquished, and he was moving on to other
21 things.
22    Q.   And do you know how that was relinquished?
23    A.   Basically, at that point, we were already either
24 having two venders qualified and certified to do the product
25 for us outside, if we chose to go outside; or, as you can see,

Page 232

1 my responsibilities was to try to bring the materials in house
2 and see if we had qualified people that could build these
3 towers for us internally.
4    Q.   And Borden wasn't involved in either one of those
5 projects, going to the three outside venders or in your
6 project and seeing if you can do it inside, in house?
7    A.   He was involved in the first part of that, and I do
8 not remember to what degree.  He may have been involved with
9 the second.
10    Q.   The first project he was only involved in because he
11 gave you a Rolodex card with three names?
12    A.   That is correct.
13    Q.   So that's his only involvement.  He looked in the
14 yellow pages and gave you three aluminum welders?
15    A.   I'm not sure where he found the names from.
16    Q.   Okay.  We have been speaking on and off about
17 whether or not this project had actually been given to Borden,
18 as I have been telling you that your dad is out saying to
19 people, and we went through this exhibit where Borden wrote
20 this memo, and then Mr. Snook wrote the memo.  Do you remember
21 that testimony just moments ago?
22    A.   Yes.
23    Q.   Now, your testimony is that you don't know that your
24 dad is out saying that he gave this project of replacement for
25 the pylon to Bill Snook, and Bill and Borden went into their

Page 233

1 little place?  You're saying that you're not aware of your dad
2 saying that?
3    A.   Of the little place?  I -- I -- not -- I don't know
4 that he's saying "little place."  I do know that at the point
5 in time, as I testified earlier, that when we were made aware
6 of this, of the impending possibility that we were going to
7 lose the -- the position as being the premier towboats for
8 these two tournaments, that it was communicated, from what I
9 best recollect, to Bill Snook; and at that point is when the
10 process started.  Now, little rooms and how that was all
11 constructed, I don't know.
12    Q.   But from Borden's memo that he wrote and Bill's memo
13 that he wrote on the 20th and the 21st -- I have misplaced?
14       MR. NORMAN:  Here's a copy if you like it.
15       MR. LARSON:  Yeah.
16 BY MR. LARSON:
17    Q.   These memos, which are Exhibit 17, Borden didn't say
18 that he was responding to that, what your dad said.  It says,
19 "I was working -- struggling with ways to store skis and a
20 wakeboard, and I thought about sticking them on top of the
21 bimini top."
22    A.   Correct.
23    Q.   And Bill says on the next page, "I wasn't working on
24 on trying to find a way to replace the pylon.  Borden just
25 comes to me and presents me with a sketch in early August of

Page 234

1 '96."
2      MR. NORMAN:  Objection.  Mischaracterizes the
3  document.
4      A.   Yeah.  I don't see any that.  I don't see that in
5  here, no.
6 BY MR. LARSON:
7      Q.   It says right there, "Borden presented me with a
8  concept sketch of the flight control tower in early August of
9  '96."
10      A.   That is correct, yes.
11      Q.   It doesn't say on here that your dad told Bill to go
12  and work on a replacement of the pylon?
13      A.   Correct.
14      Q.   Doesn't say that?
15      A.   No, it does not.
16      Q.   And the last sentence or first sentence of the
17  paragraph:  "The concept of flight control tower clearly
18  originated with Borden late in the summer of '96."
19      A.   Correct.
20      Q.   That also doesn't say that, "I was working with
21  Borden on this project that Walt told us."  It doesn't say
22  that?
23      A.   No.  It does not in that memo.
24      Q.   But now at the trial -- and I'm going to go show you
25  Exhibit 8 again, which is the trial testimony, and if you

Page 235

1  could, turn to 75, or I'll just show you mine.
2      MR. NORMAN:  75 of which day?
3      MR. LARSON:  Of -- of.
4      MR. NORMAN:  Which day?
5      MR. LARSON:  Day 2.
6      THE WITNESS:  Day 2?
7      MR. LARSON:  Okay.  75.
8 BY MR. LARSON:
9      Q.   If you look page 75 of page (sic) 2, line 21, the
10  answer says, "During that time Bill Snook -- "
11      MR. NORMAN:  Who's testifying here?
12      MR. LARSON:  Gary Meloon.
13      MR. NORMAN:  Gary's testifying, okay.
14 BY MR. LARSON:
15      Q.   And his answer to this question -- and we're trying
16  to explain to the jury how this thing came about.
17      Answer:  "During that time Bill Snook and Borden
18  Larson were charged by my father, the president of the
19  company, to come up with an idea to create and design a tow
20  apparatus other than what was available at the time on the
21  market, which was the extended pylon, the tow tower or
22  pylons."
23      So here's my point.  Gary, you testified here that
24  your dad had actually given Bill Snook and Borden Larson the
25  job to come up with the extended pylon.

Page 236

1      MR. NORMAN:  Wait.  Read the whole sentence, the
2  whole page.  That's at the August 30th meeting.  He told
3  them to go do it.  Read the whole page, sir.
4      MR. LARSON:  Okay.  The next question.
5      MR. NORMAN:  No.  Read the questions above it.
6      Question:  "Were you involved when Mr. Snook and
7  Mr. Larson brought the idea of a tower to the management?"
8      "Yes, sir."
9      Then he goes through and reads the sentence you just
10  had.  Don't take it out of context, please, sir.
11 BY MR. LARSON:
12      Q.   Okay.  So in other words, are you that saying the
13  only time that --
14      MR. NORMAN:  Let him read the whole thing.  Then
15  he'll answer your next question.
16      THE WITNESS:  So that is involving that August 30 --
17  30th; correct?  Let me see real quick.  Okay.
18 BY MR. LARSON:
19      Q.   So, Mr. Meloon, was your testimony there that your
20  dad only told Mr. Snook and Borden on August 30th to now go
21  out and solve this pylon problem, or did he tell him before
22  August 30th?  Because on August 30th is when Borden came in
23  with the sketches.
24      MR. NORMAN:  So you're asking him what his testimony
25  was?

Page 237

1      MR. LARSON:  You were -- you were the one that just
2  read it and said, "No.  That's about the August."
3      MR. NORMAN:  Right.  I just want to know what your
4  question is.  Is -- is -- are you asking him, is his
5  testimony accurate?  Is that?  I think that's your
6  question, but I want to make sure.
7      MR. LARSON:  Let me just simply ask my question.
8      MR. NORMAN:  Okay.
9 BY MR. LARSON:
10      Q.   You testified here.  It says:  "During that time
11 Bill Snook and Borden were charged by my dad --
12      A.   By my father.
13      Q.   " -- the president of the company, to come up with
14  an idea to create and design a tow apparatus other than what
15  was available at the time on the market, which was the
16  extended pylons."
17      My question to you is:  When did your dad charge
18  Bill and Borden?  And you can read this testimony --
19      MR. NORMAN:  You should read the next page.
20 BY MR. LARSON:
21      Q.   -- going forward, and I want to know when your dad
22  charged Borden, because we know Borden came in on August 30th
23  and gave the sketches.  Are you saying that only after Borden
24  gave the sketches, now your dad charged him, or did your dad
25  charge Borden back in June?  Because we know he drew it back

Page 238

1 in June and held it for two months. My question, based on
2 your testimony here, take your time with it. In fact, maybe
3 you should look at yours, because mine, as you can see, the
4 pagination, they screwed it up.
5     MR. NORMAN: You should start the top of 75 and read
6 on a couple pages.
7     THE WITNESS: What page is that number?
8     MR. LARSON: It's 75, but we're on the second day.
9     THE WITNESS: Correct.
10 BY MR. LARSON:
11    Q. I want to know, you're testifying that your father
12 charged Bill and Borden. I want to know when he did it. In
13 fact, maybe you should start at 73. That's where your
14 testimony, I think, starts. Your direct testimony starts at
15 73.
16    A. (Witness complies.)
17    Q. Do you have an answer?
18    A. To -- if I -- let me restate, see if I make sure
19 that I'm going to answer the right question. You said, based
20 on my testimony, do I believe that my father charged Bill
21 and Borden to go out and create and design a tow apparatus
22 based on my testimony. And as my testimony stands, yes, I do.
23    Q. That's not my question.
24    A. Okay. Then when is it?
25    Q. My question is: When did your dad charge Bill and

Page 239

1 Borden?
2     A. Based on the testimony here, it is when Bill and
3 Borden brought the ideas to the management, and the only
4 reference that I have right now of documentation in front of
5 me was the exhibit of where they came to that August 30th
6 meeting.
7     Q. But that would mean that Borden had already thought
8 up this idea in June, had sat on it until August. He showed
9 it to Bill in August, and he says, "What do you think?"
10    And Bill goes, "Let's give it a fly."
11    And then Borden brought it in August, and that's
12 the first time your dad saw it, and then he says, "You guys go
13 out and create something?"
14    Is that what you're saying?
15    A. That's what my testimony reflects here, yes. That
16 is what transpired during that time frame.
17    Q. So in other words, your father didn't go tell Bill
18 and Borden to go find an alternative to the pylon, and Bill
19 and Borden then went out and came up with the tower that was
20 presented on August 30th?
21    A. I don't know that time reference, no. I don't know
22 what time reference.
23    Q. But according to your testimony, you're saying that
24 your dad charged them after the August 30th meeting, after
25 your dad had already seen the tower?

Page 240

1     MR. NORMAN: Mischaracterizes the document and his
2 prior testimony.
3     MR. LARSON: I don't know why you say that.
4     MR. NORMAN: I could tell you, because it says that
5 they were charged with solving a certain problem. They
6 went out and solved it and brought that information back
7 in, which implies it must have happened before they came
8 back in.
9     MR. LARSON: Where does it say that?
10    MR. NORMAN: I'll show you. It says at the bottom
11 of page 75.
12    MR. LARSON: Show your -- show your client, because
13 he's the one.
14    MR. NORMAN: "Can you explain to the jury what
15 happened at that meeting?"
16    This is the August 30th meeting.
17    "During that time Bill and Borden were charged by my
18 father, the president of the company, to come up with an
19 idea to create and design a tow apparatus other than that
20 was available at the time, which was an extended pylon,
21 the tow towers or the pylons."
22    "What was Correct Craft's position with regard to
23 those pylons?"
24    He goes on to say.
25    "And were you involved in a meeting where Bill Snook

Page 241

1 and Mr. Larson brought back their idea?"
2     Well, if they brought it back, that would imply that
3 sometime before then they were sent out.
4     MR. LARSON: Okay.
5     MR. NORMAN: So unless they sent them out in the
6 same meeting and brought it back to them, I would suspect
7 that's what happened.
8 BY MR. LARSON:
9     Q. So, Gary, does that make sense now?
10    A. Yes. I --
11    Q. So in other words, you're saying that your dad had
12 told Bill and Borden months before or weeks before or days
13 before the August 30th meeting, "Well, you guys go solve this
14 problem. Go solve our towing problem," and then Bill and
15 Borden went out on their own to this little space and worked
16 it up and brought their results back to the meeting?
17    MR. NORMAN: Mischaracterizes prior testimony.
18 BY MR. LARSON:
19    Q. So that's what you're saying?
20    A. No. Not to that degree, no.
21    Q. Well, to what degree?
22    A. Well, that at some point in time, he charged them to
23 go out, based on what I had said earlier, on that there was a
24 need to create a tow point -- tow point advantage over what we
25 already had or what was on the marketplace.

Page 242

1   Q.  But Bill Snook's memo and Borden's memo, that are
2  both in Exhibit 17, don't confirm any of that.  Now, how can
3  you resolve the fact that the two guys who knew about the
4  inception of this -- Borden, between June and August all
5  alone; and Bill, a few days before August 30th and maybe a
6  week before August 30th -- the two guys that are doing it do
7  not confirm that your dad ever gave them a charge to go out
8  and do this?
9       MR. NORMAN:  Objection.  Assumes facts not in
10  evidence.  Mischaracterizes the document.
11      I'll give you mine back again.  You couldn't find it
12  before, remember?  Yeah.  I don't know where yours is.
13  You can borrow mine if you like.
14  BY MR. LARSON:
15   Q.  Do you know what the question is?
16   A.  No, sir.  I do not remember now what the question
17  is.
18   Q.  My question is very simply:  Why don't Bill Snook's
19  memo and Borden's memo reflect the fact that they were solving
20  this problem that had been given to them by your dad?
21      MR. NORMAN:  Objection.  Calls for speculation.
22   A.  I can't answer that question.  I do not know.
23  BY MR. LARSON:
24   Q.  But you do admit that both Bill and Borden's memos
25  do not confirm what you're saying in your testimony?

Page 243

1       MR. NORMAN:  Objection.  Mischaracterizes the
2  documents.
3  BY MR. LARSON:
4   Q.  I want you to look at page 140 in that transcript.
5   A.  Second day?
6   Q.  The second day.  It's your dad's testimony.  Did you
7  find it?
8   A.  Yes.
9   Q.  Okay.  Page 140, line 8.
10   A.  Okay.
11   Q.  Or line 6.
12      Question:  "Your professionals were choosing not to
13  use your boats?"
14      MR. NORMAN:  I got -- I got the wrong 140.
15      MR. LARSON:  140, line 8, second day.
16      MR. NORMAN:  Second day.  Yes.  I got it.  Sorry
17  about that.  Go ahead.  This is Mr. Walter Meloon
18  testifying?
19      MR. LARSON:  Yes.  Walt Meloon.
20      THE WITNESS:  Yes.
21  BY MR. LARSON:
22   Q.  Okay.  Now, I'm on line 6.  It says:
23      Question:  "Your professions were choosing not to
24  use your boats?"
25      Line 8, Answer:  "I don't -- I don't know.  There

Page 244

1  was a tournament they chose not to, and the threat was there,
2  and it was very evident that if we didn't make some change --
3  we did elevate the pole, oh, maybe 18 inches or so, and that
4  was our way of giving in a little bit, but it wasn't
5  effective, and it wasn't what they wanted."
6       Question:  "Wasn't going over well?"
7       Answer:  "No, it wasn't."
8       Question:  "At that point did you talk to your
9  engineering department?"
10      Answer:  "Yes.  We had long conversations as to what
11  to do and how to do it."
12      Question -- this is the phonetics of it -- "Your
13  engineering department at the time was made up of whom?"
14      Answer:  "Engineering at the time was made up of
15  Bill Snook and Borden Larson."
16      Question:  "What did you task Mr. Snook and
17  Mr. Larson to do?"
18      Answer:  "Well, the challenge was to do something so
19  that we could compete in the world and be effective and
20  enhance the performance of the boat plus enhance the
21  performance of the wakeboarders at the time."
22      Question:  "Was there anybody else in the industry
23  you're aware of using utilizing anything similar to a tower?"
24      Answer:  "Not at that time."
25      Question:  "And Mr. Snook and Mr. Larson went off to

Page 245

1  their little area.  Did they come back to one of your
2  management meetings with an idea?"
3       Answer:  "Yes, they did.  They went out and did a
4  little research and came back."
5       Question:  "And what did they present to you?"
6       Answer:  "Basically they present to us the original
7  tower that we built and put on the boat."
8       Now, Mr. Meloon, do you have any evidence that any
9  of that is true in any of these documents that you have seen
10  at any time since 1996 to present?
11   A.  Any of the documents that are presently in front of
12  me, no, I do not.
13   Q.  What about back at the office?
14   A.  I would say that if they were, you would have them,
15  or we would have them here today.
16   Q.  And at that time, we're talking now about
17  engineering.  I'm looking at page 140, line 22 and 23:
18  "Engineering at the time was Bill Snook and Borden Larson."
19      From what we know today, that's not true.
20      MR. NORMAN:  Objection.  Mischaracterizes prior
21  testimony.  It doesn't give a time frame.
22      MR. LARSON:  We know the time frame is in June to
23  August of '96.
24      MR. NORMAN:  We don't know when he sent them out and
25  had the initial conversations.  It doesn't say.  It just

Page 246

1    says that he had them and that they came back in August,
2    unless I missed something.
3  BY MR. LARSON:
4    Q.   Okay. I'm going to fastforward here.
5    A.   Okay.
6    Q.   Let's go back our complaint. I want you to
7  fastforward. I don't know what page. I'm going to
8  fastforward to your counterclaim, your Count II, Slander of
9  Title.
10   A.   Yes, sir.
11       MR. NORMAN: It's not actually in the complaint.
12  It's going to be in your answer.
13       THE WITNESS: Oh, my answer. Okay.
14       MR. NORMAN: Countercomplaint. It's not the
15  complaint.
16       THE WITNESS: Okay. Thank you.
17       MR. NORMAN: It's in the answer. It's going to be
18  page 12.
19       THE WITNESS: Gotcha. Yes.
20  BY MR. LARSON:
21   Q.   In paragraph 14, you say: "On information and
22  belief, Larson and/or its agents has asserted to third parties
23  that Correct Craft does not own the right, title, or interest
24  to its patents."
25       What evidence do you have that Borden or his agents

Page 247

1  have asserted to anybody that you don't own the right, title,
2  or interest in the patents that are subject in this lawsuit?
3    A.   From what I understand that that was original filing
4  of the complaint in court, because it's public knowledge, so
5  therefore, is where we felt that he was going to third parties
6  and, you know, saying that we did not own the right or title
7  or interest to his patent.
8    Q.   So you're not saying that Borden --
9    A.   And second --
10   Q.   I'm sorry.
11       MR. NORMAN: Finish your answer.
12   A.   Second, it had come to my knowledge as I was
13  reviewing this particular slander of title, because this was
14  part of Borden and I's lunch meeting that he was very
15  concerned that he was being hit with a slander counterclaim,
16  is that we felt that he had contacted some past employees, and
17  I had found out that the name Bob Burns had been contacted, or
18  at some point in time, about this and the lawsuit, and so
19  there is then the third party.
20   Q.   Okay. Where -- when did Bob Burns get contacted?
21   A.   I have no knowledge of that time frame.
22   Q.   When did you find out?
23   A.   Within just the last week as I was given this
24  information to review.
25   Q.   But this counterclaim was done three years ago?

Page 248

1    A.   If I can answer to that question, yes, it was. It
2  was done three years ago by an attorney who no longer
3  represents us on this case because they have been
4  disqualified. Our current counsel has sought to have this
5  slander of title removed because there's no basis on it, and
6  we just feel it's a frivolous point right now to pursue this.
7    Q.   Do you know that it was I that spoke to Bob Burns,
8  and I did it a month ago?
9    A.   No, I did not know. I just knew that Bob Burns had
10  been contacted, did not know the time frame.
11   Q.   So if you drafted this based on Borden asserting to
12  third parties and if the only conversation with Bob Burns was
13  mine a month ago, you certainly couldn't be using that. So if
14  it wasn't Bob Burns, who else was it?
15   A.   I believe there was another name of Jody Seals (ph)
16  that had been contacted as well.
17   Q.   Okay. And I contacted Jody Seals about two months
18  ago.
19       MR. NORMAN: So he's supposed to accept both of
20  these time frames?
21       MR. LARSON: No. I'm asking.
22       MR. NORMAN: Assume. Assume it. Do you know those
23  time frames to be true?
24       THE WITNESS: No, I do not.
25  BY MR. LARSON:

Page 249

1    Q.   Who else?
2    A.   That is it of the third parties.
3    Q.   Okay. So Bob Burns and Jody Seals are the third
4  parties?
5    A.   Correct.
6    Q.   And what was said to Bob Burns and Jody Seals that
7  Correct Craft does not own the right, title, and patents --
8  interest and patents? What was said to them?
9    A.   From what I understand is that they were going to be
10  subpoenaed or deposed for depositions in the lawsuit that
11  Borden Larson had brought against us and that we did not, I
12  guess, own the rights or title to the interest of the patents,
13  and that's what they were being deposed for.
14   Q.   And did they tell you that?
15   A.   Jody Seal did, yes, that he had been contacted at
16  some point in time.
17   Q.   And what did he say about it?
18   A.   He just told me that he had been contacted and knew
19  that this thing was coming to a head and wanted me to be aware
20  of it.
21   Q.   That Correct Craft doesn't own the rights or that
22  Borden is trying to get the rights back?
23   A.   That Correct Craft -- well, he didn't say. He just
24  said that he was being deposed for the trial.
25   Q.   Okay. And if you accept that fact that I talked to

Page 250

1 him six weeks ago, who else do you have that you would have
2 used two years ago or three years ago when you wrote this
3 counterclaim?
4     MR. NORMAN:  He needs to assume that to be true for
5 the purpose of the next question --
6     MR. LARSON:  I want --
7     MR. NORMAN:  -- that you contacted them in the last
8 couple months.
9     MR. LARSON:  I want know who else.
10     MR. NORMAN:  Who else?  Okay.  Other than Mr. Burns
11 and Jody Seals?
12     MR. LARSON:  Yes.
13   A.  Those are the only two names that I am aware of as I
14 went in to research this just the last week or so.
15 BY MR. LARSON:
16   Q.  Have you ever been asked to go research this in the
17 next months or last months or last year?
18   A.  No, I have not.  I have not been asked to do that,
19 until just when I was given this a week or so ago.
20   Q.  So the only one you have is Bob Burns and Jody
21 Seals?
22   A.  That's to my knowledge.  I don't know at the time
23 when the slander of title was filed if there were others, if
24 those were the same two, or in what the referencing of that
25 was.

Page 251

1   Q.  Now, you're the corporate representative.  I put
2 this on my corporate thing.  Who else at Correct Craft would
3 know where your evidence is when you filed this counterclaim
4 of these people that Borden supposedly, or his agents, which I
5 guess could be me, have asserted back when you filed this?
6     MR. NORMAN:  So you're not asking him what's the
7 company's position on who the other people could be, but
8 who might know the answer of who the other people could
9 have been three years ago?
10     MR. LARSON:  Yeah.  Because Mr. Meloon doesn't know.
11 He says, "Hey, I just searched this in the last week.  I
12 got Bob Burns and Jody Seals."  You don't have to accept
13 that I --
14     MR. NORMAN:  That's the corporate --
15     MR. LARSON:  -- spoke to them in the last six weeks.
16 I'm not worried about them.
17 BY MR. LARSON:
18   Q.  I want to know, when you filed this lawsuit, did you
19 have any evidence, and what was it?
20   A.  I -- based on current counsel's -- and I think there
21 was a -- a -- I don't know what you call it in front of you --
22 to dismiss this Count II, Slander of Title.
23   Q.  And I saw something in the court filing.
24   A.  And the reason we did that was on two counts.  One,
25 it was based on that the action that you all took in bringing

Page 252

1 this before the court, it's public knowledge, but that's not
2 really solid ground to stand on.  This is our current counsel
3 not past counsel who filed this three years ago.
4     Okay.  And the second is it's a waste of time to
5 chase this right now, because, you know, I don't know if there
6 were third parties, if third parties are mentioned in this
7 countersuit or the Count II, Slander of Title.
8   Q.  But my question still remains:  When you filed this
9 two or three years ago, who were these people that Larson,
10 Borden, or his agents spoke to that were asserting these
11 things?
12   A.  I do not know who those people were.
13   Q.  Is it possible there was nobody that he talked to?
14   A.  It could be a possibility, yes.
15   Q.  And you're here today on as a cooperate rep on this
16 subject, so if you don't know right now --
17     MR. NORMAN:  He said he does know right now.  He
18 doesn't know three years.  He gave you the names.
19     MR. LARSON:  Well, your obligation is to know three
20 years ago.
21     MR. NORMAN:  No.  The obligation is to know the
22 corporation's position today, and he's explained it to
23 you.  There was those two people as well as the public
24 filing.  He's explained it very clearly, I think.
25 BY MR. LARSON:

Page 253

1   Q.  So you have no evidence of any assertions when this
2 case was filed other than the public filing of a document?
3   A.  That is my knowledge, yes.
4   Q.  Do you know that a public filing of a document, do
5 you know that that is an assertion for this type of thing?
6 Whoever told you that?
7   A.  Who told me that?
8   Q.  Yeah.
9   A.  Our current counsel told me that.
10   Q.  That the public filing was?
11   A.  It could be a very slim case to be built on slander
12 of title, and the original counsel who filed this three years
13 ago, who had been disqualified in some proceedings that you
14 were involved with, took that from an example or a -- a -- a
15 case law, I believe, that the existing counsel had filed this
16 at one point in time and got a ruling on it.
17     MR. LARSON:  You have a copy?  You have that ruling?
18     MR. NORMAN:  I don't know what he's talking about.
19 BY MR. LARSON:
20   Q.  Okay.  In 15 it says:  "Statements by Larson and/or
21 its agents are false and malicious statements disparaging
22 Correct Craft's rights."
23     What was false and malicious where Borden made
24 statements?
25   A.  Claiming that he had rights to the patents, and we

Page 254

1 did not.
2    Q.   Where in the patents does it say he claims his
3 rights?  Where in this lawsuit does it claim Borden has
4 rights?
5        MR. NORMAN:  If you can find places where he said
6 that he owns the patent.
7        MR. LARSON:  Isn't this lawsuit --
8        MR. NORMAN:  The first amended complaint.
9 BY MR. LARSON:
10    Q.   Isn't this lawsuit trying to get his rights back?
11       MR. NORMAN:  That calls for a league conclusion, but
12 if you would like me to look for the places, I can point
13 them out to you, all the places where he says he owns
14 these patents.
15       MR. LARSON:  No.  We don't -- we don't have time to
16 argue about that.
17       MR. NORMAN:  Okay.
18       MR. LARSON:  I mean, this lawsuit is trying to get
19 his patents back.
20       MR. NORMAN:  Well, that's not what it says, but
21 okay.  It says that he never assigned them to anything.
22 BY MR. LARSON:
23    Q.   Okay.  Mr. Meloon, 17, 17, it says:  "Larson's
24 actions have been upon information and belief, conducted with
25 malice, willful and intentionally wrongful."

Page 255

1     What malice does Borden Larson have against you or
2 Correct Craft?
3    A.   I am not absolutely sure.
4    Q.   You're saying here he does have malice?
5    A.   We're also on the same hand today saying that we
6 would like to withdraw this and dismiss it, because we feel it
7 is not of a purpose that needs to be pursued or taken in.
8    Q.   But you have pursued this for three years or two
9 years.  When you filed this, what malice did Borden Larson
10 have against Correct Craft?
11    A.   I have no idea what that malice was at that time.
12    Q.   He has a bumper sticker on his car that says "Ski
13 Nautique."  He doesn't have to have that there.  Does that
14 look like malice to you?
15    A.   No.
16    Q.   It says "willful."  What has Borden Larson done
17 willful against Correct Craft?
18    A.   Other than bring the lawsuit against us, I can only
19 say that that's where the malice, willful and intentional
20 wrongful effort to harm Correct Craft come from.
21    Q.   But didn't Borden sign six different assignments
22 giving you rights to an invention that you're making roughly
23 $20 million on?
24    A.   I do not believe any of that is correct.  I don't
25 know how many assignments he did assign.  I'm not aware of the

Page 256

1 number, nor am I aware of the number that you stated the --
2 the royalties are growing at.
3        MR. LARSON:  Okay.  Let's change our tape.
4 (Pause in the proceedings.)
5        THE COURT REPORTER:  Court Reporter Michelle Manni.
6 Today is September 29th, 2006.  The time is 5:47.  We're
7 at 1516 East Hillcrest, Orlando, Florida, the deposition
8 of corporate representative Gary Meloon.
9 BY MR. LARSON:
10    Q.   Okay.  Paragraph Number 18 says:  As a direct and
11 proximate result of all of these statements, Correct Craft has
12 suffered monetary damages.
13       Tell me how Correct Craft has suffered damages
14 because Borden has stated in statements to people that you
15 don't know who they are?
16       MR. NORMAN:  Objection.  Mischaracterizes prior
17 testimony.
18    A.   Yeah.  Because it says:  "And/or its agents oral or
19 written statements disparaging title to Correct Craft's
20 patents."  I would say that the -- the suffered monetary
21 damages is the attorney's fees and money that we have had to
22 extend to defend this.
23    Q.   Okay.  But you haven't lost any sales?
24    A.   I could not qualify or quantify that statement at
25 this time.

Page 257

1    Q.   Have you looked into whether or not you've lost
2 sales?
3    A.   No.  I have not personally looked into it nor has
4 the company, I believe.
5    Q.   So this monetary damages didn't mean that you lost
6 sales or royalty income?  It only meant attorneys' fees?
7    A.   It might have some -- it might some connotation to
8 that, yes.  It could have resulted in that.
9    Q.   It could have, but you didn't know?
10    A.   I don't know, but I'm assuming based on past trials
11 and claims that have been brought against us like this, it has
12 slowed down the number of people that would sign up as royalty
13 -- for royalties or cause them to back off on making royalty
14 payments to see what the outcome of something like this would
15 be.
16    Q.   But do you know anybody who has backed off?
17    A.   Not to my knowledge, no, I do not know that.
18    Q.   Okay.  19:  "Larson and his agents have published
19 and distributed false allegations, including but not limited
20 to a claim that Correct Craft is infringing on Larson's
21 patents."
22       Now, where does Borden ever say that you're
23 infringing on his patents?
24    A.   I'm assuming that when the claims that he makes in
25 his -- his suit is what we're referencing to, that those are

Page 258

1 false allegations.
2   Q.   Is this a patent?
3   A.   That we're infringing on his patent, and it's not
4 his patent.
5   Q.   But isn't -- this isn't a patent infringement suit,
6 is it?  Where in here does he say that he wants damages
7 because you're infringing on his patent?
8       MR. NORMAN:  Objection.  Calls for a legal
9 conclusion.
10  A.   Yeah.  I'm not -- I'm not sure.
11 BY MR. LARSON:
12  Q.   Okay.  Let's go back to your affirmative defenses.
13 Go back a few pages.
14  A.   Okay.  Affirmative, there's nine of them total?
15      MR. NORMAN:  Yeah.
16      THE WITNESS:  Okay.
17 BY MR. LARSON:
18  Q.   First affirmative defense.
19  A.   Yeah.
20  Q.   The claim fails to assert a cause of action.  What
21 does that mean?
22  A.   It's a legalese, and I'm not sure what it means.  Do
23 you know what it means?
24  Q.   I do know what it means.  In fact, I don't think
25 it's a valid affirmative defense, but that's just chatter

Page 259

1 right now.  Do you know what your evidence is on that?
2       MR. NORMAN:  Objection.  Calls for a legal
3   conclusion and mischaracterizes the concept of failed to
4   state a cause of action.  There is no such thing as
5   evidence on a failure to state a cause of action.
6       MR. LARSON:  Why is it under special defense?
7       MR. NORMAN:  I'm not going to argue with you on this
8   point.  I would only indicate that to a lay witness,
9       that's confusing at best.
10 BY MR. LARSON:
11  Q.   Okay.  Let's go to the second one.
12  A.   Okay.
13  Q.   The claims are barred by the statute of limitations.
14 Which claims and which statutes?
15  A.   I'm not -- I could not cite to you what claims and
16 statutes, but I would have to assume that those are the ones
17 that are around the time of where you could file on an action
18 for something that you believe you've been wronged on.
19  Q.   Could you go back to your office and write up
20 something that tells up which claims and which statutes?
21      MR. NORMAN:  Are you asking, does he have the
22      physical capabilities to do that or whether he's going to
23      do that for you?
24      MR. LARSON:  Both.
25      MR. NORMAN:  Okay.

Page 260

1       MR. LARSON:  He needs the physical capabilities to
2 do it.
3       MR. NORMAN:  Well --
4       MR. LARSON:  And willingness is another issue.  My
5 question is, I have asked for this in discovery, and they
6 have -- you have objected because for whatever you say
7 it's irrelevant.
8       MR. NORMAN:  Were your objections sustained, or did
9 you bring them -- call it up to the Court?  I don't know
10 the answer.  I'm just --
11      MR. LARSON:  Well, it's a crazy thing to even object
12 to.  I'm trying to find out what statutes and what claims.
13 It's your case.
14      MR. NORMAN:  Right.
15 BY MR. LARSON:
16  Q.   Mr. Meloon, I know this is legal stuff.  It's very
17 hard for you to sit there and tell me which claims are barred
18 by what statute.  There's a lot of different statutes of
19 limitations.  I couldn't recite them right now off the top of
20 my head, and I'm sure you couldn't recite them.  Can you go
21 back and find me an answer to this?
22      MR. NORMAN:  You're asking him, does he have the
23      physical ability to figure out what the statute of
24      limitations on this claim are?  Mr. Meloon, not me, not
25      his lawyers, but Mr. Meloon.

Page 261

1       MR. LARSON:  No.
2       MR. NORMAN:  He has the physical --
3       MR. LARSON:  No.  With you, Mr. Meloon and you.  I
4 want a response back.  He can't respond here.  He says, "I
5 don't know."  He can --
6       MR. NORMAN:  I want a response to the underlying
7   facts of why the statute of limitations bars it.  He can't
8   cite to you statutes or can he cite to you case law.
9       MR. LARSON:  Okay.  What are the underlying -- what
10  are the underlying facts?
11      MR. NORMAN:  Ask him when the events occurred.
12  A.   From what I understand, from the point in time that
13 the patent was filed, there's four years statute of
14 limitations.  This suit was brought to us four years after
15 that statute of limitations ran out.
16  Q.   On which patent?
17  A.   I would have to -- to --
18      MR. NORMAN:  You can look at the patents and find
19      the dates on them if you like.  They're attached -- they
20      were attached to the complaint.  I don't think they were
21      attached to what he gave you today.  If you give him the
22      original complaint, I'm sure he'll tell you the date.
23 BY MR. LARSON:
24  Q.   Okay.  So you're saying that the statute is four
25 years after you filed each of those patents?

Page 262

1    A.   Yeah.  I -- you're saying there are multiple
2  patents, then I would have to accept that as yes.
3    Q.   So if I went to the multiple patents and found the
4  four and found the dates, I would say just add four years to
5  the all the patent dates?
6    A.   From my knowledge of what the law states, there's
7  four years after for the statute of limitations, yes.
8    Q.   Okay.  And what do you know about the law when
9  you're alleging fraud or when you prove fraud?  What does it
10  do to the four-year statute?
11   A.   Where is that?  I'm sorry.  I'm --
12   Q.   I'm asking you.  We have alleged fraud in this
13  complaint.
14      MR. NORMAN:  Calls for legal conclusion, but go
15     ahead and answer if you can.  That would be a reply that
16     he would be -- he would be, I guess, debating with you,
17     but he's told you the underlying facts of affirmative
18     defense.
19  BY MR. LARSON:
20   Q.   Okay.  Let's go to the next one.  Third:  "The
21  claims are barred by the doctrine of laches and/or equitable
22  estoppel."
23      What is that?
24   A.   I may get them confused.  Of course, I had a crash
25  course on this, but if I remember, is that laches is that you

Page 263

1  can't wait around until something happens and then claim you
2  had a right to it all along.  You -- you have to establish
3  that right before is certain action takes place.
4    Q.   Okay.  What about estoppel?
5    A.   The estoppel is you can't say something in one sense
6  and then turn around and say something totally to the
7  different effect of what you had said before.
8    Q.   And what did Borden say on one hand and change his
9  mind and say something on the other?
10   A.   For the equitable estoppel?
11   Q.   Yes.
12   A.   That is -- and I believe in some of his testimony,
13  whether it was in depositions or court, I do not remember, but
14  he -- I guess, testified in that these patents and these
15  inventions were ours, and that's where I believe this third
16  affirmative defense is coming from.
17   Q.   But now you never advised Borden to get a lawyer in
18  any of these dealings with you?
19      MR. NORMAN:  Objection.  Mischaracterizes his prior
20     testimony and asked and answered.
21   A.   I stated that before that I did not personally do
22  that, no.
23   Q.   And Correct Craft didn't?
24   A.   I do not believe we did, no.
25   Q.   So in other words, if Borden is testifying based on

Page 264

1  what your attorneys and what you have been telling him, he
2  really wasn't legally represented, was he?
3      MR. NORMAN:  Objection.  Calls for a legal
4     conclusion.  Assumes facts not in evidence.
5     Mischaracterizes his prior testimony.
6  BY MR. LARSON:
7    Q.   Okay.  Let's go to the fourth point, doctrine of
8  waiver.  What's that?
9    A.   From what I understand, the waiver is, is that, you
10  know, you basically waive or assign any of your claims or
11  anything to a -- to a document or any bill of sale or anything
12  of this nature possibly.
13   Q.   Why?  Why would you waive it?
14   A.   I have no idea.  I mean, I'm just --
15      MR. NORMAN:  Are you asking factual underpinning for
16     that, because when you say it that way, it sounds like
17     you're asking him a question of intent, and I just want it
18     to be clear for him.
19      MR. LARSON:  Well, I don't know.
20  BY MR. LARSON:
21   Q.   What are the factual underpinnings --
22      MR. NORMAN:  Right.
23  BY MR. LARSON:
24   Q.   -- for this fourth affirmative defense that you say
25  that Borden's claims are barred by the doctrine of waiver?

Page 265

1    A.   I'm not 100 percent sure.
2    Q.   Let's go 50 percent sure.
3    A.   I don't even know that I could come up with a
4  reasonable speculation as to why the claims are barred by the
5  doctrine.
6      MR. NORMAN:  Assume that waiver is the intention to
7     relinquish your rights.  What facts do you think might
8     support that?
9    A.   The assignments that he -- he assigned.  I mean,
10  that's just an assumption too, and I don't know if that's
11  correct or not.
12  BY MR. LARSON:
13   Q.   And again, for that also, you didn't advise Borden
14  to have counsel?
15   A.   No, I did not.
16   Q.   Okay.  The next one, fifth affirmative defense
17  barred by the doctrine of assignor estoppel.  What is that?
18   A.   I'm assuming by that word is that -- that him
19  assigning those is that now he can't come back and claim
20  against that.  He either did not sign them or signed them
21  under any kind of other situation other than that he knew
22  fully what he was doing.
23   Q.   Okay.  Sixth affirmative defense, claims are barred
24  by Larson's lack of standing.  What are your factual
25  underpinnings for that?

Page 266

1    A.   Oh, golly, I can't remember, factual underpinnings.
2        MR. NORMAN:  Do you understand the concept, the
3    legal concept?
4        THE WITNESS:  No, I do not.
5        MR. NORMAN:  Okay.  Let's assume that one can only
6    bring standing if they have certain rights, and then
7    figure out what facts he may have that would assume.  Do
8    you understand?
9    A.   Okay.  Based on Florida Law, he has no -- no rights
10   as this case pertains, so there's lack of standing.
11   BY MR. LARSON:
12   Q.   What do you mean he has no rights based on Florida
13   Law?
14   A.   Based on conversations that I have had with our
15   attorneys is that the Florida Law does not allow him rights in
16   this situation.
17   Q.   Okay.  Seven, Larson has not suffered any damages
18   for any of these allege acts.
19       Why is that an affirmative defense?
20   A.   Our position on that is that there's been no damage
21   to him based on our course of action during this time with the
22   patents and the royalties or any of the other.
23   Q.   Okay.  Let's go to 8:  The claims are barred by the
24   doctrine of judicial estoppel.
25       What are your factual underpinnings for that?

Page 267

1    A.   That at least in two situations that I'm aware of,
2    and that is the MasterCraft case as well as the at Atlantic
3    Tower case, the courts have ruled, and again, you can't get a
4    court to go back and say differently than what they have
5    already ruled on in the past.
6    Q.   What have they ruled on?
7    A.   That we are the sole ownership or rights to the
8    patents.
9    Q.   But the issue in those -- neither of those, the
10   issue was not inventorship and ownership based on
11   inventorship, was it?
12   A.   I can't answer that question, because I do not
13   remember or do not know.
14       MR. LARSON:  Okay.  Let's hear from Mr. Snook.
15       (The deposition concluded at 6:04 p.m.)
16                * * * * * * *
17
18
19
20
21
22
23
24
25

Page 268

1        CERTIFICATE OF OATH
2    STATE OF FLORIDA
     COUNTY OF ORANGE
3
4    I, MICHELLE A. MANNI, being a Notary Public, State of
     Florida at Large, and a Court Reporter, certify that WALTER
5    GARY MELOON personally appeared before me and was duly sworn.
6    Witness my hand and official seal this 29th day of
     September, 2006.
7
8              Michelle A. Manni
               Notary Public, State of Florida
9              Notary Comm. No. DD227736
               Comm. Expires:06/30/07
10
11
12
13       CERTIFICATE OF REPORTER
14   STATE OF FLORIDA
     COUNTY OF ORANGE
15
     I, MICHELLE A. MANNI, Court Reporter, hereby certify that
16   I was authorized to and did stenographically report the
     videotaped corporate deposition of WALTER GARY MELOON; that a
17   review of the transcript was requested; and that pages 1
     through 268, inclusive, are a true record of my stenographic
18   notes.
     I FURTHER CERTIFY that I am not a relative or employee or
19   attorney or counsel of any of the parties, nor am I a relative
     or employee of any of the parties' attorney or counsel
20   connected with the action, nor am I financially interested in
     the action.
21
     DATED this 29th day of September, 2006.
22
23   _____
     Michelle A. Manni
24   Court Reporter
25